Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal. Bar No. 333540)
martin@dovel.com
Gabriel Doble (Cal. Bar No. 335335)
gabe@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>GT'S LIVING FOODS, LLC.,<br><br>*Defendant.* | Case No. 2:19-cv-10920-FMO-DSRx<br><br>**EVIDENTIARY APPENDIX IN SUPPORT OF JOINT BRIEF ON PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing Date:** April 23, 2026<br>**Time:** 10:00 a.m.<br>**Courtroom:** 6D<br><br>Hon. Fernando M. Olguin |

# TABLE OF CONTENTS

**PAGE**

**Declaration of Amit Patel**................................................................................................1

**Declaration of Lauren Schmidt**......................................................................................4

**Declaration of Christopher Nunez**.................................................................................7

**Declaration of Simon Franzini**..................................................................................... 10

Exhibit 1 to Franzini Declaration
    Exhibit 20 to February 26, 2021, GT Dave Deposition....................................... 16

Exhibit 2 to Franzini Declaration
    Exhibit 21 to February 26, 2021, GT Dave Deposition....................................... 18

Exhibit 3 to Franzini Declaration
    Excerpts from January 16, 2026, Amit Patel Deposition .................................... 20

Exhibit 4 to Franzini Declaration
    Excerpts from January 14, 2026, Lauren Schmidt Deposition............................. 26

Exhibit 5 to Franzini Declaration
    Excerpts from January 8, 2026, Christopher Nunez Deposition .......................... 34

Exhibit 6 to Franzini Declaration
    February 19, 2026, Simon Franzini Declaration.................................................. 47

Exhibit 7 to Franzini Declaration
    July 9, 2024, Joint Prosecution Agreement........................................................ 51

Exhibit 8 to Franzini Declaration
    July 16, 2024, Agreement Concerning *Sharpe* Litigation .................................. 57

Exhibit 9 to Franzini Declaration
    Exhibit 15 to February 26, 2021, GT Dave Deposition....................................... 62

Exhibit 10 to Franzini Declaration
    Excerpts from February 26, 2021, GT Dave Deposition...................................... 90

Exhibit 11 to Franzini Declaration
    Defendant's April 20, 2021, Third Supplemental Responses and Objections to Plaintiffs' First Set of Special Interrogatories.................................................. 106

Exhibit 12 to Franzini Declaration
June 2, 2021, Expert Report of Bruce G. Silverman........................................................ 128

Exhibit 13 to Franzini Declaration
June 2, 2021, Expert Report of Dr. Gary Spedding.......................................................... 191

Exhibit 14 to Franzini Declaration
July 2, 2021, Rebuttal Report of Dr. Gary Spedding ...................................................... 228

Exhibit 15 to Franzini Declaration
Defendant's February 23, 2021, Corrected Supplemental Responses and
Objections to Plaintiffs' First Set of Requests for Admission ...................................... 245

Exhibit 16 to Franzini Declaration
Excerpts from June 25, 2021, Dr. Matthew McCarroll Deposition.............................. 261

Exhibit 17 to Franzini Declaration
December 15, 2025, Declaration of Colin B. Weir ......................................................... 265

Exhibit 18 to Franzini Declaration
June 2, 2021, Declaration of Colin B. Weir..................................................................... 294

Exhibit 19 to Franzini Declaration
December 15, 2025, Declaration of Dr. J. Michael Dennis ........................................... 320

Exhibit 20 to Franzini Declaration
June 2, 2021, Declaration of Dr. J. Michael Dennis........................................................ 454

Exhibit 21 to Franzini Declaration
Plaintiff Amit Patel's December 15, 2025, Responses and Objections to
Defendant's Interrogatories, Set One .............................................................................. 572

Exhibit 22 to Franzini Declaration
Plaintiff Lauren Schmidt's December 15, 2025, Responses and Objections to
Defendant's Interrogatories, Set One .............................................................................. 603

Exhibit 23 to Franzini Declaration
Plaintiff Christopher Nunez's December 15, 2025, Responses and Objections to
Defendant's Interrogatories, Set One .............................................................................. 633

**Declaration of Hal Poret**............................................................................................... 664

Exhibit 1 to Poret Declaration (Exhibit 24)
June 1, 2021, Expert Report of Hal Poret........................................................................ 666

Exhibit 2 to Poret Declaration (Exhibit 25)
    July 2, 2021, Rebuttal Expert Report of Hal Poret ........................................................ 778

Exhibit 3 to Poret Declaration (Exhibit 26)
    February 19, 2026, Rebuttal Expert Report of Hal Poret ............................................... 818

**Declaration of Dr. Matthew McCarroll** ................................................................................. 851

Exhibit W to McCarroll Declaration (Exhibit 27)
    June 2, 2021 Opening Expert Report of Dr. Matthew McCarroll ................................ 853

**Declaration of GT Dave** ............................................................................................................. 898

Exhibit 28 to Dave Declaration
    Michelson Laboratories and White Labs Certificates ..................................................... 903

**Declaration of Joseph Elie-Meyers** ...................................................................................... 1465

Exhibit 29 to Elie-Meyers Declaration
    February 23, 2021, Defendant's Corrected Supplemental Responses and
    Objections to Plaintiffs' First Set of Requests for Admissions ................................... 1469

Exhibit 30 to Elie-Meyers Declaration
    GT's Enlightened Product Labels ..................................................................................... 1485

Exhibit 31 to Elie-Meyers Declaration
    GT's Synergy Product Labels .............................................................................................. 1520

Exhibit 32 to Elie-Meyers Declaration
    2017-2021 Alcohol Tests ..................................................................................................... 1547

Exhibit 33 to Elie-Meyers Declaration
    2017-2021 Sugar Tests ........................................................................................................ 1789

Exhibit 34 to Elie-Meyers Declaration
    Retail Price Comparison ...................................................................................................... 1992

Exhibit 35 to Elie-Meyers Declaration
    Additional Excerpts from January 16, 2026, Amit Patel Deposition ........................... 1996

Exhibit 36 to Elie-Meyers Declaration
    Additional Excerpts from January 8, 2026, Christopher Nunez Deposition ............. 2025

Exhibit 37 to Elie-Meyers Declaration
    Additional Excerpts from January 14, 2026, Lauren Schmidt Deposition ................. 2056

Exhibit 38 to Elie-Meyers Declaration
   Excerpts from October 19, 2018, GT Dave Deposition ............................................. 2081

Exhibit 39 to Elie-Meyers Declaration
   Additional Excerpts from February 26, 2021, GT Dave Deposition ......................... 2090

Exhibit 40 to Elie-Meyers Declaration
   Excerpts from June 18, 2021, Bruce G. Silverman Deposition................................... 2094

Exhibit 41 to Elie-Meyers Declaration
   Excerpts from June 21, 2021, Dr. Gary Spedding Deposition................................... 2164

Exhibit 42 to Elie-Meyers Declaration
   Excerpts from February 11, 2026, Dr. J. Michael Dennis Deposition ....................... 2184

Exhibit 43 to Elie-Meyers Declaration
   Excerpts from October 21, 2020, Samii Hartman Deposition................................... 2199

Exhibit 44 to Elie-Meyers Declaration
   July 2, 2021, Rebuttal Expert Report of Dr. Matthew McCarroll .............................. 2218

Exhibit 45 to Elie-Meyers Declaration
   Additional Excerpts from June 21, 2021, Dr. Gary Spedding Deposition ................ 2261

Docusign Envelope ID: 13B37A9A-E5CE-4131-9280-0D55B91302BB

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal. Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>GT'S LIVING FOODS, LLC.,<br><br>*Defendant.* | Case No. 2:19-cv-10920-FMO-DSRx<br><br>**DECLARATION OF AMIT PATEL IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing Date:** April 23, 2026<br>**Time:** 10:00 a.m.<br>**Courtroom:** 6D<br><br>Hon. Fernando M. Olguin |

# DECLARATION OF AMIT PATEL

I, Amit Patel, declare:

1.      I am a named Plaintiff in this action.

2.      I began purchasing Defendant's Enlightened Kombucha products in 2021, and have made multiple purchases of Enlightened Kombucha in California since. I made no purchases of Enlightened Kombucha between March 11, 2011, and February 27, 2017.

3.      I am willing to serve as a class representative in this case. I understand that, as the class representative, my duty is to represent other consumers who, like me, purchased Enlightened Kombucha between February 28, 2017 and the date that class notice is disseminated, and who did not purchase Enlightened Kombucha between March 11, 2011, and February 27, 2017. I do not know of or foresee any conflicts of interest between myself and any class members.

4.      When I purchased Enlightened Kombucha products, I believed that they were non-alcoholic beverages and purchased them on the basis of this belief. I understand alcoholic beverages to be fundamentally different products from non-alcoholic beverages, and would not have purchased Enlightened Kombucha at the time if I had known that they were alcoholic beverages.

5.      When I purchased Enlightened Kombucha products, I believed that they did not contain more sugar than the amounts listed on the labels. If I had known that they contained significantly more sugar than stated on the labels, I would not have made those purchases.

6.      I want Defendant to stop its practices of selling alcoholic kombucha as non-alcoholic kombucha and misrepresenting the sugar contents of its kombucha. Currently, because of Defendant's conduct, I cannot trust that its supposedly non-alcoholic kombucha is actually non-alcoholic, or that the sugar-content representations on the labels accurately disclose the sugar content of the drinks. And because Defendant deceived me in the past, I will not be able to trust its word that it has changed its practices in the future. So I will not be able to purchase Defendant's Enlightened Kombucha products when I

Declaration of Amit Patel                    1                    Case No. 2:19-cv-10920-FMO-DSRx

Docusign Envelope ID: 13B37A9A-E5CF-4131-9280-0B55B91302BB

want a non-alcoholic, low-sugar beverage, even though I would otherwise consider doing so. But if the Court issued an order forbidding Defendant from selling Enlightened Kombucha unless it contains less than 0.5% alcohol at retail or its label has the required government warning for alcoholic beverages, and forbidding Defendant from selling Enlightened Kombucha without accurately displaying the sugar content on the labels, I could once again rely on Defendant's labels when shopping for non-alcoholic kombucha.

7. I have actively participated in this case, and will continue to do so. Throughout litigation, I have discussed the case with my lawyers, I provided information to my lawyers to help draft the Second Amended Class Action Complaint, I reviewed the Second Amended Class Action Complaint, I responded to discovery requests from Defendant both by providing written answers to Defendant's questions and by searching for documents responsive to Defendant's requests, and I sat for a deposition.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Signature: _____

DocuSigned by:

*Amit Patel*

3FD112DB378B43B...

Amit Patel

Dated: 2/20/2026

Declaration of Amit Patel 2 Case No. 2:19-cv-10920-FMO-DSRx

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal. Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> GT'S LIVING FOODS, LLC., <br><br> *Defendant.* | Case No. 2:19-cv-10920-FMO-DSRx <br><br> **DECLARATION OF LAUREN SCHMIDT IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** <br><br> **Hearing Date:** April 23, 2026 <br> **Time:** 10:00 a.m. <br> **Courtroom:** 6D <br><br> Hon. Fernando M. Olguin |

## DECLARATION OF LAUREN SCHMIDT

I, Lauren Schmidt, declare:

1. I am a named Plaintiff in this action.

2. I began purchasing Defendant's Enlightened Kombucha products in 2019, and have made multiple purchases of Enlightened Kombucha in New York since. I made no purchases of Enlightened Kombucha between March 11, 2011, and February 27, 2017.

3. I am willing to serve as a class representative in this case. I understand that, as the class representative, my duty is to represent other consumers who, like me, purchased Enlightened Kombucha between February 28, 2017 and the date that class notice is disseminated, and who did not purchase Enlightened Kombucha between March 11, 2011, and February 27, 2017. I do not know of or foresee any conflicts of interest between myself and any class members.

4. When I purchased Enlightened Kombucha products, I believed that they were non-alcoholic beverages and purchased them on the basis of this belief. I understand alcoholic beverages to be fundamentally different products from non-alcoholic beverages, and would not have purchased Enlightened Kombucha at the time if I had known that they were alcoholic beverages.

5. When I purchased Enlightened Kombucha products, I believed that they did not contain more sugar than the amounts listed on the labels. If I had known that they contained significantly more sugar than stated on the labels, I would not have made those purchases.

6. I want Defendant to stop its practices of selling alcoholic kombucha as non-alcoholic kombucha and misrepresenting the sugar contents of its kombucha. Currently, because of Defendant's conduct, I cannot trust that its supposedly non-alcoholic kombucha is actually non-alcoholic, or that the sugar-content representations on the labels accurately disclose the sugar content of the drinks. And because Defendant deceived me in the past, I will not be able to trust its word that it has changed its practices in the future. So I will not be able to purchase Defendant's Enlightened Kombucha products when I

Declaration of Lauren Schmidt               1          Case No. 2:19-cv-10920-FMO-DSRx

want a non-alcoholic, low-sugar beverage, even though I would otherwise consider doing so. But if the Court issued an order forbidding Defendant from selling Enlightened Kombucha unless it contains less than 0.5% alcohol at retail or its label has the required government warning for alcoholic beverages, and forbidding Defendant from selling Enlightened Kombucha without accurately displaying the sugar content on the labels, I could once again rely on Defendant's labels when shopping for non-alcoholic kombucha.

7.    I have actively participated in this case, and will continue to do so. Throughout litigation, I have discussed the case with my lawyers, I provided information to my lawyers to help draft the Second Amended Class Action Complaint, I reviewed the Second Amended Class Action Complaint, I responded to discovery requests from Defendant both by providing written answers to Defendant's questions and by searching for documents responsive to Defendant's requests, and I sat for a deposition.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Signature: _____

Signed by:

2A0D7D0E09E54C3...

Lauren Schmidt

Dated: 2/19/2026

Declaration of Lauren Schmidt                2                Case No. 2:19-cv-10920-FMO-DSRx

Docusign Envelope ID: 31B9BC63-3743-4D16-841F-8F51795094A0

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal. Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> GT'S LIVING FOODS, LLC., <br><br> *Defendant.* | Case No. 2:19-cv-10920-FMO-DSRx <br><br> **DECLARATION OF CHRISTOPHER NUNEZ IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** <br><br> **Hearing Date:** April 23, 2026 <br> **Time:** 10:00 a.m. <br> **Courtroom:** 6D <br><br> Hon. Fernando M. Olguin |

Evid. Appx. Page 7

## DECLARATION OF CHRISTOPHER NUNEZ

I, Christopher Nunez, declare:

1. I am a named Plaintiff in this action.

2. I began purchasing Defendant's Enlightened Kombucha products in early 2020, and have made multiple purchases of Enlightened Kombucha since. I purchased Enlightened Kombucha when I was at least 18 years old but under 21 years old, in both California and New York. I made no purchases of Enlightened Kombucha between March 11, 2011, and February 27, 2017.

3. I am willing to serve as a class representative in this case. I understand that, as the class representative, my duty is to represent other consumers who, like me, purchased Enlightened Kombucha between February 28, 2017 and the date that class notice is disseminated, and who did not purchase Enlightened Kombucha between March 11, 2011, and February 27, 2017. I do not know of or foresee any conflicts of interest between myself and any Class members.

4. When I purchased Enlightened Kombucha products, I believed that they were non-alcoholic beverages and purchased them on the basis of this belief. I understand alcoholic beverages to be fundamentally different products from non-alcoholic beverages, and would not have purchased Enlightened Kombucha at the time if I had known that they were alcoholic beverages.

5. When I purchased Enlightened Kombucha products, I believed that they did not contain more sugar than the amounts listed on the labels. If I had known that they contained significantly more sugar than stated on the labels, I would not have made those purchases.

6. I want Defendant to stop its practices of selling alcoholic kombucha as non-alcoholic kombucha and misrepresenting the sugar contents of its kombucha. Currently, because of Defendant's conduct, I cannot trust that its supposedly non-alcoholic kombucha is actually non-alcoholic, or that the sugar-content representations on the labels accurately disclose the sugar content of the drinks. And because Defendant deceived me

Declaration of Christopher Nunez             1          Case No. 2:19-cv-10920-FMO-DSRx

in the past, I will not be able to trust its word that it has changed its practices in the future. So I will not be able to purchase Defendant's Enlightened Kombucha products when I want a non-alcoholic, low-sugar beverage, even though I would otherwise consider doing so. But if the Court issued an order forbidding Defendant from selling Enlightened Kombucha unless it contains less than 0.5% alcohol at retail or its label has the required government warning for alcoholic beverages, and forbidding Defendant from selling Enlightened Kombucha without accurately displaying the sugar content on the labels, I could once again rely on Defendant's labels when shopping for non-alcoholic kombucha.

7.    I have actively participated in this case, and will continue to do so. Throughout litigation, I have discussed the case with my lawyers, I provided information to my lawyers to help draft the Second Amended Class Action Complaint, I reviewed the Second Amended Class Action Complaint, I responded to discovery requests from Defendant both by providing written answers to Defendant's questions and by searching for documents responsive to Defendant's requests, and I sat for a deposition.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Signature: _____

Signed by:

Christopher Nunez

0B067526E014456...

Christopher Nunez

Dated: 2/19/2026

Declaration of Christopher Nunez          2          Case No. 2:19-cv-10920-FMO-DSRx

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated, | Case No. 2:19-cv-10920-FMO-DSRx |
| | **DECLARATION OF SIMON FRANZINI IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** |
| *Plaintiffs,* | |
| | **Hearing Date:** April 23, 2026 |
| v. | **Time:** 10:00 a.m. |
| | **Courtroom:** 6D |
| GT'S LIVING FOODS, LLC., | |
| | Hon. Fernando M. Olguin |
| *Defendant.* | |

## DECLARATION OF SIMON FRANZINI

I, Simon Franzini, declare as follows:

1.      I am a partner at the law firm Dovel & Luner, LLP, a member of the California bar, and counsel for Plaintiffs in this action. I make this declaration in support of Plaintiffs' Renewed Motion for Class Certification. This declaration is accurate to the best of my knowledge, and I have personal knowledge of the facts stated below.

**Dovel & Luner, LLP**

2.      Dovel & Luner has extensive experience litigating class action cases and has been appointed class counsel (including interim class counsel) in a number of class action cases. *See, e.g.*, *Kramer v. Alterra Mt. Co.*, 2020 U.S. Dist. LEXIS 135770, at *8 (D. Colo.) (appointing Dovel & Luner as interim co-lead counsel among four competing groups, specifically for its "specific substantive investigation, research, and analysis already conducted to support and prosecute the claims on behalf of putative class members."); *Sanderson v. Whoop, Inc.*, No. 3:23-cv-05477-CRB (N.D. Cal.), Dkt. 62 (appointing Dovel & Luner as Class Counsel); *Goodrich, et al. v. Alterra Mt. Co., et al.*, No. 1:20-cv-01057-RM-SKC (D. Colo.), Dkt. 157 (granting final approval of a $17.5 million settlement and appointing Dovel & Luner as Class Counsel); *Damonie Earl et al. v. The Boeing Company*, No. 4:19-cv-00507 (E.D. Tex.) (a multi-billion-dollar RICO class action against Boeing and Southwest); *In re: Arch Insur. Co. Ski Pass Ins. Litig.*, MDL No. 2955 (W.D. Mo.) (an insurance coverage class action); *David Oh v. Sunvalleytek International Inc.*, No. 22-cv-00866-SVK (N.D. Cal.), Dkt. 62 (granting motion for class certification and appointing Dovel & Luner as class counsel); *Barr et al. v. Select Blinds, LLC*, No. 2:22-cv-08326-SPG-PD (C.D. Cal.), Dkt. 56 (granting final approval of a $10 million settlement in a consumer class action and appointing Dovel & Luner as class counsel).

3.      Dovel & Luner also serves on the leadership committee in *In Re: Apple Inc. App Store Simulated Casino-Style Games Litig.*, No. 5:21-md-02985-EJD (N.D. Cal.) (a class action asserting that Apple, Google, and Facebook provide illegal social gambling applications).

Declaration of Simon Franzini                    1                Case No. 2:19-cv-10920-FMO-DSRx
ISO Renewed Mot. for Class Cert.

4.      Dovel & Luner also has the rare ability to try complex class actions to verdict. Along with other attorneys at my firm, I obtained a $925 million jury verdict in a Telephone Consumer Protection Act class action pending in the District of Oregon. *Wakefield v. Visalus, Inc.*, No. 3:15-cv-01857-SI, 2020 U.S. Dist. LEXIS 146959 (D. Or. Aug. 14, 2020).

5.      Dovel & Luner has no conflicts with class members and is committed to vigorously prosecuting this case. Since taking over this case, Dovel & Luner carefully reviewed the existing record; prepared a Second Amended Complaint setting forth Defendant's conduct and Plaintiffs' and the proposed classes' claims; briefed important motions, including Plaintiffs' motion to amend the complaint to add current Plaintiffs and oppositions to two separate motions to dismiss; and undertook extensive discovery, including serving and responding to multiple sets of written discovery, reviewing documents, and defending depositions. As part of this, Dovel & Luner devoted significant time and resources to prosecuting this case, including advancing litigation costs. If appointed class counsel, Dovel & Luner will continue to vigorously prosecute this case to obtain the best possible result for the classes and subclasses.

**<u>Documents submitted in support of Plaintiffs' Renewed Motion for Class Certification</u>**

6.      Attached hereto as **Exhibit 1** is a true and correct copy of a document produced by Defendant with Bates number GT-SHARPE-0002038 (marked as Exhibit 20 to the 30(b)(6) deposition of George Thomas ("GT") Dave taken in this case on February 26, 2021).

7.      Attached hereto as **Exhibit 2** is a true and correct copy of a document produced by Defendant with Bates number GT-SHARPE-0005809 (marked as Exhibit 21 to the 30(b)(6) deposition of GT Dave taken in this case on February 26, 2021).

8.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Amit Patel taken in this case on January 16, 2026. My

Declaration of Simon Franzini                2        Case No. 2:19-cv-10920-FMO-DSRx
ISO Renewed Mot. for Class Cert.

office has highlighted in yellow portions of Mr. Patel's testimony that are relevant to Plaintiffs' motion.

9.     Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Lauren Schmidt taken in this case on January 14, 2026. My office has highlighted in yellow portions of Ms. Schmidt's testimony that are relevant to Plaintiffs' motion.

10.     Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Christopher Nunez taken in this case on January 8, 2026. My office has highlighted in yellow portions of Mr. Nunez's testimony that are relevant to Plaintiffs' motion.

11.     Attached hereto as **Exhibit 6** is a true and correct copy of the February 19, 2026 Declaration of Simon Franzini made in connection with a subpoena served on Dovel & Luner, LLP, on or around January 29, 2026.

12.     Attached hereto as **Exhibit 7** is a true and correct copy of a document produced by Plaintiffs with Bates numbers PLAINTIFFS000042-PLAINTIFFS000046 (a copy of the Joint Prosecution Agreement, dated July 9, 2024).

13.     Attached hereto as **Exhibit 8** is a true and correct copy of a document produced by Plaintiffs with Bates numbers PLAINTIFFS000047-PLAINTIFFS000050 (a copy of the Agreement Concerning *Sharpe* Litigation, dated July 16, 2024).

14.     Attached hereto as **Exhibit 9** is a true and correct copy of a document produced by Defendant with Bates numbers GT-SHARPE-0001452-GT-SHARPE-0001478 (marked as Exhibit 15 to the 30(b)(6) deposition of GT Dave taken in this case on February 26, 2021).

15.     Attached hereto as **Exhibit 10** is a true and correct copy of excerpts from the 30(b)(6) deposition of GT Dave taken in this case on February 26, 2021. My office has highlighted in yellow portions of Mr. Dave's testimony that are relevant to Plaintiffs' motion.

Declaration of Simon Franzini                    3              Case No. 2:19-cv-10920-FMO-DSRx
ISO Renewed Mot. for Class Cert.

16.    Attached hereto as **Exhibit 11** is a true and correct copy of Defendant's Third Supplemental Responses and Objections to Plaintiffs' First Set of Special Interrogatories, dated April 20, 2021.

17.    Attached hereto as **Exhibit 12** is a true and correct copy of the June 2, 2021, expert report of Bruce G. Silverman, an expert retained by Plaintiffs in this case.

18.    Attached hereto as **Exhibit 13** is a true and correct copy of the June 2, 2021, expert report of Dr. Gary Spedding, an expert retained by Plaintiffs in this case.

19.    Attached hereto as **Exhibit 14** is a true and correct copy of the July 2, 2021, rebuttal report of Dr. Gary Spedding.

20.    Attached hereto as **Exhibit 15** is a true and correct copy of Defendant's Corrected Supplemental Responses and Objections to Plaintiffs' First Set of Requests for Admission, dated February 23, 2021.

21.    Attached hereto as **Exhibit 16** is a true and correct copy of excerpts from the deposition transcript of Dr. Matthew McCarroll, an expert retained by Defendant in this case, taken on June 25, 2021. My office has highlighted in yellow portions of Dr. McCarroll's testimony that are relevant to Plaintiffs' motion.

22.    Attached hereto as **Exhibit 17** is a true and correct copy of the December 15, 2025, Declaration of Colin B. Weir, an expert retained by Plaintiffs in this case.

23.    Attached hereto as **Exhibit 18** is a true and correct copy of the June 2, 2021, Declaration of Colin B. Weir.

24.    Attached hereto as **Exhibit 19** is a true and correct copy of the December 15, 2025, Declaration of Dr. J. Michael Dennis, an expert retained by Plaintiffs in this case.

25.    Attached hereto as **Exhibit 20** is a true and correct copy of the June 2, 2021, Declaration of Dr. J. Michael Dennis.

26.    Attached hereto as **Exhibit 21** is a true and correct copy of Plaintiff Amit Patel's Responses and Objections to Defendant's Interrogatories, Set One, dated December 15, 2025.

Declaration of Simon Franzini                4          Case No. 2:19-cv-10920-FMO-DSRx
ISO Renewed Mot. for Class Cert.

27. Attached hereto as **Exhibit 22** is a true and correct copy of Plaintiff Lauren Schmidt's Responses and Objections to Defendant's Interrogatories, Set One, dated December 15, 2025.

28. Attached hereto as **Exhibit 23** is a true and correct copy of Plaintiff Christopher Nunez's Responses and Objections to Defendant's Interrogatories, Set One, dated December 15, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 2, 2026                          */s/ Simon Franzini*
                                              Simon Franzini

Declaration of Simon Franzini          5          Case No. 2:19-cv-10920-FMO-DSRx
ISO Renewed Mot. for Class Cert.

# EXHIBIT 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GT-SHARPE-0002038

# EXHIBIT 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GT-SHARPE-0005809

# EXHIBIT 3

HIGHLY CONFIDENTIAL
January 16, 2026

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

AMIT PATEL, LAUREN SCHMIDT,  )
and CHRISTOPHER NUNEZ, on    )
Behalf of Themselves and All )
Others Similarly Situated,   )
                             )
            Plaintiffs,      )
                             )
      vs.                    )     Case No.:
                             )     2:19-cv-10920-FMO-GJS
GT's LIVING FOODS, LLC,      )
                             )
            Defendant.       )
                             )
_____)

DEPOSITION OF

AMIT JYOTINDRA PATEL

LOS ANGELES, CALIFORNIA

JANUARY 16, 2026

HIGHLY CONFIDENTIAL

REPORTED BY:    ELIZABETH TORSTENBO, CSR NO. 9048, RPR

FILE NO.:       7727662

Page 1

January 16, 2026

HIGHLY CONFIDENTIAL

kombucha, approximately, how long of a time period    11:32:03

passed before you finally drank kombucha for the first    11:32:08

time?    11:32:12

    A.    Call it six to nine months.    11:32:15

    Q.    Okay.  So that when -- when Lewis Bichkoff    11:32:20

first introduced kombucha to you, is that late 2020 or    11:32:25

early 2021, or was it before that?    11:32:31

    A.    We started working in 2019.    11:32:33

    Q.    I see.    11:32:36

    And what was the first brand of kombucha    11:32:43

that you tried?    11:32:51

    A.    I don't recall, specifically.    11:32:58

    Q.    Do you recall whether it was GT's Living    11:33:01

Foods Kombucha?    11:33:04

    A.    It could have been.    11:33:04

    Q.    But you don't know for sure?    11:33:05

    A.    I don't know for sure.    11:33:07

    Q.    Did you buy the kombucha yourself, or did    11:33:09

Lewis or someone else buy it?    11:33:13

    A.    I bought it myself.    11:33:14

    Q.    Do you remember where you bought it?    11:33:16

    A.    Likely, at a Whole Foods near where I    11:33:17

lived.    11:33:19

    Q.    Okay.  When was the first time you    11:33:25

purchased GT's Living Foods Kombucha?    11:33:28

Page 55

HIGHLY CONFIDENTIAL

A.     Definitively, in 2021.                                11:33:34

Q.     How do you -- what makes you say it was              11:33:38
definitively in 2021?                                        11:33:43

A.     I think there was just a brief period of             11:33:53
time in 2020 when I was drinking kombucha.  I can tell       11:33:55
you for sure I did purchase it in 2021.                      11:33:59

Q.     How do you know that you purchased -- how            11:34:02
do you know for sure that you purchased GT's Living          11:34:04
Foods Kombucha in 2021?                                      11:34:05

A.     I remember consuming it regularly in 2021.           11:34:06

Q.     Okay.  What's the connection between you             11:34:11
consuming it and you purchasing it?  Why wasn't it           11:34:16
someone else that purchased it for you?                      11:34:19

MR. BRENNER:  Object to form.                                11:34:21

Go ahead.                                                    11:34:22

THE WITNESS:  No one else purchased kombucha                 11:34:24
that I consumed.                                             11:34:26

BY MR. HARPER:                                               11:34:27

Q.     Okay.  Do you have any receipts of any               11:34:27
GT's Living Foods Kombucha that you purchased?               11:34:33

A.     No.                                                   11:34:34

Q.     Do you have any documentation of any GT's            11:34:37
Living Foods Kombucha that you purchased?                    11:34:41

MR. BRENNER:  Asked and answered.                            11:34:43

Go ahead.                                                    11:34:44

Page 56

HIGHLY CONFIDENTIAL

A.    Not to any precision.                          14:52:53

Q.    Okay.  Back to the alcohol warning.  Where     14:53:01
it says "Kombucha is a fermented tea," what does that  14:53:10
mean to you?                                         14:53:13

A.    That means it is tea that has cultures and     14:53:18
probiotics that convert the sugars in the tea or any  14:53:30
additional tea into -- it ferments them; right?  It   14:53:33
ferments the sugars, and then it has some element of  14:53:40
alcohol in it.                                        14:53:43

Q.    And after learning from the label that         14:53:52
it's a fermented tea that contains alcohol, you       14:53:55
continued purchasing GT's Living Foods Kombucha       14:53:58
products; correct?                                    14:54:03

A.    So had I known that the alcohol content        14:54:10
was greater than .5 percent AVB, then I wouldn't have  14:54:12
made the purchase.                                    14:54:18

Q.    Okay.  But that's not my question.  So         14:54:19
please listen to my question, and we'll repeat it.    14:54:21

(Record read.)                                        14:54:40

THE WITNESS:  Yes.  At that time, not knowing         14:54:44
what I know now, I continued purchasing that product.  14:54:46

BY MR. HARPER:                                        14:54:49

Q.    Okay.  About how many times would you say      14:54:49
you purchased GT's Living Foods Kombucha after the    14:54:57
first time you read the label?                        14:55:02

Page 127

January 16, 2026

HIGHLY CONFIDENTIAL

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: JANUARY 23, 2026

_Elizabeth Torstenbo_

ELIZABETH TORSTENBO, RPR

CSR No. 9048

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300     www.veritext.com

Evid. Appx. Page 25

# EXHIBIT 4

HIGHLY CONFIDENTIAL
January 14, 2026

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

--------------------------------x

AMIT PATEL, LAUREN SCHMIDT,

and CHRISTOPHER NUNEZ, on

Behalf of Themselves and All

Others Similarly Situated,

                Plaintiffs,

    Vs.    Case No. 2:19-cv-10920-FMO-GJS

GT'S LIVING FOODS, LLC,

                Defendant.

--------------------------------x

                HIGHLY CONFIDENTIAL

        Videotape Deposition of Lauren

Schmidt taken by Defendants pursuant to

Notice, taken on January 14, 2026

beginning at 10:13 a.m., held at the

offices of Davis Wright Tremaine, LLP,

1251 Avenue of the Americas, New York,

New York 10020, before Maureen Ratto, a

Registered Professional Reporter,

Certified Court Reporter and Notary

Public.

                                        Page 1

may still be a class member in some of    11:55:34

those class actions?    11:55:36

        A.    Yes.    11:55:38

        Q.    For example, if there was a    11:55:38

class action about harassing phone    11:55:41

calls --    11:55:42

        A.    Yes.    11:55:43

        Q.    -- you didn't see the letter,    11:55:43

but you might still be a member in that    11:55:46

class action?    11:55:48

        A.    Yes.    11:55:49

        Q.    Similarly, with the Retta    11:55:49

class action, you might not have seen a    11:55:53

letter but you might have still been a    11:55:55

member in that class action; is that your    11:55:56

understanding?    11:55:58

                MR. BRENNER:    Incomplete    11:55:58

            hypothetical. Go ahead.    11:55:59

        A.    I wasn't a member of that    11:56:00

because I didn't start purchasing GT's    11:56:03

Kombucha until 2019.    And to my    11:56:07

knowledge, Retta was well -- I was -- I    11:56:09

don't know, I don't believe I'm part of    11:56:14

that class because I was not purchasing    11:56:15

kombucha for those -- during the time of    11:56:17

Page  77

that class action suit.                          11:56:20

Q.    What is kombucha?                      11:56:22

A.    It is a tea that's -- a             11:56:38
general overview, it's a tea that's like     11:56:45
living and it has probiotics in, it's        11:56:48
good for gut health, it's a healthy          11:56:51
alternative to sugary drinks.                11:56:54

Q.    When was the first time you        11:56:59
drank kombucha?                              11:57:06

A.    It was around the fall of          11:57:07
2019.                                        11:57:09

Q.    Would you describe the             11:57:26
circumstances in which you first tried       11:57:27
kombucha?                                    11:57:29

A.    I was health-conscious and         11:57:29
looking for alternatives to having a         11:57:34
cocktail with friends, I was avoiding        11:57:37
alcohol at the time.  And it was kind of     11:57:39
two-fold, I enjoyed it because of its        11:57:41
health benefits and, like I said, I was      11:57:45
avoiding alcohol, so if I was out with       11:57:48
friends I could easily have a kombucha       11:57:50
and remain sober.                            11:57:52

Q.    Where did you first hear about     11:57:59
kombucha as a drink?                         11:58:00

Page  78

A.    I couldn't tell you specifically.

Q.    Were you aware that kombucha existed as a drink before fall of 2019?

A.    Yes.

Q.    Do you recall the first time that you had a class of kombucha or bottle of kombucha?

A.    Yeah. I purchased it around that time, fall of 2019, going to my regular grocery store, seeing the health food section and going "that's looks interesting."

Q.    And do you know which brands you purchased?

A.    GT's Synergy.  I don't know the specific flavor but -- I don't know what flavor.

Q.    Do you recall what grocery store you bought it from the first time you bought kombucha?

A.    I'm pretty sure it was Greenlawn Farms. I don't know if that's all one word. I think it might be. And that's in Greenlawn which also can be

Page  79

A.    Not specifically, no.        14:37:19

Q.    Any reason to believe you did    14:37:21
not get the health benefits from        14:37:22
consuming a product such as GT's with   14:37:24
antioxidants in it?                      14:37:25

A.    I don't know.                 14:37:27

Q.    Did you -- let me rephrase.   14:37:31

During the period when you   14:37:34
were drinking and purchasing GT's        14:37:35
Kombucha, did you enjoy drinking it?     14:37:38

A.    Yes.                          14:37:39

Q.    Did you like how it tasted?   14:37:40

A.    Yes.                          14:37:42

Q.    Did you find it to be a       14:37:42
refreshing beverage?                     14:37:44

A.    Yes.                          14:37:45

Q.    Did you feel healthy after    14:37:46
drinking it?                             14:37:48

A.    Yes.                          14:37:49

Q.    Do you believe you have been  14:37:50
harmed by GT's Living Foods?             14:37:56

MR. BRENNER:  Objection,   14:38:02
vague. Go ahead.                         14:38:03

A.    I think I made purchases that 14:38:04
I wouldn't have otherwise made had I     14:38:08

Page 167

known what actually was inside the          14:38:12

bottle.          14:38:15

Q.     Do you believe you have been          14:38:17

harmed by consuming GT's Living Foods          14:38:20

products?          14:38:25

          MR. BRENNER:  Objection,          14:38:25

vague. Go ahead.          14:38:26

A.     I do not know.          14:38:27

Q.     This may feel a little bit          14:38:29

duplicative but I want to get clarity on          14:38:55

a topic we touched on before.          14:38:59

          When did you find  --          14:39:00

rephrase.          14:39:03

          When did you form the belief          14:39:03

that the GT's products you purchased          14:39:05

contained more than .5 alcohol by volume?          14:39:08

          MR. BRENNER:  Object to form,          14:39:13

asked and answered. Go ahead.          14:39:14

A.     When I saw the Instagram post          14:39:15

about GT's Kombucha having higher levels          14:39:20

of alcohol by volume and sugar during a          14:39:24

certain period.          14:39:31

Q.     Can I just -- let me direct          14:39:34

your attention to Exhibit 9.          14:39:37

          Is this the advertisement that          14:39:53

Page 168

HIGHLY CONFIDENTIAL

January 14, 2026

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, LAUREN SCHMIDT was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

Date: 1/28/2026

MAUREEN M. RATTO, RPR

License No. 817125

Page 182

Evid. Appx. Page 33

# EXHIBIT 5

January 8, 2026

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

AMIT PATEL, LAUREN SCHMIDT,
and CHRISTOPHER NUNEZ, on
Behalf of Themselves and
All Others Similarly
Situated,

       Plaintiffs,

vs.                     CASE NO.
                         2:19-cv-10920-FMO-GJS

GTS LIVING FOODS, LLC,

       Defendant.

_____

HIGHLY CONFIDENTIAL

VIDEO DEPOSITION OF CHRISTOPHER NUNEZ

January 8, 2026

10:07 a.m.

Los Angeles, California

Reported By:

Brandi R. Celestino

CSR No. 13640

Page 1

Evid. Appx. Page 35

A    Financial compensation for the purchases made    11:25:25
of GT Dave's Kombucha.    11:25:28

Q    How much compensation are you looking for?    11:25:30

A    A full refund for the purchases made since --    11:25:33
if I had known that the sugar and alcohol content were    11:25:36
at these elevated levels, I would not have made any of    11:25:40
these purchases of GT Dave's Kombucha.    11:25:44

Q    Do you check alcohol content of any beverage    11:25:48
that you purchase?    11:25:51

A    Of beverages that I anticipate to include    11:25:53
alcohol, including fermented products such as    11:25:57
Kombucha, yes.    11:26:00

MR. HARPER:  I'm going to give to the    11:26:30
reporter what I'm going to mark as Exhibit 3.    11:26:32

(Exhibit 3 marked.)    11:26:34

BY MR. HARPER:    11:26:51

Q    Do you have Exhibit 3 in front of you?    11:26:51

A    Yes.    11:26:53

Q    Do you recognize Exhibit 3?    11:26:54

A    I do.    11:26:55

Q    Why don't you tell me what that is.    11:26:55

A    I believe this was a garden party that my    11:26:57
friends, Priya and Jolie, put on.  I believe it must    11:27:03
have been summer of either 2022 or 2023.  And they    11:27:13
hosted, like, a dinner party in their backyard.    11:27:21

Page 50

Q   And is there anything else in this document that's Exhibit 12 that we're just looking at here that changes the fee allocation schedule as between Dovel and the other law firms?

MR. BRENNER:  Calls for a legal conclusion.

Go ahead.  After you review the document.

THE WITNESS:  To my understanding, other than what was already previously discussed, no.

BY MR. HARPER:

Q   What evidence do you have that your first purchase of GT's Living Foods Kombucha first took place in 2020?

A   I remember drinking it consistently during the COVID-19 pandemic, during the lockdown, which I know started in March of 2020.

Again, I don't have the exact date of when I made my first purchase memorized, but I can reasonably assume that it was in early 2020, around the start of the COVID-19 pandemic lockdown that I made my first purchase.

Q   Other than your -- other than your reasonable assumption, as you just said, about taking -- your first purchase taking place in early 2020 of GT's Living Foods Kombucha, are you certain that it wasn't -- that your first purchase wasn't before

Page 96

2020?

A    I have no reason to believe so, no.

Q    But are you certain?

MR. BRENNER:  Objection.  Asked and answered.

THE WITNESS:  Yeah, I don't have any reason to believe that I made a purchase before 2020.  It is my best guess that the first purchase I made of GT's was, again, early 2020, around the start of the COVID-19 pandemic in March of 2020.

BY MR. HARPER:

Q    Do you have a receipt of your first purchase of GT's Kombucha?

A    I do not have a receipt of my first purchase.

Q    Do you have a receipt of any purchases from 2020 of GT's Living Foods Kombucha?

A    I don't believe I have a receipt from 2020, no.

Q    Do you have any evidence of any purchase of GT's Living Foods Kombucha from 2020?

MR. BRENNER:  Asked and answered.

Go ahead.

THE WITNESS:  I don't have any receipts from 2020, I don't believe.  I know -- I think I have

Page 97

pictures of Kombucha that I purchased in 2020. 13:49:55

Whether or not that constitutes evidence of purchase, 13:49:59

I don't think I'm the one to make that distinction. 13:50:04

But I don't -- to my knowledge, I don't have any 13:50:07

receipts from that time period. 13:50:09

BY MR. HARPER: 13:50:11

Q    So other than solely your memory, you don't 13:50:11

have any other reason to think that your first 13:50:13

purchase of GT's Living Foods Kombucha took place in 13:50:18

2020 as opposed to earlier than that? 13:50:27

MR. BRENNER:  Misstates testimony. 13:50:31

Go ahead. 13:50:32

THE WITNESS:  I think because of my 13:50:34

association with purchasing GT's Kombucha with the 13:50:36

COVID-19 pandemic onset, and the photos that I have of 13:50:41

GT's Kombucha, which were pictures of bottles that I 13:50:45

purchased coinciding with this timeline, I don't have 13:50:49

any reason to believe that I would have made purchases 13:50:52

prior to that date. 13:50:55

BY MR. HARPER: 13:51:07

Q    What brand of Kombucha do you drink now? 13:51:07

A    Now, it varies, but one of the ones I have is 13:51:11

Health-Ade Kombucha. 13:51:16

Q    And what else? 13:51:17

A    Another brand, they're like generic store 13:51:20

Page 98

understood to be the limit for trace amount of          14:48:08

alcohol, 0.5 percent ABV, then I would not have made    14:48:10

these purchases of GT Dave's Kombucha as it would be    14:48:15

classified as an alcoholic beverage, and I wouldn't     14:48:20

consume an alcoholic beverage that frequently.          14:48:23

        And I think the alcohol -- the higher alcohol   14:48:27

content would have outweighed any potential benefits    14:48:30

that I may have gained from consuming the product,      14:48:34

including potential health benefits or just simple      14:48:37

enjoyment from the beverage.                            14:48:42

BY MR. HARPER:                                          14:49:12

    Q    Are there any other harms that you            14:49:12

maintain -- strike that.                                14:49:14

        Are there any other harms that you claim you   14:49:17

suffered as a result of consuming GT's Living Foods     14:49:24

Kombucha other than what you just stated?               14:49:35

    A    No.  My main harm is that I believe I was      14:49:40

deceived by the label that I relied on to reflect       14:49:44

accurately the contents of Synergy Kombucha, and I      14:49:48

believe that because of the expert testing, that        14:49:53

there's higher alcohol and sugar content that was not   14:49:56

disclosed on the label and I would have not made these  14:50:00

purchases had I known the elevated amounts of both of   14:50:03

these things.                                           14:50:06

        So my main and only harm is that financial      14:50:08

Page 125

harm.

Q   Okay.  You mentioned -- we were talking about probiotics and what is in GT's Living Foods Kombucha that initially had persuaded you to continue purchasing it.  And I think you mentioned gut health; is that right?

A   Correct.

Q   Can you tell me what that means?

A   Just helping in digestion, helping with things like less bloating or more consistent -- how do I word it -- bathroom breaks.

Q   Is it your understanding that unpasteurized Kombucha has a better or lesser impact on gut health?

A   I am not familiar with any reason to believe -- I'm not familiar if pasteurization has an impact on the potential gut health benefits of Kombucha.

Q   Does pasteurization have any impact on any health benefits, in your view, as it pertains to Kombucha?

A   Again, I'm not an expert on how pasteurization affects the nuances of the gut health benefits of Kombucha, so I'm not sure if I could answer that question.

Q   Did you know that GT's Living Foods Kombucha

Page 126

HIGHLY CONFIDENTIAL
January 8, 2026

it was like outside of a grocery store, there was a

big truck that had, like, pictures of Synergy Kombucha

on it.

I don't remember what the exact contents of

the advertisement were; if there words on the

advertisement, what the words were.  But I remember

this picture of Synergy Kombucha on that truck.

Q    Do you remember the year of seeing that

advertisement?

A    If I had to estimate, I would think 2024.

Q    2024?

A    I believe so.  This was after my first

purchase of the product.

Q    Oh, I see.  Okay.

Do you have any more details to add about the

first time you saw an advertisement for GT's Living

Foods Kombucha?

MR. BRENNER:  Object to form.

THE WITNESS:  I don't recall seeing an

advertisement, per se, for GT's Kombucha.  I remember

seeing the actual products in grocery stores, and I

remember being interested and wanting to try the

product, which is why I eventually did my first time

in early 2020.

But there wasn't a physical advertisement

Page 145

HIGHLY CONFIDENTIAL
January 8, 2026

that I saw that influenced me to make that first 15:45:12

purchase.  It was more so seeing the physical product 15:45:16

in stores and having an interest to purchase it then. 15:45:18

BY MR. HARPER: 15:45:23

Q    Had anyone in your family purchased GT's 15:45:23

Living Foods Kombucha before 2020? 15:45:27

A    No. 15:45:28

Q    Aside from buying it, have you ever drunk -- 15:45:32

drank GT's Living Foods Kombucha before 2020? 15:45:39

A    No. 15:45:42

Q    Your verification on page 28 references the 15:46:46

possibility of errors or omissions that may have been 15:46:59

made. 15:47:05

Are you aware of any errors or omissions that 15:47:06

were made in the interrogatories? 15:47:08

A    Not to my knowledge, no. 15:47:10

Q    Before this lawsuit, did you know anyone at 15:47:51

Dovel and Luner? 15:47:58

A    (No audible response.) 15:48:02

Q    Before this lawsuit, did you know anyone at 15:48:02

Smith Krivoshey? 15:48:05

A    No. 15:48:05

Q    Before this lawsuit, did you know anyone at 15:48:12

Bursor & Fisher? 15:48:18

A    No. 15:48:20

Page 146

California or New York between 2021 and 2024?

A    I believe there was a receipt that was produced from a CVS in New York where I had purchased a Kombucha product.

Some of the pictures that were in the exhibits, I know the location aren't, you know, visible in the photo itself, but I remember taking these pictures in New York at Columbia, and the metadata of these pictures would show that.

Other than that I don't have other physical records showing purchases made in New York.

Q    But it's fair to say that between 2021 and May -- sorry, between January of 2021 and May of 2024, your purchasing GT's Living Foods Kombucha, and sometimes it was in California and sometimes it was in New York?

A    Correct.  I think during that time period that you mentioned, January 2021, May 2024, the majority of purchases were in New York because I mainly resided in New York for the majority of that time.  But it did go back to California for winter breaks, summer breaks, things like that, where I made purchases in California.

Q    When you were in New York, how did you -- when you were in New York, where did you purchase GT's

Page 155

HIGHLY CONFIDENTIAL
January 8, 2026

Living Foods Kombucha?    16:06:34

A    They were from grocery stores that were around the Columbia neighborhood.  There was one called Morton Williams that was right across the street from Columbia's main campus.  Another called Westside Market couple blocks from campus.  Another, Apple Tree Deli, again, another couple blocks from campus.    16:06:35 — 16:06:58

Q    And in California, where were you purchasing them from?    16:06:58 — 16:07:01

A    In California, it was in different grocery stores.  A couple different Safeways, CVS, WinCo, all around the same area of my Oak Creek Way address.    16:07:02 — 16:07:12

Q    Between purchasing the GT's Living Foods Kombucha at the cash register or the sales kiosk or whatever it was at the grocery store, and the time that you drank a bottle of GT's Living Foods Kombucha, how much time would elapse?    16:07:43 — 16:08:12

A    I don't think there was a specific amount of time that elapsed per each purchase to the time I drank it.  I think it varied.  But it was either the same day through as long as a few days to even a week at a certain point.    16:08:16 — 16:08:34

Q    How about between the time that you purchased at the kiosk or cash register and when you would put    16:08:36 — 16:08:38

Page 156

Evid. Appx. Page 45

STATE OF CALIFORNIA     )

                        )

COUNTY OF LOS ANGELES )


     I, Brandi Celestino, a Certified Shorthand Reporter, do hereby certify:


     That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

     That said proceedings were taken before me at the time and place therein set forth and were taken down remotely by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

     I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in any way interested in the outcome thereof.

     In witness whereof, I have hereunto subscribed my name.


Dated:  January 8, 2026



*Brandi Celestino*

Brandi Celestino

Page 163

# EXHIBIT 6

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated,

     *Plaintiffs*,

v.

GT'S LIVING FOODS, LLC.,

     *Defendant*.

Case No. 2:19-cv-10920-FMO-DSRx

**DECLARATION OF SIMON FRANZINI**

Hon. Fernando M. Olguin
Magistrate Judge Daniel S. Roberts

I, Simon Franzini, declare as follows:

1.      I am a partner in Dovel & Luner, LLP ("Dovel & Luner") and a member of the California bar. I make this declaration in connection with a subpoena served on Dovel & Luner in the above-captioned action on or around January 29, 2026 (the "Dovel & Luner subpoena"). This declaration is accurate to the best of my knowledge, and I have personal knowledge of the facts stated below.

2.      I represent the Plaintiffs, Amit Patel, Lauren Schmidt, and Christopher Nunez (collectively, "Plaintiffs"), in the above-captioned action.

3.      On or around July 9, 2024, my firm, Dovel & Luner, entered an agreement with the Smith Krivoshey, PC ("Smith Krivoshey"), Bursor & Fisher, P.A. ("Bursor"), Zimmerman Reed LLP ("Zimmerman") and Westerman Law Corp ("Westerman") law firms regarding the above-captioned action ("First Agreement"). That agreement was produced by Plaintiffs in the litigation on or around December 23, 2025.

4.      On or around July 16, 2024, Dovel & Luner entered a second agreement with Smith Krivoshey, Bursor, Zimmerman, and Westerman ("Second Agreement") regarding the above-captioned action. The July 16, 2024, agreement states that it "specifically supersedes any prior agreements" between the parties to that agreement. That agreement was produced by Plaintiffs in the litigation on or around December 23, 2025, too.

5.      There are no other agreements—other than the First Agreement and the Second Agreement—between Dovel & Luner, LLP, on the one hand, and Bursor and/or Smith Krivoshey, on the other, regarding the prosecution of the above-captioned action.

6.      On or around August 14, 2024, Smith Krivoshey and Bursor withdrew from the above-captioned action.

7.      Since the date of their respective withdrawals, neither Smith Krivoshey nor Bursor:

       a.   directed or supervised the litigation of the above-captioned action, or had any authority with respect to case decision making or case strategy

Declaration of Simon Franzini                    1            Case No. 2:19-cv-10920-FMO-DSRx

in that action;

    b. drafted, or edited, or reviewed or commented on drafts of, any pleading, brief, or other case document in the above-captioned action;

    c. to the best of Dovel & Luner's knowledge, had any consultations with Plaintiffs with respect to the above-captioned action.

8. Defendant has represented and agreed that, upon receiving a declaration from Dovel & Luner that includes the representations above: (a) the Dovel & Luner subpoena would be withdrawn; (b) it would not issue any subsequent subpoenas to Dovel & Luner relating to the topics covered by the Dovel & Luner subpoena, and (c) it will not issue any other subpoenas to Dovel & Luner in connection with the motion for class certification in the above-captioned matter currently due on March 2, 2026. In agreeing to provide this declaration to Defendant, Dovel & Luner has been and is relying on those representations and agreements.

9. Nothing in this declaration is intended to be or should be construed as a waiver of any privilege or immunity. And, Dovel & Luner reserves all objections to and rights with respect to the issuance of the Dovel & Luner subpoena.

I declare under penalty of perjury, under the laws of the United States and the State of California, that the foregoing is true and correct to the best of my knowledge.

Dated: February 19, 2026

                                */s/ Simon Franzini*
                                Dovel & Luner, LLP
                                By: Simon Franzini
                                Title: Partner

Declaration of Simon Franzini        2        Case No. 2:19-cv-10920-FMO-DSRx

# EXHIBIT 7

DocuSign Envelope ID: E7049A5B-574B-4FF8-ADD7-E850B1A3CB4D



**HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY**

DocuSign Envelope ID: E7019A5B-574B-4FF8-ADD7-E850B1A3CB4D



**HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY**

**PLAINTIFFS000043**

DocuSign Envelope ID: E7019A5B-574B-4FF8-ADD7-E850B1A3CB4D



**HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY**

Evid. Appx. Page 54

**PLAINTIFFS000044**

DocuSign Envelope ID: E7049A5B-574B-4FF8-ADD7-E850B1A3CB4D



HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY

PLAINTIFFS000045

DocuSign Envelope ID: E7019A5B-574B-4FF8-ADD7-E850B1A3CB4D



**HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY**

# EXHIBIT 8

Docusign Envelope ID: D04A8A49-8F5F-4AA2-B3CB-5AEEC4CCC7DE



**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY**

**PLAINTIFFS000047**

Docusign Envelope ID: D04A8A49-8F5F-4AA2-B3CB-5AEFC4CCC7DF



HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY

Docusign Envelope ID: D04A8A49-8F5F-4AA2-B3CB-5AEEC4CCC7DF



**HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY**

Docusign Envelope ID: D04A8A49-8F5F-4AA2-B3CB-5AEFC4CCC7DF



**HIGHLY CONFIDENTIAL-ATTORNEYS'
EYES ONLY**

# EXHIBIT 9

# ORIGINAL KOMBUCHA

**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"TO MAKE YOUR PRESENCE KNOWN, YOU MUST SHARE YOUR GIFTS!"

–DONNA-LEE KNUERR
CUSTOMER CARE DIRECTOR
ORLANDO, FL.

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

*Rejoice!* **THIS IS A LIVE FOOD.**

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@drinkgts.com
Website: www.drinkgts.com

*Living Food for the Living Body.®*

## KOMBUCHA™
### organic & raw

### ORIGINAL™

**Nutrition Facts**

Serving Size 8 fl. oz.
Servings Per Container 2

Amount Per Serving

| | |
|---|---|
| Calories 25 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 6g | 2% |
| Sugars 6g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms), S. Boulardii (1 billion organisms), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), and 100% pure love!!!

*Organically produced
Do not shake

**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

*Living Food for the Living Body.®*

rebalance · reawaken · rethink · rekindle · redefine · rediscover
**electrolytes + polyphenols + enzymes**
reimagine · relive · repurpose · reinvent · reclaim · recapture

restart · regain
**probiotics**
rebirth · renew

7 22430 00016 9    FLV4

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW • VEGAN • NON-GMO • KOSHER • GLUTEN-FREE

16 fl oz

**ENLIGHTENED™**
For Everyone, Everywhere.

473 mL

**CA CASH REFUND**
5¢ Ref. ME & HI • Please Recycle



Exhibit 15

Evid. Appx. Page 63

GT-SHARPE-0001452

# LEMONADE KOMBUCHA

**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

✍ — GT Dave, Founder

*Rejoice!* THIS IS A LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

**WORDS OF ENLIGHTENMENT**

"TRUST YOUR OWN HAPPINESS."

—NATHALIE NICOLE
ACTRESS
BOCA RATON, FL

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

**Living Food for the Living Body.®**

GT'S LIVING FOODS

## KOMBUCHA™
### organic & raw

**LEMONADE**

**Nutrition Facts**

Serving Size 8 fl. oz.
Servings Per Container 2

Amount Per Serving

| Calories 25 | Calories from Fat 0 |
|---|---|

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 6g | 2% |
| Sugars 6g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), lemon juice*, and 100% pure love!!!
*Organically produced. Do Not Shake
<u>Please note:</u> Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

**Living Food for the Living Body.®**

rebalance · reawaken · rethink · rekindle · redefine · rediscover
## electrolytes + polyphenols + enzymes
reimagine · relive · repurpose · reinvent · reclaim · recapture

restart · regain
## probiotics
rebirth · renew

7 22430 10016 6
FLV7

USDA ORGANIC

CK Parve

NON GMO VERIFIED

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW • VEGAN • NON-GMO • KOSHER • GLUTEN-FREE

16 fl oz

**ENLIGHTENED™**
For Everyone, Everywhere.

473 mL

CA CASH REFUND
5¢ Ref. ME & HI • 10¢ Ref. OR
Please Recycle



# GINGERADE KOMBUCHA

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!** THIS IS A LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtlivingfoods.com
Website: gtslivingfoods.com

### WORDS OF ENLIGHTENMENT

"EVERYONE IS MADE UP OF LIGHT, WE SIMPLY NEED TO FIND OUR BEST WAY TO SHINE."

— ANNAROSE ETRA
PSYCHOLOGY STUDENT
SANTA CRUZ, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Living Food for the Living Body.®**

## GT'S

# KOMBUCHA™
## organic & raw

### GINGERADE®

### Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 25 | Calories from Fat 0 |
| | % Daily Value* |
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 6g | 2% |
| Sugars 6g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), fresh pressed ginger juice*, and 100% pure love!!!
*Organically produced. Do Not Shake
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

**Living Food for the Living Body.®**

rebalance · reawaken · rethink · rekindle · redefine · rediscover
# electrolytes + polyphenols + enzymes
reimagine · relive · repurpose · reinvent · reclaim · recapture

restart · regain
# probiotics
rebirth · renew

7 22430 20016 3

FLV6

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

16 fl oz

ENLIGHTENED™
For Everyone, Everywhere.

473 mL

CA CASH REFUND
5¢ Ref. ME & HI · 10¢ Ref. OR
Please Recycle



GT-SHARPE-0001454

# MULTI-GREEN KOMBUCHA

## Always Cultured, Never Compromised

The bottle in your hand bears my name as a symbol of promise. You have my word: GT's KOMBUCHA is the most authentic Kombucha you can buy. With respect for centuries of Eastern tradition, and using heirloom living cultures passed down by my family, this sacred offering is lovingly handcrafted with real raw ingredients you can see, taste, and *feel* - just as nature intended.

— GT Dave, Founder

*Rejoice!* THIS IS A LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

### WORDS OF ENLIGHTENMENT

"LIVE IN BLOOM; IN BLISS; IN LOVE."

—DEVON JUDD
NUTRITION STUDENT
SAN JOSE, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

### KOMBUCHA
organic & raw

**MULTI-GREEN™**

Living Food for the Living Body.®

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 1g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), klamath valley blue-green algae*, spirulina*, chlorella*, and 100% pure love!!!
*Organically produced. Do Not Shake
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent • May leak or gush if unrefrigerated.

rebalance · reawaken · rethink · rekindle · redefine · rediscover    restart · regain

## electrolytes + polyphenols + enzymes    probiotics

reimagine · relive · repurpose · reinvent · reclaim · recapture    rebirth · renew

7 22430 14016 2    FLV5

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

16 fl oz

**ENLIGHTENED™**
For Everyone, Everywhere.

473 mL

CA CASH REFUND
5¢ Ref. ME & HI · 10¢ Ref. OR
Please Recycle



GT-SHARPE-0001455

# LAVENDER LOVE KOMBUCHA



**Living Food for the Living Body.®**

### Always Cultured, Never Compromised

The bottle in your hand bears my name as a symbol of promise. You have my word: GT's KOMBUCHA is the most authentic Kombucha you can buy. With respect for centuries of Eastern tradition, and using heirloom living cultures passed down by my family, this sacred offering is lovingly handcrafted with real raw ingredients you can see, taste, and *feel* - just as nature intended.

— GT Dave, Founder

**Rejoice!**
THIS IS A
LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

### WORDS OF ENLIGHTENMENT

"IF EYES ARE THE WINDOWS TO THE SOUL, THEN HUGS ARE THE DOORS."

–JACQUI O'KANE
PHYSICIAN POET
VALDOSTA, GA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**GT'S**
LIVING FOODS

# KOMBUCHA™
## organic & raw

### LAVENDER LOVE™

**Nutrition Facts**
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), lavender*, elderberry*, and 100% pure love!!!
*Organically produced. Do Not Shake

**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

*Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.*

**Living Food for the Living Body.®**

rebalance · reawaken · rethink · rekindle · redefine · rediscover    restart · regain

## electrolytes + polyphenols + enzymes    probiotics

reimagine · relive · repurpose · reinvent · reclaim · recapture    rebirth · renew

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

**16 fl oz**

**ENLIGHTENED™**
For Everyone, Everywhere.

**473 mL**

**CA CASH REFUND**
5¢ Ref. ME & HI · 10¢ Ref. OR
Please Recycle

7 22430 16016 0    FLV6

Evid. Appx. Page 67

GT-SHARPE-0001456

# HIBISCUS GINGER KOMBUCHA



GT-SHARPE-0001457

# BILBERRY BLESSING KOMBUCHA



## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!** THIS IS A LIVE FOOD.

We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.

GT'S LIVING FOODS
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtlivingfoods.com
Website: gtslivingfoods.com

### WORDS OF ENLIGHTENMENT

"OPPORTUNITY IS GIVEN CONTINUOUSLY. WE MUST ACKNOWLEDGE THE MOMENT AND LEAP FEARLESSLY."

−LAURIE LATOUR
LAW ENFORCEMENT
SAN DIEGO, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

## GT'S LIVING FOODS

# KOMBUCHA™
### organic & raw

# BILBERRY BLESSING™

*Living Food for the Living Body.®*

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |
| | % Daily Value* |
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), bilberry*, honeysuckle* red clover*, mint*, and 100% pure love!!!
*Organically produced. Do Not Shake
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

rebalance · reawaken · rethink · rekindle · redefine · rediscover
## electrolytes + polyphenols + enzymes
reimagine · relive · repurpose · reinvent · reclaim · recapture

restart · regain
## probiotics
rebirth · renew

7 22430 18016 8

FLV5

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

16 fl oz

**ENLIGHTENED™**
For Everyone, Everywhere.

473 mL

**CA CASH REFUND**
5¢ Ref. ME & HI · 10¢ Ref. OR
Please Recycle



GT-SHARPE-0001458

# CAYENNADE KOMBUCHA



## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!**
THIS IS A
LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@drinkgts.com
Website: www.drinkgts.com

### WORDS OF ENLIGHTENMENT

"TRUST THE JOURNEY. FALL DOWN, LEARN, AND THEN GET BACK UP."

–IAN KAY
BUSINESS ENTREPRENEUR
TORRANCE, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Living Food for the Living Body.®**

## GT'S
# KOMBUCHA™
### organic & raw

## CAYENNADE™

## Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms), S. Boulardii (1 billion organisms), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), lemon juice*, fresh pressed ginger juice*, cayenne*, and 100% pure love!!!
*Organically produced
Do not shake
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

**Living Food for the Living Body.®**

rebalance · reawaken · rethink · rekindle · redefine · rediscover    restart · regain

## electrolytes + polyphenols + enzymes    probiotics

reimagine · relive · repurpose · reinvent · reclaim · recapture    rebirth · renew

USDA ORGANIC

7 22430 29016 4    FLV3

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW • VEGAN • NON-GMO • KOSHER • GLUTEN-FREE

**16 fl oz**

**ENLIGHTENED™**
For Everyone, Everywhere.

**473 mL**

CA CASH REFUND
5¢ Ref. ME & HI • Please Recycle



# CAYENNADE KOMBUCHA



**Living Food for the Living Body.®**

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"FOLLOW YOUR HEART, TRUST YOUR VISION & CARRY YOURSELF WITH CONFIDENCE."

—AMANDA SEGUIN ENTREPRENEUR WAIKIKI, HI

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Rejoice!** THIS IS A LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

### GT'S
KOMBUCHA™
organic & raw

CAYENNADE™

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

**Amount Per Serving**

| | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), lemon juice*, fresh pressed ginger juice*, cayenne*, fresh pressed lime juice*, and 100% pure love!!! *Organically produced. Do Not Shake **Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

**Living Food for the Living Body.®**

rebalance · reawaken · rethink · rekindle · redefine · rediscover     restart · regain
## electrolytes + polyphenols + enzymes     probiotics
reimagine · relive · repurpose · reinvent · reclaim · recapture     rebirth · renew

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

**16 fl oz**

**ENLIGHTENED™**
For Everyone, Everywhere.

**473 mL**

**CA CASH REFUND**
5¢ Ref. ME & HI • 10¢ Ref. OR
Please Recycle

7 22430 29016 4   FLV8

USDA ORGANIC
CK Parve
NON GMO Project VERIFIED



Evid. Appx. Page 71

GT-SHARPE-0001460

# HEART BEET KOMBUCHA



**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"ALL GOOD THINGS IN LIFE ARE CREATED THROUGH HUMAN CONNECTION AND WHOLEHEARTEDNESS."

—HANNAH TIZEDES
CREATIVE CONTENT STRATEGIST
DETROIT, MI

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Rejoice!** THIS IS A LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtslivingfoods.com
Website: gtslivingfoods.com

Living Food for the Living Body.®

## KOMBUCHA™
### organic & raw

**HEART BEET™**

**Nutrition Facts**
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms), S. Boulardii (1 billion organisms), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), fresh pressed beet juice*, rosemary*, fresh pressed ginger juice*, and 100% pure love!!!
*Organically produced
Do not shake

**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®

rebalance · reawaken · rethink · rekindle · redefine · rediscover
**electrolytes + polyphenols + enzymes**
reimagine · relive · repurpose · reinvent · reclaim · recapture

restart · regain
**probiotics**
rebirth · renew

7 22430 31016 9
FLVS

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

16 fl oz

**ENLIGHTENED™**
For Everyone, Everywhere.

473 mL

**CA CASH REFUND**
5¢ Ref. ME & HI · Please Recycle



GT-SHARPE-0001461

# TANTRIC TURMERIC KOMBUCHA

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!**
THIS IS A
LIVE FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

### WORDS OF ENLIGHTENMENT

"THERE IS POWER IN BEING YOURSELF."

—SARAH BONNER
PROFESSIONAL TRIATHLETE
WESTPORT, ONTARIO

WE INVITE YOU
TO ENLIGHTEN US
WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

### GT'S

## KOMBUCHA™
### organic & raw

## TANTRIC TURMERIC™

Living Food for the Living Body.®

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

Amount Per Serving

| Calories 25 | Calories from Fat 0 |
|---|---|

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 6g | 2% |
| Sugars 6g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), fresh pressed turmeric juice*, fresh pressed carrot juice*, fresh pressed ginger juice* and 100% pure love!!!
*Organically produced. Do Not Shake
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

rebalance · reawaken · rethink · rekindle · redefine · rediscover

restart · regain

## electrolytes + polyphenols + enzymes

## probiotics

reimagine · relive · repurpose · reinvent · reclaim · recapture

rebirth · renew

USDA ORGANIC

7 22430 32016 8    FLV8

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

**16 fl oz**

**ENLIGHTENED™**
For Everyone, Everywhere.

**473 mL**

CA CASH REFUND
5¢ Ref. ME & HI · 10¢ Ref. OR
Please Recycle



Evid. Appx. Page 73

GT-SHARPE-0001462

# KOFFEE KOMBUCHA

**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

*Rejoice!* **THIS IS A LIVE FOOD.**

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because* **love is our #1 ingredient.**

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

**WORDS OF ENLIGHTENMENT**

"RELEASE (YOUR TRUTH), TRANSFORM (YOUR MIND), MANIFEST (YOUR GREATNESS)."

—NYEESHA D. WILLIAMS
CELEBRITY COACH | GLOBAL SPEAKER
LOS ANGELES, CA
WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Living Food for the Living Body.®**

GT'S LIVING FOODS

**KOMBUCHA™**
organic & raw

**KOFFEE™**

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

**Amount Per Serving**

| | |
|---|---|
| Calories 25 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 6g | 2% |
| Sugars 6g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), cold brewed coffee*, vanilla extract*, almond extract* and 100% pure love!!!
Contains: almond
*Organically produced. Do not shake.
Contains about 80mg of caffeine per bottle.
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

**Living Food for the Living Body.®**

rebalance · reawaken · rethink · rekindle · redefine · rediscover
## electrolytes + polyphenols + enzymes
reimagine · relive · repurpose · reinvent · reclaim · recapture

restart · regain
## probiotics
rebirth · renew

USDA ORGANIC
CK Parve
NON GMO PROJECT VERIFIED

7 22430 33016 7   FLV6

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

**16 fl oz**

**ENLIGHTENED™**
For Everyone, Everywhere.

**473 mL**

**CA CASH REFUND**
5¢ Ref. ME & HI • 10¢ Ref. OR
Please Recycle



Evid. Appx. Page 74

GT-SHARPE-0001463

# COSMIC CRANBERRY SYNERGY



**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"LIGHT IS MOST BEAUTIFUL AT THE END OF A DARK TUNNEL."

—DANIELLE RADIN
NEWS REPORTER
SAN DIEGO, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Rejoice!**
**THIS IS A RAW FOOD.**

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtslivingfoods.com
Website: gtslivingfoods.com

**SYNERGY®**
organic kombucha

aminos + polyphenols

enzymes + probiotics

**COSMIC CRANBERRY®**

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

Living Food for the Living Body.®

**Nutrition Facts**
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), pure unsweetened cranberry juice*, and 100% pure love!!!
*Organically produced. Do Not Shake
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated. Naturally effervescent. May leak or gush if unrefrigerated.

7 22430 30016 0    FLV7

CA CASH REFUND 5¢ Ref. ME & HI 10¢ Ref. OR · Please Recycle

16 fl oz    473 mL    Gluten-free · Vegan · Non-GMO

# MYSTIC MANGO SYNERGY

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!** THIS IS A RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtlivingfoods.com
gtslivingfoods.com

**WORDS OF ENLIGHTENMENT**

"A CONSCIOUS QUEST MAKES THE DISCOVERY MORE MEANINGFUL."

—RON AMES
PHOTOGRAPHER
SILVER SPRING, MD

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

Living Food for the Living Body.®

aminos + polyphenols

enzymes + probiotics

## GT'S LIVING FOODS

# SYNERGY®
## organic kombucha

# MYSTIC MANGO™

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 40 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 10g | 3% |
| Sugars 10g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), mango puree*, and 100% pure love!!!
*Organically produced. Do Not Shake

<u>Please note:</u> Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®



7 22430 50016 4    FLV6

CA CASH REFUND  5¢ Ref. ME & HI  10¢ Ref. OR  • Please Recycle    16 fl oz    473 mL    Gluten-free • Vegan • Non-GMO

# GUAVA GODDESS SYNERGY

*Living Food for the Living Body.®*

aminos + polyphenols

enzymes + probiotics

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

### WORDS OF ENLIGHTENMENT

"OUR KINDNESS RIPPLES IN THE POOL OF HUMANITY."

–KIM LUCAS
HOLISTIC RN
PORTLAND, OR

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

**Rejoice!**
**THIS IS A RAW FOOD.**

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtslivingfoods.com
Website: gtslivingfoods.com

USDA ORGANIC

NON GMO PROJECT VERIFIED

CA CASH REFUND 5¢ Ref. ME & HI • Please Recycle

## SYNERGY®
### organic kombucha

**GUAVA GODDESS™**

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

16 fl oz

473 mL

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 30 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 8g | 3% |
| Sugars 8g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), guava puree*, and 100% pure love!!!
*Organically produced.
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated · Naturally effervescent. May leak or gush if unrefrigerated.

USDA ORGANIC

NON GMO PROJECT VERIFIED

7 22430 90016 2

FLV6

Gluten-free • Vegan • Non-GMO

*Living Food for the Living Body.®*



# GINGERBERRY SYNERGY

**Living Food for the Living Body.®**

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"WE ARE ALL CAPABLE OF SUCCESS WITH THE RIGHT ATTITUDE."

−KIM−SARY I
CLINICAL SUPPORT SPECIALIST
LOWELL, MA

WE INVITE YOU
TO ENLIGHTEN US
WITH YOUR WORDS AT
WORDS@DRINKOTS.COM

**Rejoice!**
THIS IS A
RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtslivingfoods.com
Website: gtslivingfoods.com

**CA CASH REFUND** 5¢ Ref. ME & HI • Please Recycle

aminos + polyphenols

## SYNERGY®
### organic kombucha

## GINGERBERRY®

renew • rebalance • rebuild • reclaim • rekindle • recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

enzymes + probiotics

16 fl oz    473 mL    Gluten-free • Vegan • Non-GMO

**Living Food for the Living Body.®**

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

## Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 25 | Calories from Fat 0 |
| | % Daily Value* |
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 6g | 2% |
| Sugars 6g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

** At the time of bottling
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), blueberry juice*, fresh pressed ginger juice* and 100% pure love!!!

*Organically produced. Do not shake.

Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

7 22430 60016 1    FLV6



GT-SHARPE-0001467

# STRAWBERRY SERENITY  SYNERGY



## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

### WORDS OF ENLIGHTENMENT

"IF YOU WANT TO MASTER THE WORLD, YOU MUST MASTER YOUR MIND."

–ALYSSA DYKSTRA
YOGI & POSITIVE VIBES
ENTHUSIAST
GRAND RAPIDS, MI

WE INVITE YOU
TO ENLIGHTEN US
WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

**Rejoice!**
THIS IS A
RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

CA CASH REFUND 5¢ Ref. ME & HI 10¢ Ref. OR • Please Recycle

Living Food for the Living Body.®

aminos + polyphenols

enzymes + probiotics

### GT'S LIVING FOODS

# SYNERGY®
## organic kombucha

## STRAWBERRY SERENITY™

renew • rebalance • rebuild • reclaim • rekindle • recharge

ENLIGHTENED™
For Everyone, Everywhere.

16 fl oz

473 mL

Gluten-free • Vegan • Non-GMO

Living Food for the Living Body.®

## Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

**Amount Per Serving**

| Calories 30 | Calories from Fat 0 |
|---|---|
| | % Daily Value* |
| **Total Fat** 0g | 0% |
| **Cholesterol** 0mg | 0% |
| **Sodium** 10mg | 1% |
| **Total Carbohydrate** 8g | 3% |
| Sugars 8g | |
| **Protein** 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), strawberry juice* and 100% pure love!!!
*Organically produced. Do not shake.
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

7 22430 40016 7

FLV6

USDA ORGANIC

Parve

NON GMO PROJECT VERIFIED

# TRILOGY SYNERGY



GT-SHARPE-0001469

# PASSIONBERRY BLISS SYNERGY

**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

~ GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"TRUE PEACE COMES WHEN YOU LEARN TO SEE THAT LIFE'S HARDEST LESSONS ARE MEANT TO TEACH."

~HEATHER CARLSON YOGA INSTRUCTOR CHICAGO, IL

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Rejoice!** THIS IS A RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

Living Food for the Living Body.®

aminos + polyphenols

enzymes + probiotics

## SYNERGY®
### organic kombucha

PASSIONBERRY BLISS™

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™** For Everyone, Everywhere.

**Nutrition Facts**
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | | |
|---|---|---|
| Calories 25 | Calories from Fat 0 | |
| | | % Daily Value* |
| Total Fat 0g | | 0% |
| Cholesterol 0mg | | 0% |
| Sodium 10mg | | 1% |
| Total Carbohydrate 6g | | 2% |
| Sugars 6g | | |
| Protein 0g | | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), blackberry juice*, passionfruit juice*, and 100% pure love!!!
*Organically produced. Do Not Shake
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated · Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®

7 22430 70016 8    FLV7

CA CASH REFUND 5¢ Ref. ME & HI 10¢ Ref. OR · Please Recycle

16 fl oz    473 mL    Gluten-free · Vegan · Non-GMO

USDA ORGANIC

CK Parve

NON GMO VERIFIED



GT-SHARPE-0001470

# WATERMELON WONDER SYNERGY

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!** THIS IS A RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

### WORDS OF ENLIGHTENMENT

"FIND JOY IN THE SIMPLE THINGS, AND LIFE WILL ALWAYS BE FULFILLING."

—ANTONIO D. EVANS
ENTREPRENEUR
CHARLOTTE, NC

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

CA CASH REFUND 5¢ Ref. ME & HI / 10¢ Ref. OR • Please Recycle

aminos + polyphenols

enzymes + probiotics

Living Food for the Living Body®

## SYNERGY®
### organic kombucha

## WATERMELON WONDER™

renew • rebalance • rebuild • reclaim • rekindle • recharge

ENLIGHTENED™
For Everyone, Everywhere.

16 fl oz    473 mL    Gluten-free • Vegan • Non-GMO

### Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

**Amount Per Serving**

| Calories 35 | Calories from Fat 0 |
|---|---|

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 9g | 3% |
| Sugars 9g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), fresh pressed watermelon juice*, cherry juice*, fresh pressed lime juice*, and 100% pure love!!!
*Organically produced. Do Not Shake
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

7 22430 34016 6    FLV6



# PINK LADY BASIL



**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"A STRONG CHARACTER IS THE FOUNDATION WHERE LOVE MAY BUILD ITS HOME."

—MELISSA FRY
NATURAL HEALER
KANSAS CITY, KANSAS

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Rejoice!** THIS IS A RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@gtslivingfoods.com
Website: gtslivingfoods.com

**CA CASH REFUND** 5¢ Ref. ME & HI 10¢ Ref. OR · Please Recycle

aminos + polyphenols

enzymes + probiotics

**GT'S** LIVING FOODS

**SYNERGY®**
organic kombucha

**PINK LADY BASIL™**

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

16 fl oz          473 mL

Living Food for the Living Body.®

## Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

Amount Per Serving

| | |
|---|---|
| Calories 25 | Calories from Fat 0 |

| | % Daily Value* |
|---|---|
| Total Fat 0g | 0% |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 7g | 2% |
| Sugars 7g | |
| Protein 0g | |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling.
INGREDIENTS: GT's Kombucha*, (kombucha culture*, black tea*, green tea*, kiwi juice*), fresh pressed pink lady apple juice*, basil*, and 100% pure love!!!
*Organically produced. Do Not Shake
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated ● Naturally effervescent. May leak or gush if unrefrigerated.

7 22430 36016 4

FLV5

Gluten-free • Vegan • Non-GMO

Evid. Appx. Page 83

GT-SHARPE-0001472

# BLACK CHIA





GT-SHARPE-0001473

# CHERRY CHIA



**Mission in a Bottle:**

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!** THIS IS A RAW FOOD.

We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because *love is our #1 ingredient.*

Chia seeds may vary in color, size, texture and flavor due to seasonal and crop variances.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@drinkgts.com
Website: www.drinkgts.com

**WORDS OF ENLIGHTENMENT**

"IN A WORLD WHERE WE ALL LIVE TOGETHER, WHY NOT HELP ONE ANOTHER."

–TIFFANY PULVINO
ACTRESS
LOS ANGELES, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

*Living Food for the Living Body.*

aminos + polyphenols

enzymes + probiotics

## SYNERGY®
### organic kombucha

**CHERRY CHIA™**

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

*Living Food for the Living Body.*

## Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 75 | Calories from Fat 30 |
| | % Daily Value* |
| Total Fat 3g | 5% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 10mg | 1% |
| Total Carbohydrate 12g | 4% |
| Sugars 8g | |
| Dietary Fiber 4g | 16% |
| Protein 2g | 4% |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms), S. Boulardii (1 billion organisms), Omega-3 (Alpha Linolenic Acid) (4200mg), Omega-6 (Linoleic Acid) (1400mg), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), raw chia seeds*, cherry juice* and 100% pure love!!!
*Organically produced
Do not shake
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

CA CASH REFUND 5¢ Ref. ME & HI • Please Recycle

16 fl oz

473 mL

Gluten-free • Vegan • Non-GMO

7 22430 19016 7

FLV4



GT-SHARPE-0001474

# GINGER CHIA



## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!** THIS IS A RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

Chia seeds may vary in color, size, texture and flavor due to seasonal and crop variances.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@drinkgts.com
Website: www.drinkgts.com

### WORDS OF ENLIGHTENMENT

"LIFE IS AS GOOD AS HOW YOU CHOOSE TO LIVE IT."

—JOSEPH M. MORENO JR.
SPIRITUALIST
MERCED, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT
WORDS@DRINKGTS.COM

**aminos + polyphenols**

**enzymes + probiotics**

## SYNERGY®
### organic kombucha

## GINGER CHIA™

renew • rebalance • rebuild • reclaim • rekindle • recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

**Living Food for the Living Body.®**

## Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 75 | Calories from Fat 30 |

| | % Daily Value* |
|---|---|
| **Total Fat** 3g | 5% |
| Trans Fat 0g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 10mg | 1% |
| **Total Carbohydrate** 12g | 4% |
| Sugars 8g | |
| Dietary Fiber 4g | 16% |
| **Protein** 2g | 4% |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms), S. Boulardii (1 billion organisms), Omega-3 (Alpha Linolenic Acid) (4200mg), Omega-6 (Linoleic Acid) (1400mg), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**INGREDIENTS:** GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), raw chia seeds*, fresh pressed ginger* and 100% pure love!!!
*Organically produced
Do not shake.
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

**Living Food for the Living Body.®**

USDA ORGANIC

7 22430 27016 6    FLV3

CA CASH REFUND 5¢ Ref. ME & HI • Please Recycle

**16 fl oz**

**473 mL**

Gluten-free • Vegan • Non-GMO



Evid. Appx. Page 86

GT-SHARPE-0001475

# GRAPE CHIA

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature.*

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!**
**THIS IS A RAW FOOD.**

We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because *love is our #1 ingredient.*

Chia seeds may vary in color, size, texture and flavor due to seasonal and crop variances.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

CA CASH REFUND 5¢ Ref. ME & HI 10¢ Ref. OR • Please Recycle

### WORDS OF ENLIGHTENMENT

"KNOWLEDGE OF SELF INCREASES SPIRITUAL WEALTH."

–JOSEPH GELL
MUSICIAN & AGRICULTURALIST
OAKLAND, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

Living Food for the Living Body.®

aminos + polyphenols

enzymes + probiotics

## SYNERGY®
### organic kombucha

**GRAPE CHIA**™

renew • rebalance • rebuild • reclaim • rekindle • recharge

**ENLIGHTENED**™
For Everyone, Everywhere.

16 fl oz        473 mL        Gluten-free • Vegan • Non-GMO

## Nutrition Facts

Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| **Calories** 75 | Calories from Fat 30 |

| | % Daily Value* |
|---|---|
| **Total Fat** 3g | 5% |
| Trans Fat 0g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 10mg | 1% |
| **Total Carbohydrate** 12g | 4% |
| Sugars 8g | |
| Dietary Fiber 4g | 16% |
| **Protein** 2g | 4% |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Omega-3 (Alpha Linolenic Acid) (4200mg), Omega-6 (Linoleic Acid) (1400mg), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), raw chia seeds*, concord grape juice* and 100% pure love!!!
*Organically produced. Do not shake.
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated

Living Food for the Living Body.®

7 22430 21016 2

FLV7



Evid. Appx. Page 87

GT-SHARPE-0001476

# GREEN CHIA



## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature*.

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

**Rejoice!**
THIS IS A
RAW FOOD.

We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because *love is our #1 ingredient.*

Chia seeds may vary in color, size, texture and flavor due to seasonal and crop variances.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
Email: info@drinkgts.com
Website: www.drinkgts.com

### WORDS OF ENLIGHTENMENT

"STRIVE TO BE THE ABSOLUTE BEST VERSION OF YOURSELF EVERYDAY."

– CYNTHIA BURNS
PERSONAL TRAINER
MONTEREY, CA

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

aminos + polyphenols

enzymes + probiotics

## GT'S

## SYNERGY®
### organic kombucha

## GREEN CHIA™

renew · rebalance · rebuild · reclaim · rekindle · recharge

**ENLIGHTENED™**
For Everyone, Everywhere.

Living Food for the Living Body.®

### Nutrition Facts
Serving Size 8 fl. oz.
Servings Per Container 2

| Amount Per Serving | |
|---|---|
| Calories 75 | Calories from Fat 30 |

| | % Daily Value* |
|---|---|
| **Total Fat** 3g | 5% |
| Trans Fat 0g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 10mg | 1% |
| **Total Carbohydrate** 12g | 4% |
| Sugars 8g | |
| Dietary Fiber 4g | 16% |
| **Protein** 2g | 4% |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms), S. Boulardii (1 billion organisms), Omega-3 (Alpha Linolenic Acid) (4200mg), Omega-6 (Linoleic Acid) (1400mg), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), raw chia seeds*, blue-green algae* and 100% pure love!!!
*Organically produced
Do not shake.
**Please note:** Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent • May leak or gush if unrefrigerated.

USDA ORGANIC

K Pareve

7 22430 24016 9   FLV3

CA CASH REFUND 5¢ Ref. ME & HI • Please Recycle

16 fl oz

473 mL

Gluten-free • Vegan • Non-GMO



# RASPBERRY CHIA

## Mission in a Bottle:

In 1995 I started making organic raw Kombucha based on the belief that it could touch people's lives. For me Kombucha represented everything that food should be: *raw, unadulterated & crafted by nature*.

Today that belief is stronger than ever. That's why I am honored and humbled to be able to share this gift with you.

— GT Dave, Founder

### WORDS OF ENLIGHTENMENT

"THE THINGS WE DON'T HAVE ARE VAGUELY KNOWN; THE THINGS WE DO HAVE ARE TRUELY KNOWN."

– DANIEL CARELLO
ARTIST
NEW ROCHELLE, NY

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT WORDS@DRINKGTS.COM

**Rejoice!**
THIS IS A
RAW FOOD.

*We believe good things come from small beginnings. That's why we make our Kombucha in the same small batches I used from the start, in my mother's kitchen. Our batches are small enough to hug. Which we do, because love is our #1 ingredient.*

Chia seeds may vary in color, size, texture and flavor due to seasonal and crop variances.

GT'S LIVING FOODS, LLC
P.O. Box 2352,
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

CA CASH REFUND 5¢ Ref. ME & HI 10¢ Ref. OR • Please Recycle

Living Food for the Living Body.®

aminos + polyphenols

enzymes + probiotics

## GT'S

# SYNERGY®
## organic kombucha

### RASPBERRY CHIA™

renew • rebalance • rebuild • reclaim • rekindle • recharge

16 fl oz

**ENLIGHTENED™**
For Everyone, Everywhere.

473 mL

Gluten-free • Vegan • Non-GMO

| Nutrition Facts | |
|---|---|
| Serving Size 8 fl. oz. | |
| Servings Per Container 2 | |
| **Amount Per Serving** | |
| Calories 75 | Calories from Fat 30 |
| | % Daily Value* |
| **Total Fat** 3g | 5% |
| Trans Fat 0g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 10mg | 1% |
| **Total Carbohydrate** 12g | 4% |
| Sugars 8g | |
| Dietary Fiber 4g | 16% |
| **Protein** 2g | 4% |

PER BOTTLE: Probiotics Bacillus coagulans GBI-30 6086 (1 billion organisms)**, S. Boulardii (1 billion organisms)**, Omega-3 (Alpha Linolenic Acid) (4200mg), Omega-6 (Linoleic Acid) (1400mg), Polyphenols (10mg), Glucuronic Acid (10mg), L(+) Lactic Acid (25mg), Acetic Acid (30mg)

**At the time of bottling
INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), raw chia seeds*, raspberry juice* and 100% pure love!!!
*Organically produced. Do not shake.
Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®

7 22430 22016 1    FLV7

USDA ORGANIC



GT-SHARPE-0001478

# EXHIBIT 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

                           )

DELANEY SHARPE, ERIN WEILER, )

JENNA LEDER, and ADRIANA     )

DIGENNARO, on behalf of      )

themselves and all others   )

similarly situated,        )

                           )

        Plaintiffs,      )

                           )

   vs.                ) No.  2:19-cv-10920-

                       )     FMO-GJS

GT'S LIVING FOODS, LLC,    )

                           )

        Defendant.      )

                           )

                           )

                           )

_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REMOTE/VIDEOTAPED DEPOSITION OF 30(b)(6) DESIGNEE

GEORGE THOMAS DAVE

Los Angeles, California

Friday, February 26, 2021

Volume I

Reported by:

SHARON LINDSAY-MILNIKEL

CSR No. 5335

Job No. 4458521

PAGES 1 - 286

Page 1

Evid. Appx. Page 91

BY MR. KRIVOSHEY:

Q    I'll -- I'll ask it this way: So I'm -- I'm not talking about the physical architecture of the label.  I'm talking about -- solely about the words used on a label -- okay -- and so with that    01:31:58 in mind, are you aware of any changes to any alcohol-related disclosures on the labels of any Enlightened Kombucha products between February 28th 2017 through the present?

A    No.    01:32:18

Q    Okay.  So during that same time period, from February 28th, 2017 through the present, have the labels of Enlightened Kombucha ever contained a surgeon general warning concerning alcohol?

A    No.    01:32:38

Q    At any time between February 28th, 2017 through the present, have the disclosures on the labels of Enlightened Kombucha with regard to the sugar content changed?

MR. VOELZ:  Objection.  Vague.    01:32:59

THE WITNESS:  So -- sorry -- so you're asking if the sugar content on this label, has it changed in any recent time until -- up till the present time?

BY MR. KRIVOSHEY:    01:33:17

Page 104

Exhibit 16?

A    Yes, I do.

Q    Do you recognize these labels?

A    Yes.

Q    What are they?                                    02:02:47

A    I'm switching to my screen but, at first
blush, they look like a Classic "SYNERGY
SUPERFRUITS" and "TRILOGY."

Q    And --

A    Would you like me to look at all -- all of    02:03:05
them?

Q    Yeah, go -- go through all of them,
please.

A    Okay, I'm just refreshing the document.

     Okay, I'm done.                                  02:05:30

Q    Okay.  So can you tell me what these
labels are.

A    These are our SYNERGY and KOMBUCHA Classic
labels.

Q    That GT's makes, right?                         02:05:46

A    Yes.

     MR. KRIVOSHEY:  And just for the record
this is -- Exhibit 16 is Bates-stamped GT-SHARPE-
1609 through -1626.

Q    Do you see on the label of the Classic       02:06:13

                                                     Page 123

Evid. Appx. Page 93

label in Exhibit 16, there's a statement -- well --

"Contains alcohol," "Must be 21+"?

Do you see that?

A    Yes.

Q    Does that statement appear on the label of    02:06:27

Enlightened Kombucha?

A    No.

Q    Do you see on the label of GT's Classic

label the statement saying:

"This product is a considered a beer    02:07:03

and contains natural effervescence."

Do you see that?

A    Yes.

Q    Does that statement appear on the

Class- -- on the labels of Enlightened Kombucha?    02:07:17

A    No.

Q    Do you see the statement:

"Kombucha is a cultured tea that is

low in alcohol, however federal law

requires a warning statement on any    02:07:31

product that may contain more than

0.5% of alcohol per volume" on the

label of the Classic Kombucha?  Do you see that?

A    Yes.

Q    Does that statement appear on the labels    02:07:44

Page 124

of Enlightened Kombucha?

A    No.

Q    And do you see the statement on the label
of Classic Kombucha:

"GOVERNMENT WARNING:                              02:07:56

"(1) ACCORDING TO THE SURGEON GENERAL

WOMEN SHOULD NOT DRINK ALCOHOLIC

BEVERAGES DURING PREGNANCY BECAUSE OF

THE RISK OF BIRTH DEFECTS.  (2)

CONSUMPTION OF ALCOHOLIC BEVERAGES               02:08:08

IMPAIRS YOUR ABILITY TO DRIVE A CAR

OR OPERATE MACHINERY AND MAY CAUSE

HEALTH PROBLEMS"?  Do you see that?

A    Yes.

Q    Does that statement appear on the labels       02:08:16
of Enlightened Kombucha?

A    No.

Q    Are you aware that for beverages
containing more than 0.5 percent alcohol by volume,
they're required to have that -- you know, that       02:08:36
government warning and I'll call it the surgeon
general warning?

        MR. VOELZ:  Objection.

        THE WITNESS:  No, that's not my exact
understanding.                                        02:08:50

                                        Page 125

Evid. Appx. Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

half or so.

MR. VOELZ:  Okay.

THE VIDEOGRAPHER:  We're going off the record.  The time is 3:47.

(Exhibit 20 was marked for identification    03:47:19 through Exhibit Share and is attached hereto.)

(Recess.)

THE VIDEOGRAPHER:  Back on the record. The time is 3:58.

BY MR. KRIVOSHEY:                                         03:58:09

Q    Okay, Mr. Dave, I've introduced Exhibit 20.

Do you see it?

A    It's not on the screen yet.

Q    No, okay.  Let me share it.  Here we go.    03:58:28

A    Okay.

MR. KRIVOSHEY:  And, for the record, Exhibit 20 is GT-SHARPE-2038.

Q    Mr. Dave, do you recognize this document?

A    Sorry, I was refreshing the other    03:58:51 document.

Yes.

Q    What is it?

A    It's a sales report.

Q    All right.  A sales report produced by    03:59:05

Page 199

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

your company?

A    Yes.

Q    And at the top it says "Enlightened Flavor Specific Sales and Qty CA."

Do you see that?                                    03:59:24

A    Yes.

Q    So these are the sales of Enlightened Kombucha in California.

Is that accurate?

A    Yes, it -- the quality of this document on    03:59:31 my screen's really bad.

Q    You know, the -- the -- I -- I can zoom in -- and I agree that it's -- it's blurry. Perhaps it is more clear in Exhibit Share than --

MR. VOELZ:   It is -- it is better in    03:59:47 Exhibit Share.

BY MR. KRIVOSHEY:

Q    Yeah, so I would ask that you to refer to there --

A    Okay.   Let me see it that way.    03:59:55

Q    -- if you can't see it.

A    Ah, much better.

Q    Okay.   So is this document wholesale sales that GT's has made in California of Enlightened Kombucha from, what, March 1, 2017 through 2019?    04:00:18

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

A    Yes, that's what it appears to be.

███ ███████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████        04:00:47

A    I'm sorry, where -- where are you -- I just got it back up on my screen, it disappeared for a second.  Maybe I can click back to yours.
So where -- where are you pointing to?

Q    I am -- well, the thing is the screen    04:01:08
share is -- is very fuzzy so I don't -- I think it's best if you're looking at Exhibit Share because this is --

A    Yeah, no, if you -- if you just point it on yours, then I'll pull up the Exhibit Share just    04:01:17
to --

Q    Sure.
So there's a -- do you see there's a couple of columns at the top, right?

A    Yes.    04:01:26

Q    And there's a column titled "Total" dollar -- "Total" then a dollar sign, right?

A    Yes.

Q    And then if you go down that column, there's a row titled "Enlightened Bottle" --    04:01:39

Page 201



"Bottles Subtotal."

Do you see that?

A     Yes.

▪ ████████████████████████████████

████████████████████████████    04:01:49

███████████████████████████

██████████████████

▪   ████

Q     Okay.  Do you know -- so this -- this short list -- this document lists "Enlightened    04:02:21 Bottles," do you know if that refers to an individual bottle or a case?

A     I believe it's cases.

Q     And how many bottles are in a case?

A     12.    04:02:35

Q     Okay.  So for the -- the -- there's a column titled "Total Qty."

Do you see that?

A     Yes.

Q     And those -- the numbers in that column    04:02:48 represent totals for cases sold wholesale, correct?

A     Correct.

Q     And so if we wanted to figure out the total amount of bottles, individual bottles, and not cases, sold, we could just multiply the figures    04:03:06

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

there times 12.

Is that accurate?

A    Yes.

Q    Okay.  And then there is a section on the bottom of that document called "Enlightened Kegs."    04:03:23

Do you see that?

A    Yes.

Q    Do you know what size kegs these are?

A    Yes.

Q    What size is that?    04:03:33

A    They're 5- -- 5-gallon.

Q    Does GT's have any other size kegs?

A    No.

Q    Do you know if GT's has run -- has run an updated version of this document to account for    04:04:02
2020 and 2021 sales?

A    I don't know.  I -- I mean I know that the document was provided at request, but I don't know exactly the timing, so it was up to date at the time of the request but --    04:04:21

Q    Okay.

A    -- I -- I don't have that specificity.

Q    But -- but it could, though, right?

A    Yes.

//    04:04:27

Page 203

Evid. Appx. Page 100

one to one, but it's the best information I can give you.



Q    And in some states you only sell                04:20:17
Enlightened but -- and no Classic at all.

Is that accurate?

A    Yes.

Q    Okay.  Do you know the average retail
price of Enlightened Kombucha in California?        04:20:35

A    I would say the average is probably 3.49.

Q    Do you know the average retail price of
Enlightened Kombucha in New York?

A    New York's a harder one to answer just
because you'll -- as -- as you likely know,        04:20:58
especially in Manhattan, you -- you know, you could
have a -- like a 4.99 bottle on -- in like a bodega
and then you could have Whole Foods that sells it
for 3.49 so it's -- it's -- it's hard to give that
average also because, clearly, the volume is much  04:21:14

Page 211

Classic doesn't have fruit juice -- well, the original that we're referencing doesn't have fruit juice, it has cane sugar, so it's a -- it's a different chemistry.

Q    When did you switch -- well, did the      04:42:31
Enlightened -- did Enlightened Kombucha also used to have cane sugar?

A    Yes, to a certain degree, it was a little bit -- because we didn't list it on the label, which I know you know because you were part of that      04:42:45
discussion and ultimate resolution, you know, we were -- we were treating them almost somewhat equally at the time as a fermenting agent and sometimes cane sugar would be a small portion of the process for our Enlightened/SYNERGY, but once      04:43:02
that update was made, that no longer was the case and we delineated Classic as a cane sugar and Enlightened/SYNERGY as a fruit juice/kiwi juice.

Q    So starting in February of 2017 through the present day, all Enlightened Kombucha would      04:43:18
have had kiwi juice and not cane sugar; is that correct?

A    Yes.

Q    All right.  Have you ever tested -- and by "you," I mean the company, tested the alcohol level      04:43:46

Page 229

Evid. Appx. Page 102

of Enlightened Kombucha at the point of retail?

MR. VOELZ:  And I'm going to instruct you not to answer to the extent it -- it reveals attorney-client communication or attorney work product.  If you can answer beyond that, you can do so.

THE WITNESS:  No.

BY MR. KRIVOSHEY:

Q    How many times has your company been sued in civil litigation regarding the levels of alcohol in your kombucha products?

A    I mean, effectively, three times.

Q    Are you sure?

A    Well, so when I say "effectively," I mean I -- the -- the -- the way it works is that you get one and then you get like two or three copycats, so at -- at the end of the day, they -- they were consolidated and treated as one singular matter, so I -- I -- I mean, again, I -- I think what really is the best answer is -- is three significant events.

Q    Okay.  Do you -- do you know the total number of lawsuits, though?

A    No, I don't.

Q    Would it be over ten?

Page 230

Evid. Appx. Page 103

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath;.

That a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;.

That the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript (X) was ( ) was not requested.

That if the foregoing proceedings were reported stenographically remote from the witness and parties, the transcript of the proceedings reflects the record that I could hear and understand to the best of my ability.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any party to this action.

//

Page 285

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 3/1/2021

SHARON LINDSAY-MILNIKEL

CSR No. 5335

Page 286

Evid. Appx. Page 105

# EXHIBIT 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SCOTT M. VOELZ (S.B. #181415)
svoelz@omm.com
ZACH A. TAFOYA (S.B. #301837)
ztafoya@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California  90071-2899
Telephone:  (213) 430-6000
Facsimile:   (213) 430-6407

Attorneys for Defendant
GT's Living Foods, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GT'S LIVING FOODS, LLC <br><br> Defendant. | Case No.: 2:19-cv-10920-FMO (GJS) <br><br> **DEFENDANT GT'S LIVING FOODS, LLC'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES** <br><br> ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*** <br><br> Judge:  Hon. Fernando M. Olguin |

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**PROPOUNDING PARTY:**     Plaintiffs Delaney Sharpe, Erin Weiler, Jenna Leder, and Adriana DiGennaro

**RESPONDING PARTY:**     Defendant GT's Living Foods, LLC

**SET NO.:**     First (1)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant GT's Living Foods, LLC ("GT's") hereby responds and objects to the First Set of Special Interrogatories (the "Interrogatories") propounded by Plaintiffs Delaney Sharpe, Erin Weiler, Jenna Leder, and Adriana DiGennaro ("Plaintiffs") as follows:

## PRELIMINARY STATEMENT

No incidental or implied admissions are intended by the responses herein. The fact that GT's responds to or objects to any of the Interrogatories should not be construed as an admission that GT's accepts or admits the existence of any facts assumed by such Interrogatory, or that such response or objection constitutes admissible evidence as to any such assumed facts.

As of the date of these responses, GT's has not completed its investigation of the facts relating to this action, has not completed discovery in this action, and has not completed its preparation for trial. Accordingly, the objections and responses set forth below are preliminary and are based solely on such information and documentation as is presently available and specifically known to GT's after having made a diligent search and reasonable and good faith inquiry, and are made without prejudice to GT's right to: (1) amend, alter, supplement, clarify, or otherwise modify these objections and responses as this matter proceeds; (2) make use of, or introduce at any hearing or trial, any documents, information, facts, evidence, and legal theories which are subsequently discovered or which are now known but the relevance, significance, or applicability of which has not yet been ascertained; and (3) offer expert witness opinions on any relevant matter, which opinions may vary from these objections and responses or the documents produced in response to the

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Interrogatories.  Furthermore, GT's responses are made without in any way intended to waive, but on the contrary, intending to preserve:

1.    The right to raise—as part of any subsequent proceeding in, or the trial of, this or any action—all questions of authenticity, foundation, relevancy, materiality, privilege, and admissibility as evidence for any purpose of any information provided in GT's responses to any portion of the Interrogatories;

2.    The right to object on any ground—as part of any subsequent proceeding in, or the trial of, this or any other action—to the use of any information provided in GT's responses to any portion of the Interrogatories; and

3.    The right to object to introduction into evidence of any of these responses.

Furthermore, GT's notes the difficulty in compiling responsive documents and information in response to the Interrogatories given the operational problems and obstacles caused by COVID-19.  Accordingly, GT's responses are limited to the information readily available.  GT's will conduct a reasonable investigation and provide supplemental responses accounting for additional responsive information, to the extent it exists, when possible.

## GENERAL OBJECTIONS

The following General Objections are incorporated into each of GT's responses, whether or not restated specifically in each response:

1.    GT's objects to each Interrogatory to the extent that it seeks information or identification of documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, or any other applicable privilege, protection, doctrine, or immunity, including those pertaining to trade secrets and other confidential material.  Nothing contained in these responses is intended as, or shall in any way be deemed, a waiver of any applicable privilege or protection.  In responding to these Interrogatories, GT's will interpret each Interrogatory as excluding information and documents subject to any

2

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

such privilege.

2.     GT's objects to each Interrogatory to the extent that it calls for information or documents held by GT's subject to an obligation of confidentiality owed toward third parties.  GT's will not produce any such information or documents except with the permission of affected third parties and/or following entry of an appropriate protective order governing its disclosure, dissemination, and use.

3.     GT's objects to each Interrogatory to the extent that it seeks disclosure of information that is publicly available, is equally or more readily accessible to Plaintiffs, or is obtainable from other sources that are more convenient, less burdensome, or less expensive.

4.     GT's objects to the Interrogatories to the extent that they purport to require a search for and production of documents or information that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5.     GT's objects to the Interrogatories to the extent that they are overbroad or unduly burdensome.

6.     GT's objects to the Interrogatories to the extent that seek information that is not likely to lead to the discovery of admissible evidence.

7.     GT's objects to the Interrogatories, including Plaintiffs' purported "Definitions," to the extent that they purport to impose obligations on GT's inconsistent with or unauthorized by the Federal Rules of Civil Procedure, the Local Rules and orders of this Court, or any other applicable law.  GT's will not comply with any such unauthorized or inconsistent definitions incorporated into the Interrogatories.

3

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

8.      GT's objects to Plaintiffs' "Definitions" to the extent that they purport to give meaning to words different from their ordinary English meaning or from definitions set forth in applicable statutes or rules on the ground that each such "Definition" is unduly burdensome and oppressive.  GT's will interpret terms used in the Interrogatories according to their ordinary and/or statutory usage, if different from Plaintiffs' "Definitions."

9.      GT's discovery, investigation, and evaluation in this matter are ongoing.  GT's responses are based on its review to date, which is not yet complete. GT's reserves the right to revise correct, supplement, or clarify its responses and its productions at any time pursuant to Federal Rule of Civil Procedure 26(e).

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 1:

IDENTIFY ALL PERSONS with knowledge concerning any testing of the alcohol or sugar content of GT KOMBUCHA.

### RESPONSE TO INTERROGATORY NO. 1:

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.  GT's further objects to the extent this Interrogatory seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's has conducted a reasonable and good faith effort to respond to this Interrogatory and, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0000002 – GT-SHARPE-0001450 and GT-SHARPE-

4

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

0001485 – GT-SHARPE-0001608, from which information responsive to this Interrogatory may be ascertained.  GT's does not possess information sufficient to respond to this Interrogatory to the extent it seeks information regarding tests that were not conducted at the direction of GT's.  In addition to the laboratories reflected in the aforementioned documents, GT's identifies George Thomas Dave and Angel Osuna, who can be contacted through counsel for GT's.

**INTERROGATORY NO. 2:**

IDENTIFY ALL persons (including laboratories) that have tested the alcohol and sugar content of GT KOMBUCHA, including the date and time of such tests.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.  GT's further objects to the extent this Interrogatory seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows:   GT's has conducted a reasonable and good faith effort to respond to this Interrogatory and, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0000002 – GT-SHARPE-0001450 and GT-SHARPE-0001485 – GT-SHARPE-0001608, from which information responsive to this Interrogatory may be ascertained.  GT's does not possess information sufficient to respond to this Interrogatory to the extent it seeks information regarding tests that were not conducted at the direction of GT's.

5

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 3:**

For each person and test identified in response to Interrogatory No. 2, IDENTIFY the methodology used to conduct the testing and the source of the GT KOMBUCHA (store-bought, shipped from factory, internal testing, etc.).

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine. GT's further objects to the extent this Interrogatory seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's has conducted a reasonable and good faith effort to respond to this Interrogatory and, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0000002 – GT-SHARPE-0001450 and GT-SHARPE-0001485 – GT-SHARPE-0001608, from which information responsive to this Interrogatory may be ascertained. GT's does not possess information sufficient to respond to this Interrogatory to the extent it seeks information regarding tests that were not conducted at the direction of GT's.

**INTERROGATORY NO. 4[1]:**

IDENTIFY EACH wholesale or retail outlet (including, but not limited to, stores, outlet stores, AND online businesses) that sells OR has sold GT KOMBUCHA.

---

[1] Plaintiffs appear to have inadvertently repeated the numbering of Interrogatories Nos. 1–3 in their request. Defendant has corrected this error by renumbering the interrogatories to avoid confusion going forward.

6

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's specifically objects to this Interrogatory because the undefined term "wholesale or retail outlet" is vague and ambiguous and renders this Interrogatory further overbroad.  GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, GT's responds as follows:   GT's has made a reasonable and good faith effort to respond to this Interrogatory, but does not possess information sufficient to identify each wholesale or retail outlet that sold GT KOMBUCHA to consumers during any periods from February 28, 2017 to the present.  However, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT's website, www.gtslivingfoods.com, which contains a third-party store locator—which functions based on data and processes not within GT's possession, custody or control—from which information regarding retail outlets that sell GT KOMBUCHA may be ascertained.

**INTERROGATORY NO. 5:**

State YOUR gross revenue from the sale of GT KOMBUCHA, by flavor, in the United States, state-by-state since its introduction to the market, on a monthly basis.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e.,

7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 28, 2017 to the present).  GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, GT's responds as follows: Because GT's sells its products to a variety of distributors rather than directly to retailers, GT's does not, in the ordinary course of business, track the final retail destinations of its Enlightened Products or record its revenues on a state-by-state basis.

Nonetheless, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0001484, from which an estimate of GT's gross revenue attributed to each flavor of GT's Enlightened products that GT's sold wholesale to distributors located in, or known to be selling in, California from February 28, 2017 to the end of 2019 can be derived.  The figures set forth in GT-SHARPE-0001484 are estimates that likely overstate GT's revenue in California because it is based on total Enlightened sales to distributors who can and do sell Enlightened products to retailers in both California and elsewhere.

Given the operational problems and obstacles caused by COVID-19, which have been discussed between the parties during the meet-and-confer process, GT's has not yet had the ability to conduct a further reasonable investigation for responsive information concerning GT's business outside California.  GT's will conduct a reasonable investigation and provide supplemental responses accounting for additional responsive information, to the extent it exists and is reasonably ascertainable, when possible.

**INTERROGATORY NO. 6:**

State the number of bottles of GT KOMBUCHA, by flavor, sold in the United States, state-by-state since its introduction to the market, on a monthly basis.

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine. GT's specifically objects to this Interrogatory to the extent that it seeks information in the possession of third parties.

Subject to and without waiving the foregoing objections, GT's responds as follows: Because GT's sells its products to a variety of distributors rather than directly to retailers, GT's does not, in the ordinary course of business, track the final retail destinations of its Enlightened Products or record the number of bottles of GT KOMBUCHA sold on a state-by-state basis.

Nonetheless, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0002038, which reflects an estimate of the number of cases, generally consisting of 12 bottles per case, of GT's Enlightened products that GT's sold wholesale to distributors located in, or known to be selling in, California from February 28, 2017 to the end of 2019. The figures set forth in GT-SHARPE-0002038 are estimates that likely overstate the actual number of bottles sold wholesale in California because it is based on total Enlightened sales to distributors who can and do sell Enlightened products to retailers in both California and elsewhere.

Additionally, GT KOMBUCHA is sold retail at thousands of sales locations across the country and GT's does not possess sales information for these locations. GT's therefore does not possess information sufficient to state the number of bottles sold retail in each state for each flavor of GT KOMBUCHA from February 28, 2017 to the present.

9

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Given the operational problems and obstacles caused by COVID-19, which have been discussed between the parties during the meet-and-confer process, GT's has not yet had the ability to conduct a further reasonable investigation for responsive information concerning GT's business outside California.  GT's will conduct a reasonable investigation and provide supplemental responses accounting for additional responsive information, to the extent it exists and is reasonably ascertainable, when possible.

**INTERROGATORY NO. 7:**

IDENTIFY ALL alcohol tests of GT KOMBUCHA that tested bottles of GT KOMBUCHA purchased from retail locations (as opposed to shipped from the manufacturer), including the date of such tests, the persons that performed such tests, and the methodology used to perform such tests.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's specifically objects to this Interrogatory because the undefined term "retail locations" is vague and ambiguous and renders this Interrogatory further overbroad.  GT's further objects to this Interrogatory to the extent it seeks third parties' information outside of GT's possession, custody, or control.  GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's has conducted a reasonable and good faith effort to respond to this Interrogatory and, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0000002 – GT-SHARPE-0001450, from which alcohol

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

test results conducted at the direction of GT's may be ascertained.  GT's does not possess information sufficient to respond to this Interrogatory to the extent it seeks information regarding alcohol tests that were not conducted at the direction of GT's.

**INTERROGATORY NO. 8:**

For each of the LABELS or packaging produced by YOU in response to Plaintiffs' Requests for Production (Set One) served upon YOU, IDENTIFY the time period (including DATES) each LABEL or packaging was used on each of the GT KOMBUCHA flavors.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's will meet and confer with Plaintiffs to address how this Interrogatory may be limited and/or clarified to (i) seek information that is relevant to the claims or defenses in this litigation or is reasonably calculated to lead to the discovery of admissible evidence; and (ii) avoid placing an undue burden on GT's.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Subject to and without waiving the foregoing objections, GT's further responds as follows: In accordance with the parties' meet-and-confer discussions concerning this Interrogatory, GT's states that the label used for each of the flavors in its Enlightened/Synergy line of kombucha products (including those flavors newly introduced during the putative class period) has remained materially identical since February 28, 2017 with regard to the flavor-specific label's disclosure of the presence of alcohol and the amount of sugar in each serving, which varied (depending on the flavor) from 6g to 10g per 8 oz. serving (or, 12g to 20g per bottle)

11

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

as shown on the label. In particular, throughout the entirety of the class period, each flavor's label states, "Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs." Pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0001451 – GT-SHARPE-0001482, and GT-SHARPE-0005705 – GT-SHARPE-0005729, from which the sugar content disclosed for each serving of each flavor of GT's Enlightened/Synergy kombucha, as well as the alcohol warning described above, may be ascertained.

**INTERROGATORY NO. 9:**

IDENTIFY EACH ingredient and the amount in GT KOMBUCHA, for each flavor, since its introduction to the market.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine. GT's specifically objects to this Interrogatory to the extent that it seeks disclosure of information that is publicly available, is equally or more readily accessible to Plaintiffs, or is obtainable from other sources that are more convenient, less burdensome, or less expensive. GT's specifically objects to this Interrogatory to the extent that it seeks information or documents reflecting GT's trade secrets and/or proprietary and confidential information.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's will meet and confer with Plaintiffs to address how this Interrogatory may be limited and/or clarified to (i) seek information that is relevant to the claims or defenses in this litigation or is reasonably calculated to lead to the discovery of

12

admissible evidence; and (ii) avoid placing an undue burden on GT's or otherwise seeking GT's trade secrets and proprietary information.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

13

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



15

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 10:**

State the recommended and/or average retail price and wholesale price for units of GT KOMBUCHA, state-by-state, since its introduction on the market, on a monthly basis. Include the number of ounces in each unit listed in response to this interrogatory. If YOU contend that the recommended and/or average retail price and wholesale price differs OR has differed by region, date, retailer, OR flavor, IDENTIFY EACH recommended and/or average retail price and wholesale price for ANY such region, date, retailer, OR flavor.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.  GT's specifically objects to this Interrogatory to the extent that it seeks information in the possession of third parties.  GT's specifically objects to this Interrogatory because the undefined term "retailer" is vague and ambiguous and renders this Interrogatory further overbroad.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's has made a reasonable and good faith effort to respond to this Interrogatory, but given that the retail price varies across thousands of sales locations across the country and GT's does not possess price information for those locations, GT's does not possess information sufficient to state the average retail price of a bottle of GT KOMBUCHA sold state-by-state during all periods from February 28, 2017 to the present.  However, pursuant to Federal Rule of Civil Procedure 33(d), GT's directs Plaintiffs to GT-SHARPE-0002036 – GT-SHARPE-0002037, from

16

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

which the average wholesale price of a bottle of GT KOMBUCHA that GT's sold in California from February 28, 2017 to the present may be ascertained.

Given the operational problems and obstacles caused by COVID-19, which have been discussed between the parties during the meet-and-confer process, GT's has not yet had the ability to conduct a further reasonable investigation for responsive information concerning GT's business outside California. GT's will conduct a reasonable investigation and provide supplemental responses accounting for additional responsive information, to the extent it exists and is reasonably ascertainable, when possible.

**INTERROGATORY NO. 11:**

IDENTIFY all SKUs for GT KOMBUCHA sold within the United States.

**RESPONSE TO INTERROGATORY NO. 11:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).

Subject to and without waiving the foregoing objections, GT's responds as follows: Given the operational problems and obstacles caused by COVID-19, which have been discussed between the parties during the meet-and-confer process, GT's has not yet had the ability to conduct a reasonable investigation for responsive information. GT's will conduct a reasonable investigation and provide supplemental responses accounting for responsive information, to the extent it exists and is reasonably ascertainable, when possible.

**INTERROGATORY NO. 12:**

IDENTIFY ALL PERSONS with knowledge of the number of the sales and pricing of GT KOMBUCHA.

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving the general and specific objections, GT's responds as follows: The person most knowledgeable of the number of sales and pricing of GT KOMBUCHA from February 28, 2017 to the present is GT Dave, Chief Executive Officer at GT's Living Foods, LLC.

**INTERROGATORY NO. 13:**

IDENTIFY ALL market research, studies, surveys, or analyses that YOU considered or used to create any LABELING or marketing for GT KOMBUCHA, including but not limited to any pricing and consumer purchase analysis. For all consumer research, studies or surveys or market research identified, state the (i) the title of each survey or research study; (ii) when it was conducted (including DATES); (iii) who conducted it; (iv) where it was conducted; and (v) the purpose of the survey or research study.

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to its General Objections, GT's specifically objects to this Interrogatory as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's specifically objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or

18

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the attorney work product doctrine.  GT's specifically objects to this Interrogatory to the extent that it seeks information in the possession of third parties.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's does not, in the ordinary course of business, conduct market research, studies, surveys, or analyses to create labeling or marketing for GT's Enlightened products.

Dated:       April 20, 2021          O'MELVENY & MYERS LLP


By: /s/ *Scott M. Voelz*
    Scott M. Voelz
    Zach A. Tafoya
    Attorneys for Defendant

19

DEFENDANT'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

## VERIFICATION

I, George Thomas Dave, am duly authorized by GT's Living Foods, LLC ("GT's") to execute this verification on its behalf. I have read the document listed below. To the best of my knowledge, information, and belief, and on the basis of information made available to me, the matters set forth in the document listed below are true and correct.

- **DEFENDANT GT'S LIVING FOODS, LLC'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 19 day of April, 2021.

George Thomas Dave
Chief Executive Officer
GT's Living Foods, LLC

1
VERIFICATION

Evid. Appx. Page 127

# EXHIBIT 12

**SILVERMAN
CONSULTING LLC**

## EXPERT REPORT OF BRUCE G. SILVERMAN

*DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO, on
Behalf of Themselves and All Others Similarly Situated,*

Plaintiffs,

v.

*GT'S LIVING FOODS, LLC.*

Defendant

United States District Court
Central District of California
Case No. 2:19-CV-10920-FMO-GJS

*June 2, 2021*

CONTAINS CONFIDENTIAL INFORMATION

SILVERMAN CONSULTING LLC
3168 DONA MEMA PLACE  STUDIO CITY CA 91604
TEL: 323-654-7659   MOBILE: 310-200-7670
BGSLA@ROADRUNNER.COM   WWW.BRUCESILVERMANCONSULTING.COM

## CONTENTS

I.      Introduction .............................................................................................2

II.     Qualifications .........................................................................................5

III.    Summary Of Opinions........................................................................12

IV.     The Challenged Products Are Labeled In Such A Manner That A
        Reasonable Consumer Would Be Convinced They Are Non-Alcoholic ..............13

V.      The Absence Of The Standard Government Warning Label Regarding
        Alcohol Content Would Be Material To A Reasonable Consumer ......................20

VI.     The "Please Note" Statement On The Label Of The Challenged Products
        Is Unlikely To Be Read By A Reasonable Consumer...........................................23

VII.    It Is Unreasonable To Expect Consumers To Seek Out Information On The
        Label That Might Be Seen To Contradict The Overall Impression That
        The Products Are Non-Alcoholic..........................................................................28

VIII.   The Understated Sugar Content On The Nutrition Facts Label Would Be
        Material To Consumers.........................................................................................30

IX.     If Consumers Had Been Made Aware That The Challenged Products
        Contained Alcohol And That Their Sugar Content Was Understated, Such
        Disclosure Would Have Adversely Affected Consumers' Willingness To
        Purchase The Products ..........................................................................................33

EXHIBIT "A".................................................................................................35

EXHIBIT "B".................................................................................................39

EXHIBIT "C".................................................................................................57

i

## I. INTRODUCTION

1.      My name is Bruce G. Silverman. I am an advertising expert retained by Plaintiffs' counsel in connection with the action styled *Delaney Sharpe, Erin Weiler, Jenna Leder, and Adriana DiGennaro, et al.* (hereafter "Plaintiffs") vs. *GT's Living Foods, LLC.,* (hereafter "GT's" or "Defendant"), Case No. 2:19-cv-10920-FMO-GJS, pending in the United States District Court for the Central District of California.

2.      Plaintiffs allege that Defendant "…has passed off millions of bottles of its wildly successful Enlightened Kombucha[1] beverages (hereafter "Enlightened Kombucha" or "The Challenged Products") as non-alcoholic, when, in fact, the beverages contain 18 to 442 percent more alcohol than the legal limit for non-alcoholic beverages."[2]  Plaintiff's further allege that Defendant knowingly omitted information as to the true alcohol content of its Enlightened Kombucha products because that would result in greater marketplace appeal, thus generating enhanced retail sales for its line of kombucha beverages.[3]

3.      Plaintiffs also allege that "Defendant greatly understates the sugar content of its Enlightened Kombucha beverages on the products' labels, making consumers believe the beverages are healthier than they really are. Independent testing shows that Defendant's

---

[1] Plaintiffs' Amended Complaint  states in Footnote 1, "Enlightened Kombucha refers to every flavor of Defendant's Enlightened Synergy and Enlightened Kombucha beverages sold nationwide, as described herein, including, but not limited to, the following flavors: Original, Gingerade, Lavender Love, Hibiscus Ginger, Lemonade, Multi-Green, Bilberry Blessing, Cayennade, Tantric Turmeric, Heart Beet, Golden Sage, Cucumber Mint Lime, Karma Citra, Koffee, Strawberry Lemonade, Pomegranate Power, Rose Berry, Pink Lady Basil, Watermelon Wonder, Trilogy, Mystic Mango, Cosmic Cranberry, Guava Goddess, Gingerberry, Passionberry Bliss, Strawberry Serenity, Cherry Chia, Grape Chia, Raspberry Chia, and Black Chia. The various flavors of Enlightened Kombucha are substantially identical other than their flavor profile, as each flavor is above the 0.5 percent alcohol by volume threshold and understates the amount of sugar in the beverages. None of the flavors has the requisite government warning required for alcoholic beverages."

[2] Plaintiff's Amended Complaint, ¶1.

[3] *Id.*

2

Enlightened Kombucha contains more than 15 percent more sugar than listed on the beverages' labels."[4]

4.     For purposes of this report I have assumed that the allegations stated in Plaintiff's Amended Class Action Complaint regarding alcohol and sugar content in the Challenged Products are correct.

5.     I have been asked to:

i.     Discuss the role product labeling plays in the consumer purchase decision process for beverages sold at retail outlets; and

ii.     Opine as to whether a reasonable consumer would view the Challenged Products as non-alcoholic; and

iii.    Opine as to whether buying a product that could expose a consumer to criminality would be material to a reasonable consumer, and whether a reasonable consumer would buy a product under such circumstances; and

iv.     Opine whether a reasonable consumer would purchase a product for which it was not possible to rely on its label concerning whether the product was alcoholic; and

v.     Opine as to the materiality of the absence of a government warning label regarding alcohol content[5] on the Challenged Products; and

---

[4] *Id*. ¶2.

[5] Defendant includes the following warning label on its "Classic" Kombucha products: "GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVEAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABIITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS." (Upper-case typography as it appears on Defendant's "Original" Kombucha labels.)

3

vi.    Opine as to whether a reasonable consumer would read the "Please note" message that appears on the labels of the Challenged Products; and

vii.    Opine as to whether it is reasonable to expect consumers to seek out information on the Challenged Products that might be seen to contradict the overall impression that the products are non-alcoholic; and

viii.    Opine on the materiality of the understated sugar content on the Nutrition Facts label on the Challenged Products.

6.    My opinions and recommendations, as set forth herein, are based, among other things, on the following:

(a)    My 50 years of professional experience in the marketing-communication industry, as set forth in further detail below;

(b)    A review of the pleadings, exhibits, deposition transcripts, relevant websites and other materials listed in Exhibit "A," which is hereto attached;

(c)    A review of the product labels that appear on the Challenged Products;

(d)    A review of relevant academic and industry literature;

7.    A complete list of materials I relied on is attached hereto as Exhibit "A."

8.    My compensation for expert witness services is $575 per hour for meetings, telephone conferences, document review, research, and report writing. My fee for appearances at depositions, arbitrations, or trial is $5,000 (flat rate) per day. Additionally, I am to be compensated for travel and preparation expenses associated with my work on this case. My compensation is in no way contingent on the opinions I reach or the outcome of the case.

<div align="center">4</div>

## II. QUALIFICATIONS

9.      I am the owner and manager of Silverman Consulting LLC, an advertising and branding firm I founded in 2005 to provide advice and counsel to companies both in the U.S. and abroad engaged in marketing consumer goods and services. In addition, I have worked with law firms both as a consultant and as an expert witness on cases involving false and deceptive advertising, trademark and copyright infringement, branding, publicity rights, and advertising industry custom and practice. I have testified as an expert in federal courts in Arizona, California, Delaware, Florida, and Oregon, in state courts in California and Missouri, at arbitrations, and before the Copyright Royalty Judges of the Library of Congress.

10.     Attached as Exhibit "B" is a copy of my *curriculum vitae.* Also attached is Exhibit "C," a list of cases in which I have given sworn expert witness testimony during the past four years.

11.     My opinions are reflective of the accumulated knowledge and insights I have gained over the course of a 50-year career working at the highest levels in the "real world" of marketing, branding and advertising.

12.     After graduating with a Bachelor of Arts degree from Adelphi University (Garden City, New York) in 1966 and attending Albany (New York) Law School for one year, I began my advertising career at the Ogilvy & Mather agency ("O&M") in New York in late 1967. During my more than 13 years at O&M, I worked in the agency's offices in New York (twice), London, Houston, and Los Angeles. During much of that period, I was able to work side-by-side with advertising legend David Ogilvy, the agency's founder and

<div align="center">5</div>

one of the three most important advertising figures of the 20th century.[6] Under Mr. Ogilvy's tutelage, I became a copywriter, later a copy supervisor, eventually a creative director and finally, a member of the agency's Board of Directors and Senior Vice President/Executive Creative Director of the firm's flagship New York office.[7] At that time, O&M was the fifth-largest advertising agency in the world, serving such clients as American Express, Avon, British Travel Association, Campbell Soup Company (Pepperidge Farm, Swanson, et al.), General Foods (Maxwell House, Post Cereals, Country Time lemonade, et al.), Hershey's, IBM, Lever Brothers (Dove soap, Imperial margarine, et al.), Mattel, Mercedes-Benz, Merrill Lynch, Mountain Dew, Pepsi-Cola, Old Crow Bourbon Whiskey, Sears, Schaefer beer, Shell, Stolichnaya vodka, TWA, and the United States Travel Service.

13.     I later held C-level positions (Chief Creative Officer/Chief Operating Officer) at two other global agencies, Bozell & Jacobs (1981-1983), whose clients included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay, Pace Foods, Quaker Oats, Southwestern Bell, and Zale Corporation, and BBDO (1984-1986), whose clients included Apple, Dodge, Coldwell Banker, Pepsi-Cola, Sizzler, Vitel mineral water, and the Union

---

[6] David Mackenzie Ogilvy CBE (23 June 1911-21 July 1999) was founder of the global advertising firm Ogilvy & Mather. Mr. Ogilvy was made a Commander of the Order of the British Empire in 1967, elected to the U.S. Advertising Hall of Fame in 1977, and to France's Order of Arts and Letters in 1990.

[7] Executive Creative Director, or Chief Creative Officer as it is sometimes called, is the highest-ranking position in the creative department of an advertising agency. He or she is responsible for the development, production, and ultimately, the effectiveness of all creative materials (i.e., television and radio commercials, magazine and newspaper ads, billboards, on-line advertising, etc.) provided to the agency's clients. The Executive Creative Director manages the agency's creative department, which often includes a number of Group Creative Directors and their respective teams of copywriters, art directors, designers, and producers. During the period I was Executive Creative Director of O&M New York, the creative staff included more than 200 professionals and accounted for more than one-third of the agency's salary expense.

Evid. Appx. Page 135

Bank of California. My responsibilities at those agencies included oversight of *all* client-service functions, including the account management and media departments, as well as the creative teams.

14. In 1986, I joined the Asher/Gould agency in Los Angeles as co-owner and President. Asher/Gould grew from $10 million to $160 million in annual billings during my tenure there, becoming one of the largest privately-owned advertising agencies in the country. Our clients included Avery Dennison (office products), Baskin-Robbins, the California Department of Health Services, HBO, MGM Grand Resorts, more than a dozen alcoholic and non-alcoholic beverages produced and marketed by the Pabst Brewing Company, Pizza Hut, Sanyo, Sheraton hotels, Sun America (financial services), and Suzuki cars and trucks.

15. Throughout the period I worked at O&M, Bozell, BBDO, and Asher/Gould, I continued to be deeply involved in the creation and production of television and radio commercials, magazine and newspaper advertisements, out-of-home ads (e.g., billboards, transit ads, etc.), and point-of-sale materials.

16. In 1997, I was appointed President/CEO of the principal U.S. unit of Initiative, then the largest ($22 billion in annual billings) media planning and media buying agency in the world. During the period I led the agency (1997-2002), we served more than 500 clients, including American Honda's Acura division, Albertson's, American Airlines, Bell South, Carl's Jr, Chevrolet, The Walt Disney Company, The Home Depot, Johnson & Johnson, Kroger's Ralphs and Fry's divisions, the Las Vegas Convention & Visitor's Authority, Safeway, Six Flags, Taco Bell, the United States Navy Recruiting Command, and Unilever.

Evid. Appx. Page 136

17.     In 2002, longing to return to my creative roots, I joined Wong Doody, a top 100, privately-owned, full-service agency with offices in Seattle and Los Angeles, as a partner and President. The agency's clients included Alaska Airlines, Alpine Electronics, Autodesk (architectural and engineering software), Clif Bar, Inc., the Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, T-Mobile, Van Gogh vodka, and the UCLA/Anderson School of Management.

18.     As previously noted, I founded Silverman Consulting LLC in 2005. In addition to its consulting services, it has provided both creative and media services typically offered by advertising and media planning/buying agencies to a significant number of domestic and international clients, including two of the largest healthcare systems in America, a major university, multi-state retail chains, professional service providers, the largest supermarket chain in the United Kingdom, real estate developers and independent motion picture producers.

19.     A list of clients I served during and after my advertising agency career is included in my CV (Exhibit "B").

20.     Advertising practitioners are most typically recognized within the industry for the campaigns they helped create. I coined the tagline "Don't Leave Home Without It" for American Express, which it employed as its global slogan for nearly 20 years. My "Bullish on America" campaign helped transform Merrill Lynch's reputation from that of a big retail wire house into an innovative provider of a broad range of financial services and inspired its famous ⬚ logo.  I helped American consumers rethink their opinion of Mercedes-Benz automobiles by advertising them as "Engineered Like No Other Car in the World." (At that time, advertising for American luxury cars such as Cadillac, Chrysler Imperial, and Lincoln Continental focused almost entirely on styling; the bigger the tailfins

<div align="center">8</div>

the better!) My global "Shell Answer Man" campaign de-commoditized Shell gasoline, helping propel the company to market leadership in the United States for more than a decade. I created advertising that ridiculed a salsa made in "Nooo Yawk Ciddy," which resulted in Pace Picante Sauce, then marketed by a tiny company in San Antonio, becoming one of America's best-selling condiments. I am particularly proud of the role I played in the strategic development and implementation of the State of California's ground-breaking tobacco-use prevention marketing campaign. It is credited with saving hundreds of thousands of lives and more than a half-trillion dollars in healthcare costs.[8]

21.     Hundreds of the advertisements I authored have been published in consumer and business magazines, newspapers, billboards, and on websites. I also wrote and produced more than one thousand national, regional, and local television and radio commercials, many of which have been referenced in popular books about advertising or advertising textbooks written by leading academics.

22.     As noted in my CV, I have helped promote close to two dozen alcoholic and non-alcoholic beverage products, including Pabst Blue Ribbon, Hamm's and Olympia beers, Ballantine Ale, Olde English 800 Malt Liquor, Old Crow bourbon, Stolichnaya vodka, Sebastiani and M. Lamont wines, Pepsi-Cola, Pepsi-Light, and Mountain Dew soft drinks and Vitel mineral water. My experience in the beverage sector has informed my opinions in this matter,

23.     I  have been the recipient of virtually every significant award for creativity and advertising effectiveness offered by the advertising industry, including twice winning

---

[8] James Lightwood, et al., *Health Care Cost Saving Attributable to the California Tobacco Control Program, 1989 to 2018 (Final Report)*, Dep't of Clinical Pharmacy, Sch. of Pharmacy, Univ. of Cal, San Francisco (Jul. 26, 2020), available at https://escholarship.org/uc/item/53b9b8fz (last visited April 25, 2021).

Evid. Appx. Page 138

a Gold Lion at the Cannes International Advertising Festival, the "Oscar" of the advertising business. I have also been the recipient of three American Marketing Association "Effie" awards, which recognizes campaigns that are most effective at driving sales.

24.    I served on the Board of Directors of the American Association of Advertising Agencies (the principal trade association of the advertising industry) and on the boards of the Los Angeles Advertising Agency Association, the Dallas Advertising Club, and the Houston Advertising Federation. I am also a long-standing member of the commercials peer group of The Television Academy (the "Emmys" organization).

25.    I have taught advertising at Pepperdine University and the University of California, Los Angeles (UCLA) Extension, where I also served for five years as a member of the Dean's Board of Advisors. In addition, I have guest-lectured on advertising at many of America's top colleges and universities, including Arizona State University, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Houston, University of Southern California, University of Texas, and the Thunderbird School of Management.

26.    I have been interviewed by *The New York Times*, *The Chicago Tribune, The Los Angeles Times, The Washington Post, The Wall Street Journal*, *The New Yorker,* and many other newspapers and magazines, as well as by on-air personalities at television and radio networks and stations about issues involving advertising, branding, and media.

27.    I have studied consumer purchasing behavior for more than five decades, and I am considered an expert in that field. While I have found academic studies of consumer behavior to be applicable, as a practical matter, my real-world experience as an advertising professional has proven to be far more useful.

10

28.     One of the keys to creating effective advertising campaigns is to "walk in the consumer's shoes" – to do everything possible to understand how they learn, think and feel about the products and services they are considering purchasing. For that reason, advertisers and agencies spend millions of dollars annually on primary and secondary research studies that provide insights into what consumers understand and believe (or disbelieve) about the client's brand, its products, its competitors' products and, especially relevant to this matter, its packaging.

29.     In addition to deriving useful information from the thousands of proprietary quantitative studies I reviewed, I estimate that I have personally interviewed more than 5,000 consumers about advertising for products and services ranging from business jets to beer. Many of these interviews took place in the beverage aisles at supermarkets, drug stores, liquor stores and convenience stores, where I was also able to observe the shopping behavior of the customers. I have observed at least 3,500 focus group sessions as well, including sessions devoted entirely to the process by which consumers select beverage products. Every study I reviewed, every focus group I attended, every one-on-one interview I conducted and, of course, what I learned every day on the job as a working advertising and branding professional has cumulatively informed my knowledge of consumer purchasing behavior.

30.     Altogether, I have spent the better part of a half century having my feet held to the fire every day by some of the most important advertisers in the world. For these reasons, I believe I am qualified to opine on Defendant's labeling.

31.     My expert testimony has been accepted by a number of District Court judges including the Honorable Lucy H. Koh,  the Honorable William H. Orrick, and the Honorable Yvonne Gonzalez Rogers in their decisions certifying cases involving

<div align="center">11</div>

packaging statements, i.e., *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018); *Debbie Krommenhock, et al., v. Post Foods, LLC*, 2020 WL 1139582 at *20. (N.D. Cal. 2020) and *Thomas Bailey v. Rite Aid Corp.*, No. 4:18-cv-06926 YGR, 2021 U.S. Dist. LEXIS 81654 (N.D. Cal. Apr. 28, 2021).

### III. SUMMARY OF OPINIONS

32.    My opinions in this report can be summarized as follows:

i.    Product labeling is intended to convince consumers that the product will fulfill his or her needs or wants. In my opinion the Challenged Products are labeled in such a manner that a reasonable consumer would be convinced they are non-alcoholic;

ii.    The absence of the standard government warning label regarding alcohol content on the Challenged Products would be material to a reasonable consumer;

iii.    A consumer good that may expose a consumer to criminality would be material to a reasonable consumer;

iv.    A reasonable consumer would not buy the Challenged Products if he or she knew that doing so exposed him or her to criminal liability;

v.    A reasonable consumer would not buy the Challenged Products if he or she knew that he or she could not rely on whether the products are in fact alcoholic beverages;

vi.    A reasonable consumer would ignore the "Please note" copy that appears on the label of the Challenged Products;

vii.    It is unreasonable to expect consumers to seek out information on the label of the Challenged Products that might be seen to contradict the overall impression that the products are non-alcoholic;

12

viii.     The understated sugar content on the Nutrition Facts label of the Challenged Products would be material to consumers.

ix.     If consumers were made aware that the sugar content of the Challenged Products was understated, such disclosure would adversely affect consumer's willingness to purchase the products.

33.     My rationales for these opinions follow.

## IV. THE CHALLENGED PRODUCTS ARE LABELED IN SUCH A MANNER THAT A REASONABLE CONSUMER WOULD BE CONVINCED THEY ARE NON-ALCOHOLIC

34.     According to Geoffrey Hollows, a consultant at Heawood Research [in the U.K.], there are two aspects to packaging: "First, there is the physical function. Second, there is the psychological function and that is the one you have got to get right. It is at this unconscious level that consumers engage with a brand. Brand owners have long realized that they can sell a product by imbuing the brand with qualities that the consumer both recognizes and aspires to. Powerful brands are those that have successfully been able to reflect and influence a consumer's ideas, values and attitudes. It's what's on the outside…"[9]

35.     As is often true of clichés, the portrayal of packaging as a brand's "silent salesperson" is correct. After all, product labels are the last means of communication with consumers before a product is either placed in her or his shopping cart or passed by in favor of another product. Research conducted by the Point-of-Purchase Advertising International

---

[9] *See* https://www.marketingweek.com/2003/06/12/the-silent-salesman-2/?ct_5aa9aa1f33d68=5aa9aa1f33e0a. last visited 4/29/2021; Original spelling altered to reflect U.S. usage).

Evid. Appx. Page 142

trade association indicates that 76 percent of all product selections involve some final deliberations by consumers at the point of purchase.[10] The important role of packaging in the consumer purchasing decision is recognized in the classic marketing quote describing packaging as "the last five seconds of marketing" and "the first moment of truth."[11]

36.     In fact, a 2010 *Journal of the American Medical Association* (*JAMA)* article titled "Front-of-Package Food Labels; Public Health or Propaganda?" discussed research suggesting that "…consumers believe front-of-package claims, perceive them to be government-endorsed, and use them to ignore the Nutrition Facts Panel."[12]

37.     I was involved in dozens of packaging projects during my long agency career for many different kinds of products, including toys, condiments, automotive products such as motor oil and, relevant to this matter, beverages, including beer brands that offered both alcoholic and non-alcoholic versions. Not surprisingly, wherever possible, the best practice was to articulate the attribute(s) that consumers most needed or wanted to know on the package or, in the case of beverages, on the label of the bottle or can.

38.     I created advertising for more than 25 beer, ale, and malt liquor brands during my agency career, including all of the brewed products marketed by the Pabst

---

[10]     https://www.chiefmarketer.com/p-o-p-vital-as-more-shoppers-decide-in-store-study, last visited 4/29/2021.

[11] Hootstein, D. "Standing Out in the Aisles," *Marketing at Retail*, June 2007, 22-24, as quoted in Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik, *Advertising and Integrated Brand Promotion*, 2015 edition, at p. 322.

[12] Wansink B. "How do front and back package labels influence beliefs about health claims? Journal of Consumer Affairs, 2003; 37 (2): 305-316; FDA Consumer research on food labels, http:///www.fda.gov/FGood/ScienceResearch?ResearchAreas/ConsumeResearch/ucm080 407.htm., accessed January 24, 2010, as cited in JAMA, February 24, 2010, "Front-of-Package Food Labels, Public Health or Propaganda by Marion Nestle, PhD, PMH, David S. Ludwig, MD, PhD. (Hard copy available for review.)

Evid. Appx. Page 143

Brewing Company during the 11 years I headed the Asher/Gould agency. In addition to its flagship brand, Pabst Blue Ribbon ("PBR"), the company also marketed Pearl (very popular in Texas and Oklahoma), Hamm's (a leading brand in the upper Midwest), Olympia (#1 in Washington, Oregon and Idaho), and Falstaff (sadly, even then fading away in its core Midwest markets). In addition to the full-alcohol version of each brand, e.g., PBR, the product lineup for each included "Light" and non-alcoholic versions, e.g., Pabst Extra Light, Pabst Non-ALC, etc., as well.

39.    In addition to creating television and radio commercials, billboards and point-of-sale materials for Pabst, my agency, Asher/Gould, was also responsible for designing labels and consumer packaging for all its products. For the most part, our labeling work on Pabst's flagship brands was minimal; those products had long established label designs. So just about all we ever had to do with the PBR, Hamm's, Falstaff or Oly labels was to accommodate regulatory requirements, e.g., adding the government warning label to those products when it became required in 1988. But, for the most part, my team designed the labels for the company's "Light" and non-alcoholic products from scratch.

40.    As is typical in the beer businesses, the sub-brands were each distinctively labeled. While maintaining a "family look" was important from a branding standpoint, we knew consumers wanted to be able to quickly identify the version they wanted. We left no doubt as to the nature (alcoholic v. non-alcoholic) of each variety.



*Figure 1. Current Pabst Blue Ribbon NON-ALC and Pabst Extra Light labels.*

15

Beer shoppers are not inclined to dawdle in the beverage aisle.

41.    Just about every beverage marketer follows that basic approach, including Defendant.

42.    Defendant markets two lines of kombucha beverages. The products in its "Classic Kombucha" line are labeled and regulated as an alcoholic product.[13] The Classic line's labels prominently display the Government Warning message (aka Surgeon General's Warning) regarding alcohol [14] on their side panel. In addition, there are statements on the front surface of the label reading "ABV 0.5%+"[15] and "Must be 21+,"



*Figure 2. Bottle images as they appeared 5/7/2021 on the GT's Living Foods website.*

which in my experience would send a clear message to consumers that Defendant's Classic Kombucha is an alcoholic beverage. The Classic product's glass bottles are dark amber, and their caps are black.

---

[13] Statement of Uncontroverted Facts, Tortilla Factory, LLC, v. GT's Living Foods, United States District Court, Central District of California, Case No: 2:17-cv-FMO-GJS, at 6:P3.

[14] "GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVEAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABIITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS." (Upper-case typography as it appears on Defendant's labels.)

[15] ABV is an acronym for "Alcohol By Volume."

Evid. Appx. Page 145

43.    As illustrated in Figure 2, the Challenged Products, which currently are branded "Synergy," are available to consumers in clear glass bottles with white caps. They are marketed as non-alcoholic.[16]

44.    According to George Thomas Dave, who was deposed as Defendant's Rule 30(b)(6) designee, none of the Challenged Products have featured the surgeon general's warning regarding alcohol content during the class period on their labels.[17] When asked if the statements "Contains alcohol," "Must be 21+" ever appeared during the class period on the label of the Challenged Products, his response was "No." [18] When asked if a statement reading "Kombucha is a cultured tea that is low in alcohol, however federal law requires a warning statement on any product that may contain more than 0.5% of alcohol per volume" appears on the labels of the Challenged Products, Mr. Dave's answer was "No."[19] When asked if the Challenged Products had ever featured a neckband bearing the words "Over 21" (as did Defendant's Classic Kombucha products at one time), his answer was "No."[20] Each of these statements, however, did appear on the labels of the Classic Kombucha line to signal to consumers that the Classic line of products was alcoholic.

45.    **In my experience, given the fact that the Challenged Products do not and have not featured the government warning label, prominent statements that the products contain alcohol, or a statement that purchasers must be at least 21 to purchase them, a reasonable consumer would believe them to be non-alcoholic.**

---

[16] Statement of Uncontroverted Facts, Tortilla Factory, LLC, v. GT's Living Foods, at 6:P4.

[17] 30 (b) (6) deposition of George Thomas Dave, Volume I, February 26, 2021, 104:11-15.

[18] *Id.,* 123:25-124:7.

[19] *Id*, 124:17-125:2.

[20] *Id*, 132:21-23

17

**Further, a reasonable consumer would be able to easily differentiate Defendant's supposedly non-alcoholic products from its alcoholic products, even if they were displayed at retail in the same refrigerated case.**

46.     Defendant's advertising program further demonstrates that consumers were led to believe the Challenged Products were non-alcoholic. When asked if any of Defendant's social media advertisements disclosed the presence of alcohol in its Enlightened kombucha products, Mr. Dave's response was, "No."[21] He was asked if the company's digital display ads "…from February 2017 through the present disclose the presence of alcohol in Enlightened Kombucha." To this Mr. Dave also answered, "No."[22] He was asked if the print advertisements that had appeared in the *Los Angeles Times* and *New York Times* featuring the Challenged Products had disclosed the presence of alcohol in the products, his answer was also, "No."[23] Mr. Dave was also asked if the billboards Defendant had run in California, Oregon and Colorado featuring the Enlightened products had disclosed the presence of alcohol. His answer was "No."[24] Finally he was asked if Defendant's point-of-sale advertising for the Challenged Products disclosed the presence of alcohol. Again, his answer was "No."[25]

47.     Further, Mr. Dave testified that most retailers carrying the Challenged Products do not have an "age gate" for those products, and could not name a single retailer that actually had an "age gate."[26] And, even for the instances that Mr. Dave testified where

---

[21] *Dave,* 114:22-25.

[22] *Id*, 115:1-6.

[23] *Id,* 115:22-116:-1-17.

[24] *Id*, 116:18-117-10.

[25] *Id,* 122:7-10.

[26] *Id*, 120:11-121:17.

he thought there may be an "age gate," the "age gate" may have been for "18 or over," meaning that consumers under the age of 21 could still buy the Subject Products.[27]  None of the four Plaintiffs in this action were ever subjected to an "age gate," which included purchases at multiple stores in California, New York, New Jersey, Delaware, and Colorado.[28] And, I personally have never seen an "age gate" for the Challenged Products. In my experience, that would indicate to a reasonable consumer that the Challenged Products do not contain alcohol. It would also mean that the Challenged Products are available for sale to children, 'tweens and teens.

48.     GT's sells nine times as much Enlightened kombucha as its Classic kombucha.[29] In my opinion the primary reason for that sales disparity is easy to explain; consumers prefer what they believe to be the non-alcoholic version



*Figure 3. GT's Classic and Synergy products at Gelson's Supermarket, Encino, CA. 5/5/2021.*

of GT's kombucha products. The flavor varieties in Defendant's Classic (alcoholic) line are similar to  those available in the supposedly non-alcoholic Enlightened/Synergy line, and in some instances the flavor names are even identical. As illustrated in Figure 3 the

---

[27] *Id*. 120:3-10.

[28] Plaintiffs' Amended Complaint, ¶¶ 5, 8, 11, 14.

[29] Statement of Uncontroverted Facts, Tortilla Factory, LLC, v. GT's Living Foods at 12:P24.

19

product lines often share shelf space in the same refrigerator case at retail. And they are identically priced.

## V. THE ABSENCE OF THE STANDARD GOVERNMENT WARNING LABEL REGARDING ALCOHOL CONTENT WOULD BE MATERIAL TO A REASONABLE CONSUMER

49.     Multiple academic studies have demonstrated that warning labels are an effective way to communicate cautionary messages to consumers. For example, a 2004 study by Jennifer J. Argo of the University of Alberta and Kelley J. Main of York University, both in Canada, reported that "…warning labels are effective in attracting consumers attention…" and that "…they appear to positively influence consumer behavior."[30] According to the Campaign for Tobacco-Free Kids, "Health warnings on cigarette packs have been found to inform smokers about the health hazards of smoking, encourage smokers to quit, and prevent nonsmokers from starting to smoke."[31] And studies conducted regarding the Surgeon General's warning label on alcohol products by the National Institute on Alcohol Abuse and Alcoholism and others conducted since 1999 have concluded that "…there was a general awareness of the label and its message."[32]

50.     In my experience, the presence of the federally required Government Warning Label is one of the key ways consumers are able to determine if a beverage contains alcohol or not.  If the label is present, the product contains alcohol; if it is not present, the product does not.

---

[30] Argo, Jennifer J. and Kelley J. Main (2004), "Meta-Analyses of the Effectiveness of Warning Labels," *Journal of Public Policy & Marketing*, 23 (2), 193-208.

[31] Tobacco Free Kids: "Tobacco Health Warnings: Evidence of Effectiveness."

[32] "Are alcohol warning signs and labels working? An examination of approaches and outcomes" by Sharon James Williams, Daniel Dubovsky, Jason Merritt, and Pamela Martine;  Alcohol Warnings (thearc.org), last visited 5/8/2021.

20

51.    The Challenged Products do not display the government warning label. To a reasonable consumer wanting to avoid purchasing a product that contains alcohol, the omission of the label would be material.

52.    I have observed thousands of consumers in the aisles of supermarkets through my work. In my experience, most consumers start out by seeking the product they want to purchase, then the brand they want, then the variety they want, and in the case of products that are available in more than one flavor, as is the case with the Challenged Products, the flavor they want. Many shoppers also check out the Nutrition Facts label that usually appears on the rear of beverage bottles, particularly for information regarding calories and sugar content. Some consumers read the ingredients list as well.

53.    In fact, one of the named Plaintiffs in this matter, Delaney Sharpe, testified at her deposition that she followed that exact routine when she first purchased one of the Challenged Products. When asked "What parts of the label did you read," she answered, "I read the name, the flavor, and the nutrition facts." She went on to say, "I wanted to know what it would taste like, generally, and how many calories it contained."[33]

54.    Later in her deposition Ms. Sharpe was asked a series of questions regarding her understanding of the amount of alcohol that might have been present in the Challenged Product the first time she purchased it. When asked if she knew the product contained alcohol, she replied, "I was under the impression it may contain trace amounts of alcohol," and went on to say "I believed it to be under the legal limit of requiring someone to be 21 and present ID."[34] (At the time Ms. Sharpe first purchased the Challenged Product she was underage.)

---

[33] Deposition of Delaney Sharpe, December 8, 2020, 25:17-25.

[34] Sharpe, 54:8-12.

21

55.     Ms. Sharpe was also asked about later purchases of the Challenged Products that she made at a Ralphs grocery store in West Hollywood, CA. Q: "Can you describe for me the beverage display that housed the GT's Enlightened products in that store?" A: "It's a refrigerated section with nonalcoholic drinks… branded as nonalcoholic."[35]  Ms. Sharpe specifically stated that "I would not have purchased it if it had the surgeon general's warning and required an ID."[36]

56.     Ironically, by purchasing one of the Challenged Product when she was under the age limit, it is my understanding that Ms. Sharpe was subject to being charged with a crime (a misdemeanor) for the purchase itself. And, if she consumed the Challenged Products and then drove, she could have faced far more serious consequences, including being prosecuted for a felony. She faced those risks because Defendant failed to display the surgeon general's warning on the label of the Challenged Products or market them as alcoholic beverages. And, like any reasonable consumer, if she knew of those risks prior to purchase, she would not have purchased the Products.

57.     The possibility of being charged with a crime, or of committing a criminal act, would be material to a reasonable consumer.

58.     **In my opinion, the absence of the Government Warning label on the Challenged Products would be material to a reasonable consumer, as it would indicate to him or her that the product did not contain alcohol at all, or if it did, that the percentage of alcohol would be so low that it would not require the surgeon general's warning label.**

---

[35] *Id,* 61:1-14.

[36] *Id*, 82:18-19.

22

59.      **In my opinion, reasonable consumers would not buy the Challenged Products if they knew that doing so exposed them to criminal liability. Reasonable consumers would also not buy the Challenged Products if they knew they could not trust that the Challenged Products were non-alcoholic beverages at the point of sale. Reasonable consumers would not gamble buying a product that *may*, *or may not be*, a "beer" or alcoholic beverage.**

## VI. THE "PLEASE NOTE" STATEMENT ON THE LABEL OF THE CHALLENGED PRODUCTS IS UNLIKELY TO BE READ BY A REASONABLE CONSUMER



*Figure 4.  GT's Enlightened Kombucha label, GT-SHARPE0001454.*

60.      In my experience, very few consumers take the time to read every word on labels of the products they buy; it would simply take too long for a busy shopper to do so.

61.      In addition to the logo, brand name and flavor name, the Challenged Product label illustrated above includes 20 separate copy blocks. It took me three minutes and 54 seconds to read every word, and I am a reasonably fast reader. It should also be noted that I read the label on my computer monitor, which enlarged Figure 4 to fifteen and

23

a half inches wide, nearly triple the size of the image as on shown on the previous page or double the size of an actual label. It would be far more difficult to read the copy on an actual bottle where the typography would be much smaller, especially in a retail environment.

62.    At her deposition Ms. Sharpe was asked a series of questions about a statement that appears in rather small print on the side panel of the Challenged Products label. Defendant's counsel read it into the record, starting with "Do you recognize this label," to which she answered yes. "Obviously its, you know, flat and not on a bottle, so it's slightly different. Take a look at – there's a section below the nutrition facts just above the bar code that starts with, 'Please note.' And I'm just going to read it into the record and let me know if I mistake anything. 'Please note Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities or religious beliefs.'" He then asked if she had read it when she first purchased the Challenged Product. Her answer was "No."[37]

63.    Ms. Sharpe's answer does not surprise me, especially when one considers where that message is located on the Challenged Products. Defendant's counsel showed

―――――――――――――――

[37] Sharpe, 69:22-70:13.

24

her a copy of the label image similar to that shown above in Figure 4, which he described as "slightly different" than what she would have seen at the store. But the image he showed is NOT "slightly different." The bottles are curved. The "Please note" message on the bottle is on a side panel and generally not visible at retail when the bottles are properly merchandised.

64.    As illustrated in Figure 5, Defendant's "Please note" message is located at the very bottom of a column of text on the side panel. It is directly below the Ingredients paragraph, which is below the information on probiotics, which in turn is below the Nutrition Facts label, all of which are displayed on a curved surface.

65.    In my experience, it is highly unlikely that a reasonable consumer would bother to read the "Please note" information, as it is not placed or formatted to stand out as is the government warning label that appears on Defendant's Classic Kombucha products.



*Figure 5. Actual size Synergy Kombucha label.  Photo: 5/12/2021/*

25

66.     As illustrated in Figure 6, that label includes a **BOLD FACE** warning, and the copy is set in a large, all UPPERCASE font. Further, it is placed at the top of the column, not the bottom.



*Figure 6. GT's Classic (alcoholic) Kombucha bottle with government warning label.*

67.     Another named Plaintiff, Ms. Jenna Leder, also testified that when she first purchased a kombucha product (not necessarily one of the Challenged Products) she read the key parts of the label, "…like the front that says what it is and I always read the nutrition information and the ingredients."[38] She was also asked if she had read the "Please note" copy when she first purchased one of the Challenged Products. Her answer: "I just don't remember reading it."[39] Ms. Leder was later asked, "If you had read this, especially if it identifies sensitivities as a reason not to consume it, do you think you would have purchased the product?" Ms. Leder's response was, "I can't be sure, but I also did not see a government warning, so I believed it to be safe."[40]

68.     Another named Plaintiff, Erin Weiler, testified that it was her practice to read the nutrition facts label and ingredients information on labels when she first purchased a product.[41] When asked if she recalled reading the "Please note" copy on the label of the Challenged Products she had purchased, her answer was, "No." When asked, "Reading this

---

[38] Deposition of Jenna Leder, December 4, 2020, 25:4-5.

[39] *Id,* 103:16-24,

[40] *Id*. 106-6-14.

[41] Deposition of Erin Weiler, December 12, 2020, 32:20-23.

26

now, what do you understand it to mean," her response was "I don't exactly know what it means."[42]

69.    Ms. Adriana DiGennaro is also a named Plaintiff in this matter. At her deposition she testified that she read the key parts of the label the first time she purchased one of the Challenged Products, i.e., the product's name, flavor, and the nutrition label.[43] Referring to the "Please note" copy discussed above, she was asked if she had "…ever read this warning in purchasing GT's Enlightened products?" Her answer: "I have not."[44]

70.    I was struck by Defendant's counsel's use of the use of the word "warning" in his question to Ms. Leder. Speaking as a copywriter who was taught to be as clear as possible when communicating cautionary information to consumers, the phrase "Please note" simply does not signal a warning message. That, in and of itself, would make the copy that follows much less than likely to be read by a reasonable consumer than say, the warning message that appears on the labels of Defendant's Classic Kombucha products which is headed, unambiguously, in a bold face upper case type, "**GOVERNMENT WARNING**." The word "Warning" does not appear anywhere on the label of the Challenged Products.

71.    Further, the "Please note" paragraph is set in a tiny font. It has been my experience that consumers avoid reading "the fine print," even on important legal documents such as car lease contracts.

72.    I have learned that the predicate for the "Please note" message was a supposed "warning label" Defendant had agreed to include on the label of the Challenged

---

[42] Weiler, 95:23-94:6.

[43] Deposition of Adriana DiGennaro, February 19, 2021, 29:24-31:4.

[44] *Id*. 93:7-9.

27

Products as part of the settlement agreement in a pair of earlier class action cases. [45] As previously discussed, I believe that a reasonable consumer would not see the phrase "Please note" as a warning label. It is a passive statement. Further, the settlement agreement did not specify how the message was to be displayed, i.e., where it must be placed on the label, the minimum font size for copy, whether the copy had to be set in upper or lower case, whether it should be set in a bold or standard face, whether color should be used or not, whether it should be boxed off for emphasis purposes, etc. The settlement also did not have a requirement for how the message would be introduced, *i.e.*, by a word such as "Warning" as opposed to Defendant's chosen, "Please note." Given its obscure location on the label, tiny font size, a lack of a graphic treatment that would signal its importance, and the use of "Please note" (instead of "Warning") to introduce the message, it appears to me that Defendant did all it could do to make sure the "Please note" message would *not* be read by consumers at all.

## VII.  IT IS UNREASONABLE TO EXPECT CONSUMERS TO SEEK OUT INFORMATION ON THE LABEL THAT MIGHT BE SEEN TO CONTRADICT THE OVERALL IMPRESSION THAT THE PRODUCTS ARE NON-ALCOHOLIC

73.     As previously discussed, it is my opinion that a reasonable consumer would believe Defendant's Synergy/Enlightened beverages to be non-alcoholic products. The front panel of its label does not display a "Contains Alcohol" statement nor a "Must be 21+ to purchase" statement like those that appear on the labels of Defendant's Classic

---

[45] Jonathan Retta et al. v. Millennium Products, Inc. et al, and Nina Pedro et al. v. Millennium Products Inc., et al., United States District Court, Central District of California, CV14-1801 PSG AJWx and CV16-3780 PSG AJWx, Order Granting the Motions for Final Approval of Class Action Settlement, Attorneys' Fees and Costs, and Class Representative Incentive Awards, at page 3.

Kombucha products as well as on the labels of competing kombucha products that contain alcohol. Nor does it include the government warning label regarding alcohol content that is found on alcoholic kombuchas as well as other malt and fermented beverages such as beer, ale, malt liquors and wines.

74.    In my experience, consumers trust brands they are familiar with, and especially, brands that dominate a category. Research by Edelman Public Relations, the largest privately owned PR firm in the world, indicates that brands that deliver quality products or services, receive good ratings and reviews, charge fair prices, and treat its consumers and others well are considered trust-worthy by consumers. [46] And the International Food Information Council (IFIC) reported in its 2019 annual survey report that "Trust in a brand had a major impact on the purchasing decisions of 30% of consumers (with 70% saying it had at least some impact), only slightly behind price at 33% (with 68% saying price had at least some impact)."[47]

75.    Given its longevity and marketplace success, I believe it is fair to say Defendant's brand and products are, rightfully or not, trusted by consumers.

76.    Mr. Dave, the company's founder and its current CEO, first began making and marketing kombucha products in 1995. In 2017 the company's name was changed from Millennium Products to GT's Living Foods.  The "Enlightened" product line (i.e., the supposedly non-alcoholic products) was introduced in 2010.  Mr. Dave testified that it now represents 80 to 90 percent of the company's sales.[48]

---

[46] Brand Trust is More Important Than Ever for Consumers - Business 2 Community, last visited 5/2/2021.

[47] https://foodinsight.org/interest-in-sustainability-plant-based-diets-among-trends-in-ific-foundation-2019-food-and-health-survey, last visited 5/3/2021.

[48] Dave, 211:3-9.

29

77.     According to an article published in *Forbes* Daily Cover (online edition) in 2019, GT's is the biggest kombucha manufacturer in the country, owning 40% of the U.S. market. It produces more than a million gallons of its Original and Enlightened products each year.[49] The Challenged Products are sold in all 50 states.[50] And, given Defendant's market share, the Challenged Products dominate the (refrigerated) kombucha shelves at retail as well.

78.     It is also important to note that Kombucha is a growing product category. According to Grand View Research and Statista, annual industry sales revenue will reach $1.5 billion by the end of 2021.[51] And Defendant is, by far, the category leader. These factors all point to GT's being a trusted brand.

79.     Therefore, in my opinion it is very unlikely that a reasonable consumer would see a need to search the label of the Challenged Products for disclaimers or other messages that may contradict everything they have come to know and believe about the brand and the product they are about to buy. Their objective is to fill their shopping cart, find a short line at a checkout counter, and move on with their lives.

## VIII. THE UNDERSTATED SUGAR CONTENT ON THE NUTRITION FACTS LABEL WOULD BE MATERIAL TO CONSUMERS

80.     I have been involved in marketing food products to consumers for close to half a century. I have created advertising for fresh eggs, frozen dinners, chocolate bars, salad dressings, nutrition and energy bars, ketchup, toaster pastries, salsa, avocados,

---

[49] https://www.forbes.com/sites/chloesorvino/2019/05/09/gt-dave-kombucha/?sh=1d5259b155b5, last visited 5/2/2021.

[50] Dave, 207:12.

[51] Grand View Research; Statista. 2016.

packaged salads, cookies and crackers, margarine and, most relevantly, both sugared and sugar-free soft drinks, sugar-heavy kid's cereals and lower-sugar level adult cereals, and even sugar free ice cream and yogurt.

81.     In my experience, when deciding on a branded food product or beverage, one of the most important factors today's consumers consider is *whether it tastes good* and whether or not they believe the product is good for them; in short, is it *healthy*. That is why advertisements for food products have touted health benefits for decades.

82.     One of the first accounts I ever worked on was Lever Brothers Imperial® Margarine. Like most margarines of that era, Imperial was primarily positioned as an alternative to butter that cost less but tasted just as good ("Flavor Fit for a King"). But over the years the "Fit for a King" campaign evolved as consumers became ever more aware of the health risks posed by saturated fats and high cholesterol; flavor became assumed while emphasis was placed on the product's health benefits.

83.     I later worked on the Jim Fixx campaign for Quaker Oats' 100% Natural Cereal® brand, which emphasized its contribution to a healthy lifestyle. (Fixx famously advocated the health benefits of jogging in his best-selling book *The Complete Book of Running*.) Consumers interpreted "Natural" to mean "healthier; better for you."

84.     Consumer concerns about health issues led to Baskin-Robbins promoting its sugar-free flavors and low-fat/no-fat frozen yogurt on television, as did Pizza Hut for its "Veggie" pizza and Swanson for its line of low-calorie frozen dinners. And the campaigns I created for the California Egg and California Avocado commissions both included nutritional benefit information.

85.     The proliferation of products labeled "natural," "organic," "gluten-free," and "no added sugar" on supermarket shelves are not there by accident. Consumers demand

them. Global sales of healthy food products are soaring. In fact, Nielsen's 2015 Global Health & Wellness Survey revealed that 88 percent of its respondents were willing to pay more for healthier foods.[52]

86.    The International Food Information Council's 2019 Food and Health Survey reported that nearly two-thirds (63%) of consumers said recognizing the ingredients that go into a product had at least some impact on their purchasing decisions. Further, it reported that 80 percent of consumers were taking multiple actions to limit sugar or avoid sugar in their diets, including drinking water instead of caloric beverages, eliminating certain foods and beverages from their diets, reducing the amount of carbs they consume, and using the Nutrition Facts label to choose products with less sugar.[53]

87.    Simply stated, most consumers see sugar – in all forms, be it naturally occurring or added – as a potential health threat. For diabetics, accurate information about the sugar content of a product is particularly important. (I can testify to that personally.) The data in the Nutrition Facts label are not meaningless numbers that manufacturers can play fast and loose with. The label is required for foods and beverages that are regulated by the Food and Drug Administration. I would assume it expects the information on the required labels to be accurate.

88.    **Based on the material discussed above, it is my opinion that a reasonable consumer would see the disparity between the sugar level reported on the Nutrition Facts label of the Challenged Products and their actual sugar level, as evidenced by Plaintiff's scientific experts, as material.**

---

[52] *Consumers Want Healthy Foods – And Will Pay More For Them*, by Nancy Gagliardi, *Forbes*, February 18, 2015, available at https://www.forbes.com/sites/nancygagliardi/2015/02/18/consumers-want-healthy-foods-and-will-pay-more-for-them/#5e4b9d4b75c5, last visited 5/3/2021.

[53] 2019 IFFC Survey, page 48.

## IX. IF CONSUMERS HAD BEEN MADE AWARE THAT THE CHALLENGED PRODUCTS CONTAINED ALCOHOL AND THAT THEIR SUGAR CONTENT WAS UNDERSTATED, SUCH DISCLOSURE WOULD HAVE ADVERSELY AFFECTED CONSUMERS' WILLINGNESS TO PURCHASE THE PRODUCTS

89.     In my experience, when consumers are confronted with the harsh reality that a product they like and use is not all it seems to be, they react with their wallets. For example, when consumers learned through press coverage that my former client American Suzuki's Samurai SUV was prone to roll-overs, sales plummeted from 68,000 in 1988 to 12,000 a year later.

90.     Similarly, despite heavy discounting, Volkswagen's world-wide sales dropped 24.7 percent in November 2015, shortly after the emissions-cheating scandal that hit the company became public.[54]

91.     In my opinion, consumers would not have purchased the Challenged Products had they come to know that they could not trust that the products are not alcoholic, and that their sugar content was overstated. Further, if consumers were to learn the truth about the products now, they would regret having ever purchasing them.

\*   \*   \*

92.     The opinions I have expressed herein are offered to a reasonable degree of certainty based on my experience as an advertising professional. I reserve the right to amend this report if I am provided with additional evidence obtained through further discovery or otherwise, or if any expert witness report is received and/or any related deposition taken.

---

[54]     https://www.usatoday.com/story/money/cars/2015/12/01/vw-volkswagen-emissions-scandal-sales-drop/76609404, last visited 5/4/2021.

33

93.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of June 2021 in Los Angeles, California.

_____
Bruce G. Silverman

34

# EXHIBIT "A"

Evid. Appx. Page 164

## EXHIBITS AND OTHER MATERIALS REVIEWED

**COURT DOCUMENTS**

- Filed Amended Complaint

- Jonathan Retta et al. v. Millennium Products, Inc. et al, and Nina Pedro et al. v. Millennium Products Inc., et al., United States District Court, Central District of California, CV15-1801 PSG AJWx and CV16-3780 PSG AJWx, Order Granting the Motions for Final Approval of Class Action Settlement, Attorneys' Fees and Costs, and Class Representative Incentive Awards

- Declaration of L. Timothy Fisher in Support of Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Action Settlement, Case No. 2:15-cv-01801, Dkt. No. 103-3

- Statement of Uncontroverted Facts, Tortilla Factory, LLC, v. GT's Living Foods, United States District Court, Central District of California, Case No: 2:17-cv-FMO-GJS

**LABEL GRAPHICS**

- Bates 9888-98896; Converted to 27 bottle/label images

**DEPOSITION TRANSCRIPTS – SHARPE v. GT'S LIVING FOODS**

- George Thomas Dave 30 (b) (6) February 26. 2021 deposition transcript and exhibits 15 and 16

- Plaintiff Jenna Leder, December 4, 2020

- Plaintiff Delaney Sharpe, December 8, 2020

- Plaintiff Adriana DiGennaro, February 19, 2021

- Plaintiff Erin Weiler, December 17, 2020

**DEPOSITION TRANSCRIPTS, ET AL. - RELATED CASES**

- George Thomas Dave, June 22, 2018 Tortilla Factory case deposition transcript

- George Thomas Dave, October 19, 2018 Tortilla Factory case deposition transcript and Exhibit 19, Kombucha Market Study

- John Hansen, September  6, 2019 Tortilla Factory case deposition transcript
- George Belch Expert Report and Deposition Transcript, Zamora v. GT's Living Foods Case
- Hal Poret Declaration in support of Defendant GT's Opposition to Plaintiffs' motion for Class Certification, Zamora v. Gt's Living Foods case; Expert Report and Appendices A-E

**REQUEST FOR ADMISSIONS, INTERROGATORIES, ETC.**

- (Bates 8064-8108) Defendant GT's Living Foods, LLC's Responses to Plaintiff's Request for Admission, Set One (2018.07.18).pdf
- 5.7.2020 Plaintiff DeGennaro, Weiler, Leder, and Sharpe Responses to Defendant GT's Living Goods LLC's Requests for Admission
- 5.7.2020 Plaintiff DeGennaro, Weiler, Leder, and Sharpe Responses to Defendant GT's Living Goods LLC's Requests for Production
- 5.7.2020 Plaintiff DeGennaro, Weiler, Leder, and Sharpe Responses to Defendant GT's Living Goods LLC's Interrogatories
- 2.9.2021 GT's Suppl. R&Os to First Requests for Admission.pdf
- 2.9.2021 GT's Suppl. R&Os to Second Interrogatories.pdf
- 4.20.2021 GT's Living Foods LLC's Third Supplemental Responses to First Interrogatories_Redacted.pdf

**STATISTICS AND INDEPENDENT SURVEY REPORTS**

- 2019 IFIC Food and Health Survey report
- 2020 IFIC Food and Health Survey report
- Statista: statistic_id251968_sales-growth-of-the-leading-refrigerated-fruit-drink-brands-in-the-us-2017.png
- Statista: statistic_id526417_us-sales-growth-of-refrigerated-kombucha-2018-by-channel.png

- Statista: statistic_id693723_kombucha_-us-market-revenue-by-sales-channel-2014-2024.png

- Statista: statistic_id972878_kombucha-and-fermented-beverages-sales-growth-in-us-2018-by-sales-channel (1).png

- Statista: statistic_id972878_kombucha-and-fermented-beverages-sales-growth-in-us-2018-by-sales-channel.png

**WEBSITES**

- www.gtslivingfoods.com
- KOMBUCHA: Overview, Uses, Side Effects, Precautions, Interactions, Dosing and Reviews (webmd.com)
- Kombucha tea: Does it have health benefits? - Mayo Clinic
- Other websites as listed in footnotes

**LEARNED AND INDUSTRY TEXTS, ARTICLES**

- David Ogilvy, *Ogilvy on Advertising*, New York, Crown Publishers, 1983
- Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik, *Advertising and Integrated Brand Promotion*, Fifth Edition, Cincinnati, OH, South-Western Cengate Publishing, 2009
- William F. Arens, Michael F. Weigold, Christian Arens, *Contemporary Advertising and Integrated Marketing Communications, 13th Edition,* New York, McGraw Hill Irwin, 2011

38

# EXHIBIT "B"

Evid. Appx. Page 168

**BRUCE G. SILVERMAN**
*CURRICULM VITAE*

| | |
|---|---|
| May 2005 – Present | **SILVERMAN CONSULTING LLC (Los Angeles)**<br>**Principal** |

Advertising and branding consultant to advertisers and advertising agencies in the U.S., Europe and Asia engaged in marketing consumer goods and services. Consultant and expert witness for law firms throughout the U.S. and U.K. on cases where false/misleading advertising, trademark infringement, advertising industry custom and practice, publicity rights and/or media are at issue.

January 2004 – April 2005    **WONG DOODY ADVERTISING (Los Angeles)**
**President and Partner**

Privately-owned, award-winning advertising agency with offices in Los Angeles and Seattle. Clients included Alaska Airlines, Alpine Electronics, Autodesk, Clif Bar, Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, UCLA/Anderson School of Management.

April 1997 – Dec. 2003    **INITIATIVE PARTNERS (Los Angeles)**
**President/CEO; Member, Initiative Worldwide Board**
**of Directors**

Principal U.S. unit of world's largest ($22BB+) advertising media planning and buying agency. Clients included Acura, Albertson's, Arco, Carl's Jr/Hardee's, Baskin-Robbins, Chevrolet, Cisco Systems, Intel, Walt Disney Company, E*Trade, The Home Depot, Johnson & Johnson, Kaiser-Permanente, Six Flags, Taco Bell, U.S. Navy Recruiting Command, Unilever, plus more than 100 advertising agencies operating throughout the United States and Canada.

January 86 – March '97     **ASHER/GOULD ADVERTISING, INC. (Los Angeles)**
**President, Chief Creative Officer, Chief Operating**
**Officer and Partner**

Privately-owned, top 100 advertising agency with offices in
Los Angeles and Las Vegas. Clients included American
Savings Bank, Avery Dennison, Baskin-Robbins, HBO,
ITT/Sheraton, The Men's Wearhouse, Pabst Brewing
Company, Pizza Hut, MGM Resorts, Sanyo, Southern
California Cable Marketing Council, Suzuki cars and
trucks, State of California Department of Health Services,
SunAmerica

January 84 – December '86     **BBDO/WEST, INC. (Los Angeles, San Francisco)**
**Executive Vice President, General Manager, Chief**
**Creative Officer and Director**
West Coast division of Top 10 global advertising agency.
Accounts included Apple Computer International, Coldwell
Banker, HBO, Hughes Supermarkets, Pepsi, PIP Printing,
Sanyo/Fisher, Sebastiani Vineyards, Sizzler, Southern
California Dodge Dealers, Union Bank

January 81 – December '83     **BOZELL & JACOBS, SOUTHWEST, INC. (Dallas)**
**Executive Vice President, Chief Creative Officer**
Southwest division of Top 10 U.S. advertising agency.
Accounts included American Airlines, Armour Foods,
Avis, Greyhound, Mary Kay Cosmetics, Pace Foods,
Quaker Oats, Southwestern Bell, Symantec, Zale
Corporation.

August 67 – December '80     **OGILVY & MATHER, INC. (New York)**
**Senior Vice President, Executive Creative Director,**
**Member, O&M USA Council of Directors**
Top five global advertising agency.  Executive Creative
Director and General Manager, O&M Los Angeles (1977-
80); Creative Director, O&M Houston (1974-77);
Associate Creative Director, O&M London (1974),
Associate Creative Director, O&M New York (1972-73).

Accounts included American Express, British Travel
Association, Dove, French Tourism, Hershey Foods, IBM,
Imperial margarine, KLM, Korean Airlines, Panasonic,
Post cereals, Puerto Rico Tourism, Mattel, Maxwell House,
MTV, Mercedes Benz, Merrill Lynch, Nabisco,
Nickelodeon, Shell, Smith Barney, Trailways, TWA,
Universal Studios

Evid. Appx. Page 170

| | |
|---|---|
| **EDUCATION** | June 1966 BA, Adelphi University, Garden City, New York |

| | |
|---|---|
| **INDUSTRY** | Vice Chairman, Western Region – American Association of Advertising Agencies (industry trade association) (1995-2002) |
| | National Board of Directors – American Association of Advertising Agencies (1995-2002) |
| | Vice President – Los Angeles Advertising Agencies Association (1995-2002) |
| | Member, Los Angeles Advertising Club (1978-1980; 1984-2005) |
| | Vice President – Dallas Advertising Club (1981-1983) |
| | Vice President – Houston Advertising Federation (1975-1977 |
| | Member – The Television Academy |
| | Director – Los Angeles Chapter, Forensic Expert Witness Association (2006-2009) |

| | |
|---|---|
| **TEACHING POSITIONS** | Instructor: Pepperdine University, UCLA Extension |
| | Guest Instructor: Arizona State University, California State University Northridge, California State University San Diego, California State University Los Angeles, California State University San Francisco, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Hawaii, University of Houston, University of Southern California, University of Texas, Thunderbird School of Management; Dean's Board of Advisors, UCLA Extension |

| | |
|---|---|
| **OTHER** | Author: *How to Create Tobacco-Use Prevention Advertising That Works*; University of Florida Press, 1996 |
| | Media Appearances: Frequent "advertising/marketing guest authority" on Bloomberg News, NBC News, ABC 20/20; cited in articles in *Wall Street Journal, New York Times, Los Angeles Times, Washington Post, USA Today, Advertising Age, AdWeek* |

42

**AWARDS:**                    Multiple Clios, One Show "Pencils," multiple Beldings,
two Gold Lions at Cannes International Advertising
Festival; three "Effie" awards, two David Ogilvy Awards.

43

## ADVERTISING/BRANDING CLIENTS SERVED (BY CATEGORY)

### (Partial List; 1968-2020)

| | |
|---|---|
| **Apparel/Fashion** | C& R Clothiers (Asher/Gould) |
| | Cherokee Apparel (Asher/Gould) |
| | The Men's Wearhouse (Asher/Gould) |
| | Harris & Frank Clothiers (Asher/Gould) |
| | Kennedy's Clothiers (Asher/Gould) |
| | London Fog (Asher/Gould) |
| | Mervyn's (Wong Doody) |
| | Nordstrom (Wong Doody) |
| | |
| **Automotive** | Acura (Initiative) |
| | Chevrolet (Initiative) |
| | Dodge and Dodge Dealer Associations (BBDO) |
| | Kia (Initiative) |
| | Jaguar (Bozell) |
| | Mercedes-Benz (Ogilvy) |
| | Peugeot (Ogilvy) |
| | Suzuki (Asher/Gould) |
| | |
| **Beverages** | Ballantine Ale (Asher/Gould) |
| | Brew 102 Beer (Asher/Gould) |
| | Country Club Malt Liquor (Asher/Gould) |
| | Country Time Lemonade (Ogilvy) |
| | Falstaff Beer (Ogilvy; Asher/Gould) |
| | Hamm's Beer (Asher/Gould) |
| | Mountain Dew (Ogilvy) |
| | M. LaMont Vineyards (Ogilvy) |
| | Old Crow Bourbon Whisky (Ogilvy) |
| | Olde English 800 Malt Liquor (Asher/Gould) |
| | Olympia Beer (Asher/Gould) |
| | Pabst Blue Ribbon Beer (Asher/Gould) |
| | Pearl Beer (Asher/Gould) |
| | Pepsi Light (Ogilvy) |

44

|  | Pepsi-Cola (BBDO) |
|  | Private Stock Malt Liquor by Haffenreffer (Asher/Gould) |
|  | Schaeffer Beer (Ogilvy) |
|  | Sebastiani Vineyards (BBDO) |
|  | Stolichnaya Vodka (Ogilvy) |
|  | Van Gogh Vodka (Wong Doody) |
|  | Vitel Mineral Water (BBDO) |
| **Corporate** | Autodesk (Wong Doody) |
|  | Avery Dennison (Asher/Gould) |
|  | Cessna Citation (Ogilvy) |
|  | Church of Jesus Christ of Latter-Day Saints (Initiative) |
|  | City Investing (Ogilvy) |
|  | Cooper Industries (Ogilvy) |
|  | Dresser Industries (Ogilvy) |
|  | IBM (Ogilvy) |
|  | International Nickel (Ogilvy) |
|  | International Paper (Ogilvy) |
|  | Owens-Corning Fiberglas (Ogilvy) |
|  | Rail LA (Silverman LLC) |
|  | Shell Oil Company (Ogilvy) |
|  | Worldwide Church of God (BBDO) |
| **Consumer Electronics** | Alpine Electronics (Wong Doody) |
|  | Concord Electronics (BBDO) |
|  | Fisher (BBDO) |
|  | Panasonic (Ogilvy) |
|  | Sanyo (Asher/Gould) |
| **Direct Response** | American Express cards (Ogilvy) |
|  | Associates Financial (Bozell) |
|  | Bally's Health and Fitness (Initiative) |
|  | Bryman College (Asher/Gould) |
|  | HBO (Asher/Gould) |

45

Intercept Program (Asher/Gould)

Jenny Craig (Initiative)

Kaiser/Permanente (Initiative)

Law Offices of Larry H. Parker (Asher/Gould; Silverman LLC)

Mobile Dynamics (Wong Doody)

National Education Centers (Asher/Gould)

Paintrol Clinics (Asher/Gould)

Southern California Cable Marketing Council (Asher/Gould)

UCLA Anderson School of Management (Wong Doody)

**Education**

Bryman College (Asher/Gould)

Geisinger Commonwealth School of Medicine (Silverman LLC)

Mobile Dynamics (Wong Doody)

National Education Centers (Asher/Gould)

National University (Initiative)

UCLA Anderson School of Management (Wong Doody)

**Entertainment**

Albuquerque Studios (Silverman LLC)

Big Moving Pictures (Silverman LLC)

Buena Vista Pictures (Initiative)

Center Theatre Group/Ahmanson Theatre; Mark Taper Forum (Initiative)

Circus World (Ogilvy)

Disney Home Video (Initiative)

Dynasty Visual Effects and Animation (Silverman LLC)

Grand Ol' Opry (Ogilvy)

HBO (BBDO and Asher/Gould)

Houston Grand Opera (Ogilvy)

Los Angeles Dodgers (Wong Doody)

MGM Home Video (Wong Doody)

MTV (Ogilvy)

Nickelodeon (Ogilvy)

Opryland USA (Ogilvy)

46

Pacific Ventures (Silverman LLC)

Ringling Brothers Barnum & Bailey Circus (Ogilvy)

Six Flags (Ogilvy and Initiative)

Sony Pictures Digital Entertainment (Wong Doody)

Southern California Cable Marketing Council (Asher/Gould)

The Walt Disney Company (Initiative)

Touchstone Pictures (Initiative)

UCLA Athletics (Silverman LLC)

UPN (United Paramount Network) (Initiative)

Walt Disney Pictures (Initiative)

Warner Brothers  (Initiative)

World Poker Tour (Wong Doody)

**Financial Services**

Allied Bank of Texas (Bozell)

American Express Credit Cards (Ogilvy)

American Express International Bank (Ogilvy)

American Savings Bank (Asher/Gould)

Associates Financial (Bozell)

Bowery Savings Bank (Ogilvy)

E*Trade (Initiative)

Gibraltar Savings & Loan of California (Ogilvy)

Gibraltar Savings & Loan of Texas (Ogilvy)

Merrill Lynch (Ogilvy)

J. P. Morgan & Co. (Ogilvy)

Nationwide Insurance (Ogilvy)

Plastic Cash International  (Wong Doody)

Republic Bank of Texas (Bozell)

Smith Barney (Ogilvy)

SunAmerica (Asher/Gould)

Union Bank of California (BBDO)

U.S. Trust (Ogilvy)

Valley National Bank – AZ (Bozell)

Wei Dong Investment Holdings Ltd.  (Silverman LLC)

Evid. Appx. Page 176

| | |
|---|---|
| **Gaming** | Augustine Casino (Wong Doody) |
| | Bellagio Hotel & Casino (Initiative) |
| | California Lottery (Initiative) |
| | Desert Inn Hotel & Casino (Asher/Gould) |
| | Las Vegas Convention and Visitor's Authority (Initiative) |
| | MGM Grand Hotel & Casino (Asher/Gould) |
| | Mirage Hotel & Casino (Initiative) |
| | New York New York Hotel & Casino (Asher/Gould) |
| | Treasure Island Hotel & Casino (Initiative) |
| **Grocery Products (includes. Packaged Goods)** | Armour Dinner Classics (Bozell) |
| | Armour Hot Dogs (Bozell) |
| | Armour Deli Meats (Bozell) |
| | Balance Bar (Initiative) |
| | Beijing Zhong Gao International HR Co. Ltd. (Silverman LLC) |
| | California Avocados (Asher/Gould) |
| | California Eggs (Asher/Gould) |
| | Clif Bar (Wong Doody) |
| | Conagra Foods (Bozell) |
| | Gaines (Ogilvy) |
| | Dove Liquid (Ogilvy) |
| | Heath Bars (Bozell) |
| | Hershey (Ogilvy) |
| | Imperial Margarine (Ogilvy) |
| | Luna Bar (Wong Doody) |
| | Nabisco Double Stuf (Ogilvy) |
| | Nabisco Krazy Glazy (Ogilvy) |
| | Nabisco Saltine Crackers (Ogilvy) |
| | Nabisco Sooper Kookies (Ogilvy) |
| | Pace Picante Sauce (Bozell) |
| | Pepperidge Farm (Ogilvy) |
| | Post Alpha-Bits (Ogilvy) |

|  | Post Cocoa Pebbles (Ogilvy) |
|---|---|
|  | Post Fruity Pebbles (Ogilvy) |
|  | Post Super Sugar Crisp (Ogilvy) |
|  | Purina dog chows (Ogilvy) |
|  | Quaker Oats (Bozell) |
|  | Quaker Chewy Granola Bars (Bozell) |
|  | Quaker Masa Harina (Bozell) |
|  | Quaker 100% Natural Cereal (Bozell) |
|  | Ralston-Purina Cookie Crisp cereal (Ogilvy) |
|  | Reese's Peanut Butter Cups (Ogilvy) |
|  | Swanson Frozen Dinners (Ogilvy) |
| **Health & Beauty Aids** | Avon Cosmetics (Ogilvy) |
|  | Contac (Ogilvy) |
|  | Dove Beauty Bar (Ogilvy) |
|  | Kinerase (Wong Doody) |
|  | Mary Kay Cosmetics (Bozell) |
|  | Mead-Johnson Enfamil (Ogilvy) |
|  | Mead-Johnson Metrecal (Ogilvy) |
|  | Pears Soap (Ogilvy) |
|  | Rembrandt Whitening Toothpaste (Wong Doody) |
|  | Twice as Nice shampoo (Ogilvy) |
| **Healthcare** | Cedars-Sinai Health System (Silverman LLC) |
|  | Century Aesthetics (Silverman LLC) |
|  | Century City Doctors Hospital (Silverman LLC) |
|  | Contac Cold and Flu medicine (Ogilvy) |
|  | Doctor Campbell Credit Dentists (Asher/Gould) |
|  | Geisinger Health (Silverman LLC) |
|  | Intercept Program (Asher/Gould) |
|  | Kaiser Permanente (Initiative) |
|  | Modern Diagnostics (Silverman LLC) |
|  | Paintrol Clinics (Asher/Gould) |
|  | Private Health Management (Silverman LLC) |
|  | Salus Surgical Centers (Silverman LLC) |

49

|  |  |
|---|---|
|  | UCLA Health System (Silverman LLC) |
|  | United Health Plan (Asher/Gould) |
|  | Virginia Mason Medical Center (Wong Doody) |
| **Hi-Tech** | Apple Computers/International (BBDO) |
|  | Autodesk (Wong Doody) |
|  | Cadforce (Silverman LLC) |
|  | Cisco (Initiative) |
|  | Compaq (Ogilvy) |
|  | Gateway (Initiative) |
|  | IBM (Ogilvy) |
|  | Intel (Initiative) |
|  | Symantec (Bozell) |
| **Industrial** | Cessna (Ogilvy; Bozell) |
|  | International Nickel (Ogilvy) |
|  | International Paper (Ogilvy) |
|  | Dresser Industries (Ogilvy) |
|  | Falcon Waterfree (Silverman LLC) |
|  | Owens-Corning Fiberglas (Ogilvy) |
|  | Shell Farm Chemicals (Ogilvy) |
|  | Shell Industrial Chemicals (Ogilvy) |
|  | Shell Plastics and Resins (Ogilvy) |
|  | Shell Synthetic Rubber (Ogilvy) |
| **Internet** | America On-Line (Initiative) |
|  | E-Trade On-Line (Initiative) |
|  | Event 411.com (Initiative) |
|  | Petstore.com (Initiative) |
|  | PlasticCash.com (Wong Doody) |
|  | Yahoo! (Initiative) |

Evid. Appx. Page 179

| | |
|---|---|
| **Marketing Communications Agencies** | Ayzenberg (Silverman LLC) |
| | Beijing Reach-All Investment Company Ltd. (Silverman LLC) |
| | BH Direct (Silverman LLC) |
| | Bright Strategic Design (Silverman LLC) |
| | Bullpen Integrated Marketing (Silverman LLC) |
| | Donnenfeld & Associates (Silverman LLC) |
| | Eclipse Studio, Beijing (Silverman LLC) |
| | Glyphix (Silverman LLC) |
| | Horizon Media (Silverman LLC) |
| | M Creative Group (Silverman LLC) |
| | Nice Advertising (Silverman LLC) |
| | The Phelps Group (Silverman LLC) |
| | Radarworks (Silverman LLC) |
| | Rogers & Associates (Silverman LLC) |
| | Schiller LLC (Silverman LLC) |
| | U.S. International Media (Silverman LLC) |
| | The Woo Agency (Silverman LLC) |
| **Media/Publishing** | 24/6 Media dba Pocket Billboards (Silverman LLC) |
| | Bulzi (Silverman LLC) |
| | The Equestrian News (Silverman LLC) |
| | Frontiers Media LLC (Silverman LLC) |
| | HBO (BBDO and Asher/Gould) |
| | KCAL 9 Television (Initiative) |
| | Sirius XM (Silverman LLC) |
| | Southern California Cable Marketing Council (Asher/Gould) |
| | Triton Media (Silverman LLC) |
| | UPN (United Paramount Network) (Initiative) |
| **Miscellaneous Products** | Paragon Luggage  (Wong Doody) |
| | Steuben Glass (Ogilvy) |
| | Zippo (Ogilvy) |

| | |
|---|---|
| **Office Products** | Avery Dennison (Asher/Gould) |
| | Intuit – QuickBooks (Wong Doody) |
| **Petroleum Products** | Arco (Initiative) |
| | Shell Fire & Ice Motor Oil (Ogilvy) |
| | Shell Gasoline (Ogilvy) |
| **Professional Services** | Cadforce (Silverman LLC) |
| | CFO911 (Silverman LLC) |
| | Law Offices of Larry H. Parker, Inc.  (Asher/Gould; Silverman LLC) |
| | Perona, Langer, Beck Inc. (Silverman LLC) |
| **Real Estate** | Coldwell Banker (BBDO) |
| | Esprit (Silverman LLC) |
| | Move.com (Silverman LLC) |
| | Pacifica Ventures (Silverman LLC) |
| | Relocation.com (Silverman LLC) |
| | Waterwood (Ogilvy) |
| | The Woodlands (Ogilvy) |
| **Restaurants** | Acapulco (Asher/Gould) |
| | Baskin-Robbins (Ogilvy; Asher/Gould) |
| | Bennigan's (Bozell) |
| | Burger Chef (Ogilvy) |
| | Carl's Jr. (Initiative) |
| | Der Weinerschnitzel (Initiative) |
| | Godfather's Pizza (Bozell) |
| | Hardee's (Initiative) |
| | KFC (Initiative) |
| | Packard's Grill (Asher/Gould) |
| | Pioneer Chicken (Asher/Gould) |
| | Pizza Hut (Asher/Gould) |
| | Sizzler (BBDO) |
| | Steak & Ale (Bozell) |
| | Taco Bell (Initiative) |

52

Togo's (Initiative)

Tom Sawyer's Old Fashioned Fried Chicken (Ogilvy)

**Retail**
Aaron Brothers Art Marts (Asher/Gould)

Albertson's Supermarkets (Initiative)

Arco (Initiative)

Bailey Banks & Biddle Jewelers (Bozell)

Big Lots (Initiative)

C&R Clothiers (Asher/Gould)

Checker Auto Parts (Bozell)

Circle K (Initiative)

Factory2You Stores (Asher/Gould)

Family Bargain Center Stores (Asher/Gould)

Harris & Frank Clothiers (Asher/Gould)

Hughes Supermarkets (BBDO)

Kennedy's Clothiers (Asher/Gould)

Men's Wearhouse (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

Puppy Palace (Ogilvy)

PIP Printers (BBDO)

Ralphs Supermarkets (Initiative)

Safeway Supermarkets (Initiative)

Sainsbury Supermarkets (Silverman LLC)

Sears (Ogilvy)

Sit 'n Sleep (Silverman LLC)

Stater Brothers Supermarkets (Initiative)

Steuben Glass (Ogilvy)

The Home Depot (Initiative)

Tesco Supermarkets (Silverman LLC)

Vons Supermarkets (Initiative)

Wherehouse Records & Tapes (Asher/Gould)

Zale Jewelers (Bozell)

| | |
|---|---|
| **Social Marketing** | California Department of Health Services – BabyCal (Asher/Gould) |
| | California Department of Health Services – First5 (Asher/Gould) |
| | California Department of Health Services – HIV Prevention (Asher/Gould) |
| | California Department of Health Services – Tobacco-Use Prevention (Asher/Gould) |
| | Los Angeles County Department of Public Health – Tobacco-Use Prevention (Asher/Gould) |
| | Oregon Health Department – Tobacco-Use Prevention (Asher/Gould) |
| | United States Department of Commerce, Census 2000 (Initiative) |
| | United States Government; Centers for Disease Control – Tobacco-Use Prevention (Initiative) |
| | White House office of National Drug Control Policy – Drug-use Prevention (Initiative) |
| **Telecommunications** | Nextel (Initiative) |
| | Telcentris (Silverman LLC) |
| | Southwestern Bell (Bozell) |
| | VoxOx (Silverman LLC) |
| **Tobacco** | Tijuana Smalls (Ogilvy) |
| **Tires/Batteries/ Accessories** | Arco (Initiative) |
| | Goodyear (Ogilvy) |
| | Shell (Ogilvy) |
| **Toys/Games** | Electronic Arts (Initiative) |
| | Mattel Electronics (Ogilvy) |
| | Mattel Toys and Games (Ogilvy) |

| | |
|---|---|
| **Travel/Tourism** | Alaska Airlines (Wong Doody) |
| | Alaska Tourism (Initiative) |
| | ALM Royal Dutch Airlines (Ogilvy) |
| | American Airlines (Bozell; Initiative) |
| | American Express Travel Service (Ogilvy) |
| | Avis Rent-a-Car (Bozell) |
| | Bellagio Hotel & Casino (Initiative) |
| | British Tourist Authority (Ogilvy) |
| | Cunard Lines (Ogilvy) |
| | Desert Inn Hotel & Casino (Asher/Gould) |
| | Disney Cruise Lines (Initiative) |
| | Disneyland and Walt Disney World (Initiative) |
| | French Government Tourist Office (Ogilvy) |
| | Greyhound Lines (Bozell) |
| | Hyatt Regency Maui (Ogilvy) |
| | Hyatt Regency Waikiki (Ogilvy) |
| | Hyatt Kuilima Resort (Silverman LLC) |
| | KLM Royal Dutch Airlines (Ogilvy) |
| | Korean Airlines (Ogilvy) |
| | Las Vegas Convention & Visitors Bureau (Initiative) |
| | Loreto Bay (Wong Doody) |
| | Marriott (Ogilvy) |
| | MGM Grand Hotel & Casino (Asher/Gould) |
| | Mirage Hotel & Casino (Initiative) |
| | New York New York Hotel & Casino (Asher/Gould) |
| | Opryland USA (Ogilvy) |
| | Six Flags (Ogilvy and Initiative) |
| | Trailways Bus Lines (Ogilvy) |
| | Treasure Island Hotel & Casino (Initiative) |
| | TWA (Ogilvy) |
| | United States Travel Authority (Ogilvy) |

Evid. Appx. Page 184

|  | Universal Studios Hollywood (Ogilvy) |
|  | Yosemite National Park and the Curry Company (Ogilvy) |
| **Utilities** | Bell South (Initiative) |
|  | Houston Lighting & Power (Ogilvy) |
|  | Nextel (Initiative) |
|  | Salt River Project (Bozell) |
|  | Southwestern Bell (Bozell) |

56

Evid. Appx. Page 185

# EXHIBIT "C"

Evid. Appx. Page 186

## EXPERT WITNESS EXPERIENCE

### DEPOSITION, ARBITRATION AND/OR TRIAL TESTIMONY

(2017-2021; Underscore indicates client)

*TOYA EDWARDS et al. c. WALMART, INC.*
United States District Court
Central District of California
Case No.2:18-cv-9655 GW-FFM
Deposed May 11, 2021

*JUSTIN LYTLE et al. v. NUTRAMAX LABORATORIES, INC., et al.*
United States District Court, Central District of California
Case No.: 5:19-cv-00835-JBG-SP
Deposed 3/31/2021

*REMY SHAKER et al. v. CHAMPION PETFOODS USA, et al.*
United States District Court for the Eastern District of Michigan
Case No. 2:18-cv-13603-LJM-DRG

        and,

*RACHEL COLANGELO et al. v. CHAMPION PETFOODS USA, et al.*
United States District Court
Northern District of New York
Case No. 6:18:CV-01228-LEK-DEP

        and,

*AFSHIN ZARINEBAF et al. v. CHAMPION PETFOODS, et al.*
United States District Court
Northern District of Illinois, Eastern Division
Case No. 1:18-cv-06951
Deposed 3/11/2-21

*THOMAS BAILEY, et al. v. RITE AID CORPORATION*
United States District Court, Northern District of California
Case 4:18-cv-06926-YGR
Deposed 12/10/2020

Evid. Appx. Page 187

*JENNIFER SONG AND SCOTT WERTKIN, et al.* v. *CHAMPION PETFOODS, USA, INC., et al.*
United States District Court, District of Minnesota
Case No. 18-CV-3205-PJS-KMM,

and,

*CAMMEO RENFRO, BARB MCGRAW AND DESIREE DEMPSTER et al*. v. *CHAMPION PETFOODS USA, INC. and CHAMPION PETFOODS L.P.*
United States District Court, District of Colorado
Civil Action No: 18-cv-02756-MEH
Deposed 11/24/2020

*RALPH MILAN, SARAH AQUINO, and ELIZABETH ARNOLD* v. *CLIF BAR & COMPANY*
United States District Court for the Northern District of California
Case No. 3:18-cv-02354-JD
Deposed 10/14/2020

*ALFWEAR, INC. v. MAST-JAEGERMEISTER U.S. INC. and OPPERMANWEISS, LLC.*
United States District Court for the District of Utah, Central Division
Case No. 2:17-CV-00936-tc
Deposed 8/31/2020

*STATE OF HAWAII BY ITS OFFICE OF CONSUMER PROTECTION* v. *LIVING ESSENTIALS, LLC, and INNOVATION VENTURES, LLC.*
In the Circuit Court of the First Circuit, State of Hawaii
Civil No. 15-1-0142-01 ECN (Other Civil Action)
Deposed 5/24/2019; 8/14/2020

*LIBERTY MEDIA GROUP, LLC, et al.* v. *NATIONAL PROMOTIONS and ADVERTISING, INC., et al.*
Superior Court of the State of California, County of Los Angeles, Central District
Case No. SC126900
Deposed 11/22/2019

*BRANDI PRICE and CHRISTINE CHADWICK, et al*. v. *L'ORÉAL USA, INC. and MATRIX ESSENTIALS, LLC.*
United States District Court, Southern District of New York
Case No. 1:17-cv-00614-LGS
Deposed 8/19/2019

*DIVISION SIX SPORTS, INC., v. SHAUN WHITE AND SHAUN WHITE ENTERPRISES, INC.*
Superior Court for the State of California, County of Los Angeles
Case No: BC2619646
Deposed 8/15/2019

*HARBOR BREEZE CORPORATION* et al v. NEWPORT LANDING, INC., et al.
United States District Court, Central District of California, Southern Division
Case No. 8:2017cv01613
Deposed 10/9/2017 and 5/9/2019; Trial testimony 6/20/2019

*UNIVERSAL STANDARD INC. v. TARGET CORPORATION, et al.*
United States District Court, Southern District Of New York
Case No. 1:18-cv-06042-LGS
Deposed 5/14/2019

*STEPHEN HADLEY et al. v. KELLOGG SALES COMPANY*
United States District Court Northern District of California
Case No. 5:16-cv-04955
Deposed 5/28/2018; 5/1/2019

*DEBBIE KROMMENHOCK and STEPHEN HADLEY, et al. v. POST FOODS LLC*
United States District Court, Northern District of California
Case No. 3:16-cv-049585-WHO (JSC)
Deposed 2/21/2019

*AMERICAN CRUISE LINES v. HMS AMERICAN QUEEN STEAMBOAT COMPANY, et al.*
The United States District Court for the District of Delaware
Civil Action No. 13-324-rga
Deposed 10/12/2016; Trial testimony 1/9/2019

*STATE OF VERMONT, v. LIVING ESSENTIALS, LLC, and INNOVATION VENTURES, LLC*
State of Vermont, Superior Court, Washington Unit
Civil Division Docket No. 443-7-14 Wncv
Deposed 3/8/2018; 12/6/2018

*SWAROVSKI RETAIL VENTURES LTD, v. JGB VEGAS RETAIL LESSEE, LLC*
District Court, Clark County, Nevada
Case No. A-15-727008-B
Deposed 12/21/2017

*VIP PRODUCTS, LLC v. JACK DANIEL'S PROPERTIES, INC.*
United States District Court, District of Arizona
Case No. 2:14-cv-02057-DGC
Deposed 8/12/2015; Trial testimony 10/5/2017

*LIBERTY MEDIA GROUP, LLC, et al. v. CINECAUSE, LLC, et al.*
Superior Court of the State of California, Los Angeles
Case No. BC606196
Deposed 9/19/2017

*STRATEGIC PARTNERS, INC. vs. VESTAGEN PROTECTIVE TECHNOLOGIES, INC.*
The United States District Court, Central District of California
Case No. 2:16-CV-5900-RGK (PLA) 2:16-CV-5900-RGK (PLA) 2:16-CV-5900-RGK
(PLA) 2:16-CV-5900-RGK (PLA)
Deposed 8/17/2017

*XIOMARA MARTINEZ ARROYO et al vs. THE NEMOURS FOUNDATION d/b/a
NEMOURS CHILDREN'S HOSPITAL, ORLANDO*
Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
Case No: 2015-CA-004791-O
Deposed 2/23/2017

61

# EXHIBIT 13

# EXPERT REPORT OF DR. GARY SPEDDING

*DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO, on
Behalf of Themselves and All Others Similarly Situated,*

Plaintiffs,

v.

*GT'S LIVING FOODS, LLC.*

Defendant

United States District Court
Central District of California
Case No. 2:19-CV-10920-FMO-GJS

*June 2, 2021*

## TABLE OF CONTENTS

**PAGE(S)**

I.     INTRODUCTION ................................................................................ 2

II.    QUALIFICATIONS ............................................................................ 3

III.   SUMMARY OF OPINIONS .............................................................. 10

IV.    100 PERCENT OF ENLIGHTENED KOMBUCHA TESTED BY MY LAB
       WAS ABOVE 0.5 PERCENT ALCHOL BY VOLUME .................................. 11

V.     MY TESTING WAS CONSISTENT WITH AND CORROBORATED
       BY RESULTS OF OTHER EXPERTS TESTING THE ALCOHOL
       CONTENT OF ENLIGHTENED KOMBUCHA AT THE RETAIL
       LEVEL ............................................................................................14

VI.    REFRIGERATION IS NOT SUFFICIENT TO KEEP THE ALCOHOL
       PERCENTAGE OF ENLIGHTENED KOMBUCHA BELOW 0.5
       PERCENT ALCHOL BY VOLUME ................................................19

VII.   ENLIGHTENED KOMBUCHA CONTAINS SIGNIFICANTLY MORE
       SUGAR THAN LISTED ON ITS LABELS ......................................24

Evid. Appx. Page 193

## **I. INTRODUCTION**

1.      My name is Gary Spedding, Ph.D.  I was retained as an expert by Plaintiffs'

counsel in *Sharpe vs. GT's Living Foods, LLC,* Case No. 2:19-cv-10920-FMO-GJS,

pending in the United States District Court for the Central District of California.

2.      In this case, Plaintiffs allege that Defendant's Enlightened Kombucha[1]

beverages contain more than 0.5 percent alcohol by volume and that they contain more

sugar than listed on the beverages' labels.

3.      I have been asked to:

i.      Test the alcohol content of Enlightened Kombucha beverages using a

scientifically valid methodology;

ii.      Test the sugar content of Enlightened Kombucha beverages using a

scientifically valid methodology;

iii.      Opine as to the alcohol content of Enlightened Kombucha beverages at

the retail level;

iv.      Opine as to whether refrigeration of Enlightened Kombucha is sufficient

to prevent the buildup of alcohol above 0.5 percent alcohol by volume;

v.      Opine as to the sugar content of Enlightened Kombucha beverages at

the retail level;

---

[1] Plaintiffs' Amended Complaint  states in Footnote 1, "Enlightened Kombucha refers to every flavor of Defendant's Enlightened Synergy and Enlightened Kombucha beverages sold nationwide, as described herein, including, but not limited to, the following flavors: Original, Gingerade, Lavender Love, Hibiscus Ginger, Lemonade, Multi-Green, Bilberry Blessing, Cayennade, Tantric Turmeric, Heart Beet, Golden Sage, Cucumber Mint Lime, Karma Citra, Koffee, Strawberry Lemonade, Pomegranate Power, Rose Berry, Pink Lady Basil, Watermelon Wonder, Trilogy, Mystic Mango, Cosmic Cranberry, Guava Goddess, Gingerberry, Passionberry Bliss, Strawberry Serenity, Cherry Chia, Grape Chia, Raspberry Chia, and Black Chia."

4.      My opinions are based on the following:

(a)      My 21 years of experience in the field of brewing and distilling;

(b)      My ten years of experience testing the alcohol content of kombucha beverages;

(c)      My education;

(d)      My review of documents that have been provided to me by counsel and other materials listed in Exhibit A, which is attached hereto;

(e)      My testing of the sugar and alcohol levels of Enlightened Kombucha over the past six years;

(f)      My review of literature and testing of Enlightened Kombucha as reported by other experts in the field;

5.      I am being compensated at a rate of $175.00 per hour for my work consulting on this case, and $250.00 per hour if I am needed to testify at any deposition, trial or arbitration hearing.  Additionally, I was compensated at my usual and customary rates for the testing of Enlightened Kombucha as listed in the then current on-line and paper catalogs of BDAS, LLC.  Specifically, over the past six years I have charged $30 per sample tested for alcohol content, and $125 per sample tested for sugar content.  Those are the same rates charged in this case.  My compensation is not contingent in any way on the opinions I reach in this case, or the result of the case.

## II. QUALIFICATIONS

6.      I was educated in the United Kingdom, starting off with a bachelor's degree with Honours in Biological Sciences (**University of East Anglia**).  I earned, in three years, a PhD in the field of microbial biochemistry and antibiotic research from the **University of Leicester**, under the tutelage of the esteemed research fellow Professor Eric Cundliffe

3

(my Ph.D. degree conferred in 1984). Research involved the culturing and growth of microorganisms and encouraging the organisms to produce antibiotics under controlled fermentation conditions. I also analyzed the complex piece of cell machinery known as the ribosome. Research involved the study of the antibiotic resistance mechanisms of bacteria involved taking the ribosome apart (over 50 components), separating the components (RNA and protein) and rebuilding them with different components into functionally and metabolically active organelles to figure out which of the 50 component parts were involved in resistance. To reconstitute the ribosome into an active machine again was considered quite an achievement at the time.

7.    I subsequently undertook several postdoctoral research positions – the first in Canada where I began to look at ribosomes again in the molecular biology department – **University of Guelph**, headed by another leader in the field of ribosome research, Professor Bruce H. Sells. Work here involved breaking down the ribosome and trying to understand the metabolic factors involved in its synthesis. Such work employed the use of the then cutting-edge tools emerging in the field of molecular biology. I became a "gene hunter" trying to locate the genes involved in ribosomal component production. The careful culturing of organisms was again a huge part of that endeavor. Work from there was published in a book I both wrote Chapters for and edited in a major series of landmark works in the IRL Press/University of Oxford Practical Approach Series (Ribosomes and Protein Synthesis: A Practical Approach). The leading scientists in the field of the day contributed to this oft-cited work. Other reviews were called for after that and I appeared in molecular biology encyclopedias and other volumes describing how to build in-vitro (outside the cell) protein synthesizing systems.

<div align="center">4</div>

8.      A chance encounter then with the father of a friend of mine – Dr. Elliott Middleton Jr., one of North America's leading Allergy experts at **Buffalo General Hospital (BGH)** and associated with the Roswell Park Cancer Institute, led me into a different direction.  Middleton was also interested in gene hunting - that for plant flavonoid synthesis genes.  While a bit of a wild theory of Dr. Middleton's, that work led to an unsuccessful search for flavonoid synthesis genes in mammalian genomes.  I, nevertheless, learned more molecular biology techniques and dealing with animal tissues. What did pan out however, serendipitously, along with my now esteemed colleague Anil K. Ratty (Singapore) was a finding that certain plant flavonoids can inhibit an important enzyme involved in virus multiplication – reverse transcriptase. This enzyme is crucial for many viruses to reproduce including the AIDS virus and now Covid (a mention of one of our references from work at BGH was noted in a recent leading Covid Virus research paper). Of significance to my future move into brewing science though was learning about enzyme inhibition.  We were able to show that two flavonoids inhibited the enzyme in synthesizing RNA from complementary nucleic acid templates.  Each flavonoid presenting two slightly different mechanisms of inhibition.  A patent was granted for that work.  The kinetics learned from those studies led me to better appreciate and to contemplate another vastly more complex chemical system later.

9.      Following that successful sojourn, I headed back into a new realm of microbiological and ribosome research at **Southern Illinois University** in Carbondale, IL. With Dr. Ramesh Gupta. I wished to learn more about the protein synthesizing systems that were ancient to the world, though newly emerging group of organisms to study – the archaebacteria.  Learning to grow these organisms was not an easy task – they grow under unusually high salt and or heat conditions unlike psychrophiles, another group of

5

extremophilic organisms that are capable of growth and reproduction in low temperatures. While I learned much about the growth of such organisms, we did not get far into my desired ribosome-track, so I headed to the laboratory of physical biochemist Professor David E Draper and the DED lab (**Johns Hopkins University** in Baltimore). While fully staffed with research students I was David's first Post-doc. Draper's group, while not specifically a ribosome lab, worked on ribosomal RNA. Several species of this molecule involved in the ribosome and later proven to be the catalytic center of peptidyl transferase activity – the joining together of amino acids to produce proteins. Back to breaking the ribosome up again, this time earlier studies in Guelph noted above came to bear and we were able, via Draper's physical chemistry prowess and ideas and my "bench hands" and ribosome skills, to deduce how ribosomes control the synthesis of proteins – ironically, a ribosomal protein known as S4. RNAs were prepared by methods I described in my Practical Approach series book noted above. I adapted a now classical approach called toeprinting, to look at RNA structure and determined the mechanism behind, and then measured, the kinetic steps in the process leading to an instance of messenger RNA translation by bacterial ribosomes. As lead on the project and first author, this work was accepted for publication in two of the leading journals - The Journal of Molecular Biology and the Proceedings of the National Academy of Sciences (USA).

10.     Following my final post-doc stint at Hopkins, I then took on the role of assistant professor **Butler University** in Indianapolis, IN, where I established the first ever undergraduate laboratory course in biochemistry in the Department of Chemistry. First semester eventually developed into a Biochemistry of Milk program with the second semester a very powerful look at Molecular Biology. Research moved back to looking at flavonoids and reverse transcriptase and publishing, with student authors, in Trends in

Evid. Appx. Page 198

Genetics and the Journal of Molecular Recognition on our novel development of a non-radioactive assay system for screening for inhibitors of RNA-dependent reverse transcriptases.

11.    After working at Butler University, I took a course in brewing technology at the oldest brewing school in the USA - the **Siebel Institute of Technology in Chicago** (SIT, 1998).  I landed a position of Manager and later Director of Laboratories at the institute.  I became acquainted with brewing analytics and lead sensory specialist after learning from the best in the country – fellow teachers at the institute.  I also taught in several of the short courses there.  I also prepared microbiological media formulations.

12.    Following a takeover bid of the SIT by a company called **Alltech** (Nicholasville, KY), which ultimately fell through, several Siebel staff and I moved to Kentucky to join Alltech, where I established a brewing and distilling analytical testing laboratory there.  However, two years in, and just as the analytical lab program was really taking off, a shift of focus for Alltech - lead to them moving off in other directions.  It was then that I laid down the foundation for **Brewing and Distilling Analytical Services (BDAS, LLC, 2002)**.  I refused to let down my clients, leaving them without the analytical services they had come to rely upon from me.  During our start up I became adjunct professor at **Eastern Kentucky University**, teaching lab courses and two semesters of general chemistry.  My business – BDAS, LLC (now with two locations, KY, and CO) has become a premier testing facility for brewers and distillers in the US and our business model adopted by many.  I appointed Matt Linske as our lead microbiologist, and he has worked at several breweries and assisted in kombucha production at one point.  Matt now runs our microbiology and chemistry lab in Denver CO. **Without many interruptions we have consistently been one of only a few labs involved in beverage testing to hold all**

7

**three TTB Chemist certifications – Beer, Wine and Distilled Spirits** (a program subject to renewed certification every two years). The beer certification is quite new and **BDAS, LLC was consulted by the TTB as to which tests to include in that collaborative test program.** At one point the issue was raised as to us teaching TTB agents some aspects of brewing and the techniques we use.

13. I continue to be called on to assist other companies with their measuring of alcohol and ongoing quality control needs, including such giants as Anheuser Busch and Molson Coors, along with Grupo Modelo (Corona) Mexico and many craft brewers, distillers, seltzer and kombucha producers. I have assisted others in setting up their own QC labs. I have been called in to audit the testing of samples at Anheuser Busch in New Jersey and to oversee a collapsed distillery warehouse in KY. We are called upon for insurance claims, a case involving an alcohol related death and to assist and audit other facilities including laboratories. A colleague and I have taught sensory evaluation at many breweries and distilleries and the teaching of brewing and distilling science has recently become a bigger part of what we do – after founding **BDES – The educational division of BDAS, LLC**. We taught short classes to the judges at the GABF competition every year for many years – many dealing with defects in beer and with lessons in how to avoid them. I have taught alone once and jointly one time, the comprehensive sessions on sensory analysis for **The American Brewers Guild**.

14. I was also involved in planning a pilot scale brewery and the implementation of a brewing science/fermentation program at **Eastern Kentucky University**, and we planned the building of a new laboratory to be associated with this new program in Richmond KY. While full approval for the program to go ahead was made it eventually fizzled out. Though I did teach a few classes in their earlier stage program. One

8

of their students now works for BDAS, LLC.  And we maintained operations in Lexington at our original location.  Several other universities and colleges have spoken with us related to fermentation, brewing and distilling courses and we are becoming a bit more involved with the newly formed **UK Beam Institute**, and I have taught in their alcohol beverage courses.  I have now been asked to assist in an online course on brewing and fermentation for a Kansas City, MO University (**AVILA**).

15.    I have also served on numerous committees – the latest being the **Alternative Methods of Analysis** committee for the **ASBC**.  I have also been involved in several collaborative methods programs for this organization.  This committee is exploring the testing of seltzers and kombuchas currently.  The **American Distilling Institute** and the **American Craft Spirits Association** have reached out to me and invited me to speak at most of their conferences and publish frequently in their magazines.  If I recall correctly, I have an article in every issue (four per year) of **Artisan Spirit** magazine for the past five years and a major series on spirits maturation for **ADI's Distiller** was recently reworked, extended and published in a booklet form. The **Brewers Association (BA)** asked me to write a **Quality Control Best Practices** work dealing with beer in trade, which was published in several languages and BDAS, LLC did an **extended series of nutritional tests for the BA and their nutritional data base**.

16.    As a founding member and lead instigator for the **Society of Distilling Scientists and Technologists** I am honored to have been appointed **lead science editor** for the **Journal of Distilling Science**.

17.    Called upon to write for magazines, journals and books, my focus has been on alcohol determinations (we even tested the recently publicized powdered alcohol – as far as we can tell the only lab in the US to be called to that task).  We overcame obstacles

9

in measuring the true alcohol content in a highly concentrated alcohol/citric acid blend and were challenged to come up with a method to correctly measure the nutrient content extract in seltzers and are working with a Density meter/Refractometry company in looking at algorithms to deduce key parameters in alcoholic beverages and with a view to getting the tedious method of distilling higher alcohol containing beverages out the way.

18.     Other concerns we deal with are can and bottle product failures, unusual foreign materials and sediments and flocs in beverages – unidentified floating objects and more.  Shelf-life stability tests are done by us on an ever-increasing basis, rapid maturation studies and understanding the thermodynamic and chemical kinetic complexity of spirit in wood maturation – I termed the catalytic or surface-active barrel engine model.  I have adopted a rapid spectroscopic fingerprinting method for the authentication of beverages. Most of these topics have been written up for so many brewing and distilling magazines I have lost count.  Our white papers span Spectroscopic methods for quality consistency and authentication of beverages, Kombucha, The Measurement of Alcohol using Different methods, UFO's – Unidentified floating objects, Determining the sugar contribution of fruit in beer, Beer Nutritional Analysis and Testing, Preservative Use in Beverages and so much more.

## III. SUMMARY OF OPINIONS

19.     The following is a summary of my opinions in this case:

- 100% of Enlightened Kombucha sold in the United States since at least 2015 has contained more than 0.5 percent alcohol by volume at the retail level;

- The alcohol content of Enlightened Kombucha increases over time, and crosses the 0.5 percent alcohol by volume threshold within the listed expiration dates;

10

- The alcohol content of Enlightened Kombucha increases over time both when the beverages are refrigerated and when left out at room temperature;

- Refrigeration of Enlightened Kombucha is not adequate to prevent continued fermentation and alcohol buildup in the beverages;

- The vast majority of flavors of Enlightened Kombucha contain far more sugar than listed on the products' labels, including almost double the amount declared for some flavors.

## IV. 100 PERCENT OF ENLIGHTENED KOMBUCHA TESTED BY MY LAB WAS ABOVE 0.5 PERCENT ALCHOL BY VOLUME

20.     Between 2015 and 2021, my lab and I have tested 44 samples (bottles) of GT's Enlightened Kombucha for its alcohol by volume content.  17 were tested in 2015, 25 were tested between 2018 and 2019, and two were tested in March 2021.

21.     The samples were obtained in two manners.  Some of the samples were purchased at retail and shipped on ice (and received cold) to our facilities, including from retail locations in California.  Other samples were purchased by me directly from local retail establishments near my lab in Lexington, Kentucky (including both samples tested in 2021) from the stores' refrigerated displays.  All samples were immediately refrigerated upon receipt by the lab, with the temperature of the refrigerator set to 0.5 °C (32.9 °F).

22.     Upon receipt of the samples, we confirmed that none of the beverages passed their stated expiration dates.  And, we made sure that all testing was complete by the end of the listed expiration dates.

23.     If done correctly, there are several ways to accurately test the alcohol content in kombucha.  For testing of Enlightened Kombucha, I tested the samples using

11

ABV DMA NIR[2].  As discussed in further detail below, I thoroughly vetted each of the methods used to test the alcohol content of Enlightened Kombucha to ensure that the results were accurate and scientifically valid.  The methods used to test the alcohol content of Enlightened Kombucha are accurate, and accepted within the industry.

24.    Of the 44 samples tested, all 44 samples tested at above 0.5 percent alcohol by volume.  In other words, 100 percent of the samples tested over the six year period were over the legal limit of 0.5 percent alcohol by volume for purported non-alcoholic beverages.

25.    Table 1, below, provides a summary of the alcohol test results of the 17 Enlightened Kombucha samples tested in 2015.

*Table 1*



<hr />

[2] ABV DMA NIR – Degassed and filtered samples tested via DMA5000 density meter and Alcolyzer.

12

26.     Table 2, below, provides a summary of the alcohol test results of the 25

Enlightened Kombucha samples tested between 2018 to 2019:

*Table 2*



27.     The alcohol by volume content of the 44 samples tested ranged from 0.6

percent alcohol by volume to 2.2 percent alcohol by volume, with a mean of 1.2 percent

alcohol by volume.  Not a single sample was below 0.5 percent alcohol by volume.

28.     I have learned through a review of documents provided to me that sometime

in early 2017, GT's Living Foods changed the formulation of Enlightened Kombucha by

replacing cane sugar with kiwi juice.  Based on my review of the testing results prior to

and after 2017, however, the change has not caused the alcohol content of Enlightened

Kombucha to decrease below the 0.5 alcohol by volume threshold.  Enlightened Kombucha

was over the 0.5 percent alcohol by volume limit both before and after the formula change.

13

## V.  MY TESTING WAS CONSISTENT WITH AND CORROBORATED BY RESULTS OF OTHER EXPERTS TESTING THE ALCOHOL CONTENT OF ENLIGHTENED KOMBUCHA AT THE RETAIL LEVEL

29.    I have conducted an extensive review of literature and other studies concerning the validity of the testing methodologies I used to test the alcohol content of Enlightened Kombucha.  I have also analyzed results from other laboratories testing the alcohol content of Enlightened Kombucha at the retail level.  **From what I have found, all experts in the field that have tested the alcohol level of Enlightened Kombucha purchased from retail locations have uniformly found that the beverages contain more than 0.5 percent alcohol by volume.**

30.    In 2015, to ensure the accuracy and reliability of the results from the density meter/alcolyzer method, I worked in collaboration with three other independent laboratories to verify the results of my methodology.  The other labs utilized HPLC (High Performance Liquid Chromatography) and GC-FID (Gas Chromatography with Flame Ionization) methodologies.  Each of the labs tested the exact same samples, shipped to the respective labs in refrigerated containers.  This collaborative testing, using different methodologies, showed that each of the methodologies used provided virtually identical results, with a deviation of only 0.1%.

31.    One of the samples used in this collaborative study was of Enlightened Kombucha.  Table 3, below, shows the results of five different testing methodologies used by the laboratories in the collaboration, each of which showed that the Enlightened Kombucha sample was above 0.5 percent alcohol by volume:

14

*Table 3*



32.    As seen in Table 3, the results of five different testing methodologies, utilized by different independent laboratories, showed that the alcohol content of the Enlightened Kombucha sample tested ranged between 1.83-1.92 percent alcohol by volume.  The fact that five different testing methodologies used by different laboratories all showed that the alcohol values were within .1 percent of each other strongly demonstrates the reliability of the methodology I used to test the alcohol content of Enlightened Kombucha in this case.

33.    Since 2015, I have participated in several other collaborative studies and tests regarding the accuracy of my laboratory's testing of the alcohol content of Enlightened Kombucha.  This has included consultations with instrument manufacturers and brewers, and the testing of hundreds of kombucha samples.  Through my extensive research and experience, I am confident that the results concerning the alcohol content of Enlightened Kombucha as performed by my laboratory are accurate and reliable.

15

34.     For instance, in June 2018, I again participated in a collaborative testing of the alcohol content of Enlightened Kombucha with the ETS Lab in California. At that time, ETS used the GC-FID (AOAC 983.13 method), testing three identical samples as those tested by our lab (the samples were sent to ETS on ice overnight). The results showed that all three samples contained well over 0.5 percent alcohol by volume (between 0.79-1.37 percent). And, again, ETS's results corroborated my laboratory's findings, as the interlab samples deviated by no more than 0.03 percent alcohol by volume. The results also showed that my methodology for testing the alcohol content of Enlightened Kombucha was repeatable and reliable internally, as the interlab standard of deviation was 0.007 percent.

35.     My review of the available literature and testing results of other experts confirms that every bottle of Enlightened Kombucha purchased at retail is above 0.5 percent alcohol by volume, and corroborates my own testing of the alcohol level of the beverages.

36.     For instance, in a June 29, 2017 study published in Food Analytical Methods and conducted by researchers at the Department of Chemistry and Biochemistry at the University of Texas at Arlington, the authors reported testing the alcohol content of eight different flavors of Enlightened Kombucha using a headspace gas chromatography method. All eight of the flavors of Enlightened Kombucha tested were above 0.5% alcohol by volume. Table 4 provides a summary of the alcohol by volume test results from the University of Texas study in 2017:

<div align="center">16</div>

*Table 4*



37.     I have also reviewed the October 15, 2019 Declaration of Blake Ebersole in

*Tortilla Factory, LLC v. GT's Living Foods, LLC*, Case No. 2:17-cv-07539-FMO-GJS.  I

am of the opinion that Mr. Ebersole is a qualified expert, and that the testing he reported

regarding the alcohol content of Enlightened Kombucha is valid, reliable, and accurate.

Notably, 100 percent of the Enlightened Kombucha samples Mr. Ebersole tested between

2015 through 2019 contained more than 0.5 percent alcohol by volume, including:

> o  February 2019 testing using AOAC Official Method of Analysis AOAC
>    2016.12, a gas chromatography with flame ionization detection (GC-FID)
>    with headspace autosampling methodology run by Covance-Eurofins
>    Laboratory, showed that all 29 Enlightened Kombucha samples were above
>    0.5 percent alcohol by volume, ranging from 0.64 to 1.85 percent alcohol
>    by volume.;

17

o December 2015 and July 2016 testing using the same GC-FID methodology at Covance-Eurofins Laboratory showed that all 21 Enlightened Kombucha samples tested were above 0.5 percent alcohol by volume, ranging from 1.09 to 1.96 percent alcohol by volume.;

o Testing in March 2016 within a method verification and round-robin study showed that all 4 samples tested by all the three laboratories involved were above 0.5 percent alcohol by volume, ranging from 1.27 to 1.51 percent alcohol by volume.

38.    Mr. Ebersole's report also cites testing conducted by Enartis Vinquiry in 2017 and 2018 using GC-FID where all 46 bottles of Enlightened Kombucha tested were above 0.5 percent alcohol by volume, ranging from 0.60 to 2.05 percent alcohol by volume. Mr. Ebersole also cites to a 2015 report from John Edwards, Ph.D. from Process NMR associates who tested three samples of Enlightened Kombucha, all of which were above 0.5 percent alcohol by volume, ranging from 1.23 to 1.40 percent alcohol by volume.  I have personally worked and collaborated with Dr. Edwards regarding alcohol testing methodologies and believe that his results are valid and reliable.  Clearly, Mr. Ebersole's testing, as well as the other reports he cites and attaches to his declaration, all corroborate the testing I have performed in this case.

39.    Based on my own testing, and a review of the recent literature and studies concerning the alcohol content of Enlightened Kombucha, in my professional opinion, Enlightened Kombucha has for years (since at least 2015) contained, and still contains, more than 0.5 percent alcohol by volume.  **Well over a hundred samples of Enlightened Kombucha tested over the last six years, purchased from different retail locations around the country, from different lot codes, tested using different methodologies by**

18

**different laboratories and experts, have all come to the same conclusion: every**

**Enlightened Kombucha at the retail level contains more than 0.5 percent alcohol by**

**volume.**

## VI.  REFRIGERATION IS NOT SUFFICIENT TO KEEP THE ALCOHOL PERCENTAGE OF ENLIGHTENED KOMBUCHA BELOW 0.5 PERCENT ALCHOL BY VOLUME

40.     I also sought to quantify any changes in the alcohol content of Enlightened Kombucha over time, both in refrigerated and room temperature conditions.

41.     In 2015, my laboratory purchased several samples of the same lot codes of Enlightened Kombucha.  Half of the samples were kept in a refrigerator, and half were kept at room temperature (ca. 24 °C).  Each set of samples was then tested one week from purchase, and then again one week prior to the listed expiration date.

42.     All samples tested at above 0.5 percent alcohol by volume, including the samples kept in the refrigerator at the end of the first week.  The refrigerated samples, 1 week after purchase, ranged from 0.96 to 2.02 percent alcohol by volume.  The testing results from this analysis are summarized in Tables 5a-d below.  The blue bars refer to samples that were kept refrigerated (at one week after purchase, and one week before expiration, from left to right, respectively), and the red bars refer to samples that were left out at room temperature (at one week after purchase, and one week before expiration, from left to right, respectively):

19

*Table 5a*







20

*Table 5b*







21

*Table 5c*







22

*Table 5d*



43.     As summarized in Tables 5a-d, every sample of Enlightened Kombucha stored at room temperature increased in alcohol value, and most quite dramatically.  For instance, the Synergy Trilogy flavor gained 1.33 percent of alcohol, an increase of 53.6 percent.  And, seven out of ten flavors of Enlightened Kombucha increased in alcohol even when kept refrigerated.  Notably, all ten samples were well over the 0.5 percent alcohol by volume threshold from the outset.

44.     My results are consistent with similar testing reported in the June 2017 University of Texas study discussed above.  That study showed that the alcohol content of Enlightened Kombucha increased dramatically when left at room temperature during the first 14 days, followed by a slight decline after 21 days.  It also showed that Enlightened Kombucha stored at refrigerated temperatures (4 °C) climbed gradually for 14 days, at which point the alcohol content remained nearly unchanged.  Table 6 (which was Figure 4 in the University of Texas report) provides a summary of the University of Texas findings:

23

*Table 6*



**Fig. 4 a** The effect of storage period on ethanol content of new unopened GT's Kombucha Original samples. **b** The effect of storage period on ethanol concentration of opened but refrigerated GT's Kombucha Original sample. See the "Materials and Methods" section for method details

45. Based on my review of the University of Texas data, as well as my own testing, it is clear that refrigeration of Enlightened Kombucha does not prevent the buildup of alcohol beyond 0.5 percent alcohol by volume. The three samples (out of ten) that I tested where the alcohol level either stayed the same or decreased slightly when kept refrigerated is consistent with the University of Texas data, as it appears that the alcohol content of those samples had peaked at refrigerated temperatures, plateaued, and then decreased slightly. Further, 100 percent of the samples tested were well above 0.5 percent alcohol by volume threshold even when kept at refrigerated temperatures.

## VII. ENLIGHTENED KOMBUCHA CONTAINS SIGNIFICANTLY MORE SUGAR THAN LISTED ON ITS LABELS

46. In 2019, I also tested the sugar content of Enlightened Kombucha, using the HPLC (High Performance Liquid Chromatography) methodology. The beverages were purchased at a retail location in California and shipped to my laboratory in a refrigerated/iced container. None of the bottles were expired at the date of testing. BDAS then immediately refrigerated the bottles upon receipt.

24

47.     When compared to the amount of sugar listed on the labels of the respective flavors of Enlightened Kombucha tested, the testing shows that the vast majority of flavors of Enlightened Kombucha contain far more sugar than listed on the products' labels, including almost double the amount declared for some flavors (Gingerberry).  Only one (out of 19) flavors – Tantric Turmeric – tested at or below the amount of sugar listed on the beverage's label.  Table 7 provides a comparison of the grams of sugar listed on the labels of Enlightened Kombucha juxtaposed with the levels of sugar that I found through testing:

*Table 7*

| Flavor | Grams of Sugar Listed on the Label, per 8 fl. oz | Grams of Sugar Found By BDAS Testing, per 8 fl. oz. | Percent Difference of Sugar Content |
|---|---|---|---|
| Gingerberry | 6.0 | 11.75 | 95.83% |
| Strawberry Serenity | 8.0 | 10.01 | 25.13% |
| Watermelon Wonder | 9.0 | 10.39 | 15.4% |
| Passionberry Bliss | 6.0 | 10.61 | 76.83% |
| Guava Goddess | 8.0 | 10.53 | 31.63% |
| Pink Lady Basil | 7.0 | 10.29 | 47.00% |
| Trilogy | 6.0 | 9.35 | 55.83% |
| Lavender Love | 8.0 | 9.25 | 15.63% |
| Heart Beet | 8.0 | 9.03 | 12.88% |
| Tantric Turmeric | 6.0 | 5.37 | 10.50% |
| Gingerade | 6.0 | 7.96 | 32.67% |
| Original | 6.0 | 8.69 | 44.83% |

25

Evid. Appx. Page 217

| Hibiscus Ginger | 8.0 | 9.85 | 23.13% |
| Cayennade | 8.0 | 10.11 | 26.38% |
| Lemonade | 6.0 | 9.03 | 50.5% |
| Multi-Green | 8.0 | 9.55 | 19.38% |
| Raspberry Chia | 8.0 | 12.76 | 59.50% |
| Cosmic Cranberry | 8.0 | 10.57 | 32.13% |
| Mystic Mango | 10.0 | 11.57 | 15.70% |

48.    My testing of the sugar content of Enlightened Kombucha is corroborated by similar testing by other experts in the field.  For instance, Dr. Ebersole reported that during 2016 through 2019, he tested 60 samples of Enlightened Kombucha.  54 out of 60 samples contained sugar content of greater than 20 percent higher than claimed on the label.

*  *  *

49.    I understand that discovery is ongoing and that further evidence may be produced in this action.  Accordingly, I reserve the right to update or amend my opinions if provided with new or additional information that may impact my opinions stated herein.

50.    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 2nd day of June 2021 in Lexington, Kentucky.

Dr. Gary Spedding      6-2-21

26

# EXHIBIT "A"

Evid. Appx. Page 219

## **EXHIBITS AND OTHER MATERIALS REVIEWED (Other Than Those Specifically Mentioned In Report)**

**COURT DOCUMENTS**

- Filed Amended Complaint (in this case)
- 2021.05.26 Class Action Complaint in *Bell v. George Thomas Dave*, et al, Case No. 2:21-cv-11816 (D.N.J.)
- Declaration of Blake Ebersole, *Tortilla Factory v. GT's Living Foods*, Case No. 2:17-cv-07539-FMO-GJS (C.D. Cal.)

**DOCUMENTS PRODUCED IN THE LITIGATION**

- Defendant's Bates Numbers 2-1450, 1485-1608, 8046-8063, 8143-8416, 8109-8135, 8471-8500, 8574, 8588, 8589-8591,  8862-9116, 9583-9746
- Plaintiffs' Bates Numbers 1-41

**DEPOSITION TRANSCRIPTS – SHARPE v. GT'S LIVING FOODS**

- George Thomas Dave 30 (b) (6) February 26. 2021 deposition transcript and exhibits 15, 18, 19, 22, 23

**REQUEST FOR ADMISSIONS, INTERROGATORIES, ETC.**

- 2.9.2021 GT's Suppl. R&Os to Second Interrogatories.pdf
- 2.23.2021 GT's Corrected Suppl. R&Os to First Requests for Admissions
- 4.20.2021 GT's Living Foods LLC's Third Supplemental Responses to First Interrogatories

Evid. Appx. Page 220

# EXHIBIT "B"

## LIST OF PUBLICATIONS AND CONFERENCE TALKS IN THE PREVIOUS 10 YEARS

"Measuring Alcohol: Three Ways to Proof the Product" G. Spedding. Poster and Proceedings Paper for the Worldwide Distilled Spirits Conference, Glasgow Scotland, 2017. In, Distilled Spirits Local Roots; Global Reach. Edited by F. Jack, D.Dabrowska, S. Davies, M. Garden, D. Maskell, D. Murray. The Institute of Brewing and Distilling (2018)

AOAC SMPR® 2016.001. Erik J M Konings, W Bradley Barrett, Michael Beshore, Tim Beshore, Jeannie Buscher, Hannah Crum, G T Dave, Blake E Ebersole, John C Edwards, Susan Fink, Eldon Kenneth Hurley, Jr, Rasu Jayabalan, George Joseph, Rachel Kanaan, Samuel J LaBonia, Alex LaGory, Deepali Mohindra, James Neal-Kababick, Theresa Pham, Melissa Meaney Phillips, Catherine A Rimmer, Maged Sharaf, Jorgen Skovbjerg, Gary Spedding, Katherine Stenerson, Rachel Stryffeler, Darryl M Sullivan, John Szpylka, Daina Trout, Sudhakar Yadlapalli, Jinchuan Yang, Chen Zhang, Scott G Coates Journal of AOAC INTERNATIONAL, Volume 99, Issue 4, 1 July 2016, Pages 1120–1121, https://doi.org/10.5740/jaoacint.SMPR2016.001

"Alcohol and Its Measurement". G. Spedding. In: Brewing Materials and Processes: A Practical Approach to Beer Excellence. Edited by Charles. W. Bamforth. Academic Press. (2016)

ARTISAN SPIRIT

Bits and Blobs and UFO's. A Hazy Problem in Need of a Clearer Solution." Gary Spedding. Artisan Spirit. Vol. 21;92-98. (2017)

"Alcohol Dilution Practices for Distillers." Gary Spedding, Amber Weygandt and Matthew Linske. Artisan Spirit. #14, Spring issue; pp. 65-70. (2016)

"Measuring and Calculating Alcohol in Distilled Spirits and Liqueurs: Emphasis on Contemporary High Extract Containing Spirits." Gary Spedding. Artisan Spirit. Vol. 10; 94-96. (2015)

"Smelling Roses, Fruit, Stinky Feet and Much More in my Glass." Gary Spedding. Artisan Spirit. Vol. 12; 53-58. (2015)

"Alcohol Dilution Practices for Distillers." Gary Spedding, Amber Weygandt and Matthew Linske. Artisan Spirit. Vol. 14; 65-70. (2016)

"Toasting My Spirits. Maillard and the incredible reactions he uncovered in 1912. Part 1 – The Chemistry." Gary Spedding. Artisan Spirit. Vol. 18; 98-102. (2017)

"Toasting My Spirits. Maillard and the incredible reactions he uncovered in 1912. Part 2 – The Maillard Reaction and Distilled Spirits Production." Gary Spedding. Artisan Spirit. Vol. 19; 65-69. (2017)

"Testing Your Spirits in the New Age: Something Old, Something Borrowed and Something New." Gary Spedding. Artisan Spirit. Vol. 19; 81-89. (2017) [*Calories in sweetened beverages*]

"New Understanding of Human Sensory Perception. Potential for More Robust Sensory Evaluation of Distilled Spirits." Gary Spedding. Artisan Spirit. Vol. 22; 78-85. (2018)

"The Vast and Fantastic World of Botanicals. The Art of Extracting and Preserving the Exquisite Flavors of Gin." Molly Troupe and Gary Spedding. Artisan Spirit. Vol. 23; 60-67. (2018)

"The Fruits Have First Bite. Introduction, Chemistry and Part 1. [Beverage Flavor Chemistry – A Series]." Gary Spedding. Artisan Spirit. Vol. 24; 103-109. (2018)

"Describing the Flavors of Rum. A Primer." Gary Spedding. Artisan Spirit. Vol. 25; 88-91. (2018)

"Acrolein Brining Tears to Your Eyes." Gary Spedding. Artisan Spirit. Vol. 26; 99-105. (2019)

"Applying Scientific Thinking, To Better Understand Your Distillation Operations and Spirits." Gary Spedding. Artisan Spirit. Vol. 27; 82-86. (2019)

"Scientific Thinking & Sensory Biases. Lets Move Towards a Better Science of Evaluation." Gary Spedding. Artisan Spirit. Vol. 28; 90-95. (2019)

"Keeping It In. The flavor of the whiskey or the gin." Gary Spedding. Artisan Spirit. Vol. 29;109-114. (2020)

"BAIJIU an Acquired Taste. Chinese Liquor with a Range of Unique Flavor Characteristics." Gary Spedding. Artisan Spirit. Vol. 30; 100-107 (2020)

"POITIN Strong, Old and Bold – Steeped in colorful history and lore." Gary Spedding. Artisan Spirit. Vol. 31; 104-110. (2020)

"SAKE. Part One: A Cultural and Scientific Rice and Alcoholic Adventure." Gary Spedding. Artisan Spirit. Vol. 32; 91-99. (2020)

"SAKE. Part Two: From Raw Materials to Finished Product." Gary Spedding. Artisan Spirit. Vol. 33; 69-107. (2021)

"SHOCHU. Part One It is all about the base and the koji too!" Gary Spedding. Artisan Spirit. Vol. 34; 88-95. (2021)

31

DISTILLER:

Eighty Years of Rapid Maturation Studies: Why Are We Not There Yet? Part 1: Key Analytics and Solvent Chemistry. Gary Spedding. Distiller. 13 (2); 88-100. (2017)

Eighty Years of Rapid Maturation Studies: Why Are We Not There Yet? Part 2 of 3. A review of spirit in wood maturation, with some speculations on rapid maturation and future potential. Gary Spedding. Distiller. 13 (3); 136-139, 142-3. (2017-18)

Eighty Years of Rapid Maturation Studies: Why Are We Not There Yet? Part 3. A review of spirit in wood maturation, the chemistry: reactions and mechanisms; solvent and congeners; oxidation and catalysis. Gary Spedding. Distiller. 14 (1); 168-185. (2018)

"80 Years of Rapid Maturation Studies: Why Are We Not There Yet?" Gary Spedding. The booklet extended and revised edition. American Distilling Institute (March 2021)

_____

 "Sensory Analysis as a Tool for Beer Quality Assessment with an Emphasis on its use for Microbial Control in the Brewery". Gary Spedding, Tony Aiken. In: "Brewing Microbiology Managing Microbes, Ensuring Quality and Valorising Waste." Edited by Annie Hill. Woodhead Publishing. (2015)

"Scanning UV-Visible Spectroscopy and Beverage Quality, Consistency and Authentication: Preliminary Fingerprinting Application in the Analysis of a Wide Variety of Alcoholic Beverages -A Brief Application Note". Gary Spedding "White paper (self-published & on-line). BDAS, LLC WPSP#2. 2015.

"So What is Kombucha? An Alcoholic or a Non-Alcoholic Beverage? A Brief Selected Literature Review and Personal Reflection". Gary Spedding "White paper (self-published & on-line). BDAS, LLC WPSP#l. 2015.

"Authentication and Quality Testing of Distilled Spirits Using the SPECTROstar Nano. Application Note 277". Gary Spedding and C. Peters. http://www.bmglabtech.com/media/35216/1308715.pdf. 2015.

Beer Quality Production Series for the Scandinavian Brewer's Review since 2012. [Gary Spedding alone (GS) or with Amber Weygandt (AR) and Matthew Linske (ML).] Basic Quality Management (a series); BQM: Water, GS - Vol 69 (3), 2012, BQM: Malt, GS - Vol 69 (4), 2012, BQM: Hops, GS - Vol 69 (5), 2012. Basic Quality Management: Milling. [GS] Vols. 70 (1, 2, 3), 2013. Basic Quality Management: Mashing [GS, AW, ML]. Pt. 1: The Purpose of Mashing and Enzymes 71 (1), 2014. Pt. 2. Activities of Mashing: Producing the Wort Constituents 72 (2), 2014. Pt. 3. Mash Systems and Vessels 71 (3), 2014.) Basic Quality Management: Lautering, Mash Transfer and Separation: [GS, AW, ML] – Vols. 71 (1, 2, 3), 2015. Basic Quality Management – Wort Boiling [GS, AW, ML] Vols. 73

(3,4), 74 (1, 2, 3, 4), 2017. Brewing Raw Materials [GS, AW, ML] Vols. 73 (1, 2). 2016 [GS, AW, ML, Vols. 73 (3, 4) 2016

"Beer Analysis and Testing: For a New Millennium - Seven key analyses requested or needed by brewers today for their records/efficiency calculations and for satisfying regulatory agents and customer's nutritional questions." Gary Spedding. [White paper for distribution upon request. See below for extended published version.]

"Beer analysis and testing for a new generation" (Nine key analyses recommended for brewers and a follow up on related beer nutritional parameters) Amber Weygandt, B.Sc., Matt Linske, B.Sc., Philip Gennette, B.Sc., and Gary Spedding, Ph.D. The New Brewer, Vol. 34 (4); 70-72, 74, 76, 78, 80, 82. July/August 2017.

"Best Practices Guide to Quality Craft Beer." Brewers Association Technical Guides. Gary Spedding. Brewers Association Export Development Program. (2013). [Published in English, Chinese, German, Japanese and Spanish]

"Empirically Measuring and Calculating Alcohol and Extract Content in Wort and Beer with a Reasonable Degree of Accuracy and Confidence - Using a Series of Inter- related and Conversion Equations, Algorithms, Tables and an On-line Calculator." Gary Spedding. Brewers Digest (On-line) July/August 2013. pp. 23-34.

"Troubleshooting Tips Part 1: Fermentation Problems - Slow start (long-lag) or slow fermentation process." Gary Spedding, Matthew Linske. Brewers Digest (On-line) 2013-Nov-Dec; pp 27-30. "Troubleshooting Tips Part 2: Fermentation Problems - Stuck Fermentations and Attaining Correct Attenuation. Gary Spedding, Amber Weygandt, Matthew Linske. Brewers Digest (On-line). January-February 2013. pp. 29-31.

"The World's Most Popular Assay? A Review of the Ninhydrin-Based Free Amino Nitrogen Reaction (FAN Assay) Emphasizing the Development of Newer Methods and Conditions for Testing Alcoholic Beverages." G. Spedding. J. Am. Soc. Brew. Chem. 70 (2), pp. 95-102. (2013)

Acetic Acid, Acid, Acidification, Acidity, Alcohol Strength/Measurement, Alkalinity, Calories, Chromatography, Flavor Wheel, 4-Vinyl Guaiacol, 4-Vinyl Syringol, Fusel Alcohols, Gushing, lsoamyl acetate, Sugar. Gary Spedding. In, The Oxford Companion to Beer. Ed. Garrett Oliver. (2012)

"A New Way to Test the Free Amino Nitrogen Content in Alcoholic Beverages with the SPECTROstar Nano." Application Note 226. Gary Spedding, Nathan R. Harrison, Franka Ganske, EJ Dell. http://www.bmglabtech.com/ condeon/cdata/ media/35216/1043934.pdf. (2012)

_____

BREWERS JOURNAL.

"Flavor Production in a Nutshell." Gary Spedding. Brewers Journal - Launch Issue. Sept-Oct 2015; 76-78

"Brewing with Flavour. The Good, The Bad and The Ugly." Gary Spedding. Brewers Journal. Nov-Dec 2015; 66-68

"Taste the Difference." Gary Spedding. Brewers Journal. Jan-Feb 2016

"Find the Balance: Basic Beer Alcohol and Extract Determinations." Gary Spedding. Brewers Journal. Vol. 6; 73-77. (2017)

"Toasting the Grains." Gary Spedding. Brewers Journal. Spring 2017; 63-68 [Science Maillard Reaction – British and Canadian Editions]

**General and Quick Notes/Seminars etc.**

The Buzz (ASBC Newsletter). Beer and Alternative Beverages: Nutritional Calculation Issues. Gary Spedding. Vol. 81 (3). 2021

Wood and Distilled Spirits Maturation: A Complex and Long-Lasting Marriage. March 12, 2021, 3:15 PM - 3:45 PM. James B. Beam Institute Industry Conference.

Biases in Sensory Evaluations. Gary Spedding. ACSA Convention Education. 2020 Virtual. Learn How to Make Better Tasting Beer with BDAS. By Brewing & Distilling Analytical Services on July 30, 2015 https://thebrewermagazine.com/learn-make-better-tasting-beer-bdas/

"INSIDE BEER: THE SPIRITED SCIENTIST" – Interview by Tom Wilmes, Nov. 9, 2019.: https://www.spiritedbiz.com/inside-beer-the-spirited-scientist/

"A Fresh Perspective: shelf-life stability of distilled spirits, liqueurs and cocktail mixers." G. Spedding. CRAFT SPIRITS Vol. 1 (Issue 1); 62-63 (2019)

"Tinkering with the Formula: One Scientist's Take on the Effectiveness of Rapid Maturation Techniques for Brown Spirits. Gary Spedding. Spirited Magazine (2018)

"Measuring Alcohol - Part I" **On Alcohol, Alcoholic Strength and Measurements** by Gary Spedding, "Got Rum?" Publishers January 27, 2016 https://www.gotrum.com/editorials/from-the-editors/measuring-alcohol-part-i/ (2016)

"Measuring Alcohol, Part II" by Gary Spedding, "Got Rum?" Publishers  February 22, 2016 https://www.gotrum.com/editorials/from-the-editors/measuring-alcohol-part-ii/ (2016)

Master Brewers Association of the Americas > Meetings > Conference Archives > 2016 World Brewing Congress > Proceedings > 097. 97. "Tales from the brewing analytics lab: Past problems rising again along with new issues to investigate." Darrin Smith (1), Gary Spedding (2), Amber

34

Weygandt (2); (1) Eastern Kentucky University, Richmond, KY, U.S.A.; (2) Brewing and Distilling Analytical Services (BDAS), Lexington, KY, U.S.A. Analytical Poster. (2016)

CBC (Craft Brewers Conference) 2013. Calculation for Routine Measurements and Parameters in the Brewhouse and Brewery Lab. Gary Spedding. (2013)

Interlude: Running the Craft Brewery Laboratory. Basic Alcohol Calculations and Calculators. Gary Spedding. MBAA Regional Conference – Philadelphia. Oct 2012

# EXHIBIT 14

# REBUTTAL REPORT OF DR. GARY SPEDDING

*DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO, on
Behalf of Themselves and All Others Similarly Situated,*

Plaintiffs,

v.

*GT'S LIVING FOODS, LLC.*

Defendant

United States District Court
Central District of California
Case No. 2:19-CV-10920-FMO-GJS

*July 2, 2021*

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ........................................................................................................ 1

REBUTTAL TO OPINION NO. 1 ........................................................................... 1

REBUTTAL TO OPINION NO. 2 ........................................................................... 3

REBUTTAL TO OPINION NO. 3 ........................................................................... 6

REBUTTAL TO OPINION NO. 4 ........................................................................... 9

REBUTTAL TO OPINION NO. 5 ........................................................................... 13

Evid. Appx. Page 230

## INTRODUCTION

1.      This report provides my rebuttal to the expert report of Dr. Matthew McCarroll.  My qualifications, publications, compensation, and materials reviewed are included in my initial June 2, 2021 report and are incorporated herein by reference.  For the purposes of this rebuttal, I have also considered the transcript from McCarroll's June 23, 2021 deposition, as well as McCarroll's report.

2.      Each of the five opinions McCarroll provides in his June 2, 2021 report are either flawed and incorrect, or entirely irrelevant to the issues in this case – the alcohol and sugar level of Enlightened Kombucha at the retail level.  Further, based on my review of McCarroll's qualifications and his deposition testimony, it is my opinion that McCarroll does not have the requisite knowledge, experience, and qualifications to provide the opinions stated in his report.

## REBUTTAL TO OPINION NO. 1

3.      On page 4 of his report, McCarroll provides the following summary of his first opinion:

> Before 2017, there were no validated kombucha-specific standard methods to measure alcohol content of kombucha products. Laboratories thus measured kombucha alcohol content using a variety of methods derived from standard methods validated for use with beer and wine. Due to differences in sample matrix, these methods were found to deliver poor precision and accuracy when used for testing kombucha. Further, kombucha products in general are not as stable with respect to alcohol content as are beer and wine products, which can lead to additional inconsistency in testing results.

4.      It is not true that there were no validated kombucha-specific methods to measure alcohol content of kombucha products prior to 2017.  As discussed in my initial report, in 2015, I personally worked with three other independent laboratories to verify the results of my methodology for testing the alcohol content of kombucha beverages.  The

1

laboratories used multiple methodologies, including HPLC, GC-FID, ABV DMA NIR, and NMR.  This collaborative process validated each of the above methodologies for testing the alcohol content of kombucha beverages, and showed that each method is accurate and reliable.

5.     At his deposition, McCarroll testified that "it's, of course, possible for a laboratory to develop a method and validate it internally."  McCarroll Tr. at 83.  McCarroll also testified that it is common for laboratories to perform such validations (like the one I performed for alcohol, as discussed above):

> Q     Is it common for laboratories to develop internal methods and validate them for, you know, these kind of purposes, for testing alcohol in products?
>
> A     In general for any analytical method, it's common for a testing lab to develop and validate methods within their laboratories.

McCarroll Tr. at 83-84.  McCarroll also conceded at his deposition that there could have been validated methods for testing alcohol in kombucha products prior to 2017, but that he just had no idea whether there were any:

> Q     And before we were talking about the fact that, like, laboratories can do internal validations for alcohol testing.
>
>        Do you recall that?
>
> A     I do.
>
> Q     And you said that there's not an inherent problem with that, that happens all the time?
>
> A     Correct.
>
> Q     So how do you know that no labs had validated testing for alcohol content of kombucha prior to 2017?
>
> A     I don't and that's not what I said.
>
>        …

2

Q    …So there could have been validated kombucha-specific methods to measure alcohol content of kombucha products; right, prior to 2017?

A    Lab specific, yes.

Q    Okay.  But you just don't know whether there were or there were not?

A    Of course not.  Someone may have invented one 300 years ago.  I don't know about it.

McCarroll Tr. at 141-142.

6.    It is also not true that "these methods were found to deliver poor precision and accuracy when used for testing kombucha."  As discussed in my initial report, each of the methods tested in the 2015 collaboration was found to be highly reliable, accurate, and precise, with a deviation of only 0.1%.  McCarroll's unsupported statements in his report like "density-based measurements are not suitable for kombucha" are simply not true.

7.    While McCarroll is correct that "kombucha products in general are not as stable with respect to alcohol content as are beer and wine products," meaning that the alcohol content of kombucha increases over time (whereas the alcohol content of wine and beer stays relatively stable), he is not correct that such differences create inconsistencies in the testing results.  As discussed in my initial report, both the methodology that I used, and the methodologies used by other experts in the field, including Blake Ebersole, have repeatedly been shown to be precise, accurate, and reliable, and have all uniformly shown that the alcohol content of Enlightened Kombucha is more than 0.5% alcohol by volume at retail.

## **REBUTTAL TO OPINION NO. 2**

8.    On page 4 of his report, McCarroll provides the following summary of his second opinion:

3

GT's has taken various measures reasonably calculated to keep the alcohol content of its Enlightened kombucha products below 0.5% alcohol by volume (ABV) for at least the duration of their shelf lives. These measures are designed to influence the kombucha's alcohol content both during production and during the distribution cycle. The theoretical efficacy of these measures is scientifically supported, and their actual efficacy is demonstrated by, among other things, the results of third-party lab tests.

9.      First and foremost, McCarroll conceded at his deposition that he had no idea whether the methods GT's has purportedly taken to keep the alcohol content of Enlightened Kombucha below 0.5 percent have been effective *at the retail level*.

Q      So how do you know whether, in fact, there was – the measures that they've implemented has actual efficacy at the retail level?

A      I don't think I can know what happens at the retail level.

Q      … So you are not giving an opinion that the measures that GT's has implemented is, in fact – in fact, works to keep the alcohol level of Enlightened kombucha below 0.5 percent at the retail level; correct?

A      My opinion is that the measures they are taking in of production and distribution are reasonable to expect that it would stay below a half percent.

Q      But you just don't know whether they were or not at the retail level?

A      Correct.  Not knowing what might happen to the samples at that stage.

McCarroll Tr. at 143-144.

10.      Dr. McCarroll also testified that he had no idea how much Enlightened Kombucha sold at retail is over 0.5 percent alcohol by volume, and conceded that he did not know if perhaps *even 100 percent of Enlightened Kombucha sold at retail is over 0.5 percent alcohol by volume*:

Q      Do you know what percentage of Enlightened kombucha is at or above 0.5 percent alcohol by volume at retail?

A      I have no basis to know that.

Q      Do you know if it's 50 percent?

<div align="center">4</div>

A    I still have no basis to know that.

Q    Do you know if it's a hundred percent?

A    I have no basis to know that.

Q    So you are not giving an opinion in this case of what the alcohol percentage of Enlightened kombucha is at retail; correct?

A    No.

Q    Because you just don't know one way or another?

A    It's not what I was asked to do and I don't – no, I do not know that.

McCarroll Tr. at 104-105.

11.    Dr. McCarroll also conceded that the methods GT's took to purportedly keep the level of alcohol in Enlightened Kombucha below 0.5 percent *did not* guarantee that the level of alcohol in the products would in fact remain below 0.5 percent alcohol by volume.  McCarroll Tr. at 91-105.  For instance, McCarroll admitted that shortening the shelf life of Enlightened Kombucha did not guarantee that the products would not go above 0.5 percent alcohol by volume.  McCarroll Tr. at 91-92.  McCarroll also testified that he did not know whether alcohol fermentation *slowed*, as opposed to stopped, at refrigerated temperatures.  McCarroll Tr. at 98-99.  McCarroll did not, and was not asked to, determine the rate of fermentation at refrigerated temperatures and accordingly did not know the rate of fermentation.  McCarroll Tr. at 100.  And, despite opining that refrigeration was the primary method for ensuring that Enlightened Kombucha did not cross the 0.5 percent alcohol by volume threshold, McCarroll had no idea whether Enlightened Kombucha was in fact kept refrigerated during transport between distribution centers and retail locations, or what percent of Enlightened Kombucha was refrigerated at retail.  McCarroll Tr. at 102-103.

12.     McCarroll even conceded that it is possible that Enlightened Kombucha could go above 0.5 percent alcohol by volume:

> Q     Do you believe that any other flavors of the Enlightened Kombucha could go up to one percent of alcohol by volume?
>
> A     Oh, I think it's – I think it's possible.

McCarroll Tr. at 71.  This was especially true if the products were not refrigerated. McCarroll at 102-103.  Because he did nothing to find out, however, he just did not know whether, or what percentage, of Enlightened Kombucha was over 0.5 percent alcohol by volume at retail.

13.     As discussed in my initial report, it is demonstrably not true that the methods that GT's has taken have been effective in keeping the alcohol by volume of the beverages below 0.5 percent at retail.  Every test that I have ever performed, and every test performed by an expert that I am aware of, have uniformly and consistently found that the alcohol by volume level of Enlightened Kombucha exceeds 0.5 percent at retail.

## **REBUTTAL TO OPINION NO. 3**

14.     On page 4 of his report, McCarroll provides the following summary of his third opinion:

> GT's practice of testing samples both at the time of production and at the end of shelf life on at least a monthly basis, as well as its occasional reassessment of products' shelf lives by testing those products long after their expiration, exceeds KBI's recommended best practices with respect to alcohol testing.  Testing product after delivery to retailers is not suggested as a best practice in KBI's recommendations.

15.     I do not believe that McCarroll is qualified to give an expert opinion regarding KBI recommendations or best practice guidelines generally.  Nor do I believe that KBI's recommendations are reasonable or should have been followed under the circumstances here.

6

16.    McCarroll testified that he did not recall ever talking with anyone from KBI. McCarroll Tr. at 40.  McCarroll also testified that he understood that KBI is a lobby organization.  McCarroll Tr. at 40.  Because KBI is a lobby organization, McCarroll did not know whether KBI's lack of a recommendation for alcohol testing at retail was because KBI in fact suspected that kombucha products are often above 0.5 percent alcohol by volume at retail.  McCarroll at 42. McCarroll had no idea why KBI did not make such a recommendation.  McCarroll at 42-43.  McCarroll also testified that KBI is obviously not a scientific body:

Q    Do you understand that KBI is not like a scientific body?

A    Yes

McCarroll Tr. at 41.

17.    McCarroll also admitted that he had no idea what the best practices in the kombucha industry were in practice with respect to testing the alcohol content of kombucha beverages.  McCarroll Tr. at 44-51.  Indeed, it did not appear that McCarroll knew what even a single manufacturer did (other than GT) with respect to alcohol testing of kombucha beverages:

Q    Do you know what the industry practice is, in fact, with respect to testing the alcohol content of kombucha beverages at the retail level?

A    I cannot know that.  At this point that would – that would require me to know what all kombucha manufacturers are doing in practice.

Q    So do you not know what the industry practice is, in fact, with respect to testing the alcohol content of kombucha beverages at the retail level?

A    I have no basis to know what all manufacturers are doing in practice.

…

7

Q      So would you know if, for example, half of the kombucha industry, in fact, tests the alcohol content of kombucha beverages at the retail level?

A      I don't have any basis to know what they do.

Q      Okay.  And you haven't done anything to find that out; correct?

A      No.

McCarroll Tr. at 49-51.

18.      Based on his testimony and (lack of) experience, it is clear that McCarroll lacks the necessary experience and qualifications to give expert testimony on best practices regarding alcohol testing in the kombucha industry.  McCarroll testified that "We don't do a lot of testing for commercial kombucha."  McCarroll Tr. at 28.  McCarroll has done so little work in the kombucha industry that he could not recall whether any of the testing he *did* do for the industry was in 2016 *or 2020*.  McCarroll Tr. at 28.  In total, McCarroll has tested *less than twelve total samples of kombucha (of any kind) in his entire life* – whether for commercial purposes or out of self interest.  McCarroll at 31.  None of those under twelve tests were of Enlightened Kombucha.  McCarroll possesses neither the knowledge nor experience of the kombucha industry to give opinions with respect to best practices or the KBI, or whether GT's practices exceeded such purported best practices.

19.      I have spent over a decade testing kombucha products in my laboratory.  I have advised dozens of kombucha brewers regarding alcohol testing of kombucha products.  In my experience, any reasonable kombucha brewer would have tested the alcohol level of its kombucha products at the retail level after being notified of tests showing that the beverages were above 0.5 percent alcohol by volume, or after learning that the samples were compromised during transport or distribution – such as by exposure to non-refrigerated temperatures.  At his deposition, GT Dave testified that GT's regularly

8

receives reports that distributors did not properly refrigerate Enlightened Kombucha, and also testified that GT's received reports that at least some samples of Enlightened Kombucha were above 0.5 percent alcohol by volume. Under best practices, GT's should have tested Enlightened Kombucha at retail.

## **REBUTTAL TO OPINION NO. 4**

20. On page 4 of his report, McCarroll provides the following summary of his fourth opinion:

> GT's tested the alcohol content of its Enlightened products using industry-standard methods for the relevant period, including methods approved by KBI and AOAC. Save for a single test of what turned out to be a spoiled juice product, GT's test data do not show any results above 0.5% ABV when randomly selected and tested at the time of production or tested at the end of shelf life, and 98% of the tests conducted found alcohol levels of 0.4% ABV or below. In my opinion, it was reasonable for GT's to rely on these results, and I have no reason to doubt their accuracy.

21. As discussed above, I do not believe that McCarroll has the requisite experience, knowledge, or qualifications to give expert opinions regarding kombucha industry alcohol testing best practices. And, based on a review of his experience and deposition testimony, I also do not believe that McCarroll has the requisite experience, knowledge, or qualifications to give an expert opinion on the accuracy or reliability of the testing data that GT's commissioned.

22. For instance, although McCarroll touts his teaching experience as part of his qualifications, he testified that he does not cover alcohol testing of kombucha beverages in any of those courses, and never has. McCarroll Tr. at 17-18. And, McCarroll could not recall whether any student had ever tested the alcohol content of kombucha beverages at his lab. McCarroll at 22.

9

23.    Though his expert report implied that McCarroll is a certified chemist by the TTB for beer, wine, and spirits, at his deposition, McCarroll clarified that he is not currently TTB certified for beer or wine, just spirits.  McCarroll at 24.

24.    McCarroll's deposition testimony, and his background, also demonstrate that he has no clear understanding of the established and approved methods for alcohol, nutritional, calorie or carbohydrate measurements used within the industry.  And, he has done virtually nothing to educate himself on how the various tests that GT commissioned were done, instead relying solely on second hand and third hand information for which he has no personal knowledge.

25.    For instance, McCarroll has never done a single test of the alcohol or sugar content of Enlightened Kombucha at any point (at retail, and pre-distribution):

Q    Okay.  But you have never done a test of the alcohol or sugar content of the Enlightened Kombucha; correct?

A    No, I haven't.

McCarroll Tr. at 37.  McCarroll testified that he was not even curious as to what the alcohol content of Enlightened Kombucha was at retail.  McCarroll at 107.  And, McCarroll testified that GT's likewise has never tested the alcohol content of Enlightened Kombucha at retail.  McCarroll Tr. at 128.

26.    To compound his own lack of testing of Enlightened Kombucha, he never talked to any person at any of the labs GT's used to test Enlightened Kombucha.  McCarroll at 14.  Accordingly, outside of the listing of the methodology used (which can be derived from the report) McCarroll has no knowledge whatsoever about how any of those labs set up their instruments, what values they considered, how they actually ran their tests, or even what temperature the samples were stored at:

10

Q    And you never talked to anybody with firsthand knowledge at any of these labs about how these tests were actually conducted; correct?

A    I did not.

McCarroll at 135-136.

27.    While it may be appropriate in some situations in the field to rely on third-party testing, it was not appropriate for McCarroll to do so here.  For instance, McCarroll testified that it was apparent on the face of the testing results that GT's commissioned that density values for the samples were *provided by GT*, and were not independently determined by the labs.  McCarroll at 132-133.  This is highly irregular in the field, and should have set off immediate red flags about the reliability of the data.  Instead, McCarroll testified that he did not bother to check why it had been done:

Q    Do you see that in this excerpt from the report there's an indication stating, "Density value is client supplied."

Do you see that?

A    I do.

…

Q    Would that suggest to you that GT's provided the density values to the lab?

A    That that seems to be what it would indicate.

…

Q    Why didn't the lab measure it?  Is that normal?

…

A    …[I]t would be very unusual for a laboratory to use a client-supplied value in the determination of the other value.

Q    And when you say, "it would be very unusual," why is that?

A    I - - because I think it would be uncommon.

Evid. Appx. Page 241

Q       It's not something that's regularly done in testing for alcohol by labs to rely on data about density provided by the client; correct?

A       Correct.

Q       Do you have any indication that Covance did anything other than rely on the density value provided by GT's?

A       I don't have any information about what they may or may not have done with the density value that was provided by GT's.

Q       Right.  Because you never talked to anybody at Covance or at GT's about exactly how these tests were done; correct?

A       No, I did not see a need to.

McCarroll Tr. at 132-134.

28.     It was also not reasonable for GT's to rely on the testing results from its commissioned labs if GT's wanted to know the actual alcohol by volume content of Enlightened Kombucha at retail.  Multiple factors, like agitation, temperature, and transportation and storage conditions all affect the rate of fermentation after Enlightened Kombucha is introduced into the marketplace.  It is not reasonable to rely on testing done solely pre-distribution for such an unstable product like kombucha, especially where the kombucha here is not pasteurized.  Further, GT Dave testified that it routinely received reports that Enlightened Kombucha is not refrigerated during transport, meaning that Mr. Dave should have known that it was effectively guaranteed that the products would go above 0.5 percent alcohol by volume by the time they hit the shelves at retail.  Dave Tr. at 188-198.  And, it is my understanding that GT's was aware of at least some of the various tests done by experts on the alcohol content of Enlightened Kombucha at retail, all of whom found that it contained more than 0.5 percent alcohol by volume at retail.  It was not reasonable for GT's to effectively ignore this situation and pretend that the problem did not exist.

<div align="center">12</div>

29.     As discussed in my initial report, the tests that GT's commissioned of Enlightened Kombucha also are not accurate to the extent that GT's wishes to extrapolate the results to alcohol levels of Enlightened Kombucha at retail.  Reliable and accurate testing of Enlightened Kombucha at retail shows that it is above 0.5 percent alcohol by volume.

## REBUTTAL TO OPINION NO. 5

30.     On page 4 of his report, McCarroll provides the following summary of his fifth opinion:

> GT's practice of testing the sugar content of each flavor of its Enlightened kombucha products several times each year, using industry-standard methods, is a reasonable way of measuring the sugar content of those flavors. GT's test data shows that the average amount of sugar in each flavor found through such testing is less than or equal to 120% of the amount disclosed on that flavor's label, as permitted by applicable FDA regulations, and regularly found to be below the labelled amount.

31.     As I discussed above, McCarroll is not qualified to give this opinion because he did absolutely nothing to verify how any of this testing was done, and did not do any testing of Enlightened Kombucha himself to corroborate any of the results.

32.     Further, it is well understood in the industry that the amount of sugar changes throughout time as fermentation continues.  Accordingly, it would have been prudent for GT's to test the amount of sugar in the beverages at retail to determine the true sugar content.  In any case, as discussed in my initial report, the vast majority of Enlightened Kombucha sold at retail contains more sugar than disclosed on the products' labels.  And, my testing showed that more than half of Enlightened Kombucha tested higher than even the 120% of the amount disclosed on that flavor's label.

<p style="text-align:center">*   *   *</p>

<p style="text-align:center">13</p>

33.    I understand that discovery is ongoing and that further evidence may be produced in this action.  Accordingly, I reserve the right to update or amend my opinions if provided with new or additional information that may impact my opinions stated herein.

34.    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 2nd day of July 2021 in Lexington, Kentucky.

07-02-21

_____
Dr. Gary Spedding

14

# EXHIBIT 15

CONFIDENTIAL

SCOTT M. VOELZ (S.B. #181415)
svoelz@omm.com
ZACH A. TAFOYA (S.B. #301837)
ztafoya@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California  90071-2899
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407

Attorneys for Defendant
GT's Living Foods, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GT'S LIVING FOODS, LLC <br><br> Defendant. | Case No.: 2:19-cv-10920-FMO (GJS) <br><br> **DEFENDANT GT'S LIVING FOODS, LLC'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS** <br><br> *CONFIDENTIAL* <br><br> Judge:  Hon. Fernando M. Olguin |

**PROPOUNDING PARTY:**    Plaintiffs Delaney Sharpe, Erin Weiler, Jenna Leder, and Adriana DiGennaro

**RESPONDING PARTY:**    Defendant GT's Living Foods, LLC

**SET NO.:**    First (1)

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant GT's Living Foods, LLC ("GT's") hereby objects and responds to the First Set of Requests for Admission (the "Requests") propounded by Plaintiffs Delaney Sharpe, Erin Weiler, Jenna Leder, and Adriana DiGennaro ("Plaintiffs") as follows:

## **PRELIMINARY STATEMENT**

No incidental or implied admissions are intended by the responses herein. The fact that GT's responds to or objects to any of the Requests should not be construed as an admission that GT's accepts or admits the existence of any facts assumed by such Request, or that such response or objection constitutes admissible evidence as to any such assumed facts.

As of the date of these responses, GT's has not completed its investigation of the facts relating to this action, has not completed discovery in this action, and has not completed its preparation for trial. Accordingly, the objections and responses set forth below are preliminary and are based solely on such information and documentation as is presently available and specifically known to GT's after having made a diligent search and reasonable and good faith inquiry, and are made without prejudice to GT's right to: (1) amend, alter, supplement, clarify, or otherwise modify these objections and responses as this matter proceeds; (2) make use of, or introduce at any hearing or trial, any documents, information, facts, evidence, and legal theories which are subsequently discovered or which are now known but the relevance, significance, or applicability of which has not yet been ascertained; and (3) offer expert witness opinions on any relevant matter, which opinions may vary from these objections and responses or the documents produced in response to the

1

CONFIDENTIAL

Requests.  Furthermore, GT's responses are made without in any way intended to waive, but on the contrary, intending to preserve:

1.    The right to raise—as part of any subsequent proceeding in, or the trial of, this or any action—all questions of authenticity, foundation, relevancy, materiality, privilege, and admissibility as evidence for any purpose of any documents produced or identified in support of any of GT's responses to any portion of the Requests;

2.    The right to object on any ground—as part of any subsequent proceeding in, or the trial of, this or any other action—to the use of any documents produced or identified in support of any of GT's responses to any portion of the Requests; and

3.    The right to object to introduction into evidence of any of these responses.

## GENERAL OBJECTIONS

The following General Objections are incorporated into each of GT's responses, whether or not restated specifically in each response:

1.    GT's objects to each Request to the extent that it seeks information or documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, or any other applicable privilege, protection, doctrine, or immunity, including those pertaining to trade secrets and other confidential material.  Any inadvertent production of such privileged or protected information or documents shall not constitute a waiver of any applicable privilege or protection.  In responding to these Requests, GT's will interpret each Request as excluding information and documents subject to any such privilege.

2.    GT's objects to each Request to the extent that it calls for information or documents held by GT's subject to an obligation of confidentiality owed toward third parties.

DEFENDANT'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

Evid. Appx. Page 248

CONFIDENTIAL

3.    GT's objects to each Request to the extent that it seeks information that is publicly available, is equally or more readily accessible to Plaintiffs, or is obtainable from other sources that are more convenient, less burdensome, or less expensive.

4.    GT's objects to the Requests to the extent that they purport to require a search for information that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5.    GT's objects to the Requests to the extent that they are overbroad or unduly burdensome.

6.    GT's objects to the Requests to the extent that they seek information that is not reasonably calculated to lead to the discovery of admissible evidence.

7.    GT's objects to the Requests to the extent that they are not limited to a time period that is relevant to this action.

8.    GT's objects to the Requests, including Plaintiffs' purported "Definitions," to the extent that they purport to impose obligations on GT's inconsistent with or unauthorized by the Federal Rules of Civil Procedure, the Local Rules and orders of this Court, or any other applicable law.  GT's will not comply with any such unauthorized or inconsistent definitions incorporated into the Requests.

9.    GT's objects to Plaintiffs' "Definitions" to the extent that they purport to give meaning to words different from their ordinary English meaning or from definitions set forth in applicable statutes or rules on the ground that each such "Definition" is unduly burdensome and oppressive.  GT's will interpret terms used in the Requests according to their ordinary and/or statutory usage, if different from Plaintiffs' "Definitions."

3

10.     GT's objects to Plaintiffs' definition of "ENLIGHTENED KOMBUCHA" to the extent it includes formulations of GT's Enlightened/Synergy products that were used exclusively prior to February 28, 2017.  In responding to the Requests, GT's will construe "ENLIGHTENED KOMBUCHA" as only covering bottles of its Enlightened/Synergy products that were produced using formulations in effect during the putative class period, *i.e.*, on or after February 28, 2017.

11.     GT's objects to Plaintiffs' definitions of "DEFENDANT," "YOU," and "YOUR" on the ground that they are vague, ambiguous, overbroad, and unduly burdensome, and to the extent they purport to seek information not within the possession, custody, or control of GT's.  GT's responds to the Requests solely on its own behalf.

12.     GT's discovery, investigation, and evaluation in this matter are ongoing.  GT's responses are based on its review to date, which is not yet complete.  GT's reserves the right to revise correct, supplement, or clarify its responses and its productions at any time pursuant to Federal Rule of Civil Procedure 26(e).

## RESPONSE TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:**

ENLIGHTENED KOMBUCHA's alcohol content increases over time if the beverages are left unrefrigerated.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's also objects to this Request as vague and ambiguous, including due to its use of the phrases "over time" and "unrefrigerated."  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's admits only that, like any naturally fermented food or beverage, bottles of its Enlightened/Synergy kombucha may naturally ferment and produce alcohol, if the bottles are not consistently and properly refrigerated after production.

**REQUEST FOR ADMISSION NO. 2:**

ENLIGHTENED KOMBUCHA's alcohol content increases over time if the beverages are left at room temperature.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's also objects to this Request as vague and ambiguous, including due to its use of the phrases "over time" and "room temperature." GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's admits only that, like any naturally fermented food or beverage, bottles of its Enlightened/Synergy kombucha may naturally ferment and produce alcohol, if the bottles are not consistently and properly refrigerated after production.

**REQUEST FOR ADMISSION NO. 3:**

ENLIGHTENED KOMBUCHA's alcohol content increases over time if the beverages are refrigerated.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017

5

DEFENDANT'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST
SET OF REQUESTS FOR ADMISSION

to the present).  GT's also objects to this Request as vague and ambiguous, including due to its use of the phrases "over time" and "refrigerated."  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's admits only that, like any naturally fermented food or beverage, bottles of its Enlightened/Synergy kombucha may continue to naturally ferment and produce alcohol; however, based on the testing done on GT's behalf, bottles of various flavors of Enlightened/Synergy kombucha that are consistently and properly refrigerated may not continue to ferment.  Moreover, if secondary fermentation occurs in bottles that are consistently and properly refrigerated, it does so at such a rate that it does not exceed 0.5% ABV prior to the expiration date of the batch at issue.

**REQUEST FOR ADMISSION NO. 4:**

At least one test of the alcohol content of a bottle of ENLIGHTENED KOMBUCHA commissioned by DEFENDANT showed that the beverage contained more than 0.5% alcohol by volume.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows:  Deny.

DEFENDANT'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

CONFIDENTIAL

**SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's admits that, of approximately 2,000 alcohol tests produced during the putative class period, one test by Michelson Laboratories, Inc., dated July 12, 2019, showed a level of 0.75% alcohol by volume three days before the end of the shelf life for GT's Watermelon Wonder flavor of Enlightened kombucha (GT-SHARPE-0001190), and one test by Covance, dated March 28, 2018, which GT's intentionally commissioned to test an expired batch of the Raspberry Chia flavor of Enlightened kombucha, showed a level of 1.14% alcohol by volume a month after that bottle's shelf life expired (GT-SHARPE-0005489).

**REQUEST FOR ADMISSION NO. 5:**

At least one test of the alcohol content of a bottle of ENLIGHTENED KOMBUCHA performed by Michelson Laboratories, Inc. showed that the beverage contained more than 0.5% alcohol by volume.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's does not possess information sufficient to admit or deny this Request and on that basis denies it.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's admits that, of approximately 2,000 alcohol tests produced during the putative class period, one test by Michelson Laboratories, Inc., dated July 12, 2019,

7

CONFIDENTIAL

showed a level of 0.75% alcohol by volume three days before the end of the shelf life for GT's Watermelon Wonder flavor of Enlightened kombucha. (GT-SHARPE-0001190.)

**REQUEST FOR ADMISSION NO. 5:**

ENLIGHTENED KOMBUCHA beverages are sometimes left unrefrigerated from the time they are bottled to the time they are offered for sale at retail locations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's also objects to this Request as vague and ambiguous, including due to its use of the phrase "left unrefrigerated." GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's does not possess information sufficient to admit or deny this Request and on that basis denies it.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Subject to and without waiving the foregoing objections, GT's responds as follows: Subject to the parties' meet-and-confer discussions regarding the scope of this Request, and the meaning of the phrase "left unrefrigerated," GT's admits that it has learned of a variety of instances where bottles of Enlightened kombucha were stored for a material amount of time at a temperature above 40°F, which is the maximum storage temperature suggested by Kombucha Brewers International (GT-SHARPE-0007914) and is also above the 37°F temperature below which GT's instructs its customers to store Enlightened kombucha (*see, e.g.*, GT-SHARPE-0002036 – 2037; GT-SHARPE-0006063 – 6064). Although GT's does not possess

information sufficient to identify each such instance, examples include instances where: a cooler storing Enlightened products malfunctions or breaks completely; a retailer allows Enlightened products to sit unrefrigerated (whether in a customer display or for a period of time before placing them in a refrigerated back-stock or front cooler); or a distributor ships the Enlightened product on a dry truck without proper refrigeration. As a general practice, when it learns of such instances, GT's takes steps to avoid the affected products being sold to consumers. (*See* Transcript of Oct. 19, 2018 30(b)(6) Deposition of GT Dave, at 246:19-247:14.)

**REQUEST FOR ADMISSION NO. 6:**

The LABELs of ENLIGHTENED KOMBUCHA have never borne the statement: "GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems."

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.  GT's further objects to this Request as duplicative of Request Nos. 7 and 8.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's admits that it has never placed the government warning referenced in the Request on the labels of its Enlightened/Synergy kombucha products, but notes that, since the beginning of the class period, those labels have stated, "Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if

9

DEFENDANT'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs."

**REQUEST FOR ADMISSION NO. 7:**

The LABELs of ENLIGHTENED KOMBUCHA have never borne the statement required by 27 C.F.R. § 16.21 for alcoholic beverages.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control. GT's further objects to this Request as duplicative of Request Nos. 6 and 8.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's admits that it has never placed the government warning referenced in the Request on the labels of its Enlightened/Synergy kombucha products, but notes that, since the beginning of the class period, those labels have stated, "Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs."

**REQUEST FOR ADMISSION NO. 8:**

The LABELs of ENLIGHTENED KOMBUCHA have never borne the statement required by 27 U.S.C. § 215(a) for alcoholic beverages.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017

10

DEFENDANT'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST
SET OF REQUESTS FOR ADMISSION

to the present).  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.  GT's further objects to this Request as duplicative of Request Nos. 6 and 7.

Subject to and without waiving the foregoing objections, GT's responds as follows:  GT's admits that it has never placed the government warning referenced in the Request on the labels of its Enlightened/Synergy kombucha products, but notes that, since the beginning of the class period, those labels have stated, "Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs."

**REQUEST FOR ADMISSION NO. 9:**

ENLIGHTENED KOMBUCHA is offered for sale to persons under 21 years of age.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present).  GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 10:**

ENLIGHTENED KOMBUCHA is labeled as a beverage containing less than 0.5% alcohol by volume.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the

11

CONFIDENTIAL

discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's further objects to the extent this Request seeks third parties' information that is not within GT's possession, custody or control.

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's denies this Request but admits that it has never placed on the labels of its Enlightened/Synergy kombucha products the government warning applicable to alcoholic beverages. GT's also notes that, since the beginning of the class period, those labels have stated, "<u>Please note</u>: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs."

**REQUEST FOR ADMISSION NO. 11:**

DEFENDANT does not test the bottles of ENLIGHTENED KOMBUCHA for alcohol or sugar content at the point of sale.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's also objects to this Request as vague and ambiguous, including due to its use of the phrase "at the point of sale."

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's admits that, consistent with industry best practices, it tests sample bottles in its possession for alcohol and sugar content at both the time of production and at the end of the products' shelf life, but does not test the alcohol or sugar content of bottles purchased from retail locations.

12

CONFIDENTIAL

**REQUEST FOR ADMISSION NO. 12:**

DEFENDANT does not know the amount of alcohol in the bottles of ENLIGHTENED KOMBUCHA at the time of retail sales.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's also objects to this Request as vague and ambiguous, including due to its use of the phrase "at the time of retail sales."

Subject to and without waiving the foregoing objections, GT's responds as follows: GT's admits only that, given the natural fermentation process used to create Enlightened/Synergy products, the specific post-manufacture ABV may vary slightly from bottle to bottle such that GT's does not know the exact ABV of each bottle at the time it is sold; however, based on the testing done on GT's behalf, consistently and properly refrigerating the bottles keeps the ABV of the various flavors of its Enlightened/Synergy kombucha under 0.5% ABV throughout its shelf life.

**REQUEST FOR ADMISSION NO. 13:**

DEFENDANT does not know the amount of sugar in the bottles of ENLIGHTENED KOMBUCHA at the time of retail sales.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

In addition to its General Objections, GT's specifically objects to this Request as overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including because it appears to seek information outside of the relevant time period at issue in this litigation (i.e., February 28, 2017 to the present). GT's also objects to this Request as vague and ambiguous, including due to its use of the phrase "at the time of retail sales."

13

DEFENDANT'S CORRECTED SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

Subject to and without waiving the foregoing objections, GT's responds as follows:  Deny.

Dated:        February 23, 2021        O'MELVENY & MYERS LLP


By: /s/ *Scott M. Voelz*
Scott M. Voelz
Zach A. Tafoya
Attorneys for Defendant

14

# EXHIBIT 16

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DELANEY SHARPE, ERIN WEILER, )
JENNA LEDER, and ADRIANA )
DIGENNARO, on behalf of )
themselves and all others )
similarly situated; ) Case No.
) 2:19-cv-10920-FMO-GJS
                Plaintiffs, )
) HIGHLY CONFIDENTIAL
   vs. ) ATTORNEYS' EYES ONLY
)
GT'S LIVING FOODS, LLC; )
)
             Defendants. )
_____)

VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE OF

DR. MATTHEW MCCARROLL

Murphysboro, Illinois

Friday, June 25, 2021

Reported by:
Lynda L. Fenn, CSR, RPR
CSR No. 12566
JOB No. 4666356

Page 1

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Q    Do you know if it's a hundred percent?    12:21:37

A    I have no basis to know that.    12:21:41

Q    So you are not giving an opinion in this    12:21:43
case of what the alcohol percentage of Enlightened    12:21:52
kombucha is at retail; correct?    12:21:54

A    No.    12:21:57

Q    Because you just don't know one way or    12:21:57
another?    12:22:00

A    It's not what I was asked to do and I    12:22:00
don't -- no, I do not know that.    12:22:06

Q    If you wanted to know the alcohol content    12:22:08
of Enlightened kombucha at retail, what would you do    12:22:12
as a scientist?    12:22:20

A    Develop a very complicated study.    12:22:26

Q    And what would that study entail?    12:22:29

A    Well, the first thing would be to bring in    12:22:31
expertise on sampling and distribution that goes    12:22:38
beyond my expertise and then develop a study that    12:22:42
way.  So that's really outside of my area of    12:22:47
expertise and focus for this report.    12:22:51

Q    So it's beyond the level of your expertise    12:22:57
to know how to go about testing the alcohol    12:23:00
percentage of Enlightened kombucha at the retail    12:23:05
level, is that what you are saying?    12:23:11

A    That's not what you asked me.  I didn't    12:23:12

Page 105

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS THEREOF, I have this date subscribed my name this 27th day of June, 2021.

Lynda L. Fenn

CSR No. 12566

Page 196

# EXHIBIT 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

AMIT PATEL, LAUREN SCHMIDT, and
CHRISTOPHER NUNEZ, on Behalf of
Themselves and all Others Similarly Situated,

                                  Plaintiffs,

     v.

GT'S LIVING FOODS, LLC,

                                  Defendant.

Case No. 2:19-cv-10920-FMO-GJS

Declaration

of

**COLIN B. WEIR**

December 15, 2025

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "HIGHLY

CONFIDENTIAL ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am President at Economics and Technology, Inc. ("ETI"), 100 Franklin Street, 6th Floor, Boston, Massachusetts 02110.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food and beverage products, herbal remedies, health/beauty care products, household appliances, electronics, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is annexed hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.

## II. ENGAGEMENT

2.    Plaintiffs allege that GT's Living Foods, LLC has passed off millions of bottles of its wildly successful Enlightened Kombucha (the "Products") beverages as non-alcoholic, when, in fact, the beverages contain 18 to 442 percent more alcohol than the legal limit for nonalcoholic



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
December 15, 2025
Page 2 of 7

beverages. [1]  Plaintiffs bring this case for a putative Class of individuals who purchased

numerous bottles of Defendant's Enlightened Kombucha beverages based on Defendant's

misleading advertising and labeling of the products. [2]  Plaintiffs allege that these sales were

illegal, and that Plaintiffs are entitled to a refund for their purchases. [3]

3.    I have been asked by Counsel for Plaintiffs to determine whether it is possible to

determine damages in this case on a Class-wide basis using common evidence and, if so, to

provide a framework for and an initial assessment of damages and harm suffered by the Class

resulting from the illegal sales made by Defendant.

4.    ETI is being compensated at the rate of $950 per hour for my work on this case.  The

opinions expressed in this declaration are my own, and my compensation is not dependent upon

the substance of these opinions or the outcome of the litigation.

5.    The documents, data and other materials that I relied upon in forming my opinions

are identified throughout my report and in Exhibit 2, attached hereto.  In addition, I have relied

upon my educational background and more than 22 years of experience.

### III.  CLASSWIDE DAMAGES

6.    As a threshold matter, it is my opinion that it is possible to determine Class-wide

damages in this case using the Defendant's own available business records and documents, and

available market research data.

7.    I understand that Plaintiffs allege that the sales of the Products at issue in this case

were illegal and should not have taken place. [4]  As such, this case calls for a calculation of Full

---

[1] Second Amended Class Action Complaint, filed December 17, 2024, (the "Complaint").

[2] *Id*.

[3] *Id*.

[4] *See, generally*, Complaint.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
December 15, 2025
Page 3 of 7

Compensatory Damages, wherein consumers would receive a full refund for their purchases of the Kombucha Products.

8. For purposes of this preliminary analysis, I have assumed a Class period of February 28, 2017 through the date class notice is sent out.[5]

9. I have been informed by Counsel that they seek certification of a California and New York Class (all California and New York persons who purchased Enlightened Kombucha) and an Underage Subclass (persons who purchased Enlightened Kombucha when they were 18 to 20 years old, i.e. under 21) for both states.

## IV. FULL COMPENSATORY DAMAGES

10. For purposes of this litigation, given the information available to me, I have estimated Full Compensatory Damages using data provided by Information Resources, Inc. ("IRI") and its successor Circana. The data contains information as to the dollar and unit sales of the products by week and state.

11. Under a damages framework awarding full recovery, Class-wide damages are easily calculated for each product as:

$$\sum_{t=1}^{p} \$Sales\ of\ Kombucha_t$$

12. Damages may be calculated with mathematical equivalency as:

$$Average\ Retail\ Price\ per\ Unit\ of\ Product\ Sold$$
$$\times\ Number\ of\ Units\ of\ Product\ Sold$$
$$=\ Full\ Compensatory\ Damages$$

13. In addition, I understand that purchases made by members subject to a previous settlement are not part of the proposed class definitions in this case.

---

[5] Complaint, at para 61. My analysis can be tailored to any relevant date range.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
December 15, 2025
Page 4 of 7

14.  I have been provided with, and have reviewed, a copy of the Declaration of J. Michael Dennis, Ph.D. dated December 15, 2025 ("Dennis Declaration").  Dr. Dennis is a recognized expert in the design and implementation of online consumer statistical surveys with more than 25 years experience conducting such surveys at leading institutions, having most recently served as Senior Vice President at NORC in Chicago, IL from 2014 - 2025.[6]

15.  Among other things, the Dennis Declaration discusses the process by which Dr. Dennis designed and conducted a consumer survey of consumers of the Kombucha Products ("Dennis Survey").  Dr. Dennis was asked measure the proportion of the Products purchased during the class period that were purchased by members of the proposed class (to the exclusion of those purchases made by the excluded members of a prior settlement).  Specifically, the Dennis Survey measures the share of the Kombucha Products that were purchased by persons age 21+ who would be qualifying class members in this case (the "Adult Class").[7]  Dr. Dennis reported such a percentage for each year between 2017 and the present, and for each of three product categories: small bottles, large bottles, and cases.

16.  Using the above framework, the sales data presently available to me, and the results of the Dennis Survey, I have estimated Full Compensatory Damages to be as summarized below in Table 1.  This reflects total sales of the Products after having been apportioned using the factors calculated by Dr. Dennis.  Numbers in this report may not sum due to rounding.

---

[6] Dennis Declaration, at paras 2 *et seq*.

[7] See, Dennis Declaration at Section 2.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
December 15, 2025
Page 5 of 7

| Table 1: GT's Enlightened Kombucha, Adult Class<br>Full Compensatory Damages, February 28, 2017 through Present | |
|---|---|
| **State** | **Full Compensatory Damages** |
| California | $228,338,607.60 |
| New York | $73,955,877.52 |
| Total | $302,294,485.12 |

17.  The Dennis Survey also measures the share of the Kombucha Products that were purchased by persons age 18 to 20.  This can be used to apportion sales to the Underage Subclasses.

18.  Using the same framework and data as described above, along with the results of the Dennis survey, I have estimated Full Compensatory Damages for the Underage Subclasses to be as summarized below in Table 2:

| Table 2: GT's Enlightened Kombucha, Underage Subclass<br>Full Compensatory Damages, February 28, 2017 through Present | |
|---|---|
| **State** | **Full Compensatory Damages** |
| California | $8,887,446.89 |
| New York | $2,872,972.21 |
| Total | $11,760,419.10 |

19.  Table 3 below presents total Classwide damages (the combination of the Adult and Underage sales).

ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 271

Declaration of Colin B. Weir
December 15, 2025
Page 6 of 7

| Table : GT's Enlightened Kombucha Full Compensatory Damages, February 28, 2017 through Present | |
|---|---|
| **State** | **Full Compensatory Damages** |
| California | $237,226,054.49 |
| New York | $76,828,849.73 |
| Total | $314,054,904.22 |

20. More granular detail is set forth in Exhibit 3, attached hereto, showing sales by Product size and individual UPC.

## V. STATUTORY DAMAGES

21. In addition to the above damages framework for the Class, I have been advised by Counsel for Plaintiffs that statutory damages must be considered for New York consumers. I have been advised that New York GBL § 349 provides for statutory damages of $50 per violation.

22. Using the available sales records, I have determined that, in New York, approximately 17,511,484 units of the Products were sold to the Adult Class during the relevant period, and that approximately 698,908 units of the Products were sold to the Underage Subclass during the relevant period.

23. Table 4 below sets forth the calculations of Statutory Damages.

ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 272

Declaration of Colin B. Weir
December 15, 2025
Page 7 of 7

| Table 3. New York Statutory Damages | | | |
|---|---|---|---|
| **Class** | **Number of Units** | **Damages per Violation** | **Total Statutory Damages** |
| Adults | 17,511,484 | $50 | $875,574,200 |
| Underage | 698,908 | $50 | $34,945,400 |
| Total | 18,210,392 | $50 | $910,519,600 |

## VI.  RESERVATION OF RIGHTS

These calculations and estimates are based on the information and data currently available to me.  I understand that additional, different and/or updated data including IRI/Circana data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my calculations and my testimony.

### VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts, this 15th day of December, 2025.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 273

Exhibit 1

## Statement of Qualifications
## of

## COLIN B. WEIR

ECONOMICS AND
TECHNOLOGY, INC.

## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is President at Economics and Technology, Inc.  Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records.  Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations.  Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, and a business member of the Boston Bar Association.  Mr. Weir has served on the Board of Trustees of the Waring School, and served as the comptroller for the Sybaris Investment Partnership.

1

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.

2



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York*  (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.


Mr. Weir has submitted the following testimony during the last four years:

**United States District Court, Northern District of Illinois, Eastern Division,** *Tiffany Huggins, Lauren Nunez, Geoff Edwards, and Beverly Blalock, individually and on behalf of a class of similarly situated individuals, v. Abbott Laboratories*, Case No. 1:25-cv-02460, on behalf of George Feldman McDonald, PLLC, Declaration submitted on October 15, 2025.

**United States District Court for the Northern District of Illinois,** *Arnesia Thomas and Pascha Perkins, individually as a representative of all others similarly situated, v. Walmart Inc., and Wal-Mart Stores, Inc.*, Case No. 1:23-cv-05315, on behalf of Dworken & Bernstein Co., LPA, Declaration submitted on October 14, 2025; Deposition on December 1, 2025.

**United States District Court, Northern District of California, San Jose Division,** *In re: Meta Pixel Tax Filing Cases*, Master File No. 5:22-cv-07557-PCP, on behalf of Bursor & Fisher, P.A., Declaration submitted on August 18, 2025; Deposition on October 2, 2025.

**United States District Court, Northern District of California,** *Omar Masry individually and on behalf of all others similarly situated, v. Abbott Laboratories*, Case No.: 5:23-cv-04348-PCP, on behalf of Clarkson Law Firm, Declaration submitted on August 11, 2025.

**United States District Court, Northern District of California,** *In re: Nestle Boost Nutritional Drink Litigation*, Case No.: 3:21-cv-09812-PJH, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on July 25, 2025; Deposition on August 15, 2025.

**United States District Court, Northern District of California,** *Sandra Jeruchim and Melissa Varga, individually and on behalf of all others similarly situated, v. The J.M. Smucker Company and Post Consumer Brands, LLC*, Case No.: 3:22-Cv-06913-WHO, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 8, 2025; Deposition on September 8, 2025.

**United States District Court, Central District of California,** *Emily Chebul, individually and on behalf of all others similarly situated, v. Tuft & Needle, LLC*, Case No. 2:24-cv-02707-JLS-MAR, on behalf of Dovel & Luner, LLP, Declaration submitted on July 7, 2025.

**United States District Court, Northern District of California,** *In re: SanDisk SSDs Litigation*, Case No. 3 :23-cv-04152-RFL, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 11, 2025; Reply Declaration submitted on August 20, 2025; Deposition on August 26, 2025.



ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 277

*Statement of Qualifications – Colin B. Weir*

**In the Circuit Court of the City of St. Louis, State of Missouri,** *State of Missouri ex rel. Attorney General Andrew Bailey, and Missouri Department of Agriculture, v. Dolgencorp, LLC, d/b/a Dollar General*, Case No. 2322-CC096910, on behalf of the Missouri Office of the Attorney General, Deposition on June 6, 2025.

**United States District Court, Northern District of California,** *Mikhail Gershzon, Kristin Della, and Jill Lienhard, on behalf of themselves and those similarly situated v. Colgate-Palmolive Company*, Case No.: 23-cv-04086-JCS, on behalf of Gutride Safier, LLP, Declaration submitted on May 22, 2025; Deposition on June 27, 2025; Reply Declaration submitted on September 15, 2025.

**United States District Court, Northern District of California,** *Samuel Garcia, individually and on behalf of all others similarly situated, v. TC Heartland, LLC*, Case No.: 5:23-cv-04192-NW, on behalf of Clarkson Law Firm, Declaration submitted on April 21, 2025; Deposition on June 11, 2025; Reply Declaration submitted on September 15, 2025.

**United States District Court, Northern District of California,** *Rick Chen and Mindy Aiello, individually and on behalf of all others similarly situated, v. Vesync Corporation*, Case No. 3:23-cv-04458-TLT, on behalf of Bursor & Fisher, P.A., Declaration submitted on April 17, 2025; Deposition on June 9, 2025; Reply Declaration submitted on July 25, 2025; Deposition on August 5, 2025.

**United States District Court, Southern District of California,** *Albert Renn, on behalf of himself, all others similarly situated, and the general public, v. Otay Lakes Brewery, LLC*, Case No: 23-cv-1139-GPC-BLM, on behalf of Fitzgerald Monroe Flynn, PC, Declaration submitted on March 3, 2025.

**United States District Court, Northern District of California,** *Sharon Crowder, Joel Lumian, Robert Smith, Amanda Goldwasser, and Mark Elkins, each individually and on behalf of all others similarly situated, v. The Shade Store LLC*, Case No. 5:23-cv-2331, United States District Court, Western District of Washington At Seattle, *Lee Fitzgerald and Katherine Adler, individually and on behalf of all others similarly situated, v. The Shade Store LLC*, Case No. 2:23-cv-01435-RSM, on behalf of Dovel & Luner, LLP, Declaration submitted on January 23, 2025; Deposition on March 11, 2025.

**United States District Court, Northern District of California,** *Condalisa LeGrand, on behalf of herself, all others similarly situated, and the general public, v. Abbott Laboratories*, Case No. 3:22-cv-5815-TSH, on behalf of Fitzgerald Monroe Flynn, PC, Declaration submitted on January 23, 2025; Supplemental Declaration submitted on September 11, 2025.

**Superior Court of the State of California, County of Santa Clara,** *Makenzie Smith, individually and on behalf of all others similarly situated, v. LinkedIn Corporation*, Case No. 22CV404069, on behalf of Bursor & Fisher, P.A., Declaration submitted on January 13, 2025; Deposition on March 4, 2025.

4



ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 278

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Eastern District of Virginia, Richmond Division,** *James Dolan and James Morris, individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 1:19-cv-05045-REP, on behalf of Consumer Litigation Associates, PC, Declaration submitted on January 3, 2025; Reply Declaration submitted on February 12, 2025; Deposition on February 25, 2025.

**United States District Court, Northern District of California,** *Nea Vizcarra, individually and on behalf of all others similarly situated, v. Michaels Stores, Inc.*, Case No. 5:23-cv-468-PCP, on behalf of Dovel & Luner, LLP, Declaration submitted on November 15, 2024; Deposition on January 8, 2025.

**Superior Court of the State of California, for the County of Alameda,** *David Livingston, individually and on behalf of all other persons similarly situated, v. Mercedes-Benz USA, LLC,* Case No. RG21109711, on behalf of Bursor & Fisher, P.A., Declaration submitted on November 14, 2024; Deposition on December 16, 2024; Reply Declaration submitted on February 27, 2025.

**United States District Court, for the Northern District of California,** *Melissa Sanchez, Beverly Cassel, as individuals, on behalf of themselves, the general public and those similarly situated, v. Nurture, Inc.*, Case No. 5:21-cv-08566-EJD, on behalf of Gutride Safier, LLP, Declaration submitted on October 25, 2024; Deposition on December 12, 2024.

**United States District Court, Northern District of California,** *Colby Tunick, individually and on behalf of all others similarly situated, v. Takara Sake USA Inc.*, Case No. 3:23-cv-00572-TSH, on behalf of Clarkson Law Firm, Declaration submitted on October 17, 2024; Deposition on November 22, 2024; Reply Declaration submitted on January 28, 2025.

**United State District Court, Northern District of California,** *Venus Yamasaki, on behalf of herself and all others similarly situated, v. Natrol, LLC*, Case No. 3:23-cv-00182-JD, on behalf of Spangenberg Shibley & Liber LLP, Declaration submitted on October 11, 2024; Deposition on December 2, 2024.

**United States District Court, Northern District of California,** *Jennifer Vlacich, Brenda Robert, Elena Nacarino, Ana Krstic, Christina Vink, Lora Grodnick, Lisa Malara, and Teena Stambaugh, individually and on behalf of all others similarly situated, v. Del Monte Foods, Inc.*, Case No. 4:22-cv-00892-JST, on behalf of Dovel & Luner, LLP, Declaration submitted on August 30, 2024; Deposition on October 8, 2024.

**United States District Court, Northern District of Georgia, Atlanta Division,** *Kellie Carder et al., on behalf of themselves and all others similarly situated, v. Graco Children's Products, Inc.*, Case No. 2:20-cv-00137-LMM, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on August 16, 2024; Supplemental Declaration submitted on January 17, 2025.

5

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of California,** *Krystal Lopez and Damany Browne, individually and on behalf of all others similarly situated, v. Zarbee's Inc.*, Case No. 3:22-04465-CRB, on behalf of Dovel & Luner, LLP, Declaration submitted on August 2, 2024; Deposition on August 27, 2024.

**United States District Court, Southern District of New York,** *Tanysha Newman, individually and on behalf of all others similarly situated, v. Bayer Corporation and Bayer Healthcare, LLC*, Case No. 7:22-cv-07087-KMK-AEK, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 18, 2024; Deposition on September 9, 2024.

**In the United States District Court, for the Northern District of Oklahoma,** *In re: Genentech, Inc. Herceptin (Trastuzumab) Marketing and Sales Practices Litigation*, MDL Docket No. 16-MD-2700, on behalf of GableGotwals, Declaration submitted on July 15, 2024; Deposition on September 4, 2024.

**United States District Court for the Central District of California, Eastern Division,** *Steven Hernandez, individually and on behalf of all others similarly situated, v. Radio Systems Corporation*, Case No.: 22-cv-01861-JGB-KK, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on June 17, 2024; Declaration submitted on July 31, 2024; Deposition on November 1, 2024.

**United States District Court for the Southern District of California,** *Linda Sunderland and Benjamin Binder, individually and on behalf of all others similarly situated, v. Pharmacare U.S., Inc., a Delaware Corporation*, Case No.: 3:23-cv-01318-JES-BGS, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on June 3, 2024.

**United States District Court for the Northern District Of California,** *Martha Valentine, Ruby Cornejo, and Tiffany Avino, each an individual, on behalf of themselves, the general public, and those similarly situated, v. Crocs, Inc.*, Case No. 3:22-cv-07463-TLT, on behalf of Gutride Safier, LLP, Declaration submitted on May 31, 2024; Reply Declaration submitted on August 21, 2024.

**In the United States District Court for the Northern District of California,** *David Wallenstein, Montgomery Summa, individually and on behalf of all others similarly situated, v. Mondelez International, Inc., a Virginia corporation, Mondelez Global, LLC, a Delaware limited liability company, and Nabisco, Inc., a New Jersey corporation*, Case No. 3:22-cv-6033, on behalf of Fox Law APC, Declaration submitted on May 24, 2024; Deposition on June 27, 2024; Reply Declaration submitted on July 12, 2024; Reply Declaration submitted on August 9, 2024.

**United States District Court, Western District of Wisconsin,** *John Bankhurst, Pamela Anderson, Jonathan Zang, and Jesse Karp, individually and on behalf of all others similarly situated, v. Sub-Zero Group, Inc. and Wolf Appliance, Inc.*, Case No. 3:23-cv-253, on behalf of Dovel & Luner, LLP, Declaration submitted on May 17, 2024; Deposition on June 18, 2024.

ECONOMICS AND TECHNOLOGY, INC.

Evid. Appx. Page 280

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Eastern District of New York,** *Claudia Newton and Brandy Leandro, on behalf of themselves and all others similarly situated, v. R.C. Bigelow, Inc., and Does 1 through 10*, Case No.: 2:22-cv-05660-LDH-SIL, on behalf of The Wand Law Firm, Declaration submitted May 16, 2024; Rebuttal Declaration submitted on August 8, 2024; Declaration submitted on September 19, 2025.

**United States District Court, Northern District of Illinois, Eastern Division,** *Charlotte Willoughby, Lakendrea Camille Mcnealy, Shaylynn Doxie, Brittney Gray, Kataleena Helmick, Lani Johnston, Ashley Popa And Deniege Revord, individually and on behalf of a class of similarly situated individuals, v. Abbott Laboratories*, Case No. 1:22-cv-01322, on behalf of Lockridge Grindal Nauen P.L.L.P., Declaration submitted on April 12, 2024; Deposition on May 15, 2024; Reply Declaration submitted July 31, 2024.

**In the United States District Court, Northern District of California**, *Aaron Brand, John Flodin, individually and on behalf of all others similarly situated, v. Central Garden & Pet Company, a Delaware corporation, Breeder's Choice Pet Foods, Inc., and Does 1-50, inclusive*, Case No.: 4:21-cv-01631-JST, on behalf of Fox Law APC, Declaration submitted on March 15, 2024; Deposition on June 11, 2024; Reply Declaration submitted on August 20, 2024.

**United States District Court, Central District of California**, *Tristan Hurd and Ken Dimicco, individually and on behalf of all others similarly situated, v. G.Skill International Enterprise Co., LTD., G.Skill USA, Inc., Racerspeed, Inc., and Neuteck, Inc.*, Case No. 2:22-cv-00685-SSS-MAR, on behalf of Dovel & Luner, LLP, Declaration submitted on March 15, 2024; Declaration submitted on October 28, 2025.

**In the United States District Court for the Western District of Virginia**, *Wendy Prince, individually and on behalf of all others similarly situated, v. Johnson Health Tech Trading, Johnson Health Tech Retail, Inc., and Johnson Health Tech, Inc.*, Civil Action No. 5:22-cv-00035, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on February 29, 2024; Deposition on June 7, 2024.

**In the United States District Court, for the Southern District of Ohio, Eastern Division,** *Judy Kirkbride and Beeta Lewis, individually and on behalf of all others similarly situated, v. The Kroger Co.*, Case No. 2:21-cv-00022-ALM-EPD, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 23, 2024; Deposition on May 2, 2024; Reply Declaration submitted on July 25, 2024; Oral Testimony and Cross Examination on March 19 - 20, 2025.

**United States District Court, for the Southern District of New York,** *Joseph Wolf, Carmen Wolf, on behalf of themselves and those similarly situated, v. Dolgen New York LLC*, Case No.: 7:23-cv-00558-PMH, Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on February 9, 2024; Supplemental Declaration filed March 20, 2024; Deposition on March 25, 2024.

ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of California,** *Heather Turrey, Oliver Fiaty, Jordan Hernandez, and Jeffrey Sazon, individually, and on behalf of all others similarly situated, v. Vervent, Inc. fka First Associates Loan Servicing, LLC; Activate Financial, LLC; David Johnson; and Laurence Chiavaro*, Case No. 3:20-cv-00697-DMS-AHG, on behalf of Blood, Hurst, & O'Reardon, LLP, Declaration submitted on February 2, 2024.

**United States District Court, Southern District of California,** *William Lessin and Carol Smalley et al, on behalf of themselves and all others similarly situated, v. Ford Motor Company*, Case No. 19-cv-1082-AJB-WVG , on behalf of McCune Law Group, Declaration submitted on December 1, 2023; Deposition on January 19, 2024; Reply Declaration submitted on April 12, 2024.

**United States District Court, Northern District of California,** *Thomas Iglesias, David Salazar, Olivia Thurman, and Bethany Torbert, individually and on behalf of all others similarly situated, v. For Life Products, LLC*, Case No. 3:21-cv-01147-TSH, on behalf of Clarkson Law Firm, Declaration submitted on November 29, 2023; Deposition on January 4, 2024.

**United States District Court, Northern District of California,** *Matthew Sinatro and Shane Winkelbauer, individually and on behalf of all others similarly situated, v. Welch Foods Inc., A Cooperative and Promotion in Motion, Inc.*, Case No. 22-cv-07028-JD, on behalf of Clarkson Law Firm, Declaration submitted on November 20, 2023; Reply Declaration submitted on December 14, 2023; Deposition on December 20, 2023; Supplemental Declaration filed March 5, 2024.

**United States District Court, Northern District of California,** *David Swartz, as an individual, on behalf of himself, the general public and those similarly situated, v. Dave's Killer Bread, Inc., and Flowers Foods, Inc.*, Case No.: 4:21-cv-10053-YGR, on behalf of Gutride Safier, LLP, Declaration submitted on November 17, 2023; Deposition on January 23, 2024; Reply Declaration submitted on March 22, 2024; Declaration submitted on February 14; Amended Declaration submitted on February 17, 2024; Deposition on March 24, 2025.

**United States District Court, Northern District of California,** *Steven C. Johnson, an individual, on behalf of himself and all others similarly situated, v. GLOCK, INC., a Georgia Corporation; Glock Ges.m.b.H, an Austrian entity; John and Jane Does I through V; ABC Corporations I-X, XYZ Partnerships, Sole Proprietorships and/or Joint Ventures I-X, Gun Component Manufacturers I-V*, CASE NO.: 3:20-cv-08807-WHO, on behalf of Lewis and Lewis Trial Lawyers, PLC, Declaration submitted October 12, 2023; Reply Declaration submitted on April 11, 2024.

**United States District Court, Northern District of California,** *Kenneth Glassman, individually and on behalf of all others similarly situated, v. Edgewell Personal Care, LLC*, Case No. 3:21-cv-07669-RS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 14, 2023; Deposition on November 8, 2023; Reply Declaration submitted on February 12, 2024.



ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, for the Northern District of California, San Francisco,** *Tracy Howard, Adina Ringler, and Trecee Artis on behalf of themselves and those similarly situated, v. Hain Celestial Group, Inc., d/b/a Earth's Best*, Case No. 3:22-cv-00527-VC, on behalf of Gutride Safier LLP, Declaration submitted on September 5, 2023; Deposition on October 12, 2023; Reply Declaration submitted on December 13, 2023.

**Superior Court of the State of California, for the County of Alameda, Northern Division,** *Patricia Bland and Edward White, individually and on behalf of all others similarly situated, v. Premier Nutrition Corporation; and DOES 1-25, inclusive*, Case No. RG19002714, on behalf of Blood, Hurst, & O'Reardon, LLP, Deposition on September 1, 2023.

**United States District Court, Northern District of California,** *Antonio Mckinney, Clint Sundeen, and Joseph Alcantara, each individually and on behalf of all others similarly situated, v. Corsair Gaming, Inc.*, Case No. 3:22-cv-00312-CRB, on behalf of Dovel & Luner, LLP, Declaration submitted on September 1, 2023; Deposition on January 9, 2024; Declaration submitted on May 20, 2025.

**United States District Court, Northern District of California,** *Matthew Sinatro, and Jessica Prost, individually and on behalf of all others similarly situated, v. Barilla America, Inc.*, Case No: 4:22-cv-03460, on behalf of Clarkson Law Firm, Declaration submitted on August 30, 2023; Reply Declaration submitted on February 7, 2024; Declaration submitted on February 7, 2025; Deposition on April 30, 2025; Reply Declaration submitted on August 19, 2025; Deposition on September 22, 2025.

**United States District Court, for the Central District of California,** *Kathleen Cadena, et al., v. American Honda Motor Company, Inc.*, Case No. 2:18-cv-04007-MWF-MAA, on behalf of Gibbs Law Group, LLP, Declaration submitted on August 11, 2023; Deposition on September 27, 2023; Declaration submitted on December 23, 2024; Reply Declaration submitted on May 23, 2025; Deposition on June 4, 2025.

**United States District Court, for the Eastern District of Michigan,** *Edward Pistorio, Paul Murdock, Daniel Przekop, Hasan Aktulga, Sandra and Thomas Kloszewski, Randall Courtney, Corey Gerritsen, Sara Elice, Justin Bagley and Elizabeth Bagley, and Marcus Swindle on behalf of themselves and all others similarly situated, v. FCA US LLC*, Case No.: 2:20-cv-11838-SFC-RSW, on behalf of Capstone Law APC, Declaration submitted on July 31, 2023; Deposition on September 13, 2023.

**United States District Court, District of Minnesota,** *Teeda Barclay, Jay Ovsak, and Nicole Nordick, individually, and on behalf of others similarly situated, v. iFIT Health & Fitness, Inc. f/k/a Icon Health & Fitness, Inc., and Nordictrack, Inc.*, Case No. 0:19-cv-02970-ECT-DTS, on behalf of Markovits, Stock & DeMarco, LLC, Declaration submitted on July 14, 2023; Deposition on August 9, 2023; Declaration submitted on January 2, 2024.

9

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Eastern District of Michigan, Southern Division,** *Bobby Roe, et al., individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 2:18-cv-12528-LGM-APP, on behalf of Kessler Topaz Meltzer & Check LLP, Declaration submitted on June 28, 2023.

**United States District Court, for the Central District of California, Eastern Division**, *Sarah McCracken, Individually and on behalf of all others similarly situated, v. KSF Acquisition Corporation*, Case No. 5:22-cv-01666, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on May 24, 2023.

**United States District Court, Northern District of California, Oakland Division,** *Jonathan Rusoff and Joseph Gambino, on behalf of themselves and all others similarly situated, v. The Happy Group, Inc., a corporation; and DOES 1 through 10, inclusive*, Case No.: 4: 21-cv-08084-YGR, on behalf of The Wand Law Firm, Declaration submitted on April 11, 2023; Deposition on May 10, 2023; Reply Declaration submitted on July 18, 2023.

**United States District Court, Northern District of Illinois,** *Justin O'Connor, Stanislaw Zielinski, Daniel Fair, Bryan Smith, Jason Steen, William Fiedler, Michael Barcelona, Robert Marino, Brian Dougherty, Susan Heller, Victor M. Orndorff, and Michael McDonald on behalf of themselves and all others similarly situated, v. Ford Motor Company*, Case No. 1:19-cv-05045, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on March 30, 2023; Reply Declaration submitted on June 1, 2023; Deposition on June 15, 2023.

**United States District Court, Northern District of California, Oakland Division,** *In re: Plum Baby Food Litigation*, Case No. 21-cv-00913-YGR, on behalf of Lockridge Grindal Nauen P.L.L.P., Declaration submitted on December 20, 2022; Deposition on February 27, 2023; Declaration submitted on September 29, 2023.

**United States District Court, Northern District of California,** *Lisa M. Moore, individually and on behalf of all others similarly situated, v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC; Pfizer Inc.*, Case No. : 4:20-cv-09077-JSW, on behalf of Clarkson Law Firm and Moon Law APC, Declaration submitted on December 7, 2022; Deposition on April 13, 2023.

**United States District Court, Southern District of California,** *Montiqueno Corbett, Damaris Luciano, and Rob Dobbs, individually and on behalf of all others similarly situated, v. Pharmacare U.S., Inc.*, Case No.: 3:21-cv-00137-GPC-AG, on behalf of Milberg LLC, Declaration submitted on September 30, 2022; Declaration submitted on March 22, 2023; Deposition on April 10, 2023; Supplemental Declaration submitted on April 24, 2023; Declaration submitted on October 30, 2024.

ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 284

*Statement of Qualifications – Colin B. Weir*

**In the United States District Court, for the Eastern District of Texas, Sherman Division,** *William Squires, Jesse Badke, Ahmed Khalil, Michelle Nidever, John Murphy, Kevin Neuer, Nicholas Williams and Donna Sue Scott, on behalf of themselves and all others similarly situated, v. Toyota Motor Corp, Toyota Motor North America, Inc. and Toyota Motor Sales, U.S.A., Inc.*, Case No.: 4:18-cv-00138, on behalf of Berger Montague, P.C., Declaration submitted September 29, 2022; Deposition on October 27, 2022; Reply Declaration submitted December 21, 2022.

**United States District Court, Northern District of California,** *Anthony Bush, individually and on behalf of all others similarly situated, v. Rust-Oleum Corporation* Case No.: 3:20-cv-03268-LB, on behalf of Clarkson Law Firm and Moon Law, Declaration submitted on September 27, 2022; Deposition on February 8, 2023.

**United States District Court, Southern District of California,** *William D. Petterson, individually and on behalf of all others similarly situated, v. Circle K Stores Inc.*, Case No. 3:21-cv-00237-RBM-BGS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 22, 2022; Deposition on October 11, 2022.

**Superior Court of the State of California, For the County Of Santa Clara,** *Elizabeth J. VanCleave,  and Katherine Hassan, individually and on behalf of a class of similarly situated individuals, v. Abbott Laboratories*, Case No.  19CV345045, on behalf of Goldstein, Borgen, Dardarian & Ho, Declaration submitted on September 19, 2022; Reply Declaration submitted on January 10, 2023; Deposition on February 1, 2023; Declaration submitted on August 29, 2024; Deposition on October 22, 2024; Supplemental Declaration submitted on October 31, 2024; Oral Testimony and Cross Examination on February 7, 2025.

**United States District Court, Southern District of New York,** *Asher Haft, Robert Fisher, and Cheryl Jones, individually and on behalf of all others similarly situated, v. Haier US Appliance Solutions, Inc. d/b/a GE Appliances*, Case No.: 1:21-cv-00506-GHW, on behalf of Milberg LLC, Declaration submitted on August 12, 2022.

**United States District Court for the District of Delaware,** *Michael Ninivaggi, Jake Mickey and Cailin Nigrelli, individually and on behalf of all others similarly situated, v. University of Delaware,* Case No. 20-cv-1478-SB, and *Hannah Russo, individually and on behalf of all others similarly situated, v. University of Delaware*, Case No. 20-cv-1693-SB, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 1, 2022; Declaration submitted on August 1, 2022; Deposition on August 19, 2022; Reply Declaration submitted September 30, 2022.

**United States District Court, Central District of California,** *Kimberly Banks and Carol Cantwell, on behalf of themselves and all others similarly situated, v. R.C. Bigelow, Inc., a corporation; and DOES 1 through 10, inclusive,* Case No.: 20-cv-06208-DDP (RAOx), on behalf of The Wand Law Firm, Declaration submitted on June 17, 2022; Rebuttal Declaration submitted October 3, 2022; Declaration submitted on March 6, 2024; Deposition on May 30, 2024; Oral Testimony and Cross Examination on April 4, 2025.

ECONOMICS AND TECHNOLOGY, INC.

Evid. Appx. Page 285

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Central District of California,** *Mocha Gunaratna and Renee Camenforte, individually and on behalf of all others similarly situated, v. Dr. Dennis Gross Skincare, LLC, a New York Limited Liability Company*, Case No. 2:20-cv-02311-MWF-GJS, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on March 30, 2022; Deposition on May 20, 2022; Reply Declaration submitted on September 22, 2022.

**Superior Court of the State of California, County of Santa Clara,** *Lance Dutcher, individually and on behalf of all others similarly situated, v. Google LLC, d/b/a YouTube, and YouTube LLC,* Case No. 20CV366905, on behalf of Bursor & Fisher, P.A., Declaration submitted on March 2, 2022; Deposition on May 17, 2022; Reply Declaration submitted on August 2, 2022; Declaration submitted on May 2, 2023.

**United States District Court, Middle District of Tennessee, Nashville Division,** *In re Nissan North America, Inc. Litigation; Lakeita Kemp, individually and on, behalf of all others similarly situated v. Nissan North America, Inc., and Nissan Motor Co., Ltd.*, Cases Nos. 3:19-cv-00843, Case No. 3:19-cv-00854, on behalf of DiCello Levitt Gutzler, Declaration submitted February 28, 2022; Deposition on August 25, 2022; Reply Declaration submitted on November 15, 2022.

**In the Court of Claims, for the State of Ohio,** *Autumn Adams, individually and on behalf of all others similarly situated v. University of Cincinnati*, Case No. 2021-00458JD, on behalf of Bursor & Fisher, P.A., Declaration submitted February 11, 2022; Deposition on August 10, 2022; Reply Declaration submitted on November 16, 2022.

**United States District Court, Northern District of California, San Francisco Division,** *Eric Fishon, individually and on behalf, of all others similarly situated, v. Premier Nutrition Corporation f/k/a Joint Juice, Inc.*, Case No. 3:16-cv-06980-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Expert Report submitted January 24, 2022; Deposition on March 11, 2022; Oral Testimony and Cross Examination on May 31, 2022.

**United States District Court, Eastern District of Michigan,** *Chapman, et al., v. General Motors, LLC*, Case No. 2:19-cv-12333-TGB-DRG, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on March 1, 2022; Deposition on April 13, 2022; Reply Declaration submitted on June 16, 2022.

**United States District Court, Central District of California,** *Terry Sonneveldt, Esther Wright Schneider, Michael Bibbo, Alan Meshberg, Brian Hume, Amie Levasseur, Jean Levasseur, Christopher Lacasse, Beth Pickerd, Dan Pickerd, Tim Halwas, Erin Matheny, Lewis Delvecchio, Jon Sowards, Lawrence Bohana, Monika Bohana, David Dennis, Jacqueline S. Aslan, Michael Gilreath, and Renatta Gilreath, individually and on behalf of all others similarly situated, v. Mazda Motor of America, Inc. D/B/A Mazda North American Operations and Mazda Motor Corporation*, Case No.: 8:19-cv-01298-JLS-KES, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on March 11, 2022; Deposition on April 4, 2022; Declaration submitted July 26, 2022.

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**In the Court of Claims, for the State of Ohio,** *Lily Zahn v. Ohio University*, Case No. 2020-00371JD, and *Gila Duke, individually and on behalf of all others similarly situated, v. Ohio University*, Case No. 2021-00036JD, on behalf of Bursor & Fisher, P.A., Oral Testimony and Cross Examination on January 18, 2022.

**United States District Court, Southern District of California,** *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and the general public,v. Barlean's Organic Oils, LLC,* Case No. 3:19-cv-00169-JLS-BGS, on behalf of Law Offices of Jack Fitzgerald, Deposition on March 25, 2022.

**In The United States District Court, For the District of New Hampshire,** *Derick Ortiz, individually and on behalf of all others similarly situated, v. Sig Sauer, Inc.*, Case No.: 1:19-cv-01025-JL, on behalf of Bursor & Fisher, P.A., Oral Testimony and Cross Examination on May 4, 2022.

**United States District Court, Southern District of Florida,** *Javier Cardenas, Rodney and Pamela Baker, Michelle Monge, and Kurt Kirton, individually and on behalf of all others similarly situated, v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Southeast Toyota Distributors, LLC*, Case No.: 18-cv-22798-CIV-FAM, on behalf of Kessler Topaz Meltzer & Check, LLP, Supplemental Declaration submitted on February 17, 2023; Oral Testimony and Cross Examination on March 7, 2023.

**Superior Court of the State of California, County of Los Angeles,** *Jeffrey Koenig, on behalf of himself and all others similarly situated, v. Vizio, Inc.*, Case No. BC 702266, on behalf of Greg Coleman Law, Supplemental Declaration submitted on May 2, 2022; Deposition on May 12, 2022; Supplemental Declaration submitted January 16, 2023; Deposition on February 13, 2023.

**United States District Court, Southern District of New York,** *Anne De Lacour, Andrea Wright, and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 1:16-cv-08364-RA, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 22, 2022; Deposition on September 9, 2022.

Mr. Weir has provided expert testimony since 2007, served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional projects, publications and testimony at the state, federal, and international levels.

13

ECONOMICS AND
TECHNOLOGY, INC.

# Exhibit 2

# Documents Reviewed

- Amended Class Action Complaint, filed April 9, 2020

- Second Amended Class Action Complaint, filed December 17, 2024

- Retta v Millennium Products final approval order

- Declaration of J. Michael Dennis, Ph.D., June 2, 2021

- Declaration of J. Michael Dennis, Ph.D., December 15, 2025

- IRI/Circana Data

- IRI Multioutlet Universe

- Why Census-Based Data Matters

- Sample Based Scanner Data

- GT-SHARPE-0001452-1478

- GT-SHARPE-0001609-1626

- GT-SHARPE-0002038

- GT-SHARPE-0001484

- GT-SHARPE-0005704

- GT-SHARPE-0005809

- gtslivingfoods.com

# Exhibit 3

# Granular Data







# EXHIBIT 18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO on Behalf of Themselves and all Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>GT'S LIVING FOODS, LLC,<br><br>                              Defendant. | Case No. 2:19-cv-10920-FMO-GJS |

Declaration

of

**COLIN B. WEIR**

June 2, 2021

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "HIGHLY

CONFIDENTIAL ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

Evid. Appx. Page 295

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 7th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.  I hold a Masters of Business Administration, with honors from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food and beverage products, herbal remedies, health/beauty care products, household appliances, electronics, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is annexed hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.

## II. ENGAGEMENT

2.  I have been advised by Counsel for Plaintiffs that GT's Living Foods, LLC has passed off millions of bottles of its wildly successful Enlightened Kombucha beverages as non-alcoholic, when, in fact, the beverages contain 18 to 442 percent more alcohol than the legal


ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 296

Declaration of Colin B. Weir
June 2, 2021
Page 2 of 6

limit for nonalcoholic beverages.[1] I have been further advised that a putative Class of individuals purchased numerous bottles of Defendant's Enlightened Kombucha beverages based on Defendant's misleading advertising and labeling of the products.[2] Plaintiffs allege that these sales were illegal, and that Plaintiffs are entitled to a refund for their purchases.

3.    I have been asked by Counsel for Plaintiffs to determine whether it is possible to determine damages in this case on a Class-wide basis using common evidence and, if so, to provide a framework for and an initial assessment of damages and harm suffered by the Class resulting from the illegal sales made by Defendant.

4.    ETI is being compensated at the rate of $625 per hour for my work on this case. The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

5.    The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report and in Exhibit 2, attached hereto. In addition, I have relied upon my educational background and more than 17 years of experience.

## III.  CLASSWIDE DAMAGES ARE EASILY DETERMINED

6.    As a threshold matter, it is my opinion that it is possible to determine Class-wide damages in this case using the Defendant's own available business records and documents, and available market research data.

7.    I understand that Plaintiffs allege that the sales of the Products at issue in this case were illegal and should not have taken place.[3] As such, this case calls for a calculation of Full

---

[1] Amended Class Action Complaint, filed April 9, 2020, (the "Complaint").

[2] *Id*.

[3] *See, generally*, Complaint.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
June 2, 2021
Page 3 of 6

Compensatory Damages, wherein consumers would receive a full refund for their purchases of

the Kombucha Products.

8.    For purposes of this preliminary analysis, I have assumed a Class period of

February 28, 2017 through the present.[4]

9.    I have been informed by Counsel that they seek certification of a California and New

York Class and an Underage Subclass in California.

## IV.  FULL COMPENSATORY DAMAGES

10.    For purposes of this litigation, given the information available to me, I have

estimated Full Compensatory Damages using data provided by Information Resources, Inc.

("IRI").  The data contains information as to the dollar and unit sales of the products by week

and state.

11.    Under a damages framework awarding full recovery, Class-wide damages are easily

calculated for each product as:

$$\sum_{t=1}^{p} \$Sales\ of\ Kombucha_t$$

12.    Damages may be calculated with mathematical equivalency as:

$Average\ Retail\ Price\ per\ Unit\ of\ Product\ Sold$

$\times\ Number\ of\ Units\ of\ Product\ Sold$

$=\ Full\ Compensatory\ Damages$

13.    Using this framework and the data presently available to me, I have estimated Full

Compensatory Damages to be as summarized below in Table 1:

---

[4] Complaint, at para 61.  My analysis can be tailored to any relevant date range.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
June 2, 2021
Page 4 of 6

| Table 1: GT's Enlightened Kombucha<br>Full Compensatory Damages, February 28, 2017 through Present ||
|---|---|
| **State** | **Full Compensatory Damages** |
| California | $95,325,764.32 |
| New York | $25,442,851.64 |
| Total | $120,768,615.96 |

14.   I have been provided with, and have reviewed, a copy of the Declaration of J. Michael Dennis, Ph.D. dated June 2, 2021 ("Dennis Declaration").  Dr. Dennis is Senior Vice President at NORC in Chicago, IL and is a recognized expert in the design and implementation of online consumer statistical surveys with more than 20 years experience conducting such surveys at leading institutions.[5]

15.   Among other things, the Dennis Declaration discusses the process by which Dr. Dennis designed and conducted a consumer survey of consumers of the Kombucha Products ("Dennis Survey").  Specifically, the Dennis Survey measures the share of the Kombucha Products that were purchased by persons age 18 to 20 in California.  Dr. Dennis concludes that approximately 2.604%, 0.0922%, and 1.182% of purchases of the Kombucha Products (16oz, 48oz, and 6-16oz sizes, respectively) were made by members of the Underage Subclass.

16.   Using the same framework and data as described above, along with the results of the Dennis survey, I have estimated Full Compensatory Damages for the Underage Subclass to be as summarized below in Table 2:

---

[5] Dennis Declaration, at paras 1-10.

ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 299

Declaration of Colin B. Weir
June 2, 2021
Page 5 of 6

| Table 2: GT's Enlightened Kombucha, Underage Subclass Full Compensatory Damages, February 28, 2017 through Present ||
|---|---|
| **State** | **Full Compensatory Damages** |
| California | $2,323,315.02 |

## V. STATUTORY DAMAGES

17.  In addition to the above damages framework for the Class, I have been advised by Counsel for Plaintiffs that a statutory nuance must be considered for New York consumers. I have been advised that New York GBL § 349 provides for statutory damages of $50 per violation.

18.  Using the available sales records, I have determined that, in New York approximately 6,592,869 units of the Products were sold to the Class during the relevant period.

19.  Table 3 below sets forth the calculations of Statutory Damages.

| Table 3. New York Statutory Damages ||||
|---|---|---|---|
| **Statute** | **Number of Units** | **Damages per Violation** | **Total Statutory Damages** |
| GBL § 349 | 6,592,869 | $50 | $329,643,450 |

## VI. RESERVATION OF RIGHTS

These calculations and estimates are based on the information and data currently available to me.  I understand that additional, different and/or updated data including IRI data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my calculations and my testimony.

ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 300

Declaration of Colin B. Weir
June 2, 2021
Page 6 of 6

## VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and

correct to the best of my knowledge, information, and belief, and that this declaration was

executed at Tisbury, Massachusetts, this 2nd day of June, 2021.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

# Exhibit 1

# Statement of Qualifications
# of

# COLIN B. WEIR

ECONOMICS AND
TECHNOLOGY, INC.

## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is Vice President at Economics and Technology, Inc.  Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records.  Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations.  Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, serves on the Board of Trustees of the Waring School, and serves as the comptroller for the Sybaris Investment Partnership.

1

ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.

2

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.

Mr. Weir has submitted the following testimony during the last four years:

**United States District Court, Southern District of New York,** *In re: Elysium Health - ChromaDex Litigation*, Case No. 1:17-cv-07394-LJL, on behalf of Frankfurt Kurnit Klein & Selz PC, Declaration submitted on April 20, 2021; Deposition, on April 26, 2021.

**United States District Court, Southern District of Texas, Corpus Christi Division,** *Darren Fulton and Craig Jude Broussard, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 2:18-cv-00456, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on March 15, 2021; Deposition on April 16, 2021.

**United States District Court, Southern District of California,** *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and the general public,v. Barlean's Organic Oils, LLC,* Case No. 3:19-cv-00169-JLS-BGS, on behalf of Law Offices of Jack Fitzgerald, Declaration submitted on March 1, 2021; Reply Declaration submitted on May 27, 2021.

**In The United States District Court, For the District of New Hampshire,** *Derick Ortiz, individually and on behalf of all others similarly situated, v. Sig Sauer, Inc.*, Case No.: 1:19-cv-01025-JL, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 26, 2021.

**United States District Court, Western District of Washington,** *Tamara Lohr and Ravikiran Sindogi, on behalf of themselves and all others similarly situated, v. Nissan North America, Inc., and Nissan Motor Co., LTD.*, Case No.: 2:16-cv-01023-RSM and United States District Court, Northern District of California, San Francisco Division, *Sherida Johnson, Subrina Seenarain, Chad Loury, Linda Spry, Lisa Sullivan, and April Ahrens on behalf of themselves and all others similarly situated, v. Nissan North America, Inc.*, Case No.: 3:17-cv-00517-WHO, on behalf of Simmons Hanly Conroy LLC; Declaration submitted on February 16, 2021; Deposition on May 5, 2021.

**Superior Court of the State of California, County of Alameda,** *Donna Connary, Zoriana Pawluk-Florio, Adrienne Andry, and Paul Terrecillas, on behalf of themselves and all others similarly situated, v. S.C. Johnson & Son, Inc.*, Case No. RG20061675, on behalf of Feinstein Doyle Payne & Kravec, LLC; Declaration submitted on February 16, 2021.

**United States District Court, Western District of New York,** *In re: Rock 'N Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case MDL No. 1:19-md-2903, on behalf of Beasley Allen Law Firm, Declaration submitted on February 8, 2021; Deposition on March 11, 2021.

3



ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 305

*Statement of Qualifications – Colin B. Weir*

**Superior Court for The State of California, County of Los Angeles,** *Daniel Prescod, individually and on behalf of all others similarly situated, v. Celsius Holdings, Inc. and Does 1 through 10, inclusive*, Case No. 19STCV09321, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on December 23, 2020; Deposition on April 14, 2021.

**United States District Court, Central District of California,** *Sharon Willis, individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 2:19-cv-08542-JGB-RAOx, on behalf of Bursor & Fisher, P.A.; Declaration submitted on December 17, 2020; Deposition on March 30, 2021.

**United States District Court, Northern District of California,** *Gordon Noboru Yamagata, and Stamatis F. Pelardis, individually and on behalf of all others similarly situated, v. Reckitt Benckiser LLC*, Case No. 3:17-cv-03529-VC, on behalf of Blood, Hurst, & O'Reardon, LLP, Expert Report submitted December 4, 2020; Expert Report submitted December 15, 2020; Deposition on January 19, 2021.

**In the United States Court of Federal Claims,** *Bryndon Fisher, individually and on behalf of all others similarly situated, v. The United States of America,* Case No. 15-1575C, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on December 3, 2020.

**United States District Court, for the Southern District of Ohio, Western Division,** *Laura Bechtel and Troy Thoennes, on behalf of themselves and all others similarly situated, v. Fitness Equipment Services, LLC, dba SOLE Fitness*, Case No. 1:19-cv-00726-MRB, on behalf of Markovits, Stock & DeMarco, LLC, Declaration submitted on December 2, 2020.

**United States District Court, Northern District of California,** *Thomas Bailey, on behalf of himself and all others similarly situated, v. Rite Aid Corporation*, Case No. 4:18-cv-06926-YGR, on behalf of Greg Coleman Law, Declaration submitted October 19, 2020; Deposition on December 10, 2020; Reply Declaration submitted on March 16, 2021.

**United States District Court, Northern District of California,** *Jeremiah Revitch, individually and on behalf of all others similarly situated, v. New Moosejaw, LLC and Navistone, Inc.*, Case No. 3:18-cv-06827-VC, on behalf of Bursor & Fisher P.A., Declaration submitted on September 28, 2020, Deposition on November 20, 2020.

4

ECONOMICS AND
TECHNOLOGY, ɪɴᴄ.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of Florida,** *Javier Cardenas, Rodney and Pamela Baker, Michelle Monge, and Kurt Kirton, individually and on behalf of all others similarly situated, v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Southeast Toyota Distributors, LLC*, Case No.: 18-cv-22798-CIV-FAM, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on September 17, 2020; Declaration submitted on October 20, 2020; Deposition on November 12, 2020; Rebuttal Declaration submitted on November 24, 2020; Supplemental Declaration submitted on December 8, 2020; Rebuttal Declaration filed on December 9, 2020.

**United States District Court, Northern District of California,** *Ralph Milan, Sarah Aquino, and Elizabeth Arnold, on behalf of themselves, those similarly situated and the general public, v. Clif Bar & Company,* Case No. 3:18-CV-02354-JD, on behalf of Law Office of Paul K. Joseph, PC, Declaration submitted on September 17, 2020; Deposition on October 23, 2020; Reply Declaration submitted on November 27, 2020; Declaration submitted on March 2, 2021; Declaration submitted on April 9; Deposition on May 7, 2021.

**Superior Court of The State of California, County of Orange,** *William Brady, on behalf of himself and all others similarly situated, v. Bayer AG; Bayer Corporation; Bayer Healthcare LLC; and Does 1 through 10, inclusive*, Case No. 0-2016-00839608-CU-MC-CXC, on behalf of Wolf Haldenstein Adler Freeman & Herz LLP, Declaration submitted on September 9, 2020; Deposition on December 4, 2020.

**United States District Court, for the Southern District of New York,** *Matthew Chamlin, individually and on behalf of all others similarly situated, v. Johnson & Johnson and McNeil Nutritionals, LLC*, Case No. 1:19-cv-03852-AJN-DCF, on behalf of Bursor & Fisher P.A., Declaration submitted on August 14, 2020.

**United States District Court, Northern District of California, San Francisco Division,** *Daniel Zeiger, Individually, and on Behalf of All Others Similarly Situated, v. Wellpet LLC, A Delaware Corporation*, Case No. 3:17-CV-04056-WHO, on behalf of Gustafson Gluek PLLC, Declaration submitted on June 29, 2020.

**United States District Court, Central District of California, Western Division,** *Roberta Bilbrey, Jimmy Banh, Lawrence Goldman, Mark Peoples, Jamal Samaha, George Quinlan, Kara Drath, Gary Hanna, Sarah Gravlin, Caitlin Kremer, Cindy Ortiz, Alexis Chisari, Robert Moss, Michael Brumer, Dave Jahsman, John Bartholomew, Vimal Lawrence, Kayce Kleehamer, Mark Klein, Brian Klein, Charles Denaro, Adam Pryor, Srikarthik Subbarao, Daniel Allan, Paul Gonzales, Eric Faden, Hamilton Hines, And Kristen Gratton, on behalf of themselves and all others similarly situated, v. American Honda Motor Co., Inc., a California Corporation*, Case No.: 2:19-cv-05984 RGK (ASx), on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on April 9, 2020; Reply Declaration submitted on May 18, 2020; Deposition on June 12, 2020; Declaration submitted July 24, 2020.

5

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Central District of California,** *Will Kaupelis and Frank Ortega, individually and on behalf of all others similarly situated, v. Harbor Freight Tools, Inc.*, Case No. 8:19-cv-1203-JVS-DFM, on behalf of Bursor & Fisher, P.A., Declaration submitted on March 2, 2020; Deposition on May 28, 2020; Reply Declaration submitted on September 8, 2020.

**Superior Court of the State of California, County of Los Angeles,** *Jeffrey Koenig, on behalf of himself and all others similarly situated, v. Vizio, Inc*., Case No. BC 702266, on behalf of Greg Coleman Law, Declaration submitted February 27, 2020; Deposition on April 30, 2020; Reply Declaration submitted on July 13, 2020.

**United States District Court, Northern District of California, San Francisco Division,** *Kym Pardini and Carrie Wood, on behalf of themselves and all others similarly situated, v. Unilever United States, Inc., a Delaware corporation*, Case No. 3:13-cv-01675-SC, on behalf of the Eureka Law Firm, Declaration submitted on February 21, 2020.

**United States District Court, Northern District of California, San Francisco Division,** *Jennifer Nemet, Norbert Kahlert, Angela Matt Architect, Inc., Eddie Field, Tonya Dreher, Adam Schell, Bryan Sheffield, Darryl Lecours, Gisbel De La Cruz, Derek Winebaugh, Michael Skena, Melissa St. Croix, Andrew Olson, John Kubala, Brendan Daly, Steven Ferdinand, Ken Galluccio, Steven Rawczak, Mark Miller, Sven Hofmann, Thomas Siehl, III, Adam Schell, Bradley Conner, Benjamin Tyler Dunn, Ingrid Salgado, Michael Bowman, and Jon Mosley, on behalf of themselves and all others similarly situated, v. Volkswagen Group of America, Inc., Volkswagen AG, Audi AG, Audi of America, LLC, Robert Bosch Gmbh, Robert Bosch LLC, Richard Dorenkamp, Heinz-Jakob Neusser, Jens Hadler, Bernd Gottweis, Oliver Schmidt, and Jurgen Peter,* Case No. 3:17-cv-04372-CRB, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on February 14, 2020; Reply Declaration submitted on April 30, 2020; Deposition on July 22, 2020.

**United States District Court, Norther District of California, San Francisco Division,** *Vicky Maldonado and Justin Carter, individually and on behalf of themselves and all others similarly situated, v. Apple Inc., Applecare Service Company, Inc., and Apple CSC, Inc.,* Case No. 3:16-cv-04067-WHO, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on February 11, 2020; Deposition on March 12, 2020; Supplemental Declaration submitted on September 14, 2020; Deposition on November 17, 2020.

**United States District Court, District of New Jersey,** *Brian Gozdenovich, on behalf of himself and all others similarly situated, v. AARP, Inc., AARP Services Inc., AARP Insurance Plan, Unitedhealth Group, Inc., and Unitedhealthcare Insurance Company,* Case No. 9:18-cv-81258-DMM, on behalf of Bursor & Fisher, P.A., Declaration submitted on January 29, 2020; Declaration submitted on March 26, 2020; Deposition on July 1, 2020; Rebuttal Declaration submitted on July 9, 2020..

6

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, for the Central District of California, Western Division,** *Toya Edwards, on behalf of herself and all others similarly situated, v. Walmart Inc.*, Case No. 1:18-cv-9655, on behalf of Simmons Hanly Conroy LLC, Declaration submitted on December 6, 2019; Deposition on January 9, 2020; Reply Declaration submitted on February 27, 2020.

**United States District Court, District Of Connecticut,** *William Montgomery and Donald Wood Jr., individually and on behalf of all others similarly situated, v. Stanley Black & Decker, Inc., d/b/a Craftsman*, Case No. 3:19-cv-01182-AVC, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 15, 2019.

**United States District Court, Central District of California,** *Paul Stockinger, Elizabeth Stockinger, Basudeb Dey, Gailyn Kennedy, Eliezer Casper, Yvette Alley, and Norman Beil on behalf of themselves and all others similarly situated, v. Toyota Motor Sales, U.S.A., Inc., a California corporation*, Case No.: 17-cv-00035-VAP-KS, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on September 13, 2019; Deposition on October 10, 2019; Reply Declaration submitted on December 12, 2019.

**United States District Court, Southern District of California,** *Patrick McMorrow, Marco Ohlin and Melody DiGregorio, on behalf of themselves, all others similarly situated and the general public, v. Mondelez International, Inc.*, Case No. 3:17-cv-02327-BAS-JLB, on behalf of Law Offices of Jack Fitzgerald, Declaration submitted on August 30, 2019; Deposition on October 1, 2019; Omnibus Declaration submitted on December 9, 2019; Declaration submitted on May 4, 2020; Omnibus Declaration submitted on August 28, 2020; Declaration submitted on May 14, 2021.

**United States District Court for the Eastern District of Wisconsin,** *Scott Weaver, individually and on behalf of a class of similarly situated individuals, v. Champion Petfoods USA, Inc. and Champion Petfoods LP*, Case No. 2:18-cv-01996-JPS, on behalf of Gustafson Gluek PLLC, Declaration submitted on August 13, 2019; Deposition on August 22, 2019.

**United States District Court, Central District of California,** *Collin Shanks, on behalf of himself, all others similarly situated, and the general public, v. Jarrow Formulas Inc.,* Case No. 18-cv-9437-PA (AFMx), on behalf of Law Offices of Jack Fitzgerald, Declaration submitted on July 22, 2019; Reply Declaration submitted on August 12, 2019.

**United States District Court, Eastern District Of Michigan, Southern Division,** *Suresh Persad, Daniel G. Wright and Robert S. Drummond, individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 2:17-cv-12599-TGB-MKM, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on June 25, 2019; Declaration submitted on November 26, 2019.

ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 309

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of Florida, Fort Lauderdale Division,** *Milita Barbara Dolan, on behalf of herself and all others similarly situated, v. Jetblue Airways Corporation*, CASE NO.: 18-cv-62193-RNS, on behalf of Robbins Geller Rudman & Dowd, LLP, Declaration submitted on May 23, 2019; Deposition on October 25, 2019.

**United States District Court, Northern District of California,** *Joseph Gregorio, Patrick Quiroz and Adam Cooper individually and on behalf of all others similarly situated, v. The Clorox Company,* Case 4:17-cv-03824-PJH, on behalf of Bursor & Fisher, P.A., Declaration submitted on May 15, 2019; Declaration submitted July 12, 2019; Deposition on July 18, 2019; Reply Declaration submitted on August 21, 2019.

**United States District Court, District of Minnesota,** *Hudock, et al., v. LG Electronics U.S.A., Inc., et al.*, Lead Case No. 0:16-CV-01220-JRT-KMM, Relating to All Consolidated Actions, on behalf of Zimmerman Reed, LLP, Declaration submitted on May 10, 2019; Deposition on June 6, 2019.

**United States District Court, Central District of California, Western Division,** *Jennifer Reitman and Carol Shoaff, individually and on behalf of a class of similarly situated individuals, v. Champion Petfoods USA, Inc. and Champion Petfoods LP*, Case: 2:18-cv-01736-DOC-JPR, on behalf of Gustafson Gluek PLLC, Declaration submitted on April 8, 2019, Deposition on April, 26, 2019; Supplemental Declaration submitted on June 20, 2019.

**United States District Court, Central District of California, Western Division,** *Barry Braverman, et al., v. BMW of North America, LLC, et al.*, Case No. 8:16-cv-00966-TJH-SS, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on March 29, 2019; Deposition on May 30, 2019; Reply Declaration submitted on September 16, 2019; Supplemental Declaration submitted on July 6, 2020.

**United States District Court, Southern District of Florida, West Palm Beach Division,** *Judith Marilyn Donoff on behalf of herself and all others similarly situated, v. Delta Air Lines, Inc.*, Case No. 9:18-cv-81258-DMM, on behalf of Robbins Geller Rudman & Dowd, LLP, Declaration submitted on March 26, 2019.

**United States District Court, Western District of Washington,** *Jacob Beaty and Jessica Beaty on, behalf of themselves and all others similarly situated, v. Ford Motor America*, Case No. 3:17-CV-05201-RBL, on behalf of Simmons Hanly Conroy LLC; Declaration submitted on February 22, 2019; Deposition on March 29, 2019; Reply Declaration submitted on July 10, 2019; Deposition on July 30, 2019.

**United States District Court, Southern District of New York,** *Nicholas Parker, on behalf of himself and all others similarly situated, v. United Industries Corporation*, Case No. 1:17-cv-05353, on behalf of Bursor & Fisher, P.A., Declaration submitted February 3, 2019; Declaration submitted March 21, 2019; Declaration submitted on May 3, 2019; Deposition on July 24, 2019.

ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 310

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of California,** *Debbie Krommenhock and Stephen Hadley, on behalf of themselves, all others similarly situated, and the general public, v. Post Foods, LLC,* Case No. 3:16-cv-04958-WHO (JSC), on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted January 11, 2019; Deposition on March 1, 2019; Declaration on April 24, 2019; Deposition on May 14, 2019; Supplemental Declaration submitted on June 21, 2019; Omnibus Declaration submitted on August 9, 2019; Supplemental Declaration submitted on November 16, 2020; Declaration submitted on January 18, 2021.

**United States District Court, Southern District of New York,** *Leona Hunter and Anne Marie Villa, on behalf of themselves and all others similarly situated, v. Time Warner Cable Inc*., Case No. 15-cv-06445-JPO (JLC), on behalf of Bursor & Fisher, P.A. Declaration submitted on November 30, 2018; Deposition on December 21, 2018; Reply Declaration submitted on February 27, 2019.

**United States District Court, Northern District of California,** *Jeremiah Revitch, on Behalf of Himself and all Others Similarly Situated, v. Citibank, N.A*., Case No. 17-cv-06907-JCS, on behalf of Bursor & Fisher, P.A. Declaration submitted on November 27, 2018; Deposition on December 28, 2018; Reply Declaration submitted on February 1, 2019; Deposition on February 26, 2019.

**United States District Court, Central District of California,** *Kaylee Browning and Sarah Basile, on behalf of themselves and all others similarly situated, v. Unilever United States Inc.*, Case No. 8:16-cv-02210, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 22, 2018; Deposition on November 1, 2018; Reply Declaration submitted on November 23, 2018.

**United States District Court, Southern District of New York,** *Lori Canale, individually, and on behalf of all others similarly situated, v. Colgate-Palmolive Co.,* Case No. 7:16-CV-03308-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 19, 2018.

**Superior Court for the State of California, In and for the County of San Francisco,** *Michelle Gyorke-Takatri and Katie Silver on behalf of themselves and all others similarly situated, v. Nestlé USA, Inc. and Gerber Products Company,* Case No. CGC 15-546850, on behalf of Stanley Law Group, Declaration submitted on September 7, 2018.

**Superior Court of the State of California, For The County of San Francisco,** *Deanna Gastelum and Heather Bryden individually and on behalf of all other persons similarly situated, v. Frontier California Inc.*, Case No. CGC-11-511467, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration submitted on July 31, 2018, Declaration submitted August 13, 2018.

**United States District Court, For the Southern District of New York,** *Suzanna Bowling, individually and on behalf of all others similarly situated, v. Johnson & Johnson and McNeil Nutritionals, LLC*, Case No. 1:17-cv-03982-AJN, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 30, 2018, Deposition on September 6, 2018; Reply Declaration submitted on November 16, 2018.

ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of New York,** *Anne De Lacour, Andrea Wright, and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 1:16-cv-08364-RA, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 15, 2018; Deposition on August 28, 2018; Reply Declaration submitted on November 21, 2018; Declaration submitted on February 21, 2020; Reply Declaration submitted April 9, 2020.

**United States District Court, Northern District of California, San Francisco Division,** *In re: Chrysler-Dodge-Jeep EcoDiesel® Marketing, Sales Practices, and Products Liability Litigation Dorun Bali, et al., v. Fiat Chrysler Automobiles N.V., FCA US LLC, Sergio Marchionne, VM Motori S.p.A., VM North America, Inc., Robert Bosch GmbH, Robert Bosch LLC, and Volkmar Denner*, Case No. MDL 2777-EMC, on behalf of Lieff Cabraser Heimann & Bernstein, Declaration submitted on June 6, 2018, Deposition on July 18, 2018, Reply Declaration submitted on September 4, 2018.

**United States District Court, Northern District of California,** *Stephen Hadley, on behalf of himself, all others similarly situated, and the general public, v. Kellogg Sales Company*, Case No. 5:16-cv-04955-LHK-HRL, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted April 30, 2018, Deposition on May 31, 2018; Reply Declaration submitted June 25, 2018; Declaration submitted on September 20, 2018; Deposition on September 28, 2018; Declaration submitted on October 21, 2019; Declaration submitted on July 16, 2020; Declaration submitted on March 10, 2021.

**United States District Court, Northern District of Illinois, Eastern Division,** *Teresa Elward, Dennis Keesler, Leasa Brittenham, Kathy Beck and Nathaniel Beck, Angelia East, Sarah LaVergne, Tony And Lauren Fitzgerald, Gregory Gray, Bethany Williams, John McLaughlin, Stacy Cisco, and William Ferguson and Cheryl Ferguson, individually and on behalf of all others similarly situated, v. Electrolux Home Products, Inc.*, Case No. 1:15-cv-09882-JZL, on behalf of Greg Coleman Law, Declaration submitted April 20, 2018; Reply Declaration submitted on July 13, 2018; Deposition on August 17, 2018.

**United States District Court for the Northern District of California,** *Jackie Fitzhenry-Russell, an individual, on behalf of herself, the general public and those similarly situated v. The Coca Cola Company, and Does 1-50*, Case No. 5:17-CV-00603-EJD, on behalf of Gutride Safier, LLP, Declaration submitted April 16, 2018; Deposition on October 3, 2018.

**United States District Court for the Southern District of New York,** *Josephine James Edwards, individually and on behalf of all others similarly situated, v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT, on behalf of Bursor & Fisher, P.A., Declaration submitted April 16, 2018; Deposition on June 7, 2018.

10

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of California,** *Jackie Fitzhenry-Russell, Robin Dale, and Gegham Margaryan, as individuals, on behalf of themselves, the general public and those similarly situated, v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50,* Case No. 5:17-cv-00564-NC (lead); Case No. 5:17-cv-02341-NC (consolidated); Case No. 5:17-cv-04435-NC (consolidated)*, on behalf of Gutride Safier, LLP, Declaration submitted April 9, 2018; Deposition on April 19, 2018; Reply Declaration submitted June 6, 2018; Supplemental Declaration submitted on November 19, 2018.

**United States District Court for the Western District of Texas, Austin Division,** *Sylvia Morris, on behalf of herself and all others similarly situated, v. Modernize Inc.*, Case No. 17:-cv-963-SS, on behalf of Bursor & Fisher, P.A., Declaration submitted March 13, 2018; Deposition on June 14, 2018.

**United States District Court, Northern District of California, San Jose Division,** *In re: Arris Cable Modem Consumer Litigation*, Case No. 17-cv-1834-LHK, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on March 9, 2018; Reply Declaration submitted April 9, 2018; Deposition on April 11, 2018; Declaration submitted June 13, 2018; Declaration submitted January 31, 2019; Deposition on February 14, 2019; Reply Declaration submitted on March 14, 2019.

**United States District Court, Southern District of New York,** *In re: Amla Litigation*, Case No. 1:16-cv-06593-JSR, on behalf of Levi & Korsinsky LLP, Declaration submitted on March 5, 2018; Declaration submitted November 14, 2018; Deposition on November 28, 2018.

**United States District Court, Eastern District of Michigan,** *Toby Schechner, Barbara Barnes, Laura Bliss, Kathleen Jordan, Kathryn Limpede, Louise Miljenovic, Candace Oliarny, Beverly Simmons, Richard Thome And Mary Ellen Thome, v. Whirlpool Corporation,* Case No. 16-cv-12409-SJM, on behalf of Robbins Geller Rudman & Dowd, LLP, Declaration submitted February 12, 2018; Deposition on May 15, 2018; Reply Declaration submitted May 17, 2018.

**United States District Court, Southern District of California,** *Jose Conde, et al., v. Sensa, et al.*, Case No. 14-cv-51 JLS (WVG), on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018; Declaration submitted February 21, 2019.

**United States District Court, Northern District Of Illinois, Eastern Division,** *Angel Bakov, Julie Herrera, and Kinaya Hewlett, individually and on behalf of all others similarly situated, v.Consolidated World Travel, Inc. d/b/a Holiday Cruise Line, a Florida corporation,* Case No. 15-cv-02980-HDL SEC, on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018; Deposition on April 25, 2018.

11

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of Illinois,** *Jennifer Beardsall, Daniel Brown, Jennifer Carlsson, Deborah Cartnick, Amy Connor-Slaybaugh, Phyllis Czapski, Raelee Dallacqua, Autumn Dean, Skye Doucette, Christopher Draus, Gerald Gordon, Alexandra Groffsky, Emma Groffsky, Joyce Ivy, La Tanya James, Michelle Jessop, Joy Judge, Kathy Mellody, Susan Nazari, Megan Norsworthy, Deborah Ostrander, Martina Osley, Dana Phillips, Thomas Ramon, Jr., Nancy Reeves, Matthew Robertson, Shelley Waitzman, Jamilla Wang, and Amber Wimberly, Individually and on Behalf of All Others Similarly Situated, v. CVS Pharmacy, Inc., Target Corporation, Walgreen Co., Wal-Mart Stores, Inc., and Fruit of the Earth, Inc.*, Case No. 1:16-cv-06103, on behalf of Greg Coleman Law, Declaration submitted December 22, 2017; Reply Declaration on May 4, 2018.

**United States District Court, Southern District of New York,** *Jaish Markos, individually and on behalf of all others similarly situated, v. Russell Brands, LLC*, Case No. 16-CV-04362(CS), on behalf of The Sultzer Law Group, Declaration submitted on December 1, 2017, Deposition on January 4, 2018.

**United States District Court, Northern District of California,** *Siera Strumlauf, Benjamin Robles, and Brittany Crittenden, individually and on behalf of all others similarly situated, v. Starbucks Corporation,* Case No. 16-CV-01306-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 31, 2017, Deposition on December 13, 2017.

**United States District Court, Southern District of California,** *Sheila Dashnaw, William Meier, and Sherryl Jones, individually, and on behalf of all others similarly situated, v. New Balance Athletics, Inc., a corporation; and DOES 1 through 50, inclusive,* Case No. 3:17-cv-00159-L-JLB, on Behalf of The Wand Law Firm, Declaration submitted on September 8, 2017; Deposition on October 5, 2017; Rebuttal Declaration submitted December 11, 2017.

**United States District Court, Central District of California,** *Veronica Brenner, on behalf of herself and all others similarly situated, v. Procter & Gamble Co.*, Case No. 8:16-1093-JLS-JCG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 5, 2017; Deposition on October 10, 2018.

**United States District Court, Eastern District of California,** *Joann Martinelli, individually and on behalf of all others similarly situated, v. Johnson & Johnson And McNeil Nutritionals, LLC*, Case No. 2:15-cv-01733-MCE-DB, on behalf of Bursor & Fisher, P.A., Declaration submitted August 28, 2017, Deposition on December 20, 2017; Reply Declaration submitted on January 5, 2018.

**United States District Court, Northern District of California, San Francisco Division,** *Martin Schneider, Sarah Deigert, Laurie Reese, Theresa Gamage, Tiffanie Zangwill, and Nadia Parikka, Individually and on Behalf of All Others Similarly Situated, v. Chipotle Mexican Grill, Inc.*, Case No. 3:16-cv-02200-HSG, on behalf of Kaplan Fox & Kilsheimer LLP, Declaration submitted August 11, 2017; Deposition on September 22, 2017.

12

ECONOMICS AND
TECHNOLOGY, INC.
Evid. Appx. Page 314

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of Ohio,** *Tom Kondash, on behalf of himself and all others similarly situated, v. Kia Motors America, Inc., and Kia Motors Corporation*, Case No. 1:15-cv-00506-SJD, on behalf of Gibbs Law Group, LLP, Declaration submitted July 10, 2017, Deposition on November 29, 2017; Supplemental Declaration submitted on September 23, 2019.

**United States District Court, Northern District of Illinois, Eastern Division,** *Ryan Porter and Haarin Kwon, individually and on behalf of all others similarly situated, v. NBTY, Inc., United States Nutrition Inc., Healthwatchers (DE), Inc., and MET-RX Nutrition, Inc.*, Case No. 15-cv-11459, on behalf of Bursor & Fisher, P.A., Settlement Declaration submitted June 22, 2017; Declaration submitted on August 15, 2018; Deposition on October 12, 2018; Reply Declaration on December 21, 2018.

**United States District Court, Northern District of California,** *Sandra McMillion, Jessica Adekoya And Ignacio Perez, on Behalf of Themselves and all Others Similarly Situated, v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted August 25, 2017, Declaration submitted on October 16, 2017; Declaration submitted on August 10, 2018; Declaration submitted on November 6, 2018; Declaration submitted on November 12, 2018; Deposition on December 11, 2018; Oral Testimony and Cross Examination May 7 - 8, 2019.

**United States District Court, Northern District of California,** *Vincent D. Mullins, et al., v. Premier Nutrition Corporation,* Case No. 13-cv-01271-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Deposition on July 20, 2017.

**United States District Court, Southern District of California,** *Preston Jones and Shirin Delalat, on behalf of themselves, all others similarly situated, and the general public, v. Nutiva Inc.*, Case No. 16-cv-00711 HSG, on behalf of Law Offices of Jack Fitzgerald, PC, Deposition on August 23, 2017; Reply Declaration submitted January 12, 2018; Reply Declaration submitted March 2, 2018.

**United States District Court, Central District of California, Southern Division,** *Billy Glenn, Kathy Warburton, Kim Fama, and Corinne Kane, on behalf of themselves and all others similarly situated, v. Hyundai Motor America And Hyundai Motor Company*, Case No. 15-cv-02052-DOC-KES, on behalf of Gibbs Law Group, LLP, Deposition on July 27, 2017; Reply Declaration submitted on October 2, 2017; Reply Declaration submitted on October 6, 2017; Declaration submitted on March 23, 2018.

**United States District Court, Southern District of California,** *Sherry Hunter, on behalf of herself, all others similarly situated, and the general public, v. Nature's Way Products, LLC, and Schwabe North America, Inc.,* Case No. 3:16-cv-00532-WQH-BLM, on behalf of Law offices of Jack Fitzgerald, PC, Reply Declaration submitted on July 11, 2017.

13

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, Southern District Of New York,** *Joanne Hart, and Sandra Bueno, on behalf of themselves and all others similarly situated, v. BHH, LLC d/b/a Bell + Howell and Van Hauser LLC*, Case No. 1:15-cv-04804-WHP, on behalf of Bursor & Fisher, P.A., Deposition on January 10, 2018; Supplemental Declaration submitted January 30, 2018; Declaration submitted on March 2, 2018; Supplemental Declaration submitted on March 30, 2018; Supplemental Declaration submitted on November 26, 2018; Deposition on December 20, 2018.

**United States District Court, Eastern District Of New York, Brooklyn Division,** *Reply All Corp., v. Gimlet Media, Inc.,* Case No. 15-cv-04950-WFK-PK, on behalf of Wolf, Greenfield & Sacks, P.C., Declaration submitted on September 13, 2019; Deposition on October 16, 2019.

**United States District Court, Southern District of New York,** *Alan Gulkis, individually and on behalf of all others similarly situated, Zicam LLC and Matrixx Initiatives, Inc.*, Case No. 7:15-cv-09843-CS, on behalf of Bursor & Fisher, P.A., Deposition on July 14, 2017.

**United States District Court, Southern District of New York,** *Walt Famular, on behalf of himself and all others similarly situated, v. Whirlpool Corporation*, Case No. 16-cv-00944, on behalf of Bursor & Fisher, P.A., Deposition on August 15, 2017; Rebuttal Declaration on March 20, 2018.

**Circuit Court Of Cook County, Illinois County Department, Chancery Division,** *Amy Joseph, individually and on behalf of all others similarly situated, Benjamin Perez, individually and on behalf of all others similarly situated, Intervening Plaintiff, v. Monster Inc., a Delaware Corporation, and Best Buy Co., Inc., a Minnesota Corporation*, Case No. 2015 CH 13991, on behalf of Interveners, Supplemental Declaration submitted January 22, 2018.

**United States District Court, Central District of California,** *Jacqueline Dean, on behalf of herself and all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 5:15-cv-00107, on behalf of Bursor & Fisher, P.A.; Declaration submitted on October 2, 2017; Reply Declaration submitted on December 14, 2017.

**United States District Court, District of New Jersey,** *Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy on behalf of themselves and all others similarly situated, v. Whirlpool Corporation, Lowe's Home Center, Sears Holdings Corporation, The Home Depot, Inc., Fry's Electronics, Inc., And Appliance Recycling Centers Of America, Inc.,* Case No. 12-cv-0089-KM-JBC, on behalf of Bursor & Fisher, P.A., Responding Declaration submitted July 6, 2018; Rebuttal Declaration submitted on August 10, 2018.

**United States District Court, Eastern District of New York,** *D. Joseph Kurtz, individually and on behalf all others similarly situated, v. Kimberly-Clark Corporation and Costco Corporation*, Case No. 14-01142-JBW, on behalf of Robbins Geller Rudman & Dowd LLP; Supplemental Declaration submitted on July 9, 2019; Supplemental Declaration submitted on July 12, 2019; Oral testimony and cross-examination on August 6-8 and 12, 2019.

14

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**United States District Court, Eastern District of New York,** *Anthony Belfiore, on behalf of himself and all others similarly situated, v. Procter & Gamble*, Case No. 14-04090-JBR, on behalf of Wolf Popper LLP; Supplemental Declaration submitted on July 9, 2019; Deposition on July 26, 2019; Oral testimony and cross-examination on August 6-8 and 12, 2019.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC, on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration submitted July 9, 2018; Deposition on March 7, 2019; Reply Declaration submitted on May 22, 2019; Declaration submitted on February 28, 2020.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291, on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration submitted on March 8, 2019.

Mr. Weir has provided expert testimony since 2007, served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.

15

ECONOMICS AND
TECHNOLOGY, INC.

Evid. Appx. Page 317

# Exhibit 2

# Documents Reviewed

ECONOMICS AND
TECHNOLOGY, INC.

- Amended Class Action Complaint, filed April 9, 2020

- Declaration of J. Michael Dennis, Ph.D., June 2, 2021

- IRI Data

- IRI Multioutlet Universe

- Why Census-Based Data Matters

- Sample Based Scanner Data

- GT-SHARPE-0002038

- GT-SHARPE-0001484

- GT-SHARPE-0005809

- gtslivingfoods.com

ECONOMICS AND
TECHNOLOGY, INC.

# EXHIBIT 19

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

AMIT PATEL, LAUREN SCHMIDT, and
CHRISTOPHER NUNEZ, on Behalf of
Themselves and All Others Similarly
Situated, on Behalf of Themselves
and all Others Similarly Situated,

                Plaintiffs,

v.

GT'S LIVING FOODS, LLC.,

                Defendant.

Case No. 2:19-cv-10920

---

## DECLARATION OF DR. J. MICHAEL DENNIS

## DECEMBER 15, 2025

---

MAY REFERENCE MATERIAL DESIGNATED "CONFIDENTIAL" OR "CONFIDENTIAL
– ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, J. Michael Dennis, Ph.D., under penalty of perjury, hereby declare as follows:

1.  I have been retained by counsel for Plaintiffs in the matter of the named Plaintiffs, in the above-captioned litigation. If called upon to testify, I would and could testify competently to all such subject matter in this Declaration and Expert Report.

2.  My current *curriculum vitae* is attached as Attachment A, including a list of my expert testimony in the past four years.

3.  I am being compensated at my hourly rate of $450, and my compensation is not contingent on the outcome of this proceeding. My research into the matters discussed my declaration is ongoing, and I reserve the right to modify or supplement my opinions as additional information becomes available.

## SUMMARY OF QUALIFICATIONS

4.  I have attached a true and correct copy of my curriculum vitae. **Attachment A** sets forth accurate statements concerning my background, education, training, and experience concerning my expertise in the field of survey research and marketing research. The following summarizes relevant or notable qualifications related to the opinions expressed in this Declaration and Expert Report.

5.  I have worked as a survey research expert for more than 25 years, authoring more than 60 articles, conference and seminar papers, or book chapters. I am recognized as an expert in survey research methods. I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association. In recognition of my expertise in online surveys, I was appointed to be a member of the AAPOR Task Force on Online Panels that published recommendations for researchers regarding online surveys.

1

6. I have been personally involved in the design and conduct of hundreds of statistical surveys using the internet mode of data collection over the last 25 years, including the kind of consumer surveys and analysis described in this report.

7. Designing and conducting surveys about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens is a service that I have provided for my clients for more than 25 years. I have designed and conducted consumer surveys that have been accepted by courts in the following cases:

- *Price [Miles] v. Philip Morris*, Case No. 00 L 0112 (Circuit Court, Third Judicial Court, Madison County, Illinois)

- *Zill v. Sprint*, Case No. RG03114147 (Superior Court of the State of California, County of Alameda)

- *Ebin v. Kangadis Food Inc.*, Case No. 1:13-cv-02311 (S.D.N.Y.)

- *Sachs and Alden v. Toyota Motor Corp.*, Case No. BC443701 (Superior Court of the State of California, County of Los Angeles)

- *Avram v. Samsung Elecs. America, Inc. and Lowe's Home Ctrs.*, Case No. 2:11-cv-6973 (KM)(SCM) (D.N.J.)

- *Geanacopoulos v. Philip Morris, USA*, Civil Action No. 98-6002-BLSI (Superior Court for the Commonwealth of Massachusetts)

- *Scotts EZ Seed Litig.*, Case No. 12-CV-4727 (VB)(PED) (S.D.N.Y.)

- *Dzielak v Whirlpool*, Case No. 12-cv-00090 (D.N.J.)

- *Pettit v. Procter & Gamble [RE: Flushable Wipes]*, Case No. 3:15-CV-02150-RS (N.D. Cal.)

- *Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Grp., Inc., et al.*, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated) (N.D. Cal.)

- *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.*, Case No. 5:17-cv-01027-BLF (N.D. Cal)

- *Benson v. Newell Brands, Inc., et al.*, Case No. 19-cv-06836 (N.D. Ill)

2

- *Patrick McMorrow, et al. v. Mondelez Int'l, Inc.*, Case No. 3:17-cv-2327-BAS-JLB (S.D. Cal.)

- *Sharpe v. A & W Concentrate Co.*, Case No. 19-cv-00768 (BMC) (E.D.N.Y.)

- *Montera et al. v. Premier Nutrition Corp.*, Case No. 3:16-CV-06980 RS (N.D. Cal, San Francisco Div.)

- *Sharon Willis et al. v. Colgate-Palmolive Co.*, Case No. 19-8542 JGB (RAOx) (C.D. Cal.)

- *Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 16 Civ. 8364 (RA) (AJP) (S.D.N.Y)

- *Kimberly Banks et al. v. R.C. Bigelow, Inc.*, Case No. 20-cv-06208 DDP (RAOx) (C.D. Cal.)

- *Kathleen A. Cadena et al. v. American Honda Motor Co., Inc.*, Case No.: 2:18-cv-04007-MWF-MAA (C.D. Cal.)

- *Linda Sunderland et al. v. Pharmacare U.S., Inc.*, Case No.: 3:23-cv-01318-JES-AHG (S.D. Cal.)

8. I have testified on more than one hundred occasions as an expert witness since 2002, including at deposition or trial during the last twenty years. My attached current curriculum vitae lists my testimony at deposition and trial in the last four years.

9. The research I have conducted throughout my career has met the high-quality standards maintained by federal sponsors of statistical surveys funded by agencies such as the U.S. Centers for Disease Control and Prevention, the Environmental Protection Agency, and the National Science Foundation. I have been the principal investigator for studies funded by the U.S. National Science Foundation. My opinions have been quoted in The Wall Street Journal, The New York Times, Crain's Chicago Business, and Business Week.

3

10. From 2014 until July 2025, I was a Senior Vice President at NORC in Chicago, IL. I founded and led the online panel survey research business for NORC.[1] I founded the AmeriSpeak business unit at NORC (launched publicly in January 2015) and served as its executive director for its first eleven years, growing the business from a head count of zero employees and zero revenue to a $30M revenue operation with a head count of approximately 80 professional staff members. As Executive Director, I was responsible for all aspects of starting the business unit, including the design and execution of the construction of the AmeriSpeak Panel, which consists of approximately 50,000 U.S. households pre-recruited to participate in online surveys. In addition, I oversaw the conduct of approximately 200 to 300 surveys per year conducted using the AmeriSpeak Panel. The surveys were conducted for sponsors in government, academia, media, non-profit policy organizations, membership groups, and private-sector companies. AmeriSpeak is the primary sample source for polls conducted by The AP-NORC Center for Public Affairs.

11. To illustrate the types of surveys that AmeriSpeak conducted for clients during my 11-year tenure as Executive Director of NORC's AmeriSpeak unit, I note here that I was NORC's Project Director for two significant studies regarding the 2020 general elections in the U.S.

12. First, I was the NORC Director for the *2020 Facebook Election Research Project*. While funded by Facebook, the study is being directed by university-based academics. I directed all aspects of sampling and survey data collection for five-waves of data collection in a longitudinal study of approximately 300,000 U.S. adults, with surveys conducted both before

---

[1] NORC is one of the premier survey and social science research organizations in the United States. Affiliated with the University of Chicago, NORC has conducted research for federal, foundation, and academic clients for over 80 years, and is responsible for some of the most prestigious survey projects in the United States, including the General Social Survey and the Survey of Consumer Finance.

and after the November 2020 general elections. The study provided statistical evidence of the extent to which, if any, that social media has an impact on our U.S. politics, democratic institutions, and elections.

13. Second, I was also the NORC Director for the *America in One Room* (A1R) project in the fall of 2019 (prior to the start of the primary elections that led up to the 2020 general election in the U.S.). (I also directed the *America in One Room* project in preparation for the 2021 Glasgow Summit on Climate Change.) The 2019 AIR project, funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University, researched the extent to which small group deliberations and impartial policy debriefings can result in a convergence in voters' policy preferences (and therefore reduce the prevalence of political divisions in our country). The 2019 deliberative polls were chronicled in a special pull-out section of The New York Times on October 2, 2019 (Sunday edition).[2] I was interviewed by CNN, The New York Times, other media outlets, and a film documentary director.

14. In the 2020-2021 timeframe, my research focus was in directing more than twenty survey studies related to Covid-19 for the U.S. Centers for Disease Control and Prevention, AARP, Boston University, and other organizations. I also led NORC's initiative to create a partnership agreement with AARP, resulting in the June 2021 launch of Foresight 50+ research solutions.[3]

15. During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded

---

[2] *See* https://en.wikipedia.org/wiki/America_in_One_Room. Badger, Emily; Quealy, Kevin. "These 526 Voters Represent All of America. And They Spent a Weekend Together". The New York Times. Retrieved 2 October 2019. President Obama recommended The New York Times article in a tweet.

[3] https://www.norc.org/Research/Capabilities/Pages/Foresight50.aspx.

5

principal investigators who conducted health, economic, social, and political research. When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability based KnowledgePanel, which was the core company asset for Knowledge Networks. As part of the start-up of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in the areas of health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

16. In 2001, I founded the client-facing business unit "Government & Academic Research" for Knowledge Networks. In the role of Managing Director, I grew the business to become the company's largest unit in terms of revenue and net income. In building the business, I developed and implemented the business strategy and led development for key client accounts. I advised clients on the design of all phases of their survey research projects, including sample design, questionnaire design, quality control procedures, and data analysis. I grew the Government & Academic Research business unit from a headcount of zero employees and zero revenue to a headcount of over 50 professional staff members and $35M in revenue by 2012.

17. Before joining Knowledge Networks in early 2000, I was a Senior Scientist at Abt Associates, which was and still is one of the country's leading social science research firms. While at Abt Associates (from 1992 to early 2000), I was responsible for managing statistical surveys for U.S. federal agencies. From 1997 to early 2000, I managed the data collection for the largest random digit dialing telephone survey in the United States, the National Immunization Survey, which was funded by the U.S. Centers for Disease Control and Prevention with management support from the National Center for Health Statistics. I also led other survey studies funded

6

Evid. Appx. Page 327

by the National Institute on Alcohol Abuse and Alcoholism, the National Cancer Institute, the

Social Security Administration, and the White House Office of National Drug Control Policy.

## SCOPE OF MY ASSIGNMENT

18.  Plaintiffs' counsel asked me to conduct and report on the results of a scientifically rigorous

and impartial study that would address issues under litigation. I have conducted that study and

report on the results below.

19. I understand from the Second Amended Class Action Complaint (Dkt. 168) that Plaintiffs

allege that purchasers consuming the Defendant's Enlightened Kombucha Products[4] are misled

because the Products are not in fact non-alcoholic.  I understand that Plaintiffs allege that the

Products should be labeled and sold, to adults, only as required for alcoholic beverages. In

addition, persons under the age of 21 are, according to the Plaintiffs, purchasing Products that

are illegal to sell to persons under 21.

20. I previously submitted a declaration and report for this case (my June 2, 2021 report). I

understand that, since then, the Court ruled that the case cannot include persons who were part

of an earlier class settlement (the "Retta Class"), which I understand included all US persons

that purchased the Products between March 11, 2011 and February 27, 2017 (the "Retta Class

Period").[5] I understand that the Court ruled that the case may proceed for consumers that did

not start purchasing the Products until after the end of the Retta Class period (after February

2017). I understand that Plaintiffs intend to move for certification of this class (the "Patel

Class"), which will include all California and New York persons who purchased the Products

---

[4] By "Products," I refer to the litigated Enlightened Kombucha/Synergy Kombucha bottled beverages made by Defendant (excluding "Classic" and "Hard" Kombucha products also made by Defendant).

[5] *Jonathan Retta et al. v. Millennium Products, Inc. et al.*, Final Approval Order (Dkt. 142).

7

between March 2017 and the date that class notice is sent out (the "Patel Class Period"). I understand Plaintiffs also intend to move for certification of a subclass that includes such persons that were ages 18 to 20 at the time of purchase (the "Minor Subclass").

21. I was asked to design and conduct a consumer survey to measure the proportion of Products, purchased during the Patel Class Period, that were purchased by members of the Patel Class.

22. I was also asked to design and conduct a consumer survey to measure the proportion of Products, purchased by Patel Class members during the Patel Class Period, that were purchased by persons age 18 to 20 (the Minor Subclass), versus persons 21 and older.

23. I understand that Plaintiffs have retained Mr. Colin Weir for the calculation of any damages. As such, I understood that part of my assignment as providing Mr. Weir the information needed for damages calculations, for the Patel Class and Minor Subclass.

## <u>SECTION 1: OVERVIEW OF WORK PERFORMED</u>

24. Based on my knowledge and expertise in the fields of survey research and consumer market research, I designed and conducted a consumer survey. First, I created a sampling plan designed to survey respondents whose responses would project to the study's target population of purchasers of the Products. I determined that I would sample a USA nationwide adult sample and then use an in-field screening survey to identify purchasers of Defendant's Products.

25. Second, I designed the consumer survey based on my research of the Defendant's Products and products that compete with the Products, among other things. I employed memory aids to help respondents recall their purchase history of kombucha beverages. I used images of Defendant's Products to stimulate recall. I featured products marketed by Defendant's competitors to disguise my research objectives.

8

26. Third, I tested the consumer survey through pretesting with research subjects.  After testing the survey, I determined that the survey was reliable and instructed my survey vendor to collect the remaining interviews.

27. Fourth, I retained a survey vendor to program and execute the survey, as well as administer the survey to consumers of the Products. Dynata was blind to the research purposes of the project.

28. Fifth, I compiled the data from the completed survey interviews, reviewed the data to assess the quality of the survey data, and analyzed the interviews.

29. Sixth and finally, I wrote this declaration (i) to document my consumer survey and my expert opinions based on the survey and (ii) to document my consumer survey.

30. I designed and conducted the consumer survey in conformance with best practices for litigation surveys documented by Professor Diamond in her *Reference Guide on Survey Research*.[6]  My consumer survey employs a sound methodology, in light of the considerations documented by Robert Groves *et al.* in their survey research textbook*, Survey Methodology* (Second Edition), and by Peter Marsden and James Wright in the *Handbook of Survey Research* (Second Edition), among others. I also consider and rely on Norman Bradburn *et al.* in *Asking Questions*, Roger Tourangeau *et al.* in *The Psychology of Survey Response*, and Howard Schuman and Stanley Presser in *Questions and Answers in Attitude Surveys*.

31. In the paragraphs below, I first provide the key statistical findings from my consumer survey, and then I document the steps that I took to design and implement it. My attachments document my consumer survey to allow for replication and for purposes of transparency.

---

[6] Shari Seidman Diamond, 2011, "Reference Guide on Survey Research," <u>Reference Manual on Scientific Evidence</u> (Third Edition).

## SECTION 2: KEY STATISTICAL FINDINGS

32. My statistical findings are accurate and generalizable to the Patel Class and Minor Subclass.

33. I conclude from my consumer survey that Patel Class members between the ages of 18 and 20 and those age 21 and older have been and are indeed purchasing Defendant's Products, even after taking into account "Retta" consumers that continued to purchase the at-issue Products in 2017 and more recently.

34. I surveyed 16,481 persons in conducting the survey, including a large sample of 2,992 persons age 18 to 20.  I oversampled young adults to ensure that I would have adequate sample size to estimate purchase frequency for this population. My survey collected information on whether they purchased the Defendant's Products and, if so, measured reliably their purchase behavior of the Products.  The distribution of the 16,481 surveyed persons is shown below.

**Age Distribution of Respondents Starting the Survey (Before the Purchase Frequency Questions)[7]**

|  | Frequency | Percent |
|---|---|---|
| Less than 18 | 140 | .8 |
| 18-20 | 2992 | 18.2 |
| 21-24 | 3978 | 24.1 |
| 25-29 | 3263 | 19.8 |
| 30-39 | 2014 | 12.2 |
| 40-49 | 1752 | 10.6 |
| 50-59 | 763 | 4.6 |
| 60-69 | 903 | 5.5 |
| 70-79 | 565 | 3.4 |
| 80 and older | 111 | .7 |
| Total | 16481 | 100.0 |

[7] Respondents under the age of 18 were not permitted to continue in the survey.

10

35. I interviewed 1,717 respondents (a subset of the 16,481 respondents that started the survey) with questions about purchase frequency of Defendant's Products. I have attached the survey questionnaire and online screen captures showing the survey as experienced by all my respondents. I employed generally accepted methods to encourage respondents to provide accurate recall of the purchases for both before the start of the Patel Class period (prior to 2017) and during the Patel Class period.  To improve accuracy of respondents' recall, the purchase frequency questions referenced the most recent year for which the respondent purchased Defendant's Products. I used the information about respondents' most recent purchase frequency to extrapolate to the earlier years for which the respondents indicated having purchased Defendants' Products. I asked questions specifically to determine whether their purchase behavior would place them in the Retta or Patel class.

36. Most respondents did not qualify for the purchase frequency questions because they were not past kombucha purchasers, and specifically, had not purchased the at-issue Kombucha Products in the past. The 1,717 respondents completing my survey provided information about their purchase frequency of Defendant's Products, as mentioned, for the product sizes which they had purchased during the 2017-2025 time frame. The age distribution for these interviewed respondents is shown below.  I oversampled young adults to provide sample size for the analysis of persons age 18 to 20.

11

**Age Distribution of Respondents Answering the Purchase Frequency Questions**

| | Frequency | Percent |
|---|---|---|
| 18 | 56 | 3.3 |
| 19 | 76 | 4.4 |
| 20 | 76 | 4.4 |
| 21 | 72 | 4.2 |
| 22 | 94 | 5.5 |
| 23 | 123 | 7.2 |
| 24 | 100 | 5.8 |
| 25 | 116 | 6.8 |
| 26 | 81 | 4.7 |
| 27 | 94 | 5.5 |
| 28 | 56 | 3.3 |
| 29 | 91 | 5.3 |
| 30 or older | 682 | 39.7 |
| Total | 1717 | 100.0 |

37. The results for my survey are shown below for the at-issue Products for which I obtained purchase frequency data. I analyzed the data for the 2017-2025 Patel Class period. 35.8% of the respondents confirmed purchasing a GT's kombucha product in only one year between 2017 and 2025, indicating that there is substantial "churn" or "turnover" in the market.[8] I broke

---

[8] The below is a count of the number of years for which respondents indicated that they had purchased the GT's Kombucha beverage in the time frame 2017 through 2025.

**Count of Number of Years for Which Respondents Confirmed Purchasing GT's Kombucha**

| Count | Frequency | Percent |
|---|---|---|
| 1 | 634 | 35.8% |
| 2 | 375 | 21.2% |
| 3 | 266 | 15.0% |
| 4 | 136 | 7.7% |
| 5 | 94 | 5.3% |
| 6 | 68 | 3.8% |
| 7 | 34 | 1.9% |
| 8 | 36 | 2.0% |
| 9 | 127 | 7.2% |
| Total | 1770 | 100.0% |

12

out the data by year of purchase, by whether the respondent was a "Retta" or "Patel" Class member, and by age (age 18-20 years, age 21 and older). I applied a statistical adjustment (reducing their share of total number of respondents to reflect their actual share of the U.S. population) to respondents age 18-20 to offset the fact that I had oversampled them by a factor of three, ensuring that my purchase frequency totals for these young adults would be representative of the entire adult U.S. population.

38. **Purchases of the 16 fl. oz. Individually Sold Bottles.** The survey shows Patel Class Members age 18 to 20 accounted for as much 3.2% of unit sales during the class period, while persons age 21 and over accounted for between 36.8% and 78.6% of unit purchases.

| DISTRIBUTION OF SALES FOR GT'S KOMBUCHA FOR THE INDIVIDUALLY SOLD 16 FLUID OUNCE BOTTLES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | YEAR OF PURCHASES OF GT'S KOMBUCHA | | | | | | | | |
| | | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **Purchases by "Retta" Class Members** | | | | | | | | | | |
| **Age 18-20** | | | | | | | | | | |
| | 16 fl oz units | 192 | 184 | 173 | 158 | 149 | 146 | 144 | 136 | 131 |
| | % of total | 1.7% | 1.4% | 1.2% | 1.0% | 0.8% | 0.7% | 0.6% | 0.5% | 0.5% |
| **Age 21 +** | | | | | | | | | | |
| | 16 fl oz units | 6777 | 6490 | 6120 | 5586 | 5258 | 5175 | 5093 | 4806 | 4641 |
| | % of total | 60.0% | 49.5% | 43.6% | 34.6% | 29.8% | 25.3% | 21.0% | 16.8% | 17.7% |
| | | | | | | | | | | |
| **Purchases by "Patel" Class Members** | | | | | | | | | | |
| **Age 18-20** | | | | | | | | | | |
| | 16 fl oz units | 170 | 252 | 303 | 408 | 479 | 593 | 745 | 925 | 840 |
| | % of total | 1.5% | 1.9% | 2.2% | 2.5% | 2.7% | 2.9% | 3.1% | 3.2% | 3.2% |
| **Age 21 +** | | | | | | | | | | |
| | 16 fl oz units | 4161 | 6185 | 7439 | 10004 | 11743 | 14536 | 18270 | 22688 | 20607 |
| | % of total | 36.8% | 47.2% | 53.0% | 61.9% | 66.6% | 71.1% | 75.3% | 79.5% | 78.6% |
| **Col. Totals** | | 11,300 | 13,110 | 14,036 | 16,156 | 17,628 | 20,451 | 24,252 | 28,554 | 26,220 |
| **Column %** | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

13

39. **Purchases of the 48 fl. oz. Individually Sold Bottles.** The survey shows Patel Class Members age 18 to 20 accounted for as much 2.6% of unit sales during the class period, while persons age 21 and over accounted for between 31.9% and 75.5% of unit purchases.

| DISTRIBUTION OF SALES FOR GT'S KOMBUCHA FOR THE INDIVIDUALLY SOLD 48 FLUID OUNCE BOTTLES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | YEAR OF PURCHASES OF GT'S KOMBUCHA | | | | | | | | |
| | | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Purchases by "Retta" Class Members** | | | | | | | | | | |
| **Age 18-20** | | | | | | | | | | |
| | 48 fl oz units | 27 | 26 | 25 | 23 | 21 | 21 | 21 | 19 | 19 |
| | % of total | 1.2% | 1.1% | 0.9% | 0.8% | 0.7% | 0.6% | 0.5% | 0.4% | 0.4% |
| **Age 21 +** | | | | | | | | | | |
| | 48 fl oz units | 1449 | 1388 | 1309 | 1195 | 1124 | 1107 | 1089 | 1028 | 993 |
| | % of total | 65.7% | 55.6% | 49.7% | 40.2% | 35.1% | 30.1% | 25.3% | 20.5% | 21.5% |
| | | | | | | | | | | |
| **Purchases by "Patel" Class Members** | | | | | | | | | | |
| **Age 18-20** | | | | | | | | | | |
| | 48 fl oz units | 24 | 36 | 43 | 58 | 69 | 85 | 107 | 133 | 120 |
| | % of total | 1.1% | 1.4% | 1.7% | 2.0% | 2.1% | 2.3% | 2.5% | 2.6% | 2.6% |
| **Age 21 +** | | | | | | | | | | |
| | 48 fl oz units | 704 | 1046 | 1259 | 1693 | 1987 | 2459 | 3091 | 3838 | 3486 |
| | % of total | 31.9% | 41.9% | 47.8% | 57.0% | 62.1% | 67.0% | 71.8% | 76.5% | 75.5% |
| **Col. Totals** | | 2,205 | 2,497 | 2,636 | 2,968 | 3,201 | 3,672 | 4,308 | 5,018 | 4,618 |
| **Column %** | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

14

40. **Purchases of the 6 – 16 fl. oz. Bottles (sold in Boxes).** The survey shows Patel Class Members age 18 to 20 accounted for as much 1.0% of unit sales during the class period, while persons age 21 and over accounted for between 32.3% and 76.8% of unit purchases.

| DISTRIBUTION OF SALES FOR GT'S KOMBUCHA FOR THE 6 - 16 FL. OZ. BOXES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | YEAR OF PURCHASES OF GT'S KOMBUCHA | | | | | | | | |
| | | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Purchases by "Retta" Class Members** | | | | | | | | | | |
| **Age 18-20** | | | | | | | | | | |
| | 6 - 16 fl oz un | 8 | 7 | 7 | 6 | 6 | 6 | 6 | 5 | 5 |
| | % of total | 0.5% | 0.4% | 0.4% | 0.3% | 0.3% | 0.2% | 0.2% | 0.1% | 0.2% |
| **Age 21 +** | | | | | | | | | | |
| | 6 - 16 fl oz un | 1094 | 1048 | 988 | 902 | 849 | 835 | 822 | 776 | 749 |
| | % of total | 66.9% | 56.6% | 50.6% | 41.1% | 35.9% | 30.8% | 25.9% | 21.0% | 22.0% |
| | | | | | | | | | | |
| **Purchases by "Patel" Class Members** | | | | | | | | | | |
| **Age 18-20** | | | | | | | | | | |
| | 6 - 16 fl oz un | 7 | 10 | 12 | 16 | 19 | 24 | 30 | 37 | 33 |
| | % of total | 0.4% | 0.5% | 0.6% | 0.7% | 0.8% | 0.9% | 0.9% | 1.0% | 1.0% |
| **Age 21 +** | | | | | | | | | | |
| | 6 - 16 fl oz un | 528 | 785 | 944 | 1269 | 1490 | 1844 | 2318 | 2879 | 2615 |
| | % of total | 32.3% | 42.4% | 48.4% | 57.9% | 63.0% | 68.1% | 73.0% | 77.9% | 76.8% |
| **Col. Totals** | | 1,636 | 1,850 | 1,951 | 2,194 | 2,364 | 2,709 | 3,176 | 3,697 | 3,403 |
| **Column %** | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

15

### SECTION 3:  SAMPLE FRAME

41. I retained the market research firm company named Dynata to provide the sample frame for my survey. I have used Dynata on more than thirty occasions to provide me with the sample frame for my previously mentioned consumer perception, materiality, and price premium surveys conducted in the litigation context. Dynata was created from the merger of two industry-leading online survey sample companies (Research Now, Survey Sampling Inc.).

42. My selection of Dynata for the sample frame is based on my past experience in conducting surveys with Dynata and its predecessor companies. My decision is also based on their expertise and large-scale capabilities for reaching hard-to-reach and rare population segments in the U.S. Dynata has the largest pre-recruited sample of consumers – called a "panel" – comprising nearly 70 million consumers and business professionals globally.[9]

43. Dynata has previously collected background information on its U.S. panelists regarding educational obtainment and age.  Compared to a general population sample, Dynata's sample targeting increased the likelihood that my sample would be able to obtain an oversample of young adults.

---

[9] Dynata Panel Book (2024). https://www.dynata.com/wp-content/uploads/2024/01/Dynata_Panel_Book.pdf. Last accessed July 9, 2024.

16

### SECTION 4:  SURVEY PROGRAMMING, SURVEY PARTICIPANT RECRUITMENT, AND DATA COLLECTION OPERATIONS

44. In addition to providing the sample, Dynata also provided me with the online survey vendor services for programming the survey questionnaires and for hosting the online surveys by collecting the survey data.

45. I have previously used Dynata's questionnaire programming and questionnaire hosting services for my surveys listed in my description of qualifications.

46. Dynata worked under my supervision and control. I did not share with Dynata the research objectives. Dynata was "blind" to the research objectives of the study and "blind" to the sponsor of the study. Dynata did not conduct any analyses of the data as my survey administrator.

### CONCLUSION

47. The results of my consumer survey provide a reliable and accurate measurement of the prevalence and quantity of purchases of the Products, during the Patel Class Period, for Patel Class members age 18 to 20 and those age 21 and older. As such, I provided Plaintiffs' damages expert the reliable information that I understand is needed for damages calculations.

### RESERVATION OF RIGHTS

The facts and data that I considered for developing my opinions in this report are cited herein. I reserve the right to modify my opinions if I were to be provided with additional information, and to supplement them if necessary to respond to criticisms or objections from the opposing party.

17

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed in Palo Alto, CA on December 15, 2025.

_____
J. MICHAEL DENNIS, PH. D

18

# LIST OF ATTACHMENTS

A. Curriculum Vitae of J. Michael Dennis, Ph.D.

B. Survey Questionnaire (Word Document)

C. Survey Questionnaire Online Screen Captures (PowerPoint)

D. Survey Data in Excel for All the Respondents

E. Codebook for Survey Data in Excel for All the Respondents

# ATTACHMENT A

## CURRICULUM VITAE
## J. MICHAEL DENNIS, PH.D.

# CV FOR J. MICHAEL DENNIS

274 Redwood Shores Parkway, #529
Redwood City, CA 94065
JMDSTAT@gmail.com

## Education

| | | | |
|---|---|---|---|
| University of Texas, Austin | Government | B.A. | 1984 |
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

## Employment

| | |
|---|---|
| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2015-2025 | Senior Vice President, NORC |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007-2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

## Notable Past Projects

- 2020 Facebook Election Research Project, 2020-Present, NORC Director. Funded by Facebook Technologies, NORC's study director a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057). NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-Present, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712). NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present. NORC Director, funded by John D. & Catherine T. MacArthur Foundation. NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation. GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.
- Google Screenwise Research Panel 2011-2014, Director. Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.
- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179). Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.

1

- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.   Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism


Expert Witness in Litigation: Testifying at Deposition or Trial in the Last 4 Years

1. September 20, 2021. Expert Deposition. Senne et al. v. Office of the Commissioner of Baseball, et al. U.S. District Court for the Northern District of California (Case No. 3:2014-cv-00608).
2. October 8, 2021. Expert Deposition. Fishon et al. v. Peloton Interactive, Inc. United States District Court, Southern District of New York (Case No. 1:19-CV-11711-LJL).
3. October 25, 2021. Expert Deposition. IN RE KIND LLC "Healthy and All Natural" Litigation. United States District Court, Southern District of New York (15-MD-2645 (WHP)).
4. October 26, 2021. Expert Deposition. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
5. November 4, 2021. Expert Deposition.  IN RE: FISHER-PRICE ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, United States District Court, Western District of New York (Case No. 1:19-md-2903).
6. November 29, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) (Civil Action No. 19-cv-00768 (BMC)).
7. March 10, 2022. Expert Deposition. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
8. March 24, 2022. Expert Deposition. Testone et al. v. Barlean's Organic Oils, LLC. U.S. District for the Southern District of California (Case No: 19-cv-0169-JLS-BGS).
9. May 27, 2022. Trial Testimony. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
10. June 17, 2022. Expert Deposition. Hall v. Marriott International, Inc. U.S. District for the Southern District of California (Case No.: 3:19-cv-01715-JLS-AHG).
11. September 9, 2022. Trial Testimony. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
12. September 19, 2022. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court, Southern District of New York (16 Civ. 8364 (RA) (AJP)).
13. January 24, 2023. Expert Deposition. IN RE: FOLGERS COFFEE MARKETING LITIGATION. U.S. District for the Western District of Missouri (Civil Action No.: 21-2984-MD-C-BP).
14. January 29, 2023. Expert Deposition. Bush et al. v Rust-Oleum Corp., U.S. District for the Northern District of California (Case No. 3:20-cv-03268-LB).

2

15. April 3, 2023. Expert Deposition. Freeman v. MAM USA Corp., U.S. District for the Northern District of Illinois, Eastern Division (Case No.: 1:20-cv-01834).

16. April 6, 2023. Expert Deposition. Barbera v. Olé Mexican Foods Inc., U.S. District for the Central District of California (Case No.: 5:20-cv-02324-JGB (SPx)).

17. April 14, 2023. Expert Deposition. Corbett et al. v. Pharmacare U.S., Inc., U.S. District for the Central District of California (Case No.: 3:21-cv-00137-JES-AHG).

18. April 21, 2023. Expert Deposition. Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Pfizer Inc., U.S. District Court for the Northern District of California (Case No.: 4:20-cv-09077-JSW).

19. May 25, 2023. Expert Deposition. Rusoff v. The Happy Group, Inc., U.S. District Court for the Northern District of California (Case No.: 4:21-cv-08084-YGR).

20. July 14, 2023. Expert Deposition. Miller et al. v. Travel Guard Group, Inc., AIG Travel, Inc., and National Union Fire Insurance Company of Pittsburgh, PA, U.S. District for the Northern District of California (Case No. 3:21-cv-09751-TLT).

21. September 22, 2023. Expert Deposition. Patane et al. v. Nestle Waters North America, Inc., U.S. District Court of Connecticut (Case No. 3:17-CV-01381 (JAM).

22. October 6, 2023. Expert Deposition. Cadena et al. v. American Honda Motor Company, Inc., U.S. District for the Central District of California (Case No.: 2:18-cv-04007-MWF-MAA).

23. October 16, 2023. Expert Deposition. Howard et al. v. Hain Celestial Group, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-527-VC).

24. November 16, 2023. Expert Deposition. Glassman et al. v. Edgewell Personal Care, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-07669-RS).

25. January 11, 2024. Expert Deposition. Iglesias et al. v. For Life Products, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-01147-TSH).

26. March 14, 2024. Expert Deposition. Banks et al. v. R.C. Bigelow, Inc., U.S. District for the Central District of California (Case No. 20-cv-06208 DDP (RAOx)).

27. July 24, 2024. Expert Deposition. Sunderland et al. v. Pharmacare, U.S. and Pharmacare Laboratories PTY LTD., U.S. District Court for the Southern District of California (Case No.: 23cv1318-JES (AHG)).

28. August 2, 2024. Expert Deposition. Favell et al. v. University of Southern California, U.S. District Court for the Central District of California, Western Division (Case No.: 2:23-cv-00846-SPG-MAR).

29. October 14, 2024. Expert Deposition. VanCleave et al. v. Abbott Laboratories, Superior Court of the State of California, County of Santa Clara (Case No.: 19CV345045).

30. November 13, 2024. Expert Deposition. Wallenstein et al. v. Mondelez International, U.S. District Court for the Northern District of California (Case No.: 3:22-cv-06033).

31. February 5, 2024. Testimony at Trial. VanCleave et al. v. Abbott Laboratories, Superior Court of the State of California, County of Santa Clara (Case No.: 19CV345045).

32. April 29, 2025. Expert Deposition. Sinatro et al. v. Barilla America, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-03460).

33. May 29, 2025. Expert Deposition. Cadena et al. v. American Honda Motor Company, Inc., U.S. District for the Central District of California (Case No.: 2:18-cv-04007-MWF-MAA).

34. June 18, 2025. Expert Deposition. Zinger et al. v. Bai Brands, LLC., U.S. District Court for the Southern District of New York. Case No. 24-cv-3993.

35. June 25, 2025. Expert Deposition. Swartz et al. Dave's Killer Bread, Inc, U.S. District Court for the Northern District of California (Case No.: 4:21-cv-10053-YGR).

36. July 1, 2025. Expert Deposition. Gershzown et al. v. Colgate-Palmolive Company, U.S. District Court for the Northern District of California (Case No.: 23-cv-04086-JCS).

37. August 26, 2025. Expert Deposition. IN RE: Nestle Boost Nutritional Drink Litigation, U.S. District Court for the Northern District of California (Case No. 4:21-c.v-09812-JSC).

3

Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992. Chair: Professor Jon Elster. Published at https://sites.google.com/site/jmichaeldennis/home.

Publications

Fulton, B., Bilgen, I., Pineau, V., Liebert, L., King, D., & Dennis, M. 2022. "Evaluating Nonresponse Bias for a Hypernetwork Sample Generated from a Probability-Based Household Panel." Journal of Quantitative Methods, 6(2).

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. 2018. Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control 27(2).

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015. Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly. 78 (4): 889-916.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2011. "Calibrating Non-Probability Internet Samples with Probability Samples Using Early Adopter Characteristics." Joint Statistical Meetings: 4501-4515.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom. 2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions." Alcoholism: Clinical and Experimental Research 32(2): 1-8.

J. Michael Dennis and Rick Li. 2007. More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December. Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack." Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank, Richard A. Kulka. 2002. "Psychological Reactions to Terrorist Attacks: Findings from the National Study of Americans' Reactions to September 11." Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?" Marketing Research Summer: 484-488.

4

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis. "Surgeons Under Surveillance: Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

5

<u>Selected Papers</u>

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis.  Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis.  2017.  Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh.  2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality:  The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016.  Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel.  Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

6

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo.  "Online Survey Sampling Solutions for Studies of LGB."  Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III.  "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.   Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling?  An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012  "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

7

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force. Prepared for the American Association for Public Opinion Research, March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias." Available at http://www.knowledgenetworks.com/ganp/reviewer-info html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos? Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancouver. Available at http://www.knowledgenetworks.com/ganp/reviewer-info html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

8

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels." Available at http://www knowledgenetworks.com/ganp/reviewer-info html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach." Available at http://www knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign." Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www knowledgenetworks.com/ganp/reviewer-info html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604 Weighting-Description.pdf.

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

9

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.


Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to
Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.


Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans.*  Russell Senate Building, Washington DC, June 14, 2017.


Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.


 "The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?"  Workshop hosted by the University of Essex, Colchester, UK.  Presented the paper "Recommendations for Establishing a National Online Panel in the UK."  June 6-7, 2013.

"The Data Collection of the Future Has Already Started."  Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona.  Presented the paper  "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research."  July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys."  Sponsored by the National Science Foundation and hosted by NORC in Chicago.  June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions.  December 2009.

"Sample Representativeness:  Implications for Administering and Testing Stated Preference Surveys."  Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency.  Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

10

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

Educational Honors

Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)


Affiliations

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010),  Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)

11

## <u>ATTACHMENT B:  SURVEY QUESTIONNAIRE</u>

<u>SURVEY QUESTIONNAIRE:  TWO SECTIONS</u>

<u>SCREENER</u> to identify respondents eligible for the Main Study.  A subset of respondents completing the screening section of the survey will qualify for and continue to the MAIN STUDY.

<u>MAIN STUDY</u> where the key survey questions are asked to respondents that are eligible as determined by the Screener. Main Study survey measures purchasing frequency behavior of certain beverages.

1

## SCREENER SURVEY

PLEASE NOTE THAT INSTRUCTIONS TO QUESTIONNAIRE PROGRAMMERS ARE IN ALL CAPS.  'R' MEANS "RESPONDENT."

---------------------------------------------------------------------------------------------------------------

INTRO.

We'll be asking you about purchases you might have made at grocery stores, discount retailers, online stores, specialty stores, and other retailers where you might purchase various products.

---------------------------------------------------------------------------------------------------------------

[ASK ALL]

[PROMPT]P_STATE

Let's start with an easy question.  Where do you live?

[Dropdown of U.S. States, including Washington DC; include option of "Not in USA" at the bottom of the drop-down list]


**TERMINATE IF 'NOT IN THE USA'**

---------------------------------------------------------------------------------------------------------------

[ASK ALL]

D_GENDER

[SP]

What is your gender?

- o   Male
- o   Female


NO TERMINATIONS

---------------------------------------------------------------------------------------------

2

D_AGE_1

What is your age?

- o Less than 18 → **TERMINATE**
- o 18-20
- o 21-24
- o 25-29
- o 30-39
- o 40-49
- o 50-59
- o 60-69
- o 70-79
- o 80 AND OLDER

**TERMINATE IF UNDER AGE 18**

-----------------------------------------------------------------------------------------------------------------

ASK IF D_AGE_1 = 18-20

D_AGE_2.

What is your age in years?  We ask the question so that we can group your answers with others who are about your age.

- o 18
- o 19
- o 20

-----------------------------------------------------------------------------------------------------------------

ASK IF D_AGE_1 = 21-24

D_AGE_3.

What is your age in years? We ask the question so that we can group your answers with others who are about your age.

- o 21
- o 22
- o 23
- o 24

3

---------------------------------------------------------------------------------------------------------------------

-

ASK IF D_AGE_1 = 25-29

D_AGE_4.

What is your age in years? We ask the question so that we can group your answers with others who are about your age.

- o   25
- o   26
- o   27
- o   28
- o   29

---------------------------------------------------------------------------------------------------------------

[MULTI-SELECT; RANDOMIZE RESPONSE LIST; ANCHOR NONE OF THESE]

PAST_SURVEY

Have you taken any surveys in the last 30 days on any of these topics?  Please select all that apply.

- o   Sporting goods or outdoor gear
- o   Advertisements on TV
- o   Bottled water
- o   Carbonated fermented beverages **→ TERMINATE**
- o   Clothing
- o   Websites you visit
- o   Video Games
- o   Cosmetics
- o   First aid kits
- o   None of these

**[TERMINATE IF R SELECTS "Carbonated fermented beverages"]**

---------------------------------------------------------------------------------------------------------

4

SINGLE SELECT.  DISPLAY THE NUMBERING OF THE RESPONSE OPTIONS SO THAT RESPONDENTS CAN SEE THE RESPONSE OPTION NUMBER. CONFIRMED:  PLEASE SHOW NUMBER OF RESPONSE OPTION SO THAT RESPONDENTS SEE THE NUMBERS.

**ATTENTION_CHECK.** This question is for quality control to make sure you are understanding the survey.

Please select "Somewhat easy" (the fourth answer).

- o  1: Very difficult
- o  2: Somewhat difficult
- o  3: Neither difficult nor easy
- o  4: Somewhat easy → **PROCEED TO NEXT QUESTION**
- o  5: Very easy

**TERMINATE IF '**4: Somewhat easy' **IS NOT SELECTED**

-------------------------------------------------------------------------------------------------------------

The next questions are about purchases you might or might not have made before and after 2017 (before 8 to 9 years ago or after that).

The questions will be asked in time periods asking you to consider these time periods:

- Before 2017
- 2017 to now

IF D_AGE = '18 TO 29': If you cannot answer the questions or else they do not apply to you, you will be able to answer "Not Applicable" or "Not sure."]

---------------------------------------------------------------------------------------------------

5

This is a survey about things you might have **purchased before 2017 versus things you purchased in 2017 and more recently.**

---

To refresh your memory about the year **2017**, please consider:

- **In January 2017,** Donald Trump was inaugurated into U.S. Presidency for the first time.
- In **February 2017**, in Super Bowl LI, the New England Patriots defeated the Atlanta Falcons 34–28 in the first overtime game in the game's history.
- Also in **February 2017**, the 89th Academy Awards were held.  In an embarrassing gaffe, **La La Land** is thought to be the winner of the Oscar for Best Picture, before the envelope is shown to reveal **Moonlight** as the actual winner.
- In **May 2017**, the Ringling Bros. and Barnum & Bailey Circus stages the final show in its 146-year history at Nassau Veterans Memorial Coliseum in Uniondale, New York.
- In **June 2017**, House of Representatives Majority Whip Steve Scalise and his aides are hit by gunfire during a baseball practice in Virginia.
- In **August 2017**, violent clashes break out between attendees and counter-protesters in Charlottesville, Virgina at a "Unite the Right" rally.
- In **September 2017**, Hurricane Maria makes landfall in the US territory of Puerto Rico with maximum sustained winds of 250 km/h (155 mph). Millions of people are left without power.
- In **November 2017**, the Houston Astros defeated the Los Angeles Dodgers after seven games to become the World Series champions.

6

---------------------------------------------------------------------------------------------------------------------Evid. Appx. Page 359

NEW SCREEN. NO DATA COLLECTED

**To help you remember better the year 2017**, also please write out short answers to these questions about yourself.

IF D_AGE = '18-20' OR '21-29': If you cannot answer the questions or else they do not apply to you, you can answer "NA" or "Not Applicable."]

---------------------------------------------------------------------------------------------------------------------

2017_OE_1.  **In 2017**, what was your main way that you got around the area around where you lived?

> [100 CHARACTER BOX]

---------------------------------------------------------------------------------------------------------------------

2017_OE_2. If you had a job **in 2017**, what kind of tasks did you do?  If you did not have a job, what was a key activity that you spent a lot of time on?

> [100 CHARACTER BOX                    ]

---------------------------------------------------------------------------------------------------------------------

2017_OE_3. For personal entertainment and/or hobbies, what drew your attention **in 2017**?

> [100 CHARACTER BOX                ]

---------------------------------------------------------------------------------------------------------------------

NEW SCREEN. NO DATA COLLECTED.

Thanks for answering our questions about yourself.

---------------------------------------------------------------------------------------------------------------------

7

RANDOMIZE RESPONSE LIST "GROCERY STORES …WAREHOUSE CLUBS," BUT ANCHOR 'Somewhere else' and "None of these/Not applicable"

S_BUY_WHERE.

**Thinking about the year 2017**, from which types of brick-and-mortar or online stores, if any, did you purchase <u>bottled and/or canned non-alcoholic beverages</u>?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor. Please select all that apply.

If you were not making purchases of bottled and/or canned beverages in 2017, please select "None of these/Not Applicable."

- o Grocery stores
- o Drug stores/pharmacies (like CVS, Walgreens)
- o Online retailer (like Amazon)
- o Big-box retail stores (like Walmart, Target)
- o Convenience stores / Gas stations / Corner stores
- o Warehouse club stores (e.g., Costco, Sam's)
- o Somewhere else                    ANCHOR
- o None of these / Not applicable        ANCHOR/EXCLUSIVE


NO TERMINATIONS

--------------------------------------------------------------------------------

8

Evid. Appx. Page 360

CAROUSEL APPROACH.  SHOW ONLY ONE ITEM PER SCREEN. RANDOMIZE ORDER OF ITEMS.

S_BUY_TYPE.

For each type of bottled and/or canned non-alcoholic beverage, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores.  Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

**[DISPLAY ITEM HERE CENTERED AND BOLD]**


ITEMS (RANDOMIZE LIST):

Energy drinks

Coffee and coffee-flavored drinks

Tea and tea-flavored drinks

Kombucha drinks

Chometai drinks          → **SEE TERMINATION LOGIC BELOW**

Protein drinks and shakes


QUESTION WORDING:

I purchased this type of beverage … Please select all that apply.

- o Before 2017
- o Between 2017 and now

   BLANK SPACE / BLANK ROW
- o Never purchased          [EXCLUSIVE]
- o Not Sure          [EXCLUSIVE]

PROCEED IF S_BUY_TYPE FOR 'Kombucha drinks" = 'Before 2017' or 'Between 2017 and now' ; **TERMINATE IF R AT S_BUY_TYPE FOR 'Kombucha drinks" DOES NOT SELECT EITHER  'Before 2017' OR 'Between 2017 and now' OR IF R SELECTS 'Chomatai' FOR EITHER 'BEFORE 2017' OR 'BETWEEN 2017 AND NOW.'**

9

-------------------------------------------------------------------------------------------------------

**NEW SCREEN. NO DATA COLLECTED.**

The next screens will show you examples of specific brands of Kombucha-type beverages. We will show you pictures of the products to help you identify the brands.

Please indicate which TIME PERIOD OR YEARS, if any, that you personally purchased the brand of Kombucha-type beverage of <u>any size</u> or <u>any quantity</u>.

If you did not purchase the brand at all, please select "Never purchased."

Please do not guess.

-------------------------------------------------------------------------------------------------------

10

DO NOT RANDOMIZE THE ORDER OF THESE QUESTIONS.  DO NOT RANDOMIZE RESPONSE LIST. MULTI-SELECT.

HEALTH-ADE_YEARS.

Please indicate which TIME FRAME or YEARS, if any, that you personally purchased this brand of **Health-Ade Kombucha** beverage of any size or quantity.

**Examples of Health-Ade Kombucha**



Please select all that apply or select "Never purchased."

- o   Never purchased   [ANCHOR, EXCLUSIVE]

- o   Before 2017
- o   2017
- o   2018
- o   2019
- o   2020
- o   2021
- o   2022
- o   2023
- o   2024
- o   2025

- o   Not sure        [ANCHOR / EXCLUSIVE]

-------------------------------------------------------------------------------------------------------

11

Evid. Appx. Page 363

KEVITA_YEARS.

Please indicate which TIME FRAME OR YEARS, if any, that you personally purchased this brand of **KeVita Kombucha** beverage of any size or quantity.

**Examples of KeVita Master Brew Kombucha**



Please select all that apply or select "Never purchased."

- o   Never purchased   [ANCHOR, EXCLUSIVE]

- o   Before 2017
- o   2017
- o   2018
- o   2019
- o   2020
- o   2021
- o   2022
- o   2023
- o   2024
- o   2025

- o   Not sure        [ANCHOR / EXCLUSIVE]

-----------------------------------------------------------------------------------------------------------------

12

Evid. Appx. Page 364

GTS_YEARS.

Please indicate which TIME FRAME OR YEARS, if any, that you personally purchased this brand of **GT's Kombucha** beverage of any size or quantity.

**Examples of GT's Enlightened Synergy / Enlightened Kombucha**



Please select all that apply or select "Never purchased."

- o   Never purchased   [ANCHOR, EXCLUSIVE]  → **TERMINATE**
  LEAVE BLANK SPACE ROW
- o   Before 2017
- o   2017
- o   2018
- o   2019
- o   2020
- o   2021
- o   2022
- o   2023
- o   2024
- o   2025

- o   Not sure        [ANCHOR / EXCLUSIVE]      → **TERMINATE**

**PROCEED IF ONE OR MORE OF THESE ARE SELECTED:**
     Before 2017 / 2017 / 2018 / 2019 / 2022 / 2023 / 2024 / 2025
**TERMINATE IF R SELECTS ONLY 'NEVER PURCHASED' OR 'NOT SURE'**
-----------------------------------------------------------------------------------------------

13

SHOW IF GTS_YEARS = "Before 2017."  NEW SCREEN. NO DATA COLLECTED.

You said you had purchased Kombucha-type beverages before the year 2017.

The next questions are about purchases of Kombucha-type beverages you might or might not have made **before and after the year 2011** (about 14 years ago).

The questions will be asked in time periods asking you to consider these time periods:

- Before 2011
- 2011 to 2016

IF D_AGE = '18 TO 29': If you cannot answer the questions or else they do not apply to you, you will be able to answer "Not Applicable."]

-----------------------------------------------------------------------------------------------------------------

SHOW IF GTS_YEARS = "Before 2017."

NEW SCREEN. NO DATA COLLECTED.

To help you remember **purchases before 2011 versus things you purchased in 2011 and more recently**, please consider the following events of the **year 2011**.

---

- In **February 2011**, Super Bowl XLV saw the Green Bay Packers defeat the Pittsburgh Steelers 31-25. It was the first Super Bowl played in the Dallas-Ft. Worth Texas area.
- Also in **February 2011**, the 83rd Academy Awards were held. *The King's Speech* won Best Picture. *Inception* won four awards and *The Social Network* won three.
- In **April 2011,** there was a massive outbreak of 362 tornadoes in the Southeast U.S., causing widespread destruction.
- In **March 2011**, a magnitude 9.1 earthquake struck off the northeast coast of Honshu on the Japan Trench. The earthquake generated a large tsunami and widespread devastation. Three nuclear reactors were disabled.
- **In May 2011,** U.S. special forces killed al-Qaeda leader Osama bin Laden in Abbottabad, Pakistan.
- In **July 2011**, the U.S. space shuttle program ended with the final flight of the *Atlantis*.
- In **August 2011**, the stock market experienced a crash, referred to as "Black Monday," after the credit rating agency Standard & Poor's downgraded the U.S. sovereign debt rating.
- Also in **August 2011**, Hurricane Irene occurred in 2011. It caused significant damage to the Bahamas, Puerto Rico, and several eastern U.S. states.
- In **October 2011**, Apple founder Steve Jobs died of pancreatic cancer**.**
- In **November 2011**, Amazon released the Kindle Fire.

14

SHOW IF GTS_YEARS = "Before 2017."

GTS_YEARS_FU.

Thanks for getting familiar again with the year 2011.

You had said before that you had purchased **GT's Enlightened Synergy / Enlightened Kombucha** before 2017.

For the time period before 2017, please select the TIME FRAME(S) when you personally purchased this brand of **GT's Kombucha** beverage of any size or quantity.

**Examples of GT's Enlightened Synergy / Enlightened Kombucha**



Please select all that apply.

- o   Before 2011
- o   Between 2011 and 2016

- o   Not sure       [ANCHOR / EXCLUSIVE]

--------------------------------------------------------------------------------------------------------------

SHOW IF GTS_YEARS = "Before 2017."

Thanks for thinking about the time period before 2011 and from 2011 to 2016.

Now we have a question to make sure we have the right information.

--------------------------------------------------------------------------------------------------

15

ASK IF R SELECTED AT GTS_YEARS ANY OF THESE OPTIONS:  'BEFORE 2017' / 2017 / 2018 / 2019 / 2020 / 2021 / 2022 / 2023 / 2024 / 2025

CONFIRM_KOMBUCHA.

Please confirm or not confirm that you purchased **GT's ENLIGHTENED SYNERGY / ENLIGHTENED KOMBUCHA** during the indicated time frame.

|  | Confirmed | Not Confirmed |
|---|---|---|
| LIST TIME FRAMES/YEARS | [  ] | [  | |
| SELECTED AT GT'S_YEARS | [  ] | [  | |

**CREATE DOV 'BEFORE_2017'** =  1 IF R CONFIRMED 'Before 2017' [REGARDLESS OF ANY OTHER CONFIRMATIONS]

**CREATE DOV 'POST_2017' = 1**  IF R CONFIRMED ANY OF THE YEARS 2017 / 2018 / 2019 / 2020 / 2021 / 2022 / 2023 / 2024 / 2025 [REGARDLESS OF ANY OTHER CONFIRMATIONS / THERE WILL BE OVERLAP BETWEEN 'BEFORE_2017' =  1 AND  'POST_2017' = 1]

**PROCEED IF R SELECTS AT CONFIRM_KOMBUCHA ONE OR MORE OF THE FOLLOWING YEARS:** 2017 / 2018 / 2019 / 2020 / 2021 / 2022 / 2023 / 2024 / 2025 ; **OTHERWISE TERMINATE**

**CREATE DOV 'TIME'** = X [SEE DEFINITION OF 'X' BELOW]

> 'X'  IS THE YEAR THAT IS THE MOST RECENT CONFIRMATION SELECTED BY R AT CONFIRM_KOMBUCHA.  FOR EXAMPLE, IF THE MOST RECENT INSTANCE OF CONFIRMATION WAS '2020' (THAT IS, NO CONFIRMATIONS FOR 2021 THRU 2025), THEN INSERT "**2020**".  IF THE MOST RECENT INSTANCE OF CONFIRMATION WAS "2017," THEN INSERT '**2017**.'

------------------------------------------------------------------------------------------------------

16

**W1**

You have been selected to participate in our survey project.

To participate in this survey, you must agree to these instructions.

- o  Answer the questions with your honest answers and opinions.  Do not guess.

- o  Answer the questions by yourself and without asking anybody else in your household for help.

- o  Answer the questions without getting help from a website or other materials.

- o  Answer all the questions in one sitting and not stopping in the middle.

Do you agree to our instructions?

- o  Yes, I agree to do this
- o  No, I do not agree to do this    →**TERMINATE**

**TERMINATE ALL CASES THAT DO NOT AGREE**

**CREATE DOV 'ELIGIBLE' = 1 WHERE  W1 = 1**

**CREATE DOV 'SCREEN_COMPLETE' = 1 WHERE ELIGIBLE = 1 OR CASE WAS TERMINATED AT QUESTION S_BUY_TYPE AND THRU ANSWERING W1.**

-------------------------------------------------------------------

17

**MAIN STUDY**

[ADMINISTER MAIN STUDY WHERE ELIGIBLE = 1]

[NEW INFORMATION SCREEN; 10 SECOND SPEED BUMP]

In answering our survey questions, please do **not** consider purchases of **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "CLASSIC" or "HARD," as shown below
- Described as "considered a beer"
- Labelled as sold only to persons age 21 and over
- Contained a Government Warning according to the Surgeon General
- Comes in dark bottles with dark caps (not white caps), as shown in the examples below

   

18

------------------------------------------------------------------------------------------------------------

NEW SCREEN.  NO DATA COLLECTED.

Instead, consider **only** **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "SYNERGY," "ENLIGHTENED," or "SEASONAL"
- Sold in non-alcohol areas of stores
- Sold to persons of any age, not just age 21 and over
- Comes in clear bottles with white caps, as shown below.

 

------------------------------------------------------------------------------------------------------------

[NEW INFORMATION SCREEN ; 10-SECOND SPEED BUMP]

Let's talk next about any purchases you made of **GT's Enlightened Synergy / Enlightened Kombucha.**

We will show you examples of products that this survey is about.

Please look at each screen with the examples of products.

We will ask you later about any purchases you might have made of **GT's Enlightened Synergy / Enlightened Kombucha**.

---------------------------------------------------------------------------------------------------------

20

[NEW SCREEN. 5-SECOND SPEED BUMPS FOR EACH OF THE FOUR PRODUCT SCREENS. DO NOT RANDOMIZE IMAGES]

Here are examples of **GT's Enlightened Synergy / Enlightened Kombucha**.



---------------------------------------------------------------------------------------------------------------------

21

[NEW SCREEN.  5-SECOND SPEED BUMPS FOR EACH OF THE FOUR PRODUCT
SCREENS]

Here are other examples of **GT's Enlightened Synergy / Enlightened Kombucha**.



-------------------------------------------------------------------------------------------------------------

22

[NEW SCREEN.  5-SECOND SPEED BUMPS FOR EACH OF THE FOUR PRODUCT SCREENS]

Here are other examples of **GT's Enlightened Synergy / Enlightened Kombucha**.



--------------------------------------------------------------------------------------------------------------------------

23

[NEW SCREEN.  5-SECOND SPEED BUMPS FOR EACH OF THE FOUR PRODUCT SCREENS]

Here are other examples of **GT's Enlightened Synergy / Enlightened Kombucha**.



Thank you for viewing the products.

-----------------------------------------------------------------------------------------------------------------

NEW SCREEN. NO DATA COLLECTED.

We will ask you to tell us how much of these **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year [INSERT VALUE FROM DOV '**TIME'**].

[INSERT VALUE FROM DOV '**TIME'**] is the most recent year for when you last purchased **GT's Enlightened Synergy / Enlightened Kombucha Beverages**.

Before we ask you about that, let's remind you of the product sizes for **GT's Enlightened Synergy / Enlightened Kombucha Beverages**.

-----------------------------------------------------------------

24

NEW SCREEN.  NO DATA COLLECTED.

The products are sold in **16 oz.** and **48 oz.** bottles like the ones below.




-----------------------------------------------------------------------------------------------------------------

25

NEW SCREEN.  NO DATA COLLECTED.

The products are also sold in boxes having **six 16-oz. bottles**, as shown below.




-------------------------------------------------------------------------------------------------------------------

26

PRODUCT_SIZE.

[DO NOT ALLOW SELECTION OF 'NONE OF THESE SIZES' WITH SELECTION OF SUBSTANTIVE RESPONSE]

Please tell us which product sizes of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year [INSERT DOV '**TIME**'].

Please select all that apply or select "None of these."

- o  16 oz. individual bottles
- o  48 oz. individual bottles
- o  6 – 16 oz. bottles in a box

- o  None of these sizes    →  IF R SELECTED 'NONE OF THESE SIZES', PLEASE TELL THE RESPONDENT:  I'm sorry.  This survey is only for those consumers who purchased GT's Kombucha in the 16 oz., 48 oz., and 6 - 16 oz. pack sizes.   **THEN TERMINATE THE INTERVIEW**

------------------------------------------------------

NO DATA COLLECTED. NEW INFORMATION SCREEN

On the next screen, we will ask how much **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year [INSERT DOV '**TIME**'].

You can tell us in one of two ways:

- By telling us how much of the product you purchased in A TYPICAL MONTH in the year [INSERT DOV '**TIME**']. Think of this as your average number of purchases in a month.

    OR

- By telling us how much of the product you purchased IN TOTAL in the year [INSERT DOV 'TIME']. If you typically purchased less than bottle or box of the product in a typical month, please use this way to tell us.

    ----------------------------------------------------------------------------------------------------

27

[ASK IF PRODUCT_SIZE = 16 OZ. INDIVIDUAL BOTTLES]

FOR CODING TEMPLATE, PLEASE SEE SCRIPT PROGRAMMED FOR PROJECT (ORD-599376-J1G8) CONDUCTED IN 2021.

UNITS_16OZ.

In the year [INSERT DOV '**TIME**'], how many **individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the year [INSERT DOV '**TIME**'].

> Enter here the number for a TYPICAL MONTH:  [       ]
>
> OR
>
> Enter here the TOTAL NUMBER for the year [INSERT DOV '**TIME**']: [       ]
>
> [RANGE CHECK 0 – 99 FOR TYPICAL MONTH]
>
> [RANGE CHECK 0 – 500 FOR TOTAL NUMBER]
>
> [IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TYPICAL MONTH, THEN PROMPT "Please make your best estimate between 0 and 99"]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TOTAL YEAR, THEN PROMPT "Please make your best estimate between 0 and 500"]

> [IF R ATTEMPTS TO ENTER IN NUMBERS IN BOTH FIELDS, THEN PROMPT: "Please enter a number in either the box for the TYPICAL MONTH or for the TOTAL NUMBER"]

28

ASK IF UNITS_16OZ > 0 FOR 'TYPICAL MONTH' OR FOR 'TOTAL NUMBER'

UNITS_16OZ_2.

[TEXT SUBSTITUTION BASED ON WHETHER R ANSWERED IN TYPICAL MONTH OR TOTAL NUMBER.  NUMBER SUBSTITUTION BASED ON NUMERIC ENTRY TO TYPICAL MONTH OR TOTAL NUMBER OPTIONS.]]

For the year [INSERT DOV 'TIME'], you said you purchased about **[INSERT # BOLDED] individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverage** [in a TYPICAL MONTH/ in TOTAL.]

Please select one.

- That is my best estimate → CONTINUE TO NEXT QUESTION
- I would like to change my answer → GO BACK TO UNITS_16OZ AND RE-ASK


[ASK IF PRODUCT_SIZE = 48 OZ. INDIVIDUAL BOTTLES]

UNITS_48OZ.

In the year [INSERT DOV '**TIME**'], how many **individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH _or_ the TOTAL NUMBER you purchased in the year [INSERT DOV '**TIME**'].

Enter here the number for a TYPICAL MONTH:  [        ]

OR

Enter here the TOTAL NUMBER for the year [INSERT DOV '**TIME**']: [      ]

[RANGE CHECK 0 – 99]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN 99, THEN PROMPT "Please make your best estimate between 0 and 99"]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TOTAL YEAR, THEN PROMPT "Please make your best estimate between 0 and 500"]

[IF R ATTEMPTS TO ENTER IN NUMBERS IN BOTH FIELDS, THEN PROMPT: "Please enter a number in either the box for the TYPICAL MONTH or for the TOTAL NUMBER"]

---------------------------------------------------------------------------------------------------------------

29

ASK IF UNITS_48OZ > 0 FOR 'TYPICAL MONTH' OR FOR 'TOTAL NUMBER'

UNITS_48OZ_2.

[TEXT SUBSTITUTION BASED ON WHETHER R ANSWERED IN TYPICAL MONTH OR TOTAL NUMBER; NUMBER SUBSTITUTION BASED ON NUMERIC ENTRY TO TYPICAL MONTH OR TOTAL NUMBER OPTIONS.]

For the year [INSERT DOV '**TIME**'], you said you purchased about **[INSERT # BOLDED] individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** [in a TYPICAL MONTH/ in TOTAL.]

Please select one.

- o   That is my best estimate → CONTINUE TO NEXT QUESTION
- o   I would like to change my answer → GO BACK TO UNITS_48OZ AND RE-ASK

-------------------------------------------------------------------------------------------------------------

30

[ASK IF PRODUCT_SIZE = 6-PACK]

UNITS_6-PACK.

In the year [INSERT DOV '**TIME**'], how many **boxes having SIX 16-OZ. BOTTLES** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH <u>or</u> the TOTAL NUMBER you purchased in the year [INSERT DOV '**TIME**'].

> Enter here the number for a TYPICAL MONTH:   [     ]
>
> OR
>
> Enter here the TOTAL NUMBER for the last 12 months: [     ]
>
> [RANGE CHECK 0 – 30 FOR TYPICAL MONTH]
>
> [RANGE CHECK 0 – 100 FOR TOTAL NUMBER]
>
> [IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN 30 FOR TYPICAL MONTH, THEN PROMPT "Please make your best estimate between 0 and 30"]
>
> [IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TOTAL YEAR, THEN PROMPT "Please make your best estimate between 0 and 100"]
>
> [IF R ATTEMPTS TO ENTER IN NUMBERS IN BOTH FIELDS, THEN PROMPT: "Please enter a number in either the box for the TYPICAL MONTH or for the TOTAL NUMBER"]

----------------------------------------------

31

ASK IF UNITS_6-PACK > 0 FOR 'TYPICAL MONTH' OR FOR 'TOTAL NUMBER'

UNITS_6PACK_2.

[TEXT SUBSTITUTION BASED ON WHETHER R ANSWERED IN TYPICAL MONTH OR TOTAL NUMBER. NUMBER SUBSTITUTION BASED ON NUMERIC ENTRY TO TYPICAL MONTH OR TOTAL NUMBER OPTIONS.]

For the year [INSERT DOV '**TIME**'], you said you purchased about **[INSERT # BOLDED] boxes having** <u>**SIX 16-OZ.**</u> BOTTLES of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** [in a TYPICAL MONTH/ in TOTAL.]

Please select one.

- o   That is my best estimate → CONTINUE TO NEXT QUESTION
- o   I would like to change my answer → GO BACK TO UNITS_6PACK AND RE-ASK

-----------------------------------------------------------------------------------------------------------------

NEW SCREEN.

Thanks for answering our questions.  We have just two more questions so that we can group your answers with other consumers.


-----------------------------------------------------------------------------------------------------------------

32

**FINAL BATTERY**

[SINGLE SELECT]

SHOPPER.  How much of the grocery shopping do you do for your household?  Please select one.

- o   All of it
- o   Most of it
- o   About half
- o   Not much of it
- o   None of it

**NO TERMINATIONS**

--------------------------------------------------------------------------------------------------------------

EDUC.   What is the highest level of education that you have completed?

- o   Less than High School
- o   High School or GED
- o   Completed Technical or Trade School
- o   Some College
- o   College degree (4 year)
- o   Post-graduate course work or degree

NO TERMINATIONS

--------------------------------------------------------------------------------------------------------------

[END SCREEN FOR ALL]

THANK YOU FOR PARTICIPATING IN OUR STUDY AND FOR SHARING YOUR OPINIONS. YOUR PARTICIPATION IS VERY MUCH APPRECIATED.

/SURVEY END

33

# ATTACHMENT C

# Online Screen Captures for the Survey

START OF SCREENER

We'll be asking you about purchases you might have made at grocery stores, discount retailers, online stores, specialty stores, and other retailers where you might purchase various products.

Let's start with an easy question. Where do you live?

Select one...

What is your gender?

◯ Male

◯ Female

What is your age?

○ Less than 18

○ 18-20

○ 21-24

○ 25-29

○ 30-39

○ 40-49

○ 50-59

○ 60-69

○ 70-79

○ 80 AND OLDER

What is your age in years? We ask the question so that we can group your answers with others who are about your age.

○ 18

○ 19

○ 20

What is your age in years? We ask the question so that we can group your answers with others who are about your age.

○ 21

○ 22

○ 23

○ 24

What is your age in years? We ask the question so that we can group your answers with others who are about your age.

- ( ) 25
- ( ) 26
- ( ) 27
- ( ) 28
- ( ) 29

Have you taken any surveys in the last 30 days on any of these topics?

Please select all that apply.

☐ Video Games

☐ Websites you visit

☐ Sporting goods or outdoor gear

☐ Carbonated fermented beverages

☐ First aid kits

☐ Advertisements on TV

☐ Clothing

☐ Cosmetics

☐ Bottled water

☐ None of these

This question is for quality control to make sure you are understanding the survey.

Please select "Somewhat easy" (the fourth answer).

○ 1: Very difficult

○ 2: Somewhat difficult

○ 3: Neither difficult nor easy

○ 4: Somewhat easy

○ 5: Very easy

The next questions are about purchases you might or might not have made before and after 2017 (before 8 to 9 years ago or after that).

The questions will be asked in time periods asking you to consider these time periods:

- Before 2017
- 2017 to now

If you cannot answer the questions or else they do not apply to you, you will be able to answer "Not Applicable" or "Not sure."

This is a survey about things you might have **purchased before 2017 versus things you purchased in 2017 and more recently.**

To refresh your memory about the year **2017**, please consider:

- **In January 2017**, Donald Trump was inaugurated into U.S. Presidency for the first time.
- In **February 2017**, in Super Bowl LI, the New England Patriots defeated the Atlanta Falcons 34–28 in the first overtime game in the game's history.
- Also in **February 2017**, the 89th Academy Awards were held. In an embarrassing gaffe, **La La Land** is thought to be the winner of the Oscar for Best Picture, before the envelope is shown to reveal **Moonlight** as the actual winner.
- In **May 2017**, the Ringling Bros. and Barnum & Bailey Circus stages the final show in its 146-year history at Nassau Veterans Memorial Coliseum in Uniondale, New York.
- In **June 2017**, House of Representatives Majority Whip Steve Scalise and his aides are hit by gunfire during a baseball practice in Virginia.
- In **August 2017**, violent clashes break out between attendees and counter-protesters in Charlottesville, Virgina at a "Unite the Right" rally.
- In **September 2017**, Hurricane Maria makes landfall in the US territory of Puerto Rico with maximum sustained winds of 250 km/h (155 mph). Millions of people are left without power.
- In **November 2017**, the Houston Astros defeated the Los Angeles Dodgers after seven games to become the World Series champions.

**To help you remember better the year 2017**, also please write out short answers to these questions about yourself.

If you cannot answer the questions or else they do not apply to you, you can answer "NA" or "Not Applicable."

**In 2017**, what was your main way that you got around the area around where you lived?

If you had a job **in 2017**, what kind of tasks did you do? If you did not have a job, what was a key activity that you spent a lot of time on?

For personal entertainment and/or hobbies, what drew your attention **in 2017**?

Thanks for answering our questions about yourself.

**Thinking about the year 2017**, from which types of brick-and-mortar or online stores, if any, did you purchase <u>bottled and/or canned non-alcoholic beverages</u>?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor. Please select all that apply.

If you were not making purchases of bottled and/or canned beverages in 2017, please select "None of these/Not Applicable."

- [ ] Drug stores/pharmacies (like CVS, Walgreens)
- [ ] Warehouse club stores (e.g., Costco, Sam's)
- [ ] Convenience stores / Gas stations / Corner stores
- [ ] Big-box retail stores (like Walmart, Target)
- [ ] Grocery stores
- [ ] Online retailer (like Amazon)
- [ ] Somewhere else
- [ ] None of these / Not applicable

Evid. Appx. Page 404    19

For each type of <u>bottled and/or canned non-alcoholic beverage</u>, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores. Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

### Coffee and coffee-flavored drinks

I purchased this type of beverage … Please select all that apply.

☐ Before 2017

☐ Between 2017 and now

☐ Never purchased

☐ Not Sure

Evid. Appx. Page 405     20

For each type of <u>bottled and/or canned non-alcoholic beverage</u>, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores. Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

## Energy drinks

I purchased this type of beverage … Please select all that apply.

☐ Before 2017

☐ Between 2017 and now

☐ Never purchased

☐ Not Sure

Evid. Appx. Page 406        21

For each type of <u>bottled and/or canned non-alcoholic beverage</u>, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores. Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

### Tea and tea-flavored drinks

I purchased this type of beverage … Please select all that apply.

☐ Before 2017

☐ Between 2017 and now

☐ Never purchased

☐ Not Sure

For each type of <u>bottled and/or canned non-alcoholic beverage</u>, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores. Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

### Chometai drinks

I purchased this type of beverage … Please select all that apply.

☐ Before 2017

☐ Between 2017 and now

☐ Never purchased

☐ Not Sure

Evid. Appx. Page 408     23

For each type of <u>bottled and/or canned non-alcoholic beverage</u>, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores. Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

### Kombucha drinks

I purchased this type of beverage … Please select all that apply.

☐ Before 2017

☐ Between 2017 and now

☐ Never purchased

☐ Not Sure

Evid. Appx. Page 409          24

For each type of <u>bottled and/or canned non-alcoholic beverage</u>, please select the option or options that apply to purchases you might have made personally at brick-and-mortar and/or online stores. Please select all that apply.

Please select "Never purchased" if you have never purchased this type of beverage.

### Protein drinks and shakes

I purchased this type of beverage … Please select all that apply.

☐ Before 2017

☐ Between 2017 and now

☐ Never purchased

☐ Not Sure

The next screens will show you examples of specific brands of Kombucha-type beverages. We will show you pictures of the products to help you identify the brands.

Please indicate which TIME PERIOD OR YEARS, if any, that you personally purchased the brand of Kombucha-type beverage of <u>any size</u> or <u>any quantity</u>.

If you did not purchase the brand at all, please select "Never purchased."

Please do not guess.

Evid. Appx. Page 411        26

Please indicate which TIME FRAME or YEARS, if any, that you personally purchased this brand of **Health-Ade Kombucha** beverage of any size or quantity.

**Examples of Health-Ade Kombucha**



Please select all that apply or select "Never purchased."

☐ Never purchased

☐ Before 2017

☐ 2017

☐ 2018

☐ 2019

☐ 2020

☐ 2021

☐ 2022

☐ 2023

☐ 2024

☐ 2025

☐ Not sure

Evid. Appx. Page 412          27

Please indicate which TIME FRAME OR YEARS, if any, that you personally purchased this brand of **KeVita Kombucha** beverage of any size or quantity.

**Examples of KeVita Master Brew Kombucha**

    

Please select all that apply or select "Never purchased."

☐ Never purchased

☐ Before 2017

☐ 2017

☐ 2018

☐ 2019

☐ 2020

☐ 2021

☐ 2022

☐ 2023

☐ 2024

☐ 2025

☐ Not sure

Evid. Appx. Page 413    28

Please indicate which TIME FRAME OR YEARS, if any, that you personally purchased this brand of **GT's Kombucha** beverage of any size or quantity.

**Examples of GT's Enlightened Synergy / Enlightened Kombucha**



Please select all that apply or select "Never purchased."

☐ Never purchased

☐ Before 2017

☐ 2017

☐ 2018

☐ 2019

☐ 2020

☐ 2021

☐ 2022

☐ 2023

☐ 2024

☐ 2025

☐ Not sure

Evid. Appx. Page 414          29

You said you had purchased Kombucha-type beverages before the year 2017.

The next questions are about purchases of Kombucha-type beverages you might or might not have made **before and after the year 2011** (about 14 years ago).

The questions will be asked in time periods asking you to consider these time periods:

- Before 2011
- 2011 to 2016

If you cannot answer the questions or else they do not apply to you, you will be able to answer "Not Applicable."

To help you remember **purchases before 2011 versus things you purchased in 2011 and more recently**, please consider the following events of the **year 2011**.

- In **February 2011**, Super Bowl XLV saw the Green Bay Packers defeat the Pittsburgh Steelers 31-25. It was the first Super Bowl played in the Dallas-Ft. Worth Texas area.
- Also in **February 2011**, the 83rd Academy Awards were held. *The King's Speech* won Best Picture. *Inception* won four awards and *The Social Network* won three.
- In **April 2011**, there was a massive outbreak of 362 tornadoes in the Southeast U.S., causing widespread destruction.
- In **March 2011**, a magnitude 9.1 earthquake struck off the northeast coast of Honshu on the Japan Trench. The earthquake generated a large tsunami and widespread devastation. Three nuclear reactors were disabled.
- **In May 2011**, U.S. special forces killed al-Qaeda leader Osama bin Laden in Abbottabad, Pakistan.
- In **July 2011**, the U.S. space shuttle program ended with the final flight of the *Atlantis*.
- In **August 2011**, the stock market experienced a crash, referred to as "Black Monday," after the credit rating agency Standard & Poor's downgraded the U.S. sovereign debt rating.
- Also in **August 2011**, Hurricane Irene occurred in 2011. It caused significant damage to the Bahamas, Puerto Rico, and several eastern U.S. states.
- In **October 2011**, Apple founder Steve Jobs died of pancreatic cancer.
- In **November 2011**, Amazon released the Kindle Fire.

Evid. Appx. Page 416    31

Thanks for getting familiar again with the year 2011.

You had said before that you had purchased **GT's Enlightened Synergy / Enlightened Kombucha** before 2017.

For the time period before 2017, please select the TIME FRAME(S) when you personally purchased this brand of **GT's Kombucha** beverage of any size or quantity.

**Examples of GT's Enlightened Synergy / Enlightened Kombucha**



Please select all that apply.

☐ Before 2011

☐ Between 2011 and 2016

☐ Not sure

Evid. Appx. Page 417

32

Thanks for thinking about the time period before 2011 and from 2011 to 2016.

Now we have a question to make sure we have the right information.

Please confirm or not confirm that you purchased **GT's ENLIGHTENED SYNERGY / ENLIGHTENED KOMBUCHA** during the indicated time frame.

|  | Confirmed | Not Confirmed |
|---|---|---|
| 2017 | ◯ | ◯ |

Please confirm or not confirm that you purchased **GT's ENLIGHTENED SYNERGY / ENLIGHTENED KOMBUCHA** during the indicated time frame.

|      | Confirmed | Not Confirmed |
|------|-----------|---------------|
| 2019 | ○ | ○ |
| 2021 | ○ | ○ |
| 2022 | ○ | ○ |

Please confirm or not confirm that you purchased **GT's ENLIGHTENED SYNERGY / ENLIGHTENED KOMBUCHA** during the indicated time frame.

|  | Confirmed | Not Confirmed |
|---|---|---|
| 2025 | ○ | ○ |

You have been selected to participate in our survey project.

To participate in this survey, you must agree to these instructions.

- Answer the questions with your honest answers and opinions. Do not guess.
- Answer the questions by yourself and without asking anybody else in your household for help.
- Answer the questions without getting help from a website or other materials.
- Answer all the questions in one sitting and not stopping in the middle.

Do you agree to our instructions?

○ Yes, I agree to do this

○ No, I do not agree to do this

START OF MAIN SURVEY

In answering our survey questions, please do **not** consider purchases of **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "CLASSIC" or "HARD," as shown below
- Described as "considered a beer"
- Labelled as sold only to persons age 21 and over
- Contained a Government Warning according to the Surgeon General
- Comes in dark bottles with dark caps (not white caps), as shown in the examples below

   

Instead, consider **only** **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "SYNERGY," "ENLIGHTENED," or "SEASONAL"
- Sold in non-alcohol areas of stores
- Sold to persons of any age, not just age 21 and over
- Comes in clear bottles with white caps, as shown below.

 

Let's talk next about any purchases you made of **GT's Enlightened Synergy / Enlightened Kombucha.**

We will show you examples of products that this survey is about.

Please look at each screen with the examples of products.

We will ask you later about any purchases you might have made of **GT's Enlightened Synergy / Enlightened Kombucha** .

Here are examples of **GT's Enlightened Synergy / Enlightened Kombucha**.



Here are other examples of **GT's Enlightened Synergy / Enlightened Kombucha**.

    

Here are other examples of **GT's Enlightened Synergy / Enlightened Kombucha**.



Here are other examples of **GT's Enlightened Synergy / Enlightened Kombucha**.

   

Thank you for viewing the products.

We will ask you to tell us how much of these **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2017**.

**2017** is the most recent year for when you last purchased **GT's Enlightened Synergy / Enlightened Kombucha Beverages**.

Before we ask you about that, let's remind you of the product sizes for **GT's Enlightened Synergy / Enlightened Kombucha Beverages**.

The products are sold in **16 oz.** and **48 oz.** bottles like the ones below.

 

The products are also sold in boxes having **six 16-oz. bottles** , as shown below.

 

Main Survey: Example of 2017 Purchasers

Please tell us which product sizes of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2017**.

Please select all that apply or select "None of these."

☐ 16 oz. individual bottles

☐ 48 oz. individual bottles

☐ 6 – 16 oz. bottles in a box

☐ None of these sizes

On the next screen, we will ask how much **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2017**.

You can tell us in one of two ways:

- By telling us how much of the product you purchased in A TYPICAL MONTH in the year **2017**. Think of this as your average number of purchases in a month.

  OR

- By telling us how much of the product you purchased IN TOTAL in the year **2017**. If you typically purchased less than bottle or box of the product in a typical month, please use this way to tell us.

Evid. Appx. Page 436     51

Please tell us which product sizes of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2017**.

Please select all that apply or select "None of these."

☐ 16 oz. individual bottles

☐ 48 oz. individual bottles

☐ 6 – 16 oz. bottles in a box

☐ None of these sizes

For the year **2017**, you said you purchased about **20 <u>individual 16 oz. bottles</u>** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in TOTAL.

Please select one.

○ That is my best estimate

○ I would like to change my answer

For the year **2017**, you said you purchased about **5** <u>individual 16 oz. bottles</u> of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in a TYPICAL MONTH.

Please select one.

○ That is my best estimate

○ I would like to change my answer

Main Survey:  Example of 2025 Consumers

We will ask you to tell us how much of these **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2025**.

**2025** is the most recent year for when you last purchased **GT's Enlightened Synergy / Enlightened Kombucha Beverages**.

Before we ask you about that, let's remind you of the product sizes for **GT's Enlightened Synergy / Enlightened Kombucha Beverages**.

The products are sold in **16 oz.** and **48 oz.** bottles like the ones below.




The products are also sold in boxes having **six 16-oz. bottles** , as shown below.




Please tell us which product sizes of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2025**.

Please select all that apply or select "None of these."

☐ 16 oz. individual bottles

☐ 48 oz. individual bottles

☐ 6 – 16 oz. bottles in a box

☐ None of these sizes

On the next screen, we will ask how much **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the year **2025**.

You can tell us in one of two ways:

- By telling us how much of the product you purchased in A TYPICAL MONTH in the year **2025**. Think of this as your average number of purchases in a month.

  OR

- By telling us how much of the product you purchased IN TOTAL in the year **2025**. If you typically purchased less than bottle or box of the product in a typical month, please use this way to tell us.

Evid. Appx. Page 445     60

In the year **2025**, how many **individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the year **2025**.

Enter here the number for a TYPICAL MONTH:

Enter here the TOTAL NUMBER for the year **2025**:

For the year **2025**, you said you purchased about **2 <u>individual 48 oz. bottles</u>** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in a TYPICAL MONTH.

Please select one.

○ That is my best estimate

○ I would like to change my answer

For the year **2025**, you said you purchased about <u>**25**</u> <u>**individual 48 oz. bottles**</u> of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in TOTAL.

Please select one.

○ That is my best estimate

○ I would like to change my answer

FINAL BATTERY

Thanks for answering our questions. We have just two more questions so that we can group your answers with other consumers.

How much of the grocery shopping do you do for your household?

Please select one.

 All of it

Most of it

About half

Not much of it

None of it

What is the highest level of education that you have completed?

○ Less than High School

○ High School or GED

○ Completed Technical or Trade School

○ Some College

○ College degree (4 year)

○ Post-graduate course work or degree

THANK YOU FOR PARTICIPATING IN OUR STUDY AND FOR SHARING YOUR OPINIONS. YOUR PARTICIPATION IS VERY MUCH APPRECIATED.

# EXHIBIT 20

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GT'S LIVING FOODS, LLC.,<br><br>Defendant. | Case No. 2:19-cv-10920-FMO-GJS |

---

# DECLARATION OF DR. J. MICHAEL DENNIS

## JUNE 2, 2021

---

MAY REFERENCE MATERIAL DESIGNATED "CONFIDENTIAL" OR "CONFIDENTIAL – ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, J. Michael Dennis, Ph.D., under penalty of perjury, hereby declare as follows:

1.    I am a Senior Vice President at the National Opinion Research Center ("NORC"). I am over the age of 18 and have personal knowledge of the information contained in this declaration and, if called as a witness, could and would testify competently to the facts contained herein. All testimony I provide in connection with this litigation are my personal opinions and only my personal opinions.

2.    In the last four years alone, I have provided testimony before the United States District Court, Central, Eastern, Northern, and Southern Districts of California; United States District Court, Northern District of Illinois; United States District Court, District of Hawaii; United States District Court, District of New Jersey; District of New Mexico, United States District Court, Eastern and Southern District of New York; Circuit Court of Pulaski County, Arkansas Sixth Division, State of California Superior Court.

3.    As Senior Vice President at NORC, I lead the online panel survey research business for NORC. NORC is one of the premier survey research organizations in the United States. Affiliated with the University of Chicago, NORC has conducted research for Federal, foundation, and academic clients for 75 years, and is responsible for some of the most prestigious survey projects in the United States including the General Social Survey and the Survey of Consumer Finance.

4.    Prior to joining NORC in December 2014, I was a Managing Director at GfK (which acquired my employer Knowledge Networks in 2012). GfK is the

1

fifth largest market research firm worldwide, offering research services in 90 countries. During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded principal investigators who conduct health, economic, social, and political research.

5.     When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability-based KnowledgePanel, which was the core company asset for Knowledge Networks. As part of the start-up of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in the areas of health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

6.     I have worked as a survey research expert for more than 20 years, authoring more than 60 articles, conference and seminar papers, or book chapters.

7.     I have published articles in a number of academic journals, including the Journal of Official Statistics, Public Opinion Quarterly, American Journal of Psychiatry, Journal of Online Research, Journal of the American Medical Association, Marketing Research, Proceedings of the Section on Survey Research Methods, American Statistical Association, Health Services Research, and The Ethics of Medical Choice.

2

8.      I am recognized as an expert in survey research methods. I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association. In recognition of my expertise in online surveys, I was appointed to be a member of the AAPOR Task Force on Online Panels that published recommendations for researchers regarding online surveys.

9.      I hold a B.A. and M.A. degrees in Government studies from the University of Texas, Austin and I received my Ph.D. degree in political science from the University of Chicago.

10.     My current *curriculum vitae* is attached as Attachment A, including a list of my expert testimony in the past four years.

11.     I am being compensated at my hourly rate of $450, and my compensation is not contingent on the outcome of this proceeding. My research into the matters discussed my declaration is ongoing, and I reserve the right to modify or supplement my opinions as additional information becomes available.

## SCOPE OF MY ASSIGNMENT

12.      Plaintiffs' counsel asked me to conduct and report on the results of a scientifically rigorous and impartial study that would address issues under litigation. I have conducted that study and report on the results below.

3

13.    I understand from the Amended Class Action Complaint (Dkt. 29) that Plaintiffs allege that purchasers consuming the Defendant's Enlightened Kombucha Products[1] are misled because the Products are not in fact non-alcoholic. Therefore, persons under the age of 21 are, according to the Plaintiffs, purchasing Products that should be labelled as alcoholic beverages.

14.    Specifically, I was asked to conduct a consumer survey to measure the share of the Products that were purchased by persons age 18 to 20 in California.

15.    I understand that Plaintiffs have retained Mr. Colin Weir for the calculation of any damages. As such, I understood that part of my assignment as providing Mr. Weir the information needed for damages calculations premised on the harm caused by persons age 18 to 20 purchasing the Defendant's Products.

## OVERVIEW OF WORK PERFORMED

16.    Based on my knowledge and expertise in the fields of survey research and consumer market research, I designed and conducted a consumer survey. First, I created a sampling plan designed to survey respondents whose responses would project to the study's target population of purchasers of the Products. Second, I designed the consumer survey based on my research of the Defendant's Products

---

[1] By "Products," I refer to the litigated Enlightened Kombucha/Synergy Kombucha bottled beverages made by Defendant (excluding "Classic" and "Hard" Kombucha products also made by Defendant). The Products come in three sizes: 16 oz. individual bottles, 48 oz individual bottles, or 6 bottles of 16 oz. each that come in a box. My survey covers all three product sizes.

4

and products that compete with the Products, among other things. Third, I tested the consumer survey through cognitive interviews (i.e., qualitative, in-depth interviews to identify any problems respondents might be having understanding the survey) and pretesting with research subjects. Fourth, I retained a survey vendor to program and execute the survey, as well as administer the survey to consumers of the Products and competing products. Fifth, I compiled the data from the completed interviews, reviewed the data to assess the quality of the survey data, and analyzed the interviews. Sixth and finally, I wrote this declaration (i) to document my consumer survey and my expert opinions based on the survey and (ii) to document my consumer survey.

17.    I designed and conducted the consumer survey in conformance with best practices for litigation surveys documented by Professor Diamond in her *Reference Guide on Survey Research*.[2]  My consumer survey employs a sound methodology, in light of the considerations documented by Robert Groves *et al.* in their survey research textbook, *Survey Methodology* (Second Edition), and by Peter Marsden and James Wright in the *Handbook of Survey Research* (Second Edition), among others. I also consider and rely on Norman Bradburn *et al.* in *Asking Questions*, Roger Tourangeau *et al.* in *The Psychology of Survey Response*, and Howard Schuman and Stanley Presser in *Questions and Answers in Attitude Surveys*.

---

[2] Shari Seidman Diamond, 2011, "Reference Guide on Survey Research," <u>Reference Manual on Scientific Evidence</u> (Third Edition).

18.     In the paragraphs below, I first provide the key statistical findings from my consumer survey, and then I document the steps that I took to design and implement it. Afterwards, I document my consumer survey to allow for replication and for purposes of transparency.

## KEY STATISTICAL FINDINGS

19.     My statistical findings are accurate and generalizable to the class of California purchasers of the Defendant's Products age 18 to 20 between February 28, 2017 and the present.

20.     I conclude from my consumer survey that persons between the ages of 18 and 20 have been and are indeed purchasing the Defendant's Products. I surveyed 1,281 persons between the age of 18 and 21 asking questions about their beverage purchases in the past 12 months. I carefully curated the data to exclude information collected from 18-year-olds reporting as 17-year-olds and from 21-year-olds that were not reporting on their purchasing behaviors while still age 20.

21.     ***My survey found that 15.1% of these "underage" consumers purchased the Products in the last 12 months, slightly higher than the 14.6% purchase rate for "of age" consumers (age 21 and higher).***[3] The exhibit below displays the relevant statistics and interview sample sizes.

---

[3] The sampling margin of error is +/- 1.95 percentage points around the 15.1%-point estimate, not including error from non-response and measurement.

**Exhibit 1: Interview Sample Sizes and No. & Percentage of Respondents
Reporting Purchasing Enlightened Kombucha in the Last 12 Months**

| Age Segment | Total Sample Size: No. of Surveys Completed | No. of Respondents Purchasing Products | % of Respondents Purchasing Products |
|---|---|---|---|
| 18-21* | 1,289 | 195 | **15.1%** |
| 22-39 | 1,165 | 372 | 31.9% |
| 40-59 | 949 | 198 | 20.9% |
| Age 60+ | 2,044 | 29 | 1.4% |
| Total | 5,447 | 794 | 14.6% |

*21-year-old respondents answered the survey for the time period of last 12 months, including when age 20.

22.    My consumer survey found that persons age 18 to 20 purchased **2.604%** of the total purchased units of the Defendant's individual 16 oz. bottled products. The key information is displayed in the exhibit below for the three sizes of the Products. In sum, the age group 18 to 20 makes up **5.04%** of the U.S adult population and **3.92%** of the total U.S. population (age 0-100+), while their share of the 16 oz. bottled Products is **2.604%** of the total purchased units.[4]

---

[4] My respondents answered for the time period of the previous 12 months, meaning that 18-year-old persons in part reported on their purchasing behaviors while age 17, and 21-year- old persons in part reported on their purchasing behaviors while age 20. My survey results estimate the percentage of the total unit purchases that were made by consumers age 18 to 20 versus consumers under age 18 and consumers age 21 and over.

7

**Exhibit 2:  Distribution of Purchases of Enlightened Kombucha
by Product Size and Age Segment**

| Age Segment | % of Total Adult U.S. Population* | Share of Purchases of Defendant's Enlightened Kombucha Products | | |
|---|---|---|---|---|
| | | 16 oz. Bottles | 48 oz. Bottles | 6 - 16 oz. Bottles in a Box |
| < 18** | NA | 0.072% | 0.810% | 0.331% |
| 18-20 | 5.04% | 2.604% | 0.922% | 1.182% |
| 21-39 | 33.32% | 48.452% | 63.031% | 58.584% |
| 40-59 | 32.40% | 46.642% | 35.206% | 38.282% |
| Age 60+ | 29.24% | 2.230% | 0.031% | 1.622% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% |

*Population Data Source: July 1, 2019 U.S. Census Data Table NC-EST2019-SYASEXN. Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010 to July 1, 2019.

**Estimated from the number of purchases of the Defendant's Products made by 18–19-year-olds as indicated from my consumer survey.[5]

Note: Calculations for the share of unit purchase of the three product sizes are based on 5% Trimmed Means for self-reported purchases of Enlightened Kombucha. The lowest 5% and highest 5% values are ignored in order to control for statistical outliers. The rates are weighted by share of U.S. adult population for each age group.

---

   [5] For the individual 16 oz. products, consumers age 18 and 19 make up only 0.031% and 0.026% of the market share of these 16 oz. products, respectively, while persons age 20 and 21 make up much larger market shares, 0.123% and 0.205%, respectively. I conducted a regression-based projection of the market share for consumers under the age of 18 using the purchase data from my survey, which shows that market share for persons under the age of 18 approaches 0%. Nonetheless, I estimated the market share of the under-18 population by substituting the market share of the segment age 18-19 for each of the three Products.

23.    The above-provided statistics apply to class members in California during the class period for the Defendant's Products that are sold in individual 16-oz. bottles, individual 48-oz. bottles, and 6 - 16 oz. bottles in a box. The statistics indicate that consumers age 18 to 20 represent a significant market share for the Defendant's Products.

## SAMPLING AND INDENTIFYING THE CORRECT SAMPLE CORRESPONDING TO THE CLASSES

24.    **Study Target Population**. This particular research project is distinguished with respect to commonplace litigation surveys in that I was not testing for any impact of any trademark, label claim, or descriptor on purchasing behavior. Instead, my assignment was to estimate precisely and objectively the actual prevalence of specific, past purchase behavior. I designed the sample accordingly.

25.    I defined the study target population to provide a reliable sample of consumers that map to the proposed classes. Based on my research and review of the Complaint and U.S. Census Data, as well as based on past experience as a research professional, and other sources of information, I determined that the appropriate survey sample should consist of a representative nationwide sample, including class members in California and other states, who have purchased the Defendant's Enlightened Kombucha products (not for resale) in the last 12 months.

26.    By surveying consumers who purchased Defendant's Products in the last 12 months (as opposed to the past five or more years), my respondents had recent experience in purchasing the Products and therefore could provide accurate recall of purchasing the Products. If I had surveyed consumers who had not purchased the Products recently, the result would have been unreliable data since my survey requires accurate recall of the quantity of purchase of the Products, in my expert opinion.

27.    **Sample Size Planning**. I determined that statistical precision would require that I obtain at least 800 to 1,000 interviews with consumers age 18-20 who could self-report on their purchasing behavior. I oversampled this age segment accordingly. Adults age 18 to 20 make up less than 4 percent of the U.S. adult population, presenting a challenge for researchers to obtain sufficient sample sizes. With respect to minimally acceptable sizes for measuring population characteristics, surveys typically require at 800 to 1,000 interviews when attempting to estimate precisely a population characteristic, such as the prevalence of a specific behavior that has an expected incidence of 10% to 20%. Having fewer interviews would risk the potential under-collection of interviews with research subjects that are the target of the inquiry, in this case, purchasers of the Defendant's Products. By collecting 1,289 interviews with persons age 18-21 (with 21-year-olds reporting on their purchasing while age 20), I was able to obtain sufficient sample size (n=195) of

actual purchasers of the Products (who gave me information on their purchases of the Products before turning age 21).

28.    I collected purchasing information on 1,289 respondents in this age 18-21 segment in order to have sufficient data to make statistically precise measurements of the purchase behavior of consumes age 18 to 20.

29.    I also determined that a comparable or larger sample size would be required for persons age 22 and over in order to estimate precisely the distribution by age the number of units of the Products (relative to adults under the age of 21 at time of purchase).

30.    By collecting 4,158 such interviews (599 of which purchased the Products), I am able to have statistical confidence in my quantitative portrait of the purchasing behavior of consumers age 21 and older.

31.    **<u>Screening Survey</u>**. My consumer survey began with a screening section to identify a representative sample of consumers from the study target population. To qualify for the consumer survey, the respondents must answer a series of questions whereby their responses meet all of the following conditions or criteria:

- Pass the CAPTCHA test;
- Be a USA resident;
- Be age 18 or older;
- Purchased non-alcoholic beverages from a store in the last 12 months;
- Purchased relevant non-alcoholic beverages (that are broadly similar to Kombucha) in the last 12 months;

11

• Purchased GT's Kombucha Enlightened Synergy / Enlightened Kombucha in the last 12 months and then confirmed this purchasing behavior;

• Agreed to complete the survey without the help of others.

32.    With this screening procedure in my survey, my survey identified actual purchasers of the Products as well as, and just as importantly, identify consumers who had **not** purchased the Products.

33.    **Age Verification of the Respondents**. This particular survey is sensitive to the collection of accurate age information from the respondents. Inaccurate information on age could lead to classification error, with potentially persons that are actually between the ages of 18 and 20 being classified as under age 18 or over age 20, and *vice versa*. I took certain steps described below.

34.    I asked for respondents to provide me their age in specific years. This is not commonplace. The usual approach in surveys is to ask for age with five or more "buckets" or categories. I needed to know the precise age in years.

35.    I was particularly focused on collecting date of birth for persons age 21. These are respondents for whom there is variance in how many of the last 12 months they were actually age 20. The matter is not trivial. By collecting date of birth (month, year), I was able to pro-rate their purchasing behavior appropriately as occurring while age 20.

36.    I adjusted the purchasing estimates to take into account that some of my respondents age 18 would have reported on their purchasing behavior while age 17. For these age 18 respondents, I statistically adjusted the data by assuming that 50% of the reported purchases of the Defendant's Products took place while the consumers were age 17 and 50% while age 18.

12

## COGNITIVE INTERVIEWS & PRETESTING

37.    While developing the questionnaire for the consumer survey, I conducted eight cognitive interviews with adults who have purchased kombucha beverage products in the past 12 months. I conducted the fourteen interviews (in total) personally on May 16, 2021 and May 18, 2021. The interviews averaged approximately 30 minutes.

38.    The cognitive interviewing methodology provided me an opportunity to determine whether respondents interpreted my survey questionnaires in the manner that I intended and to identify any areas for improving the clarity of my survey questions.

39.    Cognitive interviews have no value for providing reliable data for quantitative analysis. Data collected from cognitive interviews have no use for scientific measurement of the characteristics of a population.

40.    In my practice, I routinely conduct cognitive interviews simply because it is a best practice for survey development. But ultimately, I conduct the cognitive interviews because the survey respondents are the ultimate judge of whether the survey questions are clear, unbiased, and make sense to them as consumers. To prevent error in surveys, cognitive interviewing is the gold-standard methodology for testing survey questionnaires with respondents.

41.    Cognitive interviewing is a much more involved and thorough procedure than simple pretesting, which does not involve any question-by-question conversation about respondents' thought processes in forming and reporting answers to survey questions. Cognitive interviewing, when conducted properly, occurs before the pretest stage.

42.    In the cognitive interviews, I showed real consumers the main sections of the programmed survey questionnaire (programmed as a web survey). I displayed

13

the programmed survey on their computer screens (using webinar-type software) and asked for their feedback on each survey question as they took the survey. I spoke directly with each respondent on the telephone/VOIP while the respondent viewed my computer screen over the web from their home. Respondents shared with me their thought process as they answered each survey question orally (telling me which response to enter into the survey). As is standard practice in conducting cognitive interviews, I probed the respondents, encouraging them to explain to me whether the survey questions were clear, whether the survey questions could be improved, and whether the survey was providing them the information they needed to answer the questions. At the end of each cognitive interview, I asked respondents the following:

- Was any information missing from the survey that you feel you needed to answer the questions?

- Were the questions in the survey realistic and easy or hard to understand?

- Who or what kind of client do you think I have that wants this survey done? In other words, do you think the survey had an agenda?

43.     Because of the cognitive interviews, I added an option to the survey to allow the respondents to report how many of the Products they had purchased **in total** in the last 12 months, rather than just reporting how many they had purchased in a "typical month."

44.     The cognitive interviews confirmed that my consumer survey questions were clear and understandable to the respondents.

45.     None of my cognitive interview respondents perceived my survey to be sponsored or funded for a litigation purpose or lawsuit, or as a result of any current event or controversies in the news.

14

46.     **Pretest Survey**. I conducted a pretest to test the consumer survey with a representative sample of members of the study target population. The pretest survey is, in a sense, a dress rehearsal for the data collection. The pretest was conducted online using the same sampling and data collection procedures that I subsequently employed for the full data collection. I conducted the pretest for the following purposes: (i) for quality control and quality assurance testing of the survey instrument, (ii) to validate that the survey questionnaire was programmed correctly to my specifications, (iii) to identify any survey questions that were unclear to respondents, and (iv) to analyze the data to identify any problems, such as unexpected missing data. On May 20 and 21, 2021, Dynata (the survey firm working under my direction) administered the screener to 1,299 respondents for the pretest. Of these, 84 qualified for the main survey. I paused the data collection while I examined the pretest data.

47.     I made a change as a result of inspecting the pretest-data. The survey had been disqualifying respondents who had participated in a survey about "Food and Non-Alcoholic Beverages." Since the survey is not about "Food" at all, I asked Dynata to remove the language about "Food" and Dynata implemented the change to remove the language about the "Food" topic exclusion. Dynata implemented the change between the Pretest and the Main Study. After about a 27-hour pause in the data collection, I authorized and Dynata resumed data collection on May 22, 2021. The interviews from the pretest are in the file that I analyzed for all my reporting in this declaration. The pretest completed screener completions and interview completions are used for all calculations of findings.

46.     **Main Study Data Collection Schedule.** After the pretest, Dynata resumed the data collection on May 22, 2021. The data collection was completed on May 29, 2021.

15

47.     **Details on Sample Performance**. 6,548 consumers started the survey by answering the state of residence question. 56% of the initial respondents were female, and 43% male. There were 94 respondents under the age of 18 that were not asked any more questions, as appropriate. There were some respondents that quit the survey as they answered the initial screening questions, which is normal in online consumer surveys. There were 944 respondents that were not asked any more questions because they had taken a survey about non-alcoholic beverages in the past 30 days. This was a large amount of sample to lose, but the step was necessary to assure that I did not interview respondents who could have been conditioned by prior survey taking on a related topic. Of the 5,447 respondents asked whether they had purchased non-alcoholic beverages from a store in the last 12 months, 1,038 respondents were dropped from the survey because they had not. 862 respondents were dropped because they had not purchased a beverage related to the Defendant's Products in the last 12 months. There were 2,574 respondents dropped because they had not purchased the actual Defendant's Products in the last 12 months. My survey dropped another 39 respondents because they did not confirm purchasing the Defendant's Products.

48.     There were, as a result, 829 respondents eligible to participate in the main part of my survey out of the 6,548 that started the survey by answering the state of residence questions (for a 12.7% qualification rate). 30 more respondents dropped out of the survey as a result of their decision in answering my questions about where they buy the Products, leaving 799 respondents. Another five cases were dropped because they did not indicate whether they had purchased one of the three possible sizes for the Products, leaving 794 respondents for the purchase behavior questions: n=195 for analysis of purchasing behaviors age 18 to 21, and n=599 for analysis of purchasing behaviors age 21 and older.

## DESCRIPTION OF THE SUBSTANTIVE
## SURVEY QUESTIONNAIRE

49.     The question wording and survey logic are documented in Attachment B, while Attachment C shows the actual online screen captures documenting the respondents' experience in participating in my consumer survey. Below I provide additional information on the considerations in designing the survey questionnaire.

50.     One consideration in designing the questionnaire was to ask survey questions that would correctly identify consumers who had actually purchased the Defendant's Products. Potentially, in a poorly designed questionnaire, respondents could have misclassified themselves by indicating that they had purchased the Enlightened/Synergy Kombucha products when in fact they had purchased a different brand of kombucha beverage or else purchased the Defendant's "Classic" and/or "Hard" products. Those latter products are not part of the litigation.

51.     To avoid potential misclassification, I made use of images of the Products and products that compete with the Products to assure that consumers would correctly self-identify which kombucha beverage brands they had purchased in the last year, as shown below. After respondents indicated they had purchased the Products in the last 12 months, I asked a follow-up confirmation question to assure that the respondents had in fact purchased the Products.

17

Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the last 12 months?

Examples of GT's Enlightened Synergy / Enlightened Kombucha



| Purchased | Did Not Purchase |
|---|---|
| ○ | ○ |

52.     Additionally, I provided the respondents specific information to help them distinguish between Enlightened Synergy products on the one hand and "Classic" or "Hard" products sold by Defendant. Please see the two relevant screens.

Instead, consider **only** GT's **KOMBUCHA BEVERAGES** that were:

- Labelled "SYNERGY," "ENLIGHTENED," or "SEASONAL"
- Sold in non-alcohol areas of stores
- Sold to persons of any age, not just age 21 and over
- Comes in clear bottles with white caps, as shown below.



18

In answering our survey questions, please do **not** consider purchases of **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "CLASSIC" or "HARD," as shown below
- Described as "considered a beer"
- Labelled as sold only to persons age 21 and over
- Contained a Government Warning according to the Surgeon General
- Comes in dark bottles with dark caps, as shown below

 

53.     By these and other measures, I assured that the respondents gave me accurate information with respect to whether they had purchased the litigated Products in the last 12 months.

54.     A second consideration is to design the survey for assuring accurate recall and reporting of purchase behavior. As the objective of the study is measure accurately the market share for the litigated Products resulting from purchases of age 18-20 consumers, it was critical to design the survey to facilitate recall of actual purchase decisions.

55.     I considered the literature for both survey research and psychology in designing the purchase recall survey questions. The literature is unequivocal that long recall periods degrade the quality of collected survey information. Indeed, survey researchers have made extensive use of the literature in the field of memory research, which has concluded that survey researchers should be concerned about the accuracy of retrospective recall, particularly when the events occurred one or

19

more years prior to the respondent taking the survey.[6]  Similarly, Tourangeau, Rips, and Rasinski (2000) draw on the psychological literature in explaining that:

> "[B]y far the best attested fact about autobiographical memory is that the longer the interval between the time of the event and the time of the interview, the less likely that a person will remember it."[7]

56.    Furthermore, the recall literature in survey research observes that there is a tendency for respondents to under-report behaviors of "low salience." Specialists in the field of psychology agree that the "salience or importance of an event" can affect how well respondents can recall it.[8] Events which are more important to the respondents are more likely to be reported in the surveys "more completely and accurately than those of less importance."[9] By any realistic criteria, small-dollar

---

[6] The literature is extensive on the effect of memory on accuracy in survey responses for autobiographical surveys. A short list: Bradburn, N. M., Sudman, S., & Wansink, B. 2004. Asking Questions: A Practical Guide to Questionnaire Design. San Francisco: Jossey-Bass. Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. The Psychology of Survey Response. Cambridge University Press. Mathiowetz, N. A., & Duncan, G. J. 1988. Out of Work, Out of Mind: Response Errors in Retrospective Reports of Unemployment. *Journal of Business & Economic Statistics*, *6*(2), 221-229.

[7] Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. The Psychology of Survey Response. Cambridge University Press, p. 82.

[8] Eisenhower, Donna, Nancy A. Mathiowetz, and David Morganstein. 2011. Recall Error:  Sources and Bias Reduction Technique. In Paul Biemer et al (eds), Measurement Error in Surveys. Wiley, p. 138.

[9] Eisenhower (1974) et al. summarizing the insight of Cannell and Henson (1974). Also see Bradburn et al (2004) in Asking Questions, p. 65, where the authors

20

purchases of kombucha beverages represent decisions of "low salience" and low "emotional impact," which are at higher risk for inaccuracy in autobiographical recall, compared to "high salience" consumer purchases such as automobiles or housing, or compared to other life-affecting events such as joblessness or emergency medical episodes.

57.    With these considerations in mind, I took special care to prepare the respondents to provide complete information on their past-12-month purchase behavior with respect to the Products. First, I showed respondents four online screens having product images of 18 of the Defendant's Products. I required the respondents to spend at least five seconds on each of the four screens of the Products. Second, I asked the respondents a "warm up" or "mental calisthenics" question. The purpose of the "warm up" question is to help the respondents recollect their past purchasing behavior of the Defendant's Products before actually asking for this information.

58.    Another consideration in designing the survey is to provide a simple and clear interface for respondents to enter in the number of units purchased of the Defendant's Products for each of the three product sizes. I took extraordinary care in designing and testing the interfaces to assure an easy, carefree experience for the respondents taking my survey.

59.    As mentioned, I gave the respondents the alternative to enter in the number of units that they had purchased in a typical month or in the last 12 months.

---

commented that "[M]emory about highly salient events is satisfactory for periods of a year or possibly more. Unfortunately, little work has been done on periods much longer than a year. However, for highly salient events, such as major accidents or illnesses, periods of two or three years appear to be possible." Tourangeau et al (2000) in The Psychology of Survey Response, p. 86, similarly commented "[R]espondents are least accurate when the events they must report are irregular (and thus difficult to estimate) and unimportant (and thus difficult to retrieve)."

21

Respondents in my cognitive interviews gave me positive feedback on this design. I informed the respondents in the survey that they would have a choice in how to provide the information, as shown below.

On the next screen, we will ask how much **GT's Enlightened Synergy / Enlightened Kombucha Beverages** that you purchased in the last 12 months.

You can tell us in one of two ways:

- By telling us how much of the product you purchased in A TYPICAL MONTH in the last 12 months. Think of this as your average number of purchases in a month.

  OR

- By telling us how much of the product you purchased IN TOTAL in the last 12 months. If you typically purchased less than bottle or box of the product each month, please use this way to tell us.

60.    Below is an example of a screen asking for purchase behavior information. Respondents could enter in the number purchased in a typical month or

In the last 12 months, how many **individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the last 12 months.
Please type in the number that is your best estimate.

Enter here the number for a TYPICAL MONTH:

OR

Enter here the TOTAL NUMBER for the last 12 months:

for the last 12 months.

61.    Respondents were given the opportunity to correct their answer. On the following screen, I showed respondents their answer to the question. Respondents had the option to confirm the answer was correct or to answer the question again.

22

This sequence of information collection and confirmation/correction took place for each product size for which the respondent had indicated purchasing the product.

62. My survey also asked two questions at the end of the survey to determine whether respondents were aware of the litigation involving the Products. There were a small number of cases that indicated that they were aware of litigation. There were not enough such cases to cause concern about any potential biasing impact from awareness of any lawsuits involving the Defendant.

## SURVEY QUESTIONNAIRE PROGRAMMING AND SURVEY DATA COLLECTION

63. I retained the survey firm Dynata to provide me with the online survey vendor services for programming the questionnaire, providing the respondent sample, and for collecting the survey data. Based on my experience in the industry (as described above), Dynata is regarded as one of the most credible and reliable non-probability online panels having the necessary scale for this study, which involves collecting a substantial number of interviews on a relatively low-incidence consumer segment in specific states. Dynata programmed my survey questionnaire into an online survey under my active supervision. The actual survey data were collected using survey software and servers operated by Dynata.

## CONCLUSION

64. I have provided the court a statistically reliable survey that addresses a key issue regarding whether and to what extent California consumers between the

23

ages of 18 and 20 purchased the Defendant's Products. As such, I provided Plaintiffs' damages expert the reliable information needed for damages calculations. The results of my consumer survey provide a reliable and accurate measurement of the prevalence and quantity of purchases of the Products for California class members age 18 to 20.

65.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

66.    Executed in E. Palo Alto, California on June 2, 2021.

_____
J. MICHAEL DENNIS, PH. D

# LIST OF ATTACHMENTS

A. Curriculum Vitae of J. Michael Dennis, Ph.D.

B. Survey Questionnaire (Word Document)

C. Survey Questionnaire Online Screen Captures (PowerPoint)

D. Survey Data in Excel for All the Respondents

E. Codebook for Survey Data in Excel for All the Respondents

F. Survey Data in Excel with Purchasing Behavior Data

G. Codebook for Survey Data in Excel with Purchasing Behavior Data

25

# ATTACHMENT A

# CV OF J. MICHAEL DENNIS, PH.D.

# ATTACHMENT A

## CURRICULUM VITAE OF J. MICHAEL DENNIS

Phone: (650) 288-1930                                   274 Redwood Shores Parkway, #529
JMDSTAT@gmail.com                                       Redwood City, CA 94065

Education

| University of Texas, Austin | Government | B.A. | 1984 |
|---|---|---|---|
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

Employment

| 2015-Present | Senior Vice President, NORC |
|---|---|
| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007- 2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

Notable Past Projects

- 2020 Facebook Election Research Project, 2020-Present, NORC Director. Funded by Facebook Technologies, NORC's study director for a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057). NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-Present, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712). NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present. NORC Director, funded by John D. & Catherine T. MacArthur Foundation. NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation. GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.
- Google Screenwise Research Panel 2011-2014, Director. Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.

1

- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179).  Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.
- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.   Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism

Expert Witness in Litigation Testifying at Deposition or Trial in Last 4 Years
1. August 29, 2017. Expert Deposition. Jones et al. v. Nutiva. Case No. 3-16-cv-00711-HSG. United States District Court for the Northern District of California.
2. October 17, 2017. Expert Deposition.  Brenner v The Proctor & Gamble Co. Case No.: 8:16-1093-JLS-JCG. United States District Court for the Central District of California.
3. October 23, 2017. Expert Deposition.  Dean et al v Colgate-Palmolive Co. Case No. 5:15-CV-00107. United States District Court for the Central District of California.
4. November 13, 2017.  Expert Deposition. Joann Martinelli et al v. Johnson & Johnson and McNeil Nutritionals, LLC. Case No. 2:15-cv-01733-JAM-DAD.  United States District Court, Eastern District of California.
5. November 21, 2017. Expert Deposition. Strumlauf et al v. Starbucks Corporation.  Case No. 4:16-cv-1306-YGR.  United States District Court, Northern District of California.
6. December 11, 2017.  Expert Deposition.  IN RE: AMLA LITIGATION. Consolidated Case No. 1:16-cv-06593 (JSR). United States District Court, Southern District Of New York.
7. January 19, 2018.  Expert Deposition. Williams-Sonoma Song-Beverly Act Cases.  Superior Court of the State of California, County of San Francisco.
8. April 13, 2018.  Expert Deposition. Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated). United States District Court, Northern District of California.
9. June 22, 2018.  Expert Deposition. Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.  Case No. 5:17-cv-01027-BLF. United States District Court, Northern District of California, San Jose Division.
10. August 21, 2018. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court of New York. 16 Civ. 8364 (RA) (AJP).
11. September 5, 2018. Expert Deposition. Suzanna Bowling et al. v. Johnson & Johnson and McNeil Nutritionals, LLC.  U.S. District Court, Southern District of New York. Case No. 1:17-cv-03982.
12. September 10, 2018. Expert Deposition.  Dzielak et al. v. Whirlpool. U.S. District Court, District of New Jersey.  Civil Action No. 2:12-cv-00089-KM-JBC. .

2

13. October 26, 2018. Expert Deposition. Ryan Porter and Haarin Kwon v. NBTY, Inc., United States Nutrition, Inc., Healthwatchers (DE), Inc., et al. U.S. District Court, Northern District of Illinois. Civil Action No. 15-cv-11459.

14. October 30, 2018. Expert Deposition. Browning and Basile et al. v. Unilever United States, Inc. U.S. District Court, Central California. Case No. 8:16-CV-2210-AG-KES.

15. February 14, 2019.  Expert Deposition. Erin Allen et al. v. Conagra Foods Inc. U.S. District Court, Northern District of California, Case No. 3:13-CV-01279-VC.

16. June 21, 2019. Expert Deposition. Joseph Gregorio, et al. v The Clorox Company. U.S. District Court, Northern District of California. Case No. 4:17-cv-03824-PJH.

17. October 3, 2019. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California. Case No. 3:17-cv-2327-BAS-JLB.

18. November 9, 2019. Expert Deposition. Buckeye Tree Lodge and Sequoia Village Inn, LLC, et al. v. Expedia, Inc. U.S. District Court, Northern District of California. Case No. 16:cv-04721-VC.

19. December 17, 2019. Expert Deposition. Camille Cabrera v. Bayer Healthcare LLC and Bayer Corp., U.S. District Court for the Central District of California (Case No. 2:17-cv-08525).

20. January 16, 2020. Expert Deposition. In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products Liability Litigation. U.S. District Court for the District of New Mexico (Case No. 1:16-md-02695-JB-LF).

21. April 6, 2020.  Expert Deposition. Pardini v. Unilever. U.S. District Court for the Northern District of California (Case No. Case No. CV13-1675 SC).

22. May 27, 2020. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California. Case No. 3:17-cv-2327-BAS-JLB.

23. December 30, 2020. Expert Deposition. Michael Maeda et al. v. Kennedy Endeavors, Inc. U.S. District Court, District of Hawaii. Case No. 1:18-CV-00459-JAO-WRP.

24. January 19, 2021. Expert Deposition. Shelly Benson et al. v. Newell Brands, Inc. and NUK USA LLC. U.S. District Court, Northern District of Illinois. Civil Action No. 19-cv-06836.

25. February 26, 2021. Expert Deposition. Sharon Willis et al. v. Colgate-Palmolive Co. U.S. District Court, Central District of California. Civil Action 2:19-CV-08542-JGB-RAO.

26. March 15, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) Civil Action No. 19-cv-00768 (BMC).


Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992.  Chair:  Professor Jon Elster.  Published at https://sites.google.com/site/jmichaeldennis/home.

Selected Publications

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. Forthcoming. Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control.

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015.  Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly.  78 (4): 889-916.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

3

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom.  2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions."  Alcoholism: Clinical and Experimental Research  32(2): 1-8.

J. Michael Dennis and Rick Li.  2007.  More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December.  Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack."  Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank,  Richard A. Kulka. 2002.  "Psychological Reactions to Terrorist Attacks:  Findings from the National Study of Americans' Reactions to September 11."  Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?"  Marketing Research Summer: 484-488.

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis.  "Surgeons Under Surveillance:  Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

4

J. Michael Dennis.  "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

J. Michael Dennis.  "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

Selected Papers

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis.  Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

5

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis. 2017. Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh. 2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality: The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016. Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel. Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo. "Online Survey Sampling Solutions for Studies of LGB." Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III. "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research. Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling? An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

6

Evid. Appx. Page 487

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012 "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force. Prepared for the American Association for Public Opinion Research, March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

7

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos?  Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancouver.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach."  Available at http://www.knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign."  Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

8

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www.knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www.knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604_Weighting-Description.pdf.

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www.knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www.knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.


Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.

Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans.*  Russell Senate Building, Washington DC, June 14, 2017.

Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.

9

"The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?"  Workshop hosted by the University of Essex, Colchester, UK.  Presented the paper "Recommendations for Establishing a National Online Panel in the UK."  June 6-7, 2013.

"The Data Collection of the Future Has Already Started."  Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona.  Presented the paper  "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research."  July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys."  Sponsored by the National Science Foundation and hosted by NORC in Chicago.  June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions.  December 2009.

"Sample Representativeness:  Implications for Administering and Testing Stated Preference Surveys."  Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency.  Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

Educational Honors
Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)

Affiliations

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010),  Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)

10

# ATTACHMENT B

# SURVEY QUESTIONNAIRE (WORD DOCUMENT)

1

## ATTACHMENT B

## SURVEY QUESTIONNAIRE WORD DOC

**SCREENER SURVEY**

PLEASE NOTE THAT INSTRUCTIONS TO QUESTIONNAIRE PROGRAMMERS ARE IN ALL CAPS.  'R' MEANS "RESPONDENT."

CAPTCHA TEST FIRST

Please enter the code exactly as it appears in the image below, and then click "Continue" to continue.

Please note that the code is case sensitive.

[Captcha Box]

-----------------------------------------------------------------------------------------------------------

INTRO.

We'll be asking you about purchases you might have made at grocery stores, discount retailers, online stores, specialty stores, and other retailers where you might purchase various products.

-----------------------------------------------------------------------------------------------------------

[ASK ALL]

[PROMPT]P_STATE

Let's start with an easy question.  Where do you live?

[Dropdown of U.S. States, including Washington DC; include option of "Not in USA" at the bottom of the drop-down list]

TERMINATE IF 'NOT IN THE USA'

-----------------------------------------------------------------------------------------------------------

1

[ASK ALL]

D_GENDER

[SP]

What is your gender?

- o Male
- o Female

NO TERMINATIONS

-----------------------------------------------------------------------------------------------------

D_AGE.

What is your age in years?

[USE PICK LIST WITH TOP ROW "Less than 18" and then list 19, 20, 21, and so on until 99+]

**[TERMINATE IF UNDER AGE 18]**

-----------------------------------------------------------------------------------------------------

D_AGE_CONFIRM.

You said you are [SUBTITUTE IN # OF YEARS IN BOLD] years old.  Is that right?

- o Yes, that's correct

- o No, it is not correct  → GO BACK TO D_AGE AND REPEAT D_AGE AND D_AGE_CONFIRM.  IF RESPONDENT DOES NOT CONFIRM ON THE SECOND TRIP, THEN TERMINATE THE R.

-----------------------------------------------------------------------------------------------------

[ASK IF AGE = 21 AFTER AGE IS CORRECTED]

DOB

Please share with us the month and year of your birth.  We do not need to know the actual day of your birth to classify your responses.

MONTH – PICK LIST

YEAR – PICK LIST 2002 – 1920

2

--------------------------------------------------------------------------------------------------------------

EDUC.   What is the highest level of education that you have completed?

- o   Less than High School
- o   High School or GED
- o   Completed Technical or Trade School
- o   Some College
- o   College degree (4 year)
- o   Post-graduate course work or degree

NO TERMINATIONS

--------------------------------------------------------------------------------------------------------------

INSERT NEW SCREEN.

Thank you for telling us about yourself.

--------------------------------------------------------------------------------------------------------------

[SINGLE SELECT]


S1.  How much of the grocery shopping do you do for your household?  Please select one.

- o   All of it
- o   Most of it
- o   About half
- o   Not much of it
- o   None of it


NO TERMINATIONS

--------------------------------------------------------------------------------------------------------------

3

[MULTI-SELECT; RANDOMIZE RESPONSE LIST; ANCHOR NONE OF THESE]

PAST_SURVEY

Have you taken any surveys in the last 30 days on any of these topics?  Please select all that apply.

- o Sporting goods or outdoor gear
- o Advertisements on TV
- o Non-Alcoholic Beverages → TERMINATE
- o Clothing
- o Websites you visit
- o Video Games
- o Cosmetics
- o Shopping at retail stores
- o None of these

[TERMINATE IF R SELECTS FOOD AND BEVERAGES]

-----------------------------------------------------------------------------------------------------------

S_BUY.

Please take a moment to think about <u>bottled beverages</u> you might have purchased in the <u>last 12 months</u> from brick-and-mortar or online stores.

In the <u>last 12 months</u>, did you purchase or not purchase any <u>bottled beverages</u> from a brick-and-mortar store or online store?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor.

- o Yes, I did purchase non-alcoholic beverages from a store
- o No, I did not purchase non-alcoholic beverages from a store →TERMINATE

-----------------------------------------------------------------------------------------------------------

4

[MULTI-SELECT. RANDOMIZE RESPONSE LIST, BUT ANCHOR NONE OF THESE]

S_BUY_WHERE.

From which types of brick-and-mortar or online stores, if any, did you purchase such <u>bottled beverages</u> in the <u>last 12 months</u>?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor. Please select all that apply.

- o   Grocery stores
- o   Drug stores/pharmacies (like CVS, Walgreens)
- o   Big-box retail stores (like Walmart, Target)
- o   Convenience stores / Gas stations / Corner stores
- o   Warehouse club stores (e.g., Costco, Sam's)
- o   Somewhere else

- o   None of these

NO TERMINATIONS

------------------------------------------------------------------------------------------

[SINGLE SELECT.  ASK IF R SELECTS MORE THAN TWO TYPES OF STORES (EXCLUDING 'SOMEWHERE ELSE')]

S_BUY_WHERE_MOST.

From which type of place did you <u>most often</u> purchase <u>bottled beverages</u> in the last 12 months?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor.

Please select one.


[DISPLAY RETAILER TYPES SELECTED IN PREVIOUS QUESTION, EXCLUDING 'SOMEWHERE ELSE']


---------------------------------------------------------------------------------------------------------------

5

[MULTI SELECT; RANDOMIZE ORDER OF RESPONSE OPTIONS; KEEP NONE OF THESE ANCHORED AT BOTTOM; R CANNOT SELECT NONE OF THESE AND ANOTHER OPTION]

USE CAROSEL QUESTION FORMAT WITH ONLY ONE PRODUCT TYPE PER SCREEN.

S_BUY_TYPE.

Which of these types of <u>non-alcoholic bottled beverages</u> have you purchased in the <u>past 12 months</u>?  Please select all that apply.

- o  Energy drinks or shots  → **PROCEED**
- o  Coffee and coffee-flavored drinks
- o  Tea and tea-flavored drinks → **PROCEED**
- o  Kombucha/probiotic drinks → **PROCEED**
- o  Fruit juice and cider → **PROCEED**
- o  Protein drinks and shakes
- o  Soda and pop
- o  Water


- o  None of these


[PROCEED IF RESPONDENT SELECTED ONE OF THE TYPES FLAGGED AS 'PROCEED' … TERMINATE IF R DOES NOT SELECT AT LEAST ONE RESPONSE THAT ALLOWS R TO 'PROCEED']


-------------------------------------------------------------------------------------------------------------

6

------------------------------------------------------

NEW INFORMATION SCREEN

SPEED BUMP OF 10 SECONDS


On the next few screens, we will show you examples of bottled beverage products.

We want to know if you have or have not purchased these BRANDS in the last 12 months (not for resale).

----------------------------------------------------------

7

[RANDOMIZE RESPONSE LIST]

RANDOMIZE ORDER OF QUESTIONS OF S_BUY_KOMBUCHA_1 THRU S_BUY_KOMBUCHA_4


S_BUY_KOMBUCHA_1 THRU S_BUY_KOMBUCHA_4

SPEED BUMP OF 10 SECONDS FOR EACH QUESTION S_BUY_KOMBUCHA_1 THRU S_BUY_KOMBUCHA_4


Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the last 12 months?

[SHOW ONLY ONE COLLECTION OF BEVERAGE TYPES PER SCREEN – THERE ARE FOUR BEVERAGE TYPES AND THEREFORE FOUR CAROUSEL SCREENS:  ONE SCREEN FOR SHOWING THE GROUP OF GT'S DRINKS, ONE FOR SHOWING THE GROUP OF HEALTH-ADE, ONE FOR SHOWING THE KEVITA BOTTLES, AND ONE FOR SHWOING THE BREW DR BOTTLES.  THERE ARE ONLY FOUR ACTUAL QUESTIONS IN THIS SECTION.


RESPONSE OPTIONS FOR EACH SCREEN ARE:

Purchased          Did Not Purchase

8

**Examples of GT's Enlightened Synergy / Enlightened Kombucha**



---------------------------------------------------------

**Examples of Health-Ade Kombucha**



------------------------------

10

**Examples of KeVita Master Brew Kombucha**

    

11

-------------------------------------------------------------------------------------------

**Examples of Brew D$^R$ Kombucha**

    

**CONTINUE IF R SELECTED PURCHASED GT'S KOMBUCHA SYNERGY/ENLIGHTENED KOMBUCHA**

TERMINATE IF GT'S KOMBUCHA IS NOT SELECTED.  TERMINATED CASES ARE CODED DOV SCREEN_COMPL = 1, WHICH MEANS THAT SUCH CASES ARE SCREENER COMPLETES.  THESE ARE SCREENER COMPLETES BECAUSE THEIR ELIGIBILITY STATUS FOR THE STUDY IS DETERMINED]

CONFIRM.

Please confirm or not you purchased **GT's ENLIGHTENED SYNERGY / ENLIGHTENED KOMBUCHA** in the last 12 months.

Yes, I confirm →  **PROCEED**

No, I do not confirm → **TERMINATE**

-------------------------------------------------------------------------------

12

**W1**

You have been selected to participate in our survey project.

To participate in this survey, you must agree to these instructions.

- o   Answer the questions with your honest answers and opinions.  Do not guess.

- o   Answer the questions by yourself and without asking anybody else in your household for help.

- o   Answer the questions without getting help from a website or other materials.

- o   Answer all the questions in one sitting and not stopping in the middle.

Do you agree to our instructions?

> o   Yes, I agree to do this
> o   No, I do not agree to do this        →**TERMINATE**

**TERMINATE ALL CASES THAT DO NOT AGREE**


--------------------------------------------------------------------


**CREATE DOV ELIGIBLE = 1 FOR ALL CASES PROCEEDING PAST THIS POINT IN THE QUESTIONNAIRE**

13

# MAIN STUDY

[SHOW ALL R'S THAT HAVE NOT BEEN TERMINATED]

[NEW INFORMATION SCREEN; 10 SECOND SPEED BUMP]

In answering our survey questions, please do **not** consider purchases of **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "CLASSIC" or "HARD," as shown below
- Described as "considered a beer"
- Labelled as sold only to persons age 21 and over
- Contained a Government Warning according to the Surgeon General
- Comes in dark bottles with dark caps, as shown below

 

14

--------------------------------------------------------------

NEW INFORMATION SCREEN

Instead, consider **only** **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "SYNERGY," "ENLIGHTENED," or "SEASONAL"
- Sold in non-alcohol areas of stores
- Sold to persons of any age, not just age 21 and over
- Comes in clear bottles with white caps, as shown below.



-----------------------------------------------------

Evid. Appx. Page 507

[NEW INFORMATION SCREEN ; 10-SECOND SPEED BUMP]

Let's talk next about any purchases you made of **GT's Enlightened Synergy / Enlightened Kombucha.**

We will show you examples of products that this survey is about.

Please look at each screen with the examples of products.

We will ask you later about any purchases you might have made of **GT's Enlightened Synergy / Enlightened Kombucha** in the last 12 months.


-----------------------------------------

[5-SECOND SPEED BUMPS FOR EACH OF THE FOUR PRODUCT SCREENS]




---------------------------------------------------------



----------------------------------------------------------------------------------------------------



----------------------------------------------------------------------------------------------------

NEW SCREEN



Thank you for viewing the products.

-----------------------------------------------------------

[SELECT ALL THAT APPLY]

GTS_WHERE_BUY.

From which types of places did you purchase **GT's Enlightened Synergy / Enlightened Kombucha** in the past 12 months?  Please select all that apply.

- o   Grocery stores
- o   Drug stores/pharmacies (like CVS, Walgreens)
- o   Big-box retail stores (like Walmart, Target)
- o   Convenience stores / Gas stations / Corner stores
- o   Warehouse club stores (e.g., Costco, Sam's)
- o   Somewhere else


- o   None of these


NO TERMINATIONS

18

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

We will ask you to tell us how much of these GT's Enlightened Synergy / Enlightened Kombucha Beverages you purchased in the LAST 12 MONTHS.

Before we ask you about that, let's remind you of the product sizes for GT'S KOMBUCHA SYNERGY/ENGLIGHTENED BEVERAGES.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

19

The products are sold in **16 oz.** and **48 oz.** bottles like the ones below.

 

----------------------------------------------------------------

The products are also sold in boxes having **six 16-oz. bottles**, as shown below.

 

-------------------------------------------------

PRODUCT_SIZE.

[DO NOT ALLOW SELECTION OF 'NONE OF THESE SIZES' WITH SELECTION OF SUBSTANTIVE RESPONSE]

Please tell us which product sizes of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the last 12 months.

Please select all that apply or select "None of these."

- o  16 oz. individual bottles
- o  48 oz. individual bottles
- o  6 – 16 oz. bottles in a box

- o  None of these sizes    -------→   TERMINATE INTERVIEW

--------------------------------------------------------

NEW INFORMATION SCREEN

On the next screen, we will ask how much **GT's Enlightened Synergy / Enlightened Kombucha Beverages** that you purchased in the last 12 months.

You can tell us in one of two ways:

- By telling us how much of the product you purchased in A TYPICAL MONTH in the last 12 months.  Think of this as your average number of purchases in a month.

  OR

- By telling us how much of the product you purchased IN TOTAL in the last 12 months. If you typically purchased less than bottle or box of the product each month, please use this way to tell us.

----------------------------------------------------------------

22

[ASK IF PRODUCT_SIZE = 16 OZ. INDIVIDUAL BOTTLES]

UNITS_16OZ.

In the last 12 months, how many **individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH <u>or</u> the TOTAL NUMBER you purchased in the last 12 months.

> Enter here the number for a TYPICAL MONTH:  [      ]
>
> OR
>
> Enter here the TOTAL NUMBER for the last 12 months: [     ]
>
> [RANGE CHECK 0 – 99 FOR TYPICAL MONTH]
>
> [RANGE CHECK 0 – 500 FOR TOTAL NUMBER]
>
> [IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE

CHECK ALLOWS FOR TYPICAL MONTH, THEN PROMPT "Please make your best estimate between 0 and 99"]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TOTAL YEAR, THEN PROMPT "Please make your best estimate between 0 and 500"]

[IF R ATTEMPTS TO ENTER IN NUMBERS IN BOTH FIELDS, THEN PROMPT: "Please enter a number in either the box for the TYPICAL MONTH or for the TOTAL NUMBER"]

--------------------------------------------------------------------------

UNITS_16OZ_2.

[TEXT SUBSTITUTION BASED ON WHETHER R ANSWERED IN TYPICAL MONTH OR TOTAL NUMBER.  NUMBER SUBSTITUTION BASED ON NUMERIC ENTRY TO TYPICAL MONTH OR TOTAL NUMBER OPTIONS.]]

For the last 12 months, you said you purchased about **[INSERT # BOLDED] individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha** [in a TYPICAL MONTH / in TOTAL.]

Please select one.

- o  That is my best estimate → CONTINUE TO NEXT QUESTION
- o  I would like to change my answer → GO BACK TO UNITS_16OZ AND RE-ASK

23

[ASK IF PRODUCT_SIZE = 48 OZ. INDIVIDUAL BOTTLES]

UNITS_48OZ.

In the last 12 months, how many **individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH <u>or</u> the TOTAL NUMBER you purchased in the last 12 months.

> Enter here the number for a TYPICAL MONTH:  [       ]
>
> OR
>
> Enter here the TOTAL NUMBER for the last 12 months: [      ]
>
> [RANGE CHECK 0 – 99]
>
> [IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN 99, THEN

PROMPT "Please make your best estimate between 0 and 99"]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TOTAL YEAR, THEN PROMPT "Please make your best estimate between 0 and 500"]

[IF R ATTEMPTS TO ENTER IN NUMBERS IN BOTH FIELDS, THEN PROMPT: "Please enter a number in either the box for the TYPICAL MONTH or for the TOTAL NUMBER"]


--------------------------------------------

UNITS_48OZ_2.

[TEXT SUBSTITUTION BASED ON WHETHER R ANSWERED IN TYPICAL MONTH OR TOTAL NUMBER; NUMBER SUBSTITUTION BASED ON NUMERIC ENTRY TO TYPICAL MONTH OR TOTAL NUMBER OPTIONS.]


For the last 12 months, you said you purchased about **[INSERT # BOLDED] individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** [in a TYPICAL MONTH/ in TOTAL.]

Please select one.

- o   That is my best estimate → CONTINUE TO NEXT QUESTION
- o   I would like to change my answer → GO BACK TO UNITS_48OZ AND RE-ASK

--------------------------------------------------------------------------

[ASK IF PRODUCT_SIZE = 6-PACK

24

UNITS_6-PACK.

In the last 12 months, how many **boxes having SIX 16-OZ. BOTTLES** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH <u>or</u> the TOTAL NUMBER you purchased in the last 12 months.

You can tell us either how many you purchased in a TYPICAL MONTH <u>or</u> the TOTAL NUMBER you purchased in the last 12 months.

Enter here the number for a TYPICAL MONTH:   [      ]

OR

Enter here the TOTAL NUMBER for the last 12 months: [      ]

[RANGE CHECK 0 – 30 FOR TYPICAL MONTH]

[RANGE CHECK 0 – 100 FOR TOTAL NUMBER]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN 30 FOR TYPICAL MONTH, THEN PROMPT "Please make your best estimate between 0 and 30"]

[IF R ATTEMPTS TO PUT IN A NUMBER HIGHER THAN RANGE CHECK ALLOWS FOR TOTAL YEAR, THEN PROMPT "Please make your best estimate between 0 and 100"]

[IF R ATTEMPTS TO ENTER IN NUMBERS IN BOTH FIELDS, THEN PROMPT: "Please enter a number in either the box for the TYPICAL MONTH or for the TOTAL NUMBER"]

-----------------------------------------------

UNITS_6PACK_2.

[TEXT SUBSTITUTION BASED ON WHETHER R ANSWERED IN TYPICAL MONTH OR TOTAL NUMBER. NUMBER SUBSTITUTION BASED ON NUMERIC ENTRY TO TYPICAL MONTH OR TOTAL NUMBER OPTIONS.]

For the last 12 months, you said you purchased about **[INSERT # BOLDED] boxes having SIX 16-OZ.** BOTTLES of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** [in a TYPICAL MONTH/ in TOTAL.]

Please select one.

- o   That is my best estimate → CONTINUE TO NEXT QUESTION
- o   I would like to change my answer → GO BACK TO UNITS_6PACK AND RE-ASK

25

------------------------------------------------------------------------------------------------------------

Thank you for your answers!

We are almost done.

------------------------------------------------------------------------------------------------------------

[DISABLE BACK BUTTON; NO GOING BACK; AUTOMATIC GO FORWARD AFTER 15 SECONDS – DO NOT AUTO PUNCH A RESPONSE IF MOVING FORWARD AUTOMATICALLY]

NEG_PUB_1.

Are you aware of any negative publicity or other news about GT'S KOMBUCHA BEVERAGES?

- o  Yes, I am aware
- o  No, I am not aware

------------------------------------------------------------------------------------------------------------

[ASK IF NEG_PUB_1= YES. AUTOMATIC GO FORWARD AFTER 30 SECONDS.  SAVE ANY INFORMATION THAT IS ENTERED AT THE 30 SECOND MARK]

NEG_PUB_2.

Please tell us about any negative publicity or other news about GT'S KOMBUCHA BEVERAGES.

[100-character text box                                                    ]

------------------------------------------------------------------------------------------------------------

 [END SCREEN FOR ALL]

THANK YOU FOR PARTICIPATING IN OUR STUDY AND FOR YOU SHARING YOUR OPINIONS.  YOUR PARTICIPATION IS VERY MUCH APPRECIATED.

/SURVEY END

26

# ATTACHMENT C

# SURVEY QUESTIONNAIRE ONLINE SCREEN CAPTURES (POWERPOINT)

1

# ATTACHMENT C

# Online Screen Captures Enlightened Kombucha Survey

Note:  These screen captures were made with the test, non-production version of the survey and as a result there is yellow-shading and other aspects that were not actually in the production version shown respondents.

We'll be asking you about purchases you might have made at grocery stores, discount retailers, online stores, specialty stores, and other retailers where you might purchase various products.

Let's start with an easy question. Where do you live?

Select one...



easy question. Where do you live?

| Select one... |
| Alabama |
| Alaska |
| Arizona |
| Arkansas |
| ✓ California |
| Colorado |
| Connecticut |
| Delaware |
| Florida |
| Georgia |
| Hawaii |
| Idaho |
| Illinois |
| Indiana |
| Iowa |
| Kansas |
| Kentucky |
| Louisiana |
| Maine |
| Maryland |
| Massachusetts |
| Michigan |
| Minnesota |
| Mississippi |
| Missouri |
| Montana |
| Nebraska |
| Nevada |
| New Hampshire |
| New Jersey |
| New Mexico |
| New York |
| North Carolina |
| North Dakota |
| Ohio |
| Oklahoma |
| Oregon |
| Pennsylvania |
| Rhode Island |
| South Carolina |
| South Dakota |
| Tennessee |
| Texas |
| Utah |
| Vermont |
| Virginia |
| Washington |
| Washington, D.C. |
| West Virginia |
| Wisconsin |
| Wyoming |

Continue >

Evid. Appx. Page 523

## What is your gender?

○ Male

○ Female

## What is your age in years?

Select one...  ⌄

What is your age in years?



Continue >

You said you are **19** years old. Is that right?

◯ Yes, that's correct

◯ No, it is not correct

Please share with us the month and year of your birth. We do not need to know the actual day of your birth to classify your responses.

| MONTH | YEAR |
|-------|------|
| Select one... ▾ | Select one... ▾ |

Please share with us the month and year of your birth. We do not need to know the actual day of your birth to classify your responses.



Evid. Appx. Page 529

Thank you for telling us about yourself.

## How much of the grocery shopping do you do for your household?

Please select one.

○ All of it

○ Most of it

○ About half

○ Not much of it

○ None of it

## Have you taken any surveys in the last 30 days on any of these topics?

Please select all that apply.

- [ ] Websites you visit

- [ ] Food and Beverages

- [ ] Clothing

- [ ] Video Games

- [ ] Sporting goods or outdoor gear

- [ ] Shopping at retail stores

- [ ] Advertisements on TV

- [ ] Cosmetics

- [ ] None of these

Please take a moment to think about <u>bottled beverages</u> you might have purchased in the <u>last 12 months</u> from brick-and-mortar or online stores.

In the <u>last 12 months</u>, did you purchase or not purchase any <u>bottled beverages</u> from a brick-and-mortar store or online store?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor.

○ Yes, I did purchase non-alcoholic beverages from a store

○ No, I did not purchase non-alcoholic beverages from a store

From which types of brick-and-mortar or online stores, if any, did you purchase such bottled beverages in the last 12 months?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor.

Please select all that apply.

☐ Big-box retail stores (like Walmart, Target)

☐ Convenience stores / Gas stations / Corner stores

☐ Grocery stores

☐ Warehouse club stores (e.g., Costco, Sam's)

☐ Drug stores/pharmacies (like CVS, Walgreens)

☐ Somewhere else

☐ None of these

From which type of place did you <u>most often</u> purchase <u>bottled beverages</u> in the last 12 months?

Please exclude any alcoholic bottled beverages like beer, wine, and liquor.

Please select one.

○ Big-box retail stores (like Walmart, Target)

○ Drug stores/pharmacies (like CVS, Walgreens)

# Which of these types of non-alcoholic bottled beverages have you purchased in the past 12 months?

Please select all that apply.

- [ ] Water

- [ ] Soda and pop

- [ ] Kombucha/probiotic drinks

- [ ] Tea and tea-flavored drinks

- [ ] Fruit juice and cider

- [ ] Protein drinks and shakes

- [ ] Energy drinks or shots

- [ ] Coffee and coffee-flavored drinks

- [ ] None of these

On the next few screens, we will show you examples of bottled beverage products.

We want to know if you have or have not purchased these BRANDS in the last 12 months (not for resale).

Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the last 12 months?

## Examples of KeVita Master Brew Kombucha

    

| Purchased | Did Not Purchase |
|:---:|:---:|
| ○ | ○ |

Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the <u>last 12 months</u>?

## Examples of Health-Ade Kombucha



| Purchased | Did Not Purchase |
|:---:|:---:|
| ○ | ○ |

Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the <u>last 12 months</u>?

## Examples of Brew D<u>R</u> Kombucha

    

| Purchased | Did Not Purchase |
|:---:|:---:|
| ○ | ○ |

Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the <u>last 12 months</u>?

## Examples of GT's Enlightened Synergy / Enlightened Kombucha



| Purchased | Did Not Purchase |
|:---:|:---:|
| ○ | ○ |

Please confirm or not you purchased **GT's ENLIGHTENED SYNERGY / ENLIGHTENED KOMBUCHA** in the <u>last 12 months</u>.

◯ Yes, I confirm

◯ No, I do not confirm

You have been selected to participate in our survey project.

To participate in this survey, you must agree to these instructions.

- Answer the questions with your honest answers and opinions. Do not guess.
- Answer the questions by yourself and without asking anybody else in your household for help.
- Answer the questions without getting help from a website or other materials.
- Answer all the questions in one sitting and not stopping in the middle.

Do you agree to our instructions?

◯ Yes, I agree to do this

◯ No, I do not agree to do this

In answering our survey questions, please do **not** consider purchases of **GT'S KOMBUCHA BEVERAGES** that were:

- Labelled "CLASSIC" or "HARD," as shown below

- Described as "considered a beer"

- Labelled as sold only to persons age 21 and over

- Contained a Government Warning according to the Surgeon General

- Comes in dark bottles with dark caps, as shown below

 

Instead, consider <u>only</u> **GT's KOMBUCHA BEVERAGES** that were:

- Labelled "SYNERGY," "ENLIGHTENED," or "SEASONAL"
- Sold in non-alcohol areas of stores
- Sold to persons of any age, not just age 21 and over
- Comes in clear bottles with white caps, as shown below.

 

Let's talk next about any purchases you made of **GT's Enlightened Synergy / Enlightened Kombucha**.

We will show you examples of products that this survey is about.

Please look at each screen with the examples of products.

We will ask you later about any purchases you might have made of **GT's Enlightened Synergy / Enlightened Kombucha** in the last 12 months.









Thank you for viewing the products.

From which types of places did you purchase **GT's Enlightened Synergy / Enlightened Kombucha** in the past 12 months?

Please select all that apply.

- Grocery stores
- Drug stores/pharmacies (like CVS, Walgreens)
- Big-box retail stores (like Walmart, Target)
- Convenience stores / Gas stations / Corner stores
- Warehouse club stores (e.g., Costco, Sam's)
- Somewhere else
- None of these

We will ask you to tell us how much of these **GT's Enlightened Synergy / Enlightened Kombucha Beverages** you purchased in the LAST 12 MONTHS.

Before we ask you about that, let's remind you of the product sizes for **GT'S KOMBUCHA SYNERGY / ENLIGHTENED BEVERAGES**.

The products are sold in **16 oz**. and **48 oz**. bottles like the ones below.




The products are also sold in boxes having six **16-oz. bottles**, as shown below.




Please tell us which product sizes of **GT's Enlightened Synergy / Enlightened <mark>Kombucha</mark> Beverages** you purchased in the last 12 months.

Please select all that apply or select "None of these."

☐ 16 oz. individual bottles

☐ 48 oz. individual bottles

☐ 6 – 16 oz. bottles in a box

☐ None of these sizes

On the next screen, we will ask how much **GT's Enlightened Synergy / Enlightened Kombucha Beverages** that you purchased in the last 12 months.

You can tell us in one of two ways:

- By telling us how much of the product you purchased in A TYPICAL MONTH in the last 12 months. Think of this as your average number of purchases in a month.

    OR

- By telling us how much of the product you purchased IN TOTAL in the last 12 months. If you typically purchased less than bottle or box of the product each month, please use this way to tell us.

In the last 12 months, how many **individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH <u>or</u> the TOTAL NUMBER you purchased in the last 12 months.

Please type in the number that is your best estimate.

Enter here the number for a TYPICAL MONTH:

OR

Enter here the TOTAL NUMBER for the last 12 months:

In the last 12 months, how many **individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the last 12 months.

Please type in the number that is your best estimate.

Enter here the number for a TYPICAL MONTH:

10

OR

Enter here the TOTAL NUMBER for the last 12 months:

For the last 12 months, you said you purchased about **10 individual 16 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in a TYPICAL MONTH.

Please select one.

○ That is my best estimate

○ I would like to change my answer

In the last 12 months, how many **individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the last 12 months.

Please type in the number that is your best estimate.

Enter here the number for a TYPICAL MONTH:

OR

Enter here the TOTAL NUMBER for the last 12 months:

In the last 12 months, how many **individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the last 12 months.

Please type in the number that is your best estimate.

Enter here the number for a TYPICAL MONTH:

[        ]

OR

Enter here the TOTAL NUMBER for the last 12 months:

[ 6     ]

For the last 12 months, you said you purchased about **6 individual 48 oz. bottles** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in TOTAL.

Please select one.

○ That is my best estimate

○ I would like to change my answer

In the last 12 months, how many **boxes having SIX 16-OZ. BOTTLES** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** did you purchase?

You can tell us either how many you purchased in a TYPICAL MONTH or the TOTAL NUMBER you purchased in the last 12 months.

Please type in the number that is your best estimate.

Enter here the number for a TYPICAL MONTH:

OR

Enter here the TOTAL NUMBER for the last 12 months:

In the last 12 months, how many **boxes having <mark>SIX</mark> <mark>16-OZ.</mark> <mark>BOTTLES</mark>** of **GT's Enlightened Synergy / Enlightened <mark>Kombucha</mark> Beverages** did you purchase?

You can tell us either how many you purchased in a <mark>TYPICAL</mark> <mark>MONTH</mark> <u>or</u> the <mark>TOTAL</mark> <mark>NUMBER</mark> you purchased in the last 12 months.

Please type in the number that is your best estimate.

Enter here the number for a <mark>TYPICAL</mark> <mark>MONTH</mark>:

| 1 |

<mark>OR</mark>

Enter here the <mark>TOTAL</mark> <mark>NUMBER</mark> for the last 12 months:

For the last 12 months, you said you purchased about **1 boxes having SIX 16-OZ. BOTTLES** of **GT's Enlightened Synergy / Enlightened Kombucha Beverages** in a TYPICAL MONTH.

Please select one.

○ That is my best estimate

○ I would like to change my answer

Thank you for your answers!

We are almost done.

Are you aware of any negative publicity or other news about GT'S KOMBUCHA BEVERAGES?

○ Yes, I am aware

○ No, I am not aware

Please tell us about any negative publicity or other news about GT'S KOMBUCHA BEVERAGES.

Thanks for completing the survey. This page is shown for testing only. Please close the window to exit.

# ELECTRONICALLY SUBMITTED ATTACHMENTS

**ATTACHMENT D**    **Survey Data in Excel for All the Respondents**

**ATTACHMENT E**    **Codebook for Survey Data in Excel for All the Respondents**

**ATTACHMENT F**    **Survey Data in Excel with Purchasing Behavior Data**

**ATTACHMENT G**    **Codebook for Survey Data in Excel with Purchasing Behavior Data**

# EXHIBIT 21

Docusign Envelope ID: 3B87AB07-BAAF-4169-B41F-8D5EC4E84865

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>GT'S LIVING FOODS, LLC.,<br><br>    *Defendant*. | Case No. 2:19-cv-10920-FMO-DSR<br><br>**PLAINTIFF AMIT PATEL'S RESPONSES AND OBJECTIONS TO DEFENDANT GT'S LIVING FOODS, LLC'S INTERROGATORIES TO PLAINTIFF AMIT PATEL, SET ONE** |

Plaintiff Patel's Responses and
Objections to Defendant's
Interrogatories, Set 1

Case No. 2:19-cv-10920-FMO-DSR

Plaintiff Amit Patel ("Plaintiff") hereby responds to Defendant GT's Living Foods, LLC's ("Defendant" or "GT's") Interrogatories, Set One, as follows:

## PRELIMINARY STATEMENT

Plaintiff responds to these interrogatories based upon the investigation conducted thus far. Accordingly, these responses are based upon information now known and presently available to Plaintiff and that Plaintiff believes to be relevant to the subject matter covered by the interrogatories. It is anticipated that further discovery, independent investigation, and legal research and analysis could supply additional facts, add meaning to the known facts, as well as establish entirely new factual contentions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions set forth herein. The following responses are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered fact or facts which Plaintiff may recall later. Plaintiff accordingly reserves the right to supplement Plaintiff's responses should additional responsive, non-privileged documents and/or information be located and change all answers herein as additional facts are ascertained, analysis is made, and legal research is completed.

Plaintiff will respond as required by the Federal Rules of Civil Procedure, the Local Rules of this Court, and this Court's orders, but will not comply with instructions that exceed those requirements.

## GENERAL OBJECTIONS

Plaintiff incorporates by reference the following general objections and responses to each interrogatory, whether or not stated as a specific objection to each interrogatory.

1.     In responding to Defendant's Interrogatories, Plaintiff does not concede that any of the information provided is relevant or material to the subject matter of this litigation, reasonably calculated to lead to the discovery of admissible evidence, or is proportional to the needs of the case. Plaintiff reserves the right to object to the

Plaintiff Patel's Responses and              1              Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: 3B87AB07-BAAF-4169-B41F-8B5EC4E84865

admissibility at trial, or at any other stage of the litigation, of any of the information or documents produced in response to Defendant's Interrogatories.

2. Plaintiff objects to Defendant's Interrogatories to the extent that they purport to impose any obligations upon Plaintiff beyond the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and/or any applicable Local Rules or other court order.

3. Plaintiff's responses made herein are solely for the purpose of this civil action. Each response is subject to any and all objections to competency, relevancy, materiality, propriety, and admissibility, and to any and all other objections and grounds that would require the exclusion of any information identified herein if the information was asked of or disclosed by a witness present and testifying in court, all of which objections and grounds are hereby expressly reserved and may be interposed at a later date.

4. Plaintiff further objects to Defendant's Interrogatories to the extent that the information sought: (a) contains privileged attorney client communications; (b) constitutes protected attorney work product; (c) was prepared in anticipation of or in connection with litigation or trial; (d) discloses the mental impressions, conclusions, opinions, or legal theories of any attorney for or other representative of Plaintiff; (e) is subject to the common-interest or joint-defense privileges; or (f) is otherwise privileged or exempt from discovery (collectively, "privileged documents or information"). Plaintiff does not intend to provide any privileged documents or information. Any disclosure of privileged documents or information in these responses is inadvertent and shall not be deemed waiver of any applicable privileges or protections, and Plaintiff requests that any such information be discarded and disregarded promptly.

5. Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff Patel's Responses and Objections to Defendant's Interrogatories, Set 1      2      Case No. 2:19-cv-10920-FMO-DSR

6. Plaintiff further objects to Defendant's Interrogatories on the grounds and to the extent that they are overly broad, unduly burdensome, and oppressive.

7. Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they are vague, ambiguous, and lacking particularity.

8. Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they are not limited to the time period relevant to this litigation, on the ground that such interrogatories seek information which is not relevant to any issue in this action, calculated to lead to the discovery of admissible evidence, or proportional to the needs of the case.

9. Plaintiff further objects to the definition of the terms "PLAINTIFF," "YOU," and "YOUR" to the extent they seek to impose the obligation on Plaintiff to respond based on information or documents not in Plaintiff's possession, custody, or control. Unless specifically stated otherwise, or unless necessary in the context of the interrogatory or response, Plaintiff will interpret these terms to mean "Amit Patel."

10. Plaintiff further objects to the definition of the term "PROMOTIONAL MATERIALS" because it is overbroad and unduly burdensome. Plaintiff further objects on the ground and to the extent that the term seeks information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, and because the term is not limited to the time period relevant to this litigation.

11. Plaintiff further objects to the definition of the terms "ALCOHOL CLAIMS" and "SUGAR CLAIMS" because they are overbroad and unduly burdensome. Plaintiff further objects on the ground and to the extent that the terms seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, and because the terms are not limited to the time period relevant to this litigation.

12. Plaintiff further objects to the definition of "DESCRIBE" to the extent it renders any interrogatory impermissibly compound.

Plaintiff Patel's Responses and            3            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

DESCRIBE every purchase YOU have made of any PRODUCTS during the RELEVANT TIME PERIOD, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

### Response to Interrogatory No. 1:

Plaintiff incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as overbroad in scope and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for eleven different characteristics of every purchase Plaintiff made of the PRODUCTS over eight years. Plaintiff further objects to the interrogatory as compound as to (a) every purchase; (b) date; (c) product name; (d) UPC; (e) size; (f) quantity purchased; (g) retailer; (h) payment method; (i) price paid; (j) sales channel; (k) presence of another; and (l) any other details. Plaintiff further objects to the interrogatory as vague with respect to "any other details."

Subject to the above objections, Plaintiff responds as follows: Plaintiff began purchasing GT's Kombucha PRODUCTS in 2021 and continued purchasing the PRODUCTS through 2023. Plaintiff does not recall the precise dates of purchase, the specific number of bottles purchased, or the specific purchase price. Plaintiff typically purchased 16-ounce bottles for approximately $3.50 to $4.00 per bottle. Plaintiff purchased GT's Kombucha PRODUCTS in at least the following flavors:

- Gingerade
- Trilogy

Plaintiff Patel's Responses and              4              Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

- Mystic Mango

- Lemon Berry

- Strawberry Serenity

Plaintiff recalls purchasing GT's Kombucha PRODUCTS in-person from the following stores and locations:

- Whole Foods

    o 11737 San Vicente Blvd., Los Angeles, CA 90049

    o 6350 W. 3rd St., Los Angeles, CA 90036

    o 1765 California St., San Francisco, CA 94109

- Ralphs

    o 1644 Cloverfield Blvd., Santa Monica, CA 90404.

**INTERROGATORY NO. 2:**

DESCRIBE, for every purchase YOU have made of any PRODUCTS during the RELEVANT TIME PERIOD, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 2:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and overbroad in that it seeks information concerning every representation Plaintiff read and relied upon before every purchase regardless of whether such representations have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff read and relied on representations on the PRODUCTS' labels before purchasing. These representations included the representations on the nutrition label, including the SUGAR CLAIMS. These label representations also include the ALCOHOL CLAIMS. Plaintiff also

Plaintiff Patel's Responses and
Objections to Defendant's
Interrogatories, Set 1

5      Case No. 2:19-cv-10920-FMO-DSR

read and relied on the flavor representations of the PRODUCTS and the price of the PRODUCTS when he made his purchases.

**INTERROGATORY NO. 3:**

DESCRIBE every purchase YOU have made of any PRODUCTS between March 11, 2011, and February 26, 2017, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 3:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any PRODUCTS between March 11, 2011, and February 26, 2017.

**INTERROGATORY NO. 4:**

DESCRIBE, for every purchase YOU have made of any PRODUCTS between March 11, 2011, and February 26, 2017, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 4:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as overbroad in that it seeks information concerning every representation Plaintiff read and relied upon before every purchase regardless of whether such representations have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any PRODUCTS between March 11, 2011, and February 26, 2017.

Plaintiff Patel's Responses and            6            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 5:**

DESCRIBE every purchase YOU have made of any kombucha beverage, excluding DEFENDANT'S PRODUCTS, during the RELEVANT TIME PERIOD, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 5:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for eleven different characteristics of every purchase Plaintiff made of any kombucha beverage other than Defendant's PRODUCTS over eight years regardless of whether such purchases have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects to the interrogatory as compound as to (a) every purchase; (b) date; (c) product name; (d) UPC; (e) size; (f) quantity purchased; (g) retailer; (h) payment method; (i) price paid; (j) sales channel; (k) presence of another; and (l) any other details. Plaintiff further objects to the interrogatory as vague with respect to "any other details." Plaintiff further objects that the term "any kombucha beverage" is vague and ambiguous. Plaintiff will interpret this term to mean beverages that are labeled "kombucha."

Subject to the above objections, Plaintiff responds as follows: Plaintiff began purchasing kombucha beverages other than Defendant's PRODUCTS in 2021 around the time he first began purchasing Defendant's PRODUCTS. Plaintiff does not recall the precise dates of purchase, the specific number of bottles purchased, or the specific purchase price. Plaintiff typically purchased a single-serving bottle for approximately $2.50

Plaintiff Patel's Responses and                    7            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

to $4.00 per bottle. Plaintiff purchased at least the follow brands and flavors of kombucha beverages other than Defendant's PRODUCTS:

- Health-Ade Kombucha
    - Ginger Lemon
    - Passion Fruit Tangerine
    - Pomegranate Blueberry
    - Pink Lady Apple
    - Tropical Pineapple
    - Guava Dragon Fruit
    - Watermelon
- 365 by Whole Foods Market
    - Ginger Lemon
    - Strawberry Peach Mint
    - Mango Coconut
    - Guava Hibiscus
    - Pineapple Mango
- Brew Dr.
    - Pineapple Paradise

Plaintiff recalls purchasing kombucha beverages other than Defendant's PRODUCTS in-person from the same stores and locations identified in Plaintiff's response to Interrogatory No. 1, and incorporates that information here.

**INTERROGATORY NO. 6:**

DESCRIBE, for every purchase YOU have made of any kombucha beverage, excluding DEFENDANT'S PRODUCTS, during the RELEVANT TIME PERIOD, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

Plaintiff Patel's Responses and                8          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**Response to Interrogatory No. 6:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for information for every purchase Plaintiff made of any kombucha beverage other than Defendant's PRODUCTS over eight years regardless of whether such purchases have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects that the term "any kombucha beverage" is vague and ambiguous. Plaintiff will interpret this term to mean beverages that are labeled "kombucha."

Subject to the above objections, Plaintiff responds as follows: Plaintiff read and relied on representations on the label of kombucha beverages other than Defendant's PRODUCTS. These include representations on the nutrition label, including representations regarding the amount of sugar in the kombucha beverages other than Defendant's PRODUCTS. Plaintiff also read and relied on the flavor representations and representations regarding the price of the kombucha beverages other than Defendant's PRODUCTS when he made his purchases. Plaintiff also relied on the beverages not being alcoholic beverages or containing a significant amount of alcohol.

**INTERROGATORY NO. 7:**

Identify all PROMOTIONAL MATERIALS that YOU received or saw related to the PRODUCTS, including whether YOU received or saw them prior to your first purchase any of the PRODUCTS or after your first purchase of any of the PRODUCTS.

**Response to Interrogatory No. 7:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects that the interrogatory is unduly burdensome and overbroad in that it seeks information concerning "all" "PROMOTIONAL

Plaintiff Patel's Responses and
Objections to Defendant's
Interrogatories, Set 1

9

Case No. 2:19-cv-10920-FMO-DSR

MATERIALS" relating to the PRODUCTS, regardless of whether such materials have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects that this interrogatory is unintelligible with respect to "prior to your first purchase any of the PRODUCTS." Plaintiff will interpret this phrase as "prior to your first purchase of any of the PRODUCTS."

Subject to the above objections, Plaintiff responds as follows: Plaintiff saw the PRODUCTS' labels prior to his first purchase of the PRODUCTS. Plaintiff also saw the PRODUCTS' labels after his first purchase of the PRODUCTS. Plaintiff does not recall receiving or seeing other PROMOTIONAL MATERIALS for the PRODUCTS.

**INTERROGATORY NO. 8:**

Identify all PROMOTIONAL MATERIALS, regardless of source or type, in which YOU contend DEFENDANT falsely and/or misleadingly represented the nature and composition of the PRODUCTS and/or any specific PRODUCT, during the RELEVANT TIME PERIOD.

**Response to Interrogatory No. 8:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous as to "misleadingly represented the nature and composition of the PRODUCTS." Plaintiff further objects that the interrogatory is unduly burdensome and overbroad in that it seeks information concerning "all" "PROMOTIONAL MATERIALS" "regardless of source or type" relating to the PRODUCTS, regardless of whether such materials have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff identifies the labels of the PRODUCTS, as they did not contain the government-mandated alcohol

Plaintiff Patel's Responses and        10        Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

warning and understated the amount of sugar in the beverages, and Defendant's practice of selling the PRODUCTS as non-alcoholic beverages in section of retail stores separate from other alcoholic beverages and not requiring that customers show proof of age to purchase the PRODUCTS.

**INTERROGATORY NO. 9:**

DESCRIBE all the harm YOU contend the PRODUCTS' alleged alcohol or sugar content have caused YOU and describe the nature and extent of that purported harm.

**Response to Interrogatory No. 9:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous as to the terms "harm," "nature," and "extent." Plaintiff further objects that the interrogatory is impermissibly compound with respect to the harm caused by the "alcohol . . . content" and the harm caused by the "sugar content." Plaintiff treats this interrogatory as two interrogatories. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the above objections, Plaintiff responds as follows: the PRODUCTS caused Plaintiff harm because each of the PRODUCTS are misleadingly marketed and labeled as non-alcoholic beverages when, in fact, the beverages contained a significant amount of alcohol (more than 0.5% abv). Plaintiff purchased the PRODUCTS with the belief that the PRODUCTS were non-alcoholic, as the labels of the PRODUCTS did not bear a government warning concerning the consumption of alcoholic beverages, and Plaintiff did not have to show any identification of age to purchase the PRODUCTS. Plaintiff would not have purchased the PRODUCTS he purchased had Plaintiff known

Plaintiff Patel's Responses and    11    Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

that they contained significant levels of alcohol or were considered alcoholic beverages. Should Plaintiff encounter the PRODUCTS in the future, Plaintiff could not rely on the PRODUCTS' labeling.

Plaintiff further responds that the PRODUCTS further caused him harm because each of the PRODUCTS are misleadingly marketed and labeled in that they each contain more sugar than listed on their labels. Plaintiff pays attention to the amount of sugar Plaintiff consumers for health reasons and Plaintiff would not have purchased the PRODUCTS he purchased had Plaintiff known that they contained more sugar than listed on their labels.

**INTERROGATORY NO. 10:**

DESCRIBE in detail the specific monetary relief to which YOU contend YOU and each putative class member are entitled in the above-captioned lawsuit as a result of DEFENDANT'S alleged use of the ALCOHOL CLAIMS and SUGAR CLAIMS, including the amount of and basis for any damages, restitution, and attorney's fees and costs, all DOCUMENTS that support the calculations and amount of such recovery; and the specific injunctive or other equitable relief YOU seek.

**Response to Interrogatory No. 10:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects on the grounds that the interrogatory seeks information protected from disclosure by the attorney-client privilege and the attorney work-product doctrine.

Plaintiff Patel's Responses and          12          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Subject to the above objections, Plaintiff responds as follows: Plaintiff would not have purchased the PRODUCTS absent Defendant's misrepresentations regarding the PRODUCTS' alcohol content and sugar content and believes that he and class members are entitled to a full refund of the purchase price of the PRODUCTS. Plaintiff refers Defendant to the expert reports of Colin Weir and Dr. J. Michael Dennis for more information concerning the monetary relief sought in this lawsuit.

**INTERROGATORY NO. 11:**

DESCRIBE in detail each and every attempt YOU made to return or obtain a refund for the PRODUCT, including the PRODUCT, the amount paid and purchase date, when such attempt was made, all associated COMMUNICATIONS, and the result of such attempts.

**Response to Interrogatory No. 11:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the information sought by the interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and is therefore not proportional to the needs of the case. Plaintiff further objects that the request is overbroad as to time and scope. Plaintiff objects to the term "YOU" as vague and ambiguous. For purposes of this interrogatory response, Plaintiff interprets the term to include Amit Patel and his representatives, managers, attorneys, employees, and agents acting on his behalf.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has not personally attempted to return the PRODUCTS. On September 13, 2019, and October 3, 2019, demand letters were sent to Defendant on behalf of purchasers of the PRODUCTS requesting that Defendant cease selling mislabeled PRODUCTS, recall mislabeled PRODUCTS, and provide a full refund to all purchasers of the PRODUCTS.

Plaintiff Patel's Responses and            13            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 12:**

If it is YOUR contention that a PRODUCT(S) YOU purchased contained more than 0.5% alcohol by volume at the time YOU purchased that PRODUCT(S), state all facts in support of this contention, including, without limitation, the name of the PRODUCT(S) purchased, the date of purchase(s), the quantity of PRODUCT(S) purchased, the complete address of the retail location(s) where purchased, the purchase price(s) at the time of purchase, and the bases for your contention that the PRODUCT(S) purchased on those dates contained more than 0.5% alcohol by volume.

**Response to Interrogatory No. 12:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and unduly burdensome in that it seeks "all facts." Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the foregoing, Plaintiff responds that all of the PRODUCTS Plaintiff identified in response to Interrogatory No. 1 contained more than 0.5% alcohol by volume. All other information related to the purchases of those PRODUCTS is incorporated herein by reference.

Plaintiff's bases for the contention that the PRODUCTS contained more than 0.5% alcohol by volume at the time of sale are as follows:

GT's Enlightened Kombucha (as defined in the Second Amended Complaint), including the PRODUCTS purchased by Plaintiff, is a raw, unpasteurized tea beverage made of a tea that ferments for up to a month while a "blob" of bacteria known as "scoby" floats on top. Basic chemistry explains that the scoby converts the sugar into carbon dioxide and alcohol. While pasteurized versions of kombucha products are non-

Plaintiff Patel's Responses and          14          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

alcoholic, as the pasteurization kills the yeast in the kombucha, raw (unpasteurized) versions of kombucha, including the PRODUCTS purchased by Plaintiff, become alcoholic over time as the living yeast in the beverage converts sugars into alcohol. Such natural conversion of sugar to alcohol in unpasteurized kombucha beverages can result in alcohol levels as high as 4 percent alcohol by volume, roughly the same alcohol content as regular beer.

Further, Defendant has a history of selling kombucha beverages containing more than 0.5% alcohol by volume at the time of sale without disclosing such critical information to consumers. For example, on September 1, 2006, Millennium (Defendant's former name) reached a settlement with the Bureau of Alcohol, Tobacco and Firearms (currently operating as the Alcohol and Tobacco Tax and Trade Bureau or "TTB") for selling kombucha beverages "that contained over 0.5% alcohol without having a basic permit" and for selling such beverages "without the proper labels [or] labels approvals," and for distributing the products "without the government warning statement." *See* Exhibit 1 to the Second Amended Complaint. In 2010, an inspector from the Maine Department of Agriculture noticed that some bottles of kombucha were leaking and bubbling in a Portland Whole Foods, sparking Federal Drug Administration ("FDA") and TTB investigations concerning the alcohol content of various kombucha products, including GT's Kombucha. After it was discovered that many kombucha products had alcohol levels as high as 2.5 percent by volume, retailers pulled kombucha products, including GT's Kombucha products, off the shelves.

After the recall, several prominent retailers, such as Honest Tea, owned and operated by the Coca-Cola Company, were unable to reformulate their kombucha beverages to ensure that the products never crossed the 0.5 alcohol by volume threshold at retail or consumption, but Defendant's C.E.O. GT Dave, "was unwilling to radically change [the company's] process," and, according to recent testing, failed to change

Plaintiff Patel's Responses and
Objections to Defendant's
Interrogatories, Set 1

15

Case No. 2:19-cv-10920-FMO-DSR

Defendant's kombucha products' formulation so as to ensure that the products did not cross the 0.5 alcohol by volume threshold at the time of sale or consumption.

Brewing & Distilling Analytical Services, LLC ("BDAS"), an Alcohol and Tobacco Tax and Trade Bureau certified laboratory, conducted tests on multiple batches of Enlightened Kombucha. BDAS utilized scientifically valid, TTB approved methodology for testing kombucha beverages. Each test showed that every bottle of the products tested contained a level of alcohol by volume greater than 0.5 percent. Specifically, in February 2018, BDAS tested the alcohol by volume content of the following flavors of Defendant's Enlightened Kombucha: Multi-Green, Strawberry Serenity, and Original. The alcohol by volume content of these samples ranged between 0.59 -1.40 percent alcohol by volume. Then, in September 2019, BDAS tested the alcohol by volume content of the following flavors of Defendant's Enlightened Kombucha: Gingerberry, Strawberry Serenity, Watermelon Wonder, Passionberry Bliss, Guava Goddess, Pink Lady Basil, Trilogy, Lavender Love, Heart Beet, Tantric Turmeric, Gingerade, Original, Hibiscus Ginger, Cayennade, Lemonade, Multi-Green, Raspberry Chia, Cosmic Cranberry, and Mystic Mango. The alcohol by volume content of these samples ranged between 0.71 and 2.21 percent alcohol by volume. At the time of the testing, none of the products had passed their stated expiration date. Not a single product tested was below the federally mandated 0.5 percent alcohol by volume limit. BDAS's testing is described further in the Expert Report of Dr. Spedding, which along with its cited materials is incorporated by reference, and in documents with Bates Numbers PLAINTIFFS000001 through PLAINTIFFS000041.

Multiple other independent laboratories have tested Defendant's Enlightened Kombucha products and have seen nearly identical results. For instance, in February 2019, Blake Ebersole, one of the foremost experts in kombucha alcohol testing in the United States, tested 29 samples of Defendant's Enlightened Kombucha products using AOAC Official Method of Analysis AOAC 2016.12, a gas chromatography with flame ionization

Plaintiff Patel's Responses and            16            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: 3B87AB07-BAAF-4169-B41F-8B5FC4E84865

detection (GC-FID) with headspace autosampling methodology, run by Covance-Eurofins Laboratory. Mr. Ebersole found that "[a]ll 29 [Enlightened Kombucha] samples tested contained greater than 0.5 percent alcohol by volume (% ABV), with results ranging from 0.64 – 1.85% ABV. This is between 28% and 370% higher than the legal limit of 0.5% ABV." A copy of Mr. Ebersole's declaration, which discusses his testing methodology and results, as attached to the Second Amended Complaint as Exhibit 2 (referred to as "Exhibit 2" throughout this response), is already in Defendant's possession.

Mr. Ebersole also "conducted testing in December 2015 and July 2016 using the same analytical method (AOAC 2016.12) at Covance on 21 [Enlightened Kombucha] samples. All 21 [Enlightened Kombucha] samples contained greater than 0.5% ABV, ranging from 1.09 – 1.96% ABV. This is between 218 and 392% higher than the legal limit of 0.5% ABV." *See* Exhibit 2, at ¶ 12(b).

Mr. Ebersole also "conducted testing in March 2016 within a method verification and round-robin study that yielded four candidate methods from three laboratories (including the headspace GC-FID method). [Mr. Ebersole] found consistency in results among the laboratories on four [Enlightened Kombucha] samples that all contained greater than 0.5% ABV. In this round of testing, alcohol in [Enlightened Kombucha] ranged from 1.27-1.51% ABV. This is between 254 and 302% higher than the legal limit of 0.5% ABV." *See* Exhibit 2, at ¶ 12(c).

For all of Mr. Ebersole's testing, the samples were purchased directly from retailers' refrigerated shelves, from non-alcoholic beverage refrigerated sections of the stores that were separate from the alcoholic beverage sections. The samples were not expired. Samples were transported in refrigerated conditions, ensuring that the samples were kept cold at all times. *See* Exhibit 2, at ¶¶ 35-40, 61-72.

Plaintiff Patel's Responses and Objections to Defendant's Interrogatories, Set 1

17

Case No. 2:19-cv-10920-FMO-DSR

Mr. Ebersole also reported that Enartis Vinquiry conducted testing of 46 bottles of Enlightened Kombucha in 2017 and 2018 using GC-FID. "The samples contained an average of 1.16% ABV, ranging from 0.60 to 2.05%." *See* Exhibit 2, at ¶ 12(d).

Mr. Ebersole also reported that these results "for alcohol in [Enlightened Kombucha] are consistent with results independently reported by others in the published literature. For example, in 2015 John Edwards, Ph.D. from Process NMR Associates analyzed three samples of [Enlightened Kombucha] in 2015 using a nuclear magnetic resonance method. He found all three samples had alcohol levels higher than 0.5% ABV, ranging from 1.23-1.40 % ABV, reflecting alcohol levels 246%-280% higher than the 0.5% limit. In 2017, Daniel Armstrong, Ph.D. and colleagues at the University of Texas analyzed eight samples of [Enlightened Kombucha] using headspace GC-FID, and found they all exceeded 0.5% alcohol, reporting a range of 1.1%-1.8% ABV in the drinks. This reflects an amount that is 220%-360% higher than the 0.5% ABV limit for non-alcoholic beverages." *See* Exhibit 2, at ¶ 12(e).

The described test results are also corroborated by Defendant's C.E.O., who, after the 2010 recall, stated that the alcohol content of Defendant's kombucha beverages was "something that is out of our control."

**INTERROGATORY NO. 13:**

If it is YOUR contention that a PRODUCT(S) YOU purchased contained more than the amount of sugar disclosed on the PRODUCT'S label at the time YOU purchased that PRODUCT(S), state all facts in support of this contention, including without limitation the name of the PRODUCT(S) purchased, the date of purchase(s), the quantity of PRODUCT(S) purchased, the complete address of the retail location(s) where purchased, the purchase price(s) at the time of purchase, and the bases for your contention that the PRODUCT(S) purchased on those dates contained more than the amount of sugar disclosed on the PRODUCT'S label.

Plaintiff Patel's Responses and               18               Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**Response to Interrogatory No. 13:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and unduly burdensome in that it seeks "all facts." Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the foregoing, Plaintiff responds that all of the PRODUCTS Plaintiff identified in response to Interrogatory No. 1 contained more sugar than disclosed on the labels. All other information related to the purchases of those PRODUCTS is incorporated herein by reference.

Plaintiff's bases for the contention that the PRODUCTS contained more sugar than declared on the labels at the time of sale are as follows: Brewing & Distilling Analytical Services, LLC ("BDAS"), an Alcohol and Tobacco Tax and Trade Bureau certified laboratory, conducted tests on multiple batches of Enlightened Kombucha. In September 2019, BDAS tested the sugar content of the following flavors of Defendant's Enlightened Kombucha: Gingerberry, Strawberry Serenity, Watermelon Wonder, Passionberry Bliss, Guava Goddess, Pink Lady Basil, Trilogy, Lavender Love, Heart Beet, Tantric Turmeric, Gingerade, Original, Hibiscus Ginger, Cayennade, Lemonade, Multi-Green, Raspberry Chia, Cosmic Cranberry, and Mystic Mango. BDAS's test results showed that Enlightened Kombucha beverages contain more than 15 percent more sugar than declared on the beverages' labels. BDAS's testing is described further in the Expert Report of Dr. Spedding, which along with its cited materials is incorporated by reference.

**INTERROGATORY NO. 14:**

State whether YOU received notice of the RETTA ACTION or the RETTA ACTION settlement, and if so, identify the date(s) YOU received notice, the medium of

Plaintiff Patel's Responses and                    19                Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

notice (mail, email, or other), and the address or email address to which the notice was sent.

**Response to Interrogatory No. 14:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff objects to the interrogatory as vague and ambiguous as to "notice of the RETTA ACTION or the RETTA ACTION settlement." Plaintiff will interpret the phrase to mean court-ordered notice of the RETTA ACTION settlement.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not receive notice of the RETTA ACTION or the RETTA ACTION settlement. Plaintiff had never heard of the RETTA ACTION before becoming involved in the above-captioned case.

**INTERROGATORY NO. 15:**

State whether YOU opted out of the RETTA ACTION settlement or submitted a RETTA ACTION settlement claim, and identify the date YOU submitted an opt-out notice or claim, the medium you submitted it through (mail, email, or other submission method), PERSONS or entities to which the claim or opt-out was sent, and whether you received a cash payment, product voucher, or any other compensation or benefit from the RETTA ACTION settlement.

**Response to Interrogatory No. 15:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any of GT's kombucha beverages between March 11, 2011, and February 27, 2017. He therefore was not a member of the RETTA ACTION settlement class, and was not permitted to opt out or submit a claim. Accordingly, Plaintiff did not opt out of the RETTA ACTION or submit a RETTA ACTION settlement claim.

Plaintiff Patel's Responses and             20             Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 16:**

DESCRIBE all monetary and other relief YOU seek to recover from DEFENDANT in this action on YOUR own behalf, including the amount of and basis for any damages, restitution, and attorney's fees and costs, including all documents that support the calculations and amount of such recovery; and the specific injunctive or other equitable relief YOU seek.

**Response to Interrogatory No. 16:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects that the interrogatory is duplicative of Interrogatory No. 10. Plaintiff further objects on the grounds that the interrogatory seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects that the interrogatory is premature to the extent it seeks information regarding attorneys' fees and costs while the case is ongoing.

Subject to the above objections, Plaintiff responds as follows: Plaintiff would not have purchased the PRODUCTS and believes that he and class members are entitled to a full refund of the purchase price of the PRODUCTS.

Plaintiff further responds that he seeks an injunction requiring Defendant to place the government warning required by 27 C.F.R. § 16.21 on the labels of Enlightened Kombucha, or, in the alternative, bar Defendant from selling Enlightened Kombucha unless it does not cross the 0.5 percent alcohol by volume threshold at retail.

Plaintiff further responds that he seeks an injunction barring Defendant from selling Enlightened Kombucha unless Defendant's Enlightened Kombucha labels accurately display the amount of sugar in the beverages.

Plaintiff Patel's Responses and                    21            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: 3B87AB07-BAAF-4169-B41F-8B5FC4E84865

**INTERROGATORY NO. 17:**

Identify by name, email address, home address, and telephone number each PERSON who has communicated with YOU or YOUR attorneys regarding the PRODUCT or any allegation contained in your COMPLAINT and DESCRIBE the substance of the COMMUNICATION.

**Response to Interrogatory No. 17:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory of overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks information regarding every communication he has had with any person regarding the PRODUCTS, regardless of whether those communications have anything to do with the allegations in the case. Plaintiff further objects on the grounds that the interrogatory seeks information protected by the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects on the basis of third-party privacy because the request seeks the home address, email address, and telephone number of third parties who have no relevance or involvement in the case. Plaintiff will identify the people who he has communicated with regarding the alcohol and sugar claims alleged in the operative complaint, if any.

Subject to the above objections, Plaintiff responds as follows: Plaintiff had brief, high-level discussions with his parents and his sister regarding the alcohol and sugar claims alleged in the operative complaint.

**INTERROGATORY NO. 18:**

If YOU have been charged or convicted of a crime within the last ten years, DESCRIBE the charge or conviction, including but not limited to the court in which YOU were charged or convicted, the date of the charge or conviction, the conduct giving rise to the charge or conviction, and the outcome of that charge or conviction.

Plaintiff Patel's Responses and                22          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**Response to Interrogatory No. 18:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, not proportional to the needs of the case, and irrelevant because it seeks information not likely to lead to the discovery of admissible information.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has not been charged or convicted of a crime within the last ten years.

**INTERROGATORY NO. 19:**

Identify each PERSON likely to have knowledge of any facts or information related to the subject matter of YOUR claims against DEFENDANT by name, address, and telephone number, and identify the facts or information known by each PERSON.

**Response to Interrogatory No. 19**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects on the basis of third-party privacy because the request seeks the home address and telephone number of third parties who have no involvement in the case.

Subject to the above objections, Plaintiff responds as follows: Plaintiff incorporates Plaintiffs Amit Patel, Lauren Schmidt, and Christopher Nunez's Rule 26(a) Initial Disclosures, served on November 24, 2025.

**INTERROGATORY NO. 20:**

State YOUR contact information since 2011, including all of the addresses for where YOU resided, all email addresses, and all phone numbers (landline and mobile), and the time period YOU used each.

**Response to Interrogatory 20:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case,

Plaintiff Patel's Responses and                23        Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

and irrelevant. Plaintiff designates his response to this interrogatory as CONFIDENTIAL. Defendant may not use the information provided in this response to contact Plaintiff. Plaintiff may be contacted through his counsel only.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has used the following email addresses since 2011:

- ███████████████████

- ████████████

- ██████████████████

- ███████████████

Plaintiff has used the following phone number from 2011 to the present: ███████████.

Plaintiff has lived at the following addresses since 2011. Plaintiff does not recall the precise dates he lived at each address, but provides his best estimate below:

- 2011 to 2013: ██████████████████████

- 2014 to 2015: ████████████████

- 2015 to 2017: ████████████████████████

- 2017 to 2018: █████████████████████████

- 2018 to 2019: ████████████████

- 2019 to 2020: ██████████████████

- 2021 to 2023: ████████████████████

- 2023 to 2024: ██████████████████████

- 2024 to present: ████████████████████

Plaintiff Patel's Responses and          24          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 21:**

DESCRIBE in detail the circumstances under which YOU first had contact with a PERSON(S) regarding this Action, including the identity of the PERSON(S) with whom you first had contact with regarding this Action.

**Response to Interrogatory No. 21:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant. Plaintiff further objects that the interrogatory seeks information protected by the attorney-client privilege and attorney work product doctrine.

Subject to the above objections, Plaintiff responds as follows: Plaintiff's first contact regarding this action was with an employee of Dovel & Luner, LLP on or around July 16, 2024.

**INTERROGATORY NO. 22:**

DESCRIBE any agreement YOU have with YOUR attorneys, or any other PERSON or entity, or any agreement YOUR attorneys have with any other PERSON or entity, concerning:

    i.    the payment or advancement of attorneys' fees, expenses, and costs with respect to this lawsuit;

    ii.    who will advance, and who is responsible for, payment of the costs and expenses incurred in connection with the prosecution of this lawsuit;

    iii.    whether a fee in this lawsuit will be shared with any PERSON not a member of YOUR attorneys' law firm; or

    iv.    the fee sharing arrangement by or among Dovel & Luner, LLP, Smith Krivoshey, PC, Bibiyan Law Group, Freeman Mathis and Gary, Bursor and Fisher PA, and/or any other lawyer, firm, or PERSON.

Plaintiff Patel's Responses and Objections to Defendant's Interrogatories, Set 1     25     Case No. 2:19-cv-10920-FMO-DSR

**Response to Interrogatory No. 22:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff treats this as two interrogatories. Plaintiff further objects to this interrogatory as overbroad because the request seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. Plaintiff further objects that this interrogatory seeks information protected by the attorney-client privilege and attorney work product doctrine. Plaintiff further objects to the interrogatory to the extent it seeks information related to any other lawsuit.

Subject to the above objections, Plaintiff responds as follows: On or around July 16, 2024, Plaintiff entered into an attorney-client privileged retention agreement with Dovel & Luner, LLP.

Plaintiff further responds that on or around July 9, 2024, Dovel & Luner, LLP entered into a Joint Prosecution Agreement for this matter with Smith Krivoshey PC, Bursor & Fisher, P.A., and Zimmerman Reed LLP and Westerman Law Corp. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs will produce a copy of this Joint Prosecution Agreement.

Plaintiff further responds that on or around July 16, 2024, Dovel & Luner, LLP entered into a subsequent Agreement Concerning *Sharpe* Litigation with Smith Krivoshey PC, Bursor & Fisher, P.A., and Zimmerman Reed LLP and Westerman Law Corp. This July 16 Agreement specifically superseded the prior Joint Prosecution Agreement. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs will produce a copy of this Agreement Concerning *Sharpe* Litigation.

Dated: December 14, 2025

By: */s/ Martin Brenner*
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal Bar No. 333540)
martin@dovel.com

Plaintiff Patel's Responses and Objections to Defendant's Interrogatories, Set 1

26

Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: 3B87AB07-BAAF-4169-B41F-8B5EC4E84865

DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

Plaintiff Patel's Responses and          27          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: 3B87AB07-BAAF-4169-B41F-8B5EC4E84865

## **Verification**

I am Amit Patel, Plaintiff in the above-captioned case. Subject to any inadvertent errors and reserving the right to make changes in the answers if it appears at any time that errors or omissions have been made, I verify that the factual information contained in Plaintiff Amit Patel's Responses and Objections to Defendant GT's Living Foods, LLC's Interrogatories to Plaintiff Amit Patel, Set One are true and correct to the best of my knowledge and belief, to the extent I am permitted to view answers based upon materials under any protective order in this case. I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Dated: _____12/14/2025_____

DocuSigned by:

*Amit Patel*

Signature: _____3FD112DB678B45B...____

Plaintiff Patel's Responses and
Objections to Defendant's
Interrogatories, Set 1                    28                    Case No. 2:19-cv-10920-FMO-DSR

## PROOF OF SERVICE

I am a resident of the state of California, I am over the age of 18 years, and I am not a party to the within action. My business address is 201 Santa Monica Blvd., Suite 600, Santa Monica, CA 90401.

On December 15, 2025, I served the foregoing document(s) described as PLAINTIFF AMIT PATEL'S RESPONSES AND OBJECTIONS TO DEFENDANT GT'S LIVING FOODS, LLC'S INTERROGATORIES TO PLAINTIFF AMIT PATEL, SET ONE on all interested parties in this action as follows:

Jacob M. Harper (SBN 259463)          *Attorneys for Defendant GT's Living Foods,*
jacobharper@dwt.com                   *LLC*
Heather F. Canner (SBN 292837)
heathercanner@dwt.com
Joseph Elie-Meyers (SBN 325183)
josepheliemeyers@dwt.com
Peter K. Bae (SBN 329158)
peterbae@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: (213) 633-6800
Fax: (213) 633-6899

**[X]    (VIA ELECTRONIC SERVICE):** I served the document(s) listed above electronically via email or electronic transmission. I caused the documents to be sent to the persons at the email addresses above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 15, 2025, at Santa Monica, California.

_____
Rachel Ong

Proof of Service

Evid. Appx. Page 602

# EXHIBIT 22

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal Bar No. 333540)
martin@dovel.com
DOVEL &f LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>GT'S LIVING FOODS, LLC.,<br><br>*Defendant*. | Case No. 2:19-cv-10920-FMO-DSR<br><br>**PLAINTIFF LAUREN SCHMIDT'S RESPONSES AND OBJECTIONS TO DEFENDANT GT'S LIVING FOODS, LLC'S INTERROGATORIES TO PLAINTIFF LAUREN SCHMIDT, SET ONE** |

Plaintiff Schmidt's Responses and
Objections to Defendant's
Interrogatories, Set 1

Case No. 2:19-cv-10920-FMO-DSR

Plaintiff Lauren Schmidt ("Plaintiff") hereby responds to Defendant GT's Living Foods, LLC's ("Defendant" or "GT's") Interrogatories, Set One, as follows:

## PRELIMINARY STATEMENT

Plaintiff responds to these interrogatories based upon the investigation conducted thus far. Accordingly, these responses are based upon information now known and presently available to Plaintiff and that Plaintiff believes to be relevant to the subject matter covered by the interrogatories. It is anticipated that further discovery, independent investigation, and legal research and analysis could supply additional facts, add meaning to the known facts, as well as establish entirely new factual contentions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions set forth herein. The following responses are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered fact or facts which Plaintiff may recall later. Plaintiff accordingly reserves the right to supplement Plaintiff's responses should additional responsive, non-privileged documents and/or information be located and change all answers herein as additional facts are ascertained, analysis is made, and legal research is completed.

Plaintiff will respond as required by the Federal Rules of Civil Procedure, the Local Rules of this Court, and this Court's orders, but will not comply with instructions that exceed those requirements.

## GENERAL OBJECTIONS

Plaintiff incorporates by reference the following general objections and responses to each interrogatory, whether or not stated as a specific objection to each interrogatory.

1. In responding to Defendant's Interrogatories, Plaintiff does not concede that any of the information provided is relevant or material to the subject matter of this litigation, reasonably calculated to lead to the discovery of admissible evidence, or is proportional to the needs of the case. Plaintiff reserves the right to object to the

Plaintiff Schmidt's Responses and Objections to Defendant's Interrogatories, Set 1

1

Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

admissibility at trial, or at any other stage of the litigation, of any of the information or documents produced in response to Defendant's Interrogatories.

2.    Plaintiff objects to Defendant's Interrogatories to the extent that they purport to impose any obligations upon Plaintiff beyond the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and/or any applicable Local Rules or other court order.

3.    Plaintiff's responses made herein are solely for the purpose of this civil action. Each response is subject to any and all objections to competency, relevancy, materiality, propriety, and admissibility, and to any and all other objections and grounds that would require the exclusion of any information identified herein if the information was asked of or disclosed by a witness present and testifying in court, all of which objections and grounds are hereby expressly reserved and may be interposed at a later date.

4.    Plaintiff further objects to Defendant's Interrogatories to the extent that the information sought: (a) contains privileged attorney client communications; (b) constitutes protected attorney work product; (c) was prepared in anticipation of or in connection with litigation or trial; (d) discloses the mental impressions, conclusions, opinions, or legal theories of any attorney for or other representative of Plaintiff; (e) is subject to the common-interest or joint-defense privileges; or (f) is otherwise privileged or exempt from discovery (collectively, "privileged documents or information"). Plaintiff does not intend to provide any privileged documents or information. Any disclosure of privileged documents or information in these responses is inadvertent and shall not be deemed waiver of any applicable privileges or protections, and Plaintiff requests that any such information be discarded and disregarded promptly.

5.    Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff Schmidt's Responses and              2              Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-49F2-85F0-6639E0FA3DE4

6.      Plaintiff further objects to Defendant's Interrogatories on the grounds and to the extent that they are overly broad, unduly burdensome, and oppressive.

7.      Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they are vague, ambiguous, and lacking particularity.

8.      Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they are not limited to the time period relevant to this litigation, on the ground that such interrogatories seek information which is not relevant to any issue in this action, calculated to lead to the discovery of admissible evidence, or proportional to the needs of the case.

9.      Plaintiff further objects to the definition of the terms "PLAINTIFF," "YOU," and "YOUR" to the extent they seek to impose the obligation on Plaintiff to respond based on information or documents not in Plaintiff's possession, custody, or control. Unless specifically stated otherwise, or unless necessary in the context of the interrogatory or response, Plaintiff will interpret these terms to mean "Lauren Schmidt."

10.     Plaintiff further objects to the definition of the term "PROMOTIONAL MATERIALS" because it is overbroad and unduly burdensome. Plaintiff further objects on the ground and to the extent that the term seeks information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, and because the term is not limited to the time period relevant to this litigation.

11.     Plaintiff further objects to the definition of the terms "ALCOHOL CLAIMS" and "SUGAR CLAIMS" because they are overbroad and unduly burdensome. Plaintiff further objects on the ground and to the extent that the terms seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, and because the terms are not limited to the time period relevant to this litigation.

12.     Plaintiff further objects to the definition of "DESCRIBE" to the extent it renders any interrogatory impermissibly compound.

Plaintiff Schmidt's Responses and            3            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

DESCRIBE every purchase YOU have made of any PRODUCTS during the RELEVANT TIME PERIOD, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 1:**

Plaintiff incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as overbroad in scope and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for eleven different characteristics of every purchase Plaintiff made of the PRODUCTS over eight years. Plaintiff further objects to the interrogatory as compound as to (a) every purchase; (b) date; (c) product name; (d) UPC; (e) size; (f) quantity purchased; (g) retailer; (h) payment method; (i) price paid; (j) sales channel; (k) presence of another; and (l) any other details. Plaintiff further objects to the interrogatory as vague with respect to "any other details."

Subject to the above objections, Plaintiff responds as follows: Plaintiff began purchasing GT's Kombucha PRODUCTS in 2019 and continued purchasing the PRODUCTS through 2022. Plaintiff does not recall the precise dates of purchase, the specific number of bottles purchased, or the specific purchase price. Plaintiff typically purchased 16-ounce bottles, but occasionally purchased 48-ounce bottles. Plaintiff estimates that she typically paid approximately $3.50 to $4.50 for a 16-ounce bottle and approximately $8.00 to $10.00 for the 48-ounce bottles. Plaintiff purchased GT's Kombucha PRODUCTS in at least the following flavors:

Plaintiff Schmidt's Responses and            4            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

- Trilogy
- Guava Goddess
- Cosmic Cranberry
- Gingerade
- Gingerberry

Plaintiff recalls purchasing GT's Kombucha PRODUCTS in-person from the following stores and locations:

- Stop & Shop
  - 454 Fort Salonga Road, Northport, NY 11768
  - 8101 Jericho Turnpike, Woodberry, NY 11797
  - 3126 Jericho Turnpike, East Northport, NY 11731
- Greenlawn Farms
  - 777 Pulaski Road, Greenlawn, NY 11740
- King Kullen
  - 50 New York Avenue, Huntington, NY 11743
- Target
  - 124 E Jericho Turnpike, Huntington Station, NY 11746
- Wild By Nature
  - 369 Main Street, Huntington, NY 11743

Plaintiff believes she may have also purchased GT's Kombucha PRODUCTS in-person from the following store and location:

- Publix
  - 5407 Overseas Highway, Marathon, FL 33050.

**INTERROGATORY NO. 2:**

DESCRIBE, for every purchase YOU have made of any PRODUCTS during the RELEVANT TIME PERIOD, the label statements, advertisements, and/or other

Plaintiff Schmidt's Responses and       5       Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-49F2-85F0-6639E0FA3DE4

representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 2:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and overbroad in that it seeks information concerning every representation Plaintiff read and relied upon before every purchase regardless of whether such representations have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff read and relied on representations on the PRODUCTS' labels before purchasing. These representations included the representations on the nutrition label, including the SUGAR CLAIMS. These label representations also include the ALCOHOL CLAIMS. Plaintiff also read and relied on the flavor representations of the PRODUCTS and the price of the PRODUCTS when she made her purchases.

**INTERROGATORY NO. 3:**

DESCRIBE every purchase YOU have made of any PRODUCTS between March 11, 2011, and February 26, 2017, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 3:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any PRODUCTS between March 11, 2011, and February 26, 2017.

Plaintiff Schmidt's Responses and        6        Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 4:**

DESCRIBE, for every purchase YOU have made of any PRODUCTS between March 11, 2011, and February 26, 2017, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 4:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as overbroad in that it seeks information concerning every representation Plaintiff read and relied upon before every purchase regardless of whether such representations have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any PRODUCTS between March 11, 2011, and February 26, 2017.

**INTERROGATORY NO. 5:**

DESCRIBE every purchase YOU have made of any kombucha beverage, excluding DEFENDANT'S PRODUCTS, during the RELEVANT TIME PERIOD, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 5:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for eleven different characteristics of every purchase Plaintiff made of any kombucha beverage other than Defendant's PRODUCTS over eight years regardless of whether such purchases have anything to do with the claims

Plaintiff Schmidt's Responses and                7          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

or labels at issue in this litigation. Plaintiff further objects to the interrogatory as compound as to (a) every purchase; (b) date; (c) product name; (d) UPC; (e) size; (f) quantity purchased; (g) retailer; (h) payment method; (i) price paid; (j) sales channel; (k) presence of another; and (l) any other details. Plaintiff further objects to the interrogatory as vague with respect to "any other details." Plaintiff further objects that the term "any kombucha beverage" is vague and ambiguous. Plaintiff will interpret this term to mean beverages that are labeled "kombucha."

Subject to the above objections, Plaintiff responds as follows: Plaintiff once purchased a kombucha beverage other than Defendant's PRODCUTS from Giunta's Meat Farm, located at 395 Fort Salonga Road, #K, Northport NY 11768, for approximately $3.50 to $4.50. Plaintiff made this purchase sometime in 2020, 2021, or 2022. Plaintiff does not recall the brand of this kombucha beverage.

**INTERROGATORY NO. 6:**

DESCRIBE, for every purchase YOU have made of any kombucha beverage, excluding DEFENDANT'S PRODUCTS, during the RELEVANT TIME PERIOD, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 6:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for information for every purchase Plaintiff made of any kombucha beverage other than Defendant's PRODUCTS over eight years regardless of whether such purchases have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects that the term "any kombucha beverage" is vague and ambiguous. Plaintiff will interpret this term to mean beverages that are labeled "kombucha."

Plaintiff Schmidt's Responses and          8          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Subject to the above objections, Plaintiff responds as follows: Plaintiff read and relied on the representations on the label of the one other kombucha beverage she purchased. She relied on the label's representation identifying the beverage as kombucha and also relied on representations regarding the price of the kombucha beverage.

**INTERROGATORY NO. 7:**

Identify all PROMOTIONAL MATERIALS that YOU received or saw related to the PRODUCTS, including whether YOU received or saw them prior to your first purchase any of the PRODUCTS or after your first purchase of any of the PRODUCTS.

**Response to Interrogatory No. 7:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects that the interrogatory is unduly burdensome and overbroad in that it seeks information concerning "all" "PROMOTIONAL MATERIALS" relating to the PRODUCTS, regardless of whether such materials have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects that this interrogatory is unintelligible with respect to "prior to your first purchase any of the PRODUCTS." Plaintiff will interpret this phrase as "prior to your first purchase of any of the PRODUCTS."

Subject to the above objections, Plaintiff responds as follows: Plaintiff saw the PRODUCTS' labels prior to her first purchase of the PRODUCTS. Plaintiff also saw the PRODUCTS' labels after her first purchase of the PRODUCTS. Plaintiff does not recall receiving or seeing other PROMOTIONAL MATERIALS for the PRODUCTS.

**INTERROGATORY NO. 8:**

Identify all PROMOTIONAL MATERIALS, regardless of source or type, in which YOU contend DEFENDANT falsely and/or misleadingly represented the nature and

Plaintiff Schmidt's Responses and       9         Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

composition of the PRODUCTS and/or any specific PRODUCT, during the RELEVANT TIME PERIOD.

**Response to Interrogatory No. 8:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous as to "misleadingly represented the nature and composition of the PRODUCTS." Plaintiff further objects that the interrogatory is unduly burdensome and overbroad in that it seeks information concerning "all" "PROMOTIONAL MATERIALS" "regardless of source or type" relating to the PRODUCTS, regardless of whether such materials have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff identifies the labels of the PRODUCTS, as they did not contain the government-mandated alcohol warning and understated the amount of sugar in the beverages, and Defendant's practice of selling the PRODUCTS as non-alcoholic beverages in section of retail stores separate from other alcoholic beverages and not requiring that customers show proof of age to purchase the PRODUCTS.

**INTERROGATORY NO. 9:**

DESCRIBE all the harm YOU contend the PRODUCTS' alleged alcohol or sugar content have caused YOU and describe the nature and extent of that purported harm.

**Response to Interrogatory No. 9:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory on the grounds that it is vague and

Plaintiff Schmidt's Responses and            10            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Evid. Appx. Page 614

ambiguous as to the terms "harm," "nature," and "extent." Plaintiff further objects that the interrogatory is impermissibly compound with respect to the harm caused by the "alcohol . . . content" and the harm caused by the "sugar content." Plaintiff treats this interrogatory as two interrogatories. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the above objections, Plaintiff responds as follows: the PRODUCTS caused Plaintiff harm because each of the PRODUCTS are misleadingly marketed and labeled as non-alcoholic beverages when, in fact, the beverages contained a significant amount of alcohol (more than 0.5% abv). Plaintiff purchased the PRODUCTS with the belief that the PRODUCTS were non-alcoholic, as the labels of the PRODUCTS did not bear a government warning concerning the consumption of alcoholic beverages, and Plaintiff did not have to show any identification of age to purchase the PRODUCTS. Plaintiff would not have purchased the PRODUCTS she purchased had Plaintiff known that they contained significant levels of alcohol or were considered alcoholic beverages because at the time of her purchases she was sober and did not knowingly consume alcohol. Should Plaintiff encounter the PRODUCTS in the future, Plaintiff could not rely on the PRODUCTS' labeling.

Plaintiff further responds that the PRODUCTS further caused her harm because each of the PRODUCTS are misleadingly marketed and labeled in that they each contain more sugar than listed on their labels. Plaintiff would not have purchased the PRODUCTS she purchased had Plaintiff known that they contained more sugar than listed on their labels.

**INTERROGATORY NO. 10:**

DESCRIBE in detail the specific monetary relief to which YOU contend YOU and each putative class member are entitled in the above-captioned lawsuit as a result of

Plaintiff Schmidt's Responses and          11          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

DEFENDANT'S alleged use of the ALCOHOL CLAIMS and SUGAR CLAIMS, including the amount of and basis for any damages, restitution, and attorney's fees and costs, all DOCUMENTS that support the calculations and amount of such recovery; and the specific injunctive or other equitable relief YOU seek.

**Response to Interrogatory No. 10:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects on the grounds that the interrogatory seeks information protected from disclosure by the attorney-client privilege and the attorney work-product doctrine.

Subject to the above objections, Plaintiff responds as follows: Plaintiff would not have purchased the PRODUCTS absent Defendant's misrepresentations regarding the PRODUCTS' alcohol content and sugar content and believes that she and class members are entitled to a full refund of the purchase price of the PRODUCTS. Plaintiff refers Defendant to the expert reports of Colin Weir and Dr. J. Michael Dennis for more information concerning the monetary relief sought in this lawsuit.

**INTERROGATORY NO. 11:**

DESCRIBE in detail each and every attempt YOU made to return or obtain a refund for the PRODUCT, including the PRODUCT, the amount paid and purchase date, when such attempt was made, all associated COMMUNICATIONS, and the result of such attempts.

Plaintiff Schmidt's Responses and        12        Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**Response to Interrogatory No. 11:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the information sought by the interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and is therefore not proportional to the needs of the case. Plaintiff further objects that the request is overbroad as to time and scope. Plaintiff objects to the term "YOU" as vague and ambiguous. For purposes of this interrogatory response, Plaintiff interprets the term to include Lauren Schmidt and her representatives, managers, attorneys, employees, and agents acting on her behalf.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has not personally attempted to return the PRODUCTS. On September 13, 2019, and October 3, 2019, demand letters were sent to Defendant on behalf of purchasers of the PRODUCTS requesting that Defendant cease selling mislabeled PRODUCTS, recall mislabeled PRODUCTS, and provide a full refund to all purchasers of the PRODUCTS.

**INTERROGATORY NO. 12:**

If it is YOUR contention that a PRODUCT(S) YOU purchased contained more than 0.5% alcohol by volume at the time YOU purchased that PRODUCT(S), state all facts in support of this contention, including, without limitation, the name of the PRODUCT(S) purchased, the date of purchase(s), the quantity of PRODUCT(S) purchased, the complete address of the retail location(s) where purchased, the purchase price(s) at the time of purchase, and the bases for your contention that the PRODUCT(S) purchased on those dates contained more than 0.5% alcohol by volume.

**Response to Interrogatory No. 12:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and unduly burdensome in that it seeks "all facts." Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that

Plaintiff Schmidt's Responses and          13          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-49F2-85F0-6639E0FA3DE4

the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the foregoing, Plaintiff responds that all of the PRODUCTS Plaintiff identified in response to Interrogatory No. 1 contained more than 0.5% alcohol by volume. All other information related to the purchases of those PRODUCTS is incorporated herein by reference.

Plaintiff's bases for the contention that the PRODUCTS contained more than 0.5% alcohol by volume at the time of sale are as follows:

GT's Enlightened Kombucha (as defined in the Second Amended Complaint), including the PRODUCTS purchased by Plaintiff, is a raw, unpasteurized tea beverage made of a tea that ferments for up to a month while a "blob" of bacteria known as "scoby" floats on top. Basic chemistry explains that the scoby converts the sugar into carbon dioxide and alcohol. While pasteurized versions of kombucha products are non-alcoholic, as the pasteurization kills the yeast in the kombucha, raw (unpasteurized) versions of kombucha, including the PRODUCTS purchased by Plaintiff, become alcoholic over time as the living yeast in the beverage converts sugars into alcohol. Such natural conversion of sugar to alcohol in unpasteurized kombucha beverages can result in alcohol levels as high as 4 percent alcohol by volume, roughly the same alcohol content as regular beer.

Further, Defendant has a history of selling kombucha beverages containing more than 0.5% alcohol by volume at the time of sale without disclosing such critical information to consumers. For example, on September 1, 2006, Millennium (Defendant's former name) reached a settlement with the Bureau of Alcohol, Tobacco and Firearms (currently operating as the Alcohol and Tobacco Tax and Trade Bureau or "TTB") for selling kombucha beverages "that contained over 0.5% alcohol without having a basic permit" and for selling such beverages "without the proper labels [or] labels approvals,"

Plaintiff Schmidt's Responses and Objections to Defendant's Interrogatories, Set 1        14        Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

and for distributing the products "without the government warning statement." *See* Exhibit 1 to the Second Amended Complaint. In 2010, an inspector from the Maine Department of Agriculture noticed that some bottles of kombucha were leaking and bubbling in a Portland Whole Foods, sparking Federal Drug Administration ("FDA") and TTB investigations concerning the alcohol content of various kombucha products, including GT's Kombucha. After it was discovered that many kombucha products had alcohol levels as high as 2.5 percent by volume, retailers pulled kombucha products, including GT's Kombucha products, off the shelves.

After the recall, several prominent retailers, such as Honest Tea, owned and operated by the Coca-Cola Company, were unable to reformulate their kombucha beverages to ensure that the products never crossed the 0.5 alcohol by volume threshold at retail or consumption, but Defendant's C.E.O. GT Dave, "was unwilling to radically change [the company's] process," and, according to recent testing, failed to change Defendant's kombucha products' formulation so as to ensure that the products did not cross the 0.5 alcohol by volume threshold at the time of sale or consumption.

Brewing & Distilling Analytical Services, LLC ("BDAS"), an Alcohol and Tobacco Tax and Trade Bureau certified laboratory, conducted tests on multiple batches of Enlightened Kombucha. BDAS utilized scientifically valid, TTB approved methodology for testing kombucha beverages. Each test showed that every bottle of the products tested contained a level of alcohol by volume greater than 0.5 percent. Specifically, in February 2018, BDAS tested the alcohol by volume content of the following flavors of Defendant's Enlightened Kombucha: Multi-Green, Strawberry Serenity, and Original. The alcohol by volume content of these samples ranged between 0.59 -1.40 percent alcohol by volume. Then, in September 2019, BDAS tested the alcohol by volume content of the following flavors of Defendant's Enlightened Kombucha: Gingerberry, Strawberry Serenity, Watermelon Wonder, Passionberry Bliss, Guava Goddess, Pink Lady Basil, Trilogy, Lavender Love, Heart Beet, Tantric Turmeric, Gingerade, Original, Hibiscus Ginger,

Plaintiff Schmidt's Responses and        15          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

Cayennade, Lemonade, Multi-Green, Raspberry Chia, Cosmic Cranberry, and Mystic Mango. The alcohol by volume content of these samples ranged between 0.71 and 2.21 percent alcohol by volume. At the time of the testing, none of the products had passed their stated expiration date. Not a single product tested was below the federally mandated 0.5 percent alcohol by volume limit. BDAS's testing is described further in the Expert Report of Dr. Spedding, which along with its cited materials is incorporated by reference, and in documents with Bates Numbers PLAINTIFFS000001 through PLAINTIFFS000041.

Multiple other independent laboratories have tested Defendant's Enlightened Kombucha products and have seen nearly identical results. For instance, in February 2019, Blake Ebersole, one of the foremost experts in kombucha alcohol testing in the United States, tested 29 samples of Defendant's Enlightened Kombucha products using AOAC Official Method of Analysis AOAC 2016.12, a gas chromatography with flame ionization detection (GC-FID) with headspace autosampling methodology, run by Covance-Eurofins Laboratory. Mr. Ebersole found that "[a]ll 29 [Enlightened Kombucha] samples tested contained greater than 0.5 percent alcohol by volume (% ABV), with results ranging from 0.64 – 1.85% ABV. This is between 28% and 370% higher than the legal limit of 0.5% ABV." A copy of Mr. Ebersole's declaration, which discusses his testing methodology and results, as attached to the Second Amended Complaint as Exhibit 2 (referred to as "Exhibit 2" throughout this response), is already in Defendant's possession.

Mr. Ebersole also "conducted testing in December 2015 and July 2016 using the same analytical method (AOAC 2016.12) at Covance on 21 [Enlightened Kombucha] samples. All 21 [Enlightened Kombucha] samples contained greater than 0.5% ABV, ranging from 1.09 – 1.96% ABV. This is between 218 and 392% higher than the legal limit of 0.5% ABV." *See* Exhibit 2, at ¶ 12(b).

Plaintiff Schmidt's Responses and          16          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Mr. Ebersole also "conducted testing in March 2016 within a method verification and round-robin study that yielded four candidate methods from three laboratories (including the headspace GC-FID method). [Mr. Ebersole] found consistency in results among the laboratories on four [Enlightened Kombucha] samples that all contained greater than 0.5% ABV. In this round of testing, alcohol in [Enlightened Kombucha] ranged from 1.27-1.51% ABV. This is between 254 and 302% higher than the legal limit of 0.5% ABV." *See* Exhibit 2, at ¶ 12(c).

For all of Mr. Ebersole's testing, the samples were purchased directly from retailers' refrigerated shelves, from non-alcoholic beverage refrigerated sections of the stores that were separate from the alcoholic beverage sections. The samples were not expired. Samples were transported in refrigerated conditions, ensuring that the samples were kept cold at all times. *See* Exhibit 2, at ¶¶ 35-40, 61-72.

Mr. Ebersole also reported that Enartis Vinquiry conducted testing of 46 bottles of Enlightened Kombucha in 2017 and 2018 using GC-FID. "The samples contained an average of 1.16% ABV, ranging from 0.60 to 2.05%." *See* Exhibit 2, at ¶ 12(d).

Mr. Ebersole also reported that these results "for alcohol in [Enlightened Kombucha] are consistent with results independently reported by others in the published literature. For example, in 2015 John Edwards, Ph.D. from Process NMR Associates analyzed three samples of [Enlightened Kombucha] in 2015 using a nuclear magnetic resonance method. He found all three samples had alcohol levels higher than 0.5% ABV, ranging from 1.23-1.40 % ABV, reflecting alcohol levels 246%-280% higher than the 0.5% limit. In 2017, Daniel Armstrong, Ph.D. and colleagues at the University of Texas analyzed eight samples of [Enlightened Kombucha] using headspace GC-FID, and found they all exceeded 0.5% alcohol, reporting a range of 1.1%-1.8% ABV in the drinks. This reflects an amount that is 220%-360% higher than the 0.5% ABV limit for non-alcoholic beverages." *See* Exhibit 2, at ¶ 12(e).

Plaintiff Schmidt's Responses and          17          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

The described test results are also corroborated by Defendant's C.E.O., who, after the 2010 recall, stated that the alcohol content of Defendant's kombucha beverages was "something that is out of our control."

**INTERROGATORY NO. 13:**

If it is YOUR contention that a PRODUCT(S) YOU purchased contained more than the amount of sugar disclosed on the PRODUCT'S label at the time YOU purchased that PRODUCT(S), state all facts in support of this contention, including without limitation the name of the PRODUCT(S) purchased, the date of purchase(s), the quantity of PRODUCT(S) purchased, the complete address of the retail location(s) where purchased, the purchase price(s) at the time of purchase, and the bases for your contention that the PRODUCT(S) purchased on those dates contained more than the amount of sugar disclosed on the PRODUCT'S label.

**Response to Interrogatory No. 13:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and unduly burdensome in that it seeks "all facts." Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the foregoing, Plaintiff responds that all of the PRODUCTS Plaintiff identified in response to Interrogatory No. 1 contained more sugar than disclosed on the labels. All other information related to the purchases of those PRODUCTS is incorporated herein by reference.

Plaintiff's bases for the contention that the PRODUCTS contained more sugar than declared on the labels at the time of sale are as follows: Brewing & Distilling Analytical Services, LLC ("BDAS"), an Alcohol and Tobacco Tax and Trade Bureau

Plaintiff Schmidt's Responses and    18    Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

certified laboratory, conducted tests on multiple batches of Enlightened Kombucha. In September 2019, BDAS tested the sugar content of the following flavors of Defendant's Enlightened Kombucha: Gingerberry, Strawberry Serenity, Watermelon Wonder, Passionberry Bliss, Guava Goddess, Pink Lady Basil, Trilogy, Lavender Love, Heart Beet, Tantric Turmeric, Gingerade, Original, Hibiscus Ginger, Cayennade, Lemonade, Multi-Green, Raspberry Chia, Cosmic Cranberry, and Mystic Mango. BDAS's test results showed that Enlightened Kombucha beverages contain more than 15 percent more sugar than declared on the beverages' labels. BDAS's testing is described further in the Expert Report of Dr. Spedding, which along with its cited materials is incorporated by reference.

**INTERROGATORY NO. 14:**

State whether YOU received notice of the RETTA ACTION or the RETTA ACTION settlement, and if so, identify the date(s) YOU received notice, the medium of notice (mail, email, or other), and the address or email address to which the notice was sent.

**Response to Interrogatory No. 14:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff objects to the interrogatory as vague and ambiguous as to "notice of the RETTA ACTION or the RETTA ACTION settlement." Plaintiff will interpret the phrase to mean court-ordered notice of the RETTA ACTION settlement.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not receive notice of the RETTA ACTION or the RETTA ACTION settlement. Plaintiff had never heard of the RETTA ACTION before becoming involved in the above-captioned case.

**INTERROGATORY NO. 15:**

State whether YOU opted out of the RETTA ACTION settlement or submitted a RETTA ACTION settlement claim, and identify the date YOU submitted an opt-out

Plaintiff Schmidt's Responses and       19       Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

notice or claim, the medium you submitted it through (mail, email, or other submission method), PERSONS or entities to which the claim or opt-out was sent, and whether you received a cash payment, product voucher, or any other compensation or benefit from the RETTA ACTION settlement.

**Response to Interrogatory No. 15:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any of GT's kombucha beverages between March 11, 2011, and February 27, 2017. She therefore was not a member of the RETTA ACTION settlement class, and was not permitted to opt out or submit a claim. Accordingly, Plaintiff did not opt out of the RETTA ACTION or submit a RETTA ACTION settlement claim.

**INTERROGATORY NO. 16:**

DESCRIBE all monetary and other relief YOU seek to recover from DEFENDANT in this action on YOUR own behalf, including the amount of and basis for any damages, restitution, and attorney's fees and costs, including all documents that support the calculations and amount of such recovery; and the specific injunctive or other equitable relief YOU seek.

**Response to Interrogatory No. 16:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects that the interrogatory is duplicative of Interrogatory No. 10. Plaintiff further objects on the grounds that the interrogatory seeks information protected from disclosure by the attorney-client privilege and the attorney work product

Plaintiff Schmidt's Responses and          20          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

doctrine. Plaintiff further objects that the interrogatory is premature to the extent it seeks information regarding attorneys' fees and costs while the case is ongoing.

Subject to the above objections, Plaintiff responds as follows: Plaintiff would not have purchased the PRODUCTS and believes that she and class members are entitled to a full refund of the purchase price of the PRODUCTS.

Plaintiff further responds that she seeks an injunction requiring Defendant to place the government warning required by 27 C.F.R. § 16.21 on the labels of Enlightened Kombucha, or, in the alternative, bar Defendant from selling Enlightened Kombucha unless it does not cross the 0.5 percent alcohol by volume threshold at retail.

Plaintiff further responds that she seeks an injunction barring Defendant from selling Enlightened Kombucha unless Defendant's Enlightened Kombucha labels accurately display the amount of sugar in the beverages.

**INTERROGATORY NO. 17:**

Identify by name, email address, home address, and telephone number each PERSON who has communicated with YOU or YOUR attorneys regarding the PRODUCT or any allegation contained in your COMPLAINT and DESCRIBE the substance of the COMMUNICATION.

**Response to Interrogatory No. 17:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory of overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks information regarding every communication she has had with any person regarding the PRODUCTS, regardless of whether those communications have anything to do with the allegations in the case. Plaintiff further objects on the grounds that the interrogatory seeks information protected by the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects on the basis of third-party privacy because the request seeks the home address, email address, and telephone number of third

Plaintiff Schmidt's Responses and Objections to Defendant's Interrogatories, Set 1        21        Case No. 2:19-cv-10920-FMO-DSR

parties who have no relevance or involvement in the case. Plaintiff will identify the people who she has communicated with regarding the alcohol and sugar claims alleged in the operative complaint, if any.

Subject to the above objections, Plaintiff responds as follows: Plaintiff had brief, high-level discussions with her husband regarding the alcohol and sugar claims alleged in the operative complaint.

**INTERROGATORY NO. 18:**

If YOU have been charged or convicted of a crime within the last ten years, DESCRIBE the charge or conviction, including but not limited to the court in which YOU were charged or convicted, the date of the charge or conviction, the conduct giving rise to the charge or conviction, and the outcome of that charge or conviction.

**Response to Interrogatory No. 18:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, not proportional to the needs of the case, and irrelevant because it seeks information not likely to lead to the discovery of admissible information.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has not been charged or convicted of a crime within the last ten years.

**INTERROGATORY NO. 19:**

Identify each PERSON likely to have knowledge of any facts or information related to the subject matter of YOUR claims against DEFENDANT by name, address, and telephone number, and identify the facts or information known by each PERSON.

**Response to Interrogatory No. 19**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects on the basis of third-party privacy because the request seeks the home address and telephone number of third parties who have no involvement in the case.

Plaintiff Schmidt's Responses and          22          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Subject to the above objections, Plaintiff responds as follows: Plaintiff incorporates Plaintiffs Amit Patel, Lauren Schmidt, and Christopher Nunez's Rule 26(a) Initial Disclosures, served on November 24, 2025.

**INTERROGATORY NO. 20:**

State YOUR contact information since 2011, including all of the addresses for where YOU resided, all email addresses, and all phone numbers (landline and mobile), and the time period YOU used each.

**Response to Interrogatory 20:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant. Plaintiff designates her response to this interrogatory as CONFIDENTIAL. Defendant may not use the information provided in this response to contact Plaintiff. Plaintiff may be contacted through her counsel only.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has used the following email addresses since 2011. Plaintiff does not recall the precise dates she used each address, but provides her best estimate below:

- Before June 2022: ███████████
- 2020 – Present: ████████████
- After June 2022: ██████████████
- After June 2022: ███████████████

Plaintiff has used the following phone number since 2011: ████████████

Plaintiff has lived at the following addresses since 2011. Plaintiff does not recall the precise dates she lived at each address, but provides her best estimate below:

- 2011 – 2012: ████████████████████
- 2012 – October 2020: ████████████████████████
- October 2020 – Present: ██████████████████████

Plaintiff Schmidt's Responses and            23            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 21:**

DESCRIBE in detail the circumstances under which YOU first had contact with a PERSON(S) regarding this Action, including the identity of the PERSON(S) with whom you first had contact with regarding this Action.

**Response to Interrogatory No. 21:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant. Plaintiff further objects that the interrogatory seeks information protected by the attorney-client privilege and attorney work product doctrine.

Subject to the above objections, Plaintiff responds as follows: Plaintiff's first contact regarding this action was with an employee of Dovel & Luner, LLP on or around August 1, 2024.

**INTERROGATORY NO. 22:**

DESCRIBE any agreement YOU have with YOUR attorneys, or any other PERSON or entity, or any agreement YOUR attorneys have with any other PERSON or entity, concerning:

    i.    the payment or advancement of attorneys' fees, expenses, and costs with respect to this lawsuit;

    ii.    who will advance, and who is responsible for, payment of the costs and expenses incurred in connection with the prosecution of this lawsuit;

    iii.    whether a fee in this lawsuit will be shared with any PERSON not a member of YOUR attorneys' law firm; or

    iv.    the fee sharing arrangement by or among Dovel & Luner, LLP, Smith Krivoshey, PC, Bibiyan Law Group, Freeman Mathis and Gary, Bursor and Fisher PA, and/or any other lawyer, firm, or PERSON.

Plaintiff Schmidt's Responses and    24    Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0EA3DE4

**Response to Interrogatory No. 22:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff treats this as two interrogatories. Plaintiff further objects to this interrogatory as overbroad because the request seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. Plaintiff further objects that this interrogatory seeks information protected by the attorney-client privilege and attorney work product doctrine. Plaintiff further objects to the interrogatory to the extent it seeks information related to any other lawsuit.

Subject to the above objections, Plaintiff responds as follows: On or around August 2, 2024, Plaintiff entered into an attorney-client privileged retention agreement with Dovel & Luner, LLP.

Plaintiff further responds that on or around July 9, 2024, Dovel & Luner, LLP entered into a Joint Prosecution Agreement for this matter with Smith Krivoshey PC, Bursor & Fisher, P.A., and Zimmerman Reed LLP and Westerman Law Corp. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs will produce a copy of this Joint Prosecution Agreement.

Plaintiff further responds that on or around July 16, 2024, Dovel & Luner, LLP entered into a subsequent Agreement Concerning *Sharpe* Litigation with Smith Krivoshey PC, Bursor & Fisher, P.A., and Zimmerman Reed LLP and Westerman Law Corp. This July 16 Agreement specifically superseded the prior Joint Prosecution Agreement. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs will produce a copy of this Agreement Concerning *Sharpe* Litigation.

Dated: December 12, 2025                    By: */s/ Martin Brenner*
                                            Simon Franzini (Cal. Bar No. 287631)
                                            simon@dovel.com
                                            Martin Brenner (Cal Bar No. 333540)
                                            martin@dovel.com

Plaintiff Schmidt's Responses and            25          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

Plaintiff Schmidt's Responses and          26          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-40F2-85F0-6639E0FA3DE4

## Verification

I am Lauren Schmidt, Plaintiff in the above-captioned case. Subject to any inadvertent errors and reserving the right to make changes in the answers if it appears at any time that errors or omissions have been made, I verify that the factual information contained in Plaintiff Lauren Schmidt's Responses and Objections to Defendant GT's Living Foods, LLC's Interrogatories to Plaintiff Lauren Schmidt, Set One are true and correct to the best of my knowledge and belief, to the extent I am permitted to view answers based upon materials under any protective order in this case. I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Dated: _12/14/2025_

Signature: _Lauren Schmidt_
2A0D7D0E09E54C3...

Plaintiff Schmidt's Responses and             27             Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: E18D4198-08F4-49F2-85F0-6639F0FA3DE4

# PROOF OF SERVICE

I am a resident of the state of California, I am over the age of 18 years, and I am not a party to the within action. My business address is 201 Santa Monica Blvd., Suite 600, Santa Monica, CA 90401.

On December 15, 2025, I served the foregoing document(s) described as PLAINTIFF LAUREN SCHMIDT'S RESPONSES AND OBJECTIONS TO DEFENDANT GT'S LIVING FOODS, LLC'S INTERROGATORIES TO PLAINTIFF LAUREN SCHMIDT, SET ONE on all interested parties in this action as follows:

Jacob M. Harper (SBN 259463)          *Attorneys for Defendant GT's Living Foods,*
jacobharper@dwt.com                   *LLC*
Heather F. Canner (SBN 292837)
heathercanner@dwt.com
Joseph Elie-Meyers (SBN 325183)
josepheliemeyers@dwt.com
Peter K. Bae (SBN 329158)
peterbae@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: (213) 633-6800
Fax: (213) 633-6899

**[X]    (VIA ELECTRONIC SERVICE):** I served the document(s) listed above electronically via email or electronic transmission. I caused the documents to be sent to the persons at the email addresses above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 15, 2025, at Santa Monica, California.

_____
Rachel Ong

# EXHIBIT 23

Docusign Envelope ID: C74185C2-5993-4393-954B-78A6762F6C1D

Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, ADRIANA DIGENNARO, AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and all Others Similarly Situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> GT'S LIVING FOODS, LLC., <br><br> *Defendant*. | Case No. 2:19-cv-10920-FMO-DSR <br><br> **PLAINTIFF CHRISTOPHER NUNEZ'S RESPONSES AND OBJECTIONS TO DEFENDANT GT'S LIVING FOODS, LLC'S INTERROGATORIES TO PLAINTIFF CHRISTOPHER NUNEZ, SET ONE** |

Plaintiff Nunez's Responses and
Objections to Defendant's
Interrogatories, Set 1

Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: C74185C2-5992-4393-954B-78A6762F6C1D

Plaintiff Christopher Nunez ("Plaintiff") hereby responds to Defendant GT's Living Foods, LLC's ("Defendant" or "GT's") Interrogatories, Set One, as follows:

## PRELIMINARY STATEMENT

Plaintiff responds to these interrogatories based upon the investigation conducted thus far. Accordingly, these responses are based upon information now known and presently available to Plaintiff and that Plaintiff believes to be relevant to the subject matter covered by the interrogatories. It is anticipated that further discovery, independent investigation, and legal research and analysis could supply additional facts, add meaning to the known facts, as well as establish entirely new factual contentions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions set forth herein. The following responses are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered fact or facts which Plaintiff may recall later. Plaintiff accordingly reserves the right to supplement Plaintiff's responses should additional responsive, non-privileged documents and/or information be located and change all answers herein as additional facts are ascertained, analysis is made, and legal research is completed.

Plaintiff will respond as required by the Federal Rules of Civil Procedure, the Local Rules of this Court, and this Court's orders, but will not comply with instructions that exceed those requirements.

## GENERAL OBJECTIONS

Plaintiff incorporates by reference the following general objections and responses to each interrogatory, whether or not stated as a specific objection to each interrogatory.

1.      In responding to Defendant's Interrogatories, Plaintiff does not concede that any of the information provided is relevant or material to the subject matter of this litigation, reasonably calculated to lead to the discovery of admissible evidence, or is proportional to the needs of the case. Plaintiff reserves the right to object to the

Plaintiff Nunez's Responses and           1          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5992-4393-954B-78A6762F6C1D

admissibility at trial, or at any other stage of the litigation, of any of the information or documents produced in response to Defendant's Interrogatories.

2. Plaintiff objects to Defendant's Interrogatories to the extent that they purport to impose any obligations upon Plaintiff beyond the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and/or any applicable Local Rules or other court order.

3. Plaintiff's responses made herein are solely for the purpose of this civil action. Each response is subject to any and all objections to competency, relevancy, materiality, propriety, and admissibility, and to any and all other objections and grounds that would require the exclusion of any information identified herein if the information was asked of or disclosed by a witness present and testifying in court, all of which objections and grounds are hereby expressly reserved and may be interposed at a later date.

4. Plaintiff further objects to Defendant's Interrogatories to the extent that the information sought: (a) contains privileged attorney client communications; (b) constitutes protected attorney work product; (c) was prepared in anticipation of or in connection with litigation or trial; (d) discloses the mental impressions, conclusions, opinions, or legal theories of any attorney for or other representative of Plaintiff; (e) is subject to the common-interest or joint-defense privileges; or (f) is otherwise privileged or exempt from discovery (collectively, "privileged documents or information"). Plaintiff does not intend to provide any privileged documents or information. Any disclosure of privileged documents or information in these responses is inadvertent and shall not be deemed waiver of any applicable privileges or protections, and Plaintiff requests that any such information be discarded and disregarded promptly.

5. Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1

2      Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: C74185C2-5992-4393-954B-78A6762F6C1B

6. Plaintiff further objects to Defendant's Interrogatories on the grounds and to the extent that they are overly broad, unduly burdensome, and oppressive.

7. Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they are vague, ambiguous, and lacking particularity.

8. Plaintiff further objects to Defendant's Interrogatories on the ground and to the extent that they are not limited to the time period relevant to this litigation, on the ground that such interrogatories seek information which is not relevant to any issue in this action, calculated to lead to the discovery of admissible evidence, or proportional to the needs of the case.

9. Plaintiff further objects to the definition of the terms "PLAINTIFF," "YOU," and "YOUR" to the extent they seek to impose the obligation on Plaintiff to respond based on information or documents not in Plaintiff's possession, custody, or control. Unless specifically stated otherwise, or unless necessary in the context of the interrogatory or response, Plaintiff will interpret these terms to mean "Christopher Nunez."

10. Plaintiff further objects to the definition of the term "PROMOTIONAL MATERIALS" because it is overbroad and unduly burdensome. Plaintiff further objects on the ground and to the extent that the term seeks information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, and because the term is not limited to the time period relevant to this litigation.

11. Plaintiff further objects to the definition of the terms "ALCOHOL CLAIMS" and "SUGAR CLAIMS" because they are overbroad and unduly burdensome. Plaintiff further objects on the ground and to the extent that the terms seek information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, and because the terms are not limited to the time period relevant to this litigation.

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1

3

Case No. 2:19-cv-10920-FMO-DSR

12. Plaintiff further objects to the definition of "DESCRIBE" to the extent it renders any interrogatory impermissibly compound.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

DESCRIBE every purchase YOU have made of any PRODUCTS during the RELEVANT TIME PERIOD, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 1:**

Plaintiff incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as overbroad in scope and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for eleven different characteristics of every purchase Plaintiff made of the PRODUCTS over eight years. Plaintiff further objects to the interrogatory as compound as to (a) every purchase; (b) date; (c) product name; (d) UPC; (e) size; (f) quantity purchased; (g) retailer; (h) payment method; (i) price paid; (j) sales channel; (k) presence of another; and (l) any other details. Plaintiff further objects to the interrogatory as vague with respect to "any other details."

Subject to the above objections, Plaintiff responds as follows: Plaintiff began purchasing GT's Kombucha PRODUCTS in the beginning of 2020 and continued purchasing the PRODUCTS into 2024. Plaintiff does not recall the precise dates of purchase, the specific number of bottles purchased, or the specific purchase price. Plaintiff typically purchased 16-ounce bottles for approximately $3.99 to $5.99. Plaintiff purchased GT's Kombucha PRODUCTS in at least the following flavors:

Plaintiff Nunez's Responses and 4 Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5993-4393-954B-78A6762F6C1D

- Trilogy
- Gingerberry
- Lemon Berry
- Watermelon Wonder
- Mystic Mango
- Strawberry Serenity
- Island Bliss
- Peach Paradise
- Honeycrisp Apple
- Guava Goddess
- Golden Pineapple
- Marine-Greens
- Lemonade
- Pomegranate Power
- Blood Orange

Plaintiff recalls purchasing GT's Kombucha PRODUCTS in-person from the following stores and locations:

- Safeway
  - 5450 Dewey Drive, Fair Oaks, CA 95628
  - 7301 Greenback Lane, Citrus Heights, CA 95621
- Winco
  - 8701 Greenback Lane, Orangevale, CA 95662
  - 2300 Watt Ave., Sacramento, CA 95825
- Sprouts
  - 7905 Greenback Lane, Citrus Heights, CA 95610
- Trader Joe's
  - 5309 Sunrise Blvd., Fair Oaks, CA 95628

Plaintiff Nunez's Responses and      5      Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5992-4393-954B-78A6762F6C1B

- Westside Market
  - 2840 Broadway, New York, NY 10025
- Morton Williams
  - 2941 Broadway, New York, NY 10027
- AppleTree Market
  - 1225 Amsterdam Ave, New York, NY 10027.

**INTERROGATORY NO. 2:**

DESCRIBE, for every purchase YOU have made of any PRODUCTS during the RELEVANT TIME PERIOD, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 2:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and overbroad in that it seeks information concerning every representation Plaintiff read and relied upon before every purchase regardless of whether such representations have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff read and relied on representations on the PRODUCTS' labels before purchasing. These representations included the representations on the nutrition label, including the SUGAR CLAIMS. These label representations also include the ALCOHOL CLAIMS. Plaintiff also read and relied on the flavor representations of the PRODUCTS and the price of the PRODUCTS when he made his purchases. Plaintiff also read and relied on other health claims included on the PRODUCTS' label, including the probiotic count.

**INTERROGATORY NO. 3:**

DESCRIBE every purchase YOU have made of any PRODUCTS between March 11, 2011, and February 26, 2017, including the date, product name, UPC, size, the quantity

Plaintiff Nunez's Responses and           6           Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper (e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 3:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any PRODUCTS between March 11, 2011, and February 26, 2017.

**INTERROGATORY NO. 4:**

DESCRIBE, for every purchase YOU have made of any PRODUCTS between March 11, 2011, and February 26, 2017, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

**Response to Interrogatory No. 4:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as overbroad in that it seeks information concerning every representation Plaintiff read and relied upon before every purchase regardless of whether such representations have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any PRODUCTS between March 11, 2011, and February 26, 2017.

**INTERROGATORY NO. 5:**

DESCRIBE every purchase YOU have made of any kombucha beverage, excluding DEFENDANT'S PRODUCTS, during the RELEVANT TIME PERIOD, including the date, product name, UPC, size, the quantity purchased, from which retailer YOU purchased the PRODUCT, the payment method YOU used, how much YOU paid, whether the purchase was online, through curbside pickup, or through a personal shopper

Plaintiff Nunez's Responses and        7        Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

(e.g., Instacart), whether anyone was with YOU when YOU made the purchase, and any other details of YOUR purchase.

**Response to Interrogatory No. 5:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for eleven different characteristics of every purchase Plaintiff made of any kombucha beverage other than Defendant's PRODUCTS over eight years regardless of whether such purchases have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects to the interrogatory as compound as to (a) every purchase; (b) date; (c) product name; (d) UPC; (e) size; (f) quantity purchased; (g) retailer; (h) payment method; (i) price paid; (j) sales channel; (k) presence of another; and (l) any other details. Plaintiff further objects to the interrogatory as vague with respect to "any other details." Plaintiff further objects that the term "any kombucha beverage" is vague and ambiguous. Plaintiff will interpret this term to mean beverages that are labeled "kombucha."

Subject to the above objections, Plaintiff responds as follows: Plaintiff began purchasing kombucha beverages other than Defendant's PRODUCTS in early 2020, around the time he first began purchasing Defendant's PRODUCTS. Plaintiff does not recall the precise dates of purchase, the specific number of bottles purchased, or the specific purchase price. Plaintiff typically purchased a single-serving bottle for approximately $3.99 to $5.99. per bottle. Plaintiff purchased at least the following brands and flavors of kombucha beverages other than Defendant's PRODUCTS:

- Health-Ade Kombucha
  - Passionfruit Tangerine
  - Pink Lady Apple
  - Pomegranate Blueberry
  - Ginger Lemon

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1  8  Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: C74185C2-5993-4393-954B-78A6762F6C1D

- o   Tropical Pineapple
- o   Grapefruit
- o   Ginger Pineapple Belly Reset
- o   Holiday Cheers
- o   Blood Orange Carrot Ginger
- o   Guava Dragon Fruit
- • Brew Dr.
  - o   Clear Mind
  - o   Blood Orange
  - o   Spiced Apple
- • BKE Kombucha
  - o   Yerba Mate & Lemon
- • Big Island Booch
  - o   Elderberry Lavender Love

Plaintiff recalls purchasing kombucha beverages other than the PRODUCTS in-person from the same stores and locations identified in Plaintiff's response to Interrogatory No. 1, and incorporates that information here. In addition, Plaintiff purchased BKE Kombucha from Met Fresh Bed-Stuy, 410 Tompkins Ave., Brooklyn, NY 11216.

**INTERROGATORY NO. 6:**

DESCRIBE, for every purchase YOU have made of any kombucha beverage, excluding DEFENDANT'S PRODUCTS, during the RELEVANT TIME PERIOD, the label statements, advertisements, and/or other representations that YOU read and relied upon in making the purchase and any information YOU considered material to YOUR purchase decisions.

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1            9            Case No. 2:19-cv-10920-FMO-DSR

Docusign Envelope ID: C74185C2-5993-4393-954B-78A6762F6C1D

**Response to Interrogatory No. 6:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory as unduly burdensome and not proportional to the needs of the case to the extent it calls for information for every purchase Plaintiff made of any kombucha beverage other than Defendant's PRODUCTS over eight years regardless of whether such purchases have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects that the term "any kombucha beverage" is vague and ambiguous. Plaintiff will interpret this term to mean beverages that are labeled "kombucha."

Subject to the above objections, Plaintiff responds as follows: Plaintiff read and relied on representations on the labels of kombucha beverages other than Defendant's PRODUCTS. These include representations on the nutrition label, including representations regarding the amount of sugar in the kombucha beverages other than Defendant's PRODUCTS. Plaintiff also read and relied on the flavor representations and representations regarding the price of the kombucha beverages other than Defendant's PRODUCTS when he made his purchases. Plaintiff also read and relied on other health claims on the labels of kombucha beverages other than Defendant's PRODUCTS, including claims regarding probiotics in the beverages. Plaintiff also relied on the beverages not being alcoholic beverages or containing a significant amount of alcohol.

**INTERROGATORY NO. 7:**

Identify all PROMOTIONAL MATERIALS that YOU received or saw related to the PRODUCTS, including whether YOU received or saw them prior to your first purchase any of the PRODUCTS or after your first purchase of any of the PRODUCTS.

**Response to Interrogatory No. 7:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1

10

Case No. 2:19-cv-10920-FMO-DSR

evidence. Plaintiff further objects that the interrogatory is unduly burdensome and overbroad in that it seeks information concerning "all" "PROMOTIONAL MATERIALS" relating to the PRODUCTS, regardless of whether such materials have anything to do with the claims or labels at issue in this litigation. Plaintiff further objects that this interrogatory is unintelligible with respect to "prior to your first purchase any of the PRODUCTS." Plaintiff will interpret this phrase as "prior to your first purchase of any of the PRODUCTS."

Subject to the above objections, Plaintiff responds as follows: Plaintiff saw the PRODUCTS' label prior to his first purchase of the PRODUCTS. He also saw the PRODUCTS' label after his first purchase of the PRODUCTS. Plaintiff recalls seeing an advertisement for the PRODUCTS on the side of a truck after he first purchased the PRODUCTS, but does not remember the content of the advertisement.

**INTERROGATORY NO. 8:**

Identify all PROMOTIONAL MATERIALS, regardless of source or type, in which YOU contend DEFENDANT falsely and/or misleadingly represented the nature and composition of the PRODUCTS and/or any specific PRODUCT, during the RELEVANT TIME PERIOD.

**Response to Interrogatory No. 8:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous as to "misleadingly represented the nature and composition of the PRODUCTS." Plaintiff further objects that the interrogatory is unduly burdensome and overbroad in that it seeks information concerning "all" "PROMOTIONAL MATERIALS" "regardless of source or type" relating to the PRODUCTS, regardless of

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1      11      Case No. 2:19-cv-10920-FMO-DSR

whether such materials have anything to do with the claims or labels at issue in this litigation.

Subject to the above objections, Plaintiff responds as follows: Plaintiff identifies the labels of the PRODUCTS, as they did not contain the government-mandated alcohol warning and understated the amount of sugar in the beverages, and Defendant's practice of selling the PRODUCTS as non-alcoholic beverages in section of retail stores separate from other alcoholic beverages and not requiring that customers show proof of age to purchase the PRODUCTS.

**INTERROGATORY NO. 9:**

DESCRIBE all the harm YOU contend the PRODUCTS' alleged alcohol or sugar content have caused YOU and describe the nature and extent of that purported harm.

**Response to Interrogatory No. 9:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and time, and is therefore not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous as to the terms "harm," "nature," and "extent." Plaintiff further objects that the interrogatory is impermissibly compound with respect to the harm caused by the "alcohol . . . content" and the harm caused by the "sugar content." Plaintiff treats this interrogatory as two interrogatories. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the above objections, Plaintiff responds as follows: the PRODUCTS caused Plaintiff harm because each of the PRODUCTS are misleadingly marketed and labeled as non-alcoholic beverages when, in fact, the beverages contained a significant amount of alcohol (more than 0.5% abv). Plaintiff purchased the PRODUCTS with the

Plaintiff Nunez's Responses and           12          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5993-4393-954B-78A6762F6C1D

belief that the PRODUCTS were non-alcoholic, as the labels of the PRODUCTS did not bear a government warning concerning the consumption of alcoholic beverages, and Plaintiff did not have to show any identification of age to purchase the PRODUCTS. Plaintiff would not have purchased the PRODUCTS he purchased had Plaintiff known that they contained significant levels of alcohol or were considered alcoholic beverages, as it would have been unlawful for Plaintiff to do so at the time (as he was under 21 years old when he made his purchases). Should Plaintiff encounter the PRODUCTS in the future, Plaintiff could not rely on the PRODUCTS' labeling.

Plaintiff further responds that the PRODUCTS further caused him harm because each of the PRODUCTS are misleadingly marketed and labeled in that they each contain more sugar than listed on their labels. Plaintiff would not have purchased the PRODUCTS he purchased had Plaintiff known that they contained more sugar than listed on their labels.

**INTERROGATORY NO. 10:**

DESCRIBE in detail the specific monetary relief to which YOU contend YOU and each putative class member are entitled in the above-captioned lawsuit as a result of DEFENDANT'S alleged use of the ALCOHOL CLAIMS and SUGAR CLAIMS, including the amount of and basis for any damages, restitution, and attorney's fees and costs, all DOCUMENTS that support the calculations and amount of such recovery; and the specific injunctive or other equitable relief YOU seek.

**Response to Interrogatory No. 10:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal

Plaintiff Nunez's Responses and                    13                    Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

conclusions. Plaintiff further objects on the grounds that the interrogatory seeks information protected from disclosure by the attorney-client privilege and the attorney work-product doctrine.

Subject to the above objections, Plaintiff responds as follows: Plaintiff would not have purchased the PRODUCTS absent Defendant's misrepresentations regarding the PRODUCTS' alcohol content and sugar content and believes that he and class members are entitled to a full refund of the purchase price of the PRODUCTS. Plaintiff refers Defendant to the expert reports of Colin Weir and Dr. J. Michael Dennis for more information concerning the monetary relief sought in this lawsuit.

**INTERROGATORY NO. 11:**

DESCRIBE in detail each and every attempt YOU made to return or obtain a refund for the PRODUCT, including the PRODUCT, the amount paid and purchase date, when such attempt was made, all associated COMMUNICATIONS, and the result of such attempts.

**Response to Interrogatory No. 11:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the information sought by the interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and is therefore not proportional to the needs of the case. Plaintiff further objects that the request is overbroad as to time and scope. Plaintiff objects to the term "YOU" as vague and ambiguous. For purposes of this interrogatory response, Plaintiff interprets the term to include Christopher Nunez and his representatives, managers, attorneys, employees, and agents acting on his behalf.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has not personally attempted to return the PRODUCTS. On September 13, 2019, and October 3, 2019, demand letters were sent to Defendant on behalf of purchasers of the PRODUCTS

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1          14          Case No. 2:19-cv-10920-FMO-DSR

requesting that Defendant cease selling mislabeled PRODUCTS, recall mislabeled PRODUCTS, and provide a full refund to all purchasers of the PRODUCTS.

**INTERROGATORY NO. 12:**

If it is YOUR contention that a PRODUCT(S) YOU purchased contained more than 0.5% alcohol by volume at the time YOU purchased that PRODUCT(S), state all facts in support of this contention, including, without limitation, the name of the PRODUCT(S) purchased, the date of purchase(s), the quantity of PRODUCT(S) purchased, the complete address of the retail location(s) where purchased, the purchase price(s) at the time of purchase, and the bases for your contention that the PRODUCT(S) purchased on those dates contained more than 0.5% alcohol by volume.

**Response to Interrogatory No. 12:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and unduly burdensome in that it seeks "all facts." Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the foregoing, Plaintiff responds that all of the PRODUCTS Plaintiff identified in response to Interrogatory No. 1 contained more than 0.5% alcohol by volume. All other information related to the purchases of those PRODUCTS is incorporated herein by reference.

Plaintiff's bases for the contention that the PRODUCTS contained more than 0.5% alcohol by volume at the time of sale are as follows:

GT's Enlightened Kombucha (as defined in the Second Amended Complaint), including the PRODUCTS purchased by Plaintiff, is a raw, unpasteurized tea beverage made of a tea that ferments for up to a month while a "blob" of bacteria known as

Plaintiff Nunez's Responses and          15          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

"scoby" floats on top. Basic chemistry explains that the scoby converts the sugar into carbon dioxide and alcohol. While pasteurized versions of kombucha products are non-alcoholic, as the pasteurization kills the yeast in the kombucha, raw (unpasteurized) versions of kombucha, including the PRODUCTS purchased by Plaintiff, become alcoholic over time as the living yeast in the beverage converts sugars into alcohol. Such natural conversion of sugar to alcohol in unpasteurized kombucha beverages can result in alcohol levels as high as 4 percent alcohol by volume, roughly the same alcohol content as regular beer.

Further, Defendant has a history of selling kombucha beverages containing more than 0.5% alcohol by volume at the time of sale without disclosing such critical information to consumers. For example, on September 1, 2006, Millennium (Defendant's former name) reached a settlement with the Bureau of Alcohol, Tobacco and Firearms (currently operating as the Alcohol and Tobacco Tax and Trade Bureau or "TTB") for selling kombucha beverages "that contained over 0.5% alcohol without having a basic permit" and for selling such beverages "without the proper labels [or] labels approvals," and for distributing the products "without the government warning statement." *See* Exhibit 1 to the Second Amended Complaint. In 2010, an inspector from the Maine Department of Agriculture noticed that some bottles of kombucha were leaking and bubbling in a Portland Whole Foods, sparking Federal Drug Administration ("FDA") and TTB investigations concerning the alcohol content of various kombucha products, including GT's Kombucha. After it was discovered that many kombucha products had alcohol levels as high as 2.5 percent by volume, retailers pulled kombucha products, including GT's Kombucha products, off the shelves.

After the recall, several prominent retailers, such as Honest Tea, owned and operated by the Coca-Cola Company, were unable to reformulate their kombucha beverages to ensure that the products never crossed the 0.5 alcohol by volume threshold at retail or consumption, but Defendant's C.E.O. GT Dave, "was unwilling to radically

Plaintiff Nunez's Responses and    16    Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

change [the company's] process," and, according to recent testing, failed to change Defendant's kombucha products' formulation so as to ensure that the products did not cross the 0.5 alcohol by volume threshold at the time of sale or consumption.

Brewing & Distilling Analytical Services, LLC ("BDAS"), an Alcohol and Tobacco Tax and Trade Bureau certified laboratory, conducted tests on multiple batches of Enlightened Kombucha. BDAS utilized scientifically valid, TTB approved methodology for testing kombucha beverages. Each test showed that every bottle of the products tested contained a level of alcohol by volume greater than 0.5 percent. Specifically, in February 2018, BDAS tested the alcohol by volume content of the following flavors of Defendant's Enlightened Kombucha: Multi-Green, Strawberry Serenity, and Original. The alcohol by volume content of these samples ranged between 0.59 -1.40 percent alcohol by volume. Then, in September 2019, BDAS tested the alcohol by volume content of the following flavors of Defendant's Enlightened Kombucha: Gingerberry, Strawberry Serenity, Watermelon Wonder, Passionberry Bliss, Guava Goddess, Pink Lady Basil, Trilogy, Lavender Love, Heart Beet, Tantric Turmeric, Gingerade, Original, Hibiscus Ginger, Cayennade, Lemonade, Multi-Green, Raspberry Chia, Cosmic Cranberry, and Mystic Mango. The alcohol by volume content of these samples ranged between 0.71 and 2.21 percent alcohol by volume. At the time of the testing, none of the products had passed their stated expiration date. Not a single product tested was below the federally mandated 0.5 percent alcohol by volume limit. BDAS's testing is described further in the Expert Report of Dr. Spedding, which along with its cited materials is incorporated by reference, and in documents with Bates Numbers PLAINTIFFS000001 through PLAINTIFFS000041.

Multiple other independent laboratories have tested Defendant's Enlightened Kombucha products and have seen nearly identical results. For instance, in February 2019, Blake Ebersole, one of the foremost experts in kombucha alcohol testing in the United States, tested 29 samples of Defendant's Enlightened Kombucha products using AOAC

Plaintiff Nunez's Responses and          17          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Official Method of Analysis AOAC 2016.12, a gas chromatography with flame ionization detection (GC-FID) with headspace autosampling methodology, run by Covance-Eurofins Laboratory. Mr. Ebersole found that "[a]ll 29 [Enlightened Kombucha] samples tested contained greater than 0.5 percent alcohol by volume (% ABV), with results ranging from 0.64 – 1.85% ABV. This is between 28% and 370% higher than the legal limit of 0.5% ABV." A copy of Mr. Ebersole's declaration, which discusses his testing methodology and results, as attached to the Second Amended Complaint as Exhibit 2 (referred to as "Exhibit 2" throughout this response), is already in Defendant's possession.

Mr. Ebersole also "conducted testing in December 2015 and July 2016 using the same analytical method (AOAC 2016.12) at Covance on 21 [Enlightened Kombucha] samples. All 21 [Enlightened Kombucha] samples contained greater than 0.5% ABV, ranging from 1.09 – 1.96% ABV. This is between 218 and 392% higher than the legal limit of 0.5% ABV." *See* Exhibit 2, at ¶ 12(b).

Mr. Ebersole also "conducted testing in March 2016 within a method verification and round-robin study that yielded four candidate methods from three laboratories (including the headspace GC-FID method). [Mr. Ebersole] found consistency in results among the laboratories on four [Enlightened Kombucha] samples that all contained greater than 0.5% ABV. In this round of testing, alcohol in [Enlightened Kombucha] ranged from 1.27-1.51% ABV. This is between 254 and 302% higher than the legal limit of 0.5% ABV." *See* Exhibit 2, at ¶ 12(c).

For all of Mr. Ebersole's testing, the samples were purchased directly from retailers' refrigerated shelves, from non-alcoholic beverage refrigerated sections of the stores that were separate from the alcoholic beverage sections. The samples were not expired. Samples were transported in refrigerated conditions, ensuring that the samples were kept cold at all times. *See* Exhibit 2, at ¶¶ 35-40, 61-72.

Plaintiff Nunez's Responses and           18           Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Mr. Ebersole also reported that Enartis Vinquiry conducted testing of 46 bottles of Enlightened Kombucha in 2017 and 2018 using GC-FID. "The samples contained an average of 1.16% ABV, ranging from 0.60 to 2.05%." *See* Exhibit 2, at ¶ 12(d).

Mr. Ebersole also reported that these results "for alcohol in [Enlightened Kombucha] are consistent with results independently reported by others in the published literature. For example, in 2015 John Edwards, Ph.D. from Process NMR Associates analyzed three samples of [Enlightened Kombucha] in 2015 using a nuclear magnetic resonance method. He found all three samples had alcohol levels higher than 0.5% ABV, ranging from 1.23-1.40 % ABV, reflecting alcohol levels 246%-280% higher than the 0.5% limit. In 2017, Daniel Armstrong, Ph.D. and colleagues at the University of Texas analyzed eight samples of [Enlightened Kombucha] using headspace GC-FID, and found they all exceeded 0.5% alcohol, reporting a range of 1.1%-1.8% ABV in the drinks. This reflects an amount that is 220%-360% higher than the 0.5% ABV limit for non-alcoholic beverages." *See* Exhibit 2, at ¶ 12(e).

The described test results are also corroborated by Defendant's C.E.O., who, after the 2010 recall, stated that the alcohol content of Defendant's kombucha beverages was "something that is out of our control."

**INTERROGATORY NO. 13:**

If it is YOUR contention that a PRODUCT(S) YOU purchased contained more than the amount of sugar disclosed on the PRODUCT'S label at the time YOU purchased that PRODUCT(S), state all facts in support of this contention, including without limitation the name of the PRODUCT(S) purchased, the date of purchase(s), the quantity of PRODUCT(S) purchased, the complete address of the retail location(s) where purchased, the purchase price(s) at the time of purchase, and the bases for your contention that the PRODUCT(S) purchased on those dates contained more than the amount of sugar disclosed on the PRODUCT'S label.

Plaintiff Nunez's Responses and          19          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5992-4393-954B-78A6762F6C1B

**Response to Interrogatory No. 13:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects to the interrogatory on the grounds that it is overbroad in scope and unduly burdensome in that it seeks "all facts." Plaintiff further objects to the interrogatory on the grounds that it is vague and ambiguous. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial.

Subject to the foregoing, Plaintiff responds that all of the PRODUCTS Plaintiff identified in response to Interrogatory No. 1 contained more sugar than disclosed on the labels. All other information related to the purchases of those PRODUCTS is incorporated herein by reference.

Plaintiff's bases for the contention that the PRODUCTS contained more sugar than declared on the labels at the time of sale are as follows: Brewing & Distilling Analytical Services, LLC ("BDAS"), an Alcohol and Tobacco Tax and Trade Bureau certified laboratory, conducted tests on multiple batches of Enlightened Kombucha. In September 2019, BDAS tested the sugar content of the following flavors of Defendant's Enlightened Kombucha: Gingerberry, Strawberry Serenity, Watermelon Wonder, Passionberry Bliss, Guava Goddess, Pink Lady Basil, Trilogy, Lavender Love, Heart Beet, Tantric Turmeric, Gingerade, Original, Hibiscus Ginger, Cayennade, Lemonade, Multi-Green, Raspberry Chia, Cosmic Cranberry, and Mystic Mango. BDAS's test results showed that Enlightened Kombucha beverages contain more than 15 percent more sugar than declared on the beverages' labels. BDAS's testing is described further in the Expert Report of Dr. Spedding, which along with its cited materials is incorporated by reference.

**INTERROGATORY NO. 14:**

State whether YOU received notice of the RETTA ACTION or the RETTA ACTION settlement, and if so, identify the date(s) YOU received notice, the medium of

Plaintiff Nunez's Responses and          20          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

notice (mail, email, or other), and the address or email address to which the notice was sent.

**Response to Interrogatory No. 14:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff objects to the interrogatory as vague and ambiguous as to "notice of the RETTA ACTION or the RETTA ACTION settlement." Plaintiff will interpret the phrase to mean court-ordered notice of the RETTA ACTION settlement.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not receive notice of the RETTA ACTION or the RETTA ACTION settlement. Plaintiff had never heard of the RETTA ACTION before becoming involved in the above-captioned case.

**INTERROGATORY NO. 15:**

State whether YOU opted out of the RETTA ACTION settlement or submitted a RETTA ACTION settlement claim, and identify the date YOU submitted an opt-out notice or claim, the medium you submitted it through (mail, email, or other submission method), PERSONS or entities to which the claim or opt-out was sent, and whether you received a cash payment, product voucher, or any other compensation or benefit from the RETTA ACTION settlement.

**Response to Interrogatory No. 15:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound.

Subject to the above objections, Plaintiff responds as follows: Plaintiff did not purchase any of GT's kombucha beverages between March 11, 2011, and February 27, 2017. He therefore was not a member of the RETTA ACTION settlement class, and was not permitted to opt out or submit a claim. Accordingly, Plaintiff did not opt out of the RETTA ACTION or submit a RETTA ACTION settlement claim.

Plaintiff Nunez's Responses and      21      Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

**INTERROGATORY NO. 16:**

DESCRIBE all monetary and other relief YOU seek to recover from DEFENDANT in this action on YOUR own behalf, including the amount of and basis for any damages, restitution, and attorney's fees and costs, including all documents that support the calculations and amount of such recovery; and the specific injunctive or other equitable relief YOU seek.

**Response to Interrogatory No. 16:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to matters on which expert testimony will be required at trial. Plaintiff further objects to this interrogatory to the extent it calls for Plaintiff's layperson response with regard to legal conclusions. Plaintiff further objects that the interrogatory is duplicative of Interrogatory No. 10. Plaintiff further objects on the grounds that the interrogatory seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects that the interrogatory is premature to the extent it seeks information regarding attorneys' fees and costs while the case is ongoing.

Subject to the above objections, Plaintiff responds as follows: Plaintiff would not have purchased the PRODUCTS and believes that he and class members are entitled to a full refund of the purchase price of the PRODUCTS.

Plaintiff further responds that he seeks an injunction requiring Defendant to place the government warning required by 27 C.F.R. § 16.21 on the labels of Enlightened Kombucha, or, in the alternative, bar Defendant from selling Enlightened Kombucha unless it does not cross the 0.5 percent alcohol by volume threshold at retail.

Plaintiff further responds that he seeks an injunction barring Defendant from selling Enlightened Kombucha unless Defendant's Enlightened Kombucha labels accurately display the amount of sugar in the beverages.

Plaintiff Nunez's Responses and                22          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5993-4393-954B-78A6762F6C1D

**INTERROGATORY NO. 17:**

Identify by name, email address, home address, and telephone number each PERSON who has communicated with YOU or YOUR attorneys regarding the PRODUCT or any allegation contained in your COMPLAINT and DESCRIBE the substance of the COMMUNICATION.

**Response to Interrogatory No. 17:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory of overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks information regarding every communication he has had with any person regarding the PRODUCTS, regardless of whether those communications have anything to do with the allegations in the case. Plaintiff further objects on the grounds that the interrogatory seeks information protected by the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects on the basis of third-party privacy because the request seeks the home address, email address, and telephone number of third parties who have no relevance or involvement in the case. Plaintiff will identify the people who he has communicated with regarding the alcohol and sugar claims alleged in the operative complaint, if any.

Subject to the above objections, Plaintiff responds as follows: Plaintiff had brief, high-level discussions with his mother, sister, and brother regarding the alcohol and sugar claims alleged in the operative complaint.

**INTERROGATORY NO. 18:**

If YOU have been charged or convicted of a crime within the last ten years, DESCRIBE the charge or conviction, including but not limited to the court in which YOU were charged or convicted, the date of the charge or conviction, the conduct giving rise to the charge or conviction, and the outcome of that charge or conviction.

Plaintiff Nunez's Responses and           23           Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Docusign Envelope ID: C74185C2-5992-4393-954B-78A6762F6C1D

**Response to Interrogatory No. 18:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, not proportional to the needs of the case, and irrelevant because it seeks information not likely to lead to the discovery of admissible information.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has not been charged or convicted of a crime within the last ten years.

**INTERROGATORY NO. 19:**

Identify each PERSON likely to have knowledge of any facts or information related to the subject matter of YOUR claims against DEFENDANT by name, address, and telephone number, and identify the facts or information known by each PERSON.

**Response to Interrogatory No. 19**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects on the basis of third-party privacy because the request seeks the home address and telephone number of third parties who have no involvement in the case.

Subject to the above objections, Plaintiff responds as follows: Plaintiff incorporates Plaintiffs Amit Patel, Lauren Schmidt, and Christopher Nunez's Rule 26(a) Initial Disclosures, served on November 24, 2025.

**INTERROGATORY NO. 20:**

State YOUR contact information since 2011, including all of the addresses for where YOU resided, all email addresses, and all phone numbers (landline and mobile), and the time period YOU used each.

**Response to Interrogatory 20:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case,

Plaintiff Nunez's Responses and          24          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

and irrelevant. Plaintiff designates his response to this interrogatory as CONFIDENTIAL. Defendant may not use the information provided in this response to contact Plaintiff. Plaintiff may be contacted through his counsel only.

Subject to the above objections, Plaintiff responds as follows: Plaintiff has used the following email addresses since 2011:

- ████████████████
- ████████████████
- ████████████████

Plaintiff has used the following phone number since 2011: ████████████

Plaintiff has lived at the following addresses since 2011. Plaintiff does not recall the precise dates he lived at each address, but provides his best estimate below:

- November 2010 – November 2012: ████████████████████████
- November 2012 – November 2016: ████████████████████
- November 2016 – January 2021: ██████████████████████████
- January 2021 – May 2023: ████████████████████
- May 2023 – September 2023: ████████████████████
- September 2023 – May 2024: ██████████████████
- May 2024 – January 2025: ██████████████████
- January 2025 – June 2025: ████████████████████
- June 2025 – Present: ██████████████████

**INTERROGATORY NO. 21:**

DESCRIBE in detail the circumstances under which YOU first had contact with a PERSON(S) regarding this Action, including the identity of the PERSON(S) with whom you first had contact with regarding this Action.

**Response to Interrogatory No. 21:**

Plaintiff Nunez's Responses and          25          Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff further objects to the interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant. Plaintiff further objects that the interrogatory seeks information protected by the attorney-client privilege and attorney work product doctrine.

Subject to the above objections, Plaintiff responds as follows: Plaintiff's first contact regarding this action was with an employee of Dovel & Luner, LLP on or around July 3, 2024.

**INTERROGATORY NO. 22:**

DESCRIBE any agreement YOU have with YOUR attorneys, or any other PERSON or entity, or any agreement YOUR attorneys have with any other PERSON or entity, concerning:

    i.    the payment or advancement of attorneys' fees, expenses, and costs with respect to this lawsuit;

    ii.    who will advance, and who is responsible for, payment of the costs and expenses incurred in connection with the prosecution of this lawsuit;

    iii.    whether a fee in this lawsuit will be shared with any PERSON not a member of YOUR attorneys' law firm; or

    iv.    the fee sharing arrangement by or among Dovel & Luner, LLP, Smith Krivoshey, PC, Bibiyan Law Group, Freeman Mathis and Gary, Bursor and Fisher PA, and/or any other lawyer, firm, or PERSON.

**Response to Interrogatory No. 22:**

Plaintiff hereby incorporates the General Objections above as if fully stated herein. Plaintiff further objects that the interrogatory is compound. Plaintiff treats this as two interrogatories. Plaintiff further objects to this interrogatory as overbroad because the request seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. Plaintiff further objects that this interrogatory seeks information

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1        26        Case No. 2:19-cv-10920-FMO-DSR

protected by the attorney-client privilege and attorney work product doctrine. Plaintiff further objects to the interrogatory to the extent it seeks information related to any other lawsuit.

Subject to the above objections, Plaintiff responds as follows: On or around July 13, 2024, Plaintiff entered into an attorney-client privileged retention agreement with Dovel & Luner, LLP.

Plaintiff further responds that on or around July 9, 2024, Dovel & Luner, LLP entered into a Joint Prosecution Agreement for this matter with Smith Krivoshey PC, Bursor & Fisher, P.A., and Zimmerman Reed LLP and Westerman Law Corp. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs will produce a copy of this Joint Prosecution Agreement.

Plaintiff further responds that on or around July 16, 2024, Dovel & Luner, LLP entered into a subsequent Agreement Concerning *Sharpe* Litigation with Smith Krivoshey PC, Bursor & Fisher, P.A., and Zimmerman Reed LLP and Westerman Law Corp. This July 16 Agreement specifically superseded the prior Joint Prosecution Agreement. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs will produce a copy of this Agreement Concerning *Sharpe* Litigation.

Dated: December 12, 2025

By: */s/ Martin Brenner*
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Martin Brenner (Cal Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: +1 (310) 656-7069

*Attorneys for Plaintiffs*

Plaintiff Nunez's Responses and Objections to Defendant's Interrogatories, Set 1          27          Case No. 2:19-cv-10920-FMO-DSR

## **Verification**

I am Christopher Nunez, Plaintiff in the above-captioned case. Subject to any inadvertent errors and reserving the right to make changes in the answers if it appears at any time that errors or omissions have been made, I verify that the factual information contained in Plaintiff Christopher Nunez's Responses and Objections to Defendant GT's Living Foods, LLC's Interrogatories to Plaintiff Christopher Nunez, Set One are true and correct to the best of my knowledge and belief, to the extent I am permitted to view answers based upon materials under any protective order in this case. I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Dated: _____12/12/2025_____

Signature: _____

Signed by:
Christopher Nunez
0B067525E014455...

Plaintiff Nunez's Responses and            28            Case No. 2:19-cv-10920-FMO-DSR
Objections to Defendant's
Interrogatories, Set 1

# PROOF OF SERVICE

I am a resident of the state of California, I am over the age of 18 years, and I am not a party to the within action. My business address is 201 Santa Monica Blvd., Suite 600, Santa Monica, CA 90401.

On December 15, 2025, I served the foregoing document(s) described as PLAINTIFF CHRISTOPHER NUNEZ'S RESPONSES AND OBJECTIONS TO DEFENDANT GT'S LIVING FOODS, LLC'S INTERROGATORIES TO PLAINTIFF CHRISTOPHER NUNEZ, SET ONE on all interested parties in this action as follows:

| | |
|---|---|
| Jacob M. Harper (SBN 259463)<br>jacobharper@dwt.com<br>Heather F. Canner (SBN 292837)<br>heathercanner@dwt.com<br>Joseph Elie-Meyers (SBN 325183)<br>josepheliemeyers@dwt.com<br>Peter K. Bae (SBN 329158)<br>peterbae@dwt.com<br>DAVIS WRIGHT TREMAINE LLP<br>350 South Grand Avenue, 27th Floor<br>Los Angeles, CA 90071<br>Telephone: (213) 633-6800<br>Fax: (213) 633-6899 | *Attorneys for Defendant GT's Living Foods, LLC* |

**[X]    (VIA ELECTRONIC SERVICE):** I served the document(s) listed above electronically via email or electronic transmission. I caused the documents to be sent to the persons at the email addresses above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 15, 2025, at Santa Monica, California.

_____
Rachel Ong

Proof of Service

Evid. Appx. Page 663