Jacob M. Harper (SBN 259463)
  *jacobharper@dwt.com*
Heather F. Canner (SBN 292837)
  *heathercanner@dwt.com*
Joseph Elie-Meyers (SBN 325183)
  *josepheliemeyers@dwt.com*
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

*Attorneys for Defendant*
*GT's Living Foods, LLC*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GT'S LIVING FOODS, LLC,<br><br>Defendant. | Case No. 2:19-cv-10920-FMO-DSRx<br><br>**DECLARATION OF HAL PORET REGARDING JOINT BRIEF ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

DECLARATION OF HAL PORET

## DECLARATION OF HAL PORET

I, Hal L. Poret, hereby declare and state as follows:

1.     I am the President of Hal Poret, LLC. I have been retained by counsel for Defendant GT's Living Foods, LLC ("GT's") to provide expert testimony in this action. I submit this declaration in relation to the Joint Brief on Plaintiffs' Motion for Class Certification. The facts stated herein are true and correct based on my own personal knowledge, and if called upon I could and would testify to them.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Hal Poret in the Matter of *Sharpe et al v. GT's Living Foods, LLC*, dated June 2021.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Rebuttal Expert Report of Hal Poret in the Matter of *Sharpe et al v. GT's Living Foods, LLC*, dated July 2021.

4.     Attached hereto as **Exhibit 3** is a true and correct copy of the Expert Report of Hal Poret in the Matter of *Patel et al v. GT's Living Foods, LLC*, dated February 2026.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is  true and correct.

Executed this 14th day of March 2026, in Sleepy Hollow, New York.



Signed by:

Hal Poret

8203C1BD49FA4EA...

Hal Poret

---

DECLARATION OF HAL PORET

1

(Exhibit 1 to Declaration of Hal Poret)

# EXHIBIT 24

**Confidential**

# EXPERT REPORT OF HAL PORET IN MATTER OF SHARPE ET AL. V. GT'S LIVING FOODS, LLC

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# SURVEY TO ASSESS WHETHER DISCLOSURES/WARNINGS RELATED TO ALCOHOL CONTENT ON GT'S ENLIGHTENED KOMBUCHA PRODUCTS WOULD HAVE A MATERIAL IMPACT ON CONSUMER PURCHASE DECISIONS

PREPARED BY:
Hal Poret
142 Hunter Ave
Sleepy Hollow, NY 10591

June 2021

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE ------------------------------------------------- 3
STUDY AUTHORSHIP AND QUALIFICATIONS --------------------------- 6
STUDY DESIGN ------------------------------------------------------------------- 8
SUMMARY OF FINDINGS ---------------------------------------------------- 25
METHODOLOGY ------------------------------------------------------------------ 28
     THE RELEVANT UNIVERSE OF INTEREST------------------------- 28
     SAMPLING PLAN --------------------------------------------------- 36
     DATA PROCESSING ----------------------------------------------- 39
     INTERVIEWING PROCEDURES--------------------------------- 40
     DOUBLE-BLIND INTERVIEWING ------------------------------ 40
     INTERVIEWING PERIOD------------------------------------------ 40
     QUALITY CONTROL ----------------------------------------------- 40
DETAILED FINDINGS------------------------------------------------------------- 44

THE FOLLOWING APPENDICES ARE PROVIDED SEPARATELY:
APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRE
APPENDIX C:   SCREENSHOTS OF SURVEY
APPENDIX D:   SURVEY DATA
APPENDIX E:   IMAGES SHOWN IN SURVEY

## *BACKGROUND AND PURPOSE*

GT's Living Foods, LLC (GT's) markets and sells bottled kombucha products, including GT's Classic and GT's Enlightened lines.  It is my understanding that the law requires beverages that exceed 0.5% alcohol by volume to be labelled as alcoholic products and to contain the following Government Warning on their labels:

> GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.

The labels for GT's <u>Classic</u> kombucha products identify the products as alcoholic beverages and contain the Government Warning regarding alcoholic beverages. The labels for GT's <u>Enlightened</u> kombucha products do <u>not</u> identify the products as alcoholic beverages and do not contain the Government Warning regarding alcoholic beverages, although they do state the following: (1) that Kombucha is a fermented tea that has naturally occurring alcohol; and (2) if a woman is pregnant or breast feeding, she should consult with a healthcare professional before consuming GT's kombucha products.

Delaney Sharpe and others (Plaintiffs) have filed a putative class action against GT's on behalf of all U.S. residents who purchased GT's Enlightened Kombucha products between February 28, 2017 and the date that class notice is disseminated, including California, New York, and other subclasses.  Plaintiffs allege that GT's Enlightened kombucha products exceed 0.5% alcohol by volume

and are misleadingly labelled because they do not identify the products as alcoholic beverages and do not include the Government Warning mandated by law for alcoholic beverages.  Plaintiffs allege that they and the proposed class suffered injuries because they allegedly would not have purchased or paid the same price for GT's Enlightened product absent Defendant's omission of the Government Warning and disclosure that the product contains alcohol.

GT's, through its counsel, retained me to design and conduct a survey to determine the extent to which, if at all, the presence or absence of a disclosure that the GT's Enlightened kombucha products contains alcohol and Government Warning regarding alcohol has a material impact on prospective kombucha purchasers' likelihood of purchasing the product or perception of the price of the product.  As discussed in more detail below, the results of the survey demonstrate that inclusion on the GT's Enlightened product label of a statement that the product contains alcohol and inclusion of the Government Warning regarding alcohol do not substantially impact consumers' likelihood of purchasing the product or their perception of the price of the product.  The survey results also demonstrate that there is not commonality across the proposed class, as the large majority of actual and prospective GT's purchasers indicated that they would be likely to purchase the GT's Enlightened product even when it includes the statement that the product contains alcohol and the Government Warning regarding alcohol, and only a negligible percentage answered that they would be unlikely to purchase the product due to the alcohol content.

In the course of designing the survey and preparing this report I reviewed the Plaintiffs' Complaint, GT's website and various GT's products and labels, both in stores and online.  I also did online searches for various other kombucha products, and other fermented foods and beverages, and examined the results.  I

Page | 4

also accounted for information provided by GT's as to the price of its kombucha products.

The flat fee I charged for the surveys, data tabulation and analysis, and report preparation was $50,000. This includes the costs paid to the outside vendors who programmed and hosted the online survey and provided access to the sample of respondents who took the survey. Any additional time incurred in connection with this matter will be charged at my ordinary rate of $725/hr.

## *AUTHORSHIP AND QUALIFICATIONS*

This study was designed, supervised, and implemented by Hal L. Poret, President at Hal Poret, LLC.

I have personally designed, supervised, and implemented well over 1,000 surveys regarding the perceptions and opinions of consumers.  Over 500 have involved consumer perception, opinion and behavior with respect to product advertising or packaging, and over 500 have been conducted online.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research (publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology),* the International Trademark Association, and the National Advertising Division of the Council of Better Business Bureaus (NAD).  I routinely conduct market research surveys for a variety of small to large corporations and organizations.

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

Page | 6

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## *STUDY DESIGN*

A total of 600 respondents participated in this online survey among purchasers of bottled kombucha products.[1]

The survey utilized a classic experimental design consisting of a Test Group and a Control Group.  The Test Group viewed images of an actual GT's Enlightened kombucha product containing the allegedly misleading labelling, and the Control Group instead viewed an altered version of the GT's Enlightened kombucha product that was identical with the sole exception of the addition of four disclosures/warnings relating to alcohol.  First, the front of the label for the Enlightened product was altered to display the same statement regarding the product containing alcohol that appears on the GT's Classic product, as shown in the following partial screenshot of the GT's Enlightened product shown to the Control Group:



---

[1] See the Relevant Universe and Sampling sections of this report for more information regarding who qualified for and completed the survey.

Second, the label was altered to add a statement indicating that the product "is considered a beer," as shown in the following partial screenshot:



Third, the label for the Enlightened product was altered to add a statement indicating that federal law requires a warning statement on any product that may contain more than .5% alcohol per volume:



Fourth, the label for the Enlightened product was altered to display the same Government Warning regarding alcohol in the same manner that it appears on the GT's Classic product, as shown in the following partial screenshot of the Enlightened product shown to the Control Group:



After reviewing the GT's Enlightened product labelling, respondents in both groups were then asked about their likelihood of purchasing the product and

Page | 10

their perception of the price of the product.  Since the only difference in the two groups is the presence or absence of the disclosure and warning relating to alcohol, comparing the results of the Test and Control Groups scientifically measures the extent to which, if at all, the disclosure and warning impact respondents' purchase intent or perception of price.

Asking the Control Group about their likelihood of purchasing the GT's Enlightened product after viewing the product with the alcohol disclosure and Government Warning also allows us to assess the extent to which purchasers would, as Plaintiffs allege, not purchase the product due to the disclosure and warning regarding alcohol.

As this was an online survey, all the instructions and questions were displayed on respondents' computer screens and each question appeared on its own screen.

<u>Test Group</u>

First all 300 respondents in the Test Group were instructed as follows:

> In a moment you are going to be shown images of a kombucha beverage product.
>
> Please use the green arrows to the sides of the page to fully rotate the product until you have completed a rotation to view the entire product. You may use the arrows to go back and forth to rotate the product as much as you'd like.  You may click on any image to see an enlarged version.
>
> When you are finished looking at the product, you will be asked some questions.  If for any question, you have no opinion or do not know, please indicate so.  Please do not guess.

Page | 11

On the next screen, respondents viewed four images of the product, one at a time, covering a full rotation of all label content.  Each image had to be viewed for at least five seconds before the respondent could advance to the next image, but could be viewed for as long as respondent desired.  This is an appropriate quality control technique that ensured that respondents did not click past any view of the label without giving it any consideration, but otherwise allowed respondents to view various aspects of the label with the level of attention they normally would if considering purchase of the product.  Respondents saw the following instruction above the first of four images of the product:[2]

Please use the green arrows to fully rotate the product.

---

[2] While some bottle images may appear smaller when reduced in size to fit onto a printed report page, all images appeared large and clearly visible on respondents' screens in the actual survey. Additionally, respondents could click on any image to view a larger version. Screenshots of how the survey appeared to respondents are provided in Appendix C of this report. The images used to program the survey are provided in Appendix E.

Page | 12



Evid. Appx. Page 679

Evid. Appx. Page 680

### Always Cultured, Never Compromised

The bottle in your hand bears my name as a symbol of promise. You have my word: GT's KOMBUCHA is the most authentic Kombucha you can buy. With respect for centuries of Eastern tradition, and using heirloom living cultures passed down by my family, this sacred offering is lovingly handcrafted with goodness you can see, taste, and *feel* - just as nature intended.

— GT Dave, Founder

**WORDS OF ENLIGHTENMENT**

"PUT GOOD THINGS INTO YOUR MIND, HEART, AND BODY AND WATCH SERENITY ENSUE."

– SHAWN OGLESBEE,
MANAGING PARTNER AND
SERIAL ENTREPRENEUR,
CHAGRIN FALLS, OH

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT GTSLIVINGFOODS.COM

**What is KOMBUCHA?** Kombucha is a fermented tea crafted with a living culture (known as a SCOBY) added to a base of sweetened tea. The SCOBY consumes sugars and caffeine, transforming the tea into this revitalizing wellness drink known in ancient Asian cultures as "the tea of immortality." Real, authentic Kombucha, like GT's, is raw and living, offers a tangy taste, natural effervescence, and visible culture strands.

GT'S LIVING FOODS, LLC
P.O. Box 2352
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

rebalance · reawaken · rethink · rekindle ·
## electrolytes + polyphenols ·
reimagine · relive · repurpose · reinvent ·

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

**Living Food for the Living Body.™**

Evid. Appx. Page 681



Evid. Appx. Page 682

Respondents could scroll back and forth between the images for as long as desired.  This allowed respondents to review the entirety of the labelling content as an ordinary consumer would.

After viewing all four images, the following instruction and options appeared on screen beneath the images:

> Before continuing with the survey, please indicate whether you have clearly viewed all of the images.
>
> - I have clearly viewed all images
> - I was unable to clearly view all images

Respondents confirmed they clearly viewed all images before continuing with the survey. This is a standard quality assurance measure to ensure respondents successfully viewed the product images.

Upon continuing, respondents were next asked:

> How likely, if at all, would you be to purchase the product you were just shown?
>
> - Extremely likely
> - Very likely
> - Somewhat likely
> - Neither likely not unlikely
> - Somewhat unlikely
> - Very unlikely
> - Extremely unlikely
> - Don't know/no opinion

Page | 17

To account for potential bias due to response option order, half of all respondents saw these options in the order shown above while half saw these options in reverse order:

- Extremely unlikely
- Very unlikely
- Somewhat unlikely
- Neither likely not unlikely
- Somewhat likely
- Very likely
- Extremely likely
- Don't know/no opinion

Next, respondents who selected any of the first seven options (i.e. respondents who did not select "Don't know/no opinion") were asked:

> What makes you say that you would be [*respondent's answer to the previous question was inserted into the question text here*] to purchase the product you were just shown?
>
> Please list all reasons or factors in separate boxes below.

Respondents could enter up to eight different reasons.  This allowed respondents to indicate any reason that they would be likely or unlikely to purchase the product, including anything about alcohol.

Meanwhile, respondents who previously answered that they don't know or have no opinion regarding how likely, if at all, they would be to purchase the products, were instead asked:

> What makes you uncertain about how likely you would be to purchase the product you were just shown?

Respondents could enter any answer.

Finally, all respondents were asked:

> Now please imagine that the price of the product you were just shown is $3.79.
>
> Which of the following best describes your reaction to the price of the product?
>
> - Much too high
> - Somewhat too high
> - Neither too high nor too low
> - Somewhat too low
> - Much too low
> - Don't know/no opinion

To account for bias due to response option order, half of all respondents saw these options in the order shown above while half saw these options in reverse order:

> - Much too low
> - Somewhat too low
> - Neither too high nor too low
> - Somewhat too high
> - Much too high
> - Don't know/no opinion

This concluded the survey for all 300 Test Group respondents.

<u>Control Group</u>

In the corresponding Control Group, 300 respondents took a survey identical to those in the Test Group with the sole exception that they saw the altered images contained the four disclosures/warnings relating to alcohol:

Page | 19



Evid. Appx. Page 686

2% Juice

**Nutrition Facts**
Serving Size 1 bottle

Amount per serving
**Calories**                              **50**
                                    % Daily Value

| | |
|---|---|
| Total Fat 0g | |
| Sodium 10mg | 1% |
| Total Carbohydrate 12g | 4% |
| Total Sugars 12g | |
| Includes 0g Added Sugars | 0% |
| Protein 0g | |

PER BOTTLE at time of bottling: Probiotics
Bacillus Coagulans GBI-306086: 1 billion
organisms, Lactobacillus Bacterium: 3 billion
organisms, L(+) Lactic Acid: 100mg, Acetic
Acid: 75mg, Glucuronic Acid: 1400mg,
Gluconic Acid: 650mg, Polyphenols: 10mg

INGREDIENTS: GT's Kombucha*
(kombucha culture*, black tea*, green
tea*, kiwi juice*), and 100% pure love!!!
*Organically produced.
Do Not Shake. Swirl gently.

This product is considered a beer and
contains a natural effervesence. Please
open carefully.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®

7  22430 00016  9

FLV-A

regain

mbiotics

renew

473 mL

CA CASH REFUND
Please Recycle • MI OR 10¢
CT HI IA MA ME NY VT 5¢

Evid. Appx. Page 687



GOVERNMENT WARNING:
(1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS.
(2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.

...fermented tea crafted with a living culture (known ...to a base of sweetened tea. The SCOBY consumes ...ffeine, transforming the tea into this revitalizing ...nown in ancient Asian cultures as "the tea of ...bed, authentic Kombucha, like GT's, is raw and living, ...ation, natural effervescence, and visible culture strands.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

KOMB...
organ...

ORIG...

...ken · rethink · rekindle · redefine · rediscover

...es + polyphenols + enzymes

...· repurpose · reinvent · reclaim · recapture

...that is low in alcohol, however ...ng statement on any product that ...alcohol per volume.

16 fl oz

ENLIGH...
For Eve...

The Control Group images were presented in an identical manner as the corresponding Test Group images, including that respondents were required to view all four images (comprising a full rotation of the label) and could not advance past any image for at least five seconds.  This ensured that respondents had a meaningful opportunity to review all aspects of the label (including the four alcohol-related disclosures/warnings) as a real consumer would.  If anything, requiring respondents to view all portions of the control label could have emphasized the alcohol disclosures/warnings even more than in the actual marketplace, since some consumers may not even look at the side/back portions of bottle labels.

This concluded the survey for all respondents.

Screenshots of the survey are provided in Appendix C.

Evid. Appx. Page 690

## SUMMARY OF FINDINGS

This section details certain key survey findings.  Other survey results are discussed further in the Detailed Findings section below.

- The following table shows the results among all 300 respondents to the question regarding their likelihood of purchasing the GT's Enlightened product:

| [Q240] How likely, if at all, would you be to purchase the product you were just shown? | Test | Control |
|---|---|---|
| Total | N=300 | N=300 |
| Extremely likely | 29% 88 | 29% 86 |
| Very likely | 32% 96 | 31% 94 |
| Somewhat likely | 23% 68 | 26% 77 |
| Neither likely not unlikely | 8% 23 | 7% 20 |
| Somewhat unlikely | 3% 8 | 3% 10 |
| Very unlikely | 2% 6 | 1% 4 |
| Extremely unlikely | 4% 11 | 3% 8 |
| Don't know/no opinion | 0% 0 | 0% 1 |

As explained more specifically in the Detailed Findings section below, there is no statistically significant difference between the results of the Test Group (where the actual Enlightened label was shown) and the Control Group (where the altered label containing the alcohol disclosures and Government Warning was shown).

Page | 25

- Only <u>four</u> Control Group respondents out of 300 (1.3%) answered that they would be unlikely to purchase the GT's Enlightened product (with the alcohol disclosures/warning present) and mentioned alcohol as a reason that they would be unlikely to purchase, and an equal number (four or 1.3%) cited alcohol as a reason they would be <u>likely</u> to purchase the GT's Enlightened product.

- 257 Control Group respondents (85.7%) answered that they would be <u>likely</u> to purchase the GT's Enlightened product even when the alcohol disclosures/warning were shown, whereas only 22 Control Group respondents (7.3%) answered that they would be <u>unlikely</u> to purchase the product.

- The following table shows the results to the question regarding respondents' perception of the price of the GT's Enlightened product:

| [Q260] Now please imagine that the price of the product you were just shown is $3.79. Which of the following best describes your reaction to the price of the product? | Test | Control |
|---|---|---|
| Total | N=300 | N=300 |
| Much too high | 9% 28 | 9% 28 |
| Somewhat too high | 41% 123 | 42% 127 |
| Neither too high nor too low | 46% 138 | 44% 133 |
| Somewhat too low | 2% 6 | 3% 8 |
| Much too low | 1% 2 | 1% 3 |
| Don't know/no opinion | 1% 3 | 0% 1 |

Evid. Appx. Page 692

There is no statistically significant difference between the results of the Test Group (where the actual Enlightened label was shown) and the Control Group (where the altered label containing the alcohol disclosures and Government Warning were shown).

These findings strongly demonstrate that the presence of the alcohol disclosure/warnings do not have a material impact on consumers' purchase decision or perception of the product's price, and that the large majority of consumers who are interested in kombucha products would be positively disposed toward purchasing the GT's Enlightened product even with the alcohol disclosure/warnings present.

See Detailed Findings section below for additional information on results.  The full data is set forth in Appendix D.

## *METHODOLOGY*

**THE RELEVANT UNIVERSE OF INTEREST**

The universe for this survey consisted of U.S. consumers age 21 and older who have purchased ready-to-drink bottled kombucha in the past six months or are likely to do so in the next six months.

The following screening questions were employed to ensure the final survey sample was comprised of respondents from the appropriate sample universe.

First, all potential respondents were asked:

> Which of the following types of <u>ready-to-drink bottled beverage</u> products, if any, have you purchased in the past 6 months?
>
> *(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

| Ready-to-Drink Bottled Beverages Purchased Past 6 Months | | |
|---|---|---|
| N=600 | N | % |
| Kombucha | 469 | 78.2% |
| Switchel/drinking vinegar | 92 | 15.3% |
| Water kefir | 92 | 15.3% |
| Probiotic tonic | 140 | 23.3% |
| Coconut water | 373 | 62.2% |
| None of these | 53 | 8.8% |

Page | 28

Including options other than kombucha on the list helped mask the purpose of the survey and provided a variety of options from which respondents could select.

Respondent who selected "Kombucha" were considered part of the relevant sample universe and qualified to participate in the main survey.

Next, respondents were asked:

> Which of the following types of <u>ready-to-drink bottled beverage</u> products, if any, are you likely to consider purchasing in the next 6 months?
>
> *(Select all that apply)*

The following table displays the proportion of final respondents who selected each:

| Ready-to-Drink Bottled Beverages Likely to Consider Purchasing in Next 6 Months | | |
|---|---|---|
| N=600 | N | % |
| Kombucha | 570 | 95.0% |
| Switchel/drinking vinegar | 165 | 27.5% |
| Water kefir | 175 | 29.2% |
| Probiotic tonic | 251 | 41.8% |
| Coconut water | 430 | 71.7% |
| None of these | 7 | 1.2% |

Respondent who selected "Kombucha" in response to this question were also considered part of the relevant sample universe and qualified to participate in the main survey.

Page | 29

Upon completion of the main survey, all respondents were asked a series of additional questions for classification purposes. First:

Do you or does anyone in your household work for any of the following?

*(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

| Related Field | | |
|---|---|---|
| N=600 | N | % |
| A company that makes or distributes kombucha products | 17 | 2.8% |
| An advertising or market research company | 17 | 2.8% |
| Neither of these | 572 | 95.3% |

Excluding the 4.7% of respondents who work or have someone in their household who works in a related field would not impact the results of this study or my conclusions.

Next, respondents were asked:

Which of the following brands of <u>kombucha</u> product, if any, have you purchased at any time since 2017?

*(Select all that apply)*

Page | 30

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

| Brands of Kombucha Purchased Since 2017 | | |
|---|---|---|
| N=600 | N | % |
| GT's NET | 311 | 51.8% |
|     GT's Kombucha | 270 | 45.0% |
|     GT's Synergy | 190 | 31.7% |
| Kevita | 320 | 53.3% |
| Suja | 150 | 25.0% |
| Health-Ade | 173 | 28.8% |
| Humm | 92 | 15.3% |
| Store brand | 146 | 24.3% |
| Local area kombucha brand | 121 | 20.2% |
| None of these | 63 | 10.5% |

Respondents who answered that they have purchased a GT's brand were then also asked:

> Which of the following GT's kombucha products, if any, have you purchased at any time since 2017?
>
> *(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

Page | 31

Evid. Appx. Page 697

| Brands of GT's Kombucha Purchased Since 2017 | | |
|---|---|---|
| N=600 | N | % |
| GT's Enlightened Synergy or Kombucha (clear bottle/silver label) | 89 | 14.8% |
| GT's Classic Synergy or Kombucha (dark bottle/black label) | 79 | 13.2% |
| Both of the above | 155 | 25.8% |
| Neither of the above | 4 | 0.7% |
| Don't know/not sure | 15 | 2.5% |
| Not asked/Did not purchase GT brand | 289 | 48.2% |

As this table shows, 244 respondents have purchased GT's Enlightened kombucha within the class period, making them putative class members. The results among this subgroup are specifically detailed in the Detailed Findings section below.

All respondents were then asked:

> For whom have you previously purchased bottled kombucha products at any time?
>
> *(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

Page | 32

| For Whom Purchased Bottled Kombucha | | |
|---|---|---|
| N=600 | N | % |
| Myself | 531 | 88.5% |
| Another adult age 21 or up | 181 | 30.2% |
| A child age 12 or under | 34 | 5.7% |
| A child age 13 to 20 | 21 | 3.5% |
| I have not previously purchased a bottled kombucha product | 47 | 7.8% |

Followed by:

> How often do you personally drink bottled kombucha products?

The following table displays the proportion of final respondents who selected each option:

| How Often Drinks Bottled Kombucha | | |
|---|---|---|
| N=600 | N | % |
| Daily | 30 | 5.0% |
| Several days a week | 168 | 28.0% |
| Once a week | 120 | 20.0% |
| Once every two weeks | 80 | 13.3% |
| Less often than once every two weeks | 151 | 25.2% |
| I have not personally drank a bottled kombucha product | 51 | 8.5% |

Respondents were also asked:

> To the best of your knowledge, which of the following, if any, apply to kombucha products?

Page | 33

Evid. Appx. Page 699

The following table displays the proportion of final respondents who selected each option:

| Applies to Kombucha Products | | |
|---|---|---|
| N=600 | N | % |
| Fermented | 442 | 73.7% |
| Caffeine free | 200 | 33.3% |
| Low calorie | 357 | 59.5% |
| Pro-biotic | 507 | 84.5% |
| None of the above | 4 | 0.7% |

Finally, respondents who answered that kombucha products are "fermented" were asked two final questions for classification purposes:

You answered that kombucha products are **fermented**.

Which of the following, if any, does this tell you about kombucha products?

*(Please answer yes, no, or don't know for each)*

The following table displays results to this question:

Page | 34

| What Does Fermented Tell You About Kombucha Products | | | |
|---|---|---|---|
| N=600 | Yes | No | Don't know/ Not asked |
| Alcohol | 46.8% 281 | 17.3% 104 | 35.8% 215 |
| Yeast | 46.3% 278 | 8.7% 52 | 45.0% 270 |
| Sugar | 47.7% 286 | 11.3% 68 | 41.0% 246 |
| Salt | 21.0% 126 | 24.3% 146 | 54.7% 328 |

Followed by:

Have you ever personally made, or researched how to make, any of the following products for yourself?

*(Select all that apply)*

The following table displays the proportion of final respondents who selected each option:

| Researched How to Make | | |
|---|---|---|
| N=600 | N | % |
| Kombucha | 98 | 16.3% |
| Kimchi | 112 | 18.7% |
| Miso | 56 | 9.3% |
| Yogurt | 123 | 20.5% |
| Water kefir | 31 | 5.2% |
| Beer | 94 | 15.7% |
| Sauerkraut | 94 | 15.7% |

Page | 35

| None of these | 209 | 34.8% |
|---|---|---|
| Not asked/Did not previously select "fermented" | 158 | 26.3% |

This concluded all screening and classification questions for all respondents.

The actual wording of the screening questions used is shown in Appendix B.

### <u>SAMPLING PLAN</u>

The sampling plan involved a random selection of consumers who are part of an online panel.

Online surveys are well-accepted in the field of survey research as a standard, reliable methodology.  Indeed, online surveys are now the most common method of conducting market research among consumers.  Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases.  I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Dynata, a leading supplier of online sample for surveys.  I have worked with Dynata on many surveys and have found its procedures and panels to be highly reliable.  Dynata has large and diverse panels consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research.  Dynata utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Through the following techniques, Dynata employs specific process behavior, pattern analysis, statistics and algorithms to ensure top quality data:

Evid. Appx. Page 702

- Digital Fingerprinting technology to ensure high quality participants. This includes checking for duplicate participants by evaluating variables, such as email address, matches across several demographic data, and device-related data.
- Double-Opt-In engaged panelists
- Third Party technologies to create non-bias decisions
- Country-specific and relevant incentive model
- Post-collection disqualifications including straightlining with Product Manager consultation, verbatims, and speeders

Additionally, Dynata profiles its panelists and keeps up-to-date on standard demographics, such as age, gender, region, household demographic, interests and hobbies.

A sampling plan was carefully structured in order to represent the demographics of relevant customers – i.e. consumers of ready-to-drink kombucha beverage products.  Throughout the survey, I monitored the actual rate of qualification within each individual age and gender group.  I then calibrated these individual incidence rates against U.S. Census data by age and gender and set revised age and gender quotas for the final sample. The following table displays the final proportion of sample achieved by age and gender for each Group:

Page | 37

| Final Number of Respondents by Age and Gender | | |
| --- | --- | --- |
| | Test Group (N=300) | Control Group (N=300) |
| Male 21 – 34 | 16.7% 50 | 17.0% 51 |
| Male 35 – 54 | 18.3% 55 | 18.0% 54 |
| Male 55 and older | 6.0% 18 | 6.0% 18 |
| Female 21 – 34 | 22.3% 67 | 22.0% 66 |
| Female 35 – 54 | 29.7% 89 | 30.0% 90 |
| Female 55 and older | 7.0% 21 | 7.0% 21 |

This methodology for producing a representative sample of the relevant category (here, consumers of ready-to-drink kombucha beverage products) is standard and well-accepted.

Because the Complaint proposes California and New York subclasses, survey invitations were sent targeting a group of New York residents, a group of California residents, and a group of residents from across the rest of the nation (the National Group).

The following number of interviews were collected in the New York, California, and National Groups:

Page | 38

| Final Number of Respondents by Geographic Subgroup | | |
|---|---|---|
| | Test Group (N=300) | Control Group (N=300) |
| New York | 33.3% 100 | 33.3% 100 |
| California | 33.3% 100 | 33.3% 100 |
| Nationally (outside NY/CA) | 33.3% 100 | 33.3% 100 |

The following table displays the final proportion of the national sample achieved by region (excluding the New York and California subgroups):

| Final Number of National Respondents by Region | | |
|---|---|---|
| | Test Group (N=100) | Control Group (N=100) |
| Northeast | 15.0% | 20.0% |
| West | 18.0% | 14.0% |
| Midwest | 25.0% | 24.0% |
| South | 24.0% | 24.0% |
| Southeast | 18.0% | 18.0% |

## INTERVIEWING PROCEDURES

The online survey was programmed and hosted by Dynata, a company specializing in web survey programming and data collection and processing. My staff and I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

Evid. Appx. Page 705

**DATA PROCESSING**

Data was collected by Dynata and made available to Hal Poret, LLC through an electronic portal on an ongoing basis.  The data set showing respondents' answers to all questions will be provided in electronic form.

**DOUBLE-BLIND INTERVIEWING**

The study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the service involved in providing the sample and administering the online interviews (Dynata) was similarly "blind" with respect to the study's purpose and sponsorship.

**INTERVIEWING PERIOD**

Interviewing was conducted from May 6, 2020 through May 24, 2020.

**QUALITY CONTROL**

Several measures were implemented to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon initially entering the survey, all respondents were required to pass a test to verify that each respondent is a live person. The test employed in this survey is a CAPTCHA[3] program that generates a task that humans can pass but current computer programs cannot. CAPTCHA is a well-known and widely-used tool in online survey research.

Upon successfully passing the CAPTCHA test, respondents were then asked to enter their year of birth and then their gender.  This information was checked

---

[3] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart."

Page | 40

against the sample provider's (Dynata's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent birth year and/or gender was unable to continue to the main survey.

Additionally, respondents were then asked to select their age range. Respondents who selected an age range inconsistent with their year of birth were unable to continue with the survey.

These combined steps ensured that the survey was being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also asked to select any web browsers or search engines they have used in the past three months. Respondents could select as many as applied to them from a list of ten options, including, "other," "not sure" and one fictitious name: Hagelin. Respondents who selected "Hagelin" were unable to continue.  Additionally, respondents who answered that they have used all seven of the actual web browsers and search engines included on the response list, were identified as "yea-sayers" and unable to continue with the survey.[4]

The following question was also asked and permitted additional screening out of respondents who were paying insufficient attention or clicking responses indiscriminately:

> For quality assurance, please type the word "survey" in the blank next to the "Other" box below and then click to continue.
>
> - Strongly agree

---

[4] "Yea-sayers" in surveys are typically defined as respondents who answer affirmatively to questions, regardless of their belief.

- Agree
- Neutral
- Disagree
- Strongly disagree
- Other _____

Respondents who selected "other" and typed a response in the blank continued with the survey. A review was conducted of all open-ended answers, including responses to this question and respondents who failed to follow instructions for this question, or gave other non-responsive or nonsense answers to open-ended questions were removed from the final data.

Respondents were then also asked to carefully read these instructions:

\* Please take the survey in <u>one</u> session without interruption.

\* Please keep your browser maximized for the entire survey.

\* While taking the survey, please do not consult any other websites or other electronic or written materials.

\* Please answer all questions on your own without consulting any other person.

\* If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree to the above instructions, and 2) I do not understand or do not agree to the above instructions.  Only respondents who understood and agreed to the instructions then continued to the main section of the survey.

Page | 42

Due to the particular content that needed to be shown in this survey, the survey program was set up in such a way as to restrict respondents from taking the survey via mobile phones. This contributed to ensuring respondents could easily and clearly view the images displayed in the survey.

## DETAILED FINDINGS

  I.  **RESULTS AMONG ALL RESPONDENTS**

The following table shows the results among all 300 respondents in each group when asked how likely, if at all, they would be to purchase the GT's Enlightened product:

| [Q240] How likely, if at all, would you be to purchase the product you were just shown? | Test | Control |
|---|---|---|
| Total | N=300 | N=300 |
| Extremely likely | 29%<br>88 | 29%<br>86 |
| Very likely | 32%<br>96 | 31%<br>94 |
| Somewhat likely | 23%<br>68 | 26%<br>77 |
| Neither likely not unlikely | 8%<br>23 | 7%<br>20 |
| Somewhat unlikely | 3%<br>8 | 3%<br>10 |
| Very unlikely | 2%<br>6 | 1%<br>4 |
| Extremely unlikely | 4%<br>11 | 3%<br>8 |
| Don't know/no opinion | 0%<br>0 | 0%<br>1 |

As is evident from the table above, the Control Group rates of respondents answering that they would be unlikely to purchase the GT's Enlightened product (either somewhat unlikely, very unlikely, or extremely unlikely) did not exceed the Test Group rates. This shows that the Control Group was no more unlikely to purchase the product due to the alcohol disclosures/warning. There is also no statistically significant difference in the Test and Control Group rates of

Page | 44

answering that they would be likely to purchase the GT's Enlightened product (either somewhat likely, very likely, or extremely likely).

Statistical significance testing of the overall pattern of results for each group also indicates that there is no statistically significant difference between the results of the Test Group (where the actual Enlightened label was shown) and the Control Group (where the altered label containing the alcohol disclosures and Government Warning was shown).[5]  This powerfully demonstrates that the inclusion of the alcohol disclosures and Government Warning had no meaningful impact on prospective consumers' likelihood of purchasing the product.

Two other aspects of the data also strongly demonstrate that the presence or absence of the alcohol disclosures/warning did not meaningfully impact purchase decisions, and that there is certainly no common impact across consumers.  First, only <u>four</u> Control Group respondents out of 300 (1.3%) answered that they would be unlikely to purchase the GT's Enlightened product (with the alcohol disclosures/warning present) and mentioned alcohol as a reason that they would be unlikely to purchase.[6]  This alone would demonstrate that any negative impact of the alcohol disclosures/warning on the decision to purchase were negligible.  However, we must also account for the fact that four Control Group respondents (an equivalent 1.3%) cited alcohol as a reason they

---

[5] An independent samples t-test was conducted to determine whether there is a statistically significant difference between the results of the two independent samples (Test and Control Groups). The key result of the test is referred to as a p-value.  The typical standard is to use a 95% significance level, which means that a p-value of 0.05 or lower would demonstrate a statistically significant difference.  Here, the p-value for the test is 0.86, which is far higher than 0.05.  This means that any differences in the results of the Test and Control Group are not significant, but rather would be expected based on random chance.

[6] Respondent ID# 338, 1258, 3771, and 6316.

Page | 45

would be <u>likely</u> to purchase the GT's Enlightened product.[7]  Therefore, the overall rate of citing alcohol as a positive versus negative factor in the decision to purchase the product were equivalent, indicating no overall impact on the purchase decision.

Finally, it is significant that 257 Control Group respondents (85.7%) answered that they would be <u>likely</u> to purchase the GT's Enlightened product even when the alcohol disclosures/warning were shown, whereas only 22 Control Group respondents (7.3%) answered that they would be <u>unlikely</u> to purchase the product.  This directly demonstrates that the large majority of prospective purchasers would still be likely to purchase the product with the alcohol disclosures/warning present, whereas very few would choose not to purchase the product.

These collective findings strongly demonstrate that the presence of the alcohol disclosure/warnings do not have a material impact on consumers' purchase decision, and that the large majority of consumers who are interested in kombucha products would be positively disposed toward purchasing the GT's Enlightened product even with the alcohol disclosure/warnings present.

The following table shows the results to the question regarding respondents' perceptions of the price of the product:

---

[7] Respondent ID# 1589, 1973, 6135, and 6443.  One additional Control Group respondent (#3396) also cited the product being "low in alcohol" as a reason for being likely to purchase it.

Page | 46

| [Q260] Now please imagine that the price of the product you were just shown is $3.79. Which of the following best describes your reaction to the price of the product? | Test | Control |
|---|---|---|
| Total | N=300 | N=300 |
| Much too high | 9% 28 | 9% 28 |
| Somewhat too high | 41% 123 | 42% 127 |
| Neither too high nor too low | 46% 138 | 44% 133 |
| Somewhat too low | 2% 6 | 3% 8 |
| Much too low | 1% 2 | 1% 3 |
| Don't know/no opinion | 1% 3 | 0% 1 |

There is also no statistically significant difference in these results.[8]  This demonstrates that respondents' perception of whether the price of the GT's Enlightened product is too high, about right, or too low is not impacted by the presence or absence of the alcohol disclosures/warning.

## II.    RESULTS AMONG PAST GT'S ENLIGHTENED PURCHASERS

The following tables shows the results for the key questions among respondents who are putative class members – i.e., those who have already purchased the GT's Enlightened product:

---

[8] The p-value of the independent samples t-test is 0.75, far higher than 0.05, demonstrating the lack of any statistically significant difference.

| [Q240] How likely, if at all, would you be to purchase the product you were just shown? | Test | Control |
|---|---|---|
| Total | N=120 | N=124 |
| Extremely likely | 49%<br>59 | 44%<br>55 |
| Very likely | 32%<br>38 | 35%<br>43 |
| Somewhat likely | 14%<br>17 | 15%<br>19 |
| Neither likely not unlikely | 1%<br>1 | 1%<br>1 |
| Somewhat unlikely | 0%<br>0 | 2%<br>3 |
| Very unlikely | 2%<br>2 | 2%<br>2 |
| Extremely unlikely | 3%<br>3 | 1%<br>1 |
| Don't know/no opinion | 0%<br>0 | 0%<br>0 |

| [Q260] Now please imagine that the price of the product you were just shown is $3.79. Which of the following best describes your reaction to the price of the product? | Test | Control |
|---|---|---|
| Total | N=120 | N=124 |
| Much too high | 10%<br>12 | 10%<br>12 |
| Somewhat too high | 43%<br>51 | 42%<br>52 |
| Neither too high nor too low | 45%<br>54 | 44%<br>55 |
| Somewhat too low | 2%<br>2 | 2%<br>3 |
| Much too low | 1%<br>1 | 2%<br>2 |
| Don't know/no opinion | 0%<br>0 | 0%<br>0 |

Evid. Appx. Page 714

There is no statistically significant difference in these results for either question.[9] This demonstrates that the presence or absence of the alcohol disclosures/warning have no meaningful impact on class members' likelihood of purchasing or perception of the price of the GT's Enlightened product.

It is also worth specifically noting that 117 of the 124 putative class members who were in the Control Group and shown the GT's Enlightened product with the alcohol disclosures/warning present (94.4%) answered that they would be likely to purchase the product, whereas only 6 (4.8%) answered that they would be unlikely. This specifically confirms that the overwhelming majority of putative class members would still be likely to purchase the product even with the alcohol disclosures/warning shown.

## III.   RESULTS BY GEOGRAPHICAL AREA

The following tables shows the results for the key questions among the subgroups of California residents, New York residents, and residents of remaining portions of the nation:

| [Q240] How likely, if at all, would you be to purchase the product you were just shown? | CA Test | CA Control | NY Test | NY Control | Other Test | Other Control |
|---|---|---|---|---|---|---|
| Total | N=100 | N=100 | N=100 | N=100 | N=100 | N=100 |
| Extremely likely | 24% | 26% | 30% | 29% | 34% | 31% |
| Very likely | 33% | 28% | 29% | 28% | 34% | 38% |
| Somewhat likely | 28% | 26% | 21% | 30% | 19% | 21% |
| Neither likely not unlikely | 7% | 10% | 10% | 7% | 6% | 3% |
| Somewhat unlikely | 2% | 4% | 5% | 3% | 1% | 3% |

---

[9] The p-value of the test for the results of Q240 is 0.77 and the p-value of the test for the results of Q260 is 0.71, demonstrating the lack of any statistically significant difference.

Page | 49

| | | | | | | |
|---|---|---|---|---|---|---|
| Very unlikely | 2% | 2% | 1% | 1% | 3% | 1% |
| Extremely unlikely | 4% | 3% | 4% | 2% | 3% | 3% |
| Don't know/no opinion | 0% | 1% | 0% | 0% | 0% | 0% |

| [Q260] Which of the following best describes your reaction to the price of the product? | CA Test | CA Control | NY Test | NY Control | Other Test | Other Control |
|---|---|---|---|---|---|---|
| Total | N=100 | N=100 | N=100 | N=100 | N=100 | N=100 |
| Much too high | 10% | 9% | 6% | 9% | 12% | 10% |
| Somewhat too high | 34% | 44% | 41% | 41% | 48% | 42% |
| Neither too high nor too low | 51% | 43% | 50% | 46% | 37% | 44% |
| Somewhat too low | 2% | 2% | 2% | 2% | 2% | 4% |
| Much too low | 2% | 1% | 0% | 2% | 0% | 0% |
| Don't know/no opinion | 1% | 1% | 1% | 0% | 1% | 0% |

There is no statistically significant difference in these results for either question for any of the three regions.[10] This demonstrates that the presence or absence of the alcohol disclosures/warning have no meaningful impact on class members' likelihood of purchasing or perception of the price of the GT's Enlightened product.

## IV.    CONCLUSIONS

Based on the survey results, it is my opinion that: (1) inclusion on the GT's Enlightened product label of a statement that the product contains alcohol and inclusion of the Government Warning regarding alcohol do not substantially impact consumers' likelihood of purchasing the product or their perception of

---

[10] The p-values of the test for the results of Q240 are 0.67 for California, 0.57 for New York, and 0.88 for the National Group.  The p-values of the test for the results of Q260 are 0.40 for California, 0.64 for New York, and 0.33 for the National Group.  All of these results demonstrate the lack of statistically significant difference.

the price of the product; and (2) there is not commonality across the proposed class, as the large majority of actual and prospective GT's purchasers indicated that they would be likely to purchase the GT's Enlightened product even when it includes the statement that the product contains alcohol and the Government Warning regarding alcohol, only a negligible percentage answered that they would be unlikely to purchase the product due to the alcohol content, and an equivalent number answered that they would be likely to purchase the product due to alcohol content.

Hal Poret

Dated:  June 1, 2021

Evid. Appx. Page 717

# APPENDIX A

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

---

## *Education*

1998    Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995    S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993    Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

## *Employment*

2016 -    President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004 - 2015    Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004    Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003    Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

Evid. Appx. Page 719

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2021    Furniture Dealer.net v. **Amazon.com**
(Deposition)                                 USDC District of MN

2021    **Treehouse Foods, Inc.** v. Keurig Green Mountain, Inc.
(Deposition)                                 USDC Southern District of NY

2021    Brady v. **Bayer**
(Deposition)                                 Superior Court of California

2021    Capri Sun v. **American Beverage Corporation**
(Deposition)                                 USDC Southern District of NY

2020    **Universal Electronics, Inc.** v. Roku Inc. et al.
(Deposition)                                 International Trade Commission

2020    Enchante Accessories v. **Turko Textiles**
(Deposition)                                 USDC Southern District of NY

2020    Greater Orlando Aviation Authority v. **Melbourne Airport Authority**
(Deposition)                                 USDC Middle District of FL

2020    **New Orleans Saints** v. WDI
(Trial)                                      American Arbitration Association

2020    Vanderbilt University v. **Scholastic**
(Deposition)                                 USDC Middle District of TN

2020    Pacific Packaging v. **Nutrisystem**
(Deposition)                                 USDC Central District of CA

2020    American Airlines v. **Delta Airlines**
(Deposition)                                 USDC Northern District of TX

2020    **FCA** v. Mahindra
(ITC Modification trial testimony)           ITC Modification Proceeding

2020    Lontex Corporation v. **Nike**
(Deposition)                                 USDC Eastern District of PA

2020    **Orgain** v. Iovate
(Deposition)                          USDC Central District of CA

2020    Gibson v. **Armadillo**
(Deposition)                          USDC Eastern District of TX

2020    Koenig v. **Vizio, Inc.**
(Deposition)                          Superior Court California (LA County)

2020    Roley v. **Google**
(Deposition)                          USDC Northern District of CA

2020    **Snaplock Industries** v. Swisstrax Corp.
(Deposition)                          USDC District of Nevada

2020    TeamSnap v. **Team Mates Pty. Ltd**,
(Deposition)                          USDC District of CO

2020    Stone Brewing v. **MillerCoors**
(Deposition)                          USDC Southern District of CA

2020    Bluetooth SIG V. **FCA, USA**
(Deposition)                          USDC Western District of Washington

2020    **Monster Energy** v. VPX
(Deposition)                          USDC Southern District of FL

2019    **George Sink PA Injury Law Firm** v. George T. Sink, Jr.
(Arbitration trial)                   American Arbitration Association

2019    Cabrera v. **Bayer Corporation**
(Deposition)                          USDC Central District of CA

2019    GDM Enterprises v. **Astral Health & Beauty**
(Deposition)                          USDC Western District of MO

2019    **Yahoo** v. Mozilla
(Deposition)                          Superior Court Santa Clara County, CA

2019    Scott Fetzer v. **John Henry, III**
(Deposition)                          Court of Common Pleas, Cuyahoga County, OH

2019    **Illinois Tool Works** v. Poly-America

(Deposition and trial)                    USDC Northern District of TX

2019   **Adidas** v. Forever 21
       (Deposition)                       USDC District of Oregon

2019   TRP v. **Simalasan**
       (Deposition)                       USDC District of NV

2019   Ironhawk Technologies v. **Dropbox Inc.**
       (Deposition)                       USDC Central District of CA

2019   Universal Standard v. **Target Corporation**
       (Deposition)                       USDC Southern District of NY

2019   **Diageo** v. Deutsch
       (Deposition)                       USDC Southern District of NY

2019   **FCA** v. Mahindra
       (Deposition and ITC trial)         ITC and USDC Eastern District of MI

2019   DealDash v. **ContextLogic**
       (Deposition)                       USDC Northern District of CA

2019   **Sprint** v. AT&T Mobility
       (Deposition and trial)             USDC Southern District of NY

2019   Merck & Co v. **Merck KGaA**
       (Deposition)                       USDC District of NJ

2019   **Arbor Pharmaceuticals** v. ANI Pharmaceuticals
       (Deposition)                       USDC District of Minnesota

2019   **American Cruise Lines** v. American Queen Steamboat Company
       (Deposition and trial)             USDC District of DE

2018   MZ Wallace v. **Oliver Thomas**
       (Deposition and trial)             USDC Southern District of NY

2018   VonRosenberg v. **Lawrence**
       (Deposition)                       USDC District of SC

2018   **Wing Enterprises** v. Tricam Industries, Inc.
       (Deposition)                       USDC District of MN

2018    Kjaer Weis v. **Kimsaprincess, Inc.**
        (Deposition)                              USDC Central District of CA

2018    In re: NCAA Grant-in-Aid Cap Litigation
        (Deposition; Trial)                       USDC Northern District of CA

2018    **Under Armour** v. Battle
        (Deposition)                              USDC District of Maryland

2018    Federal Trade Commission v. **D-Link Systems**
        (Deposition)                              USDC Northern District of CA

2018    Ezaki Glico v. **Lotte International**
        (Deposition)                              USDC District of NJ

2018    Car Freshener Corporation v. **American Covers/Energizer Holdings**
        (Deposition)                              USDC Northern District of NY

2018    **Combe** v. Dr. August Wolff
        (Deposition and trial)                    USDC Eastern District of VA

2018    In Re GM Ignition Switch Litigation
        (Deposition)                              USDC Southern District of NY

2018    Zetor v. **Ridgeway**
        (Trial Testimony Deposition)              USDC Western District of AR

2018    Superior Consulting v. **Shaklee**
        (Deposition; Hearing; Trial)              USDC Middle District of FL

2018    Monster Energy Company v. **Integrated Supply Network**
        (Deposition)                              USDC Central District of CA

2018    Sandoz v. **GlaxoSmithkline**
        (Deposition)                              USPTO Opposition

2018    Variety Stores v. **Walmart Stores, Inc.**
        (Trial)                                   USDC Eastern District of NC

2018    JB-Weld v. **Gorilla Glue Company**
        (Deposition)                              USDC Northern District of GA

2018    Bratton v. **The Hershey Company**
(Deposition)                                    USDC Western District of MO

2018    Leadership Studies v. **Blanchard Training & Development**
(Deposition)                                    USDC Southern District of CA

2017    **Gulfstream Aerospace** v. Gulfstream Unsinkable Boats
(Deposition)                                    USPTO Opposition/Cancellation

2017    **Mercado Latino** v. Indio
(Deposition)                                    USDC Central District of CA

2017    Delalat v. **Nutiva**
(Deposition)                                    USDC Northern District of CA

2017    Dashaw v. **New Balance**
(Deposition)                                    USDC Southern District of CA

2017    **Bearing Tech** v. O'Reilly Automotive
(Deposition)                                    USDC Western District of MO

2017    Soundview v. **Facebook**
(Deposition)                                    USDC District of Delaware

2017    Rovi v. **Comcast**
(Deposition)                                    USDC Southern District of NY

2017    Puma v. **Black & Decker**
(Trial)                                         New Mexico Circuit Court

2017    **Select Comfort v.** Personal Comfort
(Trial and Deposition)                          USDC District of Minn

2017    **Alzheimer's Foundation of America** v. Alzheimer's Association
(Deposition and trial)                          USDC Southern District of NY

2017    **Banc of California** v. Farmers & Merchants Bank
(Deposition)                                    USDC Central District of CA

2017    PolyGroup v. **Willis Electric**
(Deposition)                                    Patent Trial and Appeal Board

2017    Mullins v. **Premier Nutrition**             USDC Northern District of CA

Evid. Appx. Page 724

(Depositions in Class Cert and Merits phases)

2017  Lion's Gate v. **TD Ameritrade**
(Deposition)                              USDC Central District of CA

2017  **Deere & Company** v. Fimco dba Schaben
(Deposition and trial)                    USDC Western District of KY

2017  **Adidas & Reebok** v. TRB
(Deposition)                              USDC District of Oregon

2017  **Church & Dwight** v. SPD          USDC Southern District of NY
(Deposition/trial in liability phase; deposition/trial in damages phase)

2017  In re: **Coca Cola** Marketing and Sales Practices Litigation (No. II)
(Deposition)                              USDC Northern District of CA

2017  **Ducks Unlimited** v. Boondux LLC and Caleb Sutton
(Deposition and Trial)                    USDC Western District of TN

2017  Globefill v. **Element Spirits**
(Deposition and Trial)                    USDC Central District of CA

2017  Brickman v. **Fitbit**
(Deposition)                              USDC Northern District of CA

2017  Network-1 Technologies v. **Alcatel-Lucent et al.**
(Deposition)                              USDC Eastern District of TX

2017  Health Partner Plans v. **Reading Health Partners**
(Deposition and Injunction hearing)   USDC Eastern District of PA

2017  In Re **Biogen** '755 Patent Litigation
(Deposition)                              USDC District of NJ

2017  **Cava Mezze** v. Mezze Mediterranean Grill
(Trial)                                   USDC District of MD

2017  Mastrandrea v. **Vizio**
(Deposition)                              USDC Central District of CA

2017  **Adidas** v. Skechers
(Deposition and Injunction hearing)   USDC District of OR

Evid. Appx. Page 725

*Presentations*

The McCarthy Series: U.S.P.T.O. v. Booking.com: What the Recent SCOTUS Ruling Means for Trademark Law
(McCarthy Institute Webinar, July 29, 2020)

Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags
(INTA Annual Meeting, May 21, 2019)

Consumer Perception Surveys - A Primer from Survey Experts and NAD
(ASRC Conference, Dec 7, 2018)

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May 9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference, Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute) (September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable **(**April 7, 2010)

<u>Recent Trends in Trademark Surveys</u> (Virginia State Bar Intellectual Property Conference, October 2009)

<u>Trademark Surveys in US Litigation</u> (presentation for International Trademark Association Annual Conference) (May 2009)

<u>How to Conduct Surveys for use in Trademark Disputes</u> (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>Trademark and Advertising Perception Studies for Legal Disputes</u> (Opinion Research Corporation Seminar, June 2008)

<u>Understanding Advertising Perception Surveys</u> (Promotions Marketing Association Annual Law Conference) (November 2007)

<u>Designing and Implementing Studies to Substantiate Advertising Claims</u> (American Conference Institute Claims Substantiation Conference, October 2007)

<u>Surveys in Trademark and False Advertising Disputes</u> (InfoUSA Webinar, June 2007)

<u>Measuring Consumer Perception in False Advertising and Trademark Cases</u>, (multiple presentations) (2007)

<u>Potential Errors to Avoid In Designing a Trademark Dilution Survey</u> (American Intellectual Property Association paper, April 2007)

<u>Consumer Surveys in Trademark and Advertising Cases</u> (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

<u>Use of Survey Research and Expert Testimony in Trademark Litigation</u>, (International Trademark Association Annual Conference, May 2006)

<u>Survey Research as Evidence in Trademark/Trade Dress Disputes</u> (multiple presentations) (2006)

<u>Using Surveys to Measure Secondary Meaning of Trade Dress</u>, Legal Education Seminar, Boston, April 2006


***Publications/Papers***

Evid. Appx. Page 727

An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks that are Not Top-Of-Mind, 109 TMR 935 (Nov-Dec 2019)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)


*Commentary*

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

*Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

# APPENDIX B

SCREENER

**BASE: ALL RESPONDENTS**

Q99    Insert Captcha [HIDE "YOU ARE HUMAN" SCREEN]

**BASE: ALL RESPONDENTS**

Q100   Please enter your year of birth. **[PROGRAMMER: 4-DIGIT BOX. TERMINATE IF DOES NOT MATCH PANELIST'S PRELOAD.]**

**ASK IF: HAS NOT TERMINATED**

Q105   Are you… **[CHECK AGAINST PANEL VARIABLE AND TERMINATE IF IT DOES NOT MATCH]**
1.  Male [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN VALUE OF "1" FOR MALE]
2.  Female [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN VALUE OF "2" FOR FEMALE]

**ASK IF: HAS NOT TERMINATED**

Q107   Which of these age ranges includes your age?
**[TERMINATE IF UNDER 21 OR AGE RANGE NOT POSSIBLE BASED ON YEAR OF BIRTH ENTERED IN Q100]**
1.  Under 21 [TERMINATE]
2.  21-34
3.  35-54
4.  55 or older

**BASE: ANY NON-TERMINATES**

Q109   Which of the following web browsers or search engines, if any, have you used in the past 3 months?

*Please select all that apply.*
[RANDOMIZE]
1.  Google Chrome
2.  Internet Explorer
3.  Microsoft Edge
4.  Bing
5.  Yahoo
6.  Firefox
7.  Opera
8.  Hagelin **[TERMINATE]**
9.  Other **[ANCHOR]**
10. Not sure **[ANCHOR; EXCLUSIVE]**

1

**[Terminate if selects 109/8 or if selects all of 109/1-7]**

<u>ASK IF: HAS NOT TERMINATED</u>
Q110   In what state do you live?
  **[PROGRAMMER: Drop down menu of states plus D.C. Include an option for "Other" and terminate if it is selected.]**

  **[NOTE QUOTAS FOR CALIFORNIA, NY, AND NATIONAL (NON-CA/NY) SUBGROUPS WITH AGE/GENDER SUBQUOTAS FOR EACH. ONLY CONTINUE IF THERE ARE OPEN AGE/GENDER QUOTAS FOR THEIR GEOGRAPHIC SUBGROUP.
  DO NOT ASSIGN TO A CELL UNTIL AFTER RESPONDENTS HAVE QUALIFIED. DO NOT ALLOW MORE RESPONDENTS TO CONTINUE THAN THERE IS ROOM AVAILABLE IN THE SURVEY FOR THEIR AGE/GENDER/GEOGRAPHIC QUOTA GROUP.]**

**[INCLUDE HIDDEN QUESTION SHOWING RESPONDENTS BY U.S. REGION.]**

<u>ASK IF: HAS NOT TERMINATED</u>
Q120   Which of the following types of <u>ready-to-drink bottled beverage</u> products, if any, have you purchased in the past 6 months?

  *(Select all that apply)*
   **[RANDOMIZE]**
  1.   Kombucha
  2.   Switchel/drinking vinegar
  3.   Water kefir
  4.   Probiotic tonic
  5.   Coconut water
  6.   None of these **[ANCHOR; EXCLUSIVE]**

<u>ASK IF: HAS NOT TERMINATED</u>
Q130   Which of the following types of <u>ready-to-drink bottled beverage</u> products, if any, are you likely to consider purchasing in the next 6 months?

  *(Select all that apply)*
  **[SHOW SAME CHOICES AS 120 IN SAME ORDER]**

**[MUST SELECT AT LEAST ONE OF: 120=1 OR 130=1, TO CONTINUE; OTHERWISE, TERMINATE.]**

**ASK IF: HAS NOT TERMINATED**

Q170   For quality assurance, please type the word "survey" in the blank next to the "Other" box below and then click to continue.

1. Strongly agree
2. Agree
3. Neutral
4. Disagree
5. Strongly disagree
6. Other _____ [DO NOT FORCE TEXT BOX]

[TERMINATE IF SELECTED 170/1-5 OR DOES NOT TYPE IN AN ANSWER. CONTINUE IF r6 AND ENTERS ANY OPEN END.]

**ASK IF: HAS NOT TERMINATED**

Q180   You have qualified to take this survey.  Before continuing, please carefully read these instructions:

\*       Please take the survey in <u>one</u> session without interruption.

\*       Please keep your browser maximized for the entire survey.

\*       While taking the survey, please do not consult any other websites or other electronic or written materials.

\*       Please answer all questions on your own without consulting any other person.

\*       If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

1. I understand and agree to the above instructions
2. I do not understand or do not agree to the above instructions **[TERMINATE]**

**[ONLY QUALIFIED RESPONDENTS BEYOND THIS POINT. AT THIS POINT, NOW PRIORITIZE CELL ASSIGNMENT BY NEED TO FILL AGE/GENDER/GEO SUBQUOTAS. IF RESPONDENT'S AGE/GENDER/GEO QUOTAS ARE CLOSED FOR BOTH CELLS THEN DO NOT ALLOW TO CONTINUE.]**

**[PROGRAMMING NOTE: DISPLAY ANY TEXT WITH ITS OWN QUESTION NUMBER ON A SCREEN BY ITSELF]**

---

MAIN SURVEY ALL CELLS

---

**ASK ALL QUALIFIED**

Q200  In a moment you are going to be shown images of a kombucha beverage product.

Please use the green arrows to the sides of the page to fully rotate the product until you have completed a rotation to view the entire product. You may use the arrows to go back and forth to rotate the product as much as you'd like.  You may click on any image to see an enlarged version.

When you are finished looking at the product, you will be asked some questions.  If for any question, you have no opinion or do not know, please indicate so.  Please do not guess.

Appendix B: Questionnaire

**BASE: ALL**

Q220   Please use the green arrows to fully rotate the product.

**[PROGRAMMING: FOR CELL 1, DISPLAY IMAGES 1001 – 1004. FOR CELL 2, DISPLAY IMAGES 2001 – 2004.  PROGRAM IMAGES SO THEY APPEAR LARGE BUT DO NOT REQUIRE SCROLLING.  IF RESPONDENT CLICKS ON ANY IMAGE DISPLAY AN ENLARGED VERSION.  PROGRAM ARROWS TO APPEAR TO THE SIDE OF EACH IMAGE AFTER IT HAS BEEN ON SCREEN FOR 5 SECONDS SO RESPONDENTS CAN MANEUVER BACK AND FORTH BETWEEN IMAGES. PLACE THESE ARROWS ABOUT 1/3 FROM THE TOP OF THE IMAGES.  BENEATH EACH IMAGE, IN SMALL TYPE, INCLUDE "1 OF 4" "2 OF 4" ETC. PROGRAM SO IF RESPONDENT CLICKS AFTER FINAL IMAGE IT WILL RETURN TO FIRST IMAGE.**

**PRIOR TO FINAL IMAGE, SHOW TEXT AT THE BOTTOM OF THE SCREEN:** *You must completely rotate the product before continuing to the next screen.*

**AFTER FINAL IMAGE HAS BEEN DISPLAYED, <u>REPLACE</u> THIS TEXT WITH THE FOLLOWING:]**

Before continuing with the survey, please indicate whether you have clearly viewed all of the images.

1.   I have clearly viewed all images
2.   I was unable to clearly view all images **[TERMINATE – DO NOT COUNT AS COMPLETE]**

5

Appendix B: Questionnaire

**ASK: ALL QUALIFIED RESPONDENTS**

Q240  How likely, if at all, would you be to purchase the product you were just shown?

[**Rotate whether shown in order 1-7 or 7-1**]

1. Extremely likely
2. Very likely
3. Somewhat likely
4. Neither likely not unlikely
5. Somewhat unlikely
6. Very unlikely
7. Extremely unlikely
8. Don't know/no opinion [**ANCHOR**]

**ASK: 240=1-7**

Q250  What makes you say that you would be _____ [**pipe in answer from 240**] to purchase the product you were just shown?

Please list all reasons or factors in separate boxes below.

[**EIGHT TEXT BOXES. FORCE AT LEAST ONE BOX.**]

**ASK: 240=8**

Q255  What makes you uncertain about how likely you would be to purchase the product you were just shown?

[**LARGE TEXT BOX. FORCE.**]

**ASK: ALL QUALIFIED RESPONDENTS**

Q260  Now please imagine that the price of the product you were just shown is $3.79.

Which of the following best describes your reaction to the price of the product?

[**Rotate whether shown in order 1-5 or 5-1**]

1. Much too high
2. Somewhat too high
3. Neither too high nor too low
4. Somewhat too low
5. Much too low
6. Don't know/no opinion [**ANCHOR**]

6

## ASK: ALL QUALIFIED RESPONDENTS

Q300   Just a few more brief questions for classification purposes.

Do you or does anyone in your household work for any of the following?
*(Select all that apply)*
[RANDOMIZE]
1.    A company that makes or distributes kombucha products
2.    An advertising or market research company
3.    Neither of these **[ANCHOR; EXCLUSIVE]**

## ASK IF: ALL

Q310   Which of the following brands of <u>kombucha</u> product, if any, have you purchased at any time since 2017?

*(Select all that apply)*
 **[RANDOMIZE 1-6 BUT GROUP 1-2]**
1.  GT's Kombucha
2.  GT's Synergy
3.  Kevita
4.  Suja
5.  Health-Ade
6.  Humm
7.  Store brand **[ANCHOR]**
8.  Local area kombucha brand **[ANCHOR]**
9.  None of these **[ANCHOR; EXCLUSIVE]**

## ASK IF: 310=1, 2

Q320   Which of the following GT's kombucha products, if any, have you purchased at any time since 2017?

*(Select all that apply)*
 **[RANDOMIZE 1-2]**
1.  GT's Enlightened Synergy or Kombucha (clear bottle/silver label)
2.  GT's Classic Synergy or Kombucha (dark bottle/black label)
3.  Both of the above **[ANCHOR; EXCLUSIVE]**
4.  Neither of the above **[ANCHOR; EXCLUSIVE]**
5.  Don't know/not sure **[ANCHOR; EXCLUSIVE]**

Appendix B: Questionnaire

**ASK IF: ALL**
Q330  For whom have you previously purchased bottled kombucha products at any time?
*(Select all that apply)*
1. Myself
2. Another adult age 21 or up
3. A child age 12 or under
4. A child age 13 to 20
5. I have not previously purchased a bottled kombucha product **[ANCHOR; EXCLUSIVE; ONLY SHOW IF "Kombucha" IS NOT SELECTED IN Q120]**

**ASK: ALL**
Q340  How often do you personally drink bottled kombucha products?

1. Daily
2. Several days a week
3. Once a week
4. Once every two weeks
5. Less often than once every two weeks
6. I have not personally drank a bottled kombucha product

**ASK: ALL**
Q350  To the best of your knowledge, which of the following, if any, apply to kombucha products?

Kombucha products are…
**[Randomize]**
1. Fermented
2. Caffeine free
3. Low calorie
4. Pro-biotic
5. None of the above **[ANCHOR; EXCLUSIVE]**

**ASK: 350=1**
Q360  You answered that kombucha products are **fermented**.

Which of the following, if any, does this tell you about kombucha products?

*(Please answer yes, no, or don't know for each)*

8

Kombucha products contain some amount of…
**[Randomize rows. Grid with column headings: Yes, No, Don't know]**
1. Alcohol
2. Yeast
3. Sugar
4. Salt

**ASK: 350=1**

Q370   Have you ever personally made, or researched how to make, any of the following products for yourself?

*(Select all that apply)*

**[Randomize]**
1. Kombucha
2. Kimchi
3. Miso
4. Yogurt
5. Water kefir
6. Beer
7. Sauerkraut
8. None of these **[ANCHOR; EXCLUSIVE]**

# APPENDIX C

Appendix C: Screenshots

SCREENER

## Q99



## Q100



## Q105



Appendix C: Screenshots

## Q107

Which of these age ranges includes your age?

- ◯ Under 21
- ◯ 21-34
- ◯ 35-54
- ◯ 55 or older

Continue

## Q109

Which of the following web browsers or search engines, if any, have you used in the past 3 months?
*Please select all that apply.*

- ☐ Firefox
- ☐ Opera
- ☐ Google Chrome
- ☐ Hagelin
- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Bing
- ☐ Yahoo
- ☐ Other
- ☐ Not sure

Continue

Appendix C: Screenshots

Q110



Q120



Appendix C: Screenshots

Q130



Q170



Appendix C: Screenshots

Q180



MAIN SURVEY ALL CELLS

Q200



Appendix C: Screenshots

Q220   Test Group (Cell 1)



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots





Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots

Q220   Control Group (Cell 2)



Appendix C: Screenshots



Appendix C: Screenshots





Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots





Appendix C: Screenshots

## Q240

How likely, if at all, would you be to purchase the product you were just shown?

- Extremely likely
- Very likely
- Somewhat likely
- Neither likely not unlikely
- Somewhat unlikely
- Very unlikely
- Extremely unlikely
- Don't know/no opinion

Continue

## Q250

What makes you say that you would be somewhat likely to purchase the product you were just shown?

Please list all reasons or factors in separate boxes below.

Continue

## Q255

What makes you uncertain about how likely you would be to purchase the product you were just shown?

67%

Continue

## Q260

Now please imagine that the price of the product you were just shown is $3.79.

Which of the following best describes your reaction to the price of the product?

○ Much too high

○ Somewhat too high

○ Neither too high nor too low

○ Somewhat too low

○ Much too low

○ Don't know/no opinion

71%

Continue

Appendix C: Screenshots

Q300

75%

Just a few more brief questions for classification purposes.

Do you or does anyone in your household work for any of the following?
*(Select all that apply)*

☐ A company that makes or distributes kombucha products

☐ An advertising or market research company

☐ Neither of these

Continue

Q310

79%

Which of the following brands of kombucha product, if any, have you purchased at any time since 2017?
*(Select all that apply)*

☐ GT's Kombucha

☐ GT's Synergy

☐ Humm

☐ Health-Ade

☐ Kevita

☐ Suja

☐ Store brand

☐ Local area kombucha brand

☐ None of these

Continue

Appendix C: Screenshots

Q320

Which of the following GT's kombucha products, if any, have you purchased at any time since 2017?
*(Select all that apply)*

- GT's Enlightened Synergy or Kombucha (clear bottle/silver label)
- GT's Classic Synergy or Kombucha (dark bottle/black label)
- Both of the above
- Neither of the above
- Don't know/not sure

Continue

Q330

For whom have you previously purchased bottled kombucha products at any time?
*(Select all that apply)*

- Myself
- Another adult age 21 or up
- A child age 12 or under
- A child age 13 to 20
- I have not previously purchased a bottled Kombucha product

Continue

Appendix C: Screenshots

Q340



How often do you personally drink bottled kombucha products?

○ Daily

○ Several days a week

○ Once a week

○ Once every two weeks

○ Less often than once every two weeks

○ I have not personally drank a bottled kombucha product

Continue

Q350

To the best of your knowledge, which of the following, if any, apply to kombucha products?

Kombucha products are…

☐ Caffeine free

☐ Fermented

☐ Low calorie

☐ Pro-biotic

☐ None of the above

Continue

Appendix C: Screenshots

Q360



Q370

Have you ever personally made, or researched how to make, any of the following products for yourself?
*(Select all that apply)*

☐ Kimchi

☐ Kombucha

☐ Beer

☐ Sauerkraut

☐ Miso

☐ Yogurt

☐ Water kefir

☐ None of these

Continue

# APPENDIX D PROVIDED IN NATIVE FORMAT

# APPENDIX E



Evid. Appx. Page 770



2% Juice

## Nutrition Facts
Serving Size 1 bottle

Amount per serving

**Calories** 50

| | % Daily Value |
|---|---|
| Total Fat 0g | |
| Sodium 10mg | 1% |
| Total Carbohydrate 12g | 4% |
| Total Sugars 12g | |
| Includes 0g Added Sugars | 0% |
| Protein 0g | |

PER BOTTLE at time of bottling: Probiotics Bacillus Coagulans GBI-306086: 1 billion organisms, Lactobacillus Bacterium: 3 billion organisms, L(+) Lactic Acid: 100mg, Acetic Acid: 75mg, Glucuronic Acid: 1400mg, Gluconic Acid: 650mg, Polyphenols: 10mg

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), and 100% pure love!!!

*Organically produced.

Do Not Shake. Swirl gently.

Please note: Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities, or religious beliefs.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®

• regain

robiotics

• renew

7 22430 00016 9

FLV-A

473 mL

CA CASH REFUND
Please Recycle • MI OR 10¢
CT HI IA MA ME NY VT 5¢



## Always Cultured, Never Compromised

The bottle in your hand bears my name as a symbol of promise. You have my word: GT's KOMBUCHA is the most authentic Kombucha you can buy. With respect for centuries of Eastern tradition, and using heirloom living cultures passed down by my family, this sacred offering is lovingly handcrafted with goodness you can see, taste, and *feel* - just as nature intended.

~ GT Dave, Founder

WORDS OF ENLIGHTENMENT

"PUT GOOD THINGS INTO YOUR MIND, HEART, AND BODY AND WATCH SERENITY ENSUE."

– SHAWN OGLESBEE, MANAGING PARTNER AND SERIAL ENTREPRENEUR, CHAGRIN FALLS, OH

WE INVITE YOU TO ENLIGHTEN US WITH YOUR WORDS AT GTSLIVINGFOODS.COM

What is KOMBUCHA?

Kombucha is a fermented tea crafted with a living culture (known as a SCOBY) added to a base of sweetened tea. The SCOBY consumes sugars and caffeine, transforming the tea into this revitalizing wellness drink known in ancient Asian cultures as "the tea of immortality." Real, authentic Kombucha, like GT's, is raw and living, offers a tangy taste, natural effervescence, and visible culture strands.

GT'S LIVING FOODS, LLC
P.O. Box 2352
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

rebalance · reawaken · rethink · rekindle ·

# electrolytes + polyphenols·

reimagine · relive · repurpose · reinvent ·

If you are pregnant or breast feeding, please consult with your healthcare professional before consuming our products.
RAW · VEGAN · NON-GMO · KOSHER · GLUTEN-FREE

Living Food for the Living Body.™



WORDS OF
ENLIGHTENMENT

"PUT GOOD
THINGS INTO
YOUR MIND,
HEART, AND BODY
AND WATCH
SERENITY ENSUE."

- SHAWN OGLESBEE,
MANAGING PARTNER AND
SERIAL ENTREPRENEUR,
CHAGRIN FALLS, OH
WE INVITE YOU
TO ENLIGHTEN US
WITH YOUR WORDS AT
GTSLIVINGFOODS.COM

...fermented tea crafted with a living culture (known
...added to a base of sweetened tea. The SCOBY consumes
...transforming the tea into this revitalizing
...own in ancient Asian cultures as "the tea of
...authentic Kombucha, like GT's, is raw and living,
...natural effervescence, and visible culture strands.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

KOMB

organic

ORIGI

...ken · rethink · rekindle · redefine · rediscover

es + polyphenols + enzymes

...e · repurpose · reinvent · reclaim · recapture

...feeding, please consult with your
...re consuming our products.
...-KOSHER · GLUTEN-FREE

16 fl oz

ENLIGH
For Everyo

Evid. Appx. Page 773





2% Juice

**Nutrition Facts**

Serving Size 1 bottle

Amount per serving

| Calories | 50 |
|---|---|

% Daily Value

| Total Fat 0g | |
|---|---|
| Sodium 10mg | 1% |
| Total Carbohydrate 12g | 4% |
|   Total Sugars 12g | |
|     Includes 0g Added Sugars | 0% |
| Protein 0g | |

PER BOTTLE at time of bottling: Probiotics Bacillus Coagulans GBI-306086: 1 billion organisms, Lactobacillus Bacterium: 3 billion organisms, L(+) Lactic Acid: 100mg, Acetic Acid: 75mg, Glucuronic Acid: 1400mg, Gluconic Acid: 650mg, Polyphenols: 10mg

INGREDIENTS: GT's Kombucha* (kombucha culture*, black tea*, green tea*, kiwi juice*), and 100% pure love!!!
*Organically produced.
Do Not Shake. Swirl gently.

This product is considered a beer and contains a natural effervesence. Please open carefully.

Keep refrigerated • Naturally effervescent. May leak or gush if unrefrigerated.

Living Food for the Living Body.®

regain

...biotics

renew

7   22430 00016   9

FLV-A

473 mL

CA CASH REFUND
Please Recycle • MI OR 10¢
CT HI IA MA ME NY VT 5¢



Living Food for the Living Body.®

## Always Cultured, Never Compromised

The bottle in your hand bears my name as a symbol of promise. You have my word: GT's KOMBUCHA is the most authentic Kombucha you can buy. With respect for centuries of Eastern tradition, and using heirloom living cultures passed down by my family, this sacred offering is lovingly handcrafted with goodness you can see, taste, and *feel* - just as nature intended.

~ GT Dave, Founder

GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.

**What is KOMBUCHA?** *Kombucha is a fermented tea crafted with a living culture (known as a SCOBY) added to a base of sweetened tea. The SCOBY consumes sugars and caffeine, transforming the tea into this revitalizing wellness drink known in ancient Asian cultures as "the tea of immortality." Real, authentic Kombucha, like GT's, is raw and living, offers a tangy taste, natural effervescence, and visible culture strands.*

GT'S LIVING FOODS, LLC
P.O. Box 2352
Beverly Hills, CA 90213
Certified Organic by Organic Certifiers, Inc.

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

rebalance · reawaken · rethink · rekindle ·

# electrolytes + polyphenols·

reimagine · relive · repurpose · reinvent ·

Kombucha is a cultured tea that is low in alcohol, however federal law requires a warning statement on any product that may contain more than .5 % alcohol per volume.



GOVERNMENT WARNING:
(1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS.
(2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.

*...fermented tea crafted with a living culture (known ...ed to a base of sweetened tea. The SCOBY consumes ...ffeine, transforming the tea into this revitalizing ... known in ancient Asian cultures as "the tea of ... bial, authentic Kombucha, like GT's, is raw and living, ...se, natural effervescence, and visible culture strands.*

Contact us:
Toll-Free: 877.735.8423
info@gtslivingfoods.com
gtslivingfoods.com

*...ett, Inc.*

KOMB
organic

ORIG

...ken · rethink · rekindle · redefine · rediscover
...es + **polyphenols + enzymes**
... · repurpose · reinvent · reclaim · recapture

*...that is low in alcohol, however ...ing statement on any product that ...alcohol per volume.*

16 fl oz

ENLIG
For Everyon

Evid. Appx. Page 777

(Exhibit 2 to Declaration of Hal Poret)

# EXHIBIT 25

# REBUTTAL EXPERT REPORT OF HAL PORET IN MATTER OF SHARPE ET AL. V. GT'S LIVING FOODS, LLC

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# RESPONSE TO DECLARATION OF DR. J. MICHAEL DENNIS

PREPARED BY:
Hal Poret
142 Hunter Ave
Sleepy Hollow, NY 10591

July 2021

Page | 1

Evid. Appx. Page 779

## *BACKGROUND AND PURPOSE*

GT's Living Foods, LLC (GT's), through its counsel, has retained me to review the Declaration of Dr. J. Michael Dennis (June 2, 2021) and provide my opinions regarding a survey disclosed in the Dennis Declaration (the Dennis Survey). The Dennis Survey purports to measure the share of accused GT's Enlighted Kombucha/Synergy products that were purchased by persons age 18 to 20 in California. As discussed in more detail below, it is my opinion that the Dennis Survey is unreliable due to numerous severe flaws.[1]

In the course of preparing this report I reviewed the Dennis Declaration and Attachments, the Expert Report of Bruce G. Silverman, Deposition of Bruce G. Silverman, Plaintiffs' Brief in Support of its Motion for Class Certification, excerpts of Deposition testimony of Delaney Sharpe, Jenna Leder, Adriana DiGennaro, and Erin Weiler, and the materials cited in my original Expert Report in this matter. My continuing work in connection with this matter will be charged at my ordinary rate of $775/hr. My qualifications are detailed in my original Expert Report, and an updated copy of my CV is included here as Appendix A.

---

[1] My analysis and opinions pertain only to the Dennis Survey methodology. I have not performed any analysis and express no opinions regarding any statistical analysis in the Dennis Declaration.

Page | 2

*OPINIONS REGARDING DENNIS SURVEY*

I.   **The survey and its results are unreliable due to severe flaws in the screening questions that led to an improper and non-representative survey sample.**

The Dennis Survey purports to measure what share of GT's Enlighted kombucha products during the relevant class period were purchased in California by individuals in the age 18 to 20 range.  For numerous reasons, however, the Dennis Survey failed to cover an appropriate universe of GT's purchasers to reliably accomplish this objective.

A.  **The survey was not reliably limited to individuals who actually purchased the relevant GT's kombucha products.**

The Dennis Survey purports to have covered a universe of consumers who in the past 12 months had purchased GT's Enlightened kombucha products.  In fact, however, it failed to do so in a reliable manner, a flaw which single-handedly deprives the survey of any value.

The Dennis Survey asked the following screening question of all potential respondents:

Evid. Appx. Page 781

Which of these types of non-alcoholic bottled beverages have you purchased in the past 12 months?
Please select all that apply.

☐ Water

☐ Soda and pop

☐ Kombucha/probiotic drinks

☐ Tea and tea-flavored drinks

☐ Fruit juice and cider

☐ Protein drinks and shakes

☐ Energy drinks or shots

☐ Coffee and coffee-flavored drinks

☐ None of these

This question gave all potential respondents the opportunity to answer whether or not they purchased "kombucha" in the past 12 months. Any individuals who had not purchased any bottled kombucha products in the past 12 months could not have purchased the relevant GT's kombucha products. Accordingly, any respondents who did not select "kombucha" when asked what bottled beverages they had purchased in the past 12 months should have been excluded from the survey. Remarkably, however, the Dennis Survey allowed respondents to continue with the survey even if they failed to select "kombucha" as one of the bottled beverages they had purchased, as long as they selected any of the following:

- Energy drinks or shots
- Tea and tea-flavored drinks
- Fruit juice and cider

Accordingly, respondents who did not select kombucha as a bottled beverage they had purchased could still continue with the survey solely on the basis of having purchased products such as the following products:

- Monster or Red Bull energy drink
- 5-Hour energy shots
- Ocean Spray cranberry juice
- Tropicana orange juice

Such products and countless other products that could have qualified respondents to continue with the survey are far afield from kombucha and provide no valid basis for considering respondents to be genuine purchasers of any kombucha products, let alone GT's kombucha products specifically.

Despite the fact that they did not select kombucha as a product they had purchased in the past 12 months, many respondents who answered that they had only purchased non-kombucha products were nevertheless shown four consecutive screens consisting only of brands of kombucha products, and asked whether they had purchased the brand of kombucha products shown.  For example, respondents were shown the following question asking if they had purchased GT's kombucha products:

Page | 5

Have you purchased or not purchased this **BRAND OF KOMBUCHA PRODUCTS** in the <u>last 12 months</u>?

Examples of GT's Enlightened Synergy / Enlightened Kombucha



| Purchased | Did Not Purchase |
|---|---|
| ○ | ○ |

Such a screening methodology is very inappropriate.  Given that many respondents had just answered a question about which types of products they have purchased in the past 12 months and did <u>not</u> select kombucha, it would have been very bizarre for such respondents to see that the survey is showing them only <u>kombucha</u> products and asking if they have purchased that brand of kombucha.  Under such circumstances, respondents would likely realize that the survey is clearly about kombucha products, and that they need to answer that they purchase one or more of the kombucha brands shown in order to qualify to take the survey.  Having initially failed to select kombucha as a product they had purchased, subsequent answers indicating that they had purchased specific brands of kombucha after it became obvious that kombucha is the focus of the survey are completely unreliable.

In fact, 411 respondents who took the survey and are included in Dr. Dennis' analysis – well over 50% of the 794 who completed the survey – initially did <u>not</u> select kombucha when asked what products they had purchased in the past 12 years, and only qualified for the survey via the highly unreliable procedure

Page | 6

through which they were nevertheless subsequently shown four screens of kombucha products and asked if they had purchased those brands of kombucha. It is my opinion that the survey data is entirely unreliable due to the inclusion of such a large percentage of consumers that cannot be reliably identified as genuine GT's Enlightened kombucha purchasers due to the fact that they did not even select kombucha at all when initially asked what types of beverages they had purchased.

Even if the 411 respondents who completed the survey despite initially failing to select "kombucha" as a type of product they purchased in the past 12 months have truly purchased GT's Enlightened kombucha, this would not cure the problem discussed above.  This would raise an alternate problem, which is the fact that these 411 respondents (over 50% of the survey sample) were not able to provide an accurate response to a very simple question asking what types of products they purchased in the past 12 months.  For instance, imagine that these respondents had purchased GT's kombucha but did not recall this when they first saw a question asking whether they purchased kombucha, and only subsequently recalled that they had purchased kombucha when viewing the images of GT's products in the subsequent questions.  If such respondents' recall of having purchased kombucha products was so weak that they could not recall that they had purchased kombucha in the past 12 months, their ability to recall and accurately report how many GT's products they had purchased in the past 12 months would clearly be highly suspect.  Likewise, imagine that these respondents had purchased GT's kombucha but, when asked the screening question about the types of products they had purchased in the past 12 months, were too inattentive to read all the answer choices and notice that "kombucha" was a choice.  This degree of inattentiveness would also severely call into question the ability and willingness of such respondents to provide accurate and reliable answers regarding the number of GT's products they had purchased.  In

Page | 7

short, if respondents were either too forgetful or inattentive to accurately answer an extremely simple question (whether or not they had purchased any kombucha product) their answers regarding a much more difficult question (how many GT's Enlightened products they had purchased in the past 12 months) would certainly not be reliable.

B. **The survey improperly excluded respondents who had previously taken a survey about any non-alcoholic beverage.**

The Dennis Survey is also unreliable because it improperly excluded a very large number of potentially relevant consumers merely because they had taken another survey in the past 30 days regarding any non-alcoholic beverage. The survey used an online panel from Dynata. By definition, members of Dynata's panel have regular opportunities to take surveys on many topics. The Dennis Survey excluded 944 respondents because they had taken a survey about a "non-alcoholic beverage" in the past 30 days. Dr. Dennis admits that this is a large amount of potential respondents to exclude, but claims it was necessary because respondents could have been conditioned by prior surveys.[2] This purported justification is meritless. First of all, the Dennis Survey is not measuring consumers' opinions or perceptions relating to issues that could be influenced by a prior survey. Rather, it was simply attempting to collect information regarding the number of GT's products purchased. There is no reason why having taken a previous survey on any topic should "condition" respondents as to how many GT's Enlightened products they should report that they have purchased. Second, and even more importantly, "non-alcoholic beverages" is an extremely overbroad category, covering milk, bottled water, lemonade, cranberry juice, root beer, and countless other products that are far afield from kombucha which,

---

[2] Dennis Declaration Paragraph 47.

Page | 8

unlike other "non-alcoholic beverages," are fermented in nature and, as disclosed on GT's Enlightened labels, thus have "naturally occurring alcohol." There is no reason that having taken a survey on any of these or many other non-kombucha products would have any improper impact on their ability to report how many GT's Enlightened kombucha products they have purchased. Due to how broad "non-alcoholic beverages" is, it is statistically certain that the vast majority of respondents who answered that they had taken a prior survey regarding non-alcoholic beverages were referring to a survey about a type of beverage other than kombucha. There was no valid basis for excluding such respondents, and there is no way to know how much the exclusion of so many potentially qualified respondents could have skewed the results.

C. **The survey may have improperly excluded GT's Enlightened
purchasers who are aware that kombucha contains alcohol.**

The Dennis Survey initially asked potential respondents whether they had
purchased "non-alcoholic beverages" from a store in the last 12 months, and
excluded 1038 respondents because they had not.[3]  This was a severely flawed
way to screen for qualified respondents, because it improperly relies on
consumers to classify the relevant GT's Enlightened products in their own minds
as "non-alcoholic" beverages.  As fermented beverages, the relevant GT's
products do contain some alcohol, and disclose this on the label, stating that
"Kombucha is a fermented tea that has naturally occurring alcohol. Do not
consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities or
religious beliefs."  Accordingly, consumers of the relevant GT's Enlightened
products may be aware that they contain some amount of alcohol.  Consumers
who are aware that a beverage contains some amount of alcohol may not
consider it a "non-alcoholic" beverage.  Purchasers of the relevant GT's products
who do not consider them "non-alcoholic" may have answered that they have
not purchased non-alcoholic beverages and been improperly excluded even
though they have purchased GT's Enlightened kombucha products.[4]

The improper exclusion of 1038 respondents (more than the total who actually
qualified and are included in the Dennis analysis) could have skewed the results
in any number of ways.  For instance, perhaps the heaviest kombucha purchasers
have the most understanding that kombucha is a fermented tea that contains

---

[3] Dennis Declaration Paragraph 47.

[4] This problem is not cured by the fact that the survey told them to exclude alcoholic
beverages such as beer, wine, or liquor when answering whether they had purchased
"non-alcoholic" beverages.  The point remains that individuals who know that
kombucha contains alcohol may not consider it a "non-alcoholic" beverage and,
therefore, may exclude that as they would do for beer.

Page | 10

alcohol, and are the least likely to consider kombucha "non-alcoholic." If this were true, the survey may have had a tendency to screen out some of the heaviest kombucha purchasers. The exclusion of such a large number of potentially qualified GT's purchasers further renders the survey sample non-representative and the results unreliable.

**D.  The screening questions did not reliably distinguish between GT's Enlightened products and GT's Classic/Hard products**

In the main survey, where respondents were asked to report the number of GT's Enlightened products they had purchased, the Dennis Survey took particular measures to ensure that respondents understood the distinction between the Enlightened products and the Classic/Hard products. Dr. Dennis considered this important so that respondents would only report purchases of the former and not mistakenly think of the latter. At the earlier point of screening for the relevant universe, however, the survey failed to make this distinction. The screening questions simply showed respondents an image of GT's Enlightened products and asked if they had purchased this "brand" of kombucha products. Respondents who were shown the image of these GT's products could certainly understand the "brand" being asked about to be "GT's" and for this to include GT's Classic/Hard products. Accordingly, consumers who have not purchased GT's Enlightened products but have purchased GT's Classic/Hard products could have answered that they <u>have</u> purchased the <u>brand</u> shown to them (GT's) and been improperly included in the survey.[5] This further reduces the reliability of the survey sample relied on for Dr. Dennis' calculations.

---

[5] The fact that the survey subsequently asked them to confirm that they had purchased GT's Enlightened products does not cure this problem. As indicated above, the flawed screening process made it very obvious that respondents needed to select one or more of the kombucha brands shown to qualify for the survey. It would be equally obvious, if not more so, that when asked to confirm they had purchase a specific brand,

Page | 11

### E. The survey consisted mostly of non-California residents

The Dennis Survey purports to measure the share of the Products that were purchased by persons age 18 to 20 <u>in California</u>.[6]  The survey, however, included only 109 respondents from California out of the total of nearly 800 included in Dr. Dennis' analysis.  Accordingly, the survey relies on answers of non-California residents for the bulk of the analysis.  It is not clear that the proportion of the relevant products purchased by various ages in other states reliably reflects the proportion by age in California.  This further undermines the reliability of the results as projectable to California purchases.

While 109 respondents in California may be enough to meaningfully analyze if looking at the group as a whole, it is not a large enough sample size to accurately compare the results among various age subgroups within this sample.  For instance, the group of 109 California residents includes only 25 respondents who were age 18 – 20 and another 10 respondents who were age 21.  These sample sizes are small enough that they entail a substantial error rate if attempting to analyze the results among that subgroup of California residents on their own or to compare that subgroup to other age subgroups.

---

respondents would realize that they must confirm this to qualify.  Respondents who had just answered that they <u>had</u> purchased GT's brand kombucha may also not have read the subsequent confirmation question closely enough to notice it was asking them to confirm they had purchased <u>Enlightened</u> specifically.
[6] Dennis Declaration Paragraph 14.

II.    **<u>Additional problems prevent the data from being reliably projected to the overall class period.</u>**

A.  **The survey data regarding number of products purchased was collected during an extremely aberrational period of time.**

The Dennis Survey purported to measure the number of relevant GT's products purchased during the <u>past 12 months</u>.  The survey was conducted in May of 2021.  This means that the 12-month purchasing period covered by the survey (May 2020 to May 2021) largely overlapped with the Covid-19 pandemic.  The bulk of this 12-month period was extremely aberrational, as there were significant periods of lock-downs, quarantines, and generally widespread impact on consumer shopping behavior.  Many consumers did not visit stores at all for long periods of time, and generally changed all kinds of shopping/purchase behaviors.  The data regarding the number of products purchased during the pandemic cannot be reliably projected to the number of products purchased during the first several years of the class period (from Feb 2017 through May 2020).

There is particular reason to be concerned that the data collected regarding purchases during the core of the pandemic could be skewed in terms of the proportion of products purchased by age.  The Covid-19 pandemic had the most severe impact on older individuals, whereas the youngest individuals suffered the least impact.  It is easy to appreciate how older individuals may been more impacted by health issues, may have chosen to stay home as a precaution, and may have purchased less of certain non-essential products, whereas the youngest individuals (particularly those in the key 18 – 20 range focused on by Dr. Dennis) may have been less impacted by sickness, less concerned about Covid-19, and may have continued to shop and purchase more products at higher rates.  For

Page | 13

this and other reasons, the data collected regarding the proportion of GT's products purchased by various age groups <u>during the pandemic</u> cannot be reliably projected to the bulk of the class period.

### B. Even aside from the pandemic, the 2020-2021 data is not necessarily applicable to the bulk of the class period.

Even without considering the pandemic, Dr. Dennis does not provide any reliable basis for thinking that the results from the May 2020 to May 2021 period can be reliably projected to the previous years of the class period, in terms of the relative proportion of relevant GT's products purchased by various age groups. It is possible that the general awareness of and popularity of kombucha has varied from 2017 to the present among various age groups. For instance, during earlier periods of time, kombucha may have been more of a niche product for certain demographics, whereas it may have generally grown to gain awareness and popularity among a broader audience over the years. The most recent data regarding how many GT's products were purchased by various age groups may not be representative of the proportions from earlier years.

### C. The survey did not collect sufficient data to allow for reliable pro-rating of purchasers made by those who were 21 at the time of the survey.

For respondents who were 21 at the time of the survey, Dr. Dennis needed to apportion their purchases over the past 12 months to the period of time that the respondent was age 20 versus age 21. It did so by asking for respondents' birth month and attempting to use this to pro-rate the number of products purchased based on the proportion of the last 12-month period that the respondent was 20. However, since the survey did not find out the respondent's specific birth <u>date</u>, it

Page | 14

could not have done an accurate pro-rating. For instance, the survey may have learned that a respondent was turned 21 in January of 2021. Without knowing whether they turned 21 on the 1st or the 31st of the month or somewhere in between, the analysis could not have accurately determined the proportion of the 12-month period that the respondent was age 20 versus age 21. The pro-rated proportion of products that Dr. Dennis attributed to the portion of the year that respondents were 20 could not, therefore, be reliable.

Even putting this issue aside, Dr. Dennis' assumption that the proportion of relevant GT's products purchased over a 12-month period could be evenly distributed across all months is not supportable. The crux of Plaintiffs' case relates to the allegation that the product contains alcohol and should not be purchased by those under 21. Plaintiffs also argue that consumers under 21 would choose not to purchase the product if they knew it contains alcohol. Since the relevant GT's products do contain some alcohol and disclose this, some consumers may know that they contain alcohol. If Plaintiffs' arguments were valid, this would mean that some consumers who are 20 years old might choose not to purchase kombucha until they turn 21. For this reason, it is not appropriate to assume that the proportion of products purchased in the past 12 months by a then 21-year old can be evenly apportioned by month across the months that the individual was age 20 versus age 21. If a 21-year old reports purchasing 50 bottles over the past 12 months, it could be that all of those purchases occurred after they turned 21. Or there could be another uneven distribution by month. Dr. Dennis' analysis of those in the age 18 to 20 range could be significantly off-base due to unfounded assumptions about whether past 12-month purchases by those who were 21 at the time of the survey can be equally pro-rated across the months when the individual was age 20 versus 21.

Page | 15

III.    **The task imposed by the Dennis Survey was extremely difficult and almost certainly led to a meaningful degree of error**.

The Dennis Survey asked respondents to report the number of relevant GT's products purchased over a 12-month period.  This is a very difficult task that almost certainly involved meaningful error for numerous reasons.

### A.  Consumer recall of low-salience purchases over a 12-month period.

The Dennis Declaration describes the high risk of inaccuracy involved in asking consumers to report details about non-recent and "low salience" purchases.[7]  Dr. Dennis also concedes that for non-recent purchases, the result would be "unreliable data since my survey requires accurate recall of the quantity of purchase of the Product."[8]  Dr. Dennis does not, however, acknowledge the extent to which the task he asked respondents to complete could have involved such error and inaccuracy.  Respondents were asked to report the number of products purchased over a 12-month period.  This could have required respondents to report on a large number of purchases over a long period extending back to 12 months ago.  Asking respondents to think back through a full year worth of purchases to come up with a total number of products purchased could have led to a meaningful degree of inaccuracy.

### B.  Questioning about three different GT's products

The difficulty of estimating the number of products purchased over a 12-month period was exacerbated by the fact that the survey sought to separately collect data for three different products (16oz bottle, 48oz bottle, and multi-bottle

---

[7] Dennis Declaration Paragraphs 55-56.
[8] Dennis Declaration Paragraphs 26.

Page | 16

boxes).  Many respondents were required to not only think through a year's worth of purchases, but to separately distinguish between two or three different GT's Enlightened products.  This further complicated the task asked of respondents.

### C.  Distinguishing Enlightened from Classic/Hard

The difficulty of estimating the number of products purchased over a 12-month period was also exacerbated by the need to separately distinguish between GT's Enlightened products and Classic/Hard products.  This further complicated the task of thinking back through a full year of purchases and having to accurately estimate the number of a particular set of products while excluding related products.  It is not even clear to what extent consumers meaningfully distinguish between GT's Enlightened products and Classic/Hard products, or if some consumers simply think of themselves as "GT's" purchasers and don't pay much attention to the various distinctions.  For the very reasons cited by Dr. Dennis, it would be particularly hard for respondents to accurately estimate their number of purchases over a full year while both having to account for three different versions of the product and having to attempt to distinguish between whether various purchases were of the Enlightened products versus the Classic/Hard products.

### D.  Challenges for the age 18-20 year old subgroup.

The challenges discussed above may have been particularly acute for the critical age 18 – 20 age group.  These youngest individuals have the least shopping experience and the least experience thinking about or attempting to assess their overall shopping patterns.  Accordingly, the youngest individuals may have had the most difficult time accurately thinking back through their purchase history

Page | 17

and giving an accurate accounting.  This could have skewed the results in terms of the proportion of purchases reported by the youngest versus older individuals.

### E.  Skewing based on volume of purchase.

The results also could have been skewed based on the increased difficulty in accurately reporting the number of products purchased based on volume.  For instance, for an individual who purchased one bottle of kombucha on one occasion, it might be easy to provide an accurate answer.  For another individual who has made many purchases of many kombucha products over many months, the task of accurately reporting their number of purchases may be much more difficult.  Likewise, those who tend to purchase one bottle at a time versus those who buy in bulk may have different abilities to estimate the number of products purchased.  As but one example, an 18-year old may be prone to purchase a bottle at a time, whereas a 40-year old with a spouse or family may be more likely to purchase in bulk.  Such disparities may also have contributed to an error rate that could skew the proportion of products purchased by various demographics.

### IV.    An error in the survey instructions likely exacerbated the difficulty of accurately estimating.

In an attempt to increase the accuracy of respondents estimating their number of purchases, the Dennis Survey offered respondents a choice of two ways to estimate: (1) they could estimate the total number of products purchased over the 12-month period; or (2) they could estimate the number of products they purchase in a typical month.  The survey, however, had an apparent error in the

Page | 18

instructions regarding the second option, which made it difficult to understand. The instruction stated as follows:

> "If you typically purchased less than bottle or box of the product each month, please use this way to tell us."

This instruction does not make grammatical sense and is confusing. Presumably it was intended to refer to purchase of less than "one" bottle or box, but it omitted the word "one." The confusing nature of this instruction due to the error may have deterred some respondents from using this second method, even if it would have been the more suitable method for accurately estimating.

## V. The survey had extremely poor quality control, leading to data that empirically proves the unreliability of respondents' answers.

It is good survey practice to include various measures during the initial screening and demographic portions of a survey to ensure that respondents are paying attention and answering questions accurately. For instance, my original Expert Report describes various quality control measures adopted in my own survey to weed out individuals who are clicking answer choices indiscriminately or not paying sufficient attention to give reliable answers, including: (1) checking the age and gender entered by respondents against the sample provider's (Dynata's) demographics on record for each respondent to ensure they were entering accurate data; (2) asking respondents to select their age range to ensure they were paying attention and selecting accurate answer choices; (3) asking a quality control question that included a fictional answer choice to weed out those who are not paying attention and selecting inaccurate answers; and (4) asking a quality control question that instructs respondents to enter a certain

Page | 19

answer to weed out those who aren't paying attention and carefully following instructions.

The Dennis Survey did not include any such quality control measures and produced data that is clearly of such poor quality as to be entirely unreliable. This is extremely evident from the open-ended answers entered by respondents who were asked an open-ended question toward the end of the survey.  Just after providing their estimate regarding the number of GT's products purchased, respondents were asked the following question:

> Are you aware of any negative publicity or other news about GT'S KOMBUCHA BEVERAGES?

Respondents who answered affirmatively where then asked a follow-up open-ended question:

> Please tell us about any negative publicity or other news about GT'S KOMBUCHA BEVERAGES.

The answers to this follow-up question make clear that many respondents were not paying attention or inputting genuine, accurate answers.  For instance, the following are the answers of 39 respondents when asked what negative publicity or other news they have heard about GT's kombucha after answering that they have heard negative publicity or other news:

| Nonsense answers to Open-ended Question Regarding Negative Publicity |
| --- |
| amazon vnfgnfgnfgngfnfgnfgngfn fggffghfghfgnfgn |
| Beat saber si tu eres tu no I didn't get to the bank and get back. |
| bes |
| cool for me.vthi |

Page | 20

| |
|---|
| hfffggggg |
| Hgg fghh ngffcdghh nggg fg cfgg. More of the line in the day for sone of t |
| I don't know I'm just doing this survey for the money bro. |
| I don't want you no I don't want you like you to know that you |
| i dont know i dont know i dont know i dont knowi dont know i dont know |
| Internet technology and |
| Is pe |
| it' qua |
| It's great and entertaining it's great it's fun and fun to use |
| It's not like that I have to get my hair color and my hair |
| It's colure is not mach for this |
| kill |
| klkjhjlj .nn. .,fdj fg g |
| Noooooooooooooooooooooooneeeeeee |
| nothing none more less thing how what |
| Nothingo I can do that was on the phone with the |
| Now I think |
| penis |
| River is a river drive and fort was good service and service |
| sgdfhdhfghfjfytjtyjft ergerthedrhrthrthrftjerthrth srfgerherhethrthrthrthrth |
| Straw |
| sueurs et les vacances et le nombre des gens de twitter et des personnes Hahahha |
| ther i |
| There |
| Well also |
| well this one and i like it very much |
| Yeah it's good amd firing koeoor.  Kekrmrme eirkokm. Meiririe |
| Yeah yeah I don't think you can get it for a |
| yes |
| Yes |
| yes |
| Yes it's awesome an |
| yes someth |
| ممتاز وجيد |
| নকল |

These responses are clearly nonsensical or gibberish, reflecting that respondents
were not paying attention and giving genuine, accurate responses.  These
responses were provided almost immediately after inputting the number of GT's

Page | 21

Evid. Appx. Page 799

products they supposedly purchased.  These open-ended responses make clear that respondents' answers regarding their GT purchases are not at all reliable.

The following are the answers of an additional 99 respondents who initially answered that they have heard negative publicity or other news about GT's products but then immediately contradicted this answer by answering that they have not heard anything when asked what they had heard:

| Contradictory answers |
|---|
| havent heard any this is my first time seeing this |
| I  REALLY  HAVEN T  HEARD  ANYTHING  NEGATIVE  ABOUT |
| I didn't, I h |
| i do not have any comments |
| I don't really pay attention to it |
| I don't know |
| I have none to say |
| I have not heard any negative publicity about the new beverages. |
| I have not heard anything negative about the kombucha beverages |
| i haven't heard any |
| I haven't saw |
| I know of none |
| Idk |
| I've never hade anything negative about it i believe |
| N/a |
| N/S |
| No comment |
| no comment |
| No concerns |
| No dont there are any prob |
| no have |
| No negative comment I love the beverage and it's ben |
| no negative publicity |
| no nothing |
| no nothinng |
| no thing |
| no thing |
| no thing |
| NO. |

Evid. Appx. Page 800

| |
|---|
| No. Thanks. |
| non |
| None |
| none |
| None |
| none |
| none |
| none |
| none |
| None |
| None |
| None |
| None |
| None |
| None |
| None |
| None |
| none |
| none |
| None |
| None |
| NONE |
| None |
| none |
| none |
| none |
| None |
| none |
| None |
| None at |
| None at all. |
| None at all. |
| None at this time |
| None i can think of . |
| None I love them all And always excited for them!! |
| none ithing |
| None negative publicity I have seen anywh |
| None that I can think of really if I'm completely honest. |
| none that I have heard of recently to be honest. |
| none that i know of it is just a preferred taste |
| None that I was able to identify lately. |
| none yhat i know of |

Page | 23

Evid. Appx. Page 801

| |
|---|
| Nope |
| Not heard anything |
| nothing |
| nothing |
| Nothing |
| Nothing |
| Nothing |
| nothing at all |
| Nothing else |
| Nothing is negative I love them all most of them. |
| Nothing negative |
| Nothing negative afz |
| Nothing negative to call information. |
| Nothing negative to sa |
| Nothing really  very po |
| Nothing that I know of |
| nothing this everything i like |
| Nothing to negative anything |
| Nothing to say |
| Nothing to say. It good a product.  Kajaj |
| nothing to tell about |
| Nothing v |
| nothing! |
| notting |
| Odk |
| There are none |
| There aren't really any |
| there is no negative publicity |

Such respondents were clearly not paying meaningful attention when answering the previous question asking whether they had heard negative publicity or other news, and this inattention was exposed when subsequently asked an open-ended question about what they heard.

The following are the answers of an additional 36 respondents who gave answers that are largely non-responsive and/or inconsistent given that they

Page | 24

Evid. Appx. Page 802

were asked to identify what <u>negative</u> publicity or other news they had heard

about GT's products:

| Non-responsive/inconsistent answers |
| --- |
| good |
| good |
| Good |
| Good |
| good beverages in the world good pl |
| good value testey |
| great |
| Great |
| great flavors available and hwalthy = |
| great news |
| great publicity |
| I like the brand bottle |
| i like this |
| I love it all |
| I love it nothing bad |
| I've never before. Everyone I know loves kombucha drinks and this brand especially |
| It is nice. |
| IT IS VERY GOOD |
| it is very good |
| It's good! |
| ITS GOOD |
| It's great |
| It's great |
| Its so much good and better for myself. I use it and recommand |
| nice nice nice nice nice |
| No Because very good |
| positive |
| positive |
| the best to me |
| this is good product |
| very good |
| very good and great |
| very good it |
| very good we |
| VERY NICE |

Page | 25

> very tasty I must say

These answers also reflect a substantial lack of attention to the survey questions and instructions, and the failure to provide reliable, responsive answers.

The responses shown above encompass 174 of the 268 respondents who answered that they have heard negative publicity or news and were, accordingly, asked the open-ended question.  That means that a remarkable **65%** of respondents did not appear to be paying sufficient attention and providing genuine, accurate answers when answering the questions about publicity, which occurred almost immediately after the key answers about number of GT's products purchased were entered.  It is impossible to have any confidence in the answers about how many GT's products were purchased when the respondents were clearly not paying attention and providing reliable answers to the subsequent questions.  It is hard to imagine how Dr. Dennis could have reviewed these answers to his survey and felt it was appropriate to rely on the answers provided by such respondents.

In addition, this only scratches the surface of the problem.  An additional 500-plus respondents took the survey but never had an opportunity to answer an open-ended question because they answered that they had <u>not</u> heard negative publicity or other news.  Given that many of those who answered that they <u>had</u> heard publicity were clearly not paying attention when answering that question, it is certainly the case that some who answered that they had <u>not</u> heard publicity were also not paying attention.  There is no way to know how many of the additional 500-plus respondents were not paying attention but simply avoided having this revealed by an open-ended answer because they happened to answer that they had not heard publicity.

Page | 26

In sum, the alarming number of nonsensical and non-responsive answers provided by respondents immediately after answering the key questions deprives the key data regarding number of purchases of any reliability.

## CONCLUSIONS

For the foregoing reasons, it is my opinion that the Dennis Survey is unreliable due to numerous severe flaws.

Hal Poret

Dated:  July 2, 2021

# Appendix A

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

*Education*

1998        Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995        S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993        Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

*Employment*

2016 -      President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004 - 2015  Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004  Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003  Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

Evid. Appx. Page 807

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2021    **Elevations Credit Union** v. Elevate Credit Union
(Deposition)                                    USDC District of UT

2021    Sharpe v. **GT'S Living Foods**
(Deposition)                                    USDC Central District of CA

2021    Mirzoyan v. **Hershey**
(Deposition)                                    Superior Court of California

2021    Furniture Dealer.net v. **Amazon.com**
(Deposition)                                    USDC District of MN

2021    **Treehouse Foods, Inc.** v. Keurig Green Mountain, Inc.
(Deposition)                                    USDC Southern District of NY

2021    Brady v. **Bayer**
(Deposition)                                    Superior Court of California

2021    Capri Sun v. **American Beverage Corporation**
(Deposition)                                    USDC Southern District of NY

2020    **Universal Electronics, Inc.** v. Roku Inc. et al.
(Deposition)                                    International Trade Commission

2020    Enchante Accessories v. **Turko Textiles**
(Deposition)                                    USDC Southern District of NY

2020    Greater Orlando Aviation Authority v. **Melbourne Airport Authority**
(Deposition)                                    USDC Middle District of FL

2020    **New Orleans Saints** v. WDI
(Trial)                                         American Arbitration Association

2020    Vanderbilt University v. **Scholastic**
(Deposition)                                    USDC Middle District of TN

2020    Pacific Packaging v. **Nutrisystem**
(Deposition)                                    USDC Central District of CA

Evid. Appx. Page 808

2020   American Airlines v. **Delta Airlines**
(Deposition)                              USDC Northern District of TX

2020   **FCA** v. Mahindra
(ITC Modification trial testimony)        ITC Modification Proceeding

2020   Lontex Corporation v. **Nike**
(Deposition)                              USDC Eastern District of PA

2020   **Orgain** v. Iovate
(Deposition)                              USDC Central District of CA

2020   Gibson v. **Armadillo**
(Deposition)                              USDC Eastern District of TX

2020   Koenig v. **Vizio, Inc.**
(Deposition)                              Superior Court California (LA County)

2020   Roley v. **Google**
(Deposition)                              USDC Northern District of CA

2020   **Snaplock Industries** v. Swisstrax Corp.
(Deposition)                              USDC District of Nevada

2020   TeamSnap v. **Team Mates Pty. Ltd**,
(Deposition)                              USDC District of CO

2020   Stone Brewing v. **MillerCoors**
(Deposition)                              USDC Southern District of CA

2020   Bluetooth SIG V. **FCA, USA**
(Deposition)                              USDC Western District of Washington

2020   **Monster Energy** v. VPX
(Deposition)                              USDC Southern District of FL

2019   **George Sink PA Injury Law Firm** v. George T. Sink, Jr.
(Arbitration trial)                       American Arbitration Association

2019   Cabrera v. **Bayer Corporation**
(Deposition)                              USDC Central District of CA

2019   GDM Enterprises v. **Astral Health & Beauty**

(Deposition)                                    USDC Western District of MO

2019  **Yahoo** v. Mozilla
(Deposition)                                    Superior Court Santa Clara County, CA

2019  Scott Fetzer v. **John Henry, III**
(Deposition)                    Court of Common Pleas, Cuyahoga County, OH

2019  **Illinois Tool Works** v. Poly-America
(Deposition and trial)                          USDC Northern District of TX

2019  **Adidas** v. Forever 21
(Deposition)                                    USDC District of Oregon

2019  TRP v. **Simalasan**
(Deposition)                                    USDC District of NV

2019  Ironhawk Technologies v. **Dropbox Inc.**
(Deposition)                                    USDC Central District of CA

2019  Universal Standard v. **Target Corporation**
(Deposition)                                    USDC Southern District of NY

2019  **Diageo** v. Deutsch
(Deposition)                                    USDC Southern District of NY

2019  **FCA** v. Mahindra
(Deposition and ITC trial)            ITC and USDC Eastern District of MI

2019  DealDash v. **ContextLogic**
(Deposition)                                    USDC Northern District of CA

2019  **Sprint** v. AT&T Mobility
(Deposition and trial)                          USDC Southern District of NY

2019  Merck & Co v. **Merck KGaA**
(Deposition)                                    USDC District of NJ

2019  **Arbor Pharmaceuticals** v. ANI Pharmaceuticals
(Deposition)                                    USDC District of Minnesota

2019  **American Cruise Lines** v. American Queen Steamboat Company
(Deposition and trial)            USDC District of DE

2018  MZ Wallace v. **Oliver Thomas**
(Deposition and trial)                    USDC Southern District of NY

2018  VonRosenberg v. **Lawrence**
(Deposition)                              USDC District of SC

2018  **Wing Enterprises** v. Tricam Industries, Inc.
(Deposition)                              USDC District of MN

2018  Kjaer Weis v. **Kimsaprincess, Inc.**
(Deposition)                              USDC Central District of CA

2018  In re: NCAA Grant-in-Aid Cap Litigation
(Deposition; Trial)                       USDC Northern District of CA

2018  **Under Armour** v. Battle
(Deposition)                              USDC District of Maryland

2018  Federal Trade Commission v. **D-Link Systems**
(Deposition)                              USDC Northern District of CA

2018  Ezaki Glico v. **Lotte International**
(Deposition)                              USDC District of NJ

2018  Car Freshener Corporation v. **American Covers/Energizer Holdings**
(Deposition)                              USDC Northern District of NY

2018  **Combe** v. Dr. August Wolff
(Deposition and trial)                    USDC Eastern District of VA

2018  In Re GM Ignition Switch Litigation
(Deposition)                              USDC Southern District of NY

2018  Zetor v. **Ridgeway**
(Trial Testimony Deposition)              USDC Western District of AR

2018  Superior Consulting v. **Shaklee**
(Deposition; Hearing; Trial)              USDC Middle District of FL

2018  Monster Energy Company v. **Integrated Supply Network**
(Deposition)                              USDC Central District of CA

Evid. Appx. Page 811

2018    Sandoz v. **GlaxoSmithkline**
(Deposition)                                    USPTO Opposition

2018    Variety Stores v. **Walmart Stores, Inc.**
(Trial)                                         USDC Eastern District of NC

2018    JB-Weld v. **Gorilla Glue Company**
(Deposition)                                    USDC Northern District of GA

2018    Bratton v. **The Hershey Company**
(Deposition)                                    USDC Western District of MO

2018    Leadership Studies v. **Blanchard Training & Development**
(Deposition)                                    USDC Southern District of CA

2017    **Gulfstream Aerospace** v. Gulfstream Unsinkable Boats
(Deposition)                                    USPTO Opposition/Cancellation

2017    **Mercado Latino** v. Indio
(Deposition)                                    USDC Central District of CA

2017    Delalat v. **Nutiva**
(Deposition)                                    USDC Northern District of CA

2017    Dashaw v. **New Balance**
(Deposition)                                    USDC Southern District of CA

2017    **Bearing Tech** v. O'Reilly Automotive
(Deposition)                                    USDC Western District of MO

2017    Soundview v. **Facebook**
(Deposition)                                    USDC District of Delaware

2017    Rovi v. **Comcast**
(Deposition)                                    USDC Southern District of NY

2017    Puma v. **Black & Decker**
(Trial)                                         New Mexico Circuit Court

2017    **Select Comfort v.** Personal Comfort
(Trial and Deposition)                          USDC District of Minn

2017    **Alzheimer's Foundation of America** v. Alzheimer's Association

(Deposition and trial)                    USDC Southern District of NY

2017   **Banc of California** v. Farmers & Merchants Bank
       (Deposition)                         USDC Central District of CA

2017   PolyGroup v. **Willis Electric**
       (Deposition)                         Patent Trial and Appeal Board

2017   Mullins v. **Premier Nutrition**     USDC Northern District of CA
       (Depositions in Class Cert and Merits phases)

2017   Lion's Gate v. **TD Ameritrade**
       (Deposition)                         USDC Central District of CA

2017   **Deere & Company** v. Fimco dba Schaben
       (Deposition and trial)               USDC Western District of KY

2017   **Adidas & Reebok** v. TRB
       (Deposition)                         USDC District of Oregon

2017   **Church & Dwight** v. SPD           USDC Southern District of NY
       (Deposition/trial in liability phase; deposition/trial in damages phase)

2017   In re: **Coca Cola** Marketing and Sales Practices Litigation (No. II)
       (Deposition)                         USDC Northern District of CA

2017   **Ducks Unlimited** v. Boondux LLC and Caleb Sutton
       (Deposition and Trial)               USDC Western District of TN

2017   Globefill v. **Element Spirits**
       (Deposition and Trial)               USDC Central District of CA

2017   Brickman v. **Fitbit**
       (Deposition)                         USDC Northern District of CA

2017   Network-1 Technologies v. **Alcatel-Lucent et al.**
       (Deposition)                         USDC Eastern District of TX

2017   Health Partner Plans v. **Reading Health Partners**
       (Deposition and Injunction hearing)  USDC Eastern District of PA

2017   In Re **Biogen** '755 Patent Litigation
       (Deposition)                         USDC District of NJ

2017    **Cava Mezze** v. Mezze Mediterranean Grill
        (Trial)                                   USDC District of MD

2017    Mastrandrea v. **Vizio**
        (Deposition)                              USDC Central District of CA

2017    **Adidas** v. Skechers
        (Deposition and Injunction hearing)       USDC District of OR


*Presentations*

The McCarthy Series: U.S.P.T.O. v. Booking.com: What the Recent SCOTUS Ruling
Means for Trademark Law
(McCarthy Institute Webinar, July 29, 2020)

Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of
Online Shopping, Influencers and Hashtags
(INTA Annual Meeting, May 21, 2019)

Consumer Perception Surveys - A Primer from Survey Experts and NAD
(ASRC Conference, Dec 7, 2018)

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May
9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference,
Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute)
(September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark
Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property
Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark
Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute
Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research
Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association
Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American
Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple
presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American
Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions
Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International
Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple
presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006


*Publications/Papers*

An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks that are Not Top-Of-Mind, 109 TMR 935 (Nov-Dec 2019)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)

*Commentary*

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

*Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

(Exhibit 3 to Declaration of Hal Poret)

# EXHIBIT 26

**REBUTTAL EXPERT REPORT OF HAL PORET IN MATTER OF PATEL ET AL. V. GT'S LIVING FOODS, LLC**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**RESPONSE TO DECEMBER 15, 2025 DECLARATION OF DR. J. MICHAEL DENNIS**

PREPARED BY:
Hal Poret
President, Hal Poret LLC
142 Hunter Ave
Sleepy Hollow, NY 10591

February 2026

Evid. Appx. Page 819

## *BACKGROUND AND PURPOSE*

GT's Living Foods, LLC (GT's), through its counsel, previously retained me to conduct consumer surveys and to provide my opinions regarding a survey conducted by Dr. J. Michael Dennis in 2021 (the 2021 Dennis Survey), which purported to measure the share of accused GT's Enlighted Kombucha/Synergy products that were purchased by persons age 18 to 20 in California.

I have now also been asked to review and provide my opinions regarding a survey conducted by Dr. Dennis in December 2025 (the 2025 Dennis Survey), which also purports to measure the proportion of accused GT's Enlighted Kombucha/Synergy products purchased by various age groups over a certain period of time, as well as to distinguish between consumers who are part of the Retta and Patel classes.[1]

As discussed in more detail below, the 2025 Dennis Survey has no reliability or value.  First and foremost, the 2025 Dennis Survey required respondents to accomplish the impossible task of specifying the timing and quantity of their purchases of specific versions of various sizes of products dating back as many as 8 years or more in the past.  With respect to distinguishing between those who might be Retta versus Patel class members, this required respondents to recall and report with specificity whether certain purchases occurred seven versus eight versus nine years ago, etc., a task that could not be performed with sufficient accuracy to yield reliable results.  These and other severe flaws in the Dennis Survey are discussed in greater detail below.

---

[1] My analysis and opinions pertain only to the Dennis Survey methodology.  I have not performed any analysis and express no opinions regarding any statistical analysis in the Dennis Declaration.

In the course of preparing this report I reviewed the December 2025 Dennis Declaration and Attachments (including the raw data), the previous Dennis Declaration concerning the 2021 Dennis Survey, my Rebuttal Report regarding the 2021 Dennis Survey, and my original Expert Report in this matter concerning my own surveys.  My continuing work in connection with this matter will be charged at my ordinary rate of $875/hr.  My qualifications are detailed in my original Expert Report, and an updated copy of my CV is included here as Appendix A.

*OPINIONS REGARDING DENNIS SURVEY*

> **I.**    **The survey posed respondents with an impossible task of accurately reporting purchase timing and quantity from many years ago.**

It is my understanding that the "Retta Class" included all US persons that purchased the accused products between March 11, 2011 and February 27, 2017, and that the "Patel Class" includes all US persons that purchased the accused products from March 2017 through the date that class notice is sent out, excluding members of the Retta Class.[2]  The Dennis Survey purported to question respondents about the details of purchase (timing, brand, form of product, and quantity) dating back as long as 8-9 years (and in some cases upwards of 14-15 years) prior to the survey.  The survey, which was fielded in December of 2025, asked respondents to specify whether they had purchased certain products in specific years or time frames, including:

- Before 2011
- Between 2011 and 2016
- In 2017 and each subsequent year (2018, 2019,etc.)

If respondents had purchased products only in 2017 or after, Dr. Dennis classified them as being members of the Patel class, whereas respondents who reported also purchasing products in 2016 or the preceding years were classified as being members of the Retta class.

Even prior to addressing the numerous specific problems with the survey's attempt to elicit accurate data, it is clear from the outset that the reliability of the survey depended on respondents' ability to distinguish between whether they

---

[2] Dennis Declaration (2025) Paragraph 20.

had purchased certain products in the years preceding 2017, or in 2017, or in following years – i.e., respondents were expected to recall and accurately report whether a purchase was made seven versus eight versus nine or more years ago.

The virtual impossibility of the task imposed upon respondents in the Dennis Survey is rooted in well-accepted literature on the topic of consumer memory/recall that Dr. Dennis has written extensively about.  Dr. Dennis has previously opined about the extreme difficulties in asking consumers to accurately recall and report the details of low-salient purchases in the remote past, which strongly undermines his survey in the present case.  In the case of Delalat v. Nutiva, Inc.,[3] Dr. Dennis opined on a survey that sought to test whether consumers had purchased coconut oil for advertised <u>heart health</u> benefits (with Plaintiffs claiming the advertising of heart health benefits was false or misleading).  Dr. Dennis criticized the survey as unreliable because it asked respondents about their reasons for purchases that, in some instances, occurred between 1 and 4 years ago, a period far shorter in time than many respondents were asked about in the survey Dr. Dennis conducted here.  Dr. Dennis stated as follows:

> "The survey research and psychology literatures are unequivocal that long recall periods degrade the quality of the collected survey information. Survey researchers have made extensive use of the literature in the field of memory research, which has concluded that researchers should be concerned about the accuracy of retrospective recall, particularly when the events occurred one or more years prior to the respondent taking the

---

[3] N.D. Cal. Case No. 3-16-CV-00711-HSG.  I conducted the survey on behalf of Nutiva in that case.

Page | 5

survey.[4]  Dating back to at least 1974, survey researchers have concluded that recall '[a]s the time between an event and the interview increases, underreporting of information about that event becomes progressively greater.'  Therefore, the direction of the recall bias lies in a predictable direction of resulting in depressed survey estimates the more time passes between the event and the taking of the survey.[5]"

Dr. Dennis further quoted literature on the issue of memory in survey research:

"The greater the demands a question places on memory, the less accurate the respondents' answers and, all else being equal, the less accurate the survey estimates derived from them."[6]

Dr. Dennis further opined that purchases of coconut oil would be particularly hard to recall because they are "low salience" purchases:

"Compounding the difficulty for Mr. Poret's survey is that his survey topic is fairly characterized as having 'low salience' to his respondents. Specialists in the field of psychology agree that the 'salience or importance of an event' can affect how well respondents can recall it.[7] Events which are more important to the respondents are more likely to be reported in

---

[4] The literature is extensive on the effect of memory on accuracy in survey responses for autobiographical surveys. A short list: Bradburn, N. M., Sudman, S., & Wansink, B. 2004. Asking Questions: A Practical Guide to Questionnaire Design. San Francisco: Jossey-Bass. Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. The Psychology of Survey Response. Cambridge University Press.

[5] Charles and Ramon Henson. 1974. Incentives. Motives. and Response Bias. Annals of Economic and Social Measurement. 3,2, p. 307.

[6] Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. The Psychology of Survey Response. Cambridge University Press, p. 22.

[7] Eisenhower, Donna, Nancy A. Mathiowetz, and David Morganstein. 2011. Recall Error: Sources and Bias Reduction Technique. In Paul Biemer et al (eds), Measurement Error in Suveys. Wiley, p. 138.

Page | 6

the surveys 'more completely and accurately than those of less importance.'[8]  Similar to the concept of 'salience,' Tourangeau concludes that events with 'emotional impact' can be more accurately recalled by respondents (Tourangeau, p.92). By any realistic criteria, small-dollar purchases of coconut oil represent decisions of 'low salience' and low 'emotional impact,' which are at high risk for inaccuracy in autobiographical recall, compared to 'high salience' consumer purchases such as automobiles or housing, or compared to other life-affecting events such as joblessness or emergency medical episodes."

In short, Dr. Dennis opined that respondents could not accurately answer questions about routine (low salience) purchases of more than a year ago. Specifically, Dr. Dennis opined that consumers could not even be expected to recall and report whether heart health was a reason they chose to purchase a product if that purchase occurred upwards of a year or more ago.

What the 2025 Dennis Survey sought to do in the present case imposed a far greater challenge for respondents' memory, for two reasons.  First, the 2025 Dennis Survey asked about consumer purchases that occurred upwards of <u>eight to nine</u> years ago, with it being critical for respondents to accurately identify where in such a range their purchases fell in order to determine whether they fell into the Retta class.  Second, the type of information the Dennis Survey sought to

---

[8] Eisenhower (1974) et al summarizing the insight of Cannell and Henson (1974). Also see Bradburn et al (2004) in Asking Questions, p. 65, where the authors commented that "[M]emory about highly salient events is satisfactory for periods of a year or possibly more. Unfortunately, little work has been done on periods much longer than a year. However, for highly salient events, such as major accidents or illnesses, periods of two or three years appear to be possible." Tourangeau et al (2000) in The Psychology of Survey Response, p. 86, similarly commented "[R]espondents are least accurate when the events they must report are irregular (and thus difficult to estimate) and unimportant (and thus difficult to retrieve)."

elicit was far harder to recall because it is much less salient.  Whereas the survey in the Nutiva case merely required respondents to recall if <u>heart health</u> (a highly salient issue) was a motivating cause of their decision to purchase coconut oil (as opposed to purchasing it for skin, hair, or other reasons), the Dennis Survey required respondents here to remember specific years, bottle/package sizes, and quantities, all of which are far less salient to a consumer than whether a product provided heart health benefits.

As the research cited above suggests, the degradation of memory is a particular problem when it comes to ruling out the possibility that a consumer is a member of the Retta Class.  Since the ability of respondents to accurately recall purchases decreases over time, respondents are mostly likely to fail to recall the older purchases (or to correctly recall the precise year of purchases dating back nearly a decade).  This creates a severe risk that respondents who Dr. Dennis classifies as being in the Patel Class also made older purchases that place them in the Retta Class.  The memory problem also makes it virtually certain that respondent reporting of the quantity of purchases of various versions of products dating back numerous years is highly inaccurate.

Consistent with the research cited above, it is my opinion to a high degree of professional certainty that the Dennis Survey did not elicit accurate data regarding the quantity of purchases dating back numerous years in the past, and did not reliably determine whether respondents are members of only the Patel class versus having made earlier purchases that would place them in the Retta class.

II.    **Additional survey data and issues that undermine any likelihood that respondents could accurately recall the time frame and quantity <u>of their purchases of specific items.</u>**

Page | 8

### A. The survey could not and did not distinguish between whether 2017 purchases occurred during the Retta versus Patel Class periods.

The Dennis Survey sought to determine whether consumers were members of the Retta Class by asking if their relevant purchases occurred before 2017 or in 2017 or later.  In addition to the fact that respondents could not be expected to accurately recall which year(s) they made purchases so far in the past, the survey provides no ability to determine whether respondents who purchased in 2017 made purchases prior to March of that year (which would make them members of the Retta Class) or in or after March of that year, or both.  Accordingly, respondents who reported making purchases in 2017 but not earlier and are classified in the Patel Class group may actually be members of the Retta Class if those 2017 purchases occurred in the first months of the year.  This makes the survey's attempt to distinguish members of the Patel and Retta classes unreliable.

### B. Most respondents were asked only about purchases more than a year ago.

All respondents were questioned about purchases in the year that they most recently had purchased the accused products.  This year is shown in column DH of Attachment D to the Dennis Declaration (the raw data), entitled "Time." According to Attachment D, 934 of the respondents listed as "eligible" for the survey had most recently purchased the accused products in 2024 or before.  This means that the majority of respondents in the survey were being asked about purchases that occurred at least 1 to 2 years prior to taking the survey.

Of these respondents:

Page | 9

- 517 had most recently purchased in 2022, meaning they were asked about purchases that occurred between 3 and 4 years ago.
- 291 had most recently purchased in 2020, meaning they were asked about purchases that occurred between 5 and 6 years ago.

Consistent with the literature cited above on consumer recall, this strongly undermines the reliability of respondents' reporting on their quantity of purchases of various specific products.

C. **Many respondents were asked about purchases made as young children**.

The accuracy and reliability of the data is further undermined by the fact that many of the youngest respondents were asked about purchases that occurred when they were young children.  According to Attachment D to the Dennis Survey, of the respondents listed as "eligible," 87 respondents were in the age range of 18-21 and were asked about purchases that occurred between 2 and 9 years ago when they were between 10 and 18 years of age.  This includes:

- Fourteen respondents who were 18 years old and were asked about purchases that occurred when they were roughly 10 to 15 years old.
- Twenty respondents who were 19 years old and were asked about purchases that occurred when they were roughly 11 to 16 years old.
- Twenty-four respondents who were 20 years old and were asked about purchases that occurred when they were roughly 12 to 17 years old.

Page | 10

- Twenty-nine respondents who were 21 years old and were asked about purchases that occurred when they were roughly 13 to 18 years old.[9]

Particularly given the importance of the youngest age group to Dr. Dennis' objective and analysis, it is extremely concerning that significant numbers of respondents were providing data regarding purchases made when they were pre-teens or teens.

This exacerbates the problem that the youngest individuals have the least shopping experience and the least experience thinking about or attempting to assess their overall shopping patterns. Accordingly, the youngest individuals may have had the most difficult time accurately thinking back through their purchase history and giving an accurate accounting. This could have skewed the results in terms of the proportion of purchases reported by the youngest versus older individuals. It is certainly the case that reporting of purchase quantities from years ago when respondents were young children is unreliable.

### D.     Questioning about three different GT's products

The difficulty of estimating the number of products purchased over a 12-month period was exacerbated by the fact that the survey sought to separately collect data for three different products (16oz bottle, 48oz bottle, and multi-bottle boxes). Many respondents were required to not only think through a year's worth of purchases, often in the distant past, but to separately distinguish between two or three different GT's Enlightened/Synergy products. This further complicated the task asked of respondents. The fact that the size or type of

---

[9] Many other respondents were in their twenties and were being asked about purchases made as teenagers.

Page | 11

packaging respondents had purchased may not be particularly salient further undermines the reliability of respondents' reports of the quantities of purchase.

### E.        Distinguishing Enlightened/Synergy from Classic/Hard

The difficulty of estimating the number of products purchased over a 12-month period was also exacerbated by the need to separately distinguish between GT's Enlightened/Synergy products and Classic/Hard products.  This further complicated the task of thinking back through a full year of purchases and having to accurately estimate the number of a particular set of products while excluding related products.  It is not even clear to what extent consumers meaningfully distinguish between GT's Enlightened/Synergy products and Classic/Hard products, or if some consumers simply think of themselves as "GT's" purchasers and don't pay much attention to the various distinctions.  It would be particularly hard for respondents to accurately estimate their number of purchases over a full year while both having to account for three different versions of the product and having to attempt to distinguish between whether various purchases were of the Enlightened/Synergy products versus the Classic/Hard products.

The challenge in distinguishing which products respondents purchased at which time and in which quantity is exacerbated by the consistencies across GT's trade dresses.  For instance, the following are examples of a GT Synergy and Classic product:

Page | 12



The trade dress similarities make it particularly challenging for consumers to recall which GT's products they purchased in the past, in many cases years in the past.  This further undermines the reliability of the survey, as respondents' answers may not actually apply to purchases of the correct product, but may be conflated with memories of products of highly similar appearance.

### F.  Skewing based on volume of purchase.

The results also could have been skewed based on the increased difficulty in accurately reporting the number of products purchased based on volume.  For instance, for an individual who purchased one bottle of kombucha on one occasion, it might be easy to provide an accurate answer.  For another individual who has made many purchases of many kombucha products over many months, the task of accurately reporting their number of purchases may be much more difficult.  Likewise, those who tend to purchase one bottle at a time versus those

Page | 13

who buy in bulk may have different abilities to estimate the number of products purchased.  As but one example, an 18-year old may be prone to purchase a bottle at a time, whereas a 40-year old with a spouse or family may be more likely to purchase in bulk.  Such disparities may also have contributed to an error rate that could skew the proportion of products purchased by various demographics.

### III.    <u>The survey's efforts to refresh respondents' memories regarding the year 2017 were ineffective and increased respondent burden and fatigue</u>.

In apparent acknowledgement of the extreme difficulty in expecting respondents to report on purchases as far in the past as 2017 or earlier, the Dennis Survey provided respondents with the following instructions to attempt to orient them as to the 2017 time-frame:

This is a survey about things you might have **purchased before 2017 versus things you purchased in 2017 and more recently.**

To refresh your memory about the year **2017**, please consider:

- **In January 2017**, Donald Trump was inaugurated into U.S. Presidency for the first time.
- In **February 2017**, in Super Bowl LI, the New England Patriots defeated the Atlanta Falcons 34–28 in the first overtime game in the game's history.
- Also in **February 2017**, the 89th Academy Awards were held. In an embarrassing gaffe, **La La Land** is thought to be the winner of the Oscar for Best Picture, before the envelope is shown to reveal **Moonlight** as the actual winner.
- In **May 2017**, the Ringling Bros. and Barnum & Bailey Circus stages the final show in its 146-year history at Nassau Veterans Memorial Coliseum in Uniondale, New York.
- In **June 2017**, House of Representatives Majority Whip Steve Scalise and his aides are hit by gunfire during a baseball practice in Virginia.
- In **August 2017**, violent clashes break out between attendees and counter-protesters in Charlottesville, Virgina at a "Unite the Right" rally.
- In **September 2017**, Hurricane Maria makes landfall in the US territory of Puerto Rico with maximum sustained winds of 250 km/h (155 mph). Millions of people are left without power.
- In **November 2017**, the Houston Astros defeated the Los Angeles Dodgers after seven games to become the World Series champions.

These events are so far afield from and irrelevant to the subject of the survey that this information is of no value in refreshing respondents' memories of purchases of specific kombucha products upwards of eight to nine years ago.  To the contrary, asking respondents to read this content, which would take approximately one minute to read, only increases the cognitive burden of an already unduly burdensome survey task.

Respondents were next asked to write out open-ended answers to three questions relating to the year 2017:

- In 2017, what was your main way that you got around the area around where you lived?
- If you had a job in 2017, what kind of tasks did you do? If you did not have a job, what was a key activity that you spent a lot of time on?
- For personal entertainment and/or hobbies, what drew your attention in 2017?

Again, such topics are so far afield from the topic of the survey that putting respondents through these additional questions does nothing to cure the problem of recall, and merely increases the burden of the survey.

Collectively, this segment of the survey, in which respondents were required to spend roughly 2 minutes reading instructions and answering irrelevant questions, only increased the burden of the survey.  This likely resulted in respondent fatigue and frustration, leading to respondents paying even less careful attention to the ultimate questions regarding their GT's purchases. Accordingly, it is my opinion that, contrary to the stated intent of improving the reliability of respondent reporting on very old purchases by putting them

through extra tasks relating to the 2017 time-frame, this portion of the Dennis Survey only worsened the problem and led to reduced accuracy.

IV.     **The survey and its results are unreliable due to severe flaws in the screening questions that led to an improper and non-representative survey sample.**

A. **The survey improperly excluded respondents who had previously taken a survey about any carbonated fermented beverage.**

The Dennis Survey is also unreliable because it improperly excluded a very large number of potentially relevant consumers merely because they had taken another survey in the past 30 days regarding any carbonated fermented beverage.  The survey used an online panel from Dynata.  By definition, members of Dynata's panel have regular opportunities to take surveys on many topics.  The Dennis Survey excluded 1,491 respondents because they had taken a survey about a "carbonated fermented beverage" in the past 30 days.  Dr. Dennis offers no justification for these exclusions.  The Dennis Survey was not measuring consumers' opinions or perceptions relating to issues that could be influenced by a prior survey.  Rather, it was attempting to collect information regarding the number of relevant GT's products purchased.  There is no reason why having taken a previous survey on any topic should condition respondents as to how many GT's Enlightened/Synergy products they should report that they have purchased in the past.  Second, and even more importantly, "carbonated fermented beverages" is an extremely overbroad category covering items such as beer, champagne, and other products that are far afield from the kombucha products at issue (which Dr. Dennis identifies as non-alcoholic products).  There is no reason that having taken a survey on any other carbonated fermented products, such as beer, would have any improper impact

Page | 16

on their ability to report how many GT's Enlightened/Synergy kombucha products they have purchased. Due to how broad "carbonated fermented beverages" is and how popular beer is as a category, it is statistically certain that the vast majority of respondents who answered that they had taken a prior survey regarding carbonated fermented beverages were referring to a survey about a type of beverage other than kombucha, such as beer. There was no valid basis for excluding such respondents, and there is no way to know how much the exclusion of so many potentially qualified respondents could have skewed the results.

### B. The survey improperly terminated respondents who could not recall what year they purchased GT's products.

The Dennis Survey also improperly excluded 121 respondents who could not recall what year they purchased GT's products. This could have biased the survey in any number of ways, including limiting the survey to those who are most willing to speculate or guess at their purchase history or those who purchased over shorter periods of time or during less years (making it easier to recall a particular year).[10]

### C. The survey may have improperly excluded GT's Enlightened purchasers who are aware that kombucha contains alcohol.

The Dennis Survey screening questions asked about "bottled and/or canned

---

[10] Indeed, the Dennis Declaration states that 35.8% of qualified respondents had only purchased the relevant products during a single calendar year. Dennis Declaration, Paragraph 37. Well over half of all respondents (57%) answered that they had only purchased the relevant products during 2 calendar years. This data raises the possibility that the survey was improperly skewed toward those who purchased over more condensed periods of time.

Page | 17

non-alcoholic beverages." Ultimately, the survey asked potential respondents whether they had purchased "non-alcoholic" kombucha, and excluded respondents who had not. This was a severely flawed way to screen for qualified respondents, because it improperly relies on consumers to classify the relevant GT's Enlightened/Synergy products in their own minds as "non-alcoholic" beverages. As fermented beverages, the relevant GT's products do contain some alcohol, and disclose this on the label, stating that "Kombucha is a fermented tea that has naturally occurring alcohol. Do not consume if you are avoiding alcohol due to pregnancy, allergies, sensitivities or religious beliefs." Accordingly, consumers of the relevant GT's Enlightened/Synergy products may be aware that they contain some amount of alcohol. Consumers who are aware that a beverage contains some amount of alcohol may not consider it a "non-alcoholic" beverage. Purchasers of the relevant GT's products who do not consider them "non-alcoholic" may have answered that they have not purchased non-alcoholic kombucha and been improperly excluded even though they have purchased GT's Enlightened/Synergy kombucha products.[11]

The improper exclusion of respondents who do not consider kombucha to be "non-alcoholic" could have skewed the results in any number of ways. For instance, perhaps the heaviest kombucha purchasers have the most understanding that kombucha is a fermented tea that contains alcohol, and are the least likely to consider kombucha "non-alcoholic." If this were true, the survey may have had a tendency to screen out some of the heaviest kombucha purchasers. The exclusion of potentially qualified GT's purchasers further renders the survey sample non-representative and the results unreliable.

---

[11] This problem is not cured by the fact that the survey told them to exclude alcoholic beverages such as beer, wine, or liquor when answering whether they had purchased "non-alcoholic" beverages. The point remains that individuals who know that kombucha contains alcohol may not consider it a "non-alcoholic" beverage and, therefore, may exclude that as they would do for beer.

Page | 18

### D. The screening questions did not reliably distinguish between GT's Enlightened/Synergy products and GT's Classic/Hard products

In the main survey, where respondents were asked to report the number of GT's Enlightened/Synergy products they had purchased, the Dennis Survey took particular measures to ensure that respondents understood the distinction between the Enlightened/Synergy products and the Classic/Hard products. Dr. Dennis considered this important so that respondents would only report purchases of the former and not mistakenly think of the latter. At the earlier point of screening for the relevant universe, however, the survey failed to make this distinction. The screening questions simply showed respondents an image of GT's Enlightened/Synergy products and asked if they had purchased this "brand of GT's Kombucha beverage" in various years. Respondents who were shown the image of these GT's products could certainly understand the "brand" being asked about to be "GT's" and for this to include GT's Classic/Hard products (particularly given the similarity in trade dress between the products shown and some of the Classic/Hard products). Accordingly, consumers who have not purchased GT's Enlightened/Synergy products but have purchased GT's Classic/Hard products could have answered that they have purchased the brand shown to them (GT's) and been improperly included in the survey.[12] This further reduces the reliability of the survey sample relied on for Dr. Dennis'

---

[12] The fact that the survey subsequently asked them to confirm that they had purchased GT's Enlightened products does not cure this problem. As indicated above, the flawed screening process made it very obvious that respondents needed to select one or more of the kombucha brands shown to qualify for the survey. It would be equally obvious, if not more so, that when asked to confirm they had purchase a specific brand, respondents would realize that they must confirm this to qualify. Respondents who had just answered that they had purchased GT's brand kombucha may also not have read the subsequent confirmation question closely enough to notice it was asking them to confirm they had purchased Enlightened specifically.

Evid. Appx. Page 837

calculations.

E.    **The survey consisted mostly of residents of states other than California and New York.**

The Dennis Survey purports to measure the share of the Products that were purchased by a putative class of California and New York residents. The survey, however, included only 302 respondents from California (191) and New York (111) out of the total of over 1,700 included in Dr. Dennis' analysis. Accordingly, the survey relies on answers of residents from other states for the bulk of the analysis. It is not clear that the proportion of the relevant products purchased by various ages in other states reliably reflects the proportion by age in California and New York. Indeed, the Dennis Report cites nothing suggesting that purchasing behavior with respect to the challenged products in California and New York is the same as in other areas. This further undermines the reliability of the results as projectable to California and New York purchases. While 191 respondents in California and 111 in New York may be enough to meaningfully analyze if looking at the group as a whole, these are not large enough sample sizes to accurately compare the results among various age subgroups within the individual state samples. These sample sizes are small enough that they entail a substantial error rate if attempting to analyze the results among the subgroups of California or New York residents by individual age bracket.

V.    **An error in the survey instructions likely exacerbated the difficulty of accurately estimating.**

In an attempt to increase the accuracy of respondents estimating their number of purchases, the Dennis Survey offered respondents a choice of two ways to estimate: (1) they could estimate the total number of products purchased over the

Page | 20

12-month period; or (2) they could estimate the number of products they purchase in a typical month.  The survey, however, had an apparent error in the instructions regarding the second option, which made it difficult to understand.  The instruction stated as follows:

> "If you typically purchased less than bottle or box of the product each month, please use this way to tell us."

This instruction does not make grammatical sense and is confusing.  Presumably it was intended to refer to purchase of less than "one" bottle or box, but it omitted the word "one."  The confusing nature of this instruction due to the error may have deterred some respondents from using this second method, even if it would have been the more suitable method for accurately estimating.

## CONCLUSIONS

For the foregoing reasons, it is my opinion that the Dennis Survey is unreliable due to numerous severe flaws.

Hal Poret

Dated:  February 19, 2026

Page | 21

# APPENDIX A

Evid. Appx. Page 840

*Hal L. Poret (hal.inc42@gmail.com; 914-772-5087)*

*Education*

1998        Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995        S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993        Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

*Employment*

2016 -       President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004 - 2015  Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004  Internet Sports Advantage

1998 – 2003  Attorney, Foley Hoag & Eliot, Boston, MA

Page | 23

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2026    Iltaco v. **Little Caesar's**
        (PI Hearing and deposition)                    USDC Northern District of IL

2025    **Lumino Inc.** v. Lumi Importing
        (Deposition)                                    USDC Western District of WI

2025    LL Whitfield Family Trust v. **Disney Shopping**
        (Deposition)                                    USDC Eastern District of NC

2025    **New Chapter, Inc.** v. Advanced Nutrition, Inc.
        (Deposition and trial)                          USDC Eastern District of NY

2025    **adidas** v. Aviator Nation
        (Deposition)                                    USDC District of OR

2025    Reflex Media v. **Successfulmatch.com**
        (Daubert hearing and trial)                     USDC Northern District of CA

2025    Urban Intelligence v. **Spring Scaffolding**
        (Deposition)                                    USDC Eastern District of NY

2025    Metabyte v. **Meta Platforms**
        (Deposition)                                    USDC Northern District of CA

2025    **Crocs Inc.** v. Joybees, LLC
        (Deposition)                                    USDC District of CO

2025    Gibson v. **Armadillo**
        (Deposition and trial)                          USDC Eastern District of TX

2025    F.N. Herstal v. **Sturm Ruger & Co.**
        (Deposition)                                    USDC Middle District of NC

2025    **Hyundai Motor Company** v. Hyundai Technologies Group
        (Deposition)                                    USDC Northern District of CA

2024    **AK Futures** v. TBH Supply
        (Deposition)                                    USDC Central District of CA

Page | 24

Evid. Appx. Page 842

2024    Sonate Corporation v. **Beyond Meat, Inc.**
(Deposition)                    USDC Middle District of FL

2024    Flodin v. **Central Pet & Garden Company**
(Deposition)                    USDC Northern District of CA

2024    **A&E Television Network** v. Big Fish Entertainment
(Deposition)                    USDC Southern District of NY

2024    Intuit, Inc. v. **H&R Block, Inc.**
(Deposition and PI Hearing)     USDC Northern District of CA

2024    Multiple Energy Technologies v. **Under Armour**
(Deposition)                    USDC Western District of PA

2024    Mercury One v. **Honest History Co.**
(Deposition)                    USPTO Cancellation

2024    **NS Brands** v. Mastronardi
(Deposition)                    USDC Western District of TX

2024    In Re: College Athlete NIL Litigation
(Deposition)                    USDC Northern District of CA

2024    The Chosen, Inc. v. **Angel Studios, Inc.**
(Deposition and trial)          American Arbitration Association

2024    Evolve BioSystems v. **Abbott Laboratories**
(Deposition)                    USDC Eastern District of IL

2024    **Enterprise Holdings** v. Europcar International
(Deposition)                    USPTO Opposition

2024    **Illinois Tool Works** v. J-B Weld Company
(Deposition)                    USDC District of CT

2023    **Urawa** v. Kupa
(Deposition)                    USDC Central District of CA

2023    **Liaigre** v. California Furniture Collections
(Deposition)                    USDC Central District of CA

2023    **Polaroid** v. Fujifilm

(Deposition)                                    USDC Southern District of NY

2023    **Orgain** v. Iovate
(Deposition and trial)                          USDC Central District of CA

2023    **Sazerac Brands** v. Austin, Nichols & Co.
(Deposition)                                    USPTO Opposition

2023    Tradition Media Group v. **U.S. Bank National Association**
(Deposition)                                    USDC Eastern District of IL

2023    Pengu Swim School LLC v. **Blue Legend LLC**
(Trial)                                         USDC Southern District of TX

2023    **Nike** v. Customs By Ilene, Inc.
(Deposition)                                    USDC Central District of CA

2023    Golo LLC v. **Goli Nutrition**
(Deposition and trial)                          USDC District of Delaware

2023    **Darkowl LLC** v. Arkowl LLC
(Deposition and Hearing)                        USDC District of CO

2023    Maker's Mark Distillery v. **Spalding Group, Inc.**
(Deposition)                                    USDC Western District of KY

2023    Zamora v. **GT's Living Foods**
(Deposition)                                    Superior Court California

2023    World Champ Tech v. **Peloton Interactive**
(Deposition)                                    USDC Northern District of CA

2023    Global Apogee v. **Sugarfina et al.**
(Deposition)                                    USDC Central District of CA

2022    **adidas** v. Thom Browne
(Deposition and trial)                          USDC Southern District of NY

2022    Edible Arrangements v. **Green Thumb Industries**
(Deposition)                                    USDC Northern District of IL

2022    **Instagram** v. Instagoods
(Deposition)                                    USPTO Opposition

Evid. Appx. Page 844

2022    **Sinomax** v. American Signature, Inc.
(Deposition)                                              USDC Southern District of OH

2022    **Jackpocket, Inc.** v. Jackpot.com
(Deposition)                                              USDC Southern District of NY

2022    **Premier Specialty Brands** (**Kamado Joe**) v. Phase 2 (d/b/a Vision Grills)
(Deposition)                                              USDC Northern District of GA

2022    **Alcon Vision** v. Lens.com
(Deposition)                                              USDC Eastern District of NY

2022    The Cookie Department v. **Hershey**
(Deposition)                                              USDC Northern District of CA

2022    Rise Brewing Co. v. **PepsiCo.**
(Deposition)                                              USDC Southern District of NY

2022    **Chartwell Studio Inc. v.** Team Impressions Inc.
(Deposition)                                              USDC Northern District of IL

2022    **Diageo** v. Deutsch
(Deposition and trial)                                    USDC Southern District of NY

2022    Stone Brewing v. **MillerCoors**
(Deposition and trial)                                    USDC Southern District of CA

2022    **adidas** v. Fashion Nova
(Deposition)                                              USDC District of OR

2022    Fishon v. **Premier Nutrition Corp.**
(Deposition and trial)                                    USDC Northern District of CA

2022    **Zuru LLC** v. Lego Juris
(Deposition)                                              USPTO Cancellation

2022    American Eagle Outfitters, Inc. v. **Walmart**
(Deposition)                                              USDC Western District of PA

2022    Hansen v. **Newegg.com Americas, Inc.**
(Deposition)                                              Superior Court California

2021    Coachella v. **Coachillin Holdings**
(Deposition)                                 USPTO Opposition

2021    **S&P Global, Inc.** v. S&P Data LLC
(Deposition and trial)                       USDC Delaware

2021    **Wing Enterprises** v. Tricam Industries, Inc.
(Deposition and trial)                       USDC District of MN

2021    **Advance Magazine Publishers** v. Goncharova
(Trial testimony)                            USPTO Opposition

2021    Wildfang v. **Target Corporation**
(Deposition)                                 USDC District of OR

2021    Edwards Life Sciences v. **Meril Life Sciences**
(Deposition)                                 USDC Northern District of CA

2021    Publix. v. **Pharmapacks**
(Deposition)                                 USPTO Opposition

2021    **Tory Burch LLC** v. Olem Shoe Corp.
(Deposition)                                 USDC Southern District of NY

2021    **Heaven Hill** v. Log Still Distilling
(Deposition)                                 USDC Western District of KY

2021    **Kamado Joe** v. Dansons US LLC
(Deposition)                                 USDC Northern District of GA

2021    Kiva Health Brands, LLC v. **Kiva Brands Inc.**
(Deposition)                                 USDC Northern District of CA

2021    **Elevations Credit Union** v. Elevate Credit Union
(Deposition)                                 USDC District of UT

2021    Sharpe v. **GT'S Living Foods**
(Deposition)                                 USDC Central District of CA

2021    Mirzoyan v. **Hershey**
(Deposition)                                 Superior Court of California

2021    Furniture Dealer.net v. **Amazon.com**

Page | 28

(Deposition)                                        USDC District of MN

2021  **Treehouse Foods, Inc.** v. Keurig Green Mountain, Inc.
      (Deposition)                                  USDC Southern District of NY

2021  Brady v. **Bayer**
      (Deposition)                                  Superior Court of California

2021  Capri Sun v. **American Beverage Corporation**
      (Deposition)                                  USDC Southern District of NY


## *Presentations*

The McCarthy Series: U.S.P.T.O. v. Booking.com: What the Recent SCOTUS
Ruling Means for Trademark Law
(McCarthy Institute Webinar, July 29, 2020)

Surveys in the Brave New World: Designing and Using Survey Evidence in the
Age of Online Shopping, Influencers and Hashtags
(INTA Annual Meeting, May 21, 2019)

Consumer Perception Surveys - A Primer from Survey Experts and NAD
(ASRC Conference, Dec 7, 2018)

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied
Claims (ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property
Seminar, May 9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE
Conference, Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute) (September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

*Publications/Papers*

Commentary: Why Aided Awareness Is the Proper Primary Method for Assessing Fame For Dilution Claims, 115 TMR 764 (July-August 2025)

Commentary: Response to the Commentary Entitled "The Science of Proving Trademark Dilution", 111 TMR 778 (July-August 2021)

An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks that are Not Top-Of-Mind, 109 TMR 935 (Nov-Dec 2019)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

Page | 31

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)


*Professional Memberships/Affiliations*
American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

Page | 32

Jacob M. Harper (Cal. Bar No. 259463)
    jacobharper@dwt.com
Heather F. Canner (Cal. Bar No. 292837)
    heathercanner@dwt.com
Joseph Elie-Meyers (Cal. Bar No. 325183)
    josepheliemeyers@dwt.com
Peter K. Bae (Cal. Bar No. 329158)
    peterbae@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Defendant
GT's Living Foods, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and All Others Similarly Situated, | Case No. 2:19-cv-10920-FMO-GJS |
| Plaintiff, | **DECLARATION OF DR. MATTHEW MCCARROLL IN SUPPORT OF JOINT BRIEF ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| GT'S LIVING FOODS, LLC, | |
| Defendant. | |

Evid. Appx. Page 851

DECLARATION OF DR. MATTHEW MCCARROLL

# DECLARATION OF DR. MATTHEW MCCARROLL

I, Dr. Matthew McCarroll, hereby declare and state as follows:

1.      I am a professor of chemistry at Southern Illinois University and am the founding director of the Fermentation Science Institute.  I have been retained by counsel for Defendant GT's Living Foods, LLC ("GT's") to provide expert testimony in this action.  I submit this declaration in support of the Joint Brief on Plaintiffs' Motion for Class Certification.  The facts stated herein are true and correct based on my own personal knowledge and if called upon I could and would testify to them.

2.      Attached hereto as Exhibit W is a true and correct copy of the Opening Expert Report of Dr. Matthew McCarroll in this action. The tracked change to the term "Figure 1" on page 6 was inadvertent and arose in the process of converting the Word version of the report to the signed PDF—the change does not reflect any incompleteness or lack of finality to the report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 14th day of July 2021, in Murphysboro, Illinois.


_____
Dr. Matthew McCarroll

DECLARATION OF DR. MCCARROLL
2:19-CV-10920-FMO
Evid. Appx. Page 852

(Exhibit W to Declaration of Dr. Matthew McCarroll)

# EXHIBIT 27

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Before the Honorable Fernando M. Olguin**

| | |
|---|---|
| DELANEY SHARPE, ERIN WEILER, JENNA LEDER, and ADRIANA DIGENNARO, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    *v.*<br><br>GT'S LIVING FOODS, LLC,<br><br>        Defendant. | Case No. 2:19-CV-10920-FMO |

## <u>OPENING EXPERT REPORT OF DR. MATTHEW MCCARROLL</u>

CONFIDENTIAL - ATTORNEYS' EYES ONLY

June 2, 2021

# EXPERT REPORT OF DR. MATTHEW MCCARROLL

## 1. QUALIFICATIONS

My name is Dr. Matthew McCarroll.  I am a professor of chemistry at Southern Illinois University and am the founding director of the Fermentation Science Institute.  I have over 26 years of experience as a chemist and have held a PhD in analytical chemistry since 1998.  I received bachelor's degrees in chemistry and interdisciplinary studies from Appalachian State University, received my PhD in chemistry from the University of Idaho and completed two years of postdoctoral training in analytical chemistry at Louisiana State University.  A copy of my curriculum vitae is attached as **Exhibit 1**.

My doctoral training focused on analytical chemistry, which "is a field that studies and uses instruments and methods to separate, identify, and quantify matter."[1]  I have also developed expertise in fermentation and brewing science.  As director of the Fermentation Science Institute (FSI), I teach courses in brewing and general fermentation.  With regard to kombucha, I teach a section on kombucha in our foundation course in fermentation science (FERM 100/101).  In this course we cover fundamental aspects of kombucha production, including production of kombucha in the laboratory portion of the course.

For the past 9 years my research and teaching efforts have focused primarily in the area of fermentation science and quality control in fermentation industries.  I have been a Certified Chemist through the U.S. Tax and Trade Bureau (TTB) for beer, wine and spirits for export in varying capacities since 2016, as well as a member of the American Society of Brewing Chemists, the Institute of Brewing and Distilling and the Master Brewers Association of the Americas.  I also serve as a member of the editorial board for the Journal of Distilling Science.

With respect to my experience measuring alcohol in beverages, I designed and established the FSI Service Laboratory in 2016, which is a third-party testing facility.  The primary mission of the Service Laboratory is to serve an outreach function to beverage producers in our region by performing fee-for-service testing of their products.  The laboratory is outfitted with state-of-the-art equipment, including an

---

[1] Skoog, D.A.; West, D.M.; Holler, F.J.; Crouch, S.R. (2014). Fundamentals of Analytical Chemistry. Belmont: Brooks/Cole, Cengage Learning. p. 1.

2                                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

Anton-Paar system with a precision densitometer and a specialized Near-Infrared (NIR) based spectrometer (Alcolyzer) that has been developed for the beverage industry. Further, we have a gas chromatograph with both flame ionization and mass spectral detection. It is equipped with an auto-sampling apparatus capable of direct injection, headspace sampling and sample preconcentration using solid-phase microextraction (SPME).

The laboratory is qualified with the TTB to perform testing for beer, wine and spirits. In addition, we perform numerous additional quality control tests and analyses, including the measurement of sugar and alcohol in beer, wine and spirits. We have also provided third-party testing of alcohol levels for beverages not classified as alcoholic beverages by the TTB, including certain kombuchas and dealcoholized beer.

## 2. ASSIGNMENT AND MATERIALS RELIED UPON

I have been retained by counsel for GT's Living Foods, LLC (GT's) to provide expert testimony in this matter. I have been asked to review alcohol and sugar testing data of GT's non-alcoholic Enlightened/Synergy kombucha products[2] and to provide expert testimony on the methods of testing alcohol and sugar, especially in the case of the beverage known as kombucha. I have also been asked to provide testimony regarding best practices in quality control testing as it pertains to alcohol levels in commercial kombucha.

I have been provided and have reviewed certain pleadings in this case, interrogatory responses exchanged by the parties, testimony from depositions either taken or reproduced in this case, and various documents and testing reports. I also had the opportunity to speak with GT's CEO, GT Dave, and asked him questions relevant to the formation of my opinions in this case. I have also relied on my own experience and knowledge, as well as publicly available information in reaching my opinions. A complete listing of the documents and other materials on which I relied in formulating the opinions in this report is attached as **Exhibit 2**.

I am being compensated at my standard billing rate of $300 per hour. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

My work is ongoing, and I reserve the right to supplement my report and modify my opinions as I review additional data and information, including any opinions offered by the plaintiff's expert(s).

---

[2] I understand that GT's now refers to the line of non-alcoholic "Enlightened" kombucha products as its "Synergy" line of kombucha products.

3                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 3. SUMMARY OF CONCLUSIONS

(1) Before 2017, there were no validated kombucha-specific standard methods to measure alcohol content of kombucha products. Laboratories thus measured kombucha alcohol content using a variety of methods derived from standard methods validated for use with beer and wine. Due to differences in sample matrix, these methods were found to deliver poor precision and accuracy when used for testing kombucha.[3] Further, kombucha products in general are not as stable with respect to alcohol content as are beer and wine products, which can lead to additional inconsistency in testing results.

(2) GT's has taken various measures reasonably calculated to keep the alcohol content of its Enlightened kombucha products below 0.5% alcohol by volume (ABV) for at least the duration of their shelf lives. These measures are designed to influence the kombucha's alcohol content both during production and during the distribution cycle. The theoretical efficacy of these measures is scientifically supported, and their actual efficacy is demonstrated by, among other things, the results of third-party lab tests.

(3) GT's practice of testing samples both at the time of production and at the end of shelf life on at least a monthly basis, as well as its occasional reassessment of products' shelf lives by testing those products long after their expiration, exceeds KBI's recommended best practices with respect to alcohol testing. Testing product after delivery to retailers is not suggested as a best practice in KBI's recommendations.

(4) GT's tested the alcohol content of its Enlightened products using industry-standard methods for the relevant period, including methods approved by KBI and AOAC. Save for a single test of what turned out to be a spoiled juice product, GT's test data do not show any results above 0.5% ABV when randomly selected and tested at the time of production or tested at the end of shelf life, and 98% of the tests conducted found alcohol levels of 0.4% ABV or below. In my opinion, it was reasonable for GT's to rely on these results, and I have no reason to doubt their accuracy.

(5) GT's practice of testing the sugar content of each flavor of its Enlightened kombucha products several times each year, using industry-standard methods, is a reasonable way of measuring the sugar content of those flavors. GT's test data shows that the average amount of sugar in each flavor found through such testing is less than or equal to 120% of the amount disclosed on that flavor's

---

[3] Ebersole, B., Lou, Y., Schmidt, R., Eckert, M., Brown, P., "Determination of Ethanol in Kombucha Products: Single-Laboratory Validation, First Action 2016.12", *J. AOAC International*, Vol. 100, no. 3, 2017. (DOI: 10.5740/jaoacint.16-0404).

4                         CONFIDENTIAL - ATTORNEYS' EYES ONLY

label, as permitted by applicable FDA regulations, and regularly found to be below the labelled amount.

## 4. BACKGROUND

Kombucha is a beverage produced by the fermentation of brewed tea sweetened with sugar, which is also known by the name *Tea Fungus.* The beverage has a long history, and the early history and origin of kombucha are uncertain. While the origin of kombucha is often attributed to northeast China during the Tsin Dynasty circa 220 B.C.[4], more certainty can be placed on knowledge that it found use in Russia and Eastern Europe in the late 19th century and then later spread to Germany and other parts of Europe. In the United States, kombucha gained popularity as a homebrewed product and became available as a commercially produced product in the 1990's.[5]

Kombucha is produced by the presence of a symbiotic culture of bacteria and yeast that ferments the sweetened tea into a beverage that contains a combination of organic acids and small amount of ethanol. The presence of the organic acids increases the amount of acidity and lowers the pH of the solution, resulting in a moderately tart and sweet beverage many people find appealing.

During fermentation of kombucha, yeast and bacteria work in concert in a stepwise process to convert sugared tea solution into a tart, refreshing beverage. Interestingly, bacteria will convert some of the sugar into a cellulosic structure commonly referred to as the physical SCOBY, which stands for **S**ymbiotic **C**ulture of **B**acteria and **Y**east. The SCOBY serves to "house" the yeast and bacteria and to protect the fermenting kombucha as it floats to the surface. The primary organic acids produced in the process are acetic acid (vinegar) and gluconic acid, which is slightly sweet and mildly tart.

---

[4] Jayabalan, R., Malbaša, R.V., Lončar, E.S., Vitas, J.S., Sathishkumar, M., "A Review on Kombucha Tea—Microbiology, Composition, Fermentation, Beneficial Effects, Toxicity, and Tea Fungus", *Comp. Rev. Food Sci. Food Safety*, Vol. 13, 2014, 538-550.
[5] *Kombucha Industry*, Kombucha Brewers Int'l, https://kombuchabrewers.org/about-us/history-of-kombucha-brewing/ (last retrieved June 1, 2021).

5                    CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Figure 1.  Schematic depiction of the change in the concentration of sugar, organic acids and ethanol during the production of kombucha.*

Because the production of organic acids by bacteria is dependent on the production of ethanol, these processes are related and limited by the conditions of the fermentation. As the fermentation proceeds, ethanol first increases in concentration but is then moderated and even decreased by the metabolism of the ethanol into acetic acid.  This progression is depicted in Figure 1Figure 1.  The fermentation also results in the production of other organic acids and vitamins, as well as carbon dioxide, which may dissipate depending on the temperature and how long after fermentation the kombucha is bottled.

Kombucha can naturally contain amounts of alcohol that vary from levels less than 0.5% ABV to up to 1–2% depending on the production method and how the fermentation proceeds.  By way of comparison, to consume the total amount of alcohol present in a "standard" alcoholic drink—which is generally defined as 12 ounces of regular beer (~5% ABV), five ounces of wine (~12% ABV), or 1.5 ounces of distilled spirits (~40% ABV)[6]—a person would have to consume 60 ounces (or nearly four 16-ounce bottles) of 1% ABV kombucha in the same time it would take to consume one of those standard alcoholic drinks.  For kombucha with .75% ABV, a person would have to drink 80

---

[6] *See What is a Standard Drink?*, NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM, https://www.niaaa.nih.gov/alcohols-effects-health/overview-alcohol-consumption/what-standard-drink (last retrieved June 1, 2021).

CONFIDENTIAL - ATTORNEYS' EYES ONLY

ounces (five full 16-ounce bottles) to consume the same amount of alcohol in a single "standard" alcoholic drink.  Though I do not have any opinion as to how many bottles of kombucha consumers typically drink, multiple named plaintiffs testified to generally drinking only one (or less than one) bottle at a time, and a third testified that she would not drink three bottles in the same day.[7]

While kombucha can be sold as the direct product of the primary fermentation, kombucha is often mixed with other flavorants and/or juices that change the flavor of the drink and, in some cases, are used to generate additional carbon dioxide, thereby carbonating the kombucha to produce a sparkling beverage.  The kombucha can also be carbonated by "force carbonation," a process whereby a closed vessel is pressurized with carbon dioxide gas.  I understand that, for most flavors in its Enlightened line of kombucha, GT's uses cool temperatures to maintain the carbonation generated during the primary fermentation and adds carbon dioxide gas before bottling as necessary to supplement the amount of carbon dioxide remaining after primary fermentation. For other flavors where carbonation is not desired because of the ingredients involved, however, GT's does not use additional carbon dioxide and instead permits the naturally occurring carbon dioxide from the primary fermentation to fully dissipate before bottling.

## 5.  TESTING BEVERAGES FOR ALCOHOL

Manufacturers of beverages containing ethanol at concentrations of 0.5% ABV or greater are subject to regulations of the TTB, which include requirements that the beverage be produced on a premises qualified by the TTB under the Internal Revenue Code of 1986, and that the manufacturer comply with applicable labeling, formula and tax requirements.   Whether a statement of the alcohol content is required for a particular beverage can vary by the type of beverage, the alcohol level of the beverage and the jurisdiction of the state(s) involved in the manufacture and commerce of the product.  In the case of alcoholic beverages, the TTB does not require an alcohol content statement as a label component on all products, but if a statement is made there are specific tolerances that must be followed.  For example, for "malt beverages"—which can include kombucha, depending on its ingredients—the TTB Beverage Alcohol Manual and related regulations establish that "for malt beverages containing 0.5% or more alcohol by volume - a tolerance of 0.3% above or below the alcohol content stated on the label is permissible."[8]  However, the same regulations state that "[a]ny malt beverage which is labeled as containing 0.5 percent or more alcohol by volume may not contain less than 0.5 percent alcohol by volume, regardless of any tolerance"[9] and that

---

[7] December 4, 2020 Deposition of Jenna Leder, at 99:15-19; February 19, 2021 Deposition of Adriana DiGennaro, at 54:17-24; December 8, 2020 Deposition of Delaney Sharpe, at 66:21-67:2.
[8] *See* 27 C.F.R. § 7.71(c)(1).
[9] *See id.*

7                              CONFIDENTIAL - ATTORNEYS' EYES ONLY

malt beverages can only be labelled as "low alcohol" or "reduced alcohol" if they contain "less than 2.5 percent alcohol by volume."[10]  And TTB regulations separately state that the "tax on beer [is] determined at the time of its removal for consumption or sale,"[11] necessitating an understanding of alcohol content at the time a manufacturer ships its product from the brewery.  These requirements have led to the development of a number of methods or procedures used by manufacturers, third-party testing laboratories and the TTB for the measurement of alcohol content in beverages.  For the purposes of this discussion, testing methods for distilled spirits are excluded.

A.  Common Methods for Alcohol Measurement

i.  *Density-Based Measurements.* The simplest and most common method for determining alcohol content in beer and wine is by measuring the density before and after fermentation.  During the progression of the alcoholic fermentation by yeast, the density of the solution decreases as the dissolved sugars are metabolized to ethanol and carbon dioxide.  The manufacturer can measure the density before and after fermentation, then use those measurements to calculate the alcohol concentration.  The density is typically measured as the specific gravity or degrees Plato, which refers to the percentage of extracted soluble matter in the solution and is determined using a glass hydrometer.  The precision and accuracy of this method is limited by the accuracy of the specific gravity determination, which often has a readability of 0.002 units, though precision hydrometers will have better readability over a narrower range of densities.  The error associated with alcohol determination from density-based measurements is typically in the range of +/- 0.25% ABV, which is within the tolerance allowed a typical alcoholic malt beverage.  The precision can be improved by use of an electronic refractometer or an oscillating U-tube densitometer (Anton Paar).  While density-based methods are commonly used by manufacturers to monitor production, other methods are required for improved accuracy and reliability, and for use by third-party or regulatory testing labs.  It should be noted that calculation of ethanol from the change in density is an approximation and is not rigorous.

ii.  *Distillation-Based Methods.*  Another standard method for the measurement of ethanol in beer and wine is laboratory-based distillation of the sample followed by measurement of the distillate density.  Predetermined alcohol tables allow the measured density to be correlated to an estimated ethanol concentration.  Such distillation-based methods have been formally validated by the ASBC (Beer-4a, Beer-4b) and the AOAC (935.21).  Distillation followed by

---

[10] 27 C.F.R. § 7.71(d).
[11] 27 C.F.R. § 25.159(a); *see* 27 C.F.R. § 25.11.

8                          CONFIDENTIAL - ATTORNEYS' EYES ONLY

measurement with densitometry is one of the two methods TTB currently uses in the TTB Beverage Alcohol Laboratory.[12]

iii. *Refractometric Measurement.*  The refractive index of alcoholic beverages, such as beer, will vary as a function of alcohol content.  ASBC method Beer-4C is a validated method that involves construction of a calibration curve where a series of samples with differing alcohol concentrations are tested for %ABV by distillation (Beer-4A) and then measured refractometrically and for density.  The method is matrix dependent, and a unique calibration curve must be developed for each type of beer.

iv. *Gas Chromatography-Based Methods.*  Methods have been developed based on the separation method known as gas chromatography.[13]  Various methods have been developed that utilize different sample introduction methods and detection methods.  The ASBC method for beer (Beer-4D) is based on direct injection of the liquid sample and flame-ionization detection with an internal standard.  Other methods differ in the method of sample introduction, including headspace gas injection, headspace solid-phase microextraction and the use of mass spectrometry for detection.

v. *Enzymatic Methods.*  This method is specifically applicable to low alcohol concentrations and is based on the enzymatic oxidation of ethanol to acetaldehyde by nicotinamide adenine dinucleotide (NAD).  The acetaldehyde is then oxidized to acetic acid and reduced NAD (NADH), which absorbs light at a longer wavelength than NAD and can be measured using UV absorption spectrophotometry.  The ASBC method Beer-4F is an example of a validated method using this approach and is validated for samples with % ABV values ranging from 0.04–0.43% ABV.

vi. *Near-Infrared-Based Methods.*  Near-Infrared (NIR) spectroscopy is a technique based on the absorption of light in the spectral range between the visible and infrared portions of the electromagnetic spectrum, which correspond to overtones of fundamental molecular transitions observed in the infrared region of the spectrum.  Spectra in this range tend to be broad and featureless, but multivariate calibration approaches have led to widespread use of NIR spectroscopy in various applications, including the measurement of alcohol content in beverages.  The ASBC method Beer-4G is an example of a validated method based on the *Anton Paar Alcolyzer and Density Meter,* which is a common commercially available instrument based on this technique.  Calibration matrices have been developed for different beverage types and the approach is

---

[12] *Kombucha Information and Resources*, U.S. DEP'T OF THE TREASURY, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU, https://www.ttb.gov/kombucha/kombucha-general , K18 (last retrieved June 1, 2021) and personal communication.

[13] Anthony, R.M., Sutheimer, C.A., & Sunshine, I, "Acetaldehyde, Methanol and Ethanol Analysis by Headspace Gas Chromatography" *J. Anal. Toxicol.*,4, 1980, p43–45. (doi:10.1093/jat/4.1.43.)

9                                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

generally robust and is widely used in the brewing and winemaking industries, providing reliable results in cases where an appropriate calibration is available.

All the discussed methods have been developed specifically for alcoholic beverages and each has particular advantages and disadvantages, including cost, accuracy and demand for user skill.  Because the methods are based on measurement there is inherent error and uncertainty.  The application of these methods to kombucha represents a particular challenge in measuring the concentration of alcohol, as described below.

## 6.  TESTING BEVERAGES FOR SUGAR

Manufacturers of packaged beverages are subject to regulations of the FDA with respect to the information disclosed on the beverage's Nutrition Facts label.  Prior to a rules change made on July 26, 2016 (but implemented later), FDA's regulations required beverage manufacturers to disclose only the total amount of sugar per serving, whether or not such sugar was "added" (as opposed to naturally occurring).[14]  Based on that rules change, however, beverage manufacturers like GT's with at least $10 million in sales had to alter their Nutrition Facts label by January 1, 2020 to, among other things, identify the total amount of sugar per bottle (rather than per serving) and separately identify the amount of "added sugar" per bottle.[15]  Pursuant to FDA regulations, the amount of sugar actually present in a particular bottle of a product like kombucha is permitted to be up to 120% of the amount stated in the Nutrition Facts.[16]  So, for flavors of GT's Enlightened kombucha with labels that disclose 8 grams of sugar per 8-ounce serving (or 16 grams per 16-ounce bottle), FDA regulations permit individual bottles of those flavors to contain up to 9.6 grams per 8-ounce serving.

As discussed below, there are a number of accepted methodologies for accurately measuring the amount of sugar in a beverage.

A.   Common Methods for Sugar Measurement

At a basic level, the term sugar refers to a class of compounds that are water soluble carbohydrates.  They are natural found in many foods, as well as used as an ingredient and additive in foods and beverages.  Carbohydrates are the primary source of energy in living systems.  Figure 2 shows the common cyclic forms of simple carbohydrates and starch.   From a molecular structure perspective, the simplest of the sugars are fructose, galactose, and glucose and they are collectively referred to as monosaccharides. Disaccharides are simple sugars comprised of two monosaccharides chemically linked

---

[14] *See Changes to the Nutrition Facts Label*, U.S. Food & Drug Administration (Feb. 10, 2021), https://www.fda.gov/food/food-labeling-nutrition/changes-nutrition-facts-label (last retrieved June 1, 2021).
[15] *Id.*
[16] 21 C.F.R. § 101.9(g)(5).

10                           CONFIDENTIAL - ATTORNEYS' EYES ONLY

through a glycosidic bond.  While some sources of carbohydrates contain simple sugars, such as fructose in kiwi juice, others are present in the form of complex carbohydrates known as starch, which is essentially a polymer chain formed from the linking of simple sugars.  In its linear form it is referred to as amylose and if it is branched is it called amylopectin (Figure 2).



*Figure 2. Structure of common sugars and starch.*

There are many approaches that can be used to measure the sugar content of a beverage.  The limitations of various methods depend on the nature of the beverage, the type of sugar present, as well as any other parameters that might lead to inaccurate readings. The most common approaches used to measure sugar in beverages are detailed here.

*Density.*  The simplest of the methods is based on measuring the density of the solution, which allows the inference of sugar content based on measurement of the solution density.  In general, when a compound is dissolved in a solution the density will increase in a predictable manner that correlates with the amount of compound that was dissolved.  Thus, a calibration or scale can be developed to relate the measured density to the amount of sugar in the solution.  A common implementation of this is what is referred to at the Brix scale.  One degree Brix is defined as a solution that contains 1 gram of sucrose dissolved in 100 grams of water.  While the density of a solution can be measured in a variety of ways, the most common and inexpensive method is likely the use of a hydrometer, which is a device that is floated in the solution.  The weight of the displaced solution causes the hydrometer to float higher in more dense solutions and the density can be read from a scale on the hydrometer, usually in units of specific gravity.

11                          CONFIDENTIAL - ATTORNEYS' EYES ONLY

Another common method in the beverage industry is the use of an oscillating U-tube, as implemented by the instrument manufacturer Anton Paar. This method is based on the principle that a U-tube will have a resonant frequency that is a function of its mass. The glass U-tube is excited by a piezoelectric element; sensors then measure the established oscillator frequency. The frequency is a function of the density of the solution in the U-tube, which can be determined rapidly and to a high precision.

*Refraction.* Refraction is a phenomenon by which the path of a beam of light bends when passing through an interface of materials with differing optical densities. The optical density is characterized by a term called the refractive index. The refractive index can be thought of as a measure of the electron density of the material. There are various methods for measuring the refractive index of a solution, but the most common is referred to as a refractometer. In its simplest form, a refractometer is a handheld device where the user can optically determine the refractive index on as little as a drop of solution. These handheld devices are commonly used to measure dissolved sugar in fruit juice and beer wort, often even reading directly in units of Brix.

*Enzymatic Methods.* A widely accepted method for sugar measurement is an assay based on the reaction of glucose with the enzyme glucose oxidase. In this reaction, D-glucose reacts with oxygen to form D-glucono-1,5-lactone and hydrogen peroxide. The assay is based on monitoring the production of hydrogen peroxide, which will react with a chromogen that is included in the assay to produce a colored compound that can be precisely measured spectroscopically. The method measures glucose, but can be used to measure sucrose by addition of invertase enzyme. The invertase enzyme catalyzes the breakdown of sucrose into glucose and fructose in a 1:1 ratio. Fructose can also be measured by the same approach, without the action of invertase. Thus is it possible to calculate the concentration of sucrose, glucose and fructose in the solution by repeating the experiment in the presence and absence of invertase and subtracting the difference. Assay kits are widely available[17] and commonly used in many applications.

*Chromatographic Methods.* Other approaches to achieve selectivity in the detection of sugar in beverages are based on chromatographic methods that separate the compounds present in the solution. While there are gas chromatographic (GC) methods that have been developed for sugars, they tend to be less commonly used because they require derivatization to make the compound more volatile, which is a requirement in GC. For this reason the method will not be discussed in detail. A more common approach is the use of high-performance liquid chromatography (HPLC), which is generally regarded as a superior analytical separation method for nonvolatile analytes such as sugar. In HPLC, the sample is injected as a plug in what is referred to as the

---

[17] *Sucrose/D-Glocuse/D-Fructose,* Cat. Nr. 10 716 260 035, *available at* https://www.aafco.org/Portals/0/SiteContent/Regulatory/Committees/Lab-Methods-and-Services/Methods/11c_sucrose_d_glucose_d_fructose.pdf (last retrieved June 1, 2021).

12                              CONFIDENTIAL - ATTORNEYS' EYES ONLY

mobile phase. The mobile phase is pumped through a column that is packed with a porous matrix called the stationary phase. As the analyte plug flows through the column, some types of sugars will interact more with the stationary phase and will take longer to elute through the column. The different types of sugars will elute at different times, where they can be detected to produce what is called a chromatogram. A typical chromatogram is illustrated by an example from the literature as shown in Figure 3.



*Figure 3. Chromatogram of monosaccharides. (Figure Adapted from reference.[18])*

The area under each peak is proportional to the amount of the compound, which can be quantified by use of a calibration curve for each compound. Because carbohydrates do not have any usable chromophores in the accessible ultraviolet or visible spectrum, it is typical to us a refractive index detector for detection. The HPLC method for determination of sugars is often considered superior due to its ability to discriminate and simultaneously quantify multiple sugars and its limit of detection that is suitable for typical beverage applications.

There have been developments in the past few years in response to AOAC SMPR 2018.001 for a method more broadly applicable for food samples. A High-performance anion-exchange chromatography (HPAEC) with pulsed amperometric detection (PAD) method developed by Eurofins recently received first action status by AOAC.[19] While this method offers advantages in complex samples, it is yet to be seen whether it will find broad applications for the analysis of beverages such as kombucha.

---

[18] Wang, Hui-Cong & Huang, H. & Huang, Xuming & Hu, Z. (2006). Sugar and acid compositions in the arils of Litchi chinensis Sonn.: Cultivar differences and evidence for the absence of succinic acid. Journal of Horticultural Science and Biotechnology. 81. 57-62. 10.1080/14620316.2006.11512029.

[19] Vennard et al., "Sugar Profile Method by High-Performance Anion-Exchange Chromatography with Pulsed Amperometric Detection in Food, Dietary Supplements, Pet Food, and Animal Feeds: First Action 2018.16," *J. AOAC Int.*, Vol. 103 (1), 2020.

13                          CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 7. KOMBUCHA TESTING

Unlike brewers qualified by the TTB, brewers that exclusively produce kombucha with less than 0.5% ABV are not required to maintain records of the alcohol content of their products.[20]  However, as discussed in Section 4a, the production of kombucha can result in alcohol levels that exceed 0.5% ABV.  Thus, there is a need for manufacturers producing kombucha to test alcohol levels to ensure conformity of their products.

### A.   Challenges of Measuring Alcohol in Kombucha

There are several challenges in accurately measuring alcohol levels in kombucha.  One reason for this is the relatively low alcohol levels found in kombucha as compared with traditional alcoholic beverages.  Most common methods for measuring alcohol in beverages were developed for beer and wine, which typically have alcohol levels more than 5–15 times greater than kombucha.  This can challenge the limit of detection and result in large relative standard deviations.  The fact that kombucha fermentation is not a simple ethanolic fermentation means that density-based measurements are not suitable for kombucha, due primarily to the production of organic acids and cellulosic material in the SCOBY.  Further, the presence of organic acids and other components can cause interferences in some methods, samples tend to be turbid and additional difficulties can arise because most kombuchas can continue to ferment after production if not maintained at proper refrigerated conditions.

### B.   Development of More Rigorous Test Standards

Following an industry-wide voluntary product recall in 2010, kombucha makers and third-party testing labs began to investigate improved methods for determining alcohol levels in kombucha products.  This process was accelerated in 2014 with the launch of a kombucha trade organization, Kombucha Brewers International (KBI).[21]  I understand that GT's was a founding member of KBI.[22]  Among other functions of the organization, KBI has assumed a standard-setting role for the kombucha industry.[23]  As part of that work, KBI's board of directors has developed and promoted a set of industry best practices ("KBI Best Practices")—guidelines for kombucha manufacturers to follow in the areas of Business Practices, Safety & Quality, Alcohol Compliance, and Labeling.[24]  In

---

[20] *See* 27 CFR §§ 25.11, 25.293. I understand that GT's is qualified by the TTB, as its Classic line of kombucha is sold as an alcoholic beverage for which records of alcohol content must be maintained.

[21] *Board of Directors*, KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/about-us/board-of-directors/ (last retrieved June 1, 2021).

[22] GT-SHARPE-0007586–GT-SHARPE-0007997 (Sept. 5, 2018 Deposition of Hannah Crum ("Crum Deposition")) at 127:7–21, 138:8–139:2, 164:15–24.

[23] *Mission*, KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/about-us/purpose-mission/ (last retrieved June 1, 2021); Crum Deposition at 29:20–25.

[24] *Best Practices*, KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/resources/best-practices/ (last retrieved June 1, 2021); GT-SHARPE-0007911 (Crum Deposition Ex. 47); Crum Deposition at 29:19–30:5.

14                              CONFIDENTIAL - ATTORNEYS' EYES ONLY

July 2020, KBI released the first Kombucha Code of Practice, which incorporates the KBI Best Practices concerning alcohol testing.[25]

KBI divides its best practices for alcohol compliance into two sets. One set of guidelines applies to kombucha that is to be sold as a nonalcoholic beverage, while the other set of guidelines applies to kombucha that is to be sold as a regulated alcoholic beverage.[26] For kombucha that is to be sold as a nonalcoholic beverage, KBI has identified three best practices for alcohol compliance:

1. The company should use a KBI–approved alcohol testing method (which I discuss below).

2. The company should conduct alcohol testing of its product "at the point at which it is ready for market"—i.e., shortly after it comes off the production line—at least quarterly, or for every batch if the company conducts its own testing in-house. This guideline also states that the company should keep records of testing results demonstrating that the product has an alcohol level below 0.5% ABV.

3. The company should conduct alcohol testing of its product "from retention samples"—i.e., samples saved until closer to the end of the product's shelf-life—at least twice per year. This guideline also states that the company should keep records of the testing results demonstrating that the product has an alcohol level below 0.5% ABV.

In the fall of 2015, with the help of funding from GT's and four other kombucha manufacturers, KBI joined with AOAC International to form a working group focused on developing reliable, repeatable and cost-effective kombucha-specific methods of alcohol testing that would address the challenges described in Section 7.A, *supra*.[27] AOAC is an independent, non-profit organization that develops analytical methods and standards for use in a variety of fields.[28] AOAC's methods are used widely by third-party laboratories, research institutions and government agencies, including the TTB.[29] Top

---

[25] *Kombucha Code of Practice,* KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/kombucha-code%20of-practice/ (last retrieved June 1, 2021)

[26] *Best Practices*, KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/resources/best-practices/ (last retrieved June 1, 2021); GT-SHARPE-0007911 (Crum Deposition Ex. 47).

[27] GT-SHARPE-0007945 (Crum Deposition Ex. 52); Crum Deposition at 97:22–98:16.

[28] *About AOAC INTERNATIONAL,* AOAC INT'L, http://www.aoac.org/AOAC_Prod_Imis/AOAC_Member/AOACACF/About_AOAC.aspx (last retrieved June 1, 2021).

[29] *See, e.g., List of Methods of Analysis for Beverage Alcohol*, U.S. DEP'T OF THE TREASURY, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU, https://ttb.gov/ssd/pdf/list_of_beverage_methods.pdf (last retrieved June 1, 2021).

15                              CONFIDENTIAL - ATTORNEYS' EYES ONLY

TTB officials participated in the working group and served on voting and review panels.[30]

As a result of this working group, the AOAC Stakeholder Panel on Strategic Food Analytical Methods issued Standard Method Performance Requirements (SMPRs) for Determination of Ethanol in Kombucha in March of 2016, and in May of 2016 solicited submissions of methods proposed to meet the SMPR.[31]  As a result, five methods were submitted for consideration by a panel of experts in September of 2016.[32]  Two of those methods have since received First Action status with AOAC, meaning that the appointed review panel unanimously voted that sufficient data had been presented to validate the method under the SMPR.[33]  The first method to reach First Action status, in September 2016, was a method based on gas chromatography with flame-ionization detection (GC-FID).[34]  KBI now recommends this method to its members.[35]  And at AOAC's 2017 annual meeting, the review panel was honored as Expert Review Panel of the Year, in recognition of its "open and thorough scientific scrutiny of methods and its output," which "clearly demonstrate the culmination of an industry-wide effort that facilitates regulatory and industry engagement for addressing urgent analytical disputes and facilitating trade."[36]

---

[30] GT-SHARPE-0007940 (Crum Deposition Ex. 50) at '7941; GT-SHARPE-0007945 (Crum Deposition Ex. 52) at '7946; 2017 Awards Ceremony Program, AOAC Int'l, 131st AOAC International Annual Meeting, p. 7 (Sept. 24–27, 2017), http://www.aoac.org/aoac_prod_imis/AOAC_Docs/Awards%20Program/2017_Final_Program_Award_Booklet.pdf (last retrieved June 1, 2021).

[31] Crum Deposition at 100:1–5; GT-SHARPE-0007948 (Crum Deposition Ex. 53).

[32] 2017 Awards Ceremony Program, AOAC Int'l, 131st AOAC International Annual Meeting, p. 7 (Sept. 24–27, 2017), http://www.aoac.org/aoac_prod_imis/AOAC_Docs/Awards%20Program/2017_Final_Program_Award_Booklet.pdf (last retrieved June 1, 2021); Konigs, "Overview of Stakeholder Panel on Strategic Food Analytical Methods (SPSFAM)" (Sept. 18, 2016), p. 4, *available at* http://www.aoac.org/aoac_prod_imis/AOAC_Docs/SPSFAM/SPSFAM_SP_09182016_v4A.pdf (last retrieved June 1, 2021).

[33] Crum Deposition at 32:31–33:5, 100:1–20; "Appendix G: Procedures and Guidelines for the Use of AOAC Voluntary Consensus Standards to Evaluate Characteristics of a Method of Analysis," *AOAC Official Methods of Analysis*, AOAC INT'L (2014), http://www.eoma.aoac.org/app_g.pdf (last retrieved June 1, 2021).

[34] Ebersole, B., Lou, Y., Schmidt, R., Eckert, M., Brown, P., "Determination of Ethanol in Kombucha Products: Single-Laboratory Validation, First Action 2016.12", *J. AOAC International.*, Vol. 100, no. 3, 2017. (DOI: 10.5740/jaoacint.16-0404); *KBI Approved Ethanol Testing Methodology,* KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/resources/approved-alcohol-testing-methods/ (last retrieved June 1, 2021); GT-SHARPE-0007950 (Crum Deposition Ex. 54) at '7953.

[35] *KBI Approved Ethanol Testing Methodology,* KOMBUCHA BREWERS INT'L, https://kombuchabrewers.org/resources/approved-alcohol-testing-methods/ (last retrieved June 1, 2021); GT-SHARPE-0007950 (Crum Deposition Ex. 54) at '7953.

[36] 2017 Awards Ceremony Program, AOAC Int'l, 131st AOAC International Annual Meeting, p. 7 (Sept. 24–27, 2017), http://www.aoac.org/aoac_prod_imis/AOAC_Docs/Awards%20Program/2017_Final_Program_Award_Booklet.pdf (last retrieved June 1, 2021).

16                       CONFIDENTIAL - ATTORNEYS' EYES ONLY

C.   Measuring Sugar in Kombucha

Sugar is a core component in the production of kombucha and it is present in the final product in various forms and concentrations depending on the production method and the specific product being produced.  Sugar is consumed during the fermentation of kombucha.  It is metabolized by the yeast and bacteria as an energy source, and as a material in the production of the cellulosic SCOBY, organic acids and ethanol.  Because of this, simple methods such as density measurements can be used to follow the primary fermentation.  However, because of the potentially variable production of organic acids and ethanol, methods based on density and refractive index are not reliable to quantify the amount of sugar in kombucha.  In fact, in any solution, the present of any dissolved solids beyond the sugar in question will act as an interferent in the measurement.  The concentrations of organic acids produced in typical kombucha samples are on the same order of magnitude as the sugar in the finished product, thus for a method to be reliable in quantifying sugar in a kombucha sample it must have the selectivity to discriminate the sugar from other dissolved solids.

Based on the aforementioned considerations, the enzymatic method and HPLC methods are appropriate for the determination of sugar in kombucha samples.

## 8.  PARAMETERS AFFECTING ALCOHOL LEVELS

A.   Production Methods and Product Formulation

Alcohol levels can be moderated or controlled in various ways, including limiting the amount of fermentation that occurs and/or using conditions that favor the production of other fermentation products, such as organic acids.  While the actual species of bacteria can vary, the most common bacteria present in kombucha cultures are acetobacter and gluconobacter.  Correspondingly, the two primary organic acids produced in kombucha fermentation are acetic acid and gluconic acid.  The production of these compounds differs in how they depend on the yeast metabolism.  Acetic acid is produced when ethanol that was produced by yeast is oxidized to acetic acid by acetic acid bacteria, while gluconic acid is produced directly from glucose by gluconobacter without requiring the intermediate production of ethanol by yeast.

Kombucha producers can minimize the amount of alcohol in the final product and prevent or minimize further development of alcohol after packaging using a variety of methods.  GT's has employed several such techniques to ensure that the alcohol content

17                          CONFIDENTIAL - ATTORNEYS' EYES ONLY





product is kept at the appropriate temperature by, among other things, verifying that the trucks' refrigerators are working prior to dispatch.[57]  For example, when a particular delivery was discovered to have lost temperature control due to actions of the driver, that condition was discovered, and the products were destroyed rather than sold.[58]

As I will discuss further in the following section, my review of GT's expired product and end-of-shelf-life testing data supports a conclusion that the above adjustments have indeed been effective in preventing the alcohol content of GT's Enlightened products from exceeding 0.5% ABV for at least the duration of their shelf lives.

## 9.  REVIEW OF PRODUCT TESTING PRACTICES & DATA

### A.   Alcohol Testing Conducted by GT's

Based on my review of the documents and other materials identified in Exhibit 2, it is my opinion that GT's alcohol testing measures for its Enlightened kombucha products exceed industry standards, and that they have throughout the proposed class period.  In particular, GT's tests its products more frequently than is called for by the KBI Best Practices, both near the time of production and near the end of the product's shelf life, and uses industry-standard testing methodologies as available at the time.  I also conclude that GT's alcohol testing data appears reliable, and it shows that all but one of the kombucha samples tested within (or shortly after) its shelf life measured below the TTB limit of 0.5% ABV.[59]

### i.   GT's Alcohol Testing Practices

Twice per month, GT's sends samples of Enlightened product to a third-party laboratory for alcohol testing.  One of those monthly tests uses "fresh" samples—product that has been bottled within a week of being sent out for testing—while the other monthly test uses "shelf" samples—product that has been stored at GT's facilities until within a week of its expiration date, which are then tested near or shortly after (i.e., generally within two weeks after) the expiration date.[60]  For the "fresh" samples, GT's tests one bottle of

---

[57] *See* Dave Corporate *Sharpe* Deposition at 275:4–278:4.

[58] Dave Corporate *Tortilla Factory* Deposition at 173:8–17, 249:1–17.

[59] With the exception of a sample of spoiled product, *see infra* at 26, n. 83, the only Enlightened testing data that showed alcohol content of 0.5% ABV or above resulted from a test of product nearly a month after its expiration date.  *See, e.g.*, GT-SHARPE-0005489 (March 16, 2018 test of product with expiration date of February 17, 2018).  Mr. Dave testified that GT's tested expired product to assess whether GT's could extend the product's shelf life.  Dave Corporate *Tortilla Factory* Deposition at 53:13–54:4; *see also* Dave Corporate *Sharpe* Deposition at 241:24-243:2; March 3, 2021 Corrected Supplemental Responses and Objections to Plaintiffs' Second Set of Special Interrogatories, at 6.

[60] Dave Corporate *Tortilla Factory* Deposition at 61:15–62:22; 67:21–68:14, 69:14–17, 70:9–71:6, 77:9–78:3, 80:4–22; Dave Corporate *Sharpe* Deposition at 267:15-22.

21                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

each flavor that was produced that week.[61]  For the "shelf" samples, GT's tests one bottle of each flavor from the bottles in storage that were expiring that week.[62]

By testing both "fresh" and "shelf" samples on a monthly basis, GT's exceeds the recommendations in the KBI Best Practices for frequency of testing.  Specifically, GT's tests "fresh" samples three times more frequently than KBI recommends and tests "shelf" samples six times more frequently.[63]  GT's more frequent testing means that any unacceptable variations in alcohol content are more likely to be caught, and it allows a greater degree of confidence in the results.  GT's also goes beyond KBI's recommendations by testing each flavor of Enlightened kombucha in production, which is not required by the KBI Best Practices.[64]  This is a sensible practice because different flavorants can affect fermentation differently.

*ii.    GT's Alcohol Testing Data*

I have reviewed the Enlightened alcohol testing data produced by GT's in this case.[65]  Save for one spoiled product,[66] every test of Enlightened kombucha conducted before (or less than two weeks after) the product's "enjoy by date" found an alcohol content below the TTB limit of 0.5% ABV.[67]  And of the over 400 tests conducted at least two weeks *after* the product's "enjoy by date" (144 of which were conducted at least 30 days after that date), all but one found an alcohol level below 0.5% ABV.  It is my opinion that these tests appear to have been conducted reliably, using industry-standard methods available at the time, and that it was reasonable for GT's to rely on the results.  I further conclude that the testing data appears to indicate that the measures instituted by GT's to control alcohol content have been effective.

GT's has used two third-party laboratories to test the alcohol content of its Enlightened kombucha products during the relevant time period, which I understand to be February 28, 2017 to the present.  GT's first began using one of those two labs, Michelson Laboratories, well before that time period.[68]  Based on the testing reports, it appears that, through January 2018, Michelson used a modified version of AOAC Method 983.13,[69] which used GC-FID and was an accepted alcohol testing technique in the

---

[61] Dave Corporate *Tortilla Factory* Deposition at 63:5–13.

[62] *Id.* at 64:10–16.

[63] GT-SHARPE-0007911 (Crum Deposition Ex. 47).

[64] *See* 6/22/18 Deposition of GT Dave ("Dave Individual *Tortilla Factory* Deposition") at 90:4–14.

[65] GT-SHARPE-0000002–GT-SHARPE-0001450; GT-SHARPE-0002040–GT-SHARPE-0002299; GT-SHARPE-0002305–GT-SHARPE-0002493; GT-SHARPE-0005379–GT-SHARPE-0005529; GT-SHARPE-0007084–GT-SHARPE-0007580; *see also* Exhibit 3 (summary spreadsheet).

[66] As discussed in more detail below, one test of Watermelon Wonder, conducted three days before the product expired, showed an ABV of 0.75%, which, after investigation, GT's was able to attribute to spoiled watermelon juice used in that batch.  In response to the incident, GT's implemented a number of process changes to detect and avoid the use of overripe and spoilage-prone watermelons. *See infra* at 26, notes 83-84.

[67] Exhibit 3.

[68] *See* Dave Corporate *Tortilla Factory* Deposition at 37:8–11.

[69] *See, e.g.*, GT-SHARPE-0002239.

22                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

kombucha industry at the time of testing.[70]  Beginning in July 2019, when GT's started using Michelson again, Michelson's testing reports indicate the use of AOAC Method 2016.12, which is the headspace GC-FID method that was recently given First Action status by the AOAC and recommended by KBI.

In 2017, GT's began using a second laboratory, Covance Laboratories (later re-named as Eurofins Food Integrity and Innovation), in addition to Michelson.[71]  Based on the testing reports, GT's exclusively used Covance for alcohol testing between February 2018 and June 2019.[72]  The protocols GT's has used for testing through Covance are largely the same as the protocols it has employed for testing through Michelson, with a few adjustments to account for Covance's out-of-state location.[73]  For example, as a result of Covance's request for less-than-full-bottle samples, which is not uncommon for laboratories testing fermented beverages, GT's decanted four-ounce samples from the original bottles into smaller containers before shipping to Covance,[74] whereas Michaelson's location nearby to GT's facilities allows for the transportation of full sealed bottles.[75]  I would not expect the protocols used by GT's to send its samples to Covance to result in lower alcohol measurements relative to market conditions.  As for the laboratory's procedures, all of Covance's testing reports indicate the use of AOAC Method 2016.12.[76]  In fact, Covance was a collaborator in the development of and validation that qualified the method for First Action status using Covance standard operating procedures.[77] In approximately April 2020, GT's returned to using Michelson as the exclusive laboratory for alcohol testing, given the ease of transporting whole sample bottles to its local laboratory for testing.[78]

Together, the results of Michelson's and Covance's testing of the Enlightened products during the relevant time period are contained in over 1,900 testing reports.[79]  These

---

[70] AOAC *Official Methods of Analysis* Method 983.13, http://www.eoma.aoac.org/methods/info.asp?ID=2783 (last retrieved June 1, 2021); Ebersole et al.: Journal of AOAC International Vol. 100, no. 3, 2017, p732-736; *Current Testing Methods for Kombucha*, KOMBUCHA BREWERS INT'L (Oct. 14, 2015), https://kombuchabrewers.org/current-testing-methods-for-kombucha/ (last retrieved June 1, 2021).

[71] *See* GT-SHARPE-0002449–GT-SHARPE-0002471.

[72] *See generally* Exhibit 3.

[73] Dave Individual *Tortilla Factory* Deposition at 91:19–92:23.

[74] GT-SHARPE-0010027 (April 1, 2021 Declaration of GT Dave) ¶ 6.

[75] Dave Individual *Tortilla Factory* Deposition at 90:9–17, 92:1–12; Dave Corporate *Sharpe* Deposition at 235:6-10.

[76] *See, e.g.*, GT-SHARPE-0002449 (April 2017 test); GT-SHARPE-0007084 (April 2020 test).

[77] Ebersole, B., Schmidt, R., & Eckert, M., "Single-Laboratory Validation of the Determination of Ethanol in Kombucha by Headspace GC-FID," 2016, pp. 1, 2, 7, 11, *available at* https://kombuchabrewers.org/wp-content/uploads/2013/10/OMA-Data-Kombucha-Blinded.pdf (last retrieved June 1, 2021).

[78] GT-SHARPE-0010027 (April 1, 2021 Declaration of GT Dave) ¶ 7.

[79] GT-SHARPE-0000002–GT-SHARPE-0001450; GT-SHARPE-0002040–GT-SHARPE-0002299; GT-SHARPE-0002305–GT-SHARPE-0002493; GT-SHARPE-0005379–GT-SHARPE-0005529; GT-SHARPE-0007084–GT-SHARPE-0007580; *see also* Exhibit 3 (summary spreadsheet).

23              CONFIDENTIAL - ATTORNEYS' EYES ONLY

reports contain various information about the samples analyzed and the testing conducted. For example, the following image depicts a portion of the Michelson laboratory certificate produced as GT-SHARPE-0000013:



Among other things, this excerpt indicates that:

- the sample was received by Michelson on March 24, 2017;

- the product flavor was Guava Goddess ("GUA");

- the sample was taken from a bottle with an expiration (or "enjoy by") date of May 30, 2017 ("EBD: 05/30/2017") and which was bottled on August 17, 2015 ("MAR 24");

- Michelson was testing for ethanol;

- the testing method used was a modified version of AOAC Method 983.13;

- the analysis resulted in a measurement of 0.0435% ABV; and

- the analysis was conducted on March 27, 2017 ("START:DT" field).

Covance's testing reports provide similar information. The following example comes from the set of reports produced as GT-SHARPE-0000482–GT-SHARPE-0000506:

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Sample Name: | Green Chia EBD 09 14 18 | | | Eurofins Sample: | 7522061 |
|---|---|---|---|---|---|
| Project ID | GT_LIVING_-20180725-0013 | | | Receipt Date | 25-Jul-2018 |
| PO Number | CVD | | | Receipt Condition | Cold on Wet Ice or Ice Packs |
| Lot Number | 0927C1EA1 | | | Login Date | 25-Jul-2018 |
| Sample Serving Size | | | | | |
| **Analysis** | | | | | **Result** |
| Specific Gravity | | | | | |
| Density | | | | | 1.025 g/mL |
| Note | | | | | Density value is client supplied. |
| Residual Ethanol in Kombucha * | | | | | |
| Ethanol v/v | | | | | 0.086 % |

| **Method References** | **Testing Location** |
|---|---|
| Residual Ethanol in Kombucha (ETME_KB_S) | Food Integrity Innovation-Madison |
| AOAC Method 2016.12, Official Methods of Analysis of AOAC INTERNATIONAL   (2016). | |
| Anthony, Robert M.; Sutheimer, Craig A.; Sunshine, Irving, Acetaldehyde, Methanol and Ethanol Analysis by Headspace Gas Chromatography, Journal of Analytical Toxicology, Volume 4, Number 1, January 1980, pp. 43–45 (modified). | |
| Specific Gravity (SPGP_S) | Food Integrity Innovation-Madison |
| NIST Handbook 133 - Checking the Net Contents of Packaged Goods, 2015 Edition (Modified) | |

Among other things, this excerpt indicates that:

- the sample was received by Covance on July 25, 2018;

- the product being tested was the Green Chia flavor of GT's Enlightened Kombucha, which was taken from a bottle with an expiration (or "enjoy by") date of September 14, 2018 ("Green Chia EBD 09 14 18");

- the sample came from lot number 0927C1EA1, which means that it was bottled on July 9[80];

- the sample was received by Covance cold, on wet ice or ice packs[81];

---

[80] In deposition testimony reproduced in this case, Mr. Dave explained that GT's lot numbers are the production date in the format DDMM, with 2 added to the first digit of the month.  Dave Corporate *Tortilla Factory* Deposition at 32:2–33:16.  Applying that formula here, lot number 0927 corresponds to 09/07 in DDMM format, or July 9.

[81] Certain of the Covance testing reports reflect a receipt condition of "ambient temperature," while the reports generated by Michelson do not contain information regarding the temperature of the tested bottles, either at the time of receipt or during transit. However, based on my conversation with GT Dave, it is my understanding that GT's maintains sample bottles at approximately 34-35 degrees Fahrenheit and are prepared for transit to Michelson with ice packs, and are picked up by a Michelson courier, who takes it to their lab, which is approximately two miles—and generally less than a ten minute drive—from GT's facility.  While proper temperature control is critical to ensuring that the alcohol content of a sample does not *increase* between the time a sample is selected for testing and thereafter tested, problems with temperature control (i.e., warming during transport/prior to testing) would not be expected to present the possibility of *decreasing* alcohol content. Thus, to the extent any of the samples tested by Covance or Michelson experienced unintended increases in temperature during transit and/or prior to testing, it is not unreasonable for GT's to rely on those results, given that those results (as demonstrated by 98% of GT's reports from Covance and Michelson) show those samples maintained an alcohol content of less than 0.5% ABV regardless of any post-selection,

25                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Covance was testing for ethanol by volume ("Ethanol v/v");

- the analysis resulted in a measurement of 0.086% ABV; and

- the testing method used was AOAC Method 2016.12, the method developed by Covance and granted First Action status by the AOAC.

The information contained in all of these testing reports is summarized in the spreadsheet attached as **Exhibit 3**. The results are also shown graphically in Figure 4.



*Figure 4. Plot showing GT's alcohol test results for its Enlightened products during putative class period.*

Across all testing laboratories and sample types, all but one non-expired sample tested below 0.5% ABV.[82] And for the single non-expired sample that tested above 0.5% ABV, GT's investigated the cause of that exceedance and determined that the watermelon juice used in that batch had spoiled, which accounts for the 0.75% ABV level three days

---

pre-testing increase in alcohol content that might have occurred a result of any hypothetical temperature issues that occurred before testing.

[82] Of the over 400 samples tested at least two weeks after the sample's "enjoy by date," one sample that was tested a month past its expiration date for research purposes measured above 0.5% ABV. *See supra* note 59.

26                   CONFIDENTIAL - ATTORNEYS' EYES ONLY

before the sample's expiration.[83]  Based on that exceedance, GT's instituted a number of changes to the process by which it created the Watermelon Wonder flavor of its Enlightened kombucha, including instituting various criteria for determining whether the watermelons set to be juiced had already started to overripen (which poses the risk of spoilage), cycling through countries of origin more quickly to avoid suppliers sending watermelons that had over-ripened, and reiterating to GT's suppliers that watermelons should be refrigerated during transit to GT's.[84]

Furthermore, approximately 98% of all samples (including all expired samples) tested below 0.4% ABV.  As Figure 2 illustrates, the testing data shows fairly consistent results concentrated in the range of 0.0–0.3% ABV over the testing period, and the amount of variation does not exceed what I would expect from batch-to-batch and flavor-to-flavor variation.  For fresh samples, the average[85] ABV found was 0.1246%.  For end-of-shelf-life samples tested no later than two weeks after the expiration date, the average was 0.1230%, or 0.1263% if samples tested more than two weeks after expiration are included.  A further breakdown of average ABV results by testing laboratory is shown in the table below.

|  | Fresh | Shelf | Shelf + Expired |
|---|---|---|---|
| *All testing* | 0.1246% | 0.1230% | 0.1263% |
| **Michelson** | 0.1338% | 0.1270% | 0.1295% |
| **Covance** | 0.1108% | 0.1189% | 0.1220% |

A.  Sugar Testing Conducted by GT's

Based on my review of the documents and other materials identified in Exhibit 2, it is my opinion that GT's sugar testing measures for its Enlightened kombucha products meet industry standards, and that they have throughout the relevant class period.  In particular, GT's generally tests its products multiple times each year, using industry-standard testing methodologies.  I also conclude that GT's sugar testing data shows that more than 98% of the almost 200 kombucha samples tested during the relevant period returned sugar results that were within 120% of the amount disclosed on the bottle, as permitted by FDA regulations.

i.  *GT's Sugar Testing Practices*

Several times each year, GT's sends samples of Enlightened product to a third-party laboratory for sugar testing.  Although neither FDA nor KBI has issued guidance on how frequently kombucha (or other beverage) manufacturers should test the sugar content of their beverages, GT's sugar testing practices seem adequate to ascertain whether the

---

[83] Dave Corporate *Sharpe* Deposition at 251:3-252:6.
[84] *Id.* at 252:7-254:4.
[85] Certain tests found results of "<0.025%", "NDLT 0.005%" or "NDLT 0.0002%"—for purposes of calculating the averages discussed herein, I treated those tests as finding alcohol levels of 0.025%, 0.005%, and 0.0002%, respectively.

27                              CONFIDENTIAL - ATTORNEYS' EYES ONLY

inherent variability of sugar within kombucha has led any of its Enlightened kombucha products to have consistently more than the FDA-permitted 120% of the stated amount of sugar disclosed on that particular product's label.

### ii.    GT's Sugar Testing Data

I have reviewed the Enlightened sugar testing data produced by GT's in this case.[86]  All but three[87] of the almost 200 tests of Enlightened kombucha found a sugar content of less than or equal to 120% of the amount disclosed on the label, as permitted by FDA regulations.[88]  And for each flavor, the available tests show an average sugar content of below 120% of the amount disclosed on the label—which, per the labels, ranges from 6 to 10 grams per 8 ounce serving—with 19 of the 33 tested flavors having an average test result of *less* than the amount disclosed on the label.  I have no reason to believe these tests were not conducted reliably, using industry-standard methods appropriate for the measurement of sugar in kombucha.

Since February 28, 2017, GT's has used Vinquiry Laboratories by Enartis USA to test the sugar content of its Enlightened kombucha products.  Based on the testing reports, it appears that, Vinquiry used an enzymatic (inverted) method for measuring the number of grams of sugar per 8 ounces of tested kombucha.  As previously explained, the enzymatic method is an appropriate way of measuring total sugar in beverages like kombucha.

The results of Vinquiry's testing of the Enlightened products during the relevant time period are contained in almost 200 testing reports.[89]  These reports contain various information about the samples analyzed and the testing conducted.  For example, the following image depicts a portion of the Vinquiry analysis report produced as GT-SHARPE-0000013:

| Work Order # : | W2017-04-21-015 | | Analysis Performed at: Enartis USA |
|---|---|---|---|
| Sample (s) Received: | April 21, 2017 | | 7795 Bell Road |
| Report Printed: | April 25, 2017 | | Windsor, CA  95492 |

**Analysis Report**                                              Date Analyzed

| AG89914 | ENL PASSIONBERRY BLISS 1623C2ES1B | | | | |
|---|---|---|---|---|---|
| | Glucose + Fructose | 4.42 g/8 oz. | Inverted, Enzymatic* | | 04/24/17 |

Among other things, this excerpt indicates that:

---

[86] GT-SHARPE-0001485–GT-SHARPE-0001608; GT-SHARPE-0008585; GT-SHARPE-0009931–GT-SHARPE-0010000; *see also* Exhibit 4 (summary spreadsheet).

[87] As to one of the three tests showing a sugar amount above 120% of the disclosed amount, a separate analysis report for the same sample shows a result of under 120% of the disclosed amount. *Compare* GT-SHARPE-0008585 (9.1 g/8 oz) *with* GT-SHARPE-0001516 (7.1 g/8 oz).

[88] Exhibit 4.

[89] GT-SHARPE-0001485–GT-SHARPE-0001608; GT-SHARPE-0008585; GT-SHARPE-0009931–GT-SHARPE-0010000.

28                         CONFIDENTIAL - ATTORNEYS' EYES ONLY

- the sample was received by Vinquiry on April 21, 2017;

- the product flavor was Passionberry Bliss;

- the sample came from lot number 1623C2ES1B, which means that it was bottled on March 16[90];

- Vinquiry was testing for glucose and fructose;

- the testing method used was an inverted, enzymatic methodology;

- the analysis resulted in a measurement 4.42 grams of sugar per 8 ounces; and

- the analysis was conducted on April 24, 2017 ("Date Analyzed" field).

The information contained in all of these testing reports, and how the results compare to the amount of sugar disclosed on the label for the flavor tested, is summarized in the spreadsheet attached as **Exhibit 4**.  The results are also shown graphically in Figure 5.

---

[90] Applying the formula discussed *supra* at note 80, lot number 1623 corresponds to 16/03 in DDMM format, or March 16.

29                         CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Figure 5. Plot showing GT's sugar test results for GT's Enlightened products during putative class period*

Across all sugar tests, all but three individual samples tested at or below 120% of the amount of sugar disclosed on the label for the tested flavor.[91] The three individual instances in which the tested bottle contained sugar above the 120% threshold found:

- 9.1 grams / 8 ounces in a single bottle of the Trilogy flavor (which is 151.67% of the 6 grams / 8 ounces disclosed on the label);[92]
- 7.8 grams / 8 ounces in a single bottle of the Koffee flavor (which is 130% of the 6 grams / 8 ounces disclosed on the label); and
- 10 grams / 8 ounces in a single bottle of the Heartbeet flavor (which is 125% of the 8 grams / 8 ounces disclosed on the label).

---

[91] One sample that was tested a month past its expiration date for research purposes, and therefore is not properly considered here, measured above 0.5% ABV. *See supra* note 59.
[92] A separate analysis report for the same sample shows a result of under 120% of the disclosed amount. *Compare* GT-SHARPE-0008585 (9.1 g/8 oz) *with* GT-SHARPE-0001516 (7.1 g/8 oz).

30                    CONFIDENTIAL - ATTORNEYS' EYES ONLY

While these three individual instances exceed the labelled amount, the average value for the bottles tested for each of these flavors (Trilogy, Koffee, and Heartbeet) were less than 120%, ranging from 98.0% to 102.7% of the amount disclosed on the label.

And, as shown in the table below, when the results for each flavor were averaged, they are all well below that 120% threshold permissible under FDA regulations, with the average test result for 19 of 33 flavors being *below* the amount disclosed on the label.

| Flavor | Average Test | Labelled Amount | Average Test / Label |
|---|---|---|---|
| Bilberry Blessing | 7.34 g/8 oz. | 8 g/8 oz. | 91.8% |
| Black Chia | 8.05 g/8 oz. | 8 g/8 oz. | 100.6% |
| Bloom | 6.17 g/8 oz. | 8 g/8 oz. | 77.1% |
| Cayennade | 7.18 g/8 oz. | 8 g/8 oz. | 89.8% |
| Cherry Chia | 8.31 g/8 oz. | 8 g/8 oz. | 103.9% |
| Cosmic Cranberry | 7.89 g/8 oz. | 8 g/8 oz. | 98.6% |
| Cucumber Mint Lime | 9.3 g/8 oz. | 8 g/8 oz. | 116.3% |
| Ginger Chia | 9.14 g/8 oz. | 8 g/8 oz. | 114.3% |
| Gingerade | 5.86 g/8 oz. | 6 g/8 oz. | 97.7% |
| Gingerberry | 5.77 g/8 oz. | 6 g/8 oz. | 72.1% |
| Golden Pineapple[93] | 2.58 g/8 oz. | 8 g/8 oz. | 32.3% |
| Grape Chia | 8.81 g/8 oz. | 8 g / 8 oz. | 110.1% |
| Green Chia | 9.07 g/8 oz. | 8 g/8 oz. | 113.4% |
| Guava Goddess | 8.09 g/8 oz. | 8 g/8 oz. | 101.1% |
| Heart Beet | 7.84 g/8 oz. | 8 g/8 oz. | 98.0% |
| Hibiscus Ginger | 7.50 g/8 oz. | 8 g/8 oz. | 93.8% |
| Koffee | 6.16 g/8 oz. | 6 g/8 oz. | 102.7% |
| Lavender Love | 8.14 g/8 oz. | 8 g/8 oz. | 101.8% |
| Lemonade | 5.78 g/8 oz. | 6 g/8 oz. | 96.3% |
| Living in Gratitude | 8.13 g/8 oz. | 8 g/8 oz. | 102.0% |
| Multi-Green | 8.03 g/8 oz. | 8 g/8 oz. | 100.4% |
| Mystic Mango | 9.82 g/8 oz. | 10 g/8 oz. | 98.2% |
| Original | 5.91 g/8 oz. | 6 g/8 oz. | 98.5% |
| Passionberry Bliss | 5.68 g/8 oz. | 6 g/8 oz. | 94.7% |
| Pink Lady Basil | 6.59 g/8 oz. | 7 g/8 oz. | 94.1% |
| Pure Love | 6.31 g/8 oz. | 8 g/8 oz. | 78.9% |
| Raspberry Chia | 8.13 g/8 oz. | 8 g/8 oz. | 101.6% |
| Strawberry Lemonade | 7.80 g/8 oz. | 8 g/8 oz. | 97.5% |
| Strawberry Serenity | 7.22 g/8 oz. | 8 g/8 oz. | 90.3% |
| Tantric Turmeric | 6.10 g/8 oz. | 6 g/8 oz. | 101.7% |
| Trilogy | 6.03 g/8 oz. | 6 g/8 oz. | 100.5% |
| Unity | 7.65 g/8 oz. | 8 g/8 oz. | 95.6% |
| Watermelon Wonder | 8.11 g/8 oz. | 9 g/8 oz. | 90.1% |

---

[93] The test result identifies this flavor as "Golden Sage," which I understand is actually Golden Pineapple.

31    CONFIDENTIAL - ATTORNEYS' EYES ONLY

10.    CONCLUSION

The foregoing constitutes my opinions after reviewing the materials listed in Exhibit 2, and I am prepared to testify concerning them.  These opinions are based on the information currently available to me.  I reserve my right to amend my opinions if additional information or evidence comes to light, including any opinions expressed by experts retained by Plaintiffs.

Executed this __nd day of June, 2021 in Murphysboro, Illinois.

By _____
                Dr. Matthew McCarroll

32                        CONFIDENTIAL - ATTORNEYS' EYES ONLY

SCOTT M. VOELZ (S.B. #181415)
svoelz@omm.com
DANIEL J. FARIA (S.B. #285158)
dfaria@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorneys for Defendants
Millennium Products, Inc. and
George Thomas "GT" Dave

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN RETTA, KIRSTEN SCHOFIELD, and JESSICA MANIRE, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MILLENNIUM PRODUCTS, Inc., et al.<br><br>Defendants. | Case No. 15-CV-1801-PSG-AJW<br><br>**DECLARATION OF GEORGE THOMAS DAVE IN SUPPORT OF DEFENDANT MILLENNIUM PRODUCTS, INC.'S RESPONSES TO OBJECTIONS TO STIPULATION OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. Philip S. Gutierrez<br><br>Hearing Date: July 17, 2017<br>Hearing Time: 1:30 PM |

DAVE DECLARATION ISO
RESPONSES TO OBJECTORS
15-CV-1801-PSG-AJW
Evid. Appx. Page 886

Evid. Appx. Page 1718

## DECLARATION OF GEORGE THOMAS DAVE

I, George Thomas "GT" Dave, hereby declare and state as follows:

1. I am the founder of Millennium Products, Inc. ("Millennium") and have been its Chief Executive Officer since 1994. I submit this declaration in support of Millennium's responses to the objections submitted in response to the Stipulation of Class Action Settlement preliminarily approved by the Court on January 31, 2017. I have personal knowledge of the facts stated herein and could testify to them if called upon to do so.

2. Millennium is the manufacturer of the "GT's Classic Kombucha" and "GT's Enlightened Kombucha" products at issue in this action ("Products").

3. After the Parties to this action reached a settlement in principle, Millennium worked diligently to begin planning for the implementation of the injunctive relief protocols in Section 47 of the Settlement Agreement. Accordingly, Millennium redesigned the labels of Enlightened Kombucha and Enlightened Synergy products so that all product labels in the Enlightened line would state that the products contain naturally occurring alcohol and should not be consumed by individuals seeking to avoid alcohol due to pregnancy, allergies, sensitives, or religious beliefs. Attached in Exhibit 1 to this Declaration are exemplars of the current Enlightened kombucha products.

4. Prior to the outset of this action, Millennium used Michelson Laboratories to regularly test the Subject Products and assure that the ethanol and sugar content for Enlightened Products were accurately described. Since that time, the AOAC-TTB-KBI working group has (in September 2016) developed a new testing methodology for detecting and measuring ethanol levels in kombucha. Beginning in late 2016, I spoke with two laboratories capable of using this method—Enartis USA and Covance Laboratories—and retained both to test the sugar, ethanol, and nutrient content of the Subject Products. The purpose of

retaining two laboratories was to ensure that the same products, tested by two different companies, yielded consistent test results. Having determined that Enartis and Covance reported back consistent test results, I retained Covance Laboratories as Millennium's lab of choice going forward. Each month, Covance Laboratories tests samples of every flavor of the Subject Products for sugar, ethanol, and nutrient content, to ensure that the products are accurately labeled.

5. Millennium has changed the ingredients and formulations of both the Enlightened and Classic lines since this action was filed. These changes directly impacted the naturally occurring sugar content of each product, as set forth in further detail below. Attached as Exhibit 2 to this Declaration is a chart depicting the impact of these reformulations on the sugar content of the Subject Products.

6. Product development is a dynamic and evolving process. Before and throughout this litigation, Millennium has undertaken continued efforts to refresh and redesign the labels of the Subject Products and to experiment with new formulations and flavors (for both the Enlightened and Classic lines). For instance, in the past, Millennium at times used cane sugar as a precursor (to activate the culture) during its fermentation process for its Enlightened Products. Given the nature of the biological processes involved, all of the sugar was consumed during the fermentation process and was not present in the finished product. Recently, Millennium reformulated its Enlightened line and, as part of that process, ceased all use of cane sugar during the fermentation process for Enlightened Products and now uses only kiwi juice concentrate as a precursor. Labels reflecting the use of kiwi juice in the reformulated Enlightened Products are depicted in Exhibit 1. These new labels and formulations began circulating in the marketplace in April 2016. As for the Classic line, Millennium historically used either cane sugar, fruit juice, or a combination of both. However, as a result of recent formulation changes, Millennium now uses only cane sugar as a precursor for the Classic

DAVE DECLARATION ISO
RESPONSES TO OBJECTORS
15-CV-1801-PSG-AJW

Evid. Appx. Page 888

Evid. Appx. Page 1720

products, and the ingredient list for these reformulated products discloses this fact. Attached as Exhibit 3 to this Declaration are exemplars of Millennium's previous labels for the prior versions of the Classic line and current labels for the reformulated Classic products, the latter of which include "cane sugar" in their ingredient lists.

7.    Millennium's retailers play no part in the labeling or formulation of the Subject Products. Millennium ships all Subject Products to its retail consumers pre-packaged and pre-labeled and does not use formulas designed by retailers.

8.    As a manufacturer, rather than a retailer, Millennium does not set the retail price for the Products. Within the exception of a few local stores who receive shipments of the Products directly from Millennium, Millennium sells the Products to distribution companies who subsequently ship them to downstream retailers nationwide. These downstream retailers set the retail price for the Products. Accordingly, there is no feasible way for Millennium to determine how much any given store, at any given time, before or after rebates, will charge for a Product.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this ___17ᵗʰ day of July, 2017 at Vernon, California.

_____
GT Dave

DAVE DECLARATION ISO
RESPONSES TO OBJECTORS
15-CV-1801-PSG-AJW

Evid. Appx. Page 889

Evid. Appx. Page 1721

Case 2:15-cv-01801-PSG-ADW Document 136-1 Filed 07/17/17 Page 5 of 12 Page ID #:3057

# Exhibit 1



Exhibit 1 - Page 4
Evid. Appx. Page 1723

Evid. Appx. Page 891



Exhibit 1 - Page 5
Evid. Appx. Page 1724

Evid. Appx. Page 892

Case 2:15-cv-01801-PSG-ADW   Document 136-1   Filed 07/17/17   Page 8 of 12   Page ID #:3060

# Exhibit 2

Case 2:19-cv-10020-FMO-DSR Document 207-4 Filed 03/20/26 Page 231 of 234
Case 2:15-cv-01801-PSG-AJW Document 136-1 Filed 07/17/17 Page 9 of 12 Page ID
Page #:3061
#:18096

**ENLIGHTENED**

|   | FLAVOR | OLD NUTRITIONAL PANEL | | NEW NUTRITIONAL PANEL | |
|---|--------|------|--------|------|--------|
|   |        | CARBS | Sugars | CARBS | Sugars |
| A | ORIGINAL | 7 | 2 | 6 | 6 |
| B | LEMONADE (CITRUS) | 7 | 2 | 6 | 6 |
| C | GINGERADE | 7 | 2 | 6 | 6 |
| D | MULTI-GREEN | 7 | 2 | 8 | 8 |
| E | HIBISCUS GINGER | 7 | 2 | 8 | 8 |
| F | BILBERRY BLESSING | 7 | 2 | 8 | 8 |
| G | TRILOGY | 7 | 2 | 6 | 6 |
| H | COSMIC CRANBERRY | 7 | 2 | 8 | 8 |
| I | GUAVA GODDESS | 10 | 7 | 8 | 8 |
| J | GINGERBERRY | 8 | 4 | 6 | 6 |
| K | STRAWBERRY SERENITY | 8 | 4 | 8 | 8 |
| L | BLACK CHIA | 8 | 4 | 8 | 8 |
| M | CHERRY CHIA | 8 | 4 | 8 | 8 |
| N | RASPBERRY CHIA | 7 | 2 | 8 | 8 |

**CLASSIC**

|   | FLAVOR | OLD NUTRITIONAL PANEL | | NEW NUTRITIONAL PANEL | |
|---|--------|------|--------|------|--------|
|   |        | CARBS | SUGARS | CARBS | Sugars |
| O | ORIGINAL | 7 | 2 | 8 | 8 |
| P | LEMONADE (CITRUS) | 7 | 2 | 8 | 8 |
| Q | GINGERADE | 7 | 2 | 8 | 8 |
| R | MULTI-GREEN | 7 | 2 | 10 | 10 |
| S | THIRD EYE CHAI | 7 | 2 | 10 | 10 |
| T | TRILOGY | 7 | 2 | 8 | 8 |
| U | GINGERBERRY | 8 | 4 | 8 | 8 |
| V | DIVINE GRAPE | 8 | 5 | 10 | 10 |
| W | SUPERFRUITS | 8 | 4 | 10 | 10 |
| X | STRAWBERRY SERENITY | 8 | 4 | 10 | 10 |

Exhibit 2 - Page 6
Evid. Appx. Page 1726

Evid. Appx. Page 894

Case 2:19-cv-10920-FMO-DSR   Document 207-4   Filed 03/20/26   Page 232 of 234
Case 2:15-cv-01801-PSG-AJW   Document 136-1   Filed 07/17/17   Page 109 of 12   Page ID
Page #:18097
#:3062

# Exhibit 3

## Classic Kombucha Original (Old)



Exhibit 3 - Page 7
Evid. Appx. Page 1728

Evid. Appx. Page 896

Case 2:19-cv-10920-FMO-DSR    Document 207-4    Filed 03/20/26    Page 234 of 234
Case 2:15-cv-01801-PSG-AJW    Document 136-1    Filed 07/17/17    Page 129 of 12    Page ID
Page #: 18099
#: 3064

## Classic Kombucha Original (New)



Exhibit 3 - Page 8
Evid. Appx. Page 1729

Evid. Appx. Page 897